# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| CITY OF BIRMINGHAM FIREMEN'S AND POLICEMEN'S SUPPLEMENTAL PENSION SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P., GREGORY L. ARMSTRONG, AL SWANSON and CHRIS HERBOLD,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED<br><br>**ECF CASE** |

## PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System ("Plaintiff" or "Birmingham Supplemental") brings this securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors who purchased the Common Units of Plains All American Pipeline, L.P. ("Plains" or the "Company") between February 27, 2013 and August 4, 2015, inclusive.

The allegations herein are based upon Plaintiff's knowledge with respect to Plaintiff, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public statements and press releases, Plains' public filings with the United States Securities and Exchange Commission ("SEC"), wire and media reports published regarding the

Company, securities analysts' reports and advisories about the Company, transcripts of Plains' investor conference calls, and other publicly available materials.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of investors in Plains.  Plains is one of the largest crude oil and other liquid energy pipeline operators in the United States.  As set forth herein, Plains and its senior executives misled investors throughout the Class Period by concealing pervasive and systemic oil pipeline monitoring and maintenance failures, inadequate spill response measures, repeated failures to comply with federal regulations and other misconduct that led to the largest oil spill in California in 25 years.

2.     Specifically, Defendants represented throughout the Class Period that pipeline integrity and maintenance was its "***primary operational emphasis***," and that the Company had undertaken significant measures to prevent oil spills, ensure the integrity of its pipelines, and to minimize the damage any such incidents may cause.  For example, Plains represented that it had "implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention."

3.     In fact, the Company not only represented that its pipelines were "in substantial compliance" with federal regulations governing the design, installation, testing, construction, operation, replacement and management of pipeline, but also that the Company's "integrity management program" included measures that went well beyond those legal requirements.

4.     The Company further reassured investors during the Class Period that it "devote[d] substantial resources to comply with [government]-mandated pipeline integrity

rules," including "requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences."  According to Plains, the Company had "developed and implemented certain pipeline integrity measures that go beyond [its] regulatory mandate."

5.      In fact, Plains specifically represented to federal regulators that Line 901—a Plains pipeline that spans approximately 10.6 miles in Santa Barbara County, California—was closely monitored, that "*its operation are state-of-the-art*," and that a spill at this pipeline would therefore be "extremely unlikely."

6.      These representations were false.  On May 19, 2015, investors learned that Line 901 had ruptured, triggering a spill that impacted several miles of some of the most environmentally sensitive and protected coastline in North America.  Moreover, contrary to the Company's representations to investors and regulators, Plains was wholly unprepared for the spill once it occurred.

7.      For example—contrary to Plains' representations, despite the fact that state law required the Company to report the spill to the federal National Response Center within 30 minutes of detection, and that the Company's own plans required such notification "at the earliest practicable moment"—Plains did not report the spill to the National Response Center for hours after it had been discovered.  In fact, although Plains officials noticed anomalies in Line 901 by 10:30 a.m. and shut down the pipeline down at 11:30 a.m., government officials first learned of the spill through a 911 call to the Santa Barbara County Fire Department at approximately 11:42 a.m.  And it was the local fire department that first notified the National Response Center of the spill at 12:43 p.m.—nearly two-and-half hours before Plains formally informed the agency.

8.     On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (the "Pipeline Administrator"), the federal agency that oversees the vast majority of Plains' pipelines, issued a Corrective Action Order requiring Plains to take corrective actions with respect to Line 901 to protect the public, property and the environment from potential hazards arising from the spill.  The Corrective Action Order noted certain preliminary findings concerning the spill, including that Line 901 was inspected on May 5, 2015 as part of a complete in-line inspection to collect data and evaluate the integrity of the pipeline.

9.     Among other things, the Corrective Action Order noted that previous inspections performed on Line 901 in June 2007 and July 2012 had demonstrated a worsening of pipeline integrity.  In 2007, there were 13 anomalies identified that related to corrosion of Line 901, and in 2012, an inspection identified 41 such anomalies.  The May 21, 2015 Corrective Action Order required Plains to take immediate corrective actions, including shutting down and reviewing the line, testing the line, developing a remedial plan and performing a review of the Company's emergency response plan and training.

10.     Following the disclosure of the spill and the Pipeline Administration's investigation, Plains Common Units declined $2.03 per unit, or over 4%, from $49.59 per unit on May 19, 2015 to $47.56 per unit on May 21, 2015—a significant decline on extraordinarily large trading volume that occurred when the overall S&P 500 actually had a gain.

11.     After news of the spill began to make headlines, Plains sought to reassure investors that the spill was under control and contained, that the Company's response was appropriate, and that the damage inflected was minimal.  Specifically, Plains officials reported that its own analysis of a "worst case" scenario for the spill, which was based on the typical flow rate of oil and the elevation of the pipeline, showed that at most 21,100 gallons of crude oil had

gone into the Pacific Ocean, and that as many as 105,000 gallons in total may have been released from Line 901.  Subsequently, on May 26, 2015, Plains filed a Form 8-K with the SEC describing the spill and noting that the Company "currently estimates that the amount of released crude oil could be as high as approximately 2,400 barrels" or 101,000 gallons—a figure reflecting a 4,000-gallon reduction from the initial estimates the Company provided to the news media.

