UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In re PLAINS ALL AMERICAN PIPELINE, L.P. SECURITIES LITIGATION | § § § § | Lead Case No. 4:15-cv-02404 |
| | § | CLASS ACTION |
| This Document Relates To: | § § | Judge Lee H. Rosenthal |
| ALL ACTIONS. | § § § | |

**CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...........................................................................................1

II.     NATURE OF THE ACTION ........................................................................2

III.    JURISDICTION AND VENUE ....................................................................5

IV.     PARTIES .......................................................................................................5

      A.      Plaintiffs ............................................................................................5

      B.      Entity Defendants..............................................................................7

      C.      Officer Defendants............................................................................9

      D.      Director Defendants.........................................................................11

      E.      Underwriter Defendants...................................................................13

V.      FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ........................26

      A.      Plains' Relevant Operations and Applicable Legal Requirements ........................26

      B.      Plains' Pre-Class Period Maintenance and Safety Deficiencies Resulted in a Consent Decree with the EPA........................29

      C.      Plains Created a New Corporate Image to Lure Investors by Purporting to Implement Enhanced Safety and Maintenance Initiatives...................................31

      D.      The Spill..........................................................................................34

      E.      Plains Reveals the Line 901 Spill Was Far More Severe than Reported...............37

      F.      Regulatory and Congressional Investigations Reveal Further Information Concerning Plains' Defective Pipeline Maintenance, Monitoring and Spill Response ......................................40

            1.      May 21, 2015 PHMSA Corrective Action Order ......................................40

            2.      June 3, 2015 PHMSA Corrective Action Order – Amendment No. 1.....................40

            3.      September 11, 2015 Notice of Probable Violation and Proposed Compliance Order...................................42

            4.      November 12, 2015 Corrective Action Order – Amendment No. 2..........45

G.    Defendants Knew of or Recklessly Disregarded Severe Corrosion Problems on Lines 901 and 903, Which Led to Line 901's Spill and Line 903's Shut Down.................................................................................47

H.    Plains Operated Line 901 at an Unlawful Pressure in Light of Known Corrosion on the Line ...........................................................51

I.    Defendants Knew Line 901 Had Reached or Exceeded its Useful Life ...............53

J.    Decreasing Volumes Motivated Defendants to Look the Other Way As Lines 901 and 903 Deteriorated................................................................54

K.    Defendants Knowingly Failed to Conform to Industry Standards When Inspecting and Maintaining Lines 901 and 903....................................56

L.    Defendants Violated Federal Regulations Governing High Consequence Areas ...........................................................................58

M.    Defendants Failed to Correct Known Emergency Response Deficiencies on Lines 901 and 903 Despite PHMSA's Warnings ...............................................59

N.    Plains' Industry-Worst Spill Record Establishes a Widespread Culture of Non-Compliance ..........................................................................62

O.    Through Defendants' Touted Integrity Management Programs, Defendants Knew Or Were At Least Reckless in Not Knowing About Lines 901 and 903's State of Corrosion ......................................................65

P.    The Officer Defendants Were Incentivized to Minimize Expenditures on Pipeline Maintenance and Safety in Order to Increase Profits and Thereby Increase Distributions to Themselves .............................................68

VI.    VIOLATIONS OF THE EXCHANGE ACT ..................................................72

A.    Defendants' False And Misleading Statements And Omissions Issued During The Class Period..............................................................72

B.    Loss Causation .....................................................................111

C.    Applicability of the Presumption of Reliance....................................115

D.    Control Person Liability Under §20(a) of the Exchange Act .............................117

1.    Control over PAGP.............................................................117

2.    Control over PAA ...............................................................118

3.    Control over PAGP and PAA .............................................118

VII.    VIOLATIONS OF THE SECURITIES ACT................................................120

A.      The Equities Offerings Materials Contained False and Misleading Statements ......................................................................................123

      1.      The IPO Offering Materials Contained Materially False and Misleading Statements ..............................................................123

      2.      The Plains Holdings Secondary Offering Materials Contained Materially False and Misleading Statements ...........................................129

      3.      The Plains Offering Materials Contained Materially False and Misleading Statements ..............................................................133

B.      The Notes Offerings Materials Contained Materially False and Misleading Statements ..................................................................137

C.      Control Person Liability Under §15 of the Securities Act ..................................142

      1.      Control over PAGP ...........................................................142

      2.      Control Over PAA ...........................................................144

VIII.   NO SAFE HARBOR ...........................................................................145

IX.     CLASS ACTION ALLEGATIONS ..................................................................146

X.      CLAIMS FOR RELIEF ........................................................................147

A.      COUNT I Violations of §10(b) Of The Exchange Act and Rule 10b-5 Against Plains, Plains Holdings and the Officer Defendants .............................147

B.      COUNT II Violations of §20(a) of the Exchange Act Against Holdings LLC, Plains Holdings, and the Officer Defendants ("20(a) Defendants") ..........149

C.      COUNT III Violations of §11 of the Securities Act Against All Defendants ...............................................................................150

D.      COUNT IV Violation of §12(a)(2) of the Securities Act Against Plains, PAA Finance and Plains Holdings......................................................151

E.      COUNT IV Violations Of §12(a)(2) of the Securities Act Against the Underwriter Defendants...............................................................153

F.      COUNT V Violations of §15 of the Securities Act Against Holdings LLC, Plains Holdings, the Officer Defendants and the Director Defendants ...............154

XI.     PRAYER FOR RELIEF .........................................................................155

XII.    JURY DEMAND ...............................................................................155

## I.      INTRODUCTION

1.       This is a securities class action on behalf of all persons who purchased Plains All American Pipeline, L.P. ("Plains," "PAA," or the "Company") Common Units between February 27, 2013 and August 5, 2015 (the "Class Period"), and the Class A Shares of Plains GP Holdings, L.P. ("Plains Holdings" or "PAGP") between October 16, 2013 and August 5, 2015, for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. §2401.10b-6 ("Rule 10b-5") promulgated thereunder.

2.       Plaintiffs also bring claims under §§11, 12, and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons who purchased:

- Plains Holdings' Class A Shares pursuant and traceable to its initial public offering conducted on or about October 16, 2013 (the "IPO");

- Plains Holdings' Class A Shares pursuant and traceable to the public offering conducted on or about November 12, 2014 (the "Plains Holdings Secondary Offering");

- Plains shares pursuant and traceable to the public offering on or about February 26, 2015 (the "Plains Offering" and, together with the IPO and Plains Holdings Secondary Offering, the "Equities Offerings");

- Plains 3.85% senior notes due 2023 pursuant and traceable to the public offering conducted on or about August 8, 2013 (the "August 2013 Notes Offering");

- Plains 4.7% senior notes due 2044 pursuant and traceable to the public offering conducted on or about April 15, 2014 (the "April 2014 Notes Offering");

- Plains 3.6% senior notes due 2024 pursuant and traceable to the public offering conducted on or about September 2, 2014 (the "September 2014 Notes Offering"); and

- Plains 2.6% senior notes  due 2019 and 4.9% senior notes due 2045 pursuant and traceable to the public offering conducted on or about December 2, 2014 (the "December 2014 Notes Offerings" and, together with the August 2013 Notes Offering, the April 2014 Notes Offering, and the September 2014 Notes Offering, the "Notes Offerings") (the Notes Offerings, together with the Equities Offerings, are herein referred to as the "Offerings").

3.     Plaintiffs' Securities Act claims arise from false and misleading statements or omissions in the "Offering Materials," defined in the table at ¶277.

4.     Plaintiffs, individually and on behalf of all others similarly situated, by and through their counsel, allege the following based upon personal knowledge as to plaintiffs and plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Plains, Plains Holdings and PAA Finance Corp. ("PAA Finance"), media reports, analyst reports, conference call transcripts and investor presentations, reports issued by governmental agencies about the Company, and documents obtained from government sources, as well as consultation with industry experts, interviews with former Plains employees, and interviews with former employees of a Plains contractor.

II.     **NATURE OF THE ACTION**

5.     This securities class action arises from defendants' false statements and omissions to investors, which concealed pervasive oil pipeline monitoring and maintenance failures, repeated failures to comply with federal regulations and mandates, and other misconduct that led to the largest oil spill in California in 25 years.  Plains is one of the largest crude oil and other liquid energy pipeline operators in the United States.  Throughout the Class Period, defendants represented that Plains' pipelines were in compliance with applicable regulations, that pipeline integrity and maintenance was Plains' "***primary operational emphasis***" and a "***core value***," and that the Company had undertaken significant measures to prevent oil spills, ensure its pipelines' integrity, and minimize the damage any such incidents may cause.  Defendants even promised that they had "implemented" pipeline maintenance and integrity measures that went "***beyond regulatory mandate***."  Further, in an effort to mitigate a history blemished by multiple oil spills, defendants specifically assured investors during the Class Period that they had adopted significant measures to

- 2 -

remedy their past record, including through "pipeline integrity measures" that complied with or exceeded the requirements of a consent order entered into with the U.S. Environmental Protection Agency ("EPA").

6.    Defendants' representations were false.  In reality, the Company systematically eschewed pipeline integrity in an effort to reduce expenses, and defendants also knowingly or recklessly disregarded multiple red flags indicating both widespread pipeline integrity problems at the Company and severe problems with Plains' Lines 901 and 903, two crude oil pipelines that run through Santa Barbara County.  As described herein, Plains had inadequate and ineffective pipeline integrity monitoring and maintenance procedures, spill response plans and protocols, and did not comply with federal regulations pertaining to the operation of its pipelines – let alone develop and implement enhanced "integrity measures that go beyond [its] regulatory mandate," which was specifically required by regulation for Lines 901 and 903.  Defendants knew about, or recklessly disregarded, Plains' pipeline integrity problems and violations through, among other things, warnings from Pipeline and Hazardous Materials Safety Administration ("PHMSA") – the federal agency responsible for regulating Lines 901 and 903 – and Plains' inspections of Lines 901 and 903.

7.    On May 19, 2015, Line 901 ruptured, spilling as much as 143,000 gallons of crude oil into sensitive marine habitats, populated community areas and the Pacific Ocean along the scenic Santa Barbara coastline.  Line 901, along with Line 903, made up Plains' All American Pipeline, and was a segment that defendants told regulators was "*state-of-the-art*" and from which a spill would be "*extremely unlikely*."  In contrast to their representation to regulators that "[t]he risk and hazard analysis [conducted on Lines 901 and 903] concluded that the potential for a leak [due] to corrosion is *adequately mitigated*," the spill in Santa Barbara was the result of Plains' systematic failure to properly address pipeline corrosion and the deliberate disregard of information showing that Line 901's rupture was inevitable.  Moreover, despite their representations about safety and corrosion

control on Lines 901 and 903, regulators ordered defendants to shut down Line 903 shortly after the Santa Barbara oil spill because of Line 903's history of anomalies and "the similarities between the characteristics of [Line 901] and Line 903."  PHMSA later concluded that, contrary to defendants' Class Period false statements, Lines 901 and 903 had extensive, "similar corrosion characteristics" and that, in light of the extensive corrosion, "*it does not appear that Plains has an effective corrosion control program*."

8.      In the days immediately following the spill, defendants sought to reassure investors that the situation was under control, the spill was contained, the Company's response was appropriate, and that the damage inflicted was minimal.  Specifically, Plains reported that its "worst case scenario" for the spill was that 21,100 gallons of crude oil had been dumped into the Pacific Ocean and that as many as 105,000 gallons in total had been released from Line 901.  In a subsequent Form 8-K dated May 26, 2015, Plains later revised its total estimate *downward* by 4,000 gallons to 101,000 gallons.

9.      By the end of the Class Period, however, Plains disclosed that – contrary to its publicly reported "worst case scenario" – Plains had internally concluded that the spill could actually be 42,000 gallons greater – a more than 40% increase.  Plains also disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, that the Company could be liable for criminal violations of the Clean Water Act, and that the Company estimated it would cost millions to remediate the spill and satisfy potential criminal and civil penalties.

10.      In the wake of the disclosures revealing the true state of the Company's deficient pipeline maintenance and monitoring protocols, as well as the materialization of the risks those deficiencies caused and that were manifested in the Santa Barbara spill, Plains securities plunged in value, wiping out billions in market capitalization.  Specifically, Plains' Common Units lost over

- 4 -

nearly one-third of their value, Plains Holdings' Class A Shares have fallen over 15% since the IPO, and the senior notes have also declined substantially in value. Through this action, plaintiffs seek to recover the damages that plaintiffs and other Class members have suffered as a result of defendants' violations of the federal securities laws, and the resultant decline in the value of their investments in Plains and Plains Holdings.

## III.   JURISDICTION AND VENUE

11.    The claims asserted arise under §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, as well as §§11, 12 and 15 of the Securities Act. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa. Venue is proper pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Defendants have operations in this District and acts giving rise to the violations complained of herein, including the dissemination of materially false and misleading statements, occurred in this District.

12.    In connection with the acts alleged in this complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation, the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## IV.   PARTIES

### A.    Plaintiffs

13.    Lead plaintiff IAM National Pension Fund ("IAM") is a multi-employer defined benefit plan administered by a board of trustees that has provided retirement protection for members of the International Association of Machinists and Aerospace Workers and their families for over 50 years. IAM has approximately $10.9 billion in assets and pays pension benefits to over 90,000 retirees and beneficiaries. IAM purchased Plains and Plains Holdings securities on the open market

during the Class Period and was damaged as a result of defendants' wrongdoing as alleged in this complaint.

14.     Additional plaintiff City of Warren Police and Fire Retirement System ("Warren P&F") is a single employer, defined benefit governmental retirement system providing retirement, disability and death benefits to active and retired police officers and firefighters of the City of Warren, Michigan.  Warren P&F purchased 4.7% Plains notes in the April 2014 Notes Offerings as detailed in the attached certification and was damaged thereby.

15.     Additional plaintiff Ming Liu ("Liu") purchased Plains Holdings securities at artificially inflated prices during the Class Period, as described in the attached certification, and was damaged as a result of defendants' wrongdoing as alleged in the complaint.  Liu purchased Plains Holdings Class A Shares in the IPO as detailed in the attached certification and was damaged thereby.

16.     Additional plaintiff the Jacksonville Police and Fire Pension Fund ("Jacksonville P&F") is a single employer, defined benefit governmental retirement system providing retirement, disability and death benefits to active and retired police officers and firefighters of the Consolidated City of Jacksonville, Florida.  Jacksonville P&F purchased Plains and Plains Holdings securities at artificially inflated prices during the Class Period and was damaged as a result of defendants' wrongdoing as alleged in this complaint.  Specifically, Jacksonville P&F purchased Plains Holdings Class A Shares in both the IPO and the Plains Holdings Secondary Offering and was damaged thereby.

17.     Additional plaintiff the Police and Fire Retirement System of the City of Detroit ("Detroit P&F") is a single employer, defined benefit governmental retirement system providing retirement, disability and death benefits to active and retired police officers and firefighters of the City of Detroit, Michigan.  Detroit P&F purchased Plains and Plains Holdings securities at

- 6 -

artificially inflated prices during the Class Period and was damaged as a result of defendants' wrongdoing as alleged in this complaint. Specifically, Detroit P&F purchased Plains Holdings Class A Shares in the Plains Holdings Secondary Offering and Plains Common Units in the Plains Offering and was damaged thereby.

**B.    Entity Defendants**

18.    ***Plains All American Pipeline, L.P.***  Defendant Plains is a publicly traded Delaware master limited partnership (or "MLP"), involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities. Its principal executive offices are located at 333 Clay Street, Suite 1600, Houston, Texas. Plains has grown into one of North America's largest energy pipeline operators by acquiring significant pipelines and terminal systems in California, Texas and Canada, among other places. As of February 25, 2015, Plains owned 17,800 miles of crude oil and natural gas pipelines and gathering systems.

19.    Plains does not directly have officers, directors or employees. Instead, its operations and activities are managed by Plains All American GP LLC ("GP LLC"), which employs the officers, directors on the board of directors, managers, and employees (except for those in Canada). While GP LLC manages Plains' operations and activities, Plains Holdings "effectively controls [Plains'] business and affairs through the exercise of its rights as the sole and managing member of GP LLC, including its right to appoint certain members to the board of directors of GP LLC."

20.    Plains Common Units are traded on the New York Stock Exchange ("NYSE") under the symbol "PAA."

21.    ***Plains GP Holdings, L.P.***  Defendant Plains Holdings is a publicly traded Delaware limited partnership formed on July 17, 2013 to own an interest in PAA's general partner, GP LLC, and PAA's incentive distribution rights ("IDRs"). Its principal executive offices are located at 333 Clay Street, Suite 1600, Houston, Texas. Management of Plains Holdings is vested in PAA GP

- 7 -

Holdings, LLC.  However, its officers and personnel necessary to run the business are employed by GP LLC.  Plains Holdings has no board of directors, but its partnership agreement defines "Board of Directors" to mean the Board of Directors of Holdings LLC.

22.     GP LLC is managed by or under the direction of its board of directors, whose members are either designated by certain members of Holdings LLC or appointed by Plains Holdings, as the sole member of GP LLC acting through the Holdings LLC board of directors.

23.     Although Plains Holdings was formed as a limited partnership, it is taxed as a corporation for U.S. federal income taxes purposes.  For financial reporting purposes, Plains Holdings consolidates the financial results of Plains and its subsidiaries, as well as Plains AAP, L.P. ("AAP"), a Delaware limited partnership that directly owns all of Plains' IDRs and indirectly owns the 2% general partner interest in Plains.  Plains Holdings has no separate operating activities apart from those conducted by Plains and, therefore, its financial results, segment analysis, presentation and discussion as set forth in Plains Holdings' SEC filings is the same as that of Plains.  Since it has no separate operating activities, Plains Holdings' "primary business objective is to increase [its] cash available for distribution to [its] Class A shareholders through the execution by [Plains] of [Plains'] business strategy."

24.     Following its IPO in October 2013, Plains Holdings' Class A Shares trade on the NYSE under the symbol "PAGP."

25.     ***PAA Finance Corp.***  Defendant PAA Finance is a Delaware corporation formed in 2001 and wholly owned by Plains.  It was organized for the purpose of co-issuing Plains' debt securities.  Its principal executive offices are located at 333 Clay Street, Suite 1600, Houston, Texas. PAA Finance, together with Plains, filed the Plains Shelf and Plains Prospectus.  It is an "issuer" of the Notes Offerings.

- 8 -

26.     ***PAA GP Holdings LLC ("Holdings LLC")***.  Defendant Holdings LLC holds the general partner interest in Plains Holdings and thus conducts, directs and manages all activities of PAGP.  Its principal office is at 333 Clay Street, Suite 1600, Houston, Texas 77002.  Holdings LLC's board of directors consists of seven individuals, one of which is the CEO of Holdings LLC (*i.e.*, Armstrong).  Holdings LLC itself has no employees – all of its officers and other personnel necessary for its business to function are employed by GP LLC.

### C.     Officer Defendants

27.     ***Greg L. Armstrong ("Armstrong")***.  Defendant Armstrong is, and was at all relevant times, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of GP LLC, which, holding PAA's general partner interest, manages and operates PAA.  Armstrong is also, and was at all relevant times, Chairman, CEO and Director of PAA Finance and Holdings LLC, PAGP's general partner and thus the entity that conducts, directs and manages all of PAGP's activities.  Armstrong signed all of the Offering Materials and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.  Armstrong also signed the SEC filings that contained the false and misleading statements in §§VI. and VII., *infra*.  Moreover, Armstrong made false statements during investor conferences, as set forth in §§V.C., V.O., and VI.A., *infra*.

28.     ***Chris Herbold ("Herbold")***.  Defendant Herbold is, and was at all relevant times, Vice President-Accounting and Chief Accounting Officer of GP LLC, PAA Finance and Holdings LLC.  Herbold signed the Registration Statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.  Herbold also signed the SEC filings that contained the false and misleading statements in §§VI. and VII., *infra*.

29. ***Richard McGee ("McGee")***. Defendant McGee is, and was at all relevant times, Executive Vice President, General Counsel, and Secretary of GP LLC and Holdings LLC. McGee signed the SEC filings that contained the false and misleading statements in §§VI. and VII., *infra*.

30. ***Harry N. Pefanis ("Pefanis")***. Defendant Pefanis is, and was at all relevant times, President and Chief Operating Officer of GP LLC and Holdings LLC, as well as President of PAA Finance. Defendant Pefanis signed the Registration Statement for the Plains Holdings Secondary and the Notes Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Plains Holdings Secondary Offering Materials and the Notes Offerings Materials. Pefanis also signed all of PAA's and PAGP's Forms 10-K that contained the false and misleading statements in §§VI. and VII., *infra*. Pefanis attended and presented at investor conferences during which false statements were made, as set forth in §§V.C., V.O., and VI.A., *infra*, and is therefore liable for those false statements.

31. ***Al Swanson ("Swanson")***. Defendant Swanson is, and was at all relevant times, Executive Vice President and Chief Financial Officer of GP LLC, PAA Finance and Holdings LLC. Defendant Swanson signed the Registration Statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings. Swanson also signed the SEC filings that contained the false and misleading statements in §§VI. and VII., *infra*. Swanson attended and presented at investor conferences during which false statements were made, as set forth in ¶¶§§V.C., V.O., and VI.A., *infra*, and is therefore liable for those statements.

32. Defendants Armstrong, Herbold, McGee, Pefanis and Swanson, are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their executive positions at GP LLC, Holdings LLC and PAA Finance, possessed the power and authority to control the contents of PAA's, PAGP's, and PAA Finance's reports to the SEC, press releases and

- 10 -

presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of PAA's and PAGP's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### D. Director Defendants

33.     *Victor Burk ("Burk")*.  Defendant Burk is, and was at all relevant times, a Director of GP LLC and Holdings LLC.  Burk signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

34.     *Everardo Goyanes ("Goyanes")*.  Defendant Goyanes is, and was at all relevant times, a Director of GP LLC and Holdings LLC.  On each board, Goyanes served as the chairman of the audit committee during the Class Period.  Defendant Goyanes was named in the IPO Registration Statement, with his consent, as being or about to become a director.  Goyanes signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

35.     *Gary R. Petersen ("Petersen")*.  Defendant Petersen is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Petersen served as member of the compensation and governance committees during the Class Period.  Petersen signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

36.     *John T. Raymond ("Raymond")*.  Defendant Raymond is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Raymond is also, and was as at all

- 11 -

relevant times, a Director of Holdings LLC, PAGP's general partner and the entity whose corporate governance is in effect PAGP's corporate governance.  Raymond signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

37.     **Bobby S. Shackouls ("Shackouls")**.  Defendant Shackouls became in January 2014 a Director of Holdings LLC, PAGP's general partner and the entity whose corporate governance is in effect PAGP's corporate governance.  Shackouls signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

38.     **Robert V. Sinnott ("Sinnott")**.  Defendant Sinnott is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Sinnott also became in October 2013 a Director of Holdings LLC, PAGP's general partner and the entity whose corporate governance is in effect PAGP's corporate governance.  Sinnott signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

39.     **Vicky Sutil ("Sutil")**.  Until her departure from both boards in January 2015, Defendant Sutil was at all relevant times, a Director of GP LLC, which manages and operates PAA, and from October 2013 through January 2015, a Director of Holdings LLC, PAGP's general partner and the entity whose corporate governance is in effect PAGP's corporate governance.  Defendant Sutil was named in the IPO Registration statement, with her consent, as being or about to become a director.  Sutil signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

40.     **J. Taft Symonds ("Symonds")**.  Defendant Symonds is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Symonds served as member of the audit

and governance committees during the Class Period.  Symonds signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

41.     ***Christopher M. Temple ("Temple")***.  Defendant Temple is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Temple served as member of the audit and governance committees during the Class Period.  Temple signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

### E.     Underwriter Defendants

42.     ***Barclays Capital Inc. ("Barclays")***.  Defendant Barclays was an underwriter of the IPO, the Plains Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the Plains Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, Barclays was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Offering Materials, the September 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

43.     ***BB&T Capital Markets, a division of BB&T Securities, LLC. ("BB&T")***.  Defendant BB&T was an underwriter of the IPO and the August 2013 Notes Offering, as specified herein.  As an underwriter of the IPO and the August 2013 Notes Offering, BB&T was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the August 2013 Notes Offering Materials.

44.     ***BBVA Securities Inc. ("BBVA")***.  Defendant BBVA was an underwriter of the IPO and all of the Notes Offerings, as specified herein.  As an underwriter of the IPO and all of the Notes Offerings, BBVA was responsible for ensuring the truthfulness and accuracy of the various

statements contained in or incorporated by reference into the IPO Offering Materials and the Notes Offerings Materials.

45.    **BMO Capital Markets Corp. ("BMO")**.  Defendant BMO was an underwriter of the August 2013 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the August 2013 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, BMO was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the August 2013 Notes Offering Materials, the September 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

46.    **BNP Paribas Securities Corp. ("BNP Paribas")**.  Defendant BNP Paribas was an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, BNP Paribas was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, and the September 2014 Notes Offering Materials.

47.    **CIBC World Markets Corp. ("CIBC")**.  Defendant CIBC was an underwriter of the IPO and all of the Notes Offerings, as specified herein.  As an underwriter of the IPO and all of the Notes Offerings, CIBC was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Notes Offerings Materials.

48.    **Citigroup Global Markets Inc. ("Citigroup")**.  Defendant Citigroup was an underwriter of the IPO, the Plains Holdings Secondary Offering, and the April 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, and the April 2014 Notes Offering, Citigroup was responsible for ensuring the truthfulness and accuracy of

- 14 -

the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, and the April 2014 Notes Offering Materials.

49.     ***Deutsche Bank Securities Inc. ("Deutsche Bank")***.  Defendant Deutsche Bank was an underwriter of the IPO and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO and the December 2014 Notes Offerings, Deutsche Bank was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the December 2014 Notes Offering Materials.

50.     ***DNB Markets, Inc. ("DNB")***.  Defendant DNB was an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, DNB was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, and the September 2014 Notes Offering Materials.

51.     ***Fifth Third Securities, Inc. ("Fifth Third")***.  Defendant Fifth Third was an underwriter of all of the Notes Offerings, as specified herein.  As an underwriter of all of the Notes Offerings, Fifth Third was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the Notes Offerings Materials.

52.     ***Goldman, Sachs & Co. ("Goldman Sachs")***.  Defendant Goldman Sachs was an underwriter of the IPO and the Plains Holdings Secondary Offering, as specified herein.  As an underwriter of the IPO and the Plains Holdings Secondary Offering, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Plains Holdings Secondary Offering Materials.

53.     ***ING Bank N.V. ("ING Bank")***.  Defendant ING Bank was an underwriter of the April 2014 Notes Offering and the December 2014 Notes Offerings, as specified herein.  As an

underwriter of the April 2014 Notes Offering and the December 2014 Notes Offerings, ING Bank was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the April 2014 Notes Offering Materials and the December 2014 Notes Offering Materials.

54.    ***ING Financial Markets LLC ("ING Financial")***.  Defendant ING Financial was an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, ING Financial was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, and the September 2014 Notes Offering Materials.