12.    In the weeks that followed, congressional and regulatory investigations revealed additional facts concerning the spill and the Company's reaction to it.  For example, on June 3, 2015, the Pipeline Administration issued an amended Corrective Action Order that revealed that there had been "extensive external corrosion" on Line 901—and that the regulator had also identified "extensive corrosion" and other deficiencies in an adjoining pipeline, "Line 903"— and required Plains to take additional corrective actions.  The Pipeline Administration noted that the results of Plains' own May 5, 2015 inspection survey revealed four areas on Line 901 with pipe anomalies that required "***immediate investigation and remediation***" under relevant regulations and Plains' own integrity management plan.  In addition, the examination and measurements of three of these areas by the Pipeline Administration indicated "***extensive external corrosion***."

13.    In fact, the Corrective Action Order reported that experts estimated that the pipeline wall thickness at the release site had degraded to one-sixteenth of an inch, a reduction of over 80% of its original thickness.  The Pipeline Administration further noted that inspection surveys conducted in 2013 and 2014 for different segments of Line 903 appeared inconsistent—a red flag that should have prompted immediate investigation by the Company—and ordered the

Company to shut down Line 903 as well.  Following these disclosures, Plains Common Units declined another 4%, from $47.80 per unit on June 2, 2015 to $45.89 per unit on June 4, 2015.

14.     Finally, on August 5, 2015, the Company disclosed that the spill might actually be far more severe than originally reported.  The Company further disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, and that the Company could be liable for potential criminal violations of the Clean Water Act.   In response to these disclosures, Plains Common Units fell over 10%, from $40.20 per unit to close at $35.95 per unit on August 5, 2015, eliminating over $1.6 billion in investor value.

15.     In the wake of the disclosures revealing the true state of the Company's deficient pipeline maintenance and monitoring protocols, as well as the materialization of the risks those deficiencies caused that were manifested in the Santa Barbara spill, Plains securities have plunged in value.  Specifically, the Company's Common Units have lost over nearly one-third of their value in response to disclosures revealing the true extent of the Barbara spill.  Through this action, Plaintiff seeks to recover the damages that Plaintiff and other Class Members have suffered as a result of Defendants' violations of the federal securities laws, and the resultant decline in the value of their investment in Plains securities.

## II.   JURISDICTION AND VENUE

16.    The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act.  The Court has personal jurisdiction over this action because Plains is headquartered in this District and conducts business in this District.  Venue is proper pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Plains has operations in this District and acts giving rise to the violations complained of herein, including the dissemination of materially false and misleading statements, occurred in this District.

17.    In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## III.   PARTIES

### A.   Plaintiff

18.    Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System purchased Plains securities at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

### B.   Defendant

19.    Defendant Plains is a publicly-traded Delaware master limited partnership, or MLP, involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities.  Plains is headquartered in Houston, Texas.  The Company has grown into one of North America's largest energy pipeline operators by acquiring significant pipelines and terminal

systems—many of them aging and in need of significant repair—in California, Texas and Canada, among other places.  Plains Common Units are traded on the New York Stock Exchange ("NYSE") under the symbol "PAA."

     **C.**    **Individual Defendants**

20. Defendant Greg L. Armstrong ("Armstrong") is, and was at all relevant times, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Plains.  Defendant Armstrong was provided with copies of the Company's public filings, press releases and other communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Defendant Armstrong signed the SEC filings that contained the false and misleading statements identified in Section V below.

21. Defendant Al Swanson ("Swanson") is, and was at all relevant times, Executive Vice President and Chief Financial Officer.  Defendant Swanson signed the SEC filings that contained the false and misleading statements identified in Section V below.

22. Defendant Chris Herbold ("Herbold") is, and was at all relevant times, Vice President-Accounting and Chief Accounting Officer.  Defendant Herbold signed the SEC filings that contained the false and misleading statements identified in Section V below.

23. Defendants Armstrong, Swanson and Herbold, are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Plains' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after,

their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.  **SUBSTANTIVE ALLEGATIONS**

24.    Plains is a publicly-traded master limited partnership, or MLP, involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities that has grown into one of North America's largest energy pipeline operators.  That growth has been achieved through a two-decade acquisition binge during which Plains acquired significant pipelines and terminal systems—many of them aging and in need of significant repair—in California, Texas and Canada, among other places.

25.    Taking control over a vast network of pipelines, many in need of crucial maintenance, placed significant obligations on the Company to ensure the integrity of those networks.   Indeed, federal, state and local regulations placed numerous and substantial restrictions and requirements on the Company's pipeline operations.

26.    The majority of Plains' pipelines are subject to the jurisdiction of the Pipeline and Hazardous Materials Safety Administration ("Pipeline Administration"), which enforces regulations promulgated under the Hazardous Liquids Pipeline Safety Act of 1979, including rules governing the design, installation, testing, construction, operation, replacement and management of pipeline and tank facilities.  These regulations require pipeline operators to adopt measures to reduce the environmental impact of oil spills, including the maintenance of spill response plans and training.  In addition, the Pipeline Administration requires pipeline operators

like Plains to implement enhanced pipeline integrity management programs that include frequent inspections to identify and correct pipeline anomalies, as well as other measures to ensure pipeline integrity in "high consequence areas," such as high population areas, areas sensitive to environmental damage, and commercial waterways.