55.    ***J.P. Morgan Securities LLC ("J.P. Morgan")***.  Defendant J.P. Morgan was an underwriter of the IPO, the Plains Holdings Secondary 2014 Offering, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, the August 2013 Notes Offering, and the September 2014 Notes Offering, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, the August 2013 Notes Offering Materials, and September 2014 Notes Offering Materials.

56.    ***Ladenburg Thalmann & Co. Inc. ("Ladenburg")***.  Defendant Ladenburg was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Ladenburg was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

57.    ***Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch")***.  Defendant Merrill Lynch was an underwriter of the IPO, the Plains Holdings Secondary Offering, the August

2013 Notes Offering, and the September 2014 Notes Offering, as specified herein. As an underwriter of the IPO, the Plains Holdings Secondary Offering, the August 2013 Notes Offering, and the September 2014 Notes Offering, Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, the August 2013 Notes Offering Materials, and September 2014 Notes Offering Materials.

58.     *Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi")*. Defendant Mitsubishi was an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein. As an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, Mitsubishi was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, the April 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

59.     *Mizuho Securities USA Inc. ("Mizuho")*. Defendant Mizuho was an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein. As an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, Mizuho was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, and the September 2014 Notes Offering Materials.

60.     *Morgan Stanley & Co. LLC ("Morgan Stanley")*. Defendant Morgan Stanley was an underwriter of the IPO and the Plains Holdings Secondary Offering, as specified herein. As an underwriter of the IPO and the Plains Holdings Secondary Offering, Morgan Stanley was

responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Plains Holdings Secondary Offering Materials.

61. ***Oppenheimer & Co. Inc. ("Oppenheimer")***. Defendant Oppenheimer was an underwriter of the IPO, as specified herein. As an underwriter of the IPO, Oppenheimer was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

62. ***Piper Jaffray & Co. ("Piper Jaffray")***. Defendant Piper Jaffray was an underwriter of the IPO, as specified herein. As an underwriter of the IPO, Piper Jaffray was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

63. ***PNC Capital Markets LLC ("PNC")***. Defendant PNC was an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein. As an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, PNC was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, the April 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

64. ***Raymond James & Associates, Inc. ("Raymond James")***. Defendant Raymond James was an underwriter of the IPO and the Plains Holdings Secondary Offering, as specified herein. As an underwriter of the IPO and the Plains Holdings Secondary Offering, Raymond James was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Plains Holdings Secondary Offering Materials.

- 18 -

65.     ***RBC Capital Markets, LLC ("RBC")***.  Defendant RBC was an underwriter of the IPO, the August 2013 Notes Offering and the December 2014 Notes Offerings, as specified herein. As an underwriter of the IPO, the August 2013 Notes Offering and the December 2014 Notes Offerings, RBC was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials and the December 2014 Notes Offering Materials.

66.     ***Regions Securities LLC ("Regions")***.  Defendant Regions was an underwriter of the IPO and all of the Notes Offerings, as specified herein.  As an underwriter of the IPO and all of the Notes Offerings, Regions was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Notes Offerings Materials.

67.     ***Robert W. Baird & Co. Incorporated ("Robert Baird")***.  Defendant Robert Baird was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Robert Baird was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

68.     ***Scotia Capital (USA) Inc. ("Scotia")***.  Defendant Scotia was an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, Scotia was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, the April 2014 Notes Offering Materials, and the December 2014 Notes Offerings Materials.

69.     ***SG Americas Securities, LLC ("SG Americas")***.  Defendant SG Americas was an underwriter of the IPO, the August 2013 Notes Offering, the September 2014 Notes Offering, and

the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the August

2013 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings,

SG Americas was responsible for ensuring the truthfulness and accuracy of the statements contained

in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering

Materials, the September 2014 Notes Offering Materials, and the December 2014 Notes Offering

Materials.

      70.    ***Simmons & Company International ("Simmons")***.  Defendant Simmons was an

underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Simmons was responsible

for ensuring the truthfulness and accuracy of the statements contained in or incorporated by

reference into the IPO Offering Materials.

      71.    ***SMBC Nikko Securities America, Inc. ("SMBC")***.  Defendant SMBC was an

underwriter of the IPO and all of the Notes Offerings, as specified herein.  As an underwriter of the

IPO and all of the Notes Offerings, SMBC was responsible for ensuring the truthfulness and

accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials

and the Notes Offerings Materials.

      72.    ***Stephens Inc. ("Stephens")***.  Defendant Stephens was an underwriter of the IPO, as

specified herein.  As an underwriter of the IPO, Stephens was responsible for ensuring the

truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO

Offering Materials.

      73.    ***Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus")***.  Defendant Stifel

Nicolaus was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Stifel

Nicolaus was responsible for ensuring the truthfulness and accuracy of the statements contained in or

incorporated by reference into the IPO Offering Materials.

74.     *SunTrust Robinson Humphrey ("SunTrust")*.   Defendant SunTrust was an underwriter of the IPO, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the April 2014 Notes Offering, and the December 2014 Notes Offerings, SunTrust was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the April 2014 Notes Offering Materials and the December 2014 Notes Offering Materials.

75.     *Tudor, Pickering, Holt & Co. Securities, Inc. ("Tudor")*.   Defendant Tudor was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Tudor was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

76.     *UBS Securities LLC ("UBS")*.   Defendant UBS was an underwriter of the IPO, the Plains Holdings Secondary Offering, and the April 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, and the April 2014 Notes Offering, UBS was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, and the April 2014 Notes Offering Materials.

77.     *U.S. Bancorp Investments, Inc. ("U.S. Bancorp")*.   Defendant U.S. Bancorp was an underwriter of all of the Notes Offerings, as specified herein.  As an underwriter of all of the Notes Offerings, U.S. Bancorp was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the Notes Offerings Materials.

78.     *USCA Securities LLC ("USCA")*.   Defendant USCA was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, USCA was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

79.    ***Wells Fargo Securities LLC ("Wells Fargo")***.  Defendant Wells Fargo was an underwriter of the IPO, the Plains Holding Secondary Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, the April 2014 Notes Offering, and the December 2014 Notes Offering, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, the April 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

80.    Barclays, BB&T, BBVA, BMO, BNP Paribas, CIBC, Citigroup, Deutsche Bank, DNB, Fifth Third, ING Bank, ING Financial, J.P. Morgan, Merrill Lynch, Mitsubishi, Mizuho, PNC, RBC, Regions, Scotia, SG Americas, SMBC, SunTrust, U.S. Bancorp, UBS, and Wells Fargo are collectively referred to herein as the "Notes Underwriter Defendants."  The Notes Underwriter Defendants sold and distributed the senior notes in the Notes Offerings.  The extent of the Notes Underwriter Defendants' participation in the Notes Offerings and the fees earned are as follows:

| Underwriter Defendant | August 2013 Notes Offering | April 2014 Notes Offering | September 2014 Notes Offering | December 2014 Notes Offerings (4.9% due 2045) | December 2014 Notes Offerings (2.6% due 2019) | Total | Fees |
|---|---|---|---|---|---|---|---|
| Barclays | | | 112,500,000 | 104,000,000 | 80,000,000 | 296,500,000 | $2,121,250 |
| SunTrust | | 105,000,000 | | 104,000,000 | 80,000,000 | 289,000,000 | $2,308,750 |
| Wells Fargo | | 105,000,000 | | 104,000,000 | 80,000,000 | 289,000,000 | $2,308,750 |
| J.P. Morgan | 136,500,000 | | 112,500,000 | | | 249,000,000 | $1,618,500 |
| Merrill Lynch | 136,500,000 | | 112,500,000 | | | 249,000,000 | $1,618,500 |
| BBVA | 21,000,000 | 28,000,000 | 37,500,000 | 52,000,000 | 40,000,000 | 178,500,000 | $1,320,250 |
| SMBC | 21,000,000 | 28,000,000 | 37,500,000 | 52,000,000 | 40,000,000 | 178,500,000 | $1,320,250 |
| Mitsubishi | 28,000,000 | 70,000,000 | | 26,000,000 | 20,000,000 | 144,000,000 | $1,142,000 |
| Scotia | 28,000,000 | 70,000,000 | | 26,000,000 | 20,000,000 | 144,000,000 | $1,142,000 |
| BNP Paribas | 21,000,000 | | 112,500,000 | | | 133,500,000 | $867,750 |
| DNB | 73,500,000 | | 60,000,000 | | | 133,500,000 | $867,750 |
| Mizuho | 73,500,000 | | 60,000,000 | | | 133,500,000 | $867,750 |
| RBC | 21,000,000 | | | 52,000,000 | 40,000,000 | 113,000,000 | $831,500 |
| Citigroup | | 105,000,000 | | | | 105,000,000 | $918,750 |
| UBS | | 105,000,000 | | | | 105,000,000 | $918,750 |
| CIBC | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| Fifth Third | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| Regions | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| SG Americas | 28,000,000 | | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $453,250 |

| Underwriter Defendant | August 2013 Notes Offering | April 2014 Notes Offering | September 2014 Notes Offering | December 2014 Notes Offerings (4.9% due 2045) | December 2014 Notes Offerings (2.6% due 2019) | Total | Fees |
|---|---|---|---|---|---|---|---|
| U.S. Bancorp | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| BMO | 14,000,000 | | 15,000,000 | 13,000,000 | 10,000,000 | 52,000,000 | $362,250 |
| PNC | 14,000,000 | 14,000,000 | | 13,000,000 | 10,000,000 | 51,000,000 | $387,250 |
| Deutsche Bank | | | | 26,000,000 | 20,000,000 | 46,000,000 | $347,500 |
| ING Bank | | 14,000,000 | | 13,000,000 | 10,000,000 | 37,000,000 | $296,250 |
| ING Financial | 14,000,000 | | 15,000,000 | | | 29,000,000 | $188,500 |
| BB&T | 14,000,000 | | | | | 14,000,000 | $91,000 |
| **Total** | **700,000,000** | **700,000,000** | **750,000,000** | **650,000,000** | **500,000,000** | **3,300,000,000** | **$24,237,500** |

81.     Barclays, Goldman Sachs, J.P. Morgan, Citigroup, Merrill Lynch, UBS, Wells Fargo, Deutsche Bank, Morgan Stanley, Raymond James, RBC, Oppenheimer, Robert Baird, Stifel Nicolaus, USCA, Mitsubishi, BBVA, BNP Paribas, DNB, ING Financial, Mizuho, Piper Jaffray, PNC, Scotia, SG Americas, SMBC, SunTrust, BB&T, CIBC, Ladenburg, Regions, Simmons, Stephens, and Tudor are collectively referred to herein as the "IPO Underwriter Defendants." The IPO Underwriter Defendants sold and distributed the securities in the IPO. The extent of the IPO Underwriter Defendants' participation in the IPO and the fees earned are as follows:

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---|---|---|
| Barclays | 24,000,000 | $528,000,000 | $15,840,000 |
| Goldman Sachs | 21,653,333 | $476,373,326 | $14,291,200 |
| J.P. Morgan | 21,653,333 | $476,373,326 | $14,291,200 |
| Citigroup | 10,373,333 | $228,213,326 | $6,846,400 |
| Merrill Lynch | 9,093,333 | $200,053,326 | $6,001,600 |
| UBS | 9,093,333 | $200,053,326 | $6,001,600 |
| Wells Fargo | 9,093,333 | $200,053,326 | $6,001,600 |
| Deutsche Bank | 2,346,667 | $51,626,674 | $1,548,800 |
| Morgan Stanley | 2,346,667 | $51,626,674 | $1,548,800 |
| Raymond James | 2,346,667 | $51,626,674 | $1,548,800 |
| RBC | 2,346,667 | $51,626,674 | $1,548,800 |
| Oppenheimer | 1,173,333 | $25,813,326 | $774,400 |
| Robert Baird | 1,173,333 | $25,813,326 | $774,400 |
| Stifel Nicolaus | 1,173,333 | $25,813,326 | $774,400 |
| USCA | 826,667 | $18,186,674 | $545,600 |
| Mitsubishi | 800,000 | $17,600,000 | $528,000 |
| BBVA | 586,667 | $12,906,674 | $387,200 |

- 23 -

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---|---|---|
| BNP Paribas | 586,667 | $12,906,674 | $387,200 |
| DNB | 586,667 | $12,906,674 | $387,200 |
| ING Financial | 586,667 | $12,906,674 | $387,200 |
| Mizuho | 586,667 | $12,906,674 | $387,200 |
| Piper Jaffray | 586,667 | $12,906,674 | $387,200 |
| PNC | 586,667 | $12,906,674 | $387,200 |
| Scotia | 586,667 | $12,906,674 | $387,200 |
| SG Americas | 586,667 | $12,906,674 | $387,200 |
| SMBC | 586,667 | $12,906,674 | $387,200 |
| SunTrust | 586,667 | $12,906,674 | $387,200 |
| BB&T | 293,333 | $6,453,326 | $193,600 |
| CIBC | 293,333 | $6,453,326 | $193,600 |
| Ladenburg | 293,333 | $6,453,326 | $193,600 |
| Regions | 293,333 | $6,453,326 | $193,600 |
| Simmons | 293,333 | $6,453,326 | $193,600 |
| Stephens | 293,333 | $6,453,326 | $193,600 |
| Tudor | 293,333 | $6,453,326 | $193,600 |
| To be determined[1] | 4,380,000 | $96,360,000 | $2,890,800 |
| **Total** | **132,380,000** | **$2,912,360,000** | **$87,370,800** |

82.    Citigroup, J.P. Morgan, Goldman Sachs, Merrill Lynch, Morgan Stanley, Raymond James, UBS, and Wells Fargo are collectively referred to herein as the "Plains Holdings Secondary Offering Underwriter Defendants."   The Plains Holdings Secondary Offering Underwriter Defendants sold and distributed the securities in the Plains Holdings Secondary Offering.  The extent of the Plains Holdings Secondary Offering Underwriter Defendants' participation in the Plains Holdings Secondary Offering and the fees earned are as follows:

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---|---|---|
| Citigroup | 15,000,000 | $375,000,000 | $8,437,500 |
| J.P. Morgan | 15,000,000 | $375,000,000 | $8,437,500 |
| Goldman Sachs | 7,500,000 | $187,500,000 | $4,218,750 |
| Merrill Lynch | 7,500,000 | $187,500,000 | $4,218,750 |

---

[1]   The IPO Underwriter Defendants had an option to purchase, severally, additional Plains Holdings' Class A Shares from Plains Holdings for distribution to investors on or before the 30th day after the date of the IPO Prospectus.  The identities of the IPO Underwriter Defendants that exercised the option to purchase will be determined in discovery.

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---:|---:|---:|
| Morgan Stanley | 7,500,000 | $187,500,000 | $4,218,750 |
| Raymond James | 2,500,000 | $62,500,000 | $1,406,250 |
| UBS | 2,500,000 | $62,500,000 | $1,406,250 |
| Wells Fargo | 2,500,000 | $62,500,000 | $1,406,250 |
| To be determined[2] | 9,000,000 | $225,000,000 | $5,062,500 |
| **Total** | **69,000,000** | **$1,725,000,000** | **$38,812,500** |

83.   Barclays sold and distribute all of the securities in the Plains Offering.  Barclays'

distribution amount and fees earned are as follow:

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---:|---:|---:|
| Barclays | 21,000,000 | $1,050,000,000 | $8,610,000 |

84.   In aggregate, the Underwriter Defendants received $159,030,800 in fees from the

Offerings:

| Underwriter Defendant | Fees |
|---|---:|
| Barclays | $26,571,250 |
| J.P. Morgan | $24,347,200 |
| Goldman Sachs | $18,509,950 |
| Citigroup | $16,202,650 |
| Merrill Lynch | $11,838,850 |
| Wells Fargo | $9,716,600 |
| UBS | $8,326,600 |
| Morgan Stanley | $5,767,550 |
| Raymond James | $2,955,050 |
| SunTrust | $2,695,950 |
| RBC | $2,380,300 |
| Deutsche Bank | $1,896,300 |
| BBVA | $1,707,450 |
| SMBC | $1,707,450 |
| Mitsubishi | $1,670,000 |
| Scotia | $1,529,200 |

---

[2]   The Plains Holdings Secondary Offering Underwriter Defendants had an option to purchase, severally, additional Plains Holdings' Class A Shares from Plains Holdings for distribution to investors on or before the 30th day after the date of the Plains Holdings Secondary Offering Prospectus.  The identities of the Plains Holdings Secondary Offering Underwriter Defendants that exercised the option to purchase will be determined in discovery.

| Underwriter Defendant | Fees |
|---|---|
| BNP Paribas | $1,254,950 |
| DNB | $1,254,950 |
| Mizuho | $1,254,950 |
| SG Americas | $840,450 |
| PNC | $774,450 |
| Oppenheimer | $774,400 |
| Robert Baird | $774,400 |
| Stifel Nicolaus | $774,400 |
| CIBC | $678,350 |
| Regions | $678,350 |
| ING Financial | $575,700 |
| USCA | $545,600 |
| Fifth Third | $484,750 |
| U.S. Bancorp | $484,750 |
| Piper Jaffray | $387,200 |
| BMO | $362,250 |
| ING Bank | $296,250 |
| BB&T | $284,600 |
| Ladenburg | $193,600 |
| Simmons | $193,600 |
| Stephens | $193,600 |
| Tudor | $193,600 |
| To be determined | $7,953,300 |
| **Total** | **$159,030,800** |

## V.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    Plains' Relevant Operations and Applicable Legal Requirements

85.    Plains is a publicly traded MLP, involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities.  Prior to and during the Class Period, Plains grew into one of North America's largest energy pipeline operators.  That growth was achieved primarily through an acquisition binge during which Plains acquired significant pipelines and terminal systems – many of them aging and in need of crucial maintenance – in California, Texas and Canada, among other places.  Taking control of a vast network of pipelines placed significant obligations on the Company to ensure the integrity of those networks.

- 26 -

86.     Among Plains' acquisitions were Lines 901 and 903, which make up the All American Pipeline, built in 1987 and acquired by Plains in 1998.  Line 901 extends approximately 10.6 miles from Exxon's onshore facilities at Las Flores, California on the California coast to Chevron's onshore facilities at Gaviota, California (a 24-inch diameter pipe) where it connects with Line 903 (a 30-inch diameter pipe) that continues from Gaviota approximately 128 miles through Santa Barbara County, California and into Kern County, California.  When the line was acquired, Plains stated in its Form 10-K for 1998:

> *The Partnership performs scheduled maintenance on the pipeline and makes repairs and replacements when necessary or appropriate*.  As one of the most recently constructed major crude oil pipeline systems in the United States, the All American Pipeline requires a relatively low level of maintenance capital expenditures.  The Partnership attempts to control corrosion of the pipeline through the use of corrosion inhibiting chemicals injected into the crude stream, external pipe coatings and an anode bed based cathodic protection system.  *The Partnership monitors the structural integrity of the Plains All American Pipeline through a program of periodic internal inspections using electronic "smart pig" instruments*.  The Partnership conducts a weekly aerial surveillance of the entire pipeline and right-of-way to monitor activities or encroachments on rights-of-way.  Maintenance facilities containing equipment for pipe repair, digging and light equipment maintenance are strategically located along the pipeline.  *The Partnership believes that the All American Pipeline has been constructed and is maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards prescribed by the American Petroleum Institute and accepted industry standards of practice*.

87.     During the Class Period, the majority of Plains' pipelines, including Lines 901 and 903, were subject to the jurisdiction of PHMSA, which enforces regulations promulgated under the Hazardous Liquids Pipeline Safety Act of 1979 ("Pipeline Safety Act" or the "HLPSA").  Under the HLPSA, Plains was required to adopt measures to reduce the environmental impact of oil spills.  In particular, the HLPSA imposes safety requirements on petroleum pipeline operators, like defendants, related to the "design, installation, testing, construction, operation, replacement and management of pipeline and tank facilities."  Further, federal regulations enacted pursuant to the HLPSA required defendants "to adopt measures designed to reduce the environmental impact of oil discharges from

- 27 -

onshore oil pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel."

88.     Amendments to the HLPSA in 2002 and 2006 required Plains "to implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways."  In such "high consequence areas," or HCAs, Plains recognized that "a pipeline leak or rupture could produce significant adverse consequences."  Accordingly, PHMSA regulations pursuant to the HLPSA required Plains to implement enhanced measures in HCAs, such as to: conduct assessments of internal and external corrosion; establish an integrity management program that provides for "[a] continual process of assessment and evaluation to maintain a pipeline's integrity"; implement "preventive and mitigative measures to protect the high consequence area," including monitoring cathodic protection to control corrosion, establish shorter inspection intervals, and modify systems monitoring pressure and leaks; "take prompt action to address all anomalous conditions" discovered through an integrity assessment; and consider installation of Emergency Flow Restricting Devices to protect an HCA in the event of a hazardous liquid pipeline release.  Because Lines 901 and 903 were in an HCA – due to their proximity to the pristine and environmentally sensitive Santa Barbara coastline, rivers, state parks, and national forest – they were at all relevant times subject to PHMSA's enhanced HCA requirements.

89.     Plains was also subject to the Federal Water Pollution Control Act, as amended, also known as the Clean Water Act ("CWA"), which imposes restrictions and strict controls regarding the discharge of pollutants, such as crude oil, into navigable waters of the United States and Canada, as well as state waters.  Under the CWA, federal and state regulatory agencies can impose administrative, civil and/or criminal penalties for non-compliance with discharge permits or other

- 28 -

requirements of the CWA.  Moreover, the Oil Pollution Act ("OPA") amended certain provisions of

the CWA related to petroleum product spills into navigable waters.  The OPA makes owners of

pipeline facilities subject to strict, joint and potentially unlimited liability for containment and

removal costs, natural resource damages, and certain other consequences of an oil spill.  Under the

OPA, 49 C.F.R. Part 195 regulates oil spill response plans for onshore pipelines, such as Lines 901

and 903.  Such response plans require "[i]mmediate notification procedures" and "[s]pill detection

and mitigation procedures."

90.     Plains was further subject to EPA Risk Management Plan regulations.  Under EPA

regulations, Plains was required to develop and implement a plan to help emergency response

personnel prepare for and respond to chemical emergencies.  The plan includes "a five-year accident

history, an offsite consequence analysis process, a prevention program and an emergency response

program."

91.     As described herein, defendants stated falsely throughout the Class Period that the

Company was in compliance with these laws and regulations.  Indeed, defendants even misleadingly

promised investors that Plains had implemented pipeline maintenance and integrity measures that

went "***beyond regulatory mandate***."

B.     **Plains' Pre-Class Period Maintenance and Safety Deficiencies
        Resulted in a Consent Decree with the EPA**

92.     During the Class Period, a series of oil spills had rendered Plains one of if not the

worst safety and environmental-regulation violators in the pipeline business.  Plains was therefore

attempting to rehabilitate its public image to portray itself as a safe and responsible pipeline operator

in the wake of a series of oil spills, rendering the Company one of if not the worst safety and

environmental-regulation violators in the pipeline business.  Before and during the Class Period,

Plains and its related companies reported to federal regulators 229 safety and maintenance incidents

on pipelines.  In fact, among more than 1,700 operators included in a PHMSA-maintained database

- 29 -

tracking incidents from 2006 to 2015, only three operators reported more incidents than Plains.  The Company's reported infractions involved pipeline corrosion, pump failure, equipment malfunction, excavation damage and operator error, resulting in more than $141 million in property damage and the release of more than 802,000 gallons of hazardous liquid.

93.     As a result of the Company's pre-Class Period violations, in 2010, the EPA sued Plains for a series of spills in Texas, Louisiana, Oklahoma and Kansas that resulted in the discharge of 273,420 gallons of crude oil.  These spills included, among others, a spill in West Texas in which 189,000 gallons of oil was discharged, which wound up polluting the nearby Pecos River, as well as a second spill in East Texas that resulted in the release of approximately 50,000 gallons of oil.

94.     Just weeks after the EPA filed suit, the Company entered into a Consent Decree with the EPA under which the Company agreed to pay significant fines and adopt new safety measures (the "Consent Decree" or "2010 Consent Decree").  Specifically, under the 2010 Consent Decree, Plains was required to pay $3.25 million in fines and to spend $41 million to upgrade more than 10,000 miles of pipeline.  The 2010 Consent Decree also required, among other things, that Plains conduct weekly aerial patrols of certain of its pipelines to check for leaks and spend millions of dollars on efforts to mitigate threats posed by corrosion, install computational pipeline monitoring capabilities, ensure ongoing monitoring for 110 segments of pipeline, including Lines 901 and 903, and provide semi-annual updates to the EPA regarding its compliance with the Consent Decree.

95.     The 2010 Consent Order specifically required Plains to maintain leak detection protocols for Lines 901 and 903 that complied with API 1130 for as long as the pipeline remained in service.  API 1130 required, among other things, that Plains implement and maintain a leak detection system using computerized algorithmic measuring systems that should have quickly and effectively detected integrity defects and potential leaks.

- 30 -

96.     During the Class Period, defendants represented repeatedly that the Company continued to comply with the 2010 Consent Decree.

97.     These representations were false.  Despite federal mandate, and although Line 901 was expressly covered by the Consent Decree, CEO Armstrong would later confirm in response to a joint U.S. House and Senate investigation of the Santa Barbara spill that ***none*** of the $41 million in maintenance funds included in the 2010 Consent Decree were spent on upgrades, repairs, or maintenance to Line 901.

**C.     Plains Created a New Corporate Image to Lure Investors by Purporting to Implement Enhanced Safety and Maintenance Initiatives**

98.     In the wake of Plains' numerous prior violations and the Consent Decree, Plains executives made a concerted effort to assure investors that Plains had adopted enhanced measures to ensure the integrity of its pipelines, and that, as a result, spill incidents – and the risk of future incidents – had reduced significantly.  For example, in the Company's Form 10-K for the year ended December 31, 2012, filed with the SEC on February 27, 2013 – the first day of the Class Period – defendants pointed to the measures the Company had taken as part of the 2010 Consent Decree, and reassured investors that "pipeline integrity management" was its "***primary operational emphasis***," and that the Company had "***implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention***."   The Company further represented that its "pipelines are in ***substantial compliance*** with [applicable regulations]" and that the Company's "integrity management program" included measures that went well beyond those legal requirements, with "several internal programs designed to prevent incidents and . . . activities such as automating valves and replacing river crossings."

99.     During the Class Period, CEO Armstrong led the effort to convince the market that Plains' maintenance and corrosion control problems were in the past, that Plains went above and beyond applicable regulations when it came to safety and maintenance, that the risk of a catastrophic spill was extremely low, and that the Company was well prepared should a spill occur.  For example, Armstrong dedicated large portions of a June 5, 2014 Investor Day conference to convincing investors that at Plains "*Safety is a core value*" and that Plains "*foster[s] a culture that emphasizes operational excellence, asset integrity & safety*."  In his presentation, the top three items Armstrong highlighted as demonstrating Plains' "Commitment to Operational Excellence" were "*Safety*," "*Pipeline Integrity Management*," and "*Incident Response Preparation*."  Armstrong assured investors that "[w]e are committed to operational excellence in safety, pipeline integrity management, and responding to incidents in the unfortunate development that they do occur."  Armstrong was emphatic: "we do a lot and I mean a tremendous amount that will never be appreciated by the public" when it comes to safety and spill prevention.  These and similar false and misleading representations repeated throughout the Class Period lured the members of the Class, who invested in Plains and Plains Holdings securities in reliance on public representations, that the Company had prioritized accident prevention while at the same time managing to meet or beat EBITDA guidance to Wall Street for 53 consecutive quarters.