27.     During the Class Period, Plains was attempting to rehabilitate its public image as a safe and responsible pipeline operator, following a series of oil spills during recent years.  Over the last decade, Plains and its related companies have reported 229 safety and maintenance incidents on pipelines to federal regulators.  In fact, among more than 1,700 operators included in a database maintained by the Pipeline Administration, only four reported more incidents than Plains.  The Company's reported infractions involved pump failure, equipment malfunction, operator error and pipeline corrosion, resulting in more than $23 million in property damage and the release of more than 688,000 gallons of hazardous liquid.

28.     The U.S. Environmental Protection Agency ("EPA") sued Plains in 2010 for a series of spills in Texas, Louisiana, Oklahoma and Kansas that discharged 273,420 gallons of crude oil. These spills included, among others, a spill in West Texas in which 189,000 gallons of oil was discharged, some of which wound up in the nearby Pecos River, as well as a second spill in the East Texas that resulted in the release of about 50,000 gallons of oil.

29.     Just weeks after the EPA filed suit, the Company agreed to pay significant fines and adopt new safety measures.  Specifically, under the 2010 Consent Decree, the Company entered into to settle the EPA's suit, Plains was required to pay $3.25 million in fines and spend $41 million to upgrade more than 10,000 miles of pipe.  The 2010 Consent Decree also required, among other things, that Plains conduct weekly aerial patrols of its pipelines to check for leaks, as well as spend millions of dollars on efforts to mitigate threats posed by corrosion and to install

computational pipeline monitoring capabilities and ensure ongoing monitoring for 110 segments of pipeline, including Line 901.

30.     The 2010 Consent Decree specifically required that Plains ensure that it maintained leak detection protocols for Line 901 that complied with API 1130 for as long as the pipeline remained in service.  API 1130 required, among other things, that Plains implement and maintain a leak detection system using computerized algorithmic measuring systems that should have quickly and effectively detected integrity defects and potential leaks.

31.     In the wake of these prior violations, Plains executives made a concerted effort to inform investors that it had adopted enhanced measures to ensure the integrity of its pipelines, and that, as a result, spill incidents reduced significantly.  For example, in the Company's Form 10-K filed on February 26, 2013—the first day of the Class Period—pointing to the measures the Company had taken as part of the 2010 Consent Decree, Plains reassured investors that "pipeline integrity management" was its "primary operational focus," and that Company had "implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention." The Company further represented that its "pipelines are in substantial compliance with [Pipeline Safety Act]" and that the Company's "integrity management program" included measures that went well beyond those legal requirements, with "several internal programs designed to prevent incidents and…activities such as automating valves and replacing river crossings."

32.     The Company also reassured investors that it "devote[d] substantial resources to comply with [U.S. Department of Transportation]-mandated pipeline integrity rules," including "requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant

adverse consequences." According to Plains, the Company had "developed and implemented certain pipeline integrity measures that go beyond regulatory mandate." Defendants repeated these and similar representations throughout the Class Period.

33. These representations were false. In reality, Plains had inadequate and ineffective pipeline integrity monitoring and maintenance procedures, spill response plans and protocols, and did not comply with federal regulations pertaining to the operation of its pipelines—let alone develop and implement enhanced "integrity measures that go beyond [its] regulatory mandate."

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

34. The Class Period begins on February 27, 2013, when the Company filed its Annual Report on Form 10-K with the SEC. In the 2012 Form 10-K, the Company represented that it fully complied with federal regulations governing its business, including rules governing the monitoring and maintenance of its pipelines and the safety and integrity of those pipelines. Specifically, the Company reported that it spent $39 million in 2012 in connection with costs associated with the "inspection, testing and correction of identified anomalies" required by the 2002 and 2006 amendments to the Hazardous Liquids Pipeline Safety Act of 1979 ("HLPSA"). Those amendments required Plains to "implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways." The Company represented that "we believe our pipelines are in substantial compliance" with these requirements.

35.     The Company further represented that it maintained state-of-the-art oil spill response procedures that ensured that, if such an incident were to occur, the Company would be able to effectively and efficiently limit any potential damage.   Specifically, the Company represented that:

> A substantial portion of our petroleum pipelines and our storage tank facilities in the United States are subject to regulation by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") pursuant to the Hazardous Liquids Pipeline Safety Act of 1979, as amended (the "HLPSA"). The HLPSA imposes safety requirements on the design, installation, testing, construction, operation, replacement and management of pipeline and tank facilities. Federal regulations implementing the HLPSA require pipeline operators to adopt measures designed to reduce the environmental impact of oil discharges from onshore oil pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel. These regulations also require pipeline operators to develop and maintain a written qualification program for individuals performing covered tasks on pipeline facilities.
>
> ***
>
> The Federal Water Pollution Control Act, as amended, also known as the Clean Water Act ("CWA"), and analogous state and Canadian federal and provincial laws impose restrictions and strict controls regarding the discharge of pollutants into navigable waters of the United States and Canada, as well as state and provincial waters. [] Federal, state and provincial regulatory agencies can impose administrative, civil and/or criminal penalties for non-compliance with discharge permits or other requirements of the CWA.
>
> The Oil Pollution Act of 1990 ("OPA") amended certain provisions of the CWA, as they relate to the release of petroleum products into navigable waters. OPA subjects owners of facilities to strict, joint and potentially unlimited liability for containment and removal costs, natural resource damages, and certain other consequences of an oil spill. ***We believe that we are in substantial compliance with applicable OPA requirements.*** State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when they occur. ***We believe that we are in substantial compliance with all such federal, state and Canadian requirements.***

36.     The Company further represented that, "[i]n addition to required activities, our integrity management program includes several internal programs designed to prevent incidents and includes activities such as automating valves and replacing river crossings," as well as additional measures to ensure the prevent and reduce the severity of oil spills.  For example, the Company reported that it went above and beyond the requirements of these federal regulations

by maintaining "an internal review process" to "examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement."

37.     According to the Company, pursuant to this "internal review process," it could and had determined "as a result of our own internal initiatives" "to spend substantial sums to ensure the integrity of and upgrade our pipeline systems and, in some cases…take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines."

38.     The Company further represented that it "devote[d] substantial resources to comply with [Department of Transportation]-mandated pipeline integrity rules,"  including rules under the 2006 Pipeline Safety Act which included certain pipelines that were not previously subject to regulation. Under those regulations, the DOT regulations required the Company to establish "pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences." According to the Company, it had "developed and implemented certain pipeline integrity measures that go beyond regulatory mandate."

39.     In addition to the measures the Company represented it undertook to comply with federal law, Plains also represented that its businesses' "primary operational" focus was on pipeline integrity maintenance and monitoring.  Specifically, the Company represented that:

> The acquisitions we have completed over the last several years have included pipeline assets with varying ages and maintenance and operational histories. Accordingly, for 2013 and beyond, ***we will continue to focus on pipeline integrity management as a primary operational emphasis***. In that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention. We have an internal review process pursuant to which we examine various aspects of our pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate. The purpose of this process is to review the surrounding environment, condition and operating

14

history of these pipeline and gathering assets to determine if such assets warrant additional investment or replacement.

40.     Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from regulatory agency enforcement actions, we may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems to maintain environmental compliance and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines. On May 8, 2013, the Company filed its quarterly report on Form 10-Q for the first quarter of 2013.  That document referred investors to the statements concerning the Company's pipeline integrity maintenance and compliance with relevant law as set forth above, and thereby incorporated those statements by reference.

41.     On August 8, 2013, the Company filed its quarterly report on Form 10-Q for the second quarter of 2013.  That document referred investors to the statements concerning the Company's pipeline integrity maintenance and compliance with relevant law as set forth above, and thereby incorporated those statements by reference.

42.     On February 28, 2014, Plains filed its Annual Report on Form 10-K with the SEC.  In that document, Defendants represented that Plains fully complied with federal regulations governing its business, including rules governing the monitoring and maintenance of its pipelines and the safety and integrity of those pipelines.  Specifically, the Company reported that it spent $57 million in 2013 in connection with costs associated with the "inspection, testing and correction of identified anomalies" required by federal law and the 2002 and 2006 amendments to the HLSPA that "require transportation pipeline operators to implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high

population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways." The Company stated that "we believe our pipelines are in substantial compliance with" these requirements.

43. The Company further represented that it maintained state-of-the-art oil spill response procedures that ensured that, if such an incident were to occur, the Company would be able to effectively and efficiently limit any potential damage. Specifically, the Company represented that:

> A substantial portion of our petroleum pipelines and our storage tank facilities in the United States are subject to regulation by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") pursuant to the Hazardous Liquids Pipeline Safety Act of 1979, as amended (the "HLPSA"). The HLPSA imposes safety requirements on the design, installation, testing, construction, operation, replacement and management of pipeline and tank facilities. Federal regulations implementing the HLPSA require pipeline operators to adopt measures designed to reduce the environmental impact of oil discharges from onshore oil pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel. These regulations also require pipeline operators to develop and maintain a written qualification program for individuals performing covered tasks on pipeline facilities.

> \*\*\*

> The Federal Water Pollution Control Act, as amended, also known as the Clean Water Act ("CWA"), and analogous state and Canadian federal and provincial laws impose restrictions and strict controls regarding the discharge of pollutants into navigable waters of the United States and Canada, as well as state and provincial waters. [] Federal, state and provincial regulatory agencies can impose administrative, civil and/or criminal penalties for non-compliance with discharge permits or other requirements of the CWA.

> The Oil Pollution Act of 1990 ("OPA") amended certain provisions of the CWA, as they relate to the release of petroleum products into navigable waters. OPA subjects owners of facilities to strict, joint and potentially unlimited liability for containment and removal costs, natural resource damages, and certain other consequences of an oil spill. ***We believe that we are in substantial compliance with applicable OPA requirements.*** State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when they occur. ***We believe that we are in substantial compliance with all such federal, state and Canadian requirements.***

44.     Further, the Company represented that, "[i]n addition to required activities, our integrity management program includes several internal programs designed to prevent incidents and includes activities such as automating valves and replacing river crossings," reporting that costs incurred for such activities were approximately $22 million in 2013.