100.    Plains also assured investors that the Officer Defendants were directly involved in and responsible for the Company's safety, pipeline integrity management and incident response preparation.  For example, defendants stated on their website during the Class Period that the Company's Environmental, Health and Safety program "is successful because it is *developed, supported and carried out by our employees, from the senior management team down to the newest hire*."  The Company's website also represented that "Plains All American is committed to public safety, protection of the environment and operation of our facilities in a prudent and safe

manner" and that defendants "believe that all of our pipelines have been constructed and maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards proscribed by the American Petroleum Institute and accepted industry practice."

101.    The Company further reassured investors during the Class Period that it had "devote[d] substantial resources to comply with [government]-mandated pipeline integrity rules," including "requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas'" – such as the Santa Barbara coastline abutting Line 901 and the state parks, national forest and rivers traversing Line 903 – "where a pipeline leak or rupture could produce significant adverse consequences." According to Plains, the Company had "developed and implemented certain pipeline integrity measures that go beyond [its] regulatory mandate."

102.    In fact, the enhanced safety protocols Plains purportedly instituted in Santa Barbara were illusory – nothing more than false promises used by defendants to cover up the fact that Plains had severely disregarded its pipeline integrity and maintenance obligations and that it was continuing to operate pipelines, like Lines 901 and 903, that should have been taken out of operation. Indeed, PHMSA warned Plains after conducting inspections in August, September, and October 2013 that it had committed "probable violations" of the pipeline safety regulations governing "pipeline integrity in high consequence areas" through which Lines 901 and 903 ran. Among other things, PHMSA found that Plains failed to take additional preventative and mitigative measures in HCAs without any evidence of its justification for its failure to implement the required measures. *See also* §V.L., *infra*.

103.    Defendants also falsely represented that Plains was well positioned to minimize the impact of spills, assuring investors that in the event any leak was detected, Plains' response would be "immediate," well-coordinated with public officials, and comprehensive so as to minimize any

environmental impact.  In reality, Plains' response plans were either slipshod or nonexistent, and, with respect to Lines 901 and 903, violated PHMSA regulations.  *See also* §V.M., *infra*.

### D.    The Spill

104.    On May 19, 2015, Line 901 ruptured, triggering what would become the worst California oil spill in 25 years – a spill that wrought devastation spanning several miles of some of the most environmentally sensitive and protected coastline in North America.

105.    The breach in Line 901 developed on the north side of the Pacific Coast Highway and U.S. Highway 101.  Photographic evidence indicates the oil from the breached pipeline first collected in a depression in the ground surface surrounding the location of the pipeline breach.  The oil flowed southward along a surface drainage "gully" that followed the route of the buried pipeline and paralleled the highways.  The oil then flowed west through drainage culverts that passed under the highways to Refugio State Beach, where the oil entered the Pacific Ocean.

106.    The Pacific Ocean tides, waves, and currents then spread the oil to the surrounding beaches and adjacent areas of public and environmental sensitivity including Bell Canyon, Tecolote Canyon, the City of Gaviota, and Coal Oil Point Reserve.  As a result of the spill, wildlife officials reported that nearly 200 birds and more than 100 marine mammals, including dolphins and sea lions, were found dead in the spill area.  As Armstrong conceded during an Investor Day Conference held shortly after the spill, "[i]f you could pick any place in the world you would not want to have a release, [Santa Barbara] would probably qualify as the one."

107.    California state, local and federal agencies responded to the scene, including the U.S. Coast Guard, U.S. EPA, California County Office of Emergency Service, and local fire departments. Plains and ExxonMobil personnel and contracted private oil spill response organizations also responded and initiated oil spill clean-up operations.

- 34 -

108.    Contrary to the Company's representations to investors and regulators, Plains was wholly unprepared for the spill once it occurred.  For example, state law required the Company to report the spill to the federal National Response Center within 30 minutes of detection – and the Company's own plans indicated that it should take no more than 15 minutes to discover a release and shut down the flow and required such notification "at the earliest practicable moment."  Yet, Plains did not report the spill to the National Response Center for hours after it had been discovered.  In fact, it was not Plains, but a 911 call placed to the local fire department, that alerted the National Response Center to the spill.  Although Plains officials noticed anomalies in Line 901 by 10:30 a.m. and shut down the pipeline at 11:30 a.m., government officials first learned of the spill through a 911 call from beachgoers to the Santa Barbara County Fire Department at approximately 11:42 a.m.  And it was the local fire department that first notified the National Response Center of the spill at 12:43 p.m. – nearly two-and-a-half hours before Plains notified the agency.

109.    Almost immediately, defendants mobilized to spin the story.  Defendant Armstrong led the charge – according to testimony from Plains' corporate representative in front of state and county officials investigating the spill, defendant "Chairman and CEO Greg Armstrong was here from day one."  Plains sought to reassure investors that the spill was under control and contained, that the Company's response was appropriate, and that the damage inflicted was minimal.  Specifically, Plains officials reported that the Company's own analysis of a "worst case" scenario for the spill, which was based on the typical flow rate of oil and the elevation of the pipeline, showed that at most 21,100 gallons of crude oil had gone into the Pacific Ocean, and that as many as 105,000 gallons in total may have been released from Line 901.  Subsequently, on May 26, 2015, Plains filed a Form 8-K with the SEC describing the spill and noting that the Company "currently estimates that the amount of released crude oil could be as high as approximately 2,400 barrels" or 101,000 gallons – a figure reflecting a 4,000-gallon *reduction* from the initial estimates the Company provided to

- 35 -

investors.  As discussed below, Plains' estimates were false based on Plains' own mathematical method for calculating the size of potential spills.

110.    Defendants worked hard to conceal the scope of the problem.  As a result, in the wake of the spill, "[v]arious county officials . . . expressed multiple concerns with [their] experience with [the] unified command throughout the current situation it is felt that the information was controlled, not transparent and definitely not responsive."  At a public hearing on June 26, 2015, those officials expressed "ongoing concerns about the role of the responsible party, in this case Plains, and the dynamics that allowed that party to influence virtually every aspect of response and communication often contrary to the local agencies' values and practices."

111.    Consistent with the county officials' concerns, a document created by the Spill Unified Command – the committee put together to manage the spill aftermath, which included representatives from Plains – demonstrates Plains' effort to spin the spill story.  For example, a document entitled "Media Briefing Proposal: Refugio Oil Spill Response," which was approved by a Plains representative and other government agencies, indicates that "[i]n recent days, there have been a couple of neutral to negative local stories about perceived lack of accessibility to the [Unified Command] and in-field operations.  Additionally, we are beginning to detect significant concern from the community about response efforts and a lack of understanding about why and where operations are happening."  The document stated a desire to avoid leaving the "public with the perception that we are abandoning some areas or not completing operations."  The Unified Command encouraged "individual media briefings for members of the Unified Command with a handful of *neutral to positive reporters* who have been covering the incident" to whom to "tell the 'progress' story . . . ."  The document went on to identify certain "Key 'Progress' Themes For Media Briefings" and also identified certain reporters that the Unified Command viewed as "neutral to

positive." Plains' objective was clear: spin the "so-called progress story" rather than disclose the true extent of the disaster.

### E.      Plains Reveals the Line 901 Spill Was Far More Severe than Reported

112.      Finally, on August 5, 2015, the Company disclosed in an investor presentation given in connection with 2Q15 results that the spill could actually be 1,000 barrels – 143,000 gallons – 42% larger than previously reported. The Company further disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, and that the Company could be liable for potential criminal violations of the CWA. Further, defendants disclosed that Lines 901 and 903 were subject to multiple PHMSA corrective actions. Defendants also disclosed for the first time that the spill would cost Plains $257 million, and that the Company's insurance did not cover all of the costs associated with the spill. The Company also made clear that the $257 million cost did ***not*** include any lost revenue associated with the shutdown of Lines 901 and 903.

113.      This was not the first time that Plains had engaged in this type of deception. Despite applicable regulations requiring Plains to provide reasonable estimates of spill volumes when a spill may result in property damage exceeding $50,000 or the pollution of any body of water, Plains has demonstrated a pattern and practice of understating spill volumes, only to later revise them upward. For example:

- On April 29, 2011, the Rainbow Pipeline, a 45-year old Plains pipeline ruptured in Alberta, Canada, resulting in the worst oil spill in that area in 36 years. On the day of the spill, Plains reported to the Canadian authorities that the pipeline released an estimated 260,400 gallons. The actual spill size was 1,176,000 gallons – four and half times larger than the reported spill.

- On December 24, 2006, Plains' High Island Pipeline ruptured and spilled crude oil into the Gulf of Mexico. On the day of the spill, Plains provided an estimated release of 20,000 gallons. The actual spill size was 36,540 gallons – more than 80 percent larger than the reported spill.

- Plains' Pocahontas Station spilled crude oil into Silver Creek, a high consequence area near a drinking water reservoir in Illinois. According to a PHMSA Corrective Action Order dated July 14, 2015, on the day of the spill, Plains provided an

- 37 -

estimated release of "0 barrels" and an "unknown value" for spillage into the creek. The actual spill size was later corrected to 4,200 gallons.

114.    The misrepresentation of the Line 901's spill amount was a continuation of Plains' pattern of regulatory violations and rampant misstatements to investors.  On August 5, 2015, Plains disclosed to investors that the actual spill size was 42,000 gallons higher because:

> In the second half of June we completed the process of emptying and purging Line 901, which resulted in removal of approximately 26,000 barrels of crude oil from the line.  This activity provided additional data to assess the reasonableness of our worst case estimate of 2,400 barrels based on the "drain-down" methodology.

115.    This statement is fraught with inconsistencies as Plains sought to conceal its long-held knowledge of spill underestimation from investors.  Indeed, the Purge was completed long before the "second half of June."  In the May 21 CAO, PHMSA ordered Plains to empty and purge the 10.6 miles of affected pipeline (Line 901) and fill it with inert gas as soon as applicable "but no longer than *10 days* after the receipt of this order."  On the website they created to track the spill response, www.plainsline901response.com, Plains stated that "[o]n May 28, [2015], under the oversight of PHMSA and the Unified Command, excavation and removal of the affected section of pipe was completed."  Documents obtained from government sources confirm that, in fact, defendants had excavated, purged, and removed the failed pipe for "mechanical and metallurgical testing and failure analysis" as required by PHMSA, by this date.  Armstrong  himself asserted to members of the Congress on June 19, 2015 that "the affected pipe was excavated, placed in a box, sealed and transported to a third-party laboratory for evaluation and testing."  Indeed, defendants emptied and purged Line 901 by May 28, 2015, not the second half of June as conveyed to investors on August 5, 2015.  In sum, for at least *two month* (if not much longer), defendants concealed the knowledge of their underestimation of worst case spill amount from investors.

116.    During those three months, defendants communicated frequently with investors and the public about the Santa Barbara oil spill via multiple channels:

- 38 -

- On June 4, 2015, defendants hosted an investor day where Armstrong discussed the Santa Barbara oil incident, presented on the Company's history of incidents and release volumes, and encouraged investors to visit the Company website to obtain "daily updates" on the spill;

- On June 10, 2015, as reflected in Plains' June 11, 2015 8-K, filed with the SEC, defendants spoke at a media briefing and answered reporters' questions on the Line 901 crude oil release;

- On the www.plainsline901response.com website, where the Company provided "daily updates," defendants posted (1) incident updates on June 29, 2015, July 6, 2015, and July 13, 2015, (2) "Recovery Q&As" on June 17, 2015 discussing Plains' safety record, recovery completion, the affected pipeline, and how oil traveled to the ocean, and (3) the investor day presentation from June 4, 2015 and Armstrong's letters to members of Congress from June 24, 2015; and

- Defendants and other Plains representatives engaged in numerous conversations with the press about the spill between May 28, 2015 and August 5, 2015.

117.    At all times between May 28, 2015 and then end of the Class Period, in discussing the spill and its effects, defendants were obligated to disclose that the true size of the Santa Barbara oil spill was significantly larger than represented and/or correct their prior misstatements regarding the size of the spill.

118.    Additionally, as required by PHMSA guidelines for pipelines located in HCAs, the spill response plan for Lines 901 and 903 contains a summary of a "Risk and Hazard Analysis" performed by Plains to evaluate the likelihoods and consequences of a major breach in Lines 901 and 903.  The spill response plan determined that the maximum discharge from a spill, or the "Worst Case Discharge," was 167,000 gallons (3,400 barrels) – 1,000 barrels more than originally reported and much closer to the amount of oil spilled during and following the Line 901 rupture that was ultimately disclosed on August 5, 2015.

119.    Furthermore, for the worst case spill volume, the risk analysis assumes "10 minutes total time to detect rupture and 5 minutes to shutdown pipeline."  On the day of the spill, Plains' computer monitoring system in its control room in Midland, Texas failed to detect the rupture for

- 39 -

hours.  It was not until 1:30 p.m. – more than ***two hours*** after the rupture – that Plains employees sought to staunch the gushing oil using a single shovel to construct "a makeshift berm."  *See also* §V.M., *infra*.

> **F.**     **Regulatory and Congressional Investigations Reveal Further Information Concerning Plains' Defective Pipeline Maintenance, Monitoring and Spill Response**
>
> **1.     May 21, 2015 PHMSA Corrective Action Order**

120.     On May 21, 2015, PHMSA issued a Corrective Action Order (the "May 21 CAO") requiring Plains to take corrective actions with respect to Line 901 in order to protect the public, property and the environment from potential hazards caused by the spill.  The May 21 CAO noted certain preliminary findings concerning the spill, including that Line 901 had been inspected by Plains on May 5, 2015 as part of a complete in-line inspection to collect data and evaluate the integrity of the pipeline.  The May 21 CAO noted that Plains had not yet received a formal report regarding that inspection, but that previous inspections performed on Line 901 in June 2007 and July 2012 had demonstrated a worsening of pipeline integrity.  In 2007, there were 13 anomalies identified that related to corrosion of Line 901, and in 2012, an inspection identified 41 such anomalies.  Furthermore, PHMSA found that Plains used shrink wrap sleeve coating on Line 901. The May 21 CAO required Plains to take immediate corrective actions, including shutting down and reviewing the line, testing the line, developing a remedial plan, performing a review of the Company's emergency response plan and training, and identifying all areas of Line 901 that used shrink wrap sleeve coating.

> **2.     June 3, 2015 PHMSA Corrective Action Order – Amendment No. 1**

121.     On June 3, 2015, PHMSA issued an amended Corrective Action Order (the "June 3 CAO") that revealed that there was "***extensive external corrosion***" on Line 901 and also identified "***extensive corrosion***" and other deficiencies on adjoining Line 903.  The June 3 CAO required

- 40 -

Plains to take additional corrective actions, including shutting down Line 903. PHMSA noted that the results of Plains' own May 5, 2015 inspection survey revealed four areas on Line 901 with pipe anomalies that required "immediate investigation and remediation" under relevant regulations and Plains' own integrity management plan.

122.    Specifically, the June 3 CAO stated:

The results of Plains' May 5, 2015 In-Line Inspection (ILI) survey revealed four areas on [Line 901] with pipe anomalies requiring *immediate investigation and remediation* in accordance with 49 C.F.R. §195.452(h) or Plains' own criteria for investigation under its integrity management plan. Examination and measurements of three of these areas indicated *extensive external corrosion*, primarily on the bottom quadrant of the pipe. The deepest *metal loss* at each area, as measured by Plains nondestructive testing contractors, ranged between *54% and 74%* of the original pipe wall thickness. The anomalies were not limited to being near the girth welds, but also occurred at other locations along the length of the pipe. The fourth area to be investigated has not yet been completed.

[Line 901] is experiencing *active external corrosion*, as follows:

- Plains has reported to PHMSA that the May 5th ILI survey revealed metal loss of approximately 45% of the original wall thickness in the area of the pipe that failed on May 19.

- PHMSA inspectors noted *general external corrosion* of the pipe body during field examination of the failed pipe segment.

- The rupture characteristics at the Failure site indicate a longitudinally oriented opening approximately 6 inches in length and located in the bottom quadrant of the pipe. Third-party metallurgists in the field estimated that corrosion at the Failure site had degraded the wall thickness to an estimated 1/16 of an inch (.0625"). This thinning of the pipe wall is greater than the 45% metal loss which was indicated by the recent ILI survey.

- PHMSA inspectors observed three repairs to [Line 901] in the area near the Failure site that had been made due to external corrosion. These repairs were made after the 2012 ILI survey.

123.    The pipeline wall's corrosion to one-sixteenth of an inch amounts to a reduction of over *80%* of the original thickness. PHMSA further noted that inspection surveys conducted for different segments of Line 903 appeared inconsistent – a red flag that should have prompted immediate investigation by the Company – and ordered the Company to shut down Line 903 as well.

- 41 -

### 3. September 11, 2015 Notice of Probable Violation and Proposed Compliance Order

124.    On September 11, 2015, PHMSA sent Plains a Notice of Probable Violation and Proposed Compliance Order ("September 11 Compliance Order") to Troy Valenzuela, Plains' Vice President of Environmental Health and Safety at Plains' headquarters in Houston.  The September 11 Compliance Order was based on violations found during PHMSA's August 19-22, 2013, September 16-19, 2013, and September 30-October 4, 2013 inspections of Lines 901 and 903 conducted pursuant to Chapter 601 of 49 United States Code.  The September 11 Compliance Order outlined several "probable violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations."

125.    The September 11 Compliance Order determined that Plains violated §195.310(a) because "Plains did not maintain adequate documentation of pressure tests as part of its baseline assessment plan for its seven (7) breakout tanks at Pentland Station in Kern County, California." During the inspections, Plains was unable to "present evidence of past pressure tests performed on the breakout tanks to the inspection team."  Although Plains later provided PHMSA with records of tests from 1995, those "documents did not demonstrate that pressure tests were performed on the tanks in accordance with" applicable law.

126.    PHMSA also found two probable violations of §195.452, governing "Pipeline integrity management in high consequence areas."

127.    First, Plains could provide no written evidence during or after the inspection that it had undertaken the required preventive and mitigative evaluations prior to or during 2013 for segments of Line 903 that run through HCAs.  Specifically, the September 11 Compliance Order states:

> Plains did not maintain adequate documentation of its preventive and mitigative evaluations prior to the 2013 calendar year for "Sisquoc to Pentland" and "Pentland to Emidio" pipeline segments.  A Plains representative eventually stated in an email,

dated March 25, 2014, that the company was unable to locate the 2013 preventive and mitigative evaluations for those pipeline segments.

128.    Second, the September 11 Compliance Order found that Plains failed to take

additional preventative and mitigative measures in HCAs, and was unable to show evidence that it

had even considered such measures or provide a justification for the failure to implement them in

violation of applicable law.  Specifically, the September 11 Compliance Order states:

> For High Consequence Areas (HCAs) where Plains does not take additional
> preventive and mitigative (P&M) measures, Plains did not adequately document its
> consideration of P&M measures or its justification for not implementing these
> measures.  The inspection team found a lack of documentation to demonstrate the
> consideration and decision-making process of potential P&M measures.

129.    The September 11 Compliance Order further found that Plains violated §195.403,

which governs Emergency Response Training, because Plains could produce no documentation to

demonstrate the required annual review of response training or the "the decision-making process for

changes made to its program."   Additionally, Plains "did not have adequate documentation to

demonstrate that supervisors maintained a thorough knowledge of that portion of the emergency

response procedures established under §195.402 for which they are responsible to ensure

compliance."

130.    Finally, the September 11 Compliance Order found that Plains violated §195.507

regarding recordkeeping because "Plains did not document which qualified contractors performed

each covered task on a daily basis.  Each project file had a written list of all qualified individuals, but

there was no written documentation to show who performed each task on a day-to-day basis."

131.    Plains was aware of the probable violations identified by PHMSA in the September

11 Compliance Order at the time of the 2013 inspections, or shortly thereafter.  Although the final

September 11 Compliance Order was sent on September 11, 2015, the foregoing "findings and

probable violations were determined *prior to* the May 19, 2015 crude oil spill in Santa Barbara

County, California."  Further, "PHMSA requested additional information [from Plains] following

- 43 -

[PHMSA's] field visit, which was provided between late 2013 and June 2014." Finally, the September 11 Compliance Order states that the items detailed therein "were discovered in these 2013 inspections, and include consideration of supporting documentation provided by Plains in 2014."

132.    In addition to the probable violations, PHMSA enumerated a series of "Additional Areas of Safety Concern" in the Compliance Order.  PHMSA stated that "[d]uring the course of our inspection, our representatives found concerns that may impact your current level of safety. These areas of concern were discussed with Plains during the inspection, but they are not considered to be explicit regulatory violations.  Nevertheless, PHMSA recommends that these issues be addressed to improve the level of safety on your pipeline system."

133.    First, "Plains had unclear procedures and documentation of its decision making process for addressing when in-line inspection (ILI) tool run data indicates anomalous conditions. Specifically, the Plains procedures did not appear to fully discuss or document how tool tolerance was addressed or how measured anomalies that deviated significantly from the size predicted by the tool were addressed."

134.    Second, "Plains had incomplete documentation of its Management of Change (MOC) for a pressure reduction.  The inspection team found an incomplete MOC form, specifically Plains MOC form 5012-5004, dated January 12, 2012.  A pressure reduction was to be taken, but the current and proposed pressure set points were inadequately documented."

135.    Finally, "Plains is responsible for educating emergency response officials as part of its Public Awareness Program.  A review of Plains' Emergency Response Contact Reports for local fire and sheriff departments on June 26, 2013 indicated evidence of a lack of familiarity with the California One-Call System.  Plains did not provide any documentation of follow-up where Plains educated emergency response officials on the One-Call System."

4.    **November 12, 2015 Corrective Action Order – Amendment No. 2**

136.    On November 12, 2015, PHMSA sent Valenzuela Amendment No. 2 to the May 21 CAO ("November 12 CAO"), which contained additional findings and required Plains to take additional corrective actions with respect to Lines 901 an 903.  The additional findings arising from PHMSA's investigation of the accident included the following:

- PHMSA's independent review of in-line inspection (ILI) tool surveys for Lines 901 and 903 over the past 10 years found that anomalies were "***under-called***" in areas of general corrosion.  Direct field examination and measurements of the anomalies revealed that the actual length and width of the anomalies were greater than the measurements predicted by the ILI tool.  Specifically, on Line 901, direct measurement of the metal loss anomaly at the failure site and other anomalies excavated in 2015 showed that these anomalies were generally more significant than the ILI results indicated they would be.

- Common practice in the pipeline industry is to provide the ILI vendor with field data from direct investigation of anomalies to validate the ILI tool's detection capabilities and limitations, the accuracy with which it can locate and size anomalies, and the confidence associated with the tool's measurements.  After excavating, investigating, characterizing, and measuring anomalies from the results of various ILI surveys, ***Plains did not share its actual field findings with the ILI vendor so that it could enhance its interpretation of the ILI data***.

- PHMSA's independent review of ILI surveys from the past 10 years show that Line 903, particularly the Gaviota to Sisquoc segment, has ***similar corrosion characteristics as Line 901 and a number of the anomalies had characteristics consistent with the failure site***.  Specifically, Line 903 has both localized and larger or "general" areas of external corrosion.

                    *        *        *

- Freeport-McMoRan Oil & Gas (Freeport) operates a 37-mile pipeline system from its Hidalgo, Hermosa and Harvest offshore platforms.  . . .  This unprocessed crude may contain water, natural gas, and other impurities that contribute to internal corrosion.  According to Freeport, the biocide and rust inhibitor in this crude oil will begin to lose effectiveness around November 2015, adding to the risk of accelerated internal corrosion on Line 903.

- Due to the number of corrosion-caused anomalies identified on Line 903 in past ILI surveys, particularly on the Gaviota to Sisquoc segment, ***it does not appear that Plains has an effective corrosion control program and the pipe***

- 45 -

*can be expected to have degraded (lost metal due to corrosion) since the last ILI survey*.  Furthermore, leaving crude oil in Line 903 is likely to result in an increased potential for internal corrosion as the inhibitor loses its effectiveness.  The crude oil in Line 903 needs to be removed from the pipeline and the line purged with an inert gas in order to prevent further degradation of the pipeline, and eliminate the potential harm it poses from an unintended release.

- Stress corrosion cracking (SCC) or environmentally-assisted cracking can be induced on a pipeline from the combined influence of tensile stress and a corrosive medium.  As noted in PHMSA's Advisory Bulletin ADB-03-05 (issued October 7, 2003), SCC is commonly associated with disbonded coatings. Disbonded coatings may prevent the cathodic protection current used for corrosion control from reaching the pipe surface and allow an SCC-susceptible environment to form between the pipe and coating.  Tape coatings and shrink wrap sleeves are both coatings susceptible to disbondment and may lead to corrosion and possibly environmentally assisted cracking or SCC.  Line 903 has shrink wrap sleeves on the girth welds, which could contribute to SCC.

137.    In light of these findings, and PHMSA's conclusion that "a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment," Plains was required to immediately take steps to empty, purge, and shut down Line 903.  Plains was also required to provide a purge plan that included the "[i]dentification and remediation of any anomalies with characteristics similar to the Line 901 failure location."  Plains was also ordered to provide its ILI vendor "with the field measured data and request that the ILI vendor use the field data to re-evaluate the ILI results in order to identify any additional anomalies that must be remediated per §195.452(h) or that have characteristics similar to the Line 901 failure location."  Finally, Plains was ordered to provide additional training and "enhanced preventive and mitigative measures that Plains will implement to monitor the pipeline during the purge activity."

138.    PHMSA's findings were based on historical data defendants either knew about or recklessly disregarded.  For example, PHMSA's conclusions that "it does not appear that Plains has an effective corrosion control program" and that Line 903 likely had degraded further since the last

- 46 -

ILI were based on their study of historical ILI data that had been provided by Plains' ILI vendor, Rosen, to Plains in real time.  PHMSA's conclusion that Plains' ILI surveys "under-called" anomalies was based on the same data.

> **G.     Defendants Knew of or Recklessly Disregarded Severe Corrosion Problems on Lines 901 and 903, Which Led to Line 901's Spill and Line 903's Shut Down**

139.     Following initiation of operations of Line 901, Plains conducted periodic inspections of the condition of the pipeline with internal inspection devices called pipeline inspection gauges, or "smart pigs."  Smart pigs are run inside a pipeline to detect anomalies caused by corrosion, cracks, laminations, dents and other defects.  These runs are referred to as in-line inspections, or ILIs.  ILIs were conducted on Line 901 between the Las Flores and Gaviota pump stations starting in September 1996.  Additional ILIs were performed in June 1 and 19, 2007, July 2012, and May 5, 2015.  Beginning with the 2007 ILI, Rosen conducted the ILIs on Lines 901 and 903.

140.     According to PHMSA, "[i]n 2007 and 2012, there were 13 and 41 excavations of ILI-identified anomalies on the pipeline, respectively.  These anomalies were mostly due to external corrosion, frequently located near the pipeline's girth welds."  Such a dramatic increase in the number of identified anomalies during the 5-year period indicates that corrosion processes acting on the pipeline were very active despite Plains' purported external and internal corrosion mitigation processes.