45.     The Company also reported that it went above and beyond the requirements of these federal regulations by maintaining "an internal review process" to "examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement."

46.     According to the Company, pursuant to this "internal review process," it can and frequently does determine "as a result of our own internal initiatives" "to spend substantial sums to ensure the integrity of and upgrade our pipeline systems and, in some cases…take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines."

47.     The Company further represented that it "devote[d] substantial resources to comply with [Department of Transportation]-mandated pipeline integrity rules," including rules under the HLPSA which included certain pipelines that were not previously subject to regulation. Under those regulations, the Company was required to establish "pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences."  According to the Company, it had "developed and implemented certain pipeline integrity measures that go beyond regulatory mandate, some of which are now incorporated into the 2010 Consent Decrees."

48.     In addition to the measures the Company represented it undertook to comply with federal law, Plains also represented that its businesses' "primary operational" focus was on pipeline integrity maintenance and monitoring.  Specifically, the Company represented that:

For 2014 and beyond, *we will continue to focus on pipeline integrity management as a primary operational emphasis*. In that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention. We have an internal review process pursuant to which we examine various aspects of our pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate. The purpose of this process is to review the surrounding environment, condition and operating history of these pipeline and gathering assets to determine if such assets warrant additional investment or replacement.

Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from regulatory agency enforcement actions, we may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems to maintain environmental compliance and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines. We cannot provide any assurance as to the ultimate amount or timing of future pipeline integrity expenditures but any such expenditures could be significant.

49.     On May 9, 2014, Plains filed its quarterly report for the first quarter of 2014 on Form 10-Q with the SEC.  That document referred investors to the statements concerning the Company's pipeline integrity maintenance and compliance with relevant law as set forth above, and incorporated those statements by reference.

50.     On August 8, 2014, Plains filed its quarterly report for the second quarter of 2014 on Form 10-Q with the SEC.  That document referred investors to the statements concerning the Company's pipeline integrity maintenance and compliance with relevant law as set forth above, and incorporated those statements by reference.

51.     On November 7, 2014, Plains filed its quarterly report for the third quarter of 2014 on Form 10-Q with the SEC.  That document referred investors to the statements concerning the Company's pipeline integrity maintenance and compliance with relevant law as set forth above, and incorporated those statements by reference.

52.     On February 25, 2015, Plains filed its 2014 Annual Report on Form 10-K with the SEC.  In that document, the Company represented that Plains fully complied with federal

regulations governing its business, including rules governing the monitoring and maintenance of its pipelines and the safety and integrity of those pipelines.  Specifically, the Company reported that it spent $107 million in 2014 in connection with costs associated with the "inspection, testing and correction of identified anomalies" required by federal law and the 2002 and 2006 amendments to the HLSPA that "require transportation pipeline operators to implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways."  The Company stated that "we believe our pipelines are in substantial compliance with" these requirements.

53.     Further, the Company represented that, "[i]n addition to required activities, our integrity management program includes several internal programs designed to prevent incidents and includes activities such as automating valves and replacing river crossings," reporting that costs incurred for such activities were approximately $21 million in 2014.

54.     The Company further represented that it maintained state-of-the-art oil spill response procedures that ensured that, if such an incident were to occur, the Company would be able to effectively and efficiently limit any potential damage.   Specifically, the Company represented that:

> A substantial portion of our petroleum pipelines and our storage tank facilities in the United States are subject to regulation by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") pursuant to the Hazardous Liquids Pipeline Safety Act of 1979, as amended (the "HLPSA"). The HLPSA imposes safety requirements on the design, installation, testing, construction, operation, replacement and management of pipeline and tank facilities. Federal regulations implementing the HLPSA require pipeline operators to adopt measures designed to reduce the environmental impact of oil discharges from onshore oil pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel. These regulations also require pipeline operators to develop and maintain a written

qualification program for individuals performing covered tasks on pipeline facilities.

***

The Federal Water Pollution Control Act, as amended, also known as the Clean Water Act ("CWA"), and analogous state and Canadian federal and provincial laws impose restrictions and strict controls regarding the discharge of pollutants into navigable waters of the United States and Canada, as well as state and provincial waters. [] Federal, state and provincial regulatory agencies can impose administrative, civil and/or criminal penalties for non-compliance with discharge permits or other requirements of the CWA.

The Oil Pollution Act of 1990 ("OPA") amended certain provisions of the CWA, as they relate to the release of petroleum products into navigable waters. OPA subjects owners of facilities to strict, joint and potentially unlimited liability for containment and removal costs, natural resource damages, and certain other consequences of an oil spill. ***We believe that we are in substantial compliance with applicable OPA requirements.*** State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when they occur. ***We believe that we are in substantial compliance with all such federal, state and Canadian requirements.***

55.     The Company also reported that it went above and beyond the requirements of these federal regulations by maintaining "an internal review process" to "examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement."