141.     Documents obtained from a governmental sources confirm that following the 2007 ILI, Plains obtained permits to address *15 anomalies* on Lines 901 and 903, 13 of which were present on Line 901.  Furthermore, documents related to Plains' application for permits to address these anomalies discovered in the 2007 ILI reveal that one of the anomaly digs – Anomaly Dig Site 6 – "[a]ppears to be the *location of the current spill incident*" that occurred on May 19, 2015.  And, PHMSA revealed in the June 3 CAO that three repairs had been made on Line 901 "in the area near

- 47 -

the Failure site that had been made due to external corrosion," many of which can be seen in photographs of the excavated Line 901 segment.  In addition, governmental records indicate that following the 2012 ILI, Plains obtained permits to address **82 anomalies** on Line 903, the same anomalies that led to the eventual shutdown of Line 903.  Thus, defendants had previously identified the anomalies at the precise location of Line 901's rupture and those riddled along Line 903 that resulted in its eventual shut-down.  Rather than replace the pipe, as required given the age of the pipe and the proliferating corrosion, Plains opted to conduct patchwork repairs.

142.    On May 5, 2015, Rosen conducted an ILI that revealed four areas on Line 901 with pipe anomalies that required "***immediate investigation and remediation***" under relevant regulations and Plains' own integrity management plan.  Rosen's normal practice was to immediately notify Plains of any anomalies, such as those found in the May 5 ILI, that required immediate attention.  Such anomalies were identified by Rosen in a preliminary "first pass" of the data and communicated to Plains within seven to 14 days, meaning Plains would have received notice of the anomalies requiring immediate corrections before the spill or, at the very latest, on the day of the spill.  Under applicable regulations, the Company was required to shut down Line 901 pending resolution of the immediate issues.  Had defendants complied with applicable regulations, the eventual Line 901 spill would have been avoided entirely.

143.    Plaintiffs have obtained partial, redacted, results from the 2007 ILI survey of Line 901.  The 2007 ILI survey results identified 29 features in Line 901 that had corrosion metal loss that equaled or exceeded 40% of the pipeline wall thickness and 12 features that had corrosion metal loss that equaled or exceeded 50% of the pipeline wall thickness.  These metal losses were attributed both to external corrosion (frequently located near the pipeline girth welds) and internal corrosion.  The 2007 ILI survey results identified the top five most severely corroded locations.  These locations had maximum depths of corrosion that ranged between 52% and 67% of the pipeline wall thickness.

These results indicate that Line 901 was experiencing very active internal and external corrosion despite of Plain's purported maintenance and corrosion control procedures.

144.    As PHMSA found in November 12 CAO, Plains violated common industry practice by failing to provide its ILI vendor, Rosen, field data necessary to properly calibrate ILIs of Lines 901 and 903.  Thus, these ILI survey report results do not include corrections to account for the ILI instrument's "under-call" of the feature depths determined from the instrument readings, a fact PHMSA also found in the November 12 CAO.  Available data on the type of ILI instrumentation used to perform the 2007 survey indicates that the bias (true depth/instrument depth) would be in the range of 1.2 to 1.25 for a range of metal losses of 40% to 50%, meaning that ILIs underestimate metal loss by 20% to 25%.

145.    Moreover, Line 901 was set in sandy granular soils characteristic of coastal beach deposits.  These soils, the coastal environment, the tendency for the pipeline to accumulate water inside and outside, and the associated surface drainage features could be expected to produce a highly corrosive environment for a buried steel pipeline.  In addition, the photograph below of the exposed breached section of Line 901 indicates the active mechanisms present during development of the breach.  The photograph demonstrates obvious evidence of active internal and external corrosion:



146.    PHMSA also found that Lines 901 and 903 were susceptible to corrosion because of the shrink wrap sleeve repairs made at some of the pipeline's girth welds.  Shrink-sleeve coating is a process whereby plastic coatings are wrapped around the joints of a pipeline's welded areas.  These plastic coatings are prone to disbonding from the pipe, allowing moisture to enter, and leading to corrosion and environmentally assisted cracking or stressed corrosion cracking.  Indeed, Plains' own inspections showed that many of the corrosion anomalies were detected near the pipeline's girth welds.

147.    These facts, known to defendants during the Class Period, demonstrate that extensive severe external and internal corrosion was allowed to develop and persist in Line 901.  This severe external and internal corrosion was developed in Line 901 before 2007 and it existed in an

unmitigated condition in sections of the pipeline as late as May 2015, when Line 901 eventually burst.

148.     After the May 19, 2015 oil spill, Plains also had to suspend the nearby Line 903's operation as its ILI results from the past 10 years revealed similar localized and general corrosion characteristics to Line 901 and many of the anomalies were consistent with those at Line 901's rupture site.  Plains informed PHMSA that Line 903 also used shrink wrap sleeves on the girth welds.  During an inspection of the 38-miles segment between the Gaviota and Sisquoc Stations on April 26, 2013, the vendor reported 99 metal loss anomalies.  Similarly, during the June 12, 2013 inspection, the 75-mile segment between Sisquoc and Pentland Stations had a vast number of metal loss anomalies consistent with general corrosion.  For the 15-mile segment between Pentland and Emidio Stations, two girth weld anomalies required further investigation.

149.     Despite these extensive issues with Line 903 and the recent disaster at Line 901, Plains continued to operate Line 903 until PHMSA ordered Plains to shutdown Line 903.  PHMSA's shutdown order also directed Plains to purge Line 903.  Accordingly, on November 12, 2015, PHMSA demanded that Plains act to halt further degradation of Line 903 by purging the line with inert gas in order to prevent another incident of unintended release of crude oil.

**H.     Plains Operated Line 901 at an Unlawful Pressure in Light of Known Corrosion on the Line**

150.     Line 901's normal maximum operating pressure ("MOP") is reported to be 650 pounds per square inch gauge ("psi").  Plains has reported that immediately prior to the failure, the line pressure was approximately 700 psi.  According to Plains, this increase in the pipeline pressure was associated with the unplanned shut-down of the pump at the Sisquoc pump station and the delayed shut-down of the pump at the Las Flores pump station.

151.    After the pipeline was constructed, the pipeline was pressure tested in October 1990. Based on results from the pipeline pressure test and application of the PHMSA guideline for Transportation of Hazardous Liquids by Pipeline, 49 C.F.R. §195, the pipeline was determined to have a Maximum Allowable Operating Pressure ("MAOP") of 1025 psi.

152.    According to PHMSA, Line 901 is comprised of 24-inch diameter, 0.344 inch wall thickness, X-65 steel grade, high frequency electric resistance welded (ERW) girth welded pipe sections.

153.    As provided in PHMSA regulations, application of a validated computational analytical model to predict the burst pressure of a pipeline with 58% corrosion results in a burst pressure of 700 psi, equal to the reported Line 901 unplanned pressure of 700 psi prior to the rupture. This level of corrosion correlates with the PHMSA report metal loss on Line 901 of "approximately 45% of the original wall thickness in the area of the pipe that failed on May 19." Correcting this level of corrosion for the ILI's "under-call" of the measured depth, a wall thickness loss of 56% results. Based on ILIs in 2007 and 2012, Plains was well aware that Lines 901 and 903 were operating with corrosion that measured as high as 67% even before correcting for the "under-call" bias. Defendants also knew that this corrosion was getting worse as time went by but continued to operate the lines at excessive pressure.

154.    As prescribed by PHMSA regulations, remaining strength calculations for corroded pipelines were performed using the PHMSA-prescribed computational analytical models (*e.g.*, ASME/ANSI B31G) that have been validated with pipeline burst pressure testing results (tests performed in the laboratory and in the field on in-service pipelines). The computed "limiting pressure" was based on the MAOP of 1,025 psi. The validated analytical models indicated a "limiting corroded wall thickness loss" of approximately 50% for Line 901. PHMSA regulations for assessment of corroded pipelines indicate that if the pipeline has corrosion features that are equal to

- 52 -

or greater than 50%, that the features be properly repaired, the pipeline section replaced, or the MAOP lowered.

155.    According to Plains, the May 2015 ILI survey showed 45% corrosion at the failure location, even before correcting for the "under-call" bias and notwithstanding PHMSA's finding that the wall at the rupture site had corroded to 1/16 of an inch (80% corrosion).  When correcting for the ILI "under call," the 45% corrosion level exceeds the computed limiting corroded wall thickness which, again, required Plains to immediately repair the Line or reduce the Line's pressure.  Moreover, three other anomalies near the rupture site had wall thickness losses in the range of 54% to 74%, which similarly exceed the computed limiting corroded wall thickness.

156.    The 2007 ILI corrosion results indicate that since 2007, significant parts of Line 901 would not have satisfied PHMSA's Integrity Management – Corrosion Control guidelines without either properly repairing the corrosion damage, replacing the affected sections of the pipeline, or reducing the MAOP.

157.    Additionally, the 2007 ILI survey report also contained a summary of information on the properties of Line 901.  The 24-inch diameter pipeline was identified as being comprised of DSAW X65 *and* X60 steels.  Locations of the sections of pipeline fabricated with X60 steels were not identified.  If present in Line 901, these lower strength steel sections would have even lower burst strengths.

### I.    Defendants Knew Line 901 Had Reached or Exceeded its Useful Life

158.    Construction on Lines 901 and 903 began in 1987.  The lines went operational in 1990.  When Line 901 ruptured in May 2015, the line was 28 years old and had been operating for 25 years – one of the oldest pipelines owned by the Company.  According to the Company's financial statements filed with the SEC, Lines 901 and 903 had a *maximum* useful life of 30 years.  In order for the Company to properly account for the depreciation of its pipelines, it had to

accurately estimate the useful life for each pipeline.  SEC and Generally Accepted Accounting Principles rules require companies to depreciate assets based on the asset's useful life (ASC 360-10-35-3), and continually evaluate the appropriateness of the useful life of that asset (ASC 360-10-s99-2, SAB Topic 5.CC).  Defendants represented that useful life estimates for Line 901 were based on various factors including its condition, manufacturing specifications, technological advances and historical data concerning useful lives of similar assets.  As detailed herein, Plains knew that Line 901 was not only near the end of its useful life based on supposed comparable assets, but that the Line was located in a sandy, water-logged coastal environment and rife with serious corrosion problems.  Likewise, defendants knew that Line 903 was exposed to material that caused similar corrosive effects.  In addition, in calculating the useful lives of Lines 901 and 903, Plains failed to consider that the pipelines were in HCAs.  In fact, Plains used the same 30-year useful life to cover the entire All American Pipeline, without regard to whether they traversed an HCA.  If in fact defendants monitored and evaluated the condition of Lines 901 and 903, as represented to investors during the Class Period, then they knew, but simply ignored, that the Lines were at or past the end of their useful lives.  Otherwise, defendants failed to monitor and evaluate Line 901, in contrast to their Class Period representations.

**J.      Decreasing Volumes Motivated Defendants to Look the Other Way As Lines 901 and 903 Deteriorated**

159.    PAA and PAGP reported that its All American Pipeline system, which included Lines 901 and 903, transported crude oil from two outer continental shelf ("OCS") fields, off the shore of California.  On February 27, 2013, PAA reported in its 2012 Form 10-K that "[v]olumes shipped from the OCS are in decline."  In its 2013 Form 10-K filed on February 28, 2014, and repeated in its 2014 Form 10-K filed on February 25, 2015, PAA slightly modified its disclosure to say "[v]olumes shipped from the OCS are expected to decline."  From a peak of 152,000 average net barrels per day in 1995, oil transported on the All American Pipeline declined to 37,000 average net barrels per day

- 54 -

in 2014, the last reported figure – a *75% reduction*.  Based on defendants' own disclosures, volumes had declined significantly and were likely to decline even further.

160.    Declines in oil production from the All American Pipeline system meant defendants had little incentive to undertake the massive repairs necessary to keep an almost thirty-year-old pipeline safe and compliant with regulations.  As discussed herein, Plains estimated the maximum useful life of a pipeline to be 30 years.  Thus, for an aging pipeline near the end of its maximum useful life of 30 years, transporting less and less oil, defendants knowingly, or at least severely recklessly, made the calculation that it was not worth the costs required to conduct the necessary repairs.  And these repairs, as the spill ultimately showed, would have required more than patchwork, one-off fixes – they would have required replacements of large segments of pipeline heavily damaged by years of exposure to a highly corrosive, coastal environment.

161.    Despite the fact that Lines 901 and 903 traversed HCAs, defendants' motivation to repair pipeline with diminishing volumes and life expectancy was further exacerbated by the fact that Plains' insurance covered clean-up costs from any spills.  As Armstrong reported in the August 5, 2015 conference call to investors, while the total loss for the Santa Barbara spill was a $257 million charge, this cost was "offset by an estimated $192 million insurance recovery," which covered "actual and projected emergency response and cleanup costs, natural resource damage, third and third party claim settlements, as well as estimate for fines, penalties, and certain legal fees."

162.    And diminishing volumes on Lines 901 and 903 meant that any repair costs or maintenance capital spent on those lines would have detracted from PAA's reported adjusted EBITDA and the distributable cash flow – the two primary performance metrics defendants looked at in determining bonuses.  Avoiding replacement costs for Lines 901 and 903 had the desirable effect of increasing profits for the transportation segment, which was critical to Plains' consolidated

- 55 -

earnings projections provided to Wall Street during the Class Period.[3]  For example, in a May 21, 2015 NAPTP Annual Investor Conference in Orlando Florida, the Company stated "Transportation segment is the ***leading driver*** of anticipated 2015 adjusted EBITDA growth (*i.e.*, 24% year-over year growth, or ~$1.2B contribution)."  In fact, defendants boasted that they met or exceeded EBITDA guidance for the past 13 years (53 consecutive quarters).  By avoiding the costs associated with replacing Lines 901 and 903, defendants were able to continue their "meet or beat" record.  As a result, it was simply not worth it to defendants to perform the repairs necessary to Lines 901 and 903 that would have prevented the Santa Barbara spill.

### K.   Defendants Knowingly Failed to Conform to Industry Standards When Inspecting and Maintaining Lines 901 and 903

163.    As detailed herein, Plains violated common industry practice of providing ILI vendors with results of field measurements and data after the operator's investigations of anomalies. As PHMSA stated, this practice enables the validation of "the ILI tool's detection capabilities and limitations, the accuracy with which it can locate and size anomalies, and the confidence associated with the tool's measurements."

164.    During the 2008 and 2009 inspections of Plains' procedures for integrity management and operations and maintenance, PHMSA and the California State Fire Marshal found Plains' data integration process inadequate in addressing ILI tool uncertainty.  Plains' integrity management program did not specify an approach to handling the tool tolerances.  As a result, PHMSA required that Plains' process for validating ILI results be modified to incorporate the known ILI "under-call" bias.

165.    Four years later, during its 2013 inspections of Lines 901 and 903, PHMSA again raised the concern to Plains that its integrity management procedures failed to address how

---

[3]    Pipeline revenue, expenses and profits were reported in the transportation segment of the Company's financial statements.

differences in anomalies as directly measured in the fields and as sized by ILI tool would be handled. As discussed above, between 2008 and 2013, Plains made numerous excavations to investigate Line 901's corrosion anomalies.  However, it failed to share these field measurements and findings with its vendors, in contrast to industry standards.  As a result, the vendor did not have the benefit of actual field findings to use in assessing its ILI tool's anomaly detection capabilities, limitations, and accuracy.

166.    After the spill, PHMSA reviewed ILI results from the past 10 years for Lines 901 and 903 and determined that the ILI tool under-called the anomalies with respect to general corrosion. Consistent with research available at the time of the inspections, the actual length and width of the anomalies as measured during field examinations were greater than those in the ILI surveys. Furthermore, the actual metal loss at the rupture site and other excavation areas were more significant than the ILI surveys indicated.

167.    Plains also failed to conform to industry standards because Plains' pipelines are the only ones in Santa Barbara county operating without automatic shutoff system.  Such a system would have automatically shut off the Las Flores pump upon detecting changes in pressure and flow indicative of a problem in the pipeline.  Instead, Plains relied on a manual system requiring remote shutdown by personnel located in Midland, Texas.  The Midland Control Room's delay in shutting down the Las Flores pump caused pressure surges in the pipeline after the Sisquoc pump broke down twice in the morning of the spill.  The Santa Barbara County planner and the Environmental Defense Center stated that the spill would have been less extensive, if not avoided, had Plains installed automatic shutoff system in its pipelines.

168.    On June 26, 2015, Dianne Black, Assistant Director of Planning and Development Department for Santa Barbara County, confirmed that automatic shut-off systems are the safest pipeline shut-off mechanism and that, despite the heightened safety, Plains was the ***only*** pipeline

operator in Santa Barbara County that did not utilize automatic shut-off systems.  For example, Black testified that "environmental impacts are reduced, the potential for environmental impacts are reduced, with pipeline safety systems that include an automatic shut off system."  Thus, when asked, "if [Plains] had an automatic shut-off system, that may have been an earlier warning," Black confirmed: "I think it would have been an earlier reaction and it certainly could have *reduced the amount of oil spilled*."  Black also testified that she disagreed with Plains' position that automatic shut-off systems may be more dangerous that manual shut-off systems.

### L.   Defendants Violated Federal Regulations Governing High Consequence Areas

169.   PHMSA's inspections of the Lines 901 and 903 pipeline systems between August to October 2013 revealed that Plains failed to take the required enhanced preventive and mitigative measures required for pipelines in an HCA and failed to document any justifications or considerations for not implementation such measures as required by applicable regulations.  The regulations for pipeline integrity management in HCAs, 49 C.F.R. §195.452, require operators with pipelines in HCA to conduct risk analyses to identify additional measures to prevent and mitigate consequences of a pipeline failure in an effort to enhance environmental and public safety.

170.   Lines 901 and 903 are high-risk pipelines under HLPSA regulations.  Lines 901 and 903 pass through environmentally sensitive areas, such as the pristine Santa Barbara coastline and state parts, natural forests, and rivers.  The pipelines were constructed during 1987 to 1990 and have been in operation for more than 25 years.  Plains own ILIs and PHMSA's investigations showed that the pipelines' age was further exacerbated by extensive general and localized corrosion conditions. Furthermore, Line 901's 24-inch diameter with average daily volume of over 30,000 barrels per day (or over 1.26 million gallons) made its potential oil release volume sizable in the event of a spill. Plains failed to implement additional preventive and mitigative measures or enhanced practices to

protect the area, as required by applicable regulation, and continued to operate the Lines for years after PHMSA's inspections until Line 901 eventually ruptured.

### M. Defendants Failed to Correct Known Emergency Response Deficiencies on Lines 901 and 903 Despite PHMSA's Warnings

171.    Following inspections of Lines 901 and 903 in August, September, and October 2013, PHMSA warned Plains about its deficient response plans, insufficient training, and insufficient record-keeping related to spill response preparedness.  Further, in December 2013, Plains received a warning letter from PHMSA indicating that the Company was in probable violation of several HLPSA regulations related to pipeline management and control room management, including failure to record pipeline MOP information.   In fact, PHMSA's December 24, 2013 warning letter particularly concerned the Control Room Facilities in Midland, Texas, which, on the day of Line 901's rupture, failed to detect the spill for hours.  PHMSA's December 2013 letter informed the Company of the findings from two inspections undertaken on March 19-21, 2013 and June 11-12, 2013.  It specifically found violations for failing to: (1) follow Management of Change procedures by not maintaining documentation as required by PHMSA when, for example, new pipelines were added or taken offline; (2) complete Abnormal Operations forms, including providing MOP information; and (3) maintain or provide any records demonstrating an at least annual review of the controller training program to identify potential improvements.  The September 11 Compliance Order following the spill later reiterated Plains' incomplete documentation for its Management of Change for a pressure reduction.

172.    Additionally, in its June 3 CAO, PHMSA found, among other things, that Plains lacked adequate leak monitoring systems, in violation of applicable HLPSA and API regulations, and failed to take appropriate remedial measures in response to the pipeline integrity defects that had been previously identified on Line 901, in violation of HLPSA.  Ultimately, Plains' response failures and below-industry-standard safety systems exacerbated the disastrous Santa Barbara oil spill.

173. These emergency response shortcomings manifested themselves on the day of the Line 901 rupture.  Despite their representations that Plains' spill response efforts would be immediate and well-coordinated, in truth, the response to the Santa Barbara oil spill proved to be a disaster:



**Events Leading to Pipeline Rupture**

**Before 10:55 a.m. PST** — The downstream Sisquoc pump underwent an unplanned shutdown, while the upstream Las Flores pump continued to operate and line pressure increased before it was shut down.

**10:55 a.m.** — The Sisquoc and Las Flores pumps re-started.

**11:15 a.m.** — The Sisquoc pump shut down for a second time.

**Latest Possible Rupture Time** — **11:30 a.m.** — Line 901 experienced pressure anomaly and the control room in Midland, Texas remotely shut down the line.

**Efforts by Santa Barbara Fire Dept. (the "SBFD")**

**11:42 a.m.** — The SBFD received notification from the public regarding an odor.

**Around 12:00 p.m.** — The SBFD and State Park staffs found oil sheen on the water off Refugio State Beach.

**12:30 p.m.** — SBFD notified Plains' personnel, who were attending a program at Freeport-McMoran, about oil on the beach.

During the course of an hour after SBFD notified Plains' employees, Plains' employees saw the oil sheen on the water and told firefighters that the spill was too big to be from Plains' pipeline.

**1:30 p.m.** — Plains' employees discovered the Line 901 release, notified the control center in Midland, Texas, and attempted to use a shovel to build a makeshift berm to stop the oil flow to the water drainage culvert. The SBFD subsequently joined the effort.

During the course of an hour and a half after discovering the spill, Plains' Bakersfield office could not reach any on-site personnel to obtain a spill volume estimate or rupture location coordinates.

**2:56 p.m.** — Plains' Bakerfield employee called the National Response Center with a spill estimate of "approximately 500 barrels or 21,000 gallons" and location coordinates.

174.    The timeline above demonstrates Plains' inability to properly execute emergency procedures, such as prompt and effective response to an emergency notice and notification to and coordination with local authorities.  It was the Santa Barbara fire department that, after the Las Flores pump had been shut down for an hour, notified Plains employees of released oil on Refugio Beach.  Plains took another hour before it discovered the pipeline failure and did not notify the National Response Center until 2:56 p.m. – almost ***three and a half hours*** after the Las Flores pump shut down.

175.    Plains' initial report of the spill further demonstrated its inept spill response procedures.  For example, even though oil had been leaking through a 24-inch diameter pipeline pumping oil at maximum capacity of 2,000 barrels per hour for several hours, Plains reported generally that "approximately 500 barrels" of oil was spilled for hours.  In contrast to its Class Period representations, Plains was unable to respond to and control an oil spill, as it failed to even properly size the release from its pipeline and only learned of the spill from third parties, in violation of law and its own response plan.

### N.    Plains' Industry-Worst Spill Record Establishes a Widespread Culture of Non-Compliance

176.    At all times during the Class Period, defendants were well aware of the risks associated with Plains' failure to properly address the corroding pipelines.  As described below, prior to and during the Class Period, PHMSA repeatedly cited Plains for corrosion control deficiencies.  In fact, Plains' systemic corrosion control failures in violation of the HLPSA resulted in more than 78 oil spills since 2006 directly caused by corrosion.  Plains' corrosion-related incidents represented close to 40 percent of the Company's overall releases and was the leading cause of its oil spills in the past ten years.

177.    The corrosion control deficiencies related to Lines 901 and 903 were not unique; Plains' pipeline systems throughout the United States were rife with similar problems:

- In 2010, DOT issued a final order finding that Plains had violated 49 C.F.R. §195.573 for failed to electrically check external corrosion control rectifiers at the intervals required by regulations, to promptly correct corrosion control deficiencies, and to examine coupons that monitor corrosion inhibitors in its pipeline systems at various facilities. These deficiencies were discovered during inspections of Plains' facilities in California, Colorado, Wyoming, Utah, Montana, Louisiana, Oklahoma, New Mexico, Mississippi, and Texas.

- In 2011, DOT issued a final order and held that Plains' violation of 49 C.F.R. §195.581 for failing to coat a pipeline against atmospheric corrosion would be considered a prior offense in subsequent enforcement actions. This deficiency was found during a New Mexico facility inspection.

- In 2013, DOT issued a final order finding that Plains had violated 49 C.F.R. §195.579 for inadequacies and inconsistencies in Plains' procedure on corrosion control, an insufficient number of coupons used to monitor the effectiveness of corrosion inhibitors, and again, failure to examine coupons at the required interval at certain facilities. These deficiencies were found during inspections of Plains' facilities in Oklahoma, Texas, New Mexico, and Louisiana.

- In 2013, PHMSA issued a warning letter to Plains for violation of 49 C.F.R. §195.579 for failing to inspect a portion of pipeline for internal and external corrosion in violation of regulatory requirement to conduct examination of a pipeline whenever it is exposed. This deficiency was found during inspections of Plains' headquarters in Texas and facilities in Wyoming.

- In 2014, PHMSA issued a warning letter to Plains for violation of 49 C.F.R. §195.581 for the failure to properly coat pipings against corrosion at different locations, resulting in coating degradation at multiple facilities.

178.    In fact, PHMSA data reveals that Plains, prior to and during the Class Period, was the *worst* pipeline operator in the United States as measured both by the number of total incidents and number of incidents per 1,000 miles of pipeline operated. Such incidents raised red flags during the Class Period that were known to defendants but ignored in favor of a short-sighted profits-based strategy that directly contradicted the Company's public statements.

179.    Plains' dismal record of oil spills is a direct result of its long history of non-compliance with regulatory requirements on corrosion control, integrity management and emergency response training. The effects of regulatory compliance deficiencies are further exacerbated by its deviation from industry norms in its failure to share corrosion anomalies field examination results

- 63 -

with its ILI vendor and absence of automatic shutoff system in its pipeline networks.  As a result, Plains outranks it competitors in both numbers of incidents in the past ten years and incidents per 1,000 miles of pipeline:

| | Operator | System Type | Pipeline Miles | No. of Incidents | Incidents per 1,000 Miles | Pct. of Incidents Caused by Corrosion |
|---|---|---|---|---|---|---|
| 1 | **PLAINS PIPELINE, L.P.** | **HL** | **6,430** | **196** | **30** | **40%** |
| 2 | BUCKEYE PARTNERS, LP | HL | 6,214 | 141 | 23 | 13% |
| 3 | COLONIAL PIPELINE CO | HL | 5,587 | 164 | 29 | 12% |
| 4 | ENBRIDGE ENERGY, LIMITED PARTNERSHIP | HL | 4,604 | 107 | 23 | 6% |
| 5 | NUSTAR PIPELINE OPERATING PARTNERSHIP L.P. | HL | 4,359 | 47 | 11 | 15% |
| 6 | SHELL PIPELINE CO., L.P. | HL | 3,761 | 92 | 24 | 15% |
| 7 | NUSTAR LOGISTICS, L.P. | HL | 3,612 | 17 | 5 | 35% |
| 8 | PLANTATION PIPE LINE CO | HL | 3,173 | 43 | 14 | 5% |
| 9 | SFPP, LP | HL | 2,829 | 46 | 16 | 11% |
| 10 | CENTURION PIPELINE L.P. | HL | 1,882 | 15 | 8 | 31% |

180.    Plains caused 39% more incidents than Buckeye Partners, LP, its closest competitor that operates hazardous liquid pipelines with similar pipeline mileage.  When measured by incidents per 1,000 miles of pipeline, Plains exceeded Buckeye Partners, LP by 34% on an incidents-per-1,000-miles of pipeline basis.  For Plains, corrosion was the leading cause of spills and represented 40% of all incidents.  For Buckeye Partners, LP, corrosion represented only 13% of the all incidents.  Indeed, Plains had ***four times*** more corrosion-caused spills than its closest competitor.