56.     According to the Company, pursuant to this "internal review process," it can and frequently does determine "as a result of our own internal initiatives" "to spend substantial sums to ensure the integrity of and upgrade our pipeline systems and, in some cases…take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines."

57.     The Company further represented that it "devote[d] substantial resources to comply with [Department of Transportation]-mandated pipeline integrity rules," including rules under the HLPSA which included certain pipelines that were not previously subject to regulation. Under those regulations, the Company was required to establish "pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could

produce significant adverse consequences."  According to the Company, it had "developed and implemented certain pipeline integrity measures that go beyond regulatory mandate, some of which are now incorporated into the 2010 Consent Decrees."

58.     In addition to the measures the Company represented it undertook to comply with federal law, Plains also represented that its businesses' "primary operational" focus was on pipeline integrity maintenance and monitoring.  Specifically, the Company represented that:

> Accordingly, for 2014 and beyond, ***we will continue to focus on pipeline integrity management as a primary operational emphasis***. In that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention. We have an internal review process pursuant to which we examine various aspects of our pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate. The purpose of this process is to review the surrounding environment, condition and operating history of these pipeline and gathering assets to determine if such assets warrant additional investment or replacement.
>
> Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from regulatory agency enforcement actions, we may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems to maintain environmental compliance and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines. We cannot provide any assurance as to the ultimate amount or timing of future pipeline integrity expenditures but any such expenditures could be significant.

59.     On May 8, 2015, Plains filed its quarterly report for the first quarter of 2015 on Form 10-Q with the SEC.  Those documents referred investors to the statements concerning the Company's pipeline integrity maintenance and compliance with relevant law as set forth above, and incorporated those statements by reference.

60.     The statements highlighted above were materially false and misleading and contained misleading omissions of material facts.  The statements concerning the Company's compliance with rules and regulations governing its pipeline maintenance, monitoring and spill response procedures were false and misleading because, as would later be revealed, the

Company's pipelines, and its monitoring and maintenance of those pipelines, was woefully inadequate and violated federal law.  Specifically, as the Pipeline Administrator's preliminary findings in the June 3, 2015 Correct Action Order make clear, Plains lacked adequate leak monitoring systems (as required by API 1130 and the 2010 Consent Decree) and failed to take appropriate remedial measures in response to the pipeline integrity defects that had been previously identified in Line 901 (as required by the 2002 and 2006 amendments to the HLPSA).

61.     Further, as demonstrated by Plains' hours-long delay in notifying relevant regulatory officials of the spill once it was identified, the Company was wholly unprepared to respond to a leak as required by the Company's own response plan and provisions of the Clean Water Act.  Moreover, rather than maintain an internal review program designed to ensure that deficient pipelines were promptly repaired or replaced, the Company in fact deliberately ignored serious and dangerous pipeline conditions, as evidenced by June 3, 2015 Corrective Action Order findings regarding Lines 901 and 903, and the fact that, as the *Los Angeles Times* disclosed in a May 20, 2015 article, Plains in fact had an incident rate per mile of pipe that was three times the national average.

## VI.   THE TRUTH IS SLOWLY REVEALED

### A.   Line 901 Ruptures, Causing Extensive Damage to the Santa Barbara Coastline

62.     On May 19, 2015, Line 901 ruptured and began spilling thousands of barrels of heavy crude oil into an environmentally sensitive coastal area in Santa Barbara, California.  The failed pipeline, Line 901, is a 24-inch diameter pipe that runs from Exxon Mobil's storage tanks in Las Flores Canyon to Plain's Gaviota Pump Station, a distance of approximately 10.6 miles.

63.     Although state law required the Company to report the spill to the federal National Response Center within 30 minutes of detection—and the Company's own plans

required such notification "at the earliest practicable moment" and that it should take no more than 15 minutes to discover a release and shut down the flow—Plains did not report the spill to the National Response Center for hours after it had been discovered.  In fact, it was not Plains, but a 911 call placed to the local fire department that alerted the National Response Center to the spill.

64.     On May 21, 2015, the Pipeline Administration issued a Corrective Action Order requiring Plains to take corrective actions with respect to Line 901 in order to protect the public, property and the environment from potential hazards caused by the spill.  The Corrective Action Order noted certain preliminary findings concerning the spill, including that Line 901 was inspected on May 5, 2015 as part of a complete in-line inspection to collect data and evaluate the integrity of the pipeline.  The Corrective Action Order noted that Plains had not yet received a formal report regarding that inspection.  However, previous inspections performed on Line 901 in June 2007 and July 2012 had demonstrated a worsening of pipeline integrity.  In 2007, there were 13 anomalies identified that related to corrosion of Line 901, and in 2012, an inspection identified 41 such anomalies.  The May 21, 2015 Corrective Action Order required Plains to take immediate corrective actions, including shutting down and reviewing the line, testing the line, developing a remedial plan and performing a review of the Company's emergency response plan and training.

65.     Following the first disclosure of the spill and the Pipeline Administration's investigation, Plains shares declined $2.03 per share, or over 4%, from $49.59 per share on May 19, 2015 to $47.56 per share on May 21, 2015.  This two-day stock drop wiped out over $800 million of the Company's market capitalization.