181.    Despite regulatory agencies' efforts in imposing civil penalties and injunctive relief, Plains' record continued to worsen.  The number of Plains pipeline incidents resulting in significant releases of greater than 20 barrels ***increased*** by 44% in the four years after the execution of the 2010 Consent Decree when compared to the four years leading up to the Consent Decree.

182.    Armstrong recognized Plains' dismal record in his internal presentation to Plains employees on environmental safety just hours before the Santa Barbara disaster: "***Have we always highlighted or communicated safety as much as we could/should have?  Undoubtedly we have not***.

Can we do even better?  You bet!  . . .  Must we do better?  Absolutely."  However, when speaking with investors, Armstrong blamed others for Plains' dismal record: "We used to say: I really fear shallow-line pipelines and deep-pulling plows, because if somebody pulls their plow through our pipeline it may be their fault but it's our problem, and we have to go out and take care of that . . . you have the same goal, zero incidents.  That doesn't always happen.  There are wrecks; people do pull in front of you; things happen."  In truth, nobody pulled a plow through Line 901.

O.      **Through Defendants' Touted Integrity Management Programs, Defendants Knew Or Were At Least Reckless in Not Knowing About Lines 901 and 903's State of Corrosion**

183.    Since at least 2006, the DOT required oil transportation operators – like defendants – to implement integrity management programs.  As defendants repeatedly represented in their Class-Period SEC filings, these programs meant defendants were to carry out "more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways."  Only with at least severe recklessness could defendants ignore the results from such "frequent inspections," especially in places as environmentally sensitive as the pristine Santa Barbara coastline.

184.    Purportedly going "beyond regulatory mandate" in their pipeline integrity measures, defendants asserted in their SEC filings that they "currently devote substantial resources" to establish integrity management programs.  "In addition to required activities," defendants stated, "our integrity management program includes several internal programs designed to prevent incidents and includes activities such as automating valves and replacing river crossings."  As a result, defendants knew that automating valves, for example, provided additional safety to their pipelines, but defendants made the purposeful decision not to install automated shut-off systems on Line 901.

- 65 -

Lines 901 and 903 are the **only** pipelines in Santa Barbara County without automatic shut-off systems.

185.    Plains' integrity management program was overseen by Daniel Nerbonne, who was made Vice President of Engineering on March 8, 2005 and promoted to Senior Vice President of Engineering on the eve of the Class Period, on February 25, 2013.  Thus, the person in charge of the very integrity management program supposed to augment safety measures and prevent spills – particularly in HCAs like the Santa Barbara coastline – was a senior executive with direct and steady contact with senior management and the board of directors.  Defendants' own SEC filings confirm that "[a]ll [board of] directors have access to members of management, and *a substantial amount of information transfer and informal communication occurs between meetings*."  Moreover, defendants represented on their website during the Class Period that the Company's Environmental, Health and Safety program "is successful because it is developed, supported and carried out by our employees, *from the senior management team down to the newest hire*."

186.    Defendants confirmed that they stayed abreast of the procedures implemented in their integrity management program.  A year before the Line 901 burst, defendants claimed in a June 5, 2014 investor conference attended by defendants Armstrong, Pefanis, and Swanson, as well as other Plains senior management that Nerbonne's integrity management group had "implemented a tremendous amount of testing procedures."  Armstrong described the integrity management program under Nerbonne:

> We have implemented a tremendous amount of testing procedures, Dan Nerbonne and Rick Jensen and their groups in both US and Canada spend a tremendous a[m]ount of time investing in testing and trying to advance technologies to be able to monitor the pipe and to proactively get in front of some of these opportunities and issues.

To implement these procedures, Armstrong emphasized on that call that since 2007, Plains had dedicated $1.3 billion to the Company's integrity management and incident prevention program.

Because of upper management's purported focus on Plains' integrity management program and the amount of money put toward the program, defendants were at the very least severely reckless in continuing to promote Plains' safety record and legal compliance while permitting Lines 901 and 903 to corrode to the point of a devastating rupture and a government-mandated operational shut-down.

187.    Finally, by virtue of the leak-prevention and corrosion control inspections and measures required by the 2010 Consent Decree, defendants knew or were indifferent to the corrosion issues in Lines 901 and 903.  As described in §V.B., *supra*, the 2010 Consent Decree, which was signed by Mark Gorman, then Plains' Senior Vice President of Operations and Business Development, required defendants to enhance their integrity management program and corrosion control measures, conduct weekly aerial inspections, install algorithmic leak detection monitoring tools on thirty segments of pipeline, including Lines 901 and 903, spend at least $6 million toward mitigating threats posed by corrosion, and provide employee training for positions related to pipeline integrity, controls, and leak detection.   In complying with these requirements, Plains was required to submit semi-annual reports to the EPA detailing the status of the compliance measures, any problems encountered in complying with the Consent Decree, and summaries of action plans developed.  And although Plains was able to terminate the Consent Decree in November 2013, defendants represented that their compliance with the Consent Decrees was not all they had accomplished to mitigate the risk of spills.  Rather, defendants represented in their SEC filings that they had "developed and implemented certain pipeline integrity measures that go beyond regulatory mandate, some of which are now incorporated into the 2010 Consent Decrees."  With "pipeline integrity management as a primary operational emphasis," defendants had instituted an "internal review process pursuant to which we examine various aspects of our pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate."

- 67 -

**P.    The Officer Defendants Were Incentivized to Minimize Expenditures
on Pipeline Maintenance and Safety in Order to Increase Profits and
Thereby Increase Distributions to Themselves**

188.    The MLP forming PAA, like other MLPs, had a limited partner and a general partner.

The limited partner is the entity that provides the capital and receives periodic distributions from the

MLP's cash flow.  Here, the limited partnership represented a 98% interest in PAA and was made up

of the common unitholders of PAA.  PAA unitholders receive distributions within 45 days after the

end of each quarter.  The distributions come from PAA's available cash, which PAA defines as

"cash equivalents on hand at the end of each quarter less reserves established in the discretion of

[the] general partner for future requirements."

189.    The general partner is the entity that manages the MLP's affairs and receives

compensation linked to the company's performance.  Here, the general partner held a 2% interest in

PAA.  In addition to the distributions received on that 2% interest, the general partner also received

IDRs if the amount distributed to the PAA common unitholders exceeded levels specified in the

partnership agreement.  In other words, the more defendants could inflate the amount of the PAA

distributions, the more IDRs the general partner would receive in addition to the 2% PAA interest.

PAA's general partner was PAA GP LLC, in which Plains AAP, L.P. held a 100% member interest,

and thereby received all of the general partner benefits from PAA, including the 2% interest and all

of the IDRs.[4]  For the 12 months ending June 30, 2013 (immediately before the IPO), AAP had

---

[4]    AAP's ownership of PAA's IDRs and PAA's 2% general partnership interest entitles it to
receive, without duplication: 2% of all cash distributed in a quarter until $0.2250 has been
distributed in respect of each PAA common unit for that quarter; 15% of all cash distributed in a
quarter after $0.2250 has been distributed in respect of each PAA common unit for that quarter; 25%
of all cash distributed in a quarter after $0.2475 has been distributed in respect of each PAA
common unit for that quarter; and 50% of all cash distributed in a quarter after $0.3375 has been
distributed in respect of each PAA common unit for that quarter.  PAGP, owning a limited partner
interest in AAP, owns an interest in these distributions.

received a total distribution from PAA of $398 million, including IDRs.  During 2014, PAA paid $473 million to the general partner, including $454 million in IDRs.

190.    PAGP was formed in July 2013, just before the IPO.  Its then-"Existing Owners" directly or indirectly owned all of the ownership interest in both AAP (also a limited partnership) and AAP's general partner, GP LLC, the entity that manages AAP's affairs.  As general partner of AAP, who was general partner of PAA, GP LLC, then is effectively general partner of PAA.  PAA's operations are conducted through GP LLC, which employs all of the business's employees, including executives and management, and maintains a board of directors.

191.    As part of the IPO on October 16, 2013, the Existing Owners sold to PAGP 128,000,000 AAP units (representing a 21.1% limited partnership interest) and an aggregate 21.1% of the membership interests in Holdings LLC, PAGP's general partner.  PAGP, and its Existing Owners, expected to net $2.727 billion from the issuance of 128,000,000 Class A shares, whose proceeds, after underwriting discounts and commissions and offering expenses, were to be distributed to the Existing Owners.

192.    Upon completion of the recapitalization undertaken with the IPO, PAGP's sole assets consisted of a 100% member interest in GP LLC, which it thus owned and controlled, and a 21.1% limited partner interest (19.7% economic interest) in AAP, which in turn directly or indirectly owns all of the IDRs and the 2% general partner interest in PAA.  The remaining interests in AAP were held by the Existing Owners, with a 78.9% limited partner interest (73.5% economic interest), and the AAP management unit owners with a 6.8% economic interest.

193.    As of December 31, 2014, 34.1% of AAP's limited partner interest (31.8% economic interest) was held by PAGP; the remaining 65.9% of its limited partner interest  (61.2% economic interest, diluted by 7.0% for the AAP management unit owners) was held by the Existing Owners.

- 69 -

194.    First, on top of Armstrong's $375,000 annual salary, Pefanis's $300,000 annual salary, and Swanson's $250,000 annual salary, each executive garnered millions of dollars annually in cash bonuses.  For 2013 and 2014, Armstrong received a bonus of $4.4 million and $3.9 million, respectively; Pefanis gained $4.25 million of $3.8 million, respectively; and Swanson took home $1.65 million and $1.8 million, respectively.  The cash bonuses were meant to serve as "a near-term motivation."  The primary performance metric upon which cash bonuses were determined was the ability to generate increasing and sustainable cash distributions to PAA unitholders – in other words, maximizing "available cash," which disincentivized defendants to spend money on pipeline upkeep and replacement.  Also considered was PAA's adjusted EBITDA, relative to established guidance.

195.    On top of their salaries and bonuses, PAA generally granted phantom-unit awards to executive officers on a three-year cycle to encourage both performance and retention.  These long-term incentive awards are granted based on PAA's ability to increase sustainable quarterly distribution to the PAA unitholders.  The phantom-unit grants are issued to encourage and reward timely achievement of targeted distribution levels, but also required minimum service periods before vesting.  When the phantom unit "vests," unlike an option, it results in the delivery of a common PAA unit or cash of equivalent value.  In 2013, Armstrong received $2.66 million, Pefanis receive $2.40 million and Swanson received $1.77 million in long-term incentive plan phantom grants.

196.    In addition to the phantom unit grants, executives may receive AAP Management Units, which represented a "profits interest" in AAP and additional long-term incentives for management.  Upon reaching certain performance thresholds "aligned with interest of our common [PAA] unitholders," the holders of AAP Management Units are entitled to receive a portion of the distributions that would otherwise be paid to holders of AAP units.

197.    Thus, the executive officers, including defendants Armstrong, Pefanis and Swanson, were entirely incentivized – to the tune of millions of dollars – to minimize the amount spent on

pipeline integrity and maintenance to keep up the PAA quarterly distributions.  Not only were the bonuses based on PAA distributions, but long-term grants were based on PAA unitholder distributions, as well as the distributions received as limited partners in PAGP.  In fact, PAA's Form 10-K noted that as of February 17, 2015, the aggregate value of the equity ownership obtained through holding various interests in the partnership structure was "significantly" greater than the value for the salaries and bonuses of the "Named Executive Officers" (which included defendants Armstrong, Pefanis and Swanson:

> As of February 17, 2015, our Named Executive Officers beneficially owned, in the aggregate, (i) approximately 2.2 million of our common units (excluding any unvested equity awards), (ii) through their ownership of interests in PAA Management, L.P., an approximate 2.0% indirect ownership interest (approximate 1.9% economic interest) in AAP, and (iii) 28,931,571 AAP Management Units, which represent an approximate 4.1% economic interest in AAP.  Based on the market price of our common units and PAGP's Class A shares at February 17, 2015 and assuming the conversion of all earned AAP Management Units into AAP units at a conversion factor of approximately 0.930 and the exchange of such AAP units for an equivalent number of PAGP Class A shares, *the value of the equity ownership of these individuals was significantly greater than the combined aggregate salaries and bonuses of these individuals for 2014*.

198.    Additionally, defendants Armstrong, Pefanis and Swanson beneficially owned Class B shares, which they had the right to exchange along with the same number of AAP units and general partner units to receive PAGP Class A shares.  Of Class B shares, Armstrong owned 15,208,540, Pefanis owned 10,415,200, and Swanson owned 3,577,528 shares.  Armstrong, Pefanis and Swanson's Class B share-ownership comes from their ownership interests in PAA Management L.P. and ownership of AAP units and (pre-IPO) Class B units.  This gave defendants the right to exchange for Class A shares and receive even more compensation through PAGP distributions, which again, based on the partnership structure, were maximized if the PAA unitholders' distributions were maximized (because of the flow of 2% general partnership interest and the IDRs up to PAGP).

199.    Through this convoluted structure, Plains executives were incentivized to minimize maintenance and replacement costs on Plains pipelines in order to increase profits and distributions to themselves.

## VI.    VIOLATIONS OF THE EXCHANGE ACT

### A.    Defendants' False And Misleading Statements And Omissions Issued During The Class Period

200.    On February 27, 2013, the start of the Class Period, PAA filed its 2012 Annual Report on a Form 10-K with the SEC.  PAA's 2012 Form 10-K was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson, Pefanis and Herbold.

201.    PAA represented within the 2012 Form 10-K that it was in compliance with the various laws and requirements regulating its pipelines, including (1) HLPSA, regulated by PHMSA, (2) the OPA, which PHMSA oversees as it applies to onshore oil pipelines, and (3) Risk Management Plan regulations overseen by the EPA.

202.    Specifically, defendants represented falsely and/or misleadingly in the 2012 PAA Form 10-K that they complied with applicable HLPSA regulations:

> Currently, we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments.

*        *        *

> We currently devote substantial resources to comply with DOT-mandated pipeline integrity rules.

203.    Defendants also represented falsely and/or misleadingly in the 2012 PAA Form 10-K that they complied with applicable OPA and related state regulations:

> We believe that we are in substantial compliance with applicable OPA requirements. State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when they occur.  We believe that we are in substantial compliance with all such federal, state and Canadian requirements.

- 72 -

204.     Moreover, defendants represented falsely and/or misleadingly in the 2012 PAA Form 10-K that they complied with applicable EPA Risk Management Plan regulations:

We believe we are operating in substantial compliance with our risk management program.

205.     With regard to all of the environmental health and safety laws applicable to Plains, defendants stated in the 2012 Form 10-K that "[f]ailure to comply with these laws and regulation may result in the assessment of administrative, civil, and criminal penalties, the imposition of investigatory and remedial liabilities, the issuance of injunctions that may subject us to additional operational requirements and constraints, or claims of damages to property or persons resulting from our operations."

206.     In the 2012 Form 10-K, defendants also represented that their pipeline maintenance and integrity measures "go beyond regulatory mandate" and that pipeline integrity management was a "primary operational emphasis."  With respect to PAA's internal integrity management program, defendants represented falsely and/or misleadingly:

In addition to required activities, our integrity management program includes several internal programs designed to prevent incidents and includes activities such as automating valves and replacing river crossings.

*        *        *

We have an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement.  Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from U.S. EPA enforcement actions, we may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines.

*        *        *

We have also developed and implemented certain pipeline integrity measures that go **beyond regulatory mandate**, some of which are now incorporated into the 2010 Consent Decrees.

- 73 -

*     *     *

Accordingly, for 2013 and beyond, we will continue to *focus on pipeline integrity management as a primary operational emphasis*. In that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on *risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention*. We have an internal review process pursuant to which we examine various aspects of our pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate. The purpose of this process is to review the surrounding environment, condition and operating history of these pipeline and gathering assets to determine if such assets warrant *additional investment or replacement*. Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from regulatory agency enforcement actions, we may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems to maintain environmental compliance and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines.

207.    In March 2013, and continuously throughout the Class Period Plains also stated on its website that "*our commitment to EH&S [Environmental, Health and Safety] excellence* goes beyond just operating our facilities in a responsible manner, but reflects the *vision and dedication shared by our management team* and our employees who operate our facilities on a daily basis."

208.    The statements referenced in ¶¶202-207 above, which caused Plains securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts. These statements were known by Plains and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(b)    Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

- 74 -

(c)     In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)     Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(f)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K. and V.O.;

(h)     Defendants had not exceeded federal regulations in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact violated the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed, as discussed in §§V.F. and V.O.;

(i)     As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.; and

(j)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.

209.    On May 8, 2013, PAA filed with the SEC its 1Q13 quarterly report on a Form 10-Q. PAA's 1Q13 Form 10-Q was signed by PAA GP LLC, AAP, GP LLC, Armstrong and Swanson. That document referred investors to the statements in the Company's 2012 Form 10-K regarding the Company's pipeline integrity and maintenance and compliance with applicable law, as set forth in ¶¶202-206, *supra*.

210.    In June 2013, Plains continued to state on its website that "our commitment to EH&S [Environmental, Health and Safety] excellence goes beyond just operating our facilities in a responsible manner, but reflects the vision and dedication shared by our management team and our employees who operate our facilities on a daily basis."

211.    On July 29, 2013, PAGP filed an initial Form S-1 Registration Statement with the SEC for the IPO of its Class A shares.  The Form S-1 was signed by Holdings LLC, Armstrong, Swanson and Herbold.  It includes each of the false and/or misleading statements as set forth above at ¶¶202-206 concerning the Company's compliance with applicable laws and regulatory requirements, as well as its own integrity management program and internal reviews of its pipelines.[5]

212.    The statements referenced in ¶¶209-211 above, which caused Plains securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains, Plains Holdings, and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

---

[5]    The statements are duplicative except where PAA's 2012 Form 10-K used the pronoun "we," PAGP in its Registration Statement has replaced with "PAA."

(b)     Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)     In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)     Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(f)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed and as described in more detail in §§V.F. and V.O.;

(i)     As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or

replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.;

(j)    Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(k)    In addition, following PHMSA inspections in March and June 2013, PHMSA alerted defendants to the fact that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)    An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.; and

(m)    Inspection surveys conducted for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company, as discussed in §V.F.

213.    On August 8, 2013, PAA filed with the SEC its 2Q13 quarterly report Form 10-Q. PAA's 2Q13 Form 10-Q was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson and Herbold.  That document referred investors to the statements concerning the Company's pipeline integrity and maintenance and compliance with applicable law in the Company's 2012 Form 10-K, as set forth in ¶¶202-206, *supra*.

214.   On August 8, 2013, PAA made false and misleading statements in the August 2013 Notes Offering Materials, which incorporated by reference PAA's SEC filings, as described in §VII.B.  On August 12, 2013, PAA filed a Form 8-K announcing entry into a Material Definitive Agreement under which PAA and PAA Finance Corp. entered into an underwriting agreement with J.P. Morgan Securities LLC and Merrill Lynch, Pierce, Fenner & Smith Inc. for the August 2013 Notes Offering.  The offering closed on August 15, 2013.  The 8-K was signed by PAA GP LLC, GP LLC, AAP, and McGee.  Defendants represented falsely and/or misleadingly in the August 12, 2013 Form 8-K that the Company complied with applicable pipeline maintenance and safety regulations. For example, defendants stated:

> Environmental Compliance.  Except as described in the Pricing Disclosure Package and the Prospectus, ***none of the Plains Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws")***, or lacks any permits, licenses or other approvals required of them under applicable Environmental Laws to own, lease or operate their properties and conduct their business as described in the Pricing Disclosure Package and the Prospectus or is violating any terms and conditions of any such permit, license or approval, which in each case would reasonably be expected to have a Material Adverse Effect.

215.   The statements referenced in ¶214 above, which caused Plains securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)   Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(b)      Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)      In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)      Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)      Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(f)      Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(g)      Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)      Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed and as described in more detail in §§V.F. and V.O.;

(i)      As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or

- 80 -

replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.;

(j)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(k)     Following PHMSA inspections in March and June 2013, PHMSA alerted defendants to the fact that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)     An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.; and

(m)     Inspection surveys conducted for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company, as discussed in §V.F.

216.    On September 6, 2013, September 26, 2013, October 2, 2013, and October 7, 2013, PAGP filed Amendments to the Form S-1 filed on July 29, 2013 for the IPO of its Class A shares. Each Amendment was signed by Holdings LLC, Armstrong, Swanson and Herbold.  Each Amendment included each of the false and/or misleading statements as set forth above at ¶¶202-206 concerning defendants' compliance with applicable laws and regulatory requirements, as well as the Company's integrity management program and internal reviews of its pipelines.

- 81 -

217.    On October 16, 2013, PAGP filed a final Prospectus dated October 15, 2013, and conducted the IPO of 132,380,000 of its Class A shares.  The Prospectus included each of the false and/or misleading statements as set forth above at ¶¶202-206 concerning defendants' compliance with applicable laws and regulatory requirements, as well as the Company's integrity management program and internal reviews of its pipelines.

218.    On October 21, 2013, PAGP filed a Form 8-K announcing entry into a Material Definitive Agreement dated under which PAGP and Holdings LLC entered into an underwriting agreement dated October 15, 2014, with Barclays for the IPO.  The Form 8-K was signed by Holdings LLC and McGee.  Specifically, PAGP represented unequivocally that neither PAGP nor Holdings LLC, nor any material subsidiaries were in violation of any applicable laws or regulations, as set forth in ¶214, *supra*.

219.    In November 2013, Plains continued to state on its website, as it would throughout the Class Period, that "*our commitment to EH&S [Environmental, Health and Safety] excellence* goes beyond just operating our facilities in a responsible manner, but reflects the vision and *dedication shared by our management team* and our employees who operate our facilities on a daily basis."  The website went on to represent that "Plains All American is *committed to public safety, protection of the environment and operation of our facilities in a prudent and safe manner*."  Further, the website stated that the Company "perform[s] scheduled maintenance on all of our pipeline systems and *make[s] repairs and replacements when necessary or appropriate*."  Finally, the website represented that the Company "believe[s] that *all of our pipelines have been constructed and maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards proscribed by the American Petroleum Institute and accepted industry practice*."

220.    On November 6, 2013, PAA filed with the SEC its 3Q13 quarterly report on a Form 10-Q.  PAA's 3Q13 Form 10-Q was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson and Herbold.  The 10-Q referred investors to the false and misleading statements concerning the Company's compliance with applicable pipeline safety and maintenance regulations in PAA's 2012 Form 10-K as set forth above at ¶¶202-206.

221.    On November 22, 2013, PAGP filed with the SEC its 3Q13 quarterly report on a Form 10-Q.  PAGP's 3Q13 Form 10-Q was signed by Holdings LLC, Armstrong, Swanson and Herbold.  The 10-Q referred investors to false and misleading statements concerning defendants' compliance with applicable laws and regulatory requirements in the final prospectus dated October 15, 2013, as set forth above at ¶217, and thereby reiterated statements set forth above at ¶202-206 in PAA's 2012 Form 10-K.

222.    The statements referenced in ¶¶216-221 above, which caused Plains and Plains Holdings' securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains, Plains Holdings, and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(b)    Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)    In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather

than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)     Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(f)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed and as described in more detail in §§V.F. and V.O.;

(i)     As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.;

(j)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

- 84 -

(k)     Following PHMSA inspections in March and June 2013, PHMSA alerted defendants to the fact that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)     An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.;

(m)     Inspection surveys conducted for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company, as discussed in §V.F.; and

(n)     PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping, as discussed in §V.F.

1108692_1

223. On February 28, 2014 and March 12, 2014, PAA and PAGP, respectively filed their 2013 Annual Reports on Forms 10-K with the SEC. PAA's 2013 Form 10-K was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson, Pefanis and Herbold, as well as directors of GP LLC. PAGP's 2013 Form 10-K was signed by Holdings LLC, Armstrong, Swanson, Pefanis and Herbold, as well as directors of Holdings LLC. The 2013 Forms 10-K each repeated the false and misleading statements, set forth above at ¶¶202-206, concerning defendants' compliance with applicable laws and regulatory requirements, as well as the Company's integrity management program and internal reviews of its pipelines.[6]

224. On April 15, 2014, PAA made false and misleading statements in the April 2014 Notes Offering Materials, which incorporated by reference PAAs' SEC filings, as described in §VII.B. On April 18, 2014, PAA filed a Form 8-K announcing entry into a Material Definitive Agreement dated under which PAA and PAA Finance Corp. entered into an underwriting agreement dated April 15, 2014, with Citigroup, SunTrust, UBS and Wells Fargo for the April 2014 Notes Offering. The Form 8-K was signed by PAA GP LLC, AAP, GP LLC and McGee. Specifically, PAA represented unequivocally that none of PAA, PAA GP LLC, AAP, GP LLC, or material subsidiaries were in violation of any applicable laws or regulations, as set forth in ¶214, *supra*.

225. On May 9, 2014 and May 13, 2014, PAA and PAGP, respectively, filed with the SEC their 1Q14 quarterly reports on Forms 10-Q. PAA's 1Q14 10-Q was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson, and Herbold. PAGP's 1Q14 10-Q was signed by Holdings LLC, Armstrong, Swanson and Herbold. The 10-Qs referred investors to the false and misleading statements concerning the Company's compliance with applicable pipeline safety and maintenance regulations in PAA's and PAGP's 2013 Forms 10-K, as set forth in ¶¶202-206, 223, *supra*.

---

[6]   As in the IPO Offering Materials, the statements are duplicative to PAA's 2012 Form 10-K except where PAA used the pronoun "we," PAGP in its 2013 Form 10-K has replaced with "PAA."

226.    The statements referenced in ¶¶223-225 above, which caused Plains and Plains Holdings' securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains, Plains Holdings, and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(b)    Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)    In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)    Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)    Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(f)    Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(g)    Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install

automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed and as described in more detail in §§V.F. and V.O.;

(i)     As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.;

(j)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(k)     Following PHMSA inspections in March and June 2013, PHMSA alerted defendants to the fact that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)     An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.;

(m)     Inspection surveys conducted for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company, as discussed in §V.F.; and

(n)     PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping, as discussed in §V.F.

227.     On June 5, 2014, Armstrong, Pefanis, and Swanson presented at an Investor Day Conference.   During the conference, defendants falsely represented that pipeline safety and maintenance was one of the Company's top priorities, that the Company was well prepared for a spill, and that the Company, therefore, complied with applicable laws and regulations.  For example, Armstrong stated:

> *We are committed to operational excellence in safety, pipeline integrity management, and responding to incidents in the unfortunate development that they do occur*.

*     *     *

> Again, ***commitment to operational excellence***, we will start with safety, it is a ***core value***.  We foster a culture that really emphasizes ***operational excellence, asset integrity and safety***.  Our incident rate is superior to industry averages, both in terms of incidents as well as worker's compensation claims.