**B.**     **Defendants Conceal The True Extent And Scope of the Spill**

66.     In the days immediately following the spill, Plains sought to reassure investors that the spill was under control and contained, that the Company's response was appropriate, and that the damage inflected was minimal.   Specifically, Plains officials reported that its own analysis of a "worst case" scenario for the spill, which was based on the typical flow rate of oil and the elevation of the pipeline, showed that at most 21,100 gallons of crude oil had gone into the Pacific Ocean, and that as many as 105,000 gallons in total may have been released from Line 901.

67.     Subsequently, on May 26, 2015, Plains filed a Form 8-K with the SEC describing the spill and noting that the Company "currently estimates that the amount of released crude oil could be as high as approximately 2,400 barrels" or 101,000 gallons—a figure reflecting a 4,000-gallon reduction from the initial estimates the Company provided to the news media.

68.     These representations were false.   As would later be revealed, the Company's estimates for the size and extent of the spill were in fact far greater than 2,400 barrels.

**C.**     **Regulatory and Congressional Investigations Reveal Further Information Concerning Plains' Defective Pipeline Maintenance, Monitoring and Spill Response**

69.     In the weeks following the first disclosure of the spill, congressional and regulatory investigations revealed additional facts concerning the spill and the Company's reaction to it.   For example, on June 3, 2015, the Pipeline Administration issued an amended Corrective Action Order that revealed that there had been "extensive external corrosion" on Line 901—and that the regulator had also identified "extensive corrosion" and other deficiencies in adjoining Line 903—and required Plains to take additional corrective actions.   The Pipeline Administration noted that the results of Plains' own May 5, 2015 inspection survey revealed four

areas on Line 901 with pipe anomalies that required "immediate investigation and remediation" under relevant regulations and Plains' own integrity management plan.

70.     In addition, the examination and measurements of three of these areas by the Pipeline Administration indicated "extensive external corrosion," and that the impacted areas were not limited girth welds.  In fact, the Corrective Action Order reported that field experts had estimated that the pipeline wall thickness at the release site had degraded to one-sixteenth of an inch, a reduction of over 80% of its original thickness.  The Pipeline Administration further noted that inspection surveys conducted in 2013 and 2014 for different segments of Line 903 appeared inconsistent—a red flag that should have prompted immediate investigation by the Company—and ordered the Company to shut down Line 903 as well.  Underscoring the deficiencies in Plains' pipeline integrity monitoring systems, Patrick Hodgins, director of security and safety for Plains, testified before a California state legislative committee investigating the spill that "[t]he first time I heard about corrosion was when I read about it in the newspaper….We had no indication at all to assume there was an issue."

71.     Following these disclosures, Plains Common Units declined another 4%, from $47.80 per unit on June 2, 2015 to $45.89 per unit on June 4, 2015.  This two-day drop wiped out an additional $760 million of the Company's market capitalization.

**D.     Plains Reveals the Line 901 Spill Was Far More Severe Than Reported**

72.     Finally, on August 5, 2015, the Company disclosed that the spill could actually be 1,000 barrels larger than previously reported.  The Company further disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, and that the Company could be liable for potential criminal violations of the Clean Water Act.

73.     In response to the revelation that the spill could be larger than the Company previously represented, and could trigger criminal sanctions, Plains Common Units fell over 10%, from $40.20 per unit to close at $35.95 per unit on August 5, 2015, eliminating over $1.6 billion in investor value.

## VII.   SCIENTER ALLEGATIONS

74.     As alleged herein, the Company and the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Company and the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Plains, their control over, and receipt or modification of Plains allegedly materially misleading statements, and their associations with the Company which made them privy to confidential proprietary information concerning Plains, participated in the fraudulent scheme alleged herein.

## VIII.  PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

75.     Throughout the Class Period, Plains securities traded on the New York Stock Exchange, a highly efficient market that promptly digested current information with respect to Plains from publicly available sources and reflected such information in the prices of Plains' Common Units.

76.     Plains securities met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient and automated market;

B.     As a regulated issuer, Plains filed periodic public reports with the SEC and NYSE;

C.     Plains regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.     Plains was followed by numerous securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

77.    As a result of the foregoing, the market for Plains Common Units promptly digested current information regarding Plains from all publicly available sources and reflected such information in the price of Plains securities.  Under these circumstances, all purchasers of these securities during the Class Period suffered similar injury through their purchase of these securities at artificially inflated prices and the presumption of reliance applies.

78.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Plains' compliance with federal law and procedures concerning the monitoring and maintenance of its pipelines—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the

sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of this information to investors, as set forth above, that requirement is satisfied here.

## IX.   <u>LOSS CAUSATION/ECONOMIC LOSS</u>

79.   As alleged herein, Defendants made materially false and misleading misstatements and omissions by misrepresenting Plains' compliance with federal, state and local regulations governing the maintenance, monitoring and of the integrity of Plains' pipelines and its spill response procedures.  Instead of truthfully disclosing during the Class Period that Plains' pipelines were hazardously corroded, highly vulnerable to spill, and that the Company lacked required monitoring and spill response procedures and protocols, Defendants falsely reported reassured investors concerning the Company's business and operational risks.  Further, once the Line 901 ruptured and investors learned of the Santa Barbara spill, the Company misrepresented the severity and extent of the spill and its impact on the Company's business.