*     *     *

- 89 -

With respect to integrity management and incident prevention, we do a lot and I mean a tremendous amount that will never be appreciated by the public in the following regard.

\*      \*      \*

When we buy an asset in an acquisition we have not only the opportunity capital in our forecast but we have in our forecast the amount of what we call fix up capital that it takes just to get that pipeline or that tank running at the – and operated in a way that we would feel comfortable running it for the next *25 or 30 years*.

\*      \*      \*

*We do a lot of things proactively*.  Again, something that you would never see as a highlight in a press release, but we have taken out of service or sold to others about 6,000 miles of pipeline that we just thought was not necessary or was of a quality that was not safe to operate at the same time while we have added 3,000 miles of new construction or purchase type.

*We have implemented a tremendous amount of testing procedures*, Dan Nerbonne and Rick Jensen and their groups in both US and Canada spend a tremendous about of time investing in testing and trying to *advance technologies* to be able to monitor the pipe and to proactively get in front of some of these opportunities and issues.

\*      \*      \*

But in all cases we want to make sure we do the right thing.

\*      \*      \*

We're also using some of the state-of-the-art tools and technologies to do things that allow us, again, to operate it well.

\*      \*      \*

In the – we are committed also to not only doing the right things but we have learned over time that you have to make sure you convince the people who are responsible for regulating that you have done the right things.  And so, *we are committed to being prepared for potential incidents, incident planning and response training is an ongoing basis*.

\*      \*      \*

In the unfortunate event that we do have an incident *we will be prepared*. Our key objective obviously is to preserve life and safeguard the environment.  The personnel that are on site at the time that we have an event that does come up have as much unrestricted authority to make decisions to spend money as it would if I was standing on that [side alone].

- 90 -

\*        \*        \*

And then as I mentioned, ***we have improved our ability to communicate with the local officials, the regulatory bodies, etc.***, to make sure that not only are we doing the right thing but that they know we're doing the right thing, because they are put on the spot when these events happen.

\*        \*        \*

We won't want to learn that lesson twice and so ***we are well prepared***.

228.   The slides accompanying the June 5, 2014 Investor Day Conference reiterated defendants' false statements concerning the Company's purported commitment to safety and maintenance:

Commitment to Operational Excellence

- ***Safety***

- ***Pipeline Integrity Management***

- ***Incident Response Preparation***.

\*        \*        \*

Commitment to Operational Excellence: Safety

- ***Safety is a core value – We foster a culture that emphasizes operational excellence, asset integrity & safety***

- ***PAA's incident rate is superior to the industry average***

- PAA's pipeline group had fewer incidents than the industry average for the past five years and for nine of the past ten years

\*        \*        \*

***PAA is committed to prudently maintaining its assets for the long-term***

- ***Proactively high-grading the asset base*** – Over the last 10 yrs, ~6,000 miles of pipeline removed from service or sold, while constructing (or purchasing) new pipelines totaling >3,000 miles

- ***Implemented stringent testing/evaluation procedures on new pipelines being placed into service*** (Placing inspectors in the pipe mills, Hydro-testing pipe, x-raying 100% of welds, assessing gaps in pipeline coating, utilizing

- 91 -

smart pig runs to establish a baseline assessment and examine for construction-related damage)

> • ***Multiple programs established to prevent/mitigate environmental impact***

> • ***Valve Placement & Automation – Assessing asset base for sensitive areas and optimal valve placement - installing additional valves and/or automating valves to minimize potential release volumes*** . . . .

> • ***Continue to regularly assess pipeline integrity using state-of-the-art inspection tools and technologies***

> • Smart pigs, advanced data interpretation/integration, advanced GIS mapping and risk screening

> • Improving data interpretation/integration capabilities to better prioritize, focus on and assess areas warranting attention

Since 2007, we will have invested ~$1.3 B in maintenance capital & expense, integrity mgmt and API 653 repairs (incl. $275 MM in 2014)

***PAA is committed to being prepared for potential incidents***

> • Incident planning and response training on an ongoing basis

> • Regularly engaging with first responders across the company

> • Incident management tools and resources ready for use, including specific tactical plans and response strategies to be used in critical areas in the event of an emergency

In the unfortunate event of an incident

> • ***We will be prepared***

> • Our key objective is to preserve life and safeguard the environment through immediate response and deployment of resources.

229.    The statements referenced in ¶¶227-228 above, which caused Plains and Plains Holdings' securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains, Plains Holdings, and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

- 92 -

(a)     Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(b)     Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)     In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)     Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(f)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed and as described in more detail in §§V.F. and V.O.;

- 93 -

(i)　　As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.;

(j)　　Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(k)　　Following PHMSA inspections in March and June 2013, PHMSA alerted defendants to the fact that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)　　An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.;

(m)　　Inspection surveys conducted for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company, as discussed in §V.F.; and

(n)　　PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and

- 94 -

mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping, as discussed in §V.F.

230.    On August 8, 2014 and August 12, 2014, PAA and PAGP, respectively, filed with the SEC their 2Q14 quarterly reports on Forms 10-Q.  PAA's 2Q14 10-Q was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson, and Herbold.  PAGP's 2Q14 10-Q was signed by Holdings LLC, Armstrong, Swanson and Herbold.  The 10-Qs referred investors to the false and misleading statements concerning the Company's compliance with applicable pipeline safety and maintenance regulations in PAA's and PAGP's 2013 Forms 10-K, as set forth in ¶¶202-206, 223, *supra*.

231.    In August 2014, Plains repeated the false statements on its website concerning its (i) commitment to "public safety, protection of the environment and operation of [its] facilities in a prudent and safe manner"; (ii) implementation of required maintenance and repairs; and (iii) belief that all pipelines, including Lines 901 and 903, were built and maintained in accordance with applicable laws and regulations, as set forth in ¶219, *supra*.

232.    On September 2, 2014, PAA made false and misleading statements in the September 2014 Notes Offering Materials, which incorporated by reference PAAs' SEC filings, as described in §VII.B.  On September 5, 2014, PAA filed a Form 8-K announcing entry into a Material Definitive Agreement dated under which PAA and PAA Finance Corp. entered into an underwriting agreement dated September 2, 2014, with J.P. Morgan, Barclays, BNP Paribas and Merrill Lynch for the September 2014 Notes Offering.  The Form 8-K was signed by PAA GP LLC, AAP, GP LLC and McGee.  Specifically, PAA represented unequivocally that none of PAA, PAA GP LLC, AAP, GP

LLC, or material subsidiaries were in violation of any applicable laws or regulations, as set forth in ¶214, *supra*.

233.    On November 7, 2014, PAA and PAGP each filed with the SEC their 3Q14 quarterly reports on Forms 10-Q.  PAA's 3Q14 10-Q was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson, and Herbold.  PAGP's 3Q14 10-Q was signed by Holdings LLC, Armstrong, Swanson and Herbold.  The 10-Qs referred investors to the false and misleading statements concerning the Company's compliance with applicable  pipeline safety and maintenance regulations in PAA's and PAGP's 2013 Forms 10-K, as set forth in ¶¶202-206, 223, *supra*.

234.    On November 12, 2014, PAGP filed a prospectus in connection with the Plains Holdings Secondary Offering Materials that was made effective pursuant to the amended Form S-3 registering 69,000,000 Class A Shares of PAGP filed on November 6, 2014.

235.    The prospectus incorporated by reference PAGP's 2013 Form 10-K, and thereby repeated the false and misleading statements as set forth above at ¶¶202-206, 223 concerning defendants' compliance with applicable laws and regulatory requirements, as well as the Company's integrity management program and internal reviews of its pipelines.

236.    On November 13, 2014, PAGP filed a Form 8-K announcing entry into a Material Definitive Agreement dated under which PAGP and Holdings LLC entered into an underwriting agreement dated November 10, 2014, with J.P. Morgan and Citigroup for Plains Holdings Secondary Offering.  The Form 8-K was signed by Holdings LLC and McGee.  Specifically, PAGP represented unequivocally that neither PAGP nor Holdings LLC, nor any material subsidiaries were in violation of any applicable laws or regulations, as set forth in ¶214, *supra*.

237.    On December 2, 2014, PAA made false and misleading statements in the December 2014 Notes Offering Materials, which incorporated by reference PAAs' SEC filings, as described in §VII.B.  On December 5, 2014, PAA filed a Form 8-K announcing entry into a Material Definitive

Agreement dated under which PAA and PAA Finance Corp. entered into an underwriting agreement dated December 2, 2014, with Barclays, SunTrust and Wells Fargo for the December 2014 Notes Offering.  The Form 8-K was signed by PAA GP LLC, AAP, GP LLC and McGee.  Specifically, PAA represented unequivocally that none of PAA, PAA GP LLC, AAP, GP LLC, or material subsidiaries were in violation of any applicable laws or regulations, as set forth in ¶214, *supra*.

238.    The statements referenced in ¶¶230-237 above, which caused Plains and Plains Holdings' securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains, Plains Holdings, and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(b)    Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)    In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)    Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)    Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed

by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(f)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed and as described in more detail in §§V.F. and V.O.;

(i)     As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.;

(j)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(k)     Following PHMSA inspections in March and June 2013, PHMSA alerted defendants to the fact that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

- 98 -

(l)      An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.;

(m)      Inspection surveys conducted for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company, as discussed in §V.F.;

(n)      PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping, as discussed in §V.F.; and

(o)      Defendants received an inline inspection report in May 2014 regarding Line 903 that showed the segment had two girth weld anomalies requiring investigation, as discussed in §V.G.

239.    On February 25, 2015, PAA and PAGP filed their 2014 Annual Reports on Forms 10-K with the SEC.  PAA's 2014 Form 10-K was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson, Pefanis and Herbold, as well as directors of the GP LLC.  PAGP's 2014 Form 10-K was

signed by Holdings LLC, Armstrong, Swanson, Pefanis and Herbold, as well as directors of the Holdings LLC.

240.    The 2014 Forms 10-K each reiterated the false and/or misleading statements as set forth above at ¶¶202-206 concerning defendants' compliance with applicable laws and regulatory requirements, as well as the Company's integrity management program and internal reviews of its pipelines.[7]  These statements in the Forms 10-K were each false and misleading when made in that each omitted and/or misrepresented material facts.  Defendants knew or were severely reckless in not knowing but stating otherwise that the Company was in violation of applicable laws and regulations and that the Company had a long, documented history of failing to maintain and monitor its pipelines and failing to implement adequate spill response plans, as discussed in §V.

241.    On February 26, 2015, PAA made false and misleading statements in the Plains Offering Materials, which incorporated by reference PAAs' SEC filings, as described in §VII.A.3.  On March 2, 2015, PAA filed a Form 8-K announcing entry into a Material Definitive Agreement dated under which PAA entered into an underwriting agreement dated Feb. 25, 2015, with Barclays for the Plains Offering.  The Form 8-K was signed by PAA GP LLC, AAP, GP LLC and McGee.  Specifically, PAA represented unequivocally that none of PAA, PAA GP LLC, AAP, GP LLC, or material subsidiaries were in violation of any applicable laws or regulations, as set forth in ¶214, *supra*.

---

[7]    The statements are each reiterated in full, taking into account adjustments for pronouns and the relevant year, with one exception.  This statement regarding defendants' "internal review process" has been excised from the 2014 Form 10-K: "We have an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement.  Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from U.S. EPA enforcement actions, we may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines."

242.   Between February and May 2015, Plains repeated the false statements on its website concerning its (i) commitment to "public safety, protection of the environment and operation of [its] facilities in a prudent and safe manner"; (ii) implementation of required maintenance and repairs; and (iii) belief that all pipelines, including Lines 901 and 903, were built and maintained in accordance with applicable laws and regulations, as set forth in ¶219, *supra*.

243.   On May 8, 2015, PAA and PAGP each filed with the SEC their 1Q15 quarterly reports on Forms 10-Q.  PAA's 1Q15 10-Q was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson, and Herbold.  PAGP's 1Q15 10-Q was signed by Holdings LLC, Armstrong, Swanson and Herbold.  The 10-Qs referred investors to the false and misleading statements concerning the Company's compliance with applicable pipeline safety and maintenance regulations in PAA's and PAGP's 2014 Forms 10-K, as set forth in ¶¶202-206, 239, *supra*.

244.   The statements referenced in ¶¶239-243 above, which caused Plains and Plains Holdings' securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains, Plains Holdings, and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)   Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(b)   Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)   In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather

- 101 -

than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)     Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(f)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed and as described in more detail in §§V.F. and V.O.;

(i)     As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.;

(j)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

- 102 -

(k)     Following PHMSA inspections in March and June 2013, PHMSA alerted defendants to the fact that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)     An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.;

(m)     Inspection surveys conducted for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company, as discussed in §V.F.;

(n)     PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping, as discussed in §V.F.;

- 103 -

(o)      Defendants received an inline inspection report in May 2014 regarding Line 903 that showed the segment had two girth weld anomalies requiring investigation, as discussed in §V.G.; and

(p)      On May 5, 2015, an ILI of Line 901 revealed at least four anomalies that required immediate attention.  Pursuant to Rosen's normal practice, these issues were communicated to the Company within days of discovery by Rosen.  Under applicable regulations, the Company was required to shut down Line 901 pending resolution of the immediate issues.  Rather than shut down Line 901, defendants repeated the false and misleading statements concerning pipeline safety and maintenance and compliance with applicable law and continued to operate Line 901.   Had defendants complied with applicable regulations, the eventual Line 901 spill would have been avoided entirely, as discussed in §§V.F. and V.G.

245.      On May 26, 2015, days after the devastating Santa Barbara oil spill, PAA and PAGP each filed Forms 8-K with the SEC describing the spill and noting that defendants "currently estimate[] that the amount of released crude oil could be as high as approximately 2,400 barrels" or 101,000 gallons – a figure reflecting a 4,000-gallon reduction from the initial estimates the Company provided to the news media.  PAA's Form 8-K was signed by PAA GP LLC, AAP, GP LLC, and McGee.  PAGP's Form 8-K was signed by Holding LLC and McGee.

246.      On June 4, 2015, Armstrong, Pefanis, and Swanson presented at an Investor Day Conference.  During the conference, defendants discussed the Santa Barbara oil spill and continued to tout the Company's safety and maintenance procedures:

> We had a release in Santa Barbara, County.  If you could pick any place in the world you would not want to have a release, that would probably qualify as the one.  We've been doing all the right things, but we've been getting a lot of press.
>
> *      *      *
>
> It is that safe operations and protecting the environment are much more important to us than profit. . . .

- 104 -

\*          \*          \*

So at the end of the day we want to make sure we follow all the laws for environmental health and safety rules and regulation.  But we want to go farther than that.

\*          \*          \*

We assess the pipeline using the best tools that are available.  Smart pigs, we run them when it makes sense, more often than are required.  We improve our data interpretation to make sure that we are trying to prevent things from happening, not diagnose what did happen.

247.   The statements referenced in ¶¶245-246 above, which caused Plains and Plains Holdings' securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains, Plains Holdings, and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)   The true size of the Santa Barbara oil spill was significantly larger than represented and, in fact, was closer to the number of gallons that defendants knew would result in a worst-case-scenario spill.  Defendants knew no later than May 28, 2015, by which date Line 901 had been purged and excavated, that the worst case estimate for the spill was larger than previously reported to the market.  In discussing the spill and its effects, defendants were obligated to disclose this material information concerning the spill and/or correct their prior misstatements regarding the size of the spill, as discussed in §V.E.;

(b)   Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(c)   Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(d)      In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site. Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(e)      Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(f)      Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(g)      Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(h)      Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(i)      Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed and as described in more detail in §§V.F. and V.O.;

(j)      As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.J. and V.P.;

- 106 -

(k)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(l)     Following PHMSA inspections in March and June 2013, PHMSA alerted defendants to the fact that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(m)     An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.;

(n)     Inspection surveys conducted for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company, as discussed in §V.F.;

(o)     PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping, as discussed in §V.F.;

- 107 -

(p)    Defendants received an inline inspection report in May 2014 regarding Line 903 that showed the segment had two girth weld anomalies requiring investigation, as discussed in §V.G.; and

(q)    On May 5, 2015, an ILI of Line 901 revealed at least four anomalies that required immediate attention.  Pursuant to Rosen's normal practice, these issues were communicated to the Company immediately upon discovery by Rosen.  Under applicable regulations, the Company was required to shut down Line 901 pending resolution of the immediate issues.  Rather than shut down Line 901, defendants repeated the false and misleading statements concerning pipeline safety and maintenance and compliance with applicable law and continued to operate Line 901.  Had defendants complied with applicable regulations, the eventual Line 901 spill would have been avoided entirely, as discussed in §§V.F. and V.G.

248.    Between May 24, 2015 and July 13, 2015, defendants issued *26* separate "Incident Response Updates" on the website they created to track the spill response, www.plainsline901response.com, all of which are posted in chronological order on the website.  The Incident Response Updates purported to provide updated information concerning the spill, its impact, and the cleanup efforts.  Plains also published on the website "Recovery Q&As" on June 17, 2015 discussing Plains' safety record, recovery completion, affected pipeline, and how oil traveled to the ocean.  Finally, Plains republished the June 4, 2015 Investor Day presentation and on June 24, 2015 published Armstrong's June 19, 2015 letter to Congress concerning the spill, its impact, and the shutdown of Line 903.

249.    On June 11, 2015, Plains and Plains Holdings each filed a Form 8-K disclosing information provided by a Plains representative on June 10, 2015 in response to a reporter's questions at a media briefing held by federal response coordinators working on the spill.  The Form 8-K discussed costs incurred to date and the progress of the spill cleanup.  In addition, Plains and

- 108 -

Plains Holdings represented that the total costs to be incurred by Plains in connection with the spill were not reasonably capable of estimation or determination, although Plains expected its insurance coverage to apply, subject to coverage terms and deductibles.  The Form 8-K was signed by McGee.

250.    On June 26, 2015, Patrick Hodgins, director of security and safety for Plains, testified before a California state legislative committee investigating the spill that "[t]he first time I heard anything about the corrosion is what I read in the newspapers. . . .  We had no indication at all to assume there was an issue."

251.    Moreover, when asked whether the 2007 or 2012 ILIs "discover[ed] that there was a [metal] loss greater than 50%" in Line 901, Hodgins responded: "***We had not had any indication at that time***."  Finally, when asked about a spill volume of "105,000 gallons," Hodgins omitted the true size of the spill.

252.    The statements referenced in ¶¶248-251 above, which caused Plains and Plains Holdings' securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts.  These statements were known by Plains, Plains Holdings, and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Lines 901 and 903, as discussed in §V.;

(b)    Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)    In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather

than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines, as discussed in §V.G.;

(e)     Defendants received an inline inspection report in May 2014 regarding Line 903 that showed the segment had two girth weld anomalies requiring investigation;

(f)     On May 5, 2015, an ILI of Line 901 revealed at least four anomalies that required immediate attention. Pursuant to Rosen's normal practice, these issues were communicated to the Company immediately upon discovery by Rosen. Under applicable regulations, the Company was required to shut down Line 901 pending resolution of the immediate issues. Rather than shut down Line 901, defendants repeated the false and misleading statements concerning pipeline safety and maintenance and compliance with applicable law and continued to operate Line 901. Had defendants complied with applicable regulations, the eventual Line 901 spill would have been avoided entirely, as discussed in §§V.F. and V.G.;

(g)     ILI surveys from 2007 on identified numerous instances of corrosion on Line 901 greater than 50%, as discussed in §V.G.;

(h)     The true size of the Santa Barbara oil spill was significantly larger than represented and, in fact, was closer to the number of gallons that defendants knew would result in a worst-case-scenario spill. Defendants knew no later than May 28, 2015, by which date Line 901 had been purged and excavated, that the worst case estimate for the spill was larger than previously reported to the market. In discussing the spill and its effects, defendants were obligated to disclose

this material information concerning the spill and/or correct their prior misstatements regarding the size of the spill, as discussed in §V.E.; and

(i)     Defendants have admitted that by "the second half of June" they knew that the worst case estimate for the spill previously provided to the market was 1,000 barrels – or 42,000 gallons – more than the 105,000 estimate originally given, and discussed during the hearing.

## B.     Loss Causation

253.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused plaintiffs' and class members' economic loss.  Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory of reliance.  *See* §VI.C., *infra*.  The market prices of Plains Common Units and Plains Holdings Class A Shares, both actively traded on the NYSE, were artificially inflated by the false and misleading statements and material omissions complained of herein, including misleading statements and omissions concerning Plains' compliance with federal, state and local regulations governing the maintenance, monitoring and of the integrity of Plains' pipelines and its spill response procedures.  Instead of truthfully disclosing during the Class Period that Plains' pipelines, including Lines 901 and 903, were hazardously corroded, highly vulnerable to spill, and that the Company lacked required monitoring and spill response procedures and protocols, defendants falsely reassured investors concerning the Company's business and operational risks. Plaintiffs were unable to evaluate the concealed risks, and, therefore, unable to choose whether or not to undertake those risks.  Further, once Line 901 ruptured and investors learned of the Santa Barbara spill, the Company misrepresented the severity and extent of the spill and its impact on the Company's business.

254.     These false and misleading statements had the intended effect and caused Plains and Plains Holdings securities to trade at artificially inflated levels throughout the Class Period.

- 111 -

255.     The Class Period inflation in Plains' stock price was removed when the conditions and risks concealed by defendants' false and misleading statements and omissions, or the financial, regulatory, and operational impacts thereof, were revealed to the market.  The information was disseminated through several partial disclosures that slowly revealed the nature and extent of Plains' disregard for pipeline corrosion, its regulatory violations, defendants' deliberate disregard of regulatory requirements, the severity and extent of the Santa Barbara spill, and the increased costs and reduced revenues that would result from attaining the level of regulatory compliance that defendants falsely claimed Plains had been maintaining during the Class Period.  These disclosures, more particularly described below, removed artificial inflation from Plains Common Units and Plains Holdings Class A Shares, causing economic injury to plaintiffs and other members of the Class.

256.     The corrective impact of the individual disclosures alleged herein was, however, tempered by defendants' continued false and misleading statements about the regulatory compliance and safety of Plains' operations, including their false statements concerning their level of compliance, and the scope and impact of the spill.  These continued misrepresentations maintained the price of Plains Common Units and Plains Holdings Class A Shares at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Plains even after the Santa Barbara spill, and leading to further price declines that caused additional injury to the Class upon the disclosure of additional information about the true condition of Plains' operations.[8]

257.     The risks and conditions concealed from investors by defendants' fraud reached the market through a series of partial disclosures.  Each of these disclosures revealed some of the risks

---

[8]   The inflationary and corrective events identified and described herein are based upon plaintiffs' preliminary analysis, and investigation to date.  Upon further investigation, discovery, and analysis, plaintiffs may alter or amend their theory of damages, including by identifying additional inflationary or corrective events that caused or contributed to the damages claimed in this action.

and conditions concealed by defendants' fraudulent scheme, or the financial, legal, and operational consequences thereof, causing the price of Plains securities to decline, and reducing the extent to which the price of those securities was inflated by defendants' misrepresentations, thereby causing economic injury to plaintiffs and other Class members.

258.    None of the disclosures was sufficient on its own to fully remove the inflation from Plains' stock price, because each only partially revealed the risks and conditions that had been concealed from investors.  In addition, the individual corrective impact of these disclosures was reduced by defendants' contemporaneous false assertions about the cause and scope of the spill.  As a result of these partial corrective disclosures of the truth and the materialization of the risks concealed by defendants' misrepresentations and omissions, the price of Plains Common Units fell over 27%, from $49.59 per unit at the close of trading on May 19, 2015 to $35.95 per unit on August 5, 2015.  Similarly, Plains Holdings' Class A Shares declined dramatically in response to disclosures revealing the truth concerning Plains' operations and the risks it posed, as well as the true size and scope of Santa Barbara oil spill, falling from $29.34 per share on May 19, 2015 to close at $18.73 per share on August 5, 2015.

259.    The disclosures that corrected the market price to eliminate the inflation maintained by defendants' fraud are detailed below.

260.    As described herein, on May 19, 2015, Line 901 ruptured and began spilling thousands of barrels of heavy crude oil into the environmentally sensitive Santa Barbara coastal area. On May 21, 2015, PHMSA issued a Corrective Action order requiring Plains to take corrective actions with respect to Line 901, including shutting down and reviewing the line, testing the line, developing a remedial plan and performing a review of the Company's emergency response plan and training, in order to protect the public, property and the environment from potential hazards caused by the spill.  As described in §V.F., *supra*, the Corrective Action order included preliminary findings

concerning the spill and noted that prior inspections of Line 901 had identified a consistent degradation of pipeline integrity.  Following these disclosures, Plains Common Units declined $2.03 per unit, or over 4%, from $49.59 per unit on May 19, 2015 to $47.56 per unit on May 21, 2015 – a significant decline on extraordinarily large trading volume that occurred when the overall S&P 500 actually had a gain.  Likewise, Plains Holdings' Class A Shares declined from $29.34 on May 19, 2015 to $28.55 per share on May 21, 2015, also a significant decline on increased trading volumes.

261.    On June 3, 2015, PHMSA issued an amended Corrective Action Order that revealed that there had been "extensive external corrosion" on Line 901 – and that the regulator had also identified "extensive corrosion" and other deficiencies in adjoining Line 903 – and required Plains to take additional corrective actions, including shutting down Line 903.  *See* §V.F., *supra*.  Following these disclosures, Plains Common Units declined another 4%, from $47.80 per unit on June 2, 2015 to $45.89 per unit on June 4, 2015.  Plains Holdings Class A Shares also fell more than 4% on the news, from $28.06 on June 2, 2015 to $26.86 on June 4, 2015.  In contrast to Plains and Plains Holdings' performance, the S&P 500 had a nominal decline of 0.65% over the same time frame.

262.    On August 5, 2015, defendants disclosed that the spill could actually be 1,000 barrels – approximately 42,000 gallons – larger than previously reported.  Defendants disclosed that the Company's estimate of penalties and fines could be impacted by the difference between the current and final estimate of the worst case oil release.  Defendants further disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, and that the Company could be liable for potential criminal violations of the CWA.  In addition, the California Attorney General and the Santa Barbara County District Attorney  were investigating the spill for violation of state or local laws.  As the Company was a "responsible party" liable under the Oil Pollution Act, it was subject to "various costs and for natural resource damages under the OPA, and . . . exposed to payment of additional fines, penalties and costs under other applicable federal, state

- 114 -

and local laws, statutes and regulations."  Defendants also disclosed for the first time that the spill would cost Plains an estimated $257 million, and that the Company's insurance did not cover all of the costs associated with the spill.  Lost revenue related to the Lines 901 and 903 shutdown was not included in the $257 million estimate, and the Company did not establish a timeline to restart Line 901.  In response to an analyst's question concerning how much of the California and Illinois incidents were incorporated in the transportation segment's cost for the second quarter, Swanson disclosed that $65 million of the $209 million, or 31% of the cost, was attributed to the California spill.

263.    In response to the revelation that the spill could be larger than the Company previously represented, and could trigger criminal sanctions, Plains Common Units fell over 10%, from $40.20 per unit to close at $35.95 per unit on August 5, 2015, eliminating over $1.6 billion in investor value.  In addition, this disclosure caused the price of Plains Holdings Class A shares to decline by $5.65 per share, or 23%.