80.   These misstatements concerning Plains' operations and compliance with the law as described herein caused and maintained the artificial inflation in the price of Plains Common Units throughout the Class Period, until the truth was revealed to the market.

81.   These false and misleading statements had the intended effect and caused Plains securities to trade at artificially inflated levels throughout the Class Period.

82.   As alleged herein, the truth about the risks to Plains' operations and the severity and extent of the Santa Barbara spill emerged in a series of partial disclosures including those on May 19, 2015 and on August 5, 2015.  As a result of these partial corrective disclosures of the truth and the materialization of the risks concealed by Defendants' misrepresentations and

omissions, the price of Plains Common Units fell nearly 30%, from $49.59 per unit at the close of trading on May 19, 2015 to $35.95 per unit on August 5, 2015.

## X.   NO SAFE HARBOR

83.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint.   Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Plains who knew that those statements were false when made.

## XI.   CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Plains Common Units during the period of February 27, 2013 through and including August 4, 2015, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, other officers and directors of Plains at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

85.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of July 31, 2015, there were approximately 367 million Plains Common Units outstanding, owned by thousands of investors.

86.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.      Whether Defendants violated the Exchange Act;

B.      Whether Defendants omitted and/or misrepresented material facts;

C.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.      Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

E.      Whether the price of Plains securities was artificially inflated;

F.      Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.      The extent of damage sustained by Class members and the appropriate measure of damages.

87.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

88.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Plains and the Individual Defendants

90.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

91.     During the Class Period, Plains and the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Plains securities at artificially inflated prices.

92.     Plains and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Plains securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

93.     Plains and the Individual Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and compliance with the law.

94.     During the Class Period, Plains and the Individual Defendants issued the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     Plains and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Plains and the Individual Defendants engaged in this misconduct to conceal Plains' true operations and legal violations from the investing public and to support the artificially inflated prices of Plains securities.

96.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Plains securities.  Plaintiff and the Class would not have purchased these securities at the prices they paid, or at all, had they been aware that the market prices for Plains securities had been artificially inflated by the Individual Defendants' fraudulent course of conduct.

97.     As a direct and proximate result of the Plains and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

98.     By virtue of the foregoing, the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violations of Section 20(a) of The Exchange Act
### Against the Individual Defendants

99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.     The Individual Defendants acted as controlling persons of Plains within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Plains' operations and/or intimate knowledge of the false statements filed by Plains with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Plains, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Plains and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

102.     As set forth above, Plains and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Executive Defendants'

wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Plains securities during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding Plaintiff and the other members of the Class damages, including interest;

C.      Awarding Plaintiff reasonable costs and attorneys' fees; and

D.      Awarding Plaintiff such other or further relief as the Court may deem just and proper.

## XIII. JURY DEMAND

Plaintiff, on behalf of the Class, hereby demands a trial by jury.

Dated: August 20, 2015                    Respectfully submitted,


                                          **THE LAW OFFICE OF ROGER F. CLAXTON**

                                          By: _/s/ Roger F. Claxton_
                                          Roger F. Claxton
                                          Attorney-In-Charge
                                          Texas State Bar #: 04329000
                                          Southern District of Texas Bar #: 14923
                                          10000 N. Central Expressway, Suite 725
                                          Dallas, Texas 75231
                                          Telephone: 214-969-9029
                                          Facsimile: 214-953-0583
                                          Email: roger@claxtonlaw.com

                                          _Local Counsel for Plaintiff_

**SAXENA WHITE P.A.**
Joseph E. White, III.
Lester R. Hooker
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
Telephone:      (561) 394-3399
Facsimile:      (561) 394-3382
E-mail:          jwhite@saxenawhite.com
                 lhooker@saxenawhite.com

*Of Counsel for Plaintiff*

## CERTIFICATION AND AUTHORIZATION

I, James D. Love, on behalf of the City of Birmingham Firemen's and Policemen's Supplemental Pension System ("Birmingham Supplemental"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am authorized in my capacity as Assistant City Attorney and legal counsel of Birmingham Supplemental to initiate litigation and to execute this Certification on behalf of Birmingham Supplemental.

2.  Birmingham Supplemental did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Birmingham Supplemental is willing to serve as a representative party on behalf of the Class, including by providing testimony at deposition and trial, if necessary.

4.  Birmingham Supplemental transactions in Plains All American Pipeline, L.P. common units are set forth below:

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 08/27/14 | 575 | $59.76 |
| Purchase | 12/05/14 | 400 | $51.04 |
| Sale | 04/08/15 | 175 | $49.39 |

5.  Birmingham Supplemental has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    None

6.  Birmingham Supplemental has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

    None

7.  Birmingham Supplemental will not accept any payment for serving as a representative party on behalf of the Class beyond Birmingham Supplemental's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

1

Executed this /9th day of August, 2015.

City of Birmingham Firemen's and
Policemen's Supplemental Pension System

James D. Love, Assistant City Attorney