## C.    Applicability of the Presumption of Reliance

264.    Plaintiffs are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's and Plains Holdings' stocks traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's and Plains Holdings' stocks; and

(e)    plaintiffs and other members of the Class purchased Plains and Plains Holdings securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

265.    At all relevant times, the market for Plains securities traded in an efficient market for the following reasons, among others:

(a)    since well before the Class Period, Plains securities have been listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    as a regulated issuer, Plains filed periodic public reports with the SEC; and

(c)    Plains regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

266.    At all relevant times, the market for Plains Holdings securities traded in an efficient market for the following reasons, among others:

(a)    since the IPO, the Class A Shares of Plains Holdings have been listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    as a regulated issuer, Plains Holdings filed periodic public reports with the SEC; and

(c)    Plains Holdings regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

267.    A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the

Class's claims are grounded on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding Plains' failure to comply with federal, state and local regulations governing the maintenance, monitoring and of the integrity of Plains' pipelines, the condition of Plains' pipelines, and Plains' spill response procedures – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## D.  Control Person Liability Under §20(a) of the Exchange Act

### 1.  Control over PAGP

268.    Holdings LLC is a control person liable under §20(a) of the Exchange Act for its control over PAGP.  As defined in the Amended and Restated Agreement of Limited Partnership of Plains GP Holdings, L.P. ("PAGP Agreement"), Holdings LLC is PAGP's general partner.  Its principal offices are the same as PAGP's, which are also the same as the principal offices of PAA – 333 Clay Street, Suite 1600, Houston, Texas.

269.    The PAGP Agreement specifies that the general partner – Holdings LLC – "shall conduct, direct and manage all activities of the Partnership," and that "all management powers over the business and affairs of [PAGP] shall be exclusively vested in [Holdings LLC]."  Included in its powers are Holdings LLC's authority to make expenditures, borrow money, use PAGP's assets to conduct its operations, negotiate and execute contracts, maintain PAGP's insurance, distribute PAGP's cash, litigate on matters affecting PAGP's rights and obligations, and enter into listing agreements with any national securities exchange.

270.    Importantly, Holdings LLC also has the power of "making of tax, regulatory and other filings, or rendering of periodic or other reports to governmental or other agencies having jurisdiction over the business or assets of [PAGP]."  This includes such regulatory filings as those filed with the SEC.  Holdings LLC signed each SEC report that PAGP filed.

271.    As a result, because of its position of control and authority to "manage all activities," including making, authorizing and signing SEC filings, Holdings LLC had control of PAGP's false and misleading statements and omissions, and is responsible for the accuracy of the public reports and filings.

### 2.    Control over PAA

272.    PAGP is a control person liable under §20(a).  Its owns, through AAP, the 2% general partner interest in PAA and PAA's IDRs.  In addition, as sole and managing member of GP LLC, which holds the general partner interest of PAA, PAGP "effectively control[s] the business and affairs of AAP and PAA."  In addition to being PAA's managing member of PAA's general partner, GP LLC, PAGP has the right to appoint four out of eight members of GP LLC's board (three of the four must be independent directors eligible to serve on the audit committee; Armstrong, as CEO of GP LLC and three directors designated by Holdings LLC members with designating rights hold the remaining four director positions).  PAGP then able to control PAA, its operations, and the primary violators making the false and misleading public statements or omissions regarding PAA's and PAGP's businesses.

### 3.    Control over PAGP and PAA

273.    Armstrong (CEO), Herbold (Vice President – Accounting and Chief Accounting Officer), McGee (Executive Vice President, General Counsel and Secretary), Pefanis (President and Chief Operating Officer), Swanson (Executive Vice President and CFO) and each held dual titles

with GP LLC (PAA's general partner) and Holdings LLC (PAGP's general partner). In addition, Armstrong served as Director and Chairman of the Boards for both GP LLC and Holdings LLC.

274. Because of the overlapping partnership structure, with the same individuals filling the same roles, Holdings LLC's executive officers and directors overlapped with the GP LLC, PAA's general partner. According to PAGP filings, these executive officers spent less than 10% of their time on PAGP business, as distinct from PAA's business, while the directors serving on both boards spent less than 20% more time by serving on Holdings LLC's board. This means that those individuals holding positions of control and authority in Holdings, LLC, which controlled PAGP, were the same individuals with day-to-day knowledge of PAA's business and operations, and thus able to control PAA, its operations, its subsidiaries, including PAA Finance, and all primary violators who made false and misleading public statements or omissions regarding PAA's and PAGP's businesses.

275. These individuals had access to undisclosed information regarding the Company's deficient pipelines maintenance practices and the true state of Lines 901 and 903 through their involvement in the day-to-day operations, access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management meetings and committees, and reports and other information provided to them in connection with such meeting and committees. Each of these individuals received copies of the SEC filings and other public statements prior to or shortly after their issuance, or had the ability and opportunity to prevent their issuance or cause them to be corrected. Each of these individuals, except McGee (who signed the relevant Forms 8-K), signed each Form 10-K issued during the Class Period containing the false and misleading statements and omissions regarding PAA's and PAGP's compliance with safety regulations and laws relating to its pipelines.

# VII.   VIOLATIONS OF THE SECURITIES ACT

276.   Plaintiffs' claims under the Securities Act do not sound in fraud and plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of their claims under the Securities Act.  Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of plaintiffs' claims under the Securities Act, which do not require allegations of scienter, fraudulent intent, or motive.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the defendants to defraud plaintiffs or members of the Class.

277.   As set forth below, Plains and other defendants made a series of materially untrue statements and omissions of material facts in the Offering Materials in connection with the Offerings during the Class Period.  The Offering Materials are defined collectively as the offering materials described in the table below:

| Defined Term | Included Filings | Date Filed |
|---|---|---|
| "IPO Offering Materials" | Form S-1: Registration Statement 333-190227 | July 29, 2013 |
| | Form S-1/A: Am. No. 1 333-190227 | Sept. 6, 2013 |
| | Form S-1/A: Am. No. 2 333-190227 | Sept. 26, 2013 |
| | Form S-1/A: Am. No. 3 333-190227 | Oct. 2, 2013 |
| | Form S-1/A: Am. No. 4 333-190227 | Oct. 7, 2013 |
| | Rule 424(b)(4) Prospectus 333-190227 | Oct. 16, 2013 (Prospectus dated Oct. 15, 2013) |
| | Form 8-K: Underwriting Agreement | Oct. 21, 2013 (Agreement dated: Oct. 15, 2013) |
| "Plains Holdings Secondary Offering Materials" | Form S-3: Shelf Registration Statement 333-199903 | Nov. 6, 2014 |
| | Rule 424(b)(1) Prospectus 333-199903 | Nov. 12, 2014 |

| Defined Term | Included Filings | Date Filed |
|---|---|---|
| | Form 8-K: Underwriting Agreement | Nov. 13, 2014 (Agreement dated Nov. 10) |
| "Plains Offering Materials" | Form S-3: Shelf Registration Statement 333-184137 ("Plains Shelf") | Sept. 27, 2012 |
| | Prospectus forming a part of the Plains Shelf ("Plains Prospectus") | Sept. 27, 2012 |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 | Feb. 25, 2015 |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 | Feb. 27, 2015 (Prospectus supplement dated Feb. 26, 2015) |
| | Form 8-K: Underwriting Agreement | Mar. 2, 2015 (Agreement dated Feb. 25, 2015) |
| "Equities Offerings Materials" | IPO Offering Materials, Plains Holdings Secondary Offering Materials, and Plains Offering Materials | |
| "August 2013 Notes Offering Materials" | Plains Shelf | Sept. 27, 2012 |
| | Plains Prospectus | Sept. 27, 2012 |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 | Aug. 8, 2013 |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 | Aug. 9, 2013 (Prospectus supplement dated Aug. 8, 2013) |
| | Form 8-K: Underwriting Agreement | Aug. 12, 2013 (Agreement dated Aug. 8, 2013) |
| "April 2014 Notes Offering Materials" | Plains Shelf | Sept. 27, 2012 |
| | Plains Prospectus | Sept. 27, 2012 |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 | Apr. 15, 2014 |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 | Apr. 16, 2014 (Prospectus supplement dated Apr. 15, 2014) |
| | Form 8-K: Underwriting Agreement | Apr. 18, 2014 (Agreement dated Apr. 15, 2014) |

- 121 -

| Defined Term | Included Filings | Date Filed |
|---|---|---|
| "September 2014 Notes Offering Materials" | Plains Shelf | Sept. 27, 2012 |
| | Plains Prospectus | Sept. 27, 2012 |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 | Sept. 2, 2014 |
| | Rule 424(b)(5) Prospectus Supplement | Sept. 4, 2014 (Prospectus supplement dated Sept. 2, 2014) |
| | Form 8-K: Underwriting Agreement | Sept. 5, 2014 (Agreement dated Sept. 2, 2014) |
| "December 2014 Notes Offering Materials" | Plains Shelf | Sept. 27, 2012 |
| | Plains Prospectus | Sept. 27, 2012 |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 | Dec. 3, 2014 (Prospectus supplement dated Dec. 2, 2014) |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 | Dec. 2, 2014 |
| | Form 8-K: Underwriting Agreement | Dec. 4, 2014 (Agreement dated Dec. 2, 2014) |
| "Notes Offering Materials" | August 2013 Notes Offering Materials, April 2014 Notes Offering Materials, September 2014 Notes Offering Materials, and December 2014 Notes Offering Materials | |

278.    Specifically, during the Class Period, Plains and Plains Holdings conducted three registered equities securities offerings.  These offerings included: (i) Plains Holdings' October 16, 2013 initial public offering of 132.38 million Class A shares, which raised $2.91 billion; (ii) Plains Holdings' November 10, 2014 registered public offering of 69 million Class A shares, which raised $1.725 billion; and (iii) Plains' February 26, 2015 registered public offering of 21 million shares of Plains Common Units, which raised approximately $1.05 billion (the "Plains Offering") (collectively, "the Equities Offerings").

279.     In addition, during the Class Period, Plains and PAA Finance conducted four registered debt securities offerings.  These offerings included: (i) the $700 million August 2013 Notes Offering, (ii) the $700 million April 2014 Notes Offering, (iii) the $750 million September 2014 Notes Offering, and (iv) the $1.15 billion December 2014 Notes Offerings (collectively, the "Notes Offerings").

### A.     The Equities Offerings Materials Contained False and Misleading Statements

280.     As set forth herein, the Equities Offerings Materials that Plains and Plains Holdings filed with the SEC concerning each of the offerings contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, concerning: (i) Plains' compliance with federal and state regulations with respect to its pipelines; (ii) the integrity of its pipelines; (iii) the Company's spill response procedures and technologies; and (iv) commitment to enhanced pipeline safety and maintenance.

### 1.     The IPO Offering Materials Contained Materially False and Misleading Statements

281.     On October 16, 2013, PAGP conducted the IPO, a registered offering to the public of 132.38 million Class A shares of Plains Holdings at an offering price of $22.00 per share, raising $2.91 billion.

282.     The IPO was conducted pursuant to a Form S-1 Registration Statement, filed with the SEC on July 29, 2013 (Registration No. 333-190227), which was later amended by, *inter alia*, Amendment No. 1 to Form S-1, filed with the SEC and dated September 6, 2013 (Registration No. 333-190227), Amendment No. 2 to Form S-1, filed with the SEC and dated September 26, 2013 (Registration No. 333-190227), Amendment No. 3 to Form S-1, filed with the SEC and dated October 2, 2013 (Registration No. 333-190227), and Amendment No. 4 to Form S-1, filed with the SEC and dated October 7, 2013 (Registration No. 333-190227), and a Prospectus filed with the SEC

- 123 -

on Form 424B4 dated October 15, 2013 (collectively, "the IPO Registration Statements and Prospectus"). The IPO Registration Statements and Prospectus were signed by defendants Plains Holdings, Holdings LLC, Armstrong, Swanson, Herbold, and Director Defendants Raymond and Sinnott.

283. The IPO Registration Statements and Prospectus incorporated by reference, *inter alia*, the consolidated financial statements of GP LLC as of and for the three years ended December 31, 2012, the historical financial statements of GP LLC as GP LLC as of June 30, 2012, and the financial statements related to BP NGL Acquisition for the year ended December 31, 2011.

284. In the IPO Offering Materials, Plains Holdings represented that it fully complied with applicable environmental, health and safety regulations, including the rules governing the monitoring and maintenance of its pipelines and the safety and integrity of those pipelines. Specifically, PAGP represented in the IPO Offering Materials that it was in compliance with applicable laws and regulations, including (1) the HLPSA, (2) the OPA, and (3) Risk Management Plan regulations overseen by the EPA, the requirements of which are set forth in §V.A., *supra*.

285. For example, defendants represented falsely and/or misleadingly in the IPO Registration Statements and Prospectus that they complied with applicable HLPSA regulations:

> Currently, PAA believes its pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments.

> *        *        *

> PAA currently devotes substantial resources to comply with DOT-mandated pipeline integrity rules.

286. Defendants also represented falsely and/or misleadingly in the IPO Registration Statements and Prospectus that they complied with applicable OPA and related state regulations:

> PAA believes that it is in substantial compliance with applicable OPA requirements. State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when

- 124 -

they occur. [PAA] believes that [PAA is] in substantial compliance with all such federal, state and Canadian requirements.

287. Moreover, defendants represented falsely and/or misleadingly in the IPO Registration Statements and Prospectus that they complied with applicable EPA Risk Management Plan regulations:

PAA believes it is operating in substantial compliance with its risk management program.

288. The IPO Registration Statements and Prospectus also represented that the Company's pipeline maintenance and integrity measures "go beyond regulatory mandate" and promised that pipeline integrity management was a "primary operational emphasis." With respect to PAA's own internal integrity management program, defendants represented falsely and/or misleadingly in the IPO Offering Materials:

In addition to required activities, PAA's integrity management program includes several internal programs designed to prevent incidents and includes activities such as automating valves and replacing river crossings.

\* \* \*

PAA has an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if any of [PAA's] assets warrant additional investment or replacement. Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from U.S. EPA enforcement actions, PAA may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems and, in some cases, PAA may take pipelines out of service if [PAA] believes the cost of upgrades will exceed the value of the pipelines.

\* \* \*

PAA has also developed and implemented certain pipeline integrity measures that go beyond regulatory mandate, some of which are now incorporated into the 2010 Consent Decrees.

\* \* \*

For 2013 and beyond, [PAA] will continue to focus on pipeline integrity management as a primary operational emphasis. In that regard, PAA has implemented programs intended to maintain the integrity of its assets, with a focus

- 125 -

on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention. PAA has an internal review process pursuant to which it examines various aspects of its pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate. The purpose of this process is to review the surrounding environment, condition and operating history of these pipeline and gathering assets to determine if such assets warrant additional investment or replacement. Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from regulatory agency enforcement actions, PAA may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade its pipeline systems to maintain environmental compliance and, in some cases, PAA may take pipelines out of service if it believes the cost of upgrades will exceed the value of the pipelines.

289.    Plains Holdings also made false representations and warranties the underwriting agreement relating to the IPO. First, in underwriting agreement filed with the SEC as a current report on Form 8-K dated October 15, 2013, Plains Holdings made representations and warranties that the IPO Registration Statement and Prospectus and documents incorporated by reference in those documents contained no material misstatements or omissions. Second, in the underwriting agreement, Plains Holdings unequivocally – albeit falsely – represented that Plains Holdings and PAA GP Holdings LLC were not in violation of any applicable laws or regulations:

> None of the Partnership Entities is in . . . violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or of any decree of any court or governmental agency or body having jurisdiction over it . . . .
>
> *        *        *
>
> *Environmental Compliance.* Except as described in the Pricing Disclosure Package and the Prospectus, none of the Partnership Group Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants . . . .

290.    The statements referenced in ¶¶285-289 above were each false and misleading when made in that each omitted and/or misrepresented material facts. Specifically, contrary to the representations in the IPO Offering Materials set forth above, the true facts were that:

- 126 -

(a)      Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Line 901, as discussed in §V.;

(b)      Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)      In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)      Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)      Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(f)      Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(g)      Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)      Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed, as discussed in §§V.F. and V.O.;

(i)      As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.F. and V.O.;

(j)      Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(k)      PHMSA inspections in March and June 2013 revealed that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)      An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines as discussed in §V.G.;

(m)      Inspection surveys for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company as discussed in §V.F.; and

(n)      PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and

- 128 -

mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping as discussed in §V.F.

### 2. The Plains Holdings Secondary Offering Materials Contained Materially False and Misleading Statements

291.    On November 12, 2014, PAGP conducted the Plains Holdings Secondary Offering, a registered secondary offering to the public of 69 million Class A shares of Plains Holdings at an offering price of $25.00 per share, raising $1.725 billion.

292.    The Plains Holdings Secondary Offering was conducted pursuant to a Form S-3 Registration Statement, filed with the SEC on November 6, 2014 (Registration No. 333-199903), and a Prospectus filed on Form 424B1 with the SEC and dated November 12, 2014 (Registration No. 333-199903).   The Registration Statement and Prospectus were signed by defendants Plains Holdings, Holdings LLC, Armstrong, Swanson, Herbold, Pefanis, and Director Defendants Burk, Goyanes, Raymond, Shackouls, Sinnott, and Sutil.

293.    The Registration Statement and Prospectus incorporated by reference Plains Holdings' Annual Report on Form 10-K for year ended December 31, 2013, filed with the SEC on March 12, 2014 and signed by defendants Plains Holdings, Armstrong, Swanson, Herbold, Pefanis, and Director Defendants Burk, Goyanes, Raymond, Shackouls, Sinnott, and Sutil.  The Registration Statement and Prospectus also incorporated by reference (i) PAGP's quarterly financial results on Form 10-Q for the first three quarters of 2014, filed with the SEC on May 13, 2014, August 12, 2014, and November 7, 2014, respectively, all of which were signed by defendants Armstrong, Swanson and Herbold; and (ii) PAGP's Current Reports on Forms 8-K filed with the SEC on January 10, 2014, January 28, 2014, April 29, 2014, September 11, 2014, September 25, 2014, and

November 6, 2014, all of which were signed by defendant McGee, except as to the November 6, 2014 Form 8-K, which was signed by defendant Swanson.  Accordingly, the Registration Statement and Prospectus each repeated the false and misleading statements, set forth above at ¶¶285-289, concerning defendants' compliance with applicable laws and regulatory requirements, as well as the Company's integrity management program and internal reviews of its pipelines.

294.    Plains Holdings also made false representations and warranties the underwriting agreement relating to the Plains Holdings Secondary Offering.  First, in underwriting agreement filed with the SEC as a current report on Form 8-K dated November 10, 2014, Plains Holdings made representations and warranties that the registration statement and prospectus and documents incorporated by reference in those documents contained no material misstatements or omissions.  Second, in the underwriting agreement, Plains Holdings unequivocally – albeit falsely – represented that Plains Holdings and PAA GP Holdings LLC were not in violation of any applicable laws or regulations:

> None of the Partnership Entities is in . . . violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or of any decree of any court or governmental agency or body having jurisdiction over it . . . .
>
> *            *            *
>
> *Environmental Compliance*.  Except as described in the Pricing Disclosure Package and the Prospectus, none of the Partnership Group Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants . . . .

295.    The statements referenced in ¶¶293-294 above were each false and misleading when made in that each omitted and/or misrepresented material facts.  Specifically, contrary to the representations in the Plains Holdings Secondary Offering Materials set forth above, the true facts were that:

(a)     Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Line 901, as discussed in §V.;

(b)     Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)     In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(f)     Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed, as discussed in §§V.F. and V.O.;

(i)       As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.F. and V.O.;

(j)       Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(k)       PHMSA inspections in March and June 2013 revealed that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)       An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines as discussed in §V.G.;

(m)       Inspection surveys for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company as discussed in §V.F.; and

(n)       PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and

- 132 -

mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated

in an email, dated March 25, 2014, that the company was unable to locate" such documentation for

those segments; (4) take additional measures for HCAs or even document any consideration of

measures, including its justification for failing to implement such measures; and (5) comply with

regulations regarding emergency response training and record-keeping as discussed in §V.F.

### 3. The Plains Offering Materials Contained Materially False and Misleading Statements

296.     On February 25, 2015, PAA conducted the Plains Offering, a registered offering of 21

million shares of Plains Common Units at an offering price of $50.00 per share, raising

approximately $1.05 billion.

297.     The Plains Offering was conducted pursuant to a Form S-3 Registration Statement,

filed with the SEC using the Shelf Registration Process and dated September 27, 2012 (Registration

No. 333-184137), a prospectus dated September 27, 2012 that forms a part of the registration

statement, a preliminary prospectus supplement filed on Form 424B2 with the SEC and dated

February 25, 2015 (Registration No. 333-184137), and a post-effective prospectus supplement on

Form 424B5 dated February 26, 2015 and filed with the SEC on February 27, 2015.  The Plains

Offering Materials were signed by Plains, PAA GP LLC, Plains AAP, L.P., GP LLC, defendants

Armstrong, Swanson, Herbold, Pefanis, and Director Defendants Goyanes, Petersen, Raymond,

Sinnott, Sutil, Symonds, and Temple.

298.     The Plains Offering Materials incorporated by reference PAA's Annual Report on

Form 10-K for year ended December 31, 2014, filed with the SEC on February 25, 2015 and signed

by PAA GP LLC, Plains AAP, L.P., GP LLC, defendants Armstrong, Swanson, Herbold, Pefanis,

and Director Defendants Goyanes, Petersen, Raymond, Sinnott, Symonds, and Temple.

Accordingly, the Plains Offering Materials each repeated the false and misleading statements, set

forth above at ¶¶202-206, 239, concerning defendants' compliance with applicable laws and

- 133 -

regulatory requirements, as well as the Company's integrity management program and internal reviews of its pipelines.

299.    PAA also made false representations and warranties in the underwriting agreement relating to the Plains Offering.  First, in the underwriting agreement filed with the SEC as a current report on Form 8-K dated February 25, 2015 for the Plains Offering, PAA made representations and warranties that the Plains Shelf, Plains Prospectus, preliminary prospectus supplement, prospectus supplement and documents incorporated by reference in those documents contained no material misstatements or omissions.  Second, in the underwriting agreement, PAA unequivocally – albeit falsely – represented it was not in violation of any applicable laws or regulations:

> None of the Partnership, the GP Entities or the Material Subsidiaries is in violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or of any decree of any court or governmental agency or body having jurisdiction over it . . . .

*          *          *

> *Environmental Compliance*.  Except as described in the Pricing Disclosure Package and the Prospectus, none of the Plains Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants . . . .

300.    The statements referenced in ¶¶298-299 above were each false and misleading when made in that each omitted and/or misrepresented material facts.  Specifically, contrary to the representations in the Plains Offering Materials set forth above:

(a)    Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Line 901, as discussed in §V.;

(b)    Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

- 134 -

(c)     In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(f)     Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed, as discussed in §§V.F. and V.O.;

(i)     As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.F. and V.O.;

(j)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

- 135 -

(k)     PHMSA inspections in March and June 2013 revealed that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)     An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines as discussed in §V.G.;

(m)     Inspection surveys for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company as discussed in §V.F.; and

(n)     PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping as discussed in §V.F.

- 136 -

B.     **The Notes Offerings Materials Contained Materially False and Misleading Statements**

301.     During August 2013 to December 2014, Plains and PAA Finance issued $3.3 billion of senior notes.  Specifically, defendants issued the (i) August 2013 Notes Offering; (ii) April 2014 Notes Offering; (iii) September 2014 Notes Offering; and (iv) two December 2014 Notes Offerings, all of which were issued pursuant to the Plains Shelf and the Plains Prospectus.  The Plains Shelf was signed by Armstrong, on behalf of Plains and PAA Finance, and Pefanis, Swanson, Herbold, Goyanes, Petersen, Raymond, Sinnott, Sutil, Symonds, and Temple.  The Plains Shelf and Plains Prospectus expressly incorporated by reference PAA's annual report on Form 10-K for the year ended December 30, 2011 and other selected filings pursuant to Section 13 or 15(d).  In addition, the Plains Shelf and Plains Prospectus incorporated "any future filings made by Plains All American Pipeline, L.P. with the SEC under Section 13(a), 13(c), 14, or 15(d)" of the Exchange Act until "all offerings under this shelf registration statement are completed."  The Plains Shelf indicated that any such later filings would "automatically update" information in the Plains Shelf and Plains Prospectus.  Specifically, the Plains Shelf and the Plains Prospectus for each of the Notes Offerings expressly incorporated the most recent Form 10-K containing false and misleading statements concerning defendants' compliance with applicable laws and regulatory requirements, as well as the Company's integrity management program and internal reviews of its pipelines, as described below:

(a)     **August 2013 Notes Offering**.  The Plains Shelf and Plains Prospectus for the August 2013 Notes Offering incorporated by reference PAA's 2012 Form 10-K.  As a result, the untrue statements and omissions of material fact in PAA's 2012 Form 10-K, as set forth in ¶¶202-206, *supra*, were repeated in the Plains Shelf and Plains Prospectus for the August 2013 Notes Offering;

(b)     **April 2014 Notes Offering**.  The Plains Shelf and Plains Prospectus for the April 2014 Notes Offering incorporated by reference PAA's 2013 Form 10-K.  As a result, the

- 137 -

untrue statements and omissions of material fact in PAA's 2013 Form 10-K, as set forth in ¶¶202-206, 223, *supra*, were repeated in the Plains Shelf and Plains Prospectus for the April 2014 Notes Offering;

        (c)    **September 2014 Notes Offering**.  The Plains Shelf and Plains Prospectus for the September 2014 Notes Offering incorporated by reference PAA's 2013 Form 10-K.  As a result, the untrue statements and omissions of material fact in PAA's 2013 Form 10-K, as set forth in ¶¶202-206, 223, *supra*, were repeated in the Plains Shelf and Plains Prospectus for the September 2014 Notes Offering; and

        (d)    **December 2014 Notes Offerings**.  The Plains Shelf and Plains Prospectus for the December 2014 Notes Offerings incorporated by reference PAA's 2013 Form 10-K.  As a result, the untrue statements and omissions of material fact in PAA's 2013 Form 10-K, as set forth in ¶¶202-206, 223, *supra*, were repeated in the Plains Shelf and Plains Prospectus for the December 2014 Notes Offerings.

        302.    Moreover, for each of the Notes Offerings, PAA and PAA Finance filed a preliminary prospectus supplement and a prospectus supplement with the SEC, and included the Plains Prospectus with each supplement.  The Plains Prospectus urged investors to read the Plains Prospectus, any prospectus supplements, and documents incorporated by reference.  The preliminary prospectus supplement and prospectus supplement for the August 2013 Notes Offering expressly incorporated by reference the 2012 Form 10-K.  As a result, the untrue statements and omissions of material fact in PAA's 2012 Form 10-K, as set forth in ¶¶202-206, *supra*, were repeated in the preliminary prospectus supplement and prospectus supplement for the August 2013 Notes Offering.  Further, the preliminary prospectus supplements and prospectus supplements for the April 2014 Notes Offering, September 2014 Notes Offering, and December 2014 Notes Offerings expressly incorporated by reference the 2013 Form 10-K.  As a result, the untrue statements and omissions of

- 138 -

material fact in PAA's 2013 Form 10-K, as set forth in ¶¶202-206, 223, *supra*, were repeated in the preliminary prospectus supplements and prospectus supplements for the April 2014 Notes Offering, September 2014 Notes Offering, and December 2014 Notes Offerings.

303.    PAA and PAA Finance also made false representations and warranties in each of the underwriting agreements relating to the Notes Offerings.  First, in each of the underwriting agreements, PAA and PAA Finance made representations and warranties that the Plains Shelf, Note Prospectus, preliminary prospectus supplement, prospectus supplement and documents incorporated by reference in those documents contained no material misstatements or omissions.  Second, in the underwriting agreements filed with the SEC as current reports on Form 8-Ks, dated August 8, 2013 for the August 2013 Notes Offering, April 15, 2014 for the April 2014 Notes Offering, September 2, 2014 for the September 2014 Notes Offering, and December 2, 2014 for the December 2014 Notes Offerings, PAA and PAA Finance unequivocally – albeit falsely – represented that none of PAA, PAA GP LLC, AAP, GP LLC, or material subsidiaries were in violation of any applicable laws or regulations:

> [N]one of the Issuers, the GP Entities or the Material Subsidiaries is in violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or of any decree of any court or governmental agency or body having jurisdiction over it . . . .

*      *      *

> *Environmental Compliance*.  Except as described in the Pricing Disclosure Package and the Prospectus, none of the Plains Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants . . . .

304.    The statements referenced in ¶¶301-303 above were each false and misleading when made in that each omitted and/or misrepresented material facts.  Specifically, contrary to the representations in the Notes Offerings Materials set forth above:

- 139 -

(a)     Defendants failed to fully and/or promptly address the rapidly increasing anomalies found in Line 901, as discussed in §V.;

(b)     Line 901 had suffered from increasing numbers of anomalies, including 41 anomalies found in July 2012 after just 13 found in June 2007, evidencing an exponential increase in the pipeline's deterioration, as discussed in §§V.F. and V.G.;

(c)     In 2007 and again in 2012, defendants identified anomalies on Line 901 that were at and/or near the ultimate failure site.  Both times, Plains conducted patchwork repairs rather than replacement, which was required given the age of the pipe and the proliferating corrosion, as discussed in §V.G.;

(d)     Defendants lacked adequate leak monitoring systems, as discussed in §§V.F. and V.M.;

(e)     Defendants lacked an adequate spill response plan, as discussed in §V.M.;

(f)     Defendants were not in compliance with the requirements of the 2010 Consent Decrees, including because, *inter alia*, they failed to properly check for leaks, mitigate threats posed by corrosion, install adequate pipeline monitoring capabilities, or ensure adequate ongoing monitoring for PAA's pipelines, including Lines 901 and 903, as discussed in §§V.B. and V.O.;

(g)     Defendants had failed to install automatic shut-off systems on its pipelines in Santa Barbara County – making it the only pipeline operator in the County that refused to install automatic shut-off systems – despite their representations regarding Plains' purported industry-leading, state-of-the-art pipelines, as discussed in §§V.H., V.K., and V.O.;

(h)     Defendants had not exceeded federal regulation in their implementation of inspection and maintenance on Lines 901 and 903, and had in fact fallen short of the regulatory requirements for pipelines in HCAs, as PHMSA later confirmed, as discussed in §§V.F. and V.O.;

(i)     As oil volumes decreased in the OCS fields offshore California that fed Lines 901 and 903, defendants were motivated not to expend money or capital in repairing and/or replacing Lines 901 and 903 and failed to adequately do so despite knowledge that as Plains acquired additional miles of pipeline, it historically had observed an increase in the number of releases of liquid hydrocarbon into the environment, as discussed in §§V.F. and V.O.;

(j)     Line 901 had reached the end or exceeded its useful life, as discussed in §V.I.;

(k)     PHMSA inspections in March and June 2013 revealed that the Company was in violation of applicable regulations for failing to (1) maintain documentation as required by PHMSA regulations for modifying Management of Change Procedures when, for example, new pipelines were added or taken offline, (2) complete Abnormal Operations forms, including MOP information; and (3) provide any records demonstrating an at least annual review of the controller training program for potential improvements, as discussed in §V.F.;

(l)     An ILI on April 29, 2013 – the report for which was provided to Plains in June 2013 – found 99 metal loss anomalies on a 38-mile segment of Line 903 between Gaviota Station and Sisquoc Station, further alerting defendants to massive corrosion proliferation on HCA-located pipelines as discussed in §V.G.;

(m)     Inspection surveys for different segments of Line 903 were inconsistent – a red flag that should have prompted immediate investigation by the Company as discussed in §V.F.; and

(n)     PHMSA conducted inspections of Line 901 and Line 903 in August 2013, September 2013, and October 2013 and found that defendants, in violation of applicable laws, failed to: (1) maintain documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks on Line 903; (2) demonstrate that the pressure tests performed on the tanks were in accord with applicable regulations; (3) maintain adequate documentation of preventive and

- 141 -

mitigative evaluations of segments of Line 903 and, in fact, "a Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate" such documentation for those segments; (4) take additional measures for HCAs or even document any consideration of measures, including its justification for failing to implement such measures; and (5) comply with regulations regarding emergency response training and record-keeping as discussed in §V.F.

### C.    Control Person Liability Under §15 of the Securities Act

#### 1.    Control over PAGP

305.    Holdings LLC is a control person liable under §15 of the Securities Act of 1933.  As defined in the PAGP Agreement, Holdings LLC is PAGP's general partner.  Its principal offices are the same as PAGP's, which are also the same as the principal offices of PAA – 333 Clay Street, Suite 1600, Houston, Texas.

306.    The PAGP Agreement specifies that the general partner – Holdings LLC – "shall conduct, direct and manage all activities of the Partnership," and that "all management powers over the business and affairs of [PAGP] shall be exclusively vested in [Holdings LLC]."  Included in its powers are Holdings LLC's authority to make expenditures, borrow money, use PAGP's assets to conduct its operations, negotiate and execute contracts, maintain PAGP's insurance, distribute PAGP's cash, litigate on matters affecting PAGP's rights and obligations, and enter into listing agreements with any national securities exchange.

307.    In addition, Holdings LLC powers allowed it to effectuate "the purchase, sale or other acquisition or disposition of Partnership Interests, or the issuance of options, rights, warrants and appreciation rights relating to Partnership Interest."  Holdings LLC also has the power of "making tax, regulatory and other filings, or rendering of periodic or other reports to governmental or other agencies having jurisdiction over the business or assets of [PAGP]."  This includes such regulatory filings as the registration statement, amendments thereto and prospectuses filed with the SEC for the

- 142 -

IPO and the Plains Holdings Secondary Offering. On behalf of PAGP and with power to control PAGP, Holdings LLC signed the Registration Statements that PAGP filed. As a result, Holdings LLC had control of PAGP's false and misleading statements and omissions in the IPO Offering Materials and the Plains Holdings Secondary Offering Materials, and is responsible for the accuracy of the public reports and filings.

308.    As executives of Holdings LLC, Officer Defendants Armstrong, Swanson and Herbold, signed the registration statement and each amendment for the IPO. As directors for Holdings LLC, Director Defendants Raymond and Sinnott signed the amended registration statement filed on October 7, 2013 for the IPO.

309.    As executives of Holdings LLC, Officer Defendants Armstrong, Swanson, Pefanis and Herbold signed the registration statement for the Plains Holdings Secondary Offering. As directors of Holdings LLC, Director Defendants Burk, Goyanes, Raymond, Shackouls, Sinnott and Sutil signed the registration statement for the Plains Holdings Secondary Offering. In addition, each of these individuals signed the 2013 Form 10-K filed on March 12, 2014 that was incorporated by reference into the Plains Holdings Secondary Offering Materials.

310.    As an executive of Holdings LLC, McGee signed each of the Forms 8-K announcing the underwriting agreements for the IPO and the Plains Holdings Secondary Offering.

311.    The IPO Offering Materials and the Plains Holdings Secondary Offering Materials contained false and misleading information. Armstrong, Swanson, Pefanis, Herbold, Burk, Goyanes, Raymond, Shackouls, Sinnott and Sutil each possessed the power to control, and did control directly and/or indirectly the actions of PAGP in completing the IPO and Plains Holdings Secondary Offering with false and misleading information in the IPO and Plains Holdings Secondary Offering Materials. Each of these individuals received copies of the SEC filings prior to or shortly after their issuance, or had the ability and opportunity to prevent their issuance or cause them to be corrected.

- 143 -

1108692_1

By signing the IPO Offering Materials and Plains Holdings Secondary Offering Materials these individuals demonstrated that they possessed the power to control, and did control, the contents of those filings on behalf of PAGP.

2.    **Control Over PAA**

312.    Holdings LLC is a control person liable under §15 for its control over PAA.  As the general partner to PAGP, which itself owns 100% of the managing member interest in PAA's general partner, Holdings LLC had the power to control and did control PAA.

313.    Because of the overlapping partnership structure, with the same individuals filling the same roles, Holdings LLC's executive officers and directors overlapped with the GP LLC, PAA's general partner.  According to PAGP filings, these executive officers spent less than 10% of their time on PAGP business, as distinct from PAA's business, while the directors serving on both boards spent less than 20% more time by serving on Holdings LLC's board.  This means that those individuals holding positions of control and authority in Holdings LLC, were the same individuals with day-to-day knowledge of PAA's business and operations, and spent the majority of their time running those operations – thus making Holdings LLC able to control PAA and its actions.  Thus, Holdings LLC had control over PAA's issuance of the Plains Offering and the Notes Offerings.

314.    PAGP is a control person liable under §15 for its control over PAA.  Its owns, through AAP, the 2% general partner interest in PAA and PAA's IDRs.  In addition, as sole and managing member of GP LLC, which holds the general partner interest of PAA, PAGP "effectively control[s] the business and affairs of AAP and PAA."  In addition to being PAA's managing member of PAA's general partner, GP LLC, PAGP has the right to appoint to appoint four out of eight members of GP LLC's board (three of the four must be independent directors eligible to serve on the audit committee; Armstrong, as CEO of GP LLC and three directors designated by Holdings LLC members with designating rights hold the remaining four director positions).  PAGP, then, is able to

- 144 -

control and does control PAA and its actions.  Thus, PAGP had control over PAA's issuance of the Plains Offering and the Notes Offerings.

315.    Officer Defendants Armstrong, Pefanis, Swanson and Herbold, as executives on behalf of GP LLC, PAA's general partner, signed the registration statement for the Plains Offering and the Notes Offerings, as well as each Form 10-K incorporated by reference therein.  McGee signed each of the Forms 8-K announcing the underwriting agreements for the Plains Offering and the Notes Offerings.  Director Defendants Goyanes, Petersen, Raymond, Sinnott, Sutil, Symonds and Temple, as directors on behalf of GP LLC also signed the registration statement for the Plains Offering and the Notes Offerings.  Each of these directors also signed the most recently filed Form 10-K incorporated by reference into each of the Notes Offerings.  Director Defendants Goyanes, Petersen, Raymond, Sinnott, Sutil and Symonds, as directors on behalf of GP LLC signed the 2014 Form 10-K incorporated by reference in the Plains Offering.

316.    The Plains Offering Materials and the Notes Offering Materials contained false and misleading information.  Armstrong, Swanson, Pefanis, Herbold, Goyanes, Petersen, Raymond, Sinnott and Sutil, Symonds, Temple each possessed the power to control, and did control directly and/or indirectly the actions of PAA in completing the Plains Offering and Notes Offerings with false and misleading information in their respective Offering Materials.  Each of these individuals received copies of the SEC filings and other public statements prior to or shortly after their issuance, or had the ability and opportunity to prevent their issuance or cause them to be corrected.  By signing these SEC filings these individuals demonstrated that they possessed the power to control, and did control, the contents of those filings on behalf of PAGP.

## VIII.   NO SAFE HARBOR

317.    Plains' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were not meaningful and ineffective to shield

- 145 -

those statements from liability, as defendants knew that the risks warned of through their "safe harbor" warnings has already materialized.

318.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of *Plains* who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## IX.    CLASS ACTION ALLEGATIONS

319.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Plains common stock, Plains Holdings Class A shares, and the Notes Offerings during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

320.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Plains and Plains Holdings each has over $4 billion of securities at issue outstanding, owned by hundreds if not thousands of persons.

321.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether defendants violated the Exchange Act;

(b)     whether defendants violated the Securities Act;

(c)     whether defendants omitted and/or misrepresented material facts;

(d)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(f)     whether the prices of Plains' and Plains Holdings' publicly traded securities were artificially inflated; and

(g)     the extent of damage sustained by Class members and the appropriate measure of damages.

322.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

323.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

324.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.   CLAIMS FOR RELIEF

### A.   COUNT I Violations of §10(b) Of The Exchange Act and Rule 10b-5 Against Plains, Plains Holdings and the Officer Defendants

325.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

326.    During the Class Period, Plains, Plains Holdings, and the Officer Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period,

- 147 -

did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (ii) cause plaintiffs and other members of the Class to purchase Plains and Plains Holdings securities at artificially inflated prices.

327.   Plains, Plains Holdings, and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of PAA and PAGP securities in an effort to maintain artificially high market prices for PAA and PAGP securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

328.   Plains, Plains Holdings, and the Officer Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and compliance with the law.

329.   During the Class Period, Plains, Plains Holdings, and the Officer Defendants issued the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

330.   Plains, Plains Holdings, and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Plains, Plains Holdings, and Officer Defendants engaged in this misconduct to conceal Plains' true operations and legal violations from the investing public and to support the artificially inflated prices of the Plains and Plains Holdings securities.

331.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Plains and Plains Holdings securities.  Plaintiffs and the Class would not have purchased these securities at the prices they paid, or at all, had they been aware that the market prices for Plains and Plains Holdings' securities had been artificially inflated by Plains, Plains Holdings, and the Officer Defendants' fraudulent course of conduct.

332.     As a direct and proximate result of the Plains, Plains Holdings, and the Officer Defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

333.     By virtue of the foregoing, Plains, Plains Holdings, and the Officer Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**B.     COUNT II Violations of §20(a) of the Exchange Act Against Holdings LLC, Plains Holdings, and the Officer Defendants ("20(a) Defendants")**

334.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

335.     Holdings LLC, Plains Holdings and the Officer Defendants acted as controlling persons of Plains within the meaning of §20(a) of the Exchange Act as alleged herein.  Holdings LLC and the Officer Defendants acted as controlling person of Plains Holdings within the meaning of §20(a) of the Exchange Act.

336.     By virtue of the partnership structure, ownership and contractual rights, awareness of the Plains' and Plains Holdings' operations, their high-level positions and/or intimate knowledge of the false statements filed by plains and Plains Holdings with the SEC and disseminated to the investing public, the 20(a) Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Plains and Plains Holdings, including the

content and dissemination of the various statements which plaintiffs contend are false and misleading.

337.    In particular, each of the 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of the Plains and Plains Holdings, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

338.    As set forth above, Plains, Plains Holdings and the Officer Defendants each violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the 20(a) Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the 20(a) Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Plains and Plains Holdings securities during the Class Period.

C.    **COUNT III Violations of §11 of the Securities Act Against All Defendants**

339.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all members of the Class who purchased or otherwise acquired securities sold pursuant or traceable to the Offerings, and who were damaged thereby.

340.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, plaintiffs do not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §11 claim.

341.    Liability under this Count is predicated on the Officer Defendants' and the Director Defendants' signing of the registration statements and the filings incorporated by reference therein for the Offerings and all defendants' respective participation in the Offerings, which were conducted

- 150 -

pursuant to the Offering Materials.  The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

342.    Less than one year has elapsed since the time that plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

343.    By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of §11 of the Securities Act to plaintiffs and the other members of the Class pursuant to §11(e).

**D.    COUNT IV Violation of §12(a)(2) of the Securities Act Against Plains, PAA Finance and Plains Holdings**

344.    This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of all members of the Class who purchased or otherwise acquired Plains Holdings Class A Shares, Plains common stock, and Plains senior notes in and/or traceable to the Offerings and who were damaged thereby.

345.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, plaintiffs do not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

346.    By means of the Offering Materials, Plains, PAA Finance and Plains Holdings promoted sold the Plains Holdings' Class A Shares, the Plains shares, and the Plains senior notes to plaintiffs and the other members of the Class.  Plains, PAA Finance and Plains Holdings were

- 151 -

statutory sellers of securities offered and sold pursuant to the Offering Materials and solicited sales thereof for financial gain, as they benefitted financially from the sale of the securities.

347.    The Offering Materials contained untrue statements of material fact, and concealed and failed to disclose material facts.  Plains, PAA Finance and Plains Holdings owed plaintiffs and the other members of the Class who purchased Plains' and Plains Holdings' securities pursuant to the Offering Materials the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Plains, PAA Finance and Plains Holdings, in the exercise of reasonable case, should have known of the misstatements and omissions contained in the Offering Materials, as set forth above.

348.    Plaintiffs and the other Class members did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Documents at the time it acquired the Certificates.

349.    By reason of the conduct alleged herein, Plains, PAA Finance and Plains Holdings violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiffs and the other members of the Class who purchased the Plains' and Plains Holdings' securities pursuant to the Offering Materials sustained substantial damages in connection with their purchases of the securities.  Accordingly, plaintiffs and the other members of the Class who hold the securities issued pursuant to the Offering Materials have the right to rescind and recover the consideration paid for their shares, with interest thereon, and hereby tender their securities to Plains and Plains Holdings. plaintiffs and the other Class members who have sold their securities seek damages to the extent permitted by law.

- 152 -

**E.      COUNT IV Violations Of §12(a)(2) of the Securities Act Against the Underwriter Defendants**

350.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of all members of the Class who purchased or otherwise acquired Plains Holdings Class A Shares, Plains common stock, and Plains senior notes in and traceable to the Offerings and who were damaged thereby.

351.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, plaintiffs do not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

352.     The Underwriter Defendants were statutory sellers of the Offerings issued pursuant to the registration statements.

- By means of the IPO Offering Materials, the IPO Underwriter Defendants sold over 132 million Class A shares to members of the Class and raised over $2.9 billion.

- By means of the Plains Holdings Secondary Offering Materials, the Plains Holdings Secondary Offering Underwriter Defendants sold 69 million Class A shares to members of the Class and raised over $1.7 billion.

- By means of the Plains Offering Materials, the Plains Offering Underwriter Defendants sold 21 million common units to members of the Class and raised over $1.05 billion.

- By means of the Notes Offering Materials, the Notes Underwriter Defendants sold 3.3 billion of senior notes to members of the Class and raised close to $3.3 billion.

353.     In aggregate, the Offerings generated over $8.9 billion in proceeds, of which over $159 million in fees were received by the Underwriter Defendants.  These defendants were at all relevant times motivated by their own financial interests and sold the offerings by means of the materially false and misleading Offering Materials.  They acted as sellers, offerors, and/or solicitors of sales of the securities.

- 153 -

354.     The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

355.     Less than one year has elapsed since the time that plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

356.     By reason of the foregoing, the Underwriter Defendants are liable for violations of §12(a)(2) of the Securities Act to plaintiffs and the other members of the Class who purchased securities in or traceable to the Offerings, and who were damaged thereby.

F.     COUNT V Violations of §15 of the Securities Act Against Holdings LLC, Plains Holdings, the Officer Defendants and the Director Defendants

357.     This Count is asserted against Holdings LLC, Plains Holdings, the Officer Defendants and the Director Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o, on behalf of plaintiffs and the other members of the Class who purchased or otherwise acquired securities sold pursuant and traceable to the Offerings.

358.     At times relevant hereto, Holdings LLC, Officer Defendants Armstrong, Swanson and Herbold, and Director Defendants Burk, Goyanes, Raymond, Shackouls, Sinnott, and Sutil were controlling persons of Plains Holdings within the meaning of §15 of the Securities Act.

359.     At times relevant hereto, Holdings LLC, Plains Holdings, the Officer Defendants and Director Defendants Goyanes, Petersen, Raymond, Sinnott, Sutil, Symonds, and Temple were controlling persons of Plains within the meaning of §15 of the Securities Act.

360.     Holdings LLC, Plains Holdings, the Officer Defendants and the Director Defendants at times relevant hereto participated in the operation and management of Plains Holdings, and

- 154 -

1108692_1

conducted and participated, directly and indirectly, in the conduct of Plains and each entities' business affairs.

361.     The Officer and Director Defendants, as officers and directors of a publicly owned company, had a duty to disseminate accurate and truthful information with respect to Plains and Plains Holdings' financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Plains' and Plains Holdings' general partners, the Officer and Director Defendants were able to, and did, control the contents of the Offering Materials, which contained materially untrue information.

362.     By reason of the foregoing, Holdings LLC, Plains Holdings, the Officer Defendants and the Director Defendants are liable under §15 of the Securities Act, to the same extent that Plains and Plains Holdings is liable under §§11 and 12(a)(2) of the Securities Act, to plaintiffs and the other members of the Class who purchased securities pursuant and/or traceable to the Offerings pursuant to the Registration Statements and/or the applicable Offering Materials.

## XI.     PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiffs and the other members of the Class damages, including interest;

C.     Awarding plaintiffs reasonable costs and attorneys' fees; and

D.     Awarding plaintiffs such other or further relief as the Court may deem just and proper.

## XII.     JURY DEMAND

Plaintiffs demand a trial by jury.

- 155 -

DATED:  January 29, 2016

EDISON, MCDOWELL & HETHERINGTON LLP
Andrew M. Edison
Attorney-in-Charge
Southern District Bar No. 18207
andrew.edison@emhllp.com
3200 Southwest Freeway, Suite 2100
Houston, TX  77027
Telephone:  713/337-5580
713/337-8850 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
    & DOWD LLP
LUKE O. BROOKS
DARRYL J. ALVARADO
ASHLEY M. PRICE
ANGEL P. LAU


                    s/ LUKE O. BROOKS
                   ─────────────────────
                     LUKE O. BROOKS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff IAM National
Pension Fund and Plaintiff City of Warren Police
and Fire Retirement System

KENDALL LAW GROUP, LLP
JOE KENDALL
JAMIE MCKEY
3232 McKinney Ave #700, Dallas, TX 75204
Telephone: 214-744-3000
214-744-3015 (fax)

Additional Counsel for Plaintiff Ming Liu

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

- 156 -

Additional Counsel for Plaintiff City of Warren
Police and Fire Retirement System

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
JEREMY P. ROBINSON
JAKE NACHMANI
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
Telephone:  212/554-1400
212/554-1444 (fax)

Additional Counsel for Plaintiffs Jacksonville Police
and Fire Pension Fund and Police and Fire
Retirement System of the City of Detroit

- 157 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Sohol v. Yan, et al.*, No. 1:15-cv-00393 (N.D. Ohio)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of January, 2016.

CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM

By: Scott D. Salyer

Its: Chairman

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date<br>Acquired | Type of<br>Debt | Face<br>Amount | Price |
|---|---|---|---|
| 06/11/2014 | 4.7% due 06/15/2044 | 100,000 | $99.87 |

**Sales**

| Date<br>Sold | Type of<br>Debt | Face<br>Amount | Price |
|---|---|---|---|
| 11/05/2015 | 4.7% due 06/15/2044 | 5,000 | $79.29 |
| 11/18/2015 | 4.7% due 06/15/2044 | 20,000 | $76.74 |

Plaintiff's Certification of Investment in Plains GP Holdings, L.P.

I, Ming Liu, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the Complaint in this action and authorize the filing of this Certification.

2.      If chosen, I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial (if necessary). I am willing to participate on an executive committee of shareholders.

3.      Plaintiff's transactions in Plains GP Holdings, L.P. securities that are the subject of this action are:

| # SHARES PURCHASED | DATE PURCHASED | PRICE PER SHARE | CLASS OF STOCK (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SOLD PRICE |
|---|---|---|---|---|---|---|
| 400 | 10/16/2013 | $22 | Common | 400 | 9/30/2015 | $17.25 |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

4.      I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

5.      During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

6.      I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

Signed under penalty of perjury, this 22 day of December, 2015.

_Ming Whala Liu_
Signature

MING WHALA LIU
Name (please print)

919 - 554 - 0294
Telephone Number

12612 WATERLOW PARK LN
Address

RALEIGH      NC      27614
City              State           Zip

MWL0486@GMAIL.COM
Email Address

Return to:
Jamie J. McKey
Kendall Law Group, LLP
3232 McKinney Avenue, Suite 700
Dallas, Texas 75204
Telephone:  214-744-3000
Facsimile:  214-744-3015
Email: jmckey@kendalllawgroup.com
Website:  www.kendalllawgroup.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 29, 2016.

s/ LUKE O. BROOKS
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
        & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  LukeB@rgrdlaw.com

**Mailing Information for a Case 4:15-cv-02404 City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Plains All American Pipeline, L.P.**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas Robert Ajamie**
  tajamie@ajamie.com,dszak@ajamie.com,dmolloy@ajamie.com

- **Darryl J Alvarado**
  dalvarado@rgrdlaw.com

- **Thomas E Bilek**
  tbilek@bileklaw.com,lmank@bileklaw.com

- **Norman J Blears**
  nblears@sidley.com

- **Luke O Brooks**
  lukeb@rgrdlaw.com

- **Nicholas E. Chimicles**
  nick@chimicles.com

- **Roger Farrell Claxton**
  roger@claxtonlaw.com

- **Matthew J Dolan**
  mdolan@sidley.com

- **Kimberly M Donaldson Smith**
  kds@chimicles.com

- **Andrew M Edison**
  andrew.edison@emhllp.com,amanda.garza@emhllp.com

- **William B Federman**
  wbf@federmanlaw.com,ngb@federmanlaw.com,law@federmanlaw.com

- **Mark K Glasser**
  mglasser@sidley.com,nblears@sidley.com,tscuffil@sidley.com,belinda.howard@sidley.com,txefilingnotice@sidley.com,mdolan@sidley.com,epickens@sidley.com

- **Roger B Greenberg**
  roger@smglawgroup.com,sam@smglawgroup.com

- **Michael C Holmes**
  mholmes@velaw.com,pwright@velaw.com,ebrandon@velaw.com,kmccoy@velaw.com,sbishop@velaw.com

- **Jeffrey S Johnston**
  jjohnston@velaw.com,ehenderson@velaw.com

- **Angel P. Lau**
  Alau@rgrdlaw.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Catherine Pratsinakis**
  cpratsinakis@chimicles.com

- **Ashley M Price**
  aprice@rgrdlaw.com

- **Christine Donato Saler**
  cds@chimicles.com

- **Joseph R. Seidman , Jr**
  Seidman@bernlieb.com

- **Gerald H Silk**
  jerry@blbglaw.com

- **Carl E Singley**
  csingley@tlgattorneys.com

- **Thane Tyler Sponsel , III**
  sponsel@smglawgroup.com,sam@smglawgroup.com

- **Joe H Tucker**
  jtucker@tlgattorneys.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Stanley**     **Bernstein**
Bernstein Liebhard
10 E 40th St
New York, NY 10016

**Jeffrey**     **Haber**
Bernstein Liebhard et al
10 East 40th St
New York, NY 10016