United States District Court
Southern District of Texas

**ENTERED**

March 29, 2017

David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| IN RE PLAINS ALL AMERICAN PIPELINE, | § | Lead Case |
| L.P. SECURITIES LITIGATION | § | No. H:15-02404 |
| | § | |

## MEMORANDUM AND OPINION

### Contents

I.  The Parties and the Plaintiffs' Causes of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.  The Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    B.  The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        1.  The Plains Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            a.  The Corporate Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            b.  The Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . 5
                I.  The Officer Defendants . . . . . . . . . . . . . . . . . . . . . . 5
                ii.  The Director Defendants . . . . . . . . . . . . . . . . . . . . 6
        2.  The Underwriter Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    C.  The Causes of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.  The Complaint's Factual Allegations and Alleged Misrepresentations . . . . . . . . . . . . . 7
    A.  Background: Plains's Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    B.  Plains's Pre-Class Period Actions and the EPA Consent Decree . . . . . . . . . . . . 9
    C.  Plains's Efforts to Rehabilitate Its Image . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    D.  The Spill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    E.  Plains Reveals the Severity of the Spill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    F.  Investigations Reveal Additional Information About Plains's Maintenance Record
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    G.  Defendants' Knowledge of the Corrosion Problems . . . . . . . . . . . . . . . . . . . . . 17

III.  The Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    A.  Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    B.  Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    C.  The Exchange Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        1.  Material Misrepresentations and Omissions . . . . . . . . . . . . . . . . . 24
        2.  Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        3.  Statements of Opinion After *Omnicare* . . . . . . . . . . . . . . . . . . . . 28
        4.  Section 20(a) of the Securities Exchange Act of 1934 . . . . . . . . 30
    D.  The Securities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

1

IV.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    A.   The Exchange Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          1.   Statements Alleged to be Misleading  . . . . . . . . . . . . . . . . . . . . 33
              a.   Statements about Plains's efforts in integrity management, corrosion control, and leak detection. . . . . . . . . . . . . . 33
              b.   Statements about legal compliance  . . . . . . . . . . . . . . . . 45
              c.   Statements about spill-response capabilities . . . . . . . . . 64
              d.   Post-spill statements  . . . . . . . . . . . . . . . . . . . . . . . . . . 70
              e.   Conclusion on material-misrepresentation allegations  . . 75
          2.   Scienter  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
              a.   The Scienter Allegations on the Actionable Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
              b.   The Plaintiffs' General Scienter Allegations . . . . . . . . . 77
          3.   Loss Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
    B.   The Securities Act Claims: § 11, § 12, and § 15 . . . . . . . . . . . . . . . . . . . . . 89
          1.   Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
          2.   Rule 9(b)'s Particularization Requirement  . . . . . . . . . . . . . . . 97
          3.   The Securities Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

V.   Conclusion and Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

The plaintiffs in this putative securities-fraud class action allege that an oil and gas pipeline company falsely claimed to have a comprehensive, effective environmental and regulatory compliance program to prevent oil spills and, if they occurred, quickly remediate the effects. Instead, the plaintiffs allege, the touted compliance program was close to nonexistent, and Plains repeatedly violated regulatory mandates. Plains allegedly deceived the public about its compliance program with falsehoods that inflated the price of the company's securities. The lack of an effective compliance program was dramatically exposed when a Plains pipeline in Santa Barbara County, California, burst and thousands of barrels of oil spilled. Plains securities lost significant value in the aftermath. This lawsuit followed.

The plaintiffs have sued Plains and several affiliated companies, certain officers and

directors, and the banks that underwrote Plains's securities offerings, seeking compensation for the diminished value of Plains securities. The defendants have moved to dismiss the case. The plaintiffs responded, and the defendants replied. (Docket Entries No. 114, 115, 124, 127, 128). The parties presented oral argument at a lengthy hearing in September 2016.

Based on the briefs, the hearing, the record, and the applicable law, the court grants the motions to dismiss, (Docket Entry Nos. 114, 115), without prejudice and with leave to amend. The reasons are explained in detail below.

## I.     The Parties and the Plaintiffs' Causes of Action

### A.     The Plaintiffs

The plaintiffs are individuals and institutional investors who purchased equity and debt instruments issued by entities affiliated with Plains All American Pipeline, a major national oil and gas pipeline operator.[1]  Compl. ¶¶ 13-17.  They seek to represent a class of Plains investors who purchased Plains All American Pipeline, LP ("Plains") common units between February 27, 2013 and August 5, 2015, or who purchased Plains GP Holdings, LP ("Plains Holdings") Class A Shares between October 16, 2013 and August 5, 2015.  The plaintiffs also seek to represent those individuals who purchased securities "pursuant and traceable to" certain public securities offerings.

The plaintiffs' claims arise from the following public offerings:

- the Plains Holdings October 16, 2013 initial public offering of Class A shares ("IPO");

- the Plains Holdings November 12, 2014 public offering of Class A shares ("Secondary Offering");

---

[1] This factual recitation is drawn overwhelmingly from the plaintiffs' consolidated complaint, (Docket Entry No. 70).  References to the complaint will take the form "Compl. ¶ X" throughout this opinion.

- the Plains February 26, 2015 public offering of common shares ("Plains Offering");

- the Plains August 8, 2013 public offering of 3.85% senior notes due 2023;

- the Plains April 15, 2014 public offering of 4.7% senior notes due 2044;

- the Plains September 2, 2014 public offering of 3.6% senior notes due 2024; and

- the Plains December 2, 2014 public offering of 2.6% senior notes due 2019 and 4.9% senior notes due 2045.

Lead plaintiff IAM National Pension Fund is a defined benefit pension plan for members of the International Association of Machinists and Aerospace Workers. IAM bought Plains and Plains Holdings securities on the open market during the relevant class periods. *Id.* ¶ 13.

Plaintiff City of Warren Police and Fire Retirement System is a defined benefit governmental retirement system for police and firefighters in Warren, Michigan. It purchased 4.7% Plains notes in the April 2014 offering. *Id.* ¶ 14.

Plaintiff Ming Liu is an individual who purchased Plains Holdings Class A shares in the IPO. *Id.* ¶ 15.

Plaintiff Jacksonville Police and Fire Pension Fund is a defined benefit government retirement system for police and firefighters in Jacksonville, Florida. It purchased Plains Holdings Class A shares in the IPO and the Secondary Offering. *Id.* ¶ 16.

Plaintiff Detroit Police and Fire Retirement System is a defined benefit governmental retirement system for police and firefighters in Detroit, Michigan. It purchased Plains Holdings Class A shares in the Secondary Offering and Plains common units in the Plains Offering. *Id.* at ¶ 17.

There is no allegation that the named plaintiffs purchased notes in or traceable to the August

4

2013 senior-notes offering, the September 2014 senior-notes offering, or the two December 2014 senior-notes offerings.  The complaint alleges that named plaintiffs purchased securities in or traceable to four of the eight transactions at issue in this case.

### B.    The Defendants

#### 1.    The Plains Defendants

##### a.    The Corporate Defendants

Plains All American Pipeline, LP ("Plains"), is a publicly traded Delaware master limited partnership that owns and operates oil and gas pipelines throughout the United States. *Id.* ¶ 18.  A general partner, Plains All American GP LLC ("GP LLC"), manages Plains and employs Plains's officers, directors, managers, and US-based employees.  *Id.* ¶ 19.  GP LLC, in turn, is wholly controlled by Plains GP Holdings, LP ("Plains Holdings"), a publicly traded Delaware limited partnership.  *Id.* ¶ 21.  Plains Holdings is, in turn, managed by PAA GP Holdings LLC ("Holdings LLC"), which owns the general partner interest in Plains Holdings and directs that entity's activities. *Id.* ¶ 26.  Plains itself wholly owns PAA Finance Corp., a Delaware corporation formed in 2001 to co-issue Plains's debt securities.  *Id.* ¶ 25.  Each entity is a named defendant.

##### b.    The Individual Defendants

###### I.    The Officer Defendants

Greg L. Armstrong is the CEO and Chairman of the Board of GP LLC, Plains's general partner, Holdings LLC (Plains Holdings's general partner), and PAA Finance. *Id.* ¶ 27.  Armstrong signed all of the securities offering materials at issue in the case and many of the SEC filings alleged to contain false and misleading statements and allegedly made false or misleading statements at investor meetings.  *Id.*

Chris Herbold is the Vice President – Accounting and Chief Accounting Officer of GP LLC, PAA Finance, and Holdings LLC.  *Id.* ¶ 28.  He signed the registration statements for some of the securities offerings, as well as the SEC filings that contained allegedly misleading statements.  *Id.*

Richard McGee is the Executive Vice-President, General Counsel, and Secretary of GP LLC and Holdings LLC.  *Id.* ¶ 29.  He signed the SEC filings that allegedly contained false and misleading statements.  *Id.*

Harry Pefanis is President and Chief Operating Officer of GP LLC and Holdings LLC, and President of PAA finance.  *Id.* ¶ 30.  Pefanis signed the registration statement for some of the securities offerings and other SEC filings that contained allegedly false or misleading statements. *Id.*

Al Swanson is the Executive Vice-President and Chief Financial Officer of GP LLC, PAA Finance, and Holdings LLC.  *Id.* ¶ 31.  Swanson signed the allegedly misleading registration statements and SEC filings.  *Id.*

### ii.      The Director Defendants

In addition to these Officer Defendants, the plaintiffs sued various Director Defendants. Victor Burk, Everardo Goyanes, Gary Petersen, John Raymond, Bobby Shackouls, Robert Sinnott, Vicky Sutil, Taft Symonds, and Christopher Temple were all allegedly directors of various Plains entities for at least some of the relevant period.  All allegedly signed securities-offering materials containing untrue or misleading statements.  *Id.* ¶¶ 33-41.

### 2.      The Underwriter Defendants

In addition to the Plains Defendants, the plaintiffs sued various underwriter defendants. They are all financial institutions alleged to have participated in at least one Plains securities

offering in which the relevant registration statement or other offering materials contained false or misleading statements. *Id.* ¶¶ 42-79.  Different underwriter defendants allegedly participated in each of the securities offerings at issue.[2]

### C.    The Causes of Action

The plaintiffs assert claims under:

- § 10(b) of the Exchange Act and Rule 10b-5 against Plains, Plains Holdings, and the Officer Defendants;

- § 20(a) of the Exchange Act against Holdings LLC, Plains Holdings, and the Officer Defendants;

- § 11 of the Securities Act against all defendants;

- § 12(a)(2) of the Securities Act against the Underwriter Defendants; and

- § 15 of the Securities Act against Holdings LLC, Plains Holdings, the Officer Defendants, and the Director Defendants.

For the Exchange Act claims under § 10(b)/Rule 10b-5 and § 20(a), the plaintiffs seek to represent a class consisting of those purchasing Plains common units between February 27, 2013 and August 5, 2015, and those purchasing Plains Holding Class A shares between October 16, 2013 and August 5, 2015.  For the Securities Act claims under §§ 11, 12, and 15, the plaintiffs seek to represent a class of those purchasing securities "pursuant and traceable to" these offerings.  *Id.* ¶¶ 1-2.

## II.    The Complaint's Factual Allegations and Alleged Misrepresentations

This factual recitation is drawn from the plaintiffs' Consolidated Amended Complaint,

---

[2]  The underwriter defendants' alleged participation in Plains securities offerings is outlined in the Appendix to this opinion.

(Docket Entry No. 70).  For purposes of this motion to dismiss, these allegations are taken as true except to the extent that they are contradicted by the narrow category of documents the court may consider on a motion to dismiss without converting it into one for summary judgment.  The allegations are summarized, identifying the contested points.

### A.    Background: Plains's Operations

Plains All American Pipeline is a publicly traded MLP.  Its business is interstate and intrastate crude-oil pipeline transportation and storage.  Before and during the class period, Plains was one of North America's largest energy pipeline operators.  It grew primarily by acquiring significant pipeline and terminal networks.  Compl. ¶ 85.  The assets acquired included Lines 901 and 903, built in 1987 and acquired by Plains in 1998.  Line 901 extends approximately 10 miles along the California coast, where it connects to Line 903, which continues 128 miles through Santa Barbara County and into Kern County.  *Id*. ¶ 86.

During the class period, most of the Plains pipelines, including Lines 901 and 903, were under the regulatory jurisdiction of the Pipeline and Hazardous Materials Safety Administration. The Pipeline Safety Administration enforces regulations under the Hazardous Liquids Pipeline Safety Act of 1979.  *Id*. ¶ 87.  Federal regulations enacted under the Act, referred to in this opinion as the "Pipeline Safety Act," required Plains to "adopt measures designed to reduce the environmental impact of oil discharges from onshore pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel." *Id*. ¶ 87.  2002 and 2006 amendments to the Pipeline Safety Act required Plains to "implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such

as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways." *Id.* ¶ 88.  Pipeline Safety Administration regulations also required Plains to implement enhanced measures in high-consequence areas.  *Id.*

Lines 901 and 903 were in a high-consequence area because they were close to the environmentally sensitive Santa Barbara coastline, rivers, state parks, and national forests.  Plains had to comply with the Pipeline Safety Administration's enhanced high-consequence area requirements for Lines 901 and 903.  *Id.*  Plains was also generally, and specifically for Lines 901 and 903, subject to the Federal Water Pollution Control Act, referred to here as the "Clean Water Act," as amended.  That Act imposes restrictions on the discharge of pollutants, like crude oil, into navigable waters of the United States as well as into state waters.  *Id.* ¶ 89.

Plains stated (falsely, say the plaintiffs) throughout the class period that it was in compliance with these laws and regulations.  Plains also promised investors that it had implemented pipeline maintenance and integrity measures "beyond regulatory mandate."  *Id.* ¶ 91.

### B.    Plains's Pre-Class Period Actions and the EPA Consent Decree

Before and during the class period, Plains pipelines had a series of oil spills that "rendered Plains one of if not the worst safety and environmental-regulation violators in the pipeline business." *Id.* ¶ 92.  Plains and its related companies reported 229 safety and maintenance "incidents" on pipelines to the federal regulators, more than all but three other reporting companies.  These incidents resulted in more than $141 million in property damage and the release of more than 800,000 gallons of hazardous liquids.  *Id.*

The EPA sued Plains in 2010 and obtained a consent decree requiring Plains to pay significant fines for regulatory violations and to adopt new safety measures to prevent spills and

reduce the impact when they did occur.  The consent decree required Plains, among other things, to: spend $41 million to upgrade more than 10,000 miles of pipeline; conduct weekly aerial patrols of certain pipelines to check for leaks; spend millions to mitigate leak threats from corrosion; install computational pipeline-monitoring capabilities; and conduct ongoing monitoring of its pipeline system.  *Id.* ¶ 94.  None of the $41 million was spent on upgrading or repairing Lines 901 or 903. *Id.*  The plaintiffs repeatedly allege that the consent decree specifically required Plains to repair, upgrade, monitor, and take other actions on Lines 901 and 903.  The consent decree is a public document central to the plaintiffs' complaint, so the court may consider it on a motion to dismiss.

The defendants insist that the decree does not support the plaintiffs' characterization.  The consent decree is discussed in great detail later in this opinion.  For now, it is enough to note that while, as the plaintiffs argue, the decree does include Lines 901 and 903 on a lengthy list of lines subject to certain requirements, it does not require specific expenditures on Lines 901 or 903.  And, as the defendants emphasize, the United States and Plains jointly terminated the consent decree in 2013.  *See* Docket Entry No. 20, *United States v. Plains All American Pipeline, LP*, 4:10-cv-2833 (S.D. Tex. Nov. 26, 2013).

### C.     Plains's Efforts to Rehabilitate Its Image

In the wake of the consent decree, Plains executives tried to assure investors that it had adopted enhanced measures to ensure pipeline integrity.  *Id.* ¶ 98.  The 2012 10-K form, filed the first day of the class period, reassured investors that "pipeline integrity management" was Plains's "primary operational emphasis," and that Plains had "implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention."  *Id.*  The Form 10-K stated that the Plains "pipelines are

in substantial compliance with [applicable regulations]" and that Plains's "integrity management program" included measures that went well beyond legal requirements, including "several internal programs designed to prevent incidents and . . . activities such as automating valves and replacing river crossings." *Id.*

At a 2014 Investor Day conference, Plains CEO Greg Armstrong stated that "safety is a core value" and that Plains "foster[s] a culture that emphasizes operational excellence, asset integrity, & safety." *Id.* ¶ 99.  The top three items in Armstrong's presentation were "Safety," "Pipeline Integrity Management," and "Incident Response Preparation." *Id.* Armstrong assured investors that "[w]e are committed to operational excellence in safety, pipeline integrity management, and responding to incidents in the unfortunate development that they do occur." *Id.*. Armstrong also stated that "we do a lot and I mean a tremendous amount that will never be appreciated by the public" on safety and spill prevention. *Id.*

Plains also represented that its officers were involved in the company's safety, pipeline-integrity, and incident-response work. *Id.* ¶ 100.  During the class period, Plains's website asserted that its Environmental, Health, and Safety Program was "successful because it is developed, supported and carried out by our employees, from the senior management team down[;]" that "Plains All American is committed to public safety, protection of the environment and operation of our facilities in a prudent and safe manner[;]" and that the Plains entities "believe that all of our pipelines have been constructed and maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards proscribed by the American Petroleum Institute and accepted industry practice." *Id.* The website went on to state that Plains had "devote[d] substantial resources to comply with [government]-mandated pipeline regulatory rules," including

"requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas'" (like Santa Barbara's coastline) "where a pipeline leak or rupture could produce significant adverse consequences." *Id.* ¶ 101. The website also stated that Plains had "developed and implemented certain pipeline integrity measures that go beyond [its] regulatory mandate." *Id.*

Plains assured investors that, when a leak was detected, the company would immediately respond, coordinate with public officials, and implement a comprehensive plan to prevent severe environmental impacts. *Id.* ¶ 103. But, the plaintiffs say, these promises of safe and effective pipeline operation were illusory. Instead, the company had disregarded its pipeline-integrity and maintenance obligations, with predictable results. *Id.* ¶ 102.

### D.     The Spill

On May 19, 2015, Line 901 ruptured and spilled oil into the Pacific Ocean and environmentally sensitive coastal areas. The spill killed nearly 200 birds and more than 100 marine mammals, including dolphins and sea lions. *Id.* ¶ 104-06. At an Investor Day conference held shortly after the spill, Armstrong conceded that "[i]f you could pick any place in the world you would not want to have a release, [Santa Barbara] would probably qualify as the one." *Id.* ¶ 106.

Plains's response to the spill left much to be desired. State law required Plains to report the spill to the federal National Response Center within 30 minutes of detection. Instead, Plains did not report the spill to the National Response Center until hours after it was discovered. *Id.* ¶ 108. Plains's own response plans indicated that it should take no more than 15 minutes to discover a release and shut down the flow. Plains officials noticed the anomalies in Line 901 by 10:30 a.m. and shut the pipeline down at 11:30 a.m. Government officials first learned of the spill through a 911

call from beachgoers—not from Plains—at approximately 11:42 a.m.  The local fire department notified the National Response Center of the spill at 12:43 a.m., well over two hours before Plains itself notified the agency.  *Id.*

According to the plaintiffs, Plains's "spin operation" was far more effective than its on-the-ground response.  Plains officials stated that the company's "worst case" estimate showed that, at most, 21,100 gallons of oil had spread into the ocean, and as many as 105,000 gallons had been released.  *Id.* ¶ 109.  On May 26, 2015, Plains filed a Form 8-K with the SEC.  The Form 8-K described the spill and stated that Plains "currently estimates that the amount of released crude oil could be as high as approximately 2,400 barrels," equivalent to 101,000 gallons of oil; this represented a 4,000 gallon reduction from the initial "worst case" estimate.  *Id.*  Plains allegedly waged a public-relations campaign to create the impression that it was working efficiently and effectively to remedy the spill.  *Id.* ¶¶ 110-11.

### E.      Plains Reveals the Severity of the Spill

On August 5, 2015, Plains disclosed in an investor presentation that as much as 143,000 gallons of oil might have leaked, an amount 42% larger than previously reported.  *Id.* ¶ 112.  Plains also disclosed that: both the U.S. Department of Justice and the California Attorney General were investigating the spill; Plains could be liable for criminal violations of the Clean Water Act; and Lines 901 and 903 were subject to multiple Pipeline Safety Administration corrective actions.  *Id.*  For the first time, according to the plaintiffs, Plains disclosed that the spill would cost the company $257 million—not including lost revenue associated with shutting down Lines 901 and 903—and that Plains's insurance did not cover all the costs.  *Id.*

In the August presentation, Plains explained its revision:

> In the second half of June we completed the process of emptying and purging Line 901, which resulted in the removal of approximately 26,000 barrels of crude oil from the line. This activity provided additional data to assess the reasonableness of our worst case estimate of 2,400 barrels based on the "drain-down" methodology.

*Id.* ¶ 114. But this statement, the plaintiffs say, was also inaccurate. Plains completed purging Line 901 by May 28, 2015, not in the second half of June, and knew the true extent of the spill for at least two months before disclosing the results of the purge process to investors.[3] During these two months, the defendants communicated regularly with investors and the public. The communications included the following:

- On June 4, 2015, defendants hosted an investor day, at which Armstrong discussed the Santa Barbara oil incident and encouraged investors to visit the Plains website for "daily updates" on the spill. *Id.* ¶ 116.

- On June 10, 2015, as reflected in Plains's June 11, 2015 Form 8-K filed with the SEC, individual defendants spoke at a media briefing and answered reporters' questions about the Line 901 crude release. *Id.*

- On the www.plainsline901response.com website, in the "daily updates" section, Plains posted: (1) incident updates on June 29, 2015, July 6, 2013, and July 13, 2015; (2) "Recovery Q&As" on June 17, 2015; and (3) the investor-day presentation on June 4, 2015 and Armstrong's letters to members of Congress on June 24, 2015. *Id.*

- The defendants and other Plains representatives had numerous conversations with the press about the spill between May 28, 2015 and August 5, 2015. *Id.*

The Pipeline Safety Administration had required Plains to have a spill-response plan for Lines 901 and 903. That plan, in place before the spill occurred, estimated the worst-case scenario for a spill from Line 901 at 167,000 gallons, closer to the actual damage than to Plains's initially released estimates. *Id.* ¶ 118. The plan's risk analysis assumed "10 minutes total time to detect the rupture and 5 minutes to shutdown pipeline." *Id.* ¶ 119. But on the day of the spill, Plains

---

[3] The court will address this issue in more detail later in this opinion.

employees did not try to remedy the rupture for more than two hours after it began. *Id.* The plaintiffs point to this delay as evidence of Plains's misrepresentations about pipeline safety.

### F.   Investigations Reveal Additional Information About Plains's Maintenance Record

On May 21, 2015, the Pipeline Safety Administration issued a Corrective Action Order requiring Plains to take certain actions on Line 901. *Id.* ¶ 120. The May 21 Order noted that Plains's inspections of Line 901 in June 2007 and July 2012 had demonstrated declining pipeline integrity. *Id.* The Administration noted that Plains had used shrink-wrap sleeve coating on Line 901, which increases the likelihood of corrosion and therefore leaks. The May 21 Order required Plains to shut down Line 901, conduct extensive testing, review the company's emergency plans and training, and identify other shrink-wrapped parts of the line. *Id.* On June 3, 2015, the Administration issued an amended Corrective Action Order, which identified "extensive external corrosion" on Line 901 and "extensive corrosion" (among other deficiencies) on the adjoining Line 903. *Id.* ¶ 121.

On September 11, 2015, the Pipeline Safety Administration issued a Notice of Probable Violation based on its September and October 2013 inspections of Lines 901 and 903. *Id.* ¶ 124. The Notice stated that Plains had likely violated regulations requiring it to keep records of its pipeline-integrity management efforts for lines in high-consequence areas, including records of required tests on Line 903. *Id.* ¶¶ 126-27. The Notice also stated that Plains did not have records of heightened prevention and mitigation efforts in other high-consequence areas and did not have records indicating what process it used to determine what measures it should take. *Id.* ¶ 128. The Notice stated that Plains could not produce documents showing its required annual review of its emergency-response training or showing the contractors performing the tasks that the regulations

15

required.  *Id.* ¶¶ 129-130.

The Pipeline Safety Administration Notice of Probable Violation stated that the violations were "determined prior to the May 19, 2015 crude oil spill in Santa Barbara" and that the Administration asked Plains to provide "additional information following" the Administration's inspection.  Plains provided the information in late 2013 and June 2014.  *Id.* ¶ 131.  The Notice stated that "during the course of our inspection, our representatives found concerns that may impact your current level of safety" and "discussed" those concerns with Plains representatives.  One of these concerns was that "Plains had unclear procedures and documentation of its decision making process for addressing when in-line inspection (ILI) tool run data indicates anomalous conditions." *Id.* ¶¶ 132-33.  Additionally, Plains did not appear to have adequate documentation of its plans for contacting emergency responders if a spill occurred in California.  *Id.* at ¶¶ 134-35.

On November 12, 2015, the Pipeline Safety Administration sent yet another amendment to the May Corrective Action Order.  The amended Order required more remedial measures and included additional findings on Plains's pipeline maintenance.  *Id.* ¶ 136.  The amended Order also made several additional findings:

• The Administration's independent review of in-line inspection tool surveys for Lines 901 and 903 over the past 10 years found that anomalies were "under-called" in areas of general corrosion.

• Despite common industry practice, Plains did not share its in-line inspection field data with the vendor for that task, preventing Plains from more accurately analyzing its inspection data.

• The Administration's independent review of in-line inspection surveys from the past 10 years show that Line 903 has corrosion characteristics similar to Line 901's, and a number of the Line's anomalies had characteristics consistent with the Line 901 failure site.

• Based on the number of anomalies identified on Line 903, it did not appear that Plains had an effective corrosion-control program, meaning that Line 903 had likely degraded further

16

since the last in-line inspection.

•       Line 903 had shrink-wrap sleeves on some weld sites, which could contribute to stress corrosion cracking.

*Id.*

Based on these findings, the Pipeline Safety Administration required Plains to take Line 903 off-line, purge it, and try to identify problems like those found on Line 901. Plains was also ordered to provide its in-line inspection vendor with field data, to provide additional training, and to implement enhanced measures to monitor Line 903 during the purge-and-inspection period. *Id.* ¶ 137. The Administration's findings, the plaintiffs assert, were based on data that Plains either knew about or recklessly disregarded. The plaintiffs cite the fact that the Administration's conclusions about the in-line inspection under-call bias were derived from Plains's own data. *Id.* ¶ 138.

### G.       Defendants' Knowledge of the Corrosion Problems

Plains conducted in-line inspection runs on Line 901 in 2007, 2012, and on May 5, 2015, shortly before the spill. *Id.* ¶ 139. After the 2007 run, Plains obtained permits to address 15 anomalies on Lines 901 and 903. Thirteen of the anomalies were on Line 901. One of the sites that Plains excavated as part of that process appears to have been where the 2015 spill occurred. *Id.* ¶¶ 140-41. The 2007 run revealed extensive corrosion on Line 901, despite Plains's pipeline-integrity management efforts. *Id.* ¶ 143.

After the 2012 run, Plains sought permits to address 82 anomalies on Line 903. The plaintiffs allege that these are the same anomalies that led to the eventual shutdown of that line. *Id.* at ¶ 141. On May 5, 2015, shortly before the spill, Plains's in-line inspection vendor ran an inspection that revealed four areas in Line 901 requiring immediate investigation under the relevant regulations and under the Plains integrity management plan. The vendor's ordinary practice was

17

to notify Plains immediately after completing a "first pass" through the data, a process that allegedly took 7 to 14 days. *Id.* ¶ 142. Plains would have received the data, at the latest, on the day of the spill. Plains was required to shut down the line pending resolution of the anomalies as soon as it received the data. It did not. *Id.* Plains's failure to provide its in-line inspection vendor with the field data necessary to calibrate the inspection tools (an industry-standard practice that Plains did not follow), meant that these anomalies might have been only a fraction of those actually present, because the tools were under-calling the degree of corrosion. The corrosion was caused, at least in part, by Plains's decision to shrink-wrap several of the pipe weld sites. These plastic coatings are prone to "disbonding," increasing the likelihood of corrosion and other problems. *Id.* ¶ 146. Plains allegedly knew that shrink-wrap coating increased these risks, but did not commensurately increase its inspections or maintenance work on Lines 901 and 903. *Id.* ¶ 147. To make matters worse, when the leak occurred, Plains was operating Line 901 at pressures above its maximum safe operating pressure in light of the level of corrosion in the pipe walls. Indeed, according to the plaintiffs, if Plains had properly avoided under-call bias by calibrating its in-line inspection tools, it would have known that the level of corrosion in the pipe section exceeded the level requiring immediate repair or reduction of pressure. *Id.* ¶¶ 153, 155. In short, the plaintiffs allege, the 2007 in-line inspection corrosion results indicate that Plains was operating Line 901 in clear violation of Pipeline Safety Administration guidelines, greatly increasing the risk of a severe rupture and spill. *Id.* ¶ 156.

Lines 901 and 903 were built beginning in 1987. Plains's SEC filings indicated that they had a maximum useful life of 30 years. In 2015, when Line 901 ruptured, it was 28 years old. *Id.* ¶ 158. Plains knew that the pipelines were likely to have degraded. But, because production volumes for the fields that Lines 901 and 903 serviced declined significantly after the mid-1990s, Plains had little

incentive to spend money on repairing these aging pipelines.  Plains's insurance coverage also significantly reduced incentives to repair the lines.  *Id.* ¶¶ 159-161.  Even more disincentive arose, according to the plaintiffs, from the fact that money spent to repair the pipelines would have impacted financial-performance metrics that were primary drivers of the individual defendants' bonuses.  *Id.*

The plaintiffs also point to a variety of other environmental incidents and regulatory penalties that Plains experienced across its pipeline network in the years prior to the Santa Barbara spill, suggesting that Plains had a widespread culture of noncompliance.  *Id.* ¶¶ 176-77.  The plaintiffs cite Pipeline Safety Administration data that ranks Plains among the worst pipeline operators in the United States, measured by total incidents and by incidents per thousand miles of pipeline.  *Id.* ¶ 178.

Despite these failures and problems, Plains represented throughout the class period that it had effective safety and integrity programs supervised by high-level executives.  Plains's SEC filings stated that the firm's directors "have access to members of management, and a substantial amount of information transfer and informal communication occurs between meetings."  *Id.* ¶ 185. Plains's Senior Vice-President of Engineering, who was responsible for the integrity program, was a senior executive, routinely in contact with Plains's top-level management and the board.  Plains stated, for example, that "[i]n addition to required activities, our integrity management program includes several internal programs designed to prevent incidents and includes activities such as automating valves and replacing river crossings."  *Id.* ¶ 184.  But even while it made this statement, Plains was the only pipeline operator that did not install automatic shutoff valves on its Santa Barbara pipelines.  *Id.*

19

Plains represented that its environmental and safety program was "successful" because it was "developed, supported and carried out by our employees, from the senior management team down to the newest hire."  *Id.*  At a meeting attended by Armstrong, Pefanis, and Swanson, Armstrong stated:

> We have implemented a tremendous amount of testing procedures, Dan Nerbonne and Rick Jensen and their groups in both US and Canada spend a tremendous a[m]ount of time investing in testing and trying to advance technologies to be able to monitor the pipe and to proactively get in front of some of these opportunities and issues.

*Id.* ¶ 186.

The plaintiffs also point to the consent decree, which required Plains to implement an improved pipeline-integrity management program and corrosion-control measures, as well as other changes designed to reduce the risk of spills.  *Id.* ¶ 187.  Plains was required to check in with the EPA twice a year, setting out the progress it had made on these new measures.  Plains represented in SEC filings that it had "developed and implemented certain pipeline integrity measures that go beyond regulatory mandate, some of which are now incorporated in the 2010 Consent Decree."  As part of making "pipeline integrity management" a "primary operational emphasis," Plains had instituted an "internal review process pursuant to which we examine various aspects of our pipeline . . . systems that are not subject to the DOT pipeline integrity management mandate."  *Id.*

The plaintiffs allege that the corporate and individual defendants were severely reckless in continuing to promote Plains's safety record while simultaneously allowing the pipelines to waste away for want of repairs.  This recklessness was due, the plaintiffs allege, to the defendants' financial interest in boosting Plains's profits.  The ownership structure and internal incentive schemes of the various Plains partnerships and companies rewarded each group of defendants for

distributing cash to Plains All American's unit-holders.  The officer defendants' multimillion-dollar bonuses depended on their ability to generate cash, meaning that they had no incentive to repair the company's decaying pipelines.  *Id.* ¶¶ 188-199.

These allegations are examined in light of the legal standards and the documents properly considered in this motion.

## III.    The Legal Standards

### A.    Standing

Federal Rule of Civil Procedure 12(b)(1) applies to challenges to a plaintiff's standing.  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation and internal quotation marks omitted).  A court lacks power to decide a claim that a plaintiff lacks standing to bring.  The plaintiff has the burden of demonstrating that subject-matter jurisdiction exists.  *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  Standing requires: "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury."  *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The plaintiff "must demonstrate standing for each claim he seeks to press."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  Therefore, "under the general principles of standing, 'a litigant may not merely "champion the rights of another."'"  *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 248 (5th Cir. 2008) (quoting  *Scottsdale Ins. Co. v. Knox Park Constr., Inc.*, 488 F.3d 680, 684 (5th Cir. 2007)).

### B.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."  *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).  A court may "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation marks omitted). Consideration of documents attached to a defendant's motion to dismiss is limited to "documents that are referred to in the plaintiff's complaint and are

central to the plaintiff's claim." *Scanlan v. Tex. A & M. Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency. *Lovelace*, 78 F.3d at 1018 n.1. The court may consider these matters of public record without converting the motion into one seeking summary judgment. *See Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir.2011); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366); *Jathanna v. Spring Branch Indep. Sch. Dist.*, No. CIV.A. H-12-1047, 2012 WL 6096675, at *3 (S.D. Tex. Dec. 7, 2012).

### C.    The Exchange Act

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5. The Supreme Court has held that § 10(b) affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318, 127 S.Ct. 2499 (2007). "But the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura*

23

*Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal citations omitted).

To state a private claim under § 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted).

### 1.    Material Misrepresentations and Omissions

A plaintiff who asserts securities fraud in violation of § 10(b) and Rule 10b-5 must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322. Rule 9(b) requires the complaint to "state with particularity the circumstances constituting the fraud." FED. R. CIV. P. 9(b). In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006).

As Judge Ellison explained in a similar case arising from the BP Deepwater Horizon securities fraud multi-district litigation:

> The PSLRA enhances the requirements of Rule 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir.2002). These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* What constitutes particularity will necessarily differ with the facts of each case. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir.1992). A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir.2004).

*In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012) ["*BP I*"]. For each statement that the plaintiffs identify as misleading, they must explicitly and precisely set out why the statement was false or misleading and why the speaker knew (or recklessly disregarded the fact that) the statement was misleading.

The Fifth Circuit has made clear its disapproval of "group pleading." Allegations that an undifferentiated group of "the defendants" made a statement that was false or misleading are insufficient. Individualized allegations about the specific speaker are required. The plaintiffs cannot rely on or impute to individuals the collective knowledge of all or a group of persons associated with the defendant company. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

Even if misrepresentations and omissions are pleaded with sufficient specificity and individualization, they must be material to state a claim. There is no bright-line rule for materiality; it requires a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). The test for

whether a representation is material whether there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Omitting facts from a statement is material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *BP I*, 843 F. Supp.2d at 747 (citing *Basic*, 485 U.S. at 232).

Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). "[N]o reasonable investor would consider such statements material and . . . investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *BP I*, 843 F. Supp. 2d at 748. The statements the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance. As in other areas of the law, "puffery" is not actionable as a misrepresentation.

## 2.   Scienter

In addition to pleading that specific statements misrepresented or omitted material facts, the plaintiffs must plead that the person responsible for the misrepresentation acted with the necessary culpability, or scienter. *Tellabs*, 551 U.S. at 319. Section 10(b) and Rule 10b-5 are not insurance against bad corporate management. Rather, they protect only against intentional or knowing misstatements. *Shaw Group*, 537 F.3d at 535. "Scienter, in the context of securities fraud, is defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the

defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Investments LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005)).  "[F]or 'each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Shaw Group*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u–4(b)(2)); *TXU Corp.*, 565 F.3d at 207.

In considering whether the specific factual allegations create a strong inference of scienter, the court can consider documents incorporated by reference into the complaint and matters proper for judicial notice.  *BP I*, 843 F. Supp. 2d at 748 (citing *Tellabs*, 551 U.S. at 323).  The court looks to all of the allegations about a particular individual's state of mind when he or she made the statement at issue, to determine whether they support a strong inference of scienter.  *Tellabs*, 551 U.S. at 324; *Southland*, 365 F.3d at 364-65.  The inference of scienter must be "cogent and compelling," not simply "reasonable" or "permissive."  The inference must be "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  The court must consider "plausible  nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 323-24.  "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)).  "Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice."  *BP I*, 843 F. Supp.2d at 749 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)).

The rule against group pleading also applies to scienter allegations.  The plaintiffs must

make specific allegations about an individual's state of mind when the challenged statement was made.  The plaintiffs cannot simply point to the fact that some other person at the corporation knew of facts that make the statement misleading and impute that knowledge to the speaker.  *Southland*, 365 F.3d at 366.  Allegations about another person's knowledge, or "the defendants'" collective knowledge, are insufficient.  The plaintiffs must plead facts that give rise to a strong inference of scienter for each individual defendant for each purported misstatement.  *Id.*  Simply pleading that a defendant had access to internal information that contradicted his or her public statements is not enough.  To the extent that the plaintiffs' scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the character of the document, its author and contents, when it was received, and by whom it was received, to link it to the person making the challenged statement at the time the statement was made.  *Abrams*, 292 F.3d at 432.

### 3.    Statements of Opinion After *Omnicare*

The Supreme Court's opinion in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion.[4]  *Omnicare* provides "two potential avenues for plaintiffs to establish the falsity of an opinion."  *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016).  First, "every . . . statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief."  *Omnicare*, 135 S. Ct.

---

[4]  Even though "*Omnicare* was decided in the context of Section 11 of the Securities Act, courts have overwhelmingly applied its holdings in the context of alleged omissions under Section 10(b) of the Securities Exchange Act . . . ."  *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *10 (S.D. Tex. May 31, 2016) (collecting cases).  Its analysis bears both on the material misrepresentation aspect of a § 10(b) claim and on the scienter aspect.  *Id.*  Therefore, the *Omnicare* opinion's discussions about an "issuer's" statements are equally applicable to an Exchange Act defendant speaker's statements.

at 1327.  A speaker can be liable for an opinion statement if the speaker did not actually have that

opinion.  Second, "depending on the circumstances," a reasonable investor could

> understand an opinion statement to convey facts about the speaker's basis for holding
> that view.  Specifically, [a speaker's] statement of opinion may fairly imply facts
> about the inquiry the issuer conducted or the knowledge it had.  And if the real facts
> are otherwise, but not provided, the opinion statement will mislead by omission.

*Id.* at 1328.  Therefore,

> although a speaker's opinion may be sincerely held, the statement may nonetheless
> be actionable under 10b-5's omissions provision if: (I) the speaker "omits material
> facts about the issuer's inquiry into or knowledge concerning a statement of
> opinion," and (ii) "those facts conflict with what a reasonable investor would take
> from the statement itself."

*In re BP plc Sec. Litig.*, 2016 WL 3090779, at *9 (quoting *Omnicare*, 135 S. Ct. at 1329).

But, the Court emphasized, this avenue to liability does not allow a plaintiff to circumvent

the particularity and materiality requirements of a § 10(b) claim by alleging in general terms that the

defendant improperly failed to reveal the basis for his opinion, or failed to disclose "some fact

cutting the other way."  *Id.* at 1329.  "Reasonable investors understand that opinions sometimes rest

on a weighing of competing facts; indeed, the presence of such facts is one reason why a [speaker]

may frame a statement as an opinion, thus conveying uncertainty."  *Id.*

One hypothetical the *Omnicare* Court raised bears on the dispute here:

> Consider an unadorned statement of opinion about legal compliance: "We believe
> our conduct is lawful."  If the [speaker] makes that statement without having
> consulted a lawyer, it could be misleadingly incomplete.  In the context of the
> securities market, an investor, though recognizing that legal opinions can prove
> wrong in the end, still likely expects such an assertion to rest on some meaningful
> legal inquiry—rather than, say, on mere intuition, however sincere.  Similarly, if the
> [speaker] made the statement in the face of [her] lawyers' contrary advice, or with
> knowledge that the Federal Government was taking the opposite view, the investor
> again has cause to complain:  He expects not just that the issuer believes the opinion
> (however irrationally), but that it fairly aligns with the information in the [speaker]'s
> possession at the time.

*Omnicare*, 135 S. Ct. at 1328-29.

### 4.      Section 20(a) of the Securities Exchange Act of 1934

Under § 20(a) of the Exchange Act, every "person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 78t(a).  "Control person" liability under § 20(a) is "derivative, i.e. such liability is predicated on the existence of an independent violation of the securities laws." *Rubinstein v. Collins*, 20 F.3d 160, 166 n.15 (5th Cir. 1994).  A party who fails to state an underlying primary claim for an Exchange Act violation fails to state a claim for control-person liability under § 20(a).

### D.      The Securities Act

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)).  The statute provides a cause of action against the issuer of the security and its underwriters. *Id.*

> To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

*Id.* at 358-59 (quoting 15 U.S.C. § 77k(a)).

"Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *Id.* at 359 (citing 15 U.S.C. § 77l(a)(2)).  Section 12 has a broader reach than § 11.  Only specific offering

participants can be liable under § 11, while § 12 liability extends to all "statutory sellers" of the security. *Id.* A "statutory seller" is someone who: "(1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'" *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)). As a result,

> the elements of a prima facie claim under section 12(a)(2) are: (1) the defendant is a "statutory seller"; (2) the sale was effectuated "by means of a prospectus or oral communication"; and (3) the prospectus or oral communication "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."

*Id.* (quoting 15 U.S.C. § 77l(a)(2)).

Actions under § 11 and § 12 are "Securities Act siblings with roughly parallel elements, notable both for the limitations on their scope as well as the *in terrorem* nature of the liability they create." *Id.* "Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence." *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). "[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934 . . . plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." *Id.* The *Omnicare* decision, discussed above, directly addressed claims under § 11, making it apply with equal force in this context.

"Under § 15 of the Securities Act, anyone who controls persons liable under § 11 or § 12 of the Securities Act can be held jointly and severally liable to the same extent as the persons they control." *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 674 (N.D. Tex. 2013). "To allege control person liability under § 15, the plaintiff must allege both a primary violation of § 11

or § 12 and the defendant's control over the primary violator."  *Id.*  Under 17 C.F.R. § 230.405, "control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  As with § 20 of the Exchange Act, control person liability under § 15 of the Securities Act is secondary or derivative.  It exists only to the extent that the plaintiff demonstrates an underlying 'primary' violation.

Ordinary notice pleading requirements apply to Securities Act claims, unless they sound in fraud—including claims based on the same factual allegations supporting securities fraud claims under the Exchange Act.  Rule 9(b)'s heightened pleading standard applies to these fraud claims. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); *Kurtzman v. Compaq Computer Corp.*, No. CIV.A. 99-1011, 2002 WL 32442832, at *24 (S.D. Tex. Mar. 30, 2002).  Boilerplate disavowals of an intent to allege fraud do not change the analysis.  *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994); *Kurtzman*, 2002 WL 32442832, at *24; *see also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996).  When the plaintiff's Securities Act allegations are substantively identical to the Exchange Act allegations, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity.  *Schlotzsky's*, 238 F.3d at 368-69; *Melder*, 27 F.3d at 1100 n.6; *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 440 (S.D.N.Y. 2000).

## IV.   Analysis

### A.   The Exchange Act Claims

The plaintiffs' Exchange Act claims must be dismissed, without prejudice and with leave to amend, because (1) the majority of the statements at issue are not actionably misleading, at least as

currently pleaded; and (2) the plaintiffs have not alleged facts that give rise to a strong inference of scienter for any defendant for any statement.

### 1.      Statements Alleged to be Misleading

The plaintiffs' appendix splits the defendants' alleged misrepresentations into four categories.  They are misrepresentations about: (1) integrity management, corrosion control, and leak detection; (2) legal compliance; (3) spill-response capabilities; and (4) the size and scope of the spill. The plaintiffs "double count" many of the alleged misrepresentations by including them in multiple categories.  Each statement is analyzed once, in the section most closely matched to the content of that statement.

### a.      Statements about Plains's efforts in integrity management, corrosion control, and leak detection.

The plaintiffs first point to a set of statements allegedly repeated in many of the Plains SEC filings, including PAA's February 27, 2013 Form 10-K, which was signed by PAA GP LLC, AAP, GP LLC, Armstrong, Swanson, Pefanis and Herbold.  *Id.* ¶ 206.  These statements are as follows:

- "In addition to required activities, our integrity management program includes several internal programs designed to prevent incidents and includes activities such as automating valves and replacing river crossings."

- "We have an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement.  Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from U.S. EPA enforcement actions, we may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines."

- "We have also developed and implemented certain pipeline integrity measures that go beyond regulatory mandate, some of which are now incorporated into the 2010 Consent Decrees."

- "Accordingly, for 2013 and beyond, we will continue to focus on pipeline integrity management as a primary operational emphasis. In that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention. We have an internal review process pursuant to which we examine various aspects of our pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate. The purpose of this process is to review the surrounding environment, condition and operating history of these pipeline and gathering assets to determine if such assets warrant additional investment or replacement. Accordingly, in addition to potential cost increases related to unanticipated regulatory changes or injunctive remedies resulting from regulatory agency enforcement actions, we may elect (as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and upgrade our pipeline systems to maintain environmental compliance and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines."

*Id.* ¶ 206.

These statements were repeated or cross-referenced in subsequent SEC filings. The plaintiffs add additional falsity allegations based on new facts over the class period. The broadest set of falsity allegations is in a May 8, 2015, cross-reference to these statements.[5] The plaintiffs allege that

---

[5] These allegations are, strictly speaking, the plaintiffs' scienter allegations. Throughout the complaint, each set of alleged misstatements is followed by a boilerplate paragraph that reads, with minor variations, as follows:

The statements referenced in [the paragraphs above], which caused Plains securities to trade at artificially inflated prices, were each materially false and misleading when made in that each omitted and/or misrepresented material facts. These statements were known by Plains and the Officer Defendants to be false when made, or were made with severely reckless disregard for the truth, for the following reasons, among others:

That paragraph is followed by variations on the allegations. While a strict grammatical reading of the complaint suggests that these are only scienter allegations, it appears that these allegations are also intended to show that the statements are false or misleading. The plaintiffs use the same boilerplate list of allegations to show that identical statements were false or misleading in the Securities Act sections of the complaint. *E.g.*, Compl. ¶ 290. Since these are the only allegations that appear to be designed to show that the statements were false or misleading, the court will construe them as such. If these are *not* the plaintiffs' falsity allegations, the court would have no choice but to dismiss all of the plaintiffs' claims for failure to plead, for each purported misstatement, specific facts showing that the statements were false or misleading.

34

on May 8, 2015, the statements were false or misleading for the following reasons:

- the defendants failed to address the "rapidly increasing anomalies" on Lines 901 and 903;

- in-line inspection runs in 2013 revealed 41 anomalies in July 2012, compared to only 13 in June 2007, "evidencing an exponential increase in the pipeline's deterioration . . . .";

- Plains conducted "patchwork" repairs on Line 901 instead of replacing it in light of its age and the number of anomalies;

- Plains lacked an adequate leak-monitoring system;

- Plains was not in compliance with the consent decree because it failed to properly check for leaks, install adequate monitoring systems, and mitigate corrosion threats on Lines 901 and 903;

- Plains lacked an adequate spill response plan;

- Plains did not install automatic shut-off valves on Lines 901 and 903;

- Plains had not exceeded federal regulatory requirements on Lines 901 and 903, but instead was in violation of Pipeline Safety Administration regulations for pipelines in high-consequence areas;

- Plains was motivated not to spend money fixing Lines 901 and 903 in order to boost cash distributions despite its knowledge that failing to spend money would increase the chances of hydrocarbon emissions;

- Line 901 had reached or exceeded the end of its useful life;

- after the March and June 2013 inspections, the Pipeline Safety Administration told Plains that it was in violation of applicable regulations for: failing to maintain and provide documents relating to "Management of Change Procedures when, for example, new pipelines were added or taken offline"; failing to complete "Abnormal Operations forms"; and failing to "provide any records demonstrating an at least annual review of the controller training program for potential improvements";

- an April 29, 2013 in-line inspection run showed 99 metal-loss anomalies on a 38-mile segment of Line 903, alerting Plains to the rapid corrosion on pipelines running through high-consequence areas;

- inspection surveys along Line 903 produced inconsistent results, a red flag that "should have prompted immediate investigation";

- Pipeline Safety Administration inspections of Lines 901 and 903 in August through October of 2013 found that Plains had failed to maintain records of its pressure tests for several "breakout tanks" on Line 903; failed to demonstrate that the pressure tests were performed in accord with regulations; failed to maintain adequate documentation of its preventive and mitigative evaluations of segments of Line 903; failed to take additional measures for the high-consequence area or document its justifications for deciding not to take such measures; and failed to comply with regulations regarding emergency response training and record-keeping;

- an in-line inspection report in May 2014 showed two girth weld anomalies on Line 903; and

- a May 5, 2015 in-line inspection of Line 901 revealed four anomalies that the inspection vendor communicated to the company, but Plains continued to operate Line 901 instead of shutting it down to investigate and continued to make false statements about its maintenance steps and regulatory compliance.

Compl. ¶ 244.

The defendants argue that the complaint does not adequately allege that their statements are false or misleading. (Docket Entry No. 115 at 12-14). They emphasize that Line 901, which is only 10.6 miles long, makes up less than 0.0006% of Plains's 17,800-mile pipeline network. (*Id.*). Lines 901 and 903 together amount to less than 0.008% of Plains's overall pipeline network. (*Id.*). The defendants argue that the challenged statements were addressed to the company's overall pipeline operation, and that none of the plaintiffs' allegations give rise to an inference that these statements are false or misleading when considered in that context.

The defendants also point to two of Judge Ellison's opinions in the BP securities litigation, *BP II*, 852 F. Supp. 2d at 813, and *In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 823 (S.D. Tex. 2013). Judge Ellison considered similar statements describing company-wide safety and risk-management initiatives. The plaintiffs argued that their allegations that the defendants' failure to adequately ensure safety and compliance at the rig where the blowout, fire, and spill took place made their statements about overall safety and risk-management practices

36

actionably misleading.  Judge Ellison rejected that argument in substantial part.  The primary basis

was that almost none of the statements expressly or implicitly represented that the various safety

programs identified applied to every single site or to the relevant rig site in particular.  Judge Ellison

emphasized that, for companies the size of Anadarko and BP, allegations that they did not properly

implement safety protocols at a single site did not make a general, top-level statement about the

company's safety programs and priorities misleading.  *Anadarko*, 957 F. Supp. 2d at 823-24; *BP II*,

852 F. Supp. 2d 804-05.

    At the same time, Judge Ellison allowed certain representations about safety programs to go

forward.  BP had represented that it implemented a new company-wide operations-management

system designed to enhance safety and reduce spills, and that the program was in place in the Gulf

of Mexico.  The complaint alleged specific facts showing that this program was not in place in the

Gulf of Mexico when the company said it was.  Judge Ellison concluded that the complaint pleaded

misrepresentations with sufficient particularity.  *Id.* at 796.  The defendants argue that here, by

contrast, there are no allegations similar to BP's affirmative representation that a specific program

was in effect at the place where the spill occurred.  None of Plains's challenged statements are at

the necessary level of specificity.  Unlike the statements at issue in *BP II*, all of the statements

concern policies for the overall Plains network.  Allegations that the policies were not implemented

or were ineffective at a single site do not make the general statement actionably misleading.

    The plaintiffs argue that the challenged statements were misleading because Plains was not

implementing its purported and touted safety measures on Line 901 and Line 903.  They cite the

Second Circuit's opinion in *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), for the

proposition that even if statements "did not guarantee 100% compliance 100% of the time," they are

nonetheless misleading because they "gave comfort to investors that reasonably effective steps were being taken to comply with applicable . . . regulations." *Id.* at 251.  The plaintiffs argue that Judge Ellison's analysis in *BP I* also supports their case.  As part of its overall safety program, BP commissioned a panel (chaired by retired Secretary of State James Baker) to submit a report and recommendations on safety and compliance.  The Baker report set out specific safety goals for BP and a roadmap for improving its safety procedures and policies to achieve those goals.  *BP I*, 843 F. Supp. 2d at 757-59.  BP's executives repeatedly emphasized the progress it was making in implementing the Baker report's recommendations.  But, the plaintiffs alleged, BP was not in fact taking the represented actions and its progress significantly lagged behind the rosy picture that the executives painted.  Judge Ellison found that the executives' statements were actionably misleading. The challenged statements in *BP I* were not broad and general statements about corporate progress or generalized remarks about safety programs.  Instead, the executives' statements were about specific steps measurable against the "yardstick" of the Baker report, and the plaintiffs adequately alleged that the statements were false.  *Id.*  There is no statement here about specific steps at a particular site, measurable against a specific yardstick.

The plaintiffs here argue that the 2010 consent decree between Plains and the EPA serves as a yardstick against which Plains's represented actions can be measured.  The plaintiffs note similarities between the language used in the consent decree and Plains's challenged statements. Both refer to "enhanced integrity management and corrosion control" and similar terms.  The plaintiffs argue that, in context, Plains's statements about its safety programs should be understood in relation to what the consent decree required.  (Docket Entry No. 124 at 25-26).

Neither *JinkoSolar*, *BP I*, nor the consent decree support the plaintiffs' arguments.  First, this

set of alleged misrepresentations is far more like the misrepresentations in *Anadarko* and *BP II* than the misrepresentations in *JinkoSolar* and *BP I*.  As in *Anadarko* and *BP II*, these are generalized, top-level-executive statements about a very large company's overall safety policies and programs. The statements did not suggest, much less affirmatively assert, that specific steps under particular programs applied to every pipeline segment, much less the segment at issue.  As Judge Ellison noted in *Anadarko* and *BP II*, problems at a single site in the company's operations did not make a generalized summary of the company's overall policies misleading to investors.  Judge Ellison's analysis of how reasonable people understand this type of high-level corporate summary is sound.

The plaintiffs' citation to *JinkoSolar* is similarly not persuasive.  In *JinkoSolar*, the court found that statements describing the company's pollution-prevention programs and a "24-hour monitoring team" could be misleading when the complaint also alleged that a certain facility had serious regulatory noncompliance and pollution problems when the statements were made.  The defendants allegedly made specific representations that the pollution monitoring and prevention policies and programs were in place at "each of our manufacturing facilities," and that the pollution at issue occurred at one of the company's two main production sites.  *JinkoSolar*, 761 F.3d at 247-48.

*JinkoSolar* is distinguishable on its facts.  Its reasoning also suggests that, given facts similar to this case, the result may well have been consistent.  The misrepresentations in *JinkoSolar* were significantly more specific than is true here or was true in *Anadarko* or *BP II*.  The *JinkoSolar* misrepresentations explicitly referred to the problem facility.  Here, the alleged misstatements are broad and general.  They did not address Lines 901 or 903.  Second, the relative size of the alleged problem site in the company's operations is far different.  The plant in *JinkoSolar* was one of the

defendant's two main production sites.  By contrast, Lines 901 and 903 together make up eight one-thousandths of one percent of Plains's pipeline network.  A reasonable JinkoSolar investor would likely view generalized safety policy statements as describing what applied to the company's main production facility.  A reasonable Plains investor would *not* naturally understand Plains's statements as a warranty that every inch of every pipeline was covered by the recent integrity programs, that there would be no deviations, or that the programs would always succeed in preventing leaks.  Scale is a significant difference between these cases.

The plaintiffs' attempts to draw an analogy between the consent decree and the Baker report in *BP I* are also unavailing.  The documents are dissimilar and arose in different contexts.  The Baker report was  part of a public-relations campaign about safety and process management.  In the present case, the consent decree was a settlement agreement.  The only parties were Plains and the EPA.  And here, the alleged misrepresentations are not claims about Plains's progress in meeting the consent decree's requirements.  Only one of the statements mentions the consent decree, and then only in passing.  The plaintiffs argue that the alleged misrepresentations sometimes echo language in the consent decree, but this does not support an inference that the statements were intended to be understood, or would be understood, by a reasonable investor to be claims about meeting the requirements of the consent decree.  The fact that Plains used generic phrases like "pipeline integrity management" or "risk management"—phrases that also appear in the consent decree—does not mean that these statements are about the consent decree.  And even if the plaintiffs accurately characterized the alleged misrepresentations as relating to Plains's progress in meeting the consent decree requirements, the United States agreed to terminate the consent decree in 2013.  In the judgment of the EPA—the only party to whom the consent decree obligations were

due—Plains had complied with the consent decree's requirements. This set of challenged statements is not actionably misleading.

The plaintiffs also point to statements about Plains's safety policies and its process-management efforts. They first point to these statements on the Plains website:

- "[O]ur commitment to EH&S [Environmental, Health and Safety] excellence goes beyond just operating our facilities in a responsible manner, but reflects the vision and dedication shared by our management team and our employees who operate our facilities on a daily basis." Compl. ¶ 207.

- "Plains All American is committed to public safety, protection of the environment and operation of our facilities in a prudent and safe manner." *Id.*

- The Company "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate." *Id.*

The plaintiffs argue that these statements were false or misleading for the same reasons discussed above.

The first two statements are the sort of "corporate cheerleading" that a reasonable investor would not rely on in making an investment decision. *See BP I,* 843 F. Supp. 2d at 756-57; *BP II,* 852 F. Supp. 2d at 807-08. These statements are not actionably misleading. However, the third statement—that Plains makes repairs and replacements when needed on *all* of its pipelines—is actionably misleading. It is an explicit statement that Plains performs needed maintenance on all parts of its pipeline network, and the plaintiffs allege that, at least as to Lines 901 and 903, this was not true. Compl. ¶ 208. That affirmative representation makes this statement different from the others discussed so far. And the statement is material; the allegation that the company did not in fact perform needed maintenance on its pipeline systems, including aging parts subject to corrosion that ran through sensitive high-consequence areas, would undoubtedly alter the "total mix" of information on which a reasonable investor would rely in considering whether to invest in a pipeline

41

company.  This website statement is actionable and material.  Whether the plaintiffs have adequately

pleaded scienter as to this statement is separately addressed in a later portion of this opinion.

The plaintiffs also allege that a series of statements Plains CEO Greg Armstrong made at

investor presentations in June 2014 and 2015 were material misrepresentations.  Those statements

are set out below:

- "We are committed to operational excellence in safety, pipeline integrity management, and
responding to incidents in the unfortunate development that they do occur." Compl. ¶ 227.

- "Again, commitment to operational excellence, we will start with safety, it is a core value.
We foster a culture that really emphasizes operational excellence, asset integrity and safety.
Our incident rate is superior to industry averages, both in terms of incidents as well as
worker's compensation claims." *Id.*

- "With respect to integrity management and incident prevention, we do a lot and I mean a
tremendous amount that will never be appreciated by the public in the following regard."
*Id.*

- "When we buy an asset in an acquisition we have not only the opportunity capital in our
forecast but we have in our forecast the amount of what we call fix up capital that it takes
just to get that pipeline or that tank running at the - and operated in a way that we would feel
comfortable running it for the next 25 or 30 years."  *Id.*

- "We do a lot of things proactively. Again, something that you would never see as a highlight
in a press release, but we have taken out of service or sold to others about 6,000 miles of
pipeline that we just thought was not necessary or was of a quality that was not safe to
operate at the same time while we have added 3,000 miles of new construction or purchase
type."  *Id.*

- "We have implemented a tremendous amount of testing procedures, Dan Nerbonne and Rick
Jensen and their groups in both US and Canada spend a tremendous about of time investing
in testing and trying to advance technologies to be able to monitor the pipe and to
proactively get in front of some of these opportunities and issues."  *Id.*

- "But in all cases we want to make sure we do the right thing."  *Id.*

- "We're also using some of the state-of-the-art tools and technologies to do things that allow
us, again, to operate it well."  *Id.*

- "In the - we are committed also to not only doing the right things but we have learned over

time that you have to make sure you convince the people who are responsible for regulating that you have done the right things. And so, we are committed to being prepared for potential incidents, incident planning and response training is an ongoing basis." *Id.*

- "In the unfortunate event that we do have an incident we will be prepared. Our key objective obviously is to preserve life and safeguard the environment. The personnel that are on site at the time that we have an event that does come up have as much unrestricted authority to make decisions to spend money as it would if I was standing on that [side alone]." *Id.*

- "We had a release in Santa Barbara, County. If you could pick any place in the world you would not want to have a release, that would probably qualify as the one. We've been doing all the right things, but we've been getting a lot of press." *Id.* ¶ 246.

- "It is that safe operations and protecting the environment are much more important to us than profit. . . ." *Id.*

- "So at the end of the day we want to make sure we follow all the laws for environmental health and safety rules and regulation. But we want to go farther than that." *Id.*

- "We assess the pipeline using the best tools that are available. Smart pigs, we run them when it makes sense, more often than are required. We improve our data interpretation to make sure that we are trying to prevent things from happening, not diagnose what did happen." *Id.*

The plaintiffs allege that these statements are false or misleading for the same reasons that they identified for the statements discussed earlier.

This set of statements is not actionably misleading.  The plaintiffs do not allege that all of the statements were false.  Many of the statements that the plaintiffs do allege were false are the sort of corporate cheerleading that, like the similar statements in the BP litigation, cannot be the basis of a securities-fraud claim.  *See BP I*, 843 F. Supp. 2d at 756-57, *BP II*, 852 F. Supp. 2d at 807-08.

Five of these statements are more specific, and therefore potentially actionable.  The five are the statements about Plains's "incident rate"; financial forecasting of "fix up capital"; selling or decommissioning 6,000 miles of pipeline; spill responders' authority; and the use of "smart pigs" (industry slang for in-line inspection tools).  But the plaintiffs do not allege any facts that contradict

43

these statements or make them misleading through omission.  Therefore, the plaintiffs cannot base their claims on these statements.

For similar reasons, the plaintiffs cannot base their claims on the statements in the slide deck that Armstrong showed at the investor presentation.  Those statements are as follows:

- "Commitment to Operational Excellence

  - Safety

  - Pipeline Integrity Management

  - Incident Response Preparation." Compl. ¶ 228.

- "Commitment to Operational Excellence: Safety

  - Safety is a core value - We foster a culture that emphasizes operational excellence, asset integrity & safety

  - PAA's incident rate is superior to the industry average.

  - PAA's pipeline group had fewer incidents than the industry average for the past five years and for nine of the past ten years." *Id.*

- "PAA is committed to prudently maintaining its assets for the long-term

  - Proactively high-grading the asset base - Over the last 10 yrs, ~6,000 miles of pipeline removed from service or sold, while constructing (or purchasing) new pipelines totaling >3,000 miles

  - Implemented stringent testing/evaluation procedures on new pipelines being placed into service (Placing inspectors in the pipe mills, Hydrotesting pipe, x-raying 100% of welds, assessing gaps in pipeline coating, utilizing smart pig runs to establish a baseline assessment and examine for construction-related damage)

  - Multiple programs established to prevent/mitigate environmental impact

  - Valve Placement & Automation - Assessing asset base for sensitive areas and optimal valve placement - installing additional valves and/or automating valves to minimize potential release volumes . . .

  - Continue to regularly assess pipeline integrity using state-of-the-art inspection tools

44

and technologies

- Smart pigs, advanced data interpretation/integration, advanced GIS mapping and risk screening

- Improving data interpretation/integration capabilities to better prioritize, focus on and assess areas warranting attention." *Id.*

The first challenged statement is not actionable because it is generalized "corporate cheerleading" on which a reasonable investor would not rely. The second and third statements are not actionable because the plaintiffs do not allege facts that contradict these statements. There is no allegation that Plains's "incident rate" in relation to industry averages was falsely described. There is no allegation that Plains failed to decommission or sell 6,000 miles of pipeline or that Plains did not test new pipelines. The remaining parts of the third statement are not actionable for the same reason that other statements summarizing Plains's safety and prevention efforts at a broad and general level are not. The emergence of significant problems on Lines 901 and 903 does not establish that those statements were false or misleading when made.

The plaintiffs have identified one actionable statement relating to Plains's leak-prevention efforts. It is the statement that the company "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate." Compl. ¶ 207 (statement from website). The scienter issue as to that and other statements is analyzed later in this opinion.

### b. Statements about legal compliance

The plaintiffs allege a series of statements that Plains made in its SEC filings and related documents about its legal compliance. The plaintiffs first point to a set of statements repeated in many of the Forms 10-K and 10-Q, in the securities-offering registration statements, and in the

prospectuses.  The statements are:

- "Currently, we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments."  Compl. ¶ 202.

- "We currently devote substantial resources to comply with DOT-mandated pipeline integrity rules."  *Id.*

- "We believe that we are in substantial compliance with applicable OPA requirements. State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when they occur. We believe that we are in substantial compliance with all such federal, state and Canadian requirements."  *Id.* ¶ 203.

- "We believe we are operating in substantial compliance with our risk management program."  *Id.* ¶ 204.

- "Failure to comply with these laws and regulations may result in the assessment of administrative, civil, and criminal penalties, the imposition of investigatory and remedial liabilities, the issuance of injunctions that may subject us to additional operational requirements and constraints, or claims of damages to property or persons resulting from our operations."  *Id.* ¶ 205.

The plaintiffs' allegations about why these statements are false change throughout the complaint, because these statements were repeated over the course of several years and new facts arose.  The court examines the broadest set of allegations about the statements in Plains's May 8, 2015 Forms 10-Q.  *Id.* ¶ 243.  The plaintiffs allege that the statements were false because:

- the defendants failed to address the "rapidly increasing anomalies" on Lines 901 and 903;

- in-line inspection runs in 2013 revealed 41 anomalies in July 2012, compared to only 13 in June 2007, "evidencing an exponential increase in the pipeline's deterioration . . . .";

- Plains conducted "patchwork" repairs on Line 901 instead of replacing it in light of its age and the number of anomalies;

- Plains lacked an adequate leak-monitoring system;

- Plains was not in compliance with the consent decree because it failed to properly check for leaks, install adequate monitoring systems, and mitigate corrosion threats on Lines 901 and 903;

46

- Plains lacked an adequate spill response plan;

- Plains did not install automatic shut-off valves on Lines 901 and 903;

- Plains had not exceeded federal regulatory requirements on Lines 901 and 903, but instead was in violation of Pipeline Safety Administration regulations for pipelines in high-consequence areas;

- Plains was motivated not to spend money fixing Lines 901 and 903 in order to boost cash distributions despite its knowledge that failing to spend money would increase the chances of hydrocarbon emissions;

- Line 901 had reached or exceeded the end of its useful life;

- after the March and June 2013 inspections, the Pipeline Safety Administration told Plains that it was in violation of applicable regulations for: failing to maintain and provide documents relating to "Management of Change Procedures when, for example, new pipelines were added or taken offline"; failing to complete "Abnormal Operations forms"; and failing to "provide any records demonstrating an at least annual review of the controller training program for potential improvements";

- an April 29, 2013 in-line inspection run showed 99 metal-loss anomalies on a 38-mile segment of Line 903, alerting Plains to the rapid corrosion on pipelines running through high-consequence areas;

- inspection surveys along Line 903 produced inconsistent results, a red flag that "should have prompted immediate investigation";

- Pipeline Safety Administration inspections of Lines 901 and 903 in August through October of 2013 found that Plains had failed to maintain records of its pressure tests for several "breakout tanks" on Line 903; failed to demonstrate that the pressure tests were performed in accord with regulations; failed to maintain adequate documentation of its preventive and mitigative evaluations of segments of Line 903; failed to take additional measures for the high-consequence area or document its justifications for deciding not to take such measures; and failed to comply with regulations regarding emergency response training and record-keeping;

- an in-line inspection report in May 2014 showed two girth weld anomalies on Line 903; and

- a May 5, 2015 in-line inspection of Line 901 revealed four anomalies that the inspection vendor communicated to the company, but Plains continued to operate Line 901 instead of shutting it down to investigate and continued to make false statements about its maintenance steps and regulatory compliance.

47

Compl. ¶ 244.

The defendants argue that the plaintiffs have not adequately alleged that these five statements were false or misleading when made.  Three of these statements are not actionable and require only brief analysis.  The plaintiffs do not allege facts showing or supporting an inference that Plains did not devote substantial resources to this compliance work, and so the second statement is not actionable.  Like the statements in *Anadarko* and the two *BP* cases, the statement that the company devotes "substantial resources" to complying with DOT pipeline regulations is far too vague and general to form the basis of a securities-fraud claim.  The plaintiffs' falsity allegations do not mention Plains's risk-management system or detail substantial deviations from it, and therefore the fourth statement cannot be the basis for a securities-fraud claim.  And the fifth statement, that failing to comply with regulations could result in regulatory penalties and civil liability, is a truism, not a false or misleading statement.  None of those three statements is actionable.  The first and third statements present a closer question and require additional analysis.

These two statements express Plains's belief that it is in substantial compliance with "HLPSA and the 2002 and 2006 amendments" and with all federal, state, and Canadian requirements "relating to the prevention of oil releases and the remediation of areas affected by releases . . . ." The defendants make two related arguments: that the *Omnicare* decision forecloses liability, and that the "substantial compliance" qualifier and the broad and general scope of the statements bars liability, because the falsity allegations do not show that Plains's overall pipeline operation (which was subject to a web of regulations ranging from multiple federal environmental schemes like the Clean Air and Clean Water Acts, to the Department of Transportation rules on railcar and pipeline operation, state environmental and oil-and-gas law, and more) was not in substantial compliance

with that overall body of law.

Under *Omnicare*, statements of opinion can be actionably misleading (1) when the speaker does not actually hold the expressed opinion; or (2) when, even though the speaker genuinely holds the opinion, the plaintiff shows that "(i) the speaker 'omit[ed] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion,' and (ii) 'those facts conflict with what a reasonable investor would take from the statement itself.'" *In re BP plc Sec. Litig.*, 2016 WL 3090779, at *9 (quoting *Omnicare*, 135 S. Ct. at 1329). The defendants' opening briefs contest both prongs. In their opposition, the plaintiffs make clear that they are proceeding under the second prong, that the defendants omitted known facts that conflict with what a reasonable investor would infer from the statement.[6] The plaintiffs must identify facts that a reasonable investor, reading these statements in context, would assume were true, but were not.

The issue is whether the plaintiffs have alleged facts that show that the Plains defendants knew, but omitted to include in their statements, material facts contrary to what a reasonable investor would believe from reading or hearing their statements. Showing that a statement was false or misleading using this *Omnicare* prong blurs the lines between the falsity and scienter elements of an Exchange Act claim. Determining whether a statement is false or misleading turns on what the speaker knew, making it similar to the scienter inquiry. But even though this *Omnicare* inquiry overlaps with the scienter inquiry, the two are not identical. Here, the issue is whether the plaintiffs

---

[6] The fact that these Exchange Act claims are also pleaded directly against legal entities rather than natural persons does not change the analysis. A statement by a legal entity can form the basis for an Exchange Act claim only when a plaintiff shows that the statement by its nature must have been approved by corporate officers who the plaintiff can show acted with the requisite culpability. *Southland*, 365 F.3d at 366. Although the parties do not brief the issue, the analysis appears to closely track the *Omnicare* "omission of a material fact" prong. The plaintiffs must identify some natural person who approved the corporate statement and who knew the fact that was necessary to include to avoid misleading investors.

have adequately pleaded that the defendants were aware of material facts that: (1) contradicted or undermined their compliance opinion statements; and (2) that an investor would reasonably believe were not true based on that statement.  The scienter issue is the individual's state of mind in stating the opinion.

The defendants argue that the plaintiffs' allegations fail to show that the statements were misleading or false.  They assert that there are no allegations about what individual defendants knew when they signed the filings in which the statements appear.  Rather, there are group-pleading allegations that "the company" or "the defendants" knew the omitted facts and knew that those facts were inconsistent with the representations.  The defendants emphasize that, under *Omnicare*, a failure to disclose facts cutting against an opinion statement is generally not actionable unless those facts are so contrary to the opinion that a reasonable person hearing the opinion stated would assume that the omitted facts did not exist.  *Omnicare,* 135 S. Ct. at 1329.  The *Omnicare* Court emphasized that "investors understand that opinions rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion."  *Id.*

A company with operations as extensive as Plains, the defendants argue, encounters myriad legal and regulatory issues in the ordinary course of its day-to-day business.  That is what Plains told its investors.  The company's Forms 10-K stated throughout the class period that "[i]n the ordinary course of business, we are involved in various legal proceedings."  The Forms 10-K provided summaries of the most significant legal proceedings.  Plains's 2013 Form 10-K is an example. (Docket Entry No. 128-2, Ex. G at 4).  In that Form 10-K, Plains told investors that, "[a]lthough we believe that our efforts to enhance leak prevention and detection capabilities have produced positive results, we have experienced (*and likely will experience future*) releases of hydrocarbon products

50

into the environment from our pipeline and storage operations." (*Id.* at 5) (emphasis added). The defendants argue that a reasonable investor reading this would not understand the general opinion statement that the company was in substantial compliance with pipeline rules and regulations to mean that there were no undisclosed regulatory issues on any of Plains's pipelines. Indeed, the defendants argue, reasonable investors understand that in heavily regulated industries, receiving a notice of a violation of recordkeeping regulations—the basis for the Pipeline Safety Administration notices that the plaintiffs point to in pleading falsity—is not unusual in companies as large as Plains.

The defendants also emphasize that most of the Pipeline Safety Administration notices that the plaintiffs discuss in the complaint and in their briefing postdated the spill. On the defendants' account, only two of the regulatory notices that the plaintiffs identify in their falsity allegations issued during the class period. Most of the notices issued well after the spill occurred. The only notices issued during the class period related to recordkeeping matters at Plains's pipeline control room at Midland, and the violations identified in these two notices had nothing to do with Lines 901 or 903.

In response, the plaintiffs argue that the challenged statements are actionable under *Omnicare* because they omitted facts, like the company's receipt of regulatory violation notices from the Pipeline Safety Administration, that would conflict with a reasonable investor's inferences about the underlying facts that formed the basis for the opinion statements the defendants made. The plaintiffs note that, in *Omnicare*, the Supreme Court noted that a legal-compliance opinion statement could be misleading when the speaker knew that the government took the opposite view as to the company's compliance. *Omnicare*, 135 S. Ct. at 1328-29. According to the plaintiffs, the company's receipt of Pipeline Safety Administration notices of probable violations showed that the

government did not agree with the company's views on legal compliance, making opinions that the company was in substantial compliance with regulatory requirements misleading under *Omnicare*. Because the complaint alleges details about these violations, the plaintiffs assert that they have made particularized allegations that the opinion statements were false or misleading, discharging their obligation under the PSLRA and associated pleading rules.

The plaintiffs acknowledge that the main Pipeline Safety Administration notice they rely on postdated the spill. But the plaintiffs argue that notices like the ones issued after the spill only issue after "inspection or some other source indicates that a violation of pipeline safety regulations has occurred." (Docket Entry No. 124 at 29). Two cases from outside the Fifth Circuit are cited as support for a rule that legal-compliance opinion statements are materially misleading when the existence of specific legal violations is alleged. The cited cases are *Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014), and *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 730 (S.D.N.Y. 2015). In both of those cases, the courts concluded that statements similar to those at issue here—expressing opinions that the company is in substantial or material compliance with relevant laws—were misleading due to the existence of certain regulatory violations or regulatory contacts when the statements were made.

The plaintiffs additionally argue that the complaint alleges that Plains was aware of the substance of the violations before the Pipeline Safety Administration issued the notices of probable violation. The plaintiffs refer to their allegations in paragraphs 127 and 131 to 135 of the complaint. Those paragraphs contain allegations that: (1) in March 2014, a Plains representative emailed the Pipeline Safety Administration to say that the company did not have documentation regarding its "preventive and mitigative evaluations" for 2013 for some segments of Line 903; (2) the later

52

postspill notice stated that the agency's findings were determined "prior to" the spill and that the regulator and company had communicated about potential violations "discovered in the 2013 inspections" over the course of 2013 and 2014; and (3) the Pipeline Safety Administration also noted various non-violation areas of safety concern that had been communicated to Plains in 2013.

The plaintiffs' brief on whether these statements were false does not identify the facts that any individual defendant knew or did not know when they made the challenged statements. Nor does the brief identify allegations that any of the individual defendants were aware of the pre-spill Pipeline Safety Administration communications with Plains about regulatory violations. Portions of the plaintiffs' briefing on scienter are relevant here as well. The plaintiffs note that Plains stated on its website that its "senior management team" was involved in developing, supporting, and carrying out its safety and environmental program, and that the company's Senior Vice-President of Engineering reported directly to Armstrong, who in turn spoke frequently about the company's safety program. The plaintiffs argue that it is "implausible" that Plains's executives, running a company in a highly regulated industry, did not receive information of possible regulatory violations. The thrust of the plaintiffs' allegations and argument is that Plains's executives had access to information showing that the company was not in compliance with relevant regulations, like the in-line inspection data from Lines 901 and 903. On this view, the fact that the pipelines at issue were in high-consequence areas strengthens the inference that the defendants were individually aware of information showing substantial regulatory violations when they opined that the company was in substantial compliance with applicable regulations. Finally, the plaintiffs argue that there is no group pleading problem, because each defendant signed the SEC filings that contained the challenged statements. The plaintiffs cite *BP I* for the proposition that allegations that each

53

defendant signed the document containing an allegedly false statement excuses problems with group pleading and allows its use. *BP I*, 843 F. Supp. 2d at 778.

The plaintiffs' arguments are ably presented but unpersuasive. The court finds that these opinion statements as to legal compliance, considered in context, are not actionably misleading under *Omnicare*. The complaint does not adequately allege that the individual defendants were aware of the facts the plaintiffs rely on to show that they made statements that they did not believe or knew to be false or misleading. And even if the complaint did adequately allege the individual defendants' knowledge of the alleged Pipeline Safety Administration prespill communications, that knowledge would not, under *Omnicare*, make the company's legal-compliance statements actionably misleading, either affirmatively or by omission.

First, the complaint does not make particularized allegations as to any of the individual defendants. To show that these opinion statements are actionable under *Omnicare*, the plaintiffs must allege, with particularity, each individual defendant's knowledge of material facts inconsistent with the compliance-opinion statements at issue. The facts the plaintiffs identify or rely on in their brief opposing the motion to dismiss as contrary to the compliance statements are related to the company's receipt of prespill Pipeline Safety Administration communications. But the complaint does not allege that any of the defendants knew about the communications. Rather, the complaint relies on group-pleading allegations that "the company" or "the defendants" were aware of them. That is not sufficient. Nor would a bare allegation that a given specific individual knew, when the statements were made, about the problems on Lines 901 and 903 or the agency communications suffice. The plaintiffs' apparent argument is that the individuals who received the Pipeline Safety Administration communications conveyed them to the Plains executives named as defendants. In

order to plead the individual defendants' knowledge on this theory, the plaintiffs must allege the character of the reports, the author and contents, who received them, and when. *Abrams*, 292 F.3d at 432. Pleading generally that information was available from someone in the company is not adequate. The plaintiffs' allegations are neither sufficiently individualized nor sufficiently detailed to allege that the statements were false or misleading under *Omnicare*.

Applying the plaintiffs' scienter arguments to the *Omnicare* analysis does not alter the result. First, none of their arguments about inferences reasonably drawn from the company's statements about management participation in safety-program design, or from Armstrong's statements on safety, are persuasive. Even if similar allegations could demonstrate knowledge, they are not identified in this complaint as facts demonstrating that the challenged statements at issue are false, as particularity requires. More importantly, these allegations do not show that the individual defendants necessarily, or even likely, would have learned the specific facts that the plaintiffs claim that they knew. The fact that high-level corporate officers have some hand in developing or administering safety programs does not show that those officers were informed of specific recordkeeping-violation notices like the two issued prespill. Nor do these allegations show that these officers learned of emails or other similar informal communications short of violation notices sent from the Pipeline Safety Administration.

The plaintiffs argue that the group-pleading prohibition does not apply because each defendant signed the SEC documents that contained the challenged opinion statements. An allegation that the individual signed a document containing a statement ties the statement to the individual, but it does not show the individual's mental state when the statement was signed. *BP I*, which the plaintiffs cite, does not hold that alleging that various defendants signed an SEC

55

document allows group pleading.  Rather, the part of *BP I* that the plaintiffs cite states that the complaint made particularized allegations as to each defendant, asserting material misstatements by that defendant, and that the court had to individually examine the scienter allegations as to each defendant.  The court "disregard[ed]" the group-pleaded scienter allegations.  *BP I*, 843 F. Supp. 2d at 777-78.  If the plaintiffs failed to plead individualized, particularized scienter allegations about a defendant, and instead alleged globally that "the defendants" were aware of a fact, Judge Ellison dismissed the allegations.  Only defendants against whom the plaintiffs had lodged particularized and individualized scienter allegations were kept in the case.  *Id*. 778-88.  *BP I* supports the defendants' arguments here.

The plaintiffs have not adequately alleged the defendants' individual knowledge of facts contradicting their opinion statements about legal compliance.  The plaintiffs cannot base their Exchange Act claims on these statements.  Even if the plaintiffs had made sufficiently specific allegations of the defendants' knowledge of these facts, these claims still fail as currently pleaded.  The only allegations related to legal compliance that the plaintiffs present to show that these legal-compliance opinion statements were false concern Plains's receipt of Pipeline Safety Administration informal communications and notices of recordkeeping violations in other areas.  And the only argument the plaintiffs advance in their opposition to the motion to dismiss is that Plains knew that the federal government was generally "taking the opposite view" as to Plains's legal compliance, based primarily on postspill violation notices.

That is not sufficient.  Reasonable investors understand information in SEC disclosure documents in light of their "surrounding text, including hedges, disclaimers, and apparently conflicting information[;]" for that reason, "an omission that renders misleading a statement of

opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Omnicare*, 135 S. Ct. at 1329-30.  Evaluated in context, the statements here were not misleading because a reasonable investor would not understand the company's high-level, general statements that it was operating in substantial compliance with regulatory requirements as implicitly assuring absolute compliance, even with the recordkeeping regulations that the violation notices addressed.  The plaintiffs' allegations relate almost exclusively to Lines 901 and 903.  But, as already discussed, Lines 901 and 903 are a small portion of Plains's overall pipeline operation. The violation notices the company received after the spill are not properly considered in evaluating whether these statements were misleading.[7]   Even considering these notices, the plaintiffs' allegations are not sufficient.  A reasonable investor would understand the use of "hedges and disclaimers" like the phrase "*substantial* compliance" and would not reasonably infer that the company was in absolute compliance or that its regulators had no objections to the company's compliance on any pipeline.  Instead, reasonable investors would understand that, for a very large pipeline company in this heavily regulated industry, regulatory notices of recordkeeping violations on minor portions of the company's operation are commonplace and unremarkable.  *Cf. Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (reasonable investors are aware of the customs and practices of the pharmaceutical industry and do not interpret positive predictions about drug approval to mean that there are no potential regulatory roadblocks, since argument with regulators

---

[7]  The fall 2015 notice of probable violation that the plaintiffs rely on does not suggest that, before the notice issued, the company knew that the regulator considered it to be in violation of the regulations later cited.  The fact that the company communicated with the agency about the recordkeeping issues during the class period and before the spill does not demonstrate the company's awareness of the government's position that it had committed any regulatory violations at all, much less violations significant enough to put the statement that the company's pipeline operations as a whole were in substantial compliance with relevant regulations in the "misleading" category.  The regulator did not communicate a belief that a regulatory violation had occurred until after the spill.

about drug tests are ordinary part of approval process).  That is especially true in light of the overall context in which these statements appeared.  The SEC documents noted the possibility that the company's regulators would penalize them for noncompliance, and emphasized that it was not only possible but probable that there would be future oil spills.  The overlapping hedges and qualifications would inform a reasonable investor's understanding of what implicit factual assurances were communicated by the company's opinion that it was operating in substantial compliance with relevant laws.

The plaintiffs' case citations do not change the analysis or conclusion.  *Reese v. Malone* is inapposite. First, it is a pre-*Omnicare* opinion.  It applies a significantly more permissive standard for finding that opinion statements are misleading than the Supreme Court adopted.   Under *Omnicare*, there are two ways to show that an opinion statement is misleading: the speaker's lack of belief in the expressed opinion, or the speaker's omission of facts that a reasonable investor would regard as so inconsistent with the opinion that he or she naturally assumes that the speaker does not know such facts.  Under the Ninth Circuit's pre-*Omnicare* standard, an opinion statement could be found misleading if there was no reasonable basis for the defendant's belief or opinion.  In effect, the defendant had to show the statements were not misleading, rather than the plaintiff having to show that they were.  *Reese*, 747 F.3d at 579.  *Omnicare* does not allow a plaintiff to proceed on that basis, but that was the basis for the Ninth Circuit's ruling in *Reese*.  In that case, the court could not "discern[] facts supporting the management's 'belief' in material compliance under the circumstances."  *Id.  Reese* is also distinguishable on its facts.  BP's challenged legal-compliance statement came *after* a major oil spill had occurred, the company's regulators had issued a series of major violation notices and compliance orders, and BP allegedly did not comply.  *Id.*  The present

facts are different.  To make them similar, the Plains statements would have issued after the Santa Barbara spill, after the regulatory responses finding violations and ordering compliance, and after Plains failed to comply with the orders.  Those are not the facts alleged here.

The plaintiffs' citation to *In re BioScrip* is similarly inapposite.  There, in addition to a legal-compliance opinion statement, the company also made "affirmative misstatements" that it was not currently under investigation.  95 F. Supp.3d at 730.  In fact, it was subject to a "wide-ranging" federal "investigation into its sales practices."  *Id.* at 729-30.  The investigation stemmed from potential violations of the False Claims Act.  These violations imperiled the company's revenue that came from Medicare, Medicaid, and other federal government programs.  *Id.* at 721.  That revenue was one-quarter to one-third of the company's total.  *Id.*  A reasonable investor reading or hearing representations that the company was not currently under investigation and that it was in substantial compliance with applicable laws could very well—in fact almost certainly would—assume that the company was not aware of a federal investigation that could put a full third of the company's revenue on the chopping block.  By contrast, here, a reasonable investor would understand that statements that Plains was in "substantial compliance" were not equivalent to a warranty that no portion of the company's 17,000-mile pipeline network had regulatory problems.

The legal-compliance statements in the company's SEC forms are not actionably misleading.  The allegations of material falsity are not particularized or individualized and the statements are not misleading because a regulatory agency had sent informal communications and had issued two infraction notices about recordkeeping practices on a different and small part of the company's large-scale pipeline network and operation.

The next set of statements that the plaintiffs identify as false or misleading are a set of non-

opinion, though still partially qualified, legal-compliance statements in Plains's underwriting agreements with the underwriter defendants.  There are two statements:

- "[N]one of the Issuers, the GP Entities or the Material Subsidiaries is in violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or of any decree of any court or governmental agency or body having jurisdiction over it . . . ."

- "Environmental Compliance.  Except as described in the Pricing Disclosure Package and the Prospectus, none of the Plains Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), or lacks any permits, licenses or other approvals required of them under applicable Environmental Laws to own, lease or operate their properties and conduct their business as described in the Pricing Disclosure Package and the Prospectus or is violating any terms and conditions of any such permit, license or approval, which in each case would reasonably be expected to have a Material Adverse Effect."

Compl. ¶ 214.  These statements were repeated in various agreements between Plains entities and different Underwriter Defendants throughout the class period.  Like the allegations about the statements in the SEC filings discussed above, the plaintiffs' falsity allegations about the underwriting-agreement statements change to reflect new facts developed over the class period.  The plaintiffs allege that the last time these statements appeared, in February 2015, they were false for the same 16 reasons that the plaintiffs argued made the opinion statements in the SEC filings false. *Id.* ¶ 241.

The Plains Defendants argue that these statements are not actionably misleading, for several reasons.  First, the defendants argue that because these statements were warranties, and the contract stated that the warranties were made exclusively for the benefit of the contracting underwriters in each transaction, the statements cannot be the basis for a securities fraud action.  Second, the defendants correctly point out that both warranty statements noted above (not just the second) end with a "material adverse effect" qualifier. *E.g.*, (Docket Entry No. 115-4, Ex. 2-A at 5-6).  They

60

argue that this term, which was defined in at least one of the underwriting agreements as "a material adverse effect upon the condition (financial or other), business, prospects, properties, net worth or results of" the Plains companies "taken as a whole," (Docket Entry No. 115-4, Ex. 2-C at 6), means that the statements are not actionably misleading.  As part of this argument, the defendants assert that these statements would be false or misleading only if regulatory or legal actions adversely affected the company, and that the oil spill itself is not adverse event.

The plaintiffs argue that these legal-compliance statements are unqualified statements of fact that are false if Plains was in violation of any applicable law or regulation.  The plaintiffs argue that courts have often held securities issuers liable on Exchange Act claims for statements made in underwriting agreements filed with the SEC.  *E.g.*, *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 91 (S.D.N.Y. 2015).  Finally, they argue that the defendants' reliance on the "material adverse effect" language in the contracts is misplaced, given that the oil spill did cause large losses in the company's market capitalization.

The parties' briefing on these statements is cursory.  Ultimately, the court agrees with the plaintiffs that these statements are potentially actionable, but finds that the plaintiffs have not met their pleading burden to identify with particularity what specific regulatory violations existed when these statements were made and the specific reason that those regulatory violations would reasonably be expected to produce a material adverse effect when the statements were made.

The defendants cite no authority for the proposition that warranties in underwriting agreements filed with the SEC cannot serve as "statements" on which an Exchange Act claim can be based.  The cases do not make the fact that a statement appeared in a contract filed as part of a Form 8-K or other SEC filing an independent bar to Exchange Act liability.  *E.g.*, *Reese*, 643 F.3d

at 691; *Sharette*, 127 F. Supp. 3d at 91; *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1179 (D. Or. 2015).  Instead, courts ask whether a reasonable investor might rely on the statement.  In general, "an express misrepresentation of present-existing fact" in an underwriting contract filed with a Form 8-K can be such a statement.  *Reese*, 643 F.3d at 692-93 (citing *In re MobileMedia Securities Litigation*, 28 F.Supp.2d 901 (D.N.J.1998)).  The cases do not address how to evaluate whether a statement in an underwriting contract is false or misleading.  Would a reasonable investor consider these statements in the contract-law context, such that a plaintiff would have to show that the statement was false in a way that would also support an action for breach of contract?  Or is it proper to disregard that inquiry and instead apply the standard Exchange Act analysis?  The court welcomes briefing on this issue at future stages of this case.  At present, the defendants have not provided analysis or authority to justify dismissal on this ground.

The available case law that allows nonparties to underwriting agreements to sue on statements in the agreements evaluates the statements without an explicit contract-law overlay. These statements in the Plains underwriting agreements may be actionable if the plaintiffs meet their pleading burden.  In contrast to the careful and narrow statements that Plains *believed* it was in *substantial* compliance with applicable regulations, in the underwriting agreements, the company stated that there *were* no regulatory violations that could cause a material adverse effect.  The underwriting agreements also lacked warnings about possible future regulatory problems or oil-spill incidents.  The statements in the underwriting agreements were not surrounded by the hedges and qualifications that were in the SEC filings containing the opinion statements analyzed above.  An investor reading the hedged and careful legal-compliance opinion statements in the company's SEC forms would have a very different impression than an investor reading the underwriting agreement

statements.

Plains is correct that the statements in the underwriting agreements do not flatly state that no regulatory violations existed. The phrase "reasonably expected to have a Material Adverse Effect" has meaning. But the court does not agree that these statements would be false or misleading only if legal-enforcement actions had produced adverse effects. The Santa Barbara spill and its consequences—both financial and legal—are easily within the "material adverse effect" that the statement addresses. Plains cites no authority and makes no persuasive arguments to the contrary. To the extent that the plaintiffs are able to identify, with the requisite specificity and particularity, violations that existed at the time that these representations were made and why those violations would reasonably be expected to cause a material adverse effect, these statements are actionable.

The problem is that the plaintiffs have not made particularized allegations of falsity. Instead, a series of cursory statements cross-reference over 30 pages of the complaint, without clarification or specification. Two of the 16 facts alleged to show that the February 2015 repetition of these statements was misleading were events that occurred after the statements were made. Only a few of the allegations in paragraph 244 mention regulatory or legal violations at all. The only violations mentioned are the same set of Pipeline Safety Administration recordkeeping notices already discussed.[8] There are no allegations that these violations would, contrary to the purported misleading statements, reasonably be expected to cause a material adverse event, such as the oil spill itself and the subsequent regulatory response. More is needed to adequately plead that the

---

[8] The plaintiffs also allege that the defendants violated the consent decree. The court has already explained why the plaintiffs' allegations that the company violated the consent decree are not actionable as securities fraud. The decree created duties owed only to the federal government, and the federal government agreed to dissolve the consent decree in the early months of the class period.

underwriting agreement statements were false or misleading.  There is no allegation of specific actions that Plains did or did not take; what specific legal or regulatory provision these actions or inactions violated; or why, at the time the statements were made, the violations would reasonably be expected to produce a material adverse event.  The current pleadings as to these statements do not state a claim.

The final legal-compliance statement that the plaintiffs challenge is this unattributed statement from the Plains website:

- The Company "believe[s] that all of our pipelines have been constructed and maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards proscribed by the American Petroleum Institute and accepted industry practice."

Compl. ¶ 219.  The plaintiffs argue that this statement is false or misleading for the same 16 reasons that they argued that the set of statements discussed above was misleading.  This statement is not actionable for the same reasons that the legal-compliance opinion statements in the companies' SEC forms are not actionable.

Based on the current pleadings, none of the company's legal-compliance statements are actionably misleading.

c.      **Statements about spill-response capabilities**

The plaintiffs next point to a series of statements about Plains's spill-response capabilities. Many of these statements overlap with the statements about pipeline-integrity management discussed earlier and need not be addressed again.  The statements on Plains's spill-response program not already addressed warrant discussion.

The first statements are by Plains CEO Armstrong at an investor conference in June of 2014:

- "And then as I mentioned, we have improved our ability to communicate with the local

64

officials, the regulatory bodies, etc., to make sure that not only are we doing the right thing but that they know we're doing the right thing, because they are put on the spot when these events happen."

- "We won't want to learn that lesson twice and so we are well prepared."

Compl. ¶ 227.  Armstrong's slide deck added to his presentation.  The slides included these bullet points:

- "PAA is committed to being prepared for potential incidents

  - Incident planning and response training on an ongoing basis

  - Regularly engaging with first responders across the company

  - Incident management tools and resources ready for use, including specific tactical plans and response strategies to be used in critical areas in the event of an emergency"

- "In the unfortunate event of an incident

  - We will be prepared

  - Our key objective is to preserve life and safeguard the environment through immediate response and deployment of resources."

Compl. ¶ 228.

The plaintiffs argue that these statements were false or misleading for the reasons they have asserted throughout.  The 14 reasons asserted here are:

- the defendants failed to address the "rapidly increasing anomalies" on Lines 901 and 903;

- in-line inspection runs in 2013 revealed 41 anomalies in July 2012, compared to only 13 in June 2007, "evidencing an exponential increase in the pipeline's deterioration . . . .";

- Plains conducted "patchwork" repairs on Line 901 instead of replacing it in light of its age and the number of anomalies;

- Plains lacked an adequate leak-monitoring system;

- Plains was not in compliance with the consent decree because it failed to properly check for

leaks, install adequate monitoring systems, and mitigate corrosion threats on Lines 901 and 903;

•       Plains lacked an adequate spill response plan;

•       Plains did not install automatic shut-off valves on Lines 901 and 903;

•       Plains had not exceeded federal regulatory requirements on Lines 901 and 903, but instead was in violation of Pipeline Safety Administration regulations for pipelines in high-consequence areas;

•       Plains was motivated not to spend money fixing Lines 901 and 903 in order to boost cash distributions despite its knowledge that failing to spend money would increase the chances of hydrocarbon emissions;

•       Line 901 had reached or exceeded the end of its useful life;

•

•       after the March and June 2013 inspections, the Pipeline Safety Administration told Plains that it was in violation of applicable regulations for: failing to maintain and provide documents relating to "Management of Change Procedures when, for example, new pipelines were added or taken offline"; failing to complete "Abnormal Operations forms"; and failing to "provide any records demonstrating an at least annual review of the controller training program for potential improvements";

•       an April 29, 2013 in-line inspection run showed 99 metal-loss anomalies on a 38-mile segment of Line 903, alerting Plains to the rapid corrosion on pipelines running through high-consequence areas;

•       inspection surveys along Line 903 produced inconsistent results, a red flag that "should have prompted immediate investigation"; and

•       Pipeline Safety Administration inspections of Lines 901 and 903 in August through October of 2013 found that Plains had failed to maintain records of its pressure tests for several "breakout tanks" on Line 903; failed to demonstrate that the pressure tests were performed in accord with regulations; failed to maintain adequate documentation of its preventive and mitigative evaluations of segments of Line 903; failed to take additional measures for the high-consequence area or document its justifications for deciding not to take such measures; and failed to comply with regulations regarding emergency response training and record-keeping.

Compl. ¶ 229.

      The defendants argue that these statements are not actionable because they are broad, general

summaries of the company's overall safety efforts, much like the pipeline-integrity statements addressed at length above.  Relying again on *BP II* and *Anadarko*, the defendants argue that the statements are not made false or misleading by allegations that the company's response efforts were not up to the described level on two small portions of the sprawling pipeline network.  *Anadarko*, 957 F. Supp. 2d at 823-24; *BP II*, 852 F. Supp. 2d 804-05.

The plaintiffs argue that the statements here are more similar to those in *BP I*.  In that case, Judge Ellison allowed the plaintiffs to go forward on claims that BP's statements about its spill-response capabilities were false or misleading.  The plaintiffs assert that, under the *BP I* approach, Plains's statements are demonstrably false because, on the day of the spill,

> Plains (i) failed to identify the spill for hours despite several emergency warnings and red flags (and instead had to be alerted by beachgoers and other third parties); (ii) failed to coordinate with local officials; (iii) failed to timely report the spill to regulators; (iv) failed to timely shut down the pipeline and stop the flow of oil; and (v) failed to accurately size the spill.

(Docket Entry No. 124 at 31).

The statements here are more like those in *BP II* and *Anadarko* than those in *BP I*.  The first statement is similar to the "squishy" and "untethered" statements about safety progress in *BP II*.  852 F. Supp. 2d at 813.  Both cases involved broad statements to the effect that the company "will be prepared" in the event of a spill.  In *BP II* and *Anadarko*, the court held that this kind of general statement—an example of "corporate cheerleading"—was not actionable.  The same result applies here.  As in *BP II* and *Anadarko*, these general, high-level summaries of company-wide safety efforts are not misleading because, when a spill occurred at one site, the company's response did not match the general company-wide policy.  *Anadarko*, 957 F. Supp. 2d at 823-24; *BP II*, 852 F. Supp. 2d 804-05.

As the defendants accurately point out, the statements found misleading in *BP I* are different. BP specifically represented, in a publicly available spill preparedness document, that in the event of a Gulf of Mexico spill, it could recover a specific (and extremely large) number of barrels of oil per day. After the Macondo blowout, BP recovered a far smaller number of barrels each day. It was the specificity of the representations and the specificity of the falsity allegations that made the statements actionable. The alleged facts directly conflicted with BP's statements. *BP I*, 843 F. Supp. 2d at 762-63. Here, most of the alleged misstatements about spill-response readiness are very broad and general statements about company-wide policy, and the allegations of the facts that made the statements false narrowly focus on a small portion of Plains's pipeline system. These alleged misstatements are much more like those in *BP II* and *Anadarko*, and are not actionable.

Plains's statement that it had "[i]ncident management tools and resources ready for use, including specific tactical plans and response strategies to be used in critical areas in the event of an emergency" is closer to the line. It is a specific representation that Plains had "specific tactical plans and response strategies" for use in "critical areas," which included the Santa Barbara area. But the plaintiffs make only conclusory allegations that, as the Pipeline Safety Administration later concluded, the company did not have an "adequate" spill-response plan in place when the Santa Barbara leak occurred. The portions of the complaint setting out the background for these allegations do not support an inference that the statement was false or misleading when made. The allegations of falsity refer to two other sections of the complaint. These sections, in turn, refer to various later Pipeline Safety Administration determinations. As far as the court can tell,[9] the

---

[9] Of course, the fact that the plaintiffs do not state with specificity the factual basis for their falsity claims means that they have not alleged that the statements were false or misleading with sufficient particularity. The plaintiffs' falsity allegations cannot simply cross-reference large portions of the complaint

plaintiffs rely on the following more specific allegations from other sections of the complaint:

- In September of 2015, the Pipeline Safety Administration determined that Plains had committed a regulatory violation when, in the summer and early fall of 2013, it was not able to produce documentation to show that it had annually reviewed its spill-response training and the decision-making process it used for any changes to the training program. Additionally, Plains did not have documents showing that its supervisors maintained thorough knowledge of the relevant parts of the emergency-response plan. Compl. ¶ 129.

- In addition, Plains was informed in a December 2013 letter that it was probably violating "several HLPSA regulations related to pipeline management and control room management, including failure to record pipeline MOP information." Specifically, that letter indicated that, during inspections in March and June of 2013, Plains failed to present documents on its procedures for taking pipelines in or out of service, did not complete certain required paperwork, and did not have records proving that it annually reviewed its controller-training program. *Id.* ¶ 171.

- The Pipeline Safety Administration determined in June 2015 that, at the time of the spill, Plains lacked adequate leak-monitoring systems and did not take appropriate remedial measures in response to corrosion problems on Line 901. *Id.* ¶ 172.

- Plains's response was slow and ineffectual when the spill occurred. *Id.* ¶¶ 173-75.

The problem is that the allegations do not contradict the company's June 2014 representation that it had plans for spill responses in critical areas. The allegations are that: (1) nearly a year before June 2014, the company did not have legally adequate records on its *review* of the plans; (2) Plains did not have adequate leak-monitoring systems, and (3) Plains did not do a good job of reacting when the spill occurred. None of these allegations is incompatible with the June 2014 statement that Plains had specific response plans for critical areas. The plaintiffs have not adequately alleged that this statement was false or misleading when made.

---

in the hopes that the court will construct specific falsity allegations on its own. (For example, the plaintiffs cross-reference section V.F. of the complaint; that section is a full seven pages long, but only one short paragraph appears to have anything to do with the company's spill response planning efforts. Compl. ¶ 129.) The plaintiffs' burden is to set out, for each statement, particularized falsity allegations; sending the court on a hunting expedition through lengthy sections of the complaint in search of potentially relevant allegations does not adequately discharge that duty.

The challenged statements about spill response capabilities are not actionably false or misleading.

### d.     Post-spill statements

The final set of false or misleading statements that the plaintiffs identify were made after the spill.  Most relate to Plains's estimates of the spill's size.  According to the plaintiffs, Plains's statements were false or misleading because the spill was far larger than the company at first let on.  The plaintiffs' appendix identifies several allegedly misleading statements.  Some have been addressed already.  This section addresses those statements not yet discussed.

The plaintiffs point to various statements on Plains's website or filed with the SEC.  The first is the company's May 26, 2015 Form 8-K filed after the spill.  In this Form 8-K, Plains stated that the spill had occurred and that Plains "currently estimate[d] that the amount of released crude oil could be as high as approximately 2,400 barrels" (or approximately 101,000 gallons).  Compl. ¶ 245.  The plaintiffs note that this was a 4,000-gallon reduction from the initial estimates Plains gave to the news media.  The plaintiffs also allege that:

> [b]etween May 24, 2015 and July 13, 2015, defendants issued 26 separate "Incident Response Updates" on the website they created to track the spill response, www.plainsline901response.com, all of which are posted in chronological order on the website.  The Incident Response Updates purported to provide updated information concerning the spill, its impact, and the cleanup efforts.  Plains also published on the website "Recovery Q&As" on June 17, 2015 discussing Plains' safety record, recovery completion, affected pipeline, and how oil traveled to the ocean.  Finally, Plains republished the June 4, 2015 Investor Day presentation and on June 24, 2015 published Armstrong's June 19, 2015 letter to Congress concerning the spill, its impact, and the shutdown of Line 903. These communications omitted the true size of the spill.

Compl. ¶ 248.

The complaint continues:

> On June 11, 2015, Plains and Plains Holdings each filed a Form 8-K disclosing information provided by a Plains representative on June 10, 2015 in response to a reporter's questions at a media briefing held by federal response coordinators working on the spill. The Form 8-K discussed costs incurred to date and the progress of the spill cleanup. In addition, Plains and Plains Holdings represented that the total costs to be incurred by Plains in connection with the spill were not reasonably capable of estimation or determination, although Plains expected its insurance coverage to apply, subject to coverage terms and deductibles.

*Id.* ¶ 249.  According to the plaintiffs, Plains did not disclose its "true" worst-case scenario for the spill—approximately 143,000 gallons, 42% larger than the earlier estimates—until August 5, 2015.

The plaintiffs allege that these statements were false or misleading because, on May 28, 2015, Plains excavated and purged Line 901 and learned that the prior worst-case-scenario estimate was much too low.  The spill was likely much larger.  *Id.* ¶ 247.  The plaintiffs also repeat the rest of their boilerplate allegations about other false statements and the conclusion that all of the statements are therefore false or misleading.  The repeated boilerplate allegations are unrelated to the spill estimate and do not apply here.

The defendants argue that the statements about the amount of oil spilled and the clean up were not false or misleading.  The defendants point out that the Pipeline Safety Administration's final investigative report on the Santa Barbara spill—which the plaintiffs asked the court to take judicial notice of—states that Line 901 was not purged until June 18, 2015.  That was weeks after the date the plaintiffs claim in their complaint.  (Docket Entry No. 126-1, Ex. 1 at 4).  The agency report shows that the company did not know enough to revise its worst-case estimates upward until after the June 18 line purge.  (*Id.* at 14-15).  The defendants assert that none of their pre-June 18, 2015 statements were false or misleading when made.

The defendants also assert that the statement was a prediction or projection couched in cautionary language, citing *Krim v. BancTexas Grp.*, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993).

They argue that there are no allegations or facts showing that the estimates the company gave before June 18 were false or misleading when made, citing the truism that the fact that a prediction turns out to be wrong does not mean that it is actionable.  The defendants assert that while the plaintiffs allege that Plains posted false spill-related updates on its website, they do not identify statements in those updates that were misleading because the company failed to include information about the revised worst-case scenario.  Nor do the company's other statements during the period between the spill and the August 5 disclosure of the increased worst-case-scenario estimate contain contrary information  made misleading by the omitting the revised estimate.

The plaintiffs argue in response that Plains had a duty to disclose its new estimate because it chose to speak about the spill in the first place.  When the company decided to make frequent website postings about the spill and speak about it, it had to provide complete, nonmisleading information.  The plaintiffs also argue that the statements are not "forward-looking" projections, but rather "current" (and understated) estimates.

As an initial matter, the defendants are correct that, according to the Pipeline Safety Administration report that the plaintiffs rely on, the Line 901 purge did not occur until June 18 and Plains did not have a reason to revise its estimate until after the purge results.[10]  The purge was not in late May, as the complaint alleges.

The *Omnicare* framework is the best approach to evaluating whether these estimates were

---

[10] As the plaintiffs themselves argue, the Pipeline Safety Administration report is a public record that the court can consider on a motion to dismiss without converting the motion to one for summary judgment. *See Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir.2011); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366); *Jathanna v. Spring Branch Indep. Sch. Dist.*, No. CIV.A. H-12-1047, 2012 WL 6096675, at *3 (S.D. Tex. Dec. 7, 2012).  Neither party has argued that the Pipeline Safety Administration report incorrectly states the date of the purge.

false or misleading when made.  *Omnicare* applies because an "estimate" is a statement of belief or opinion.  To show that an estimate was false or misleading when made, the plaintiffs must allege either that the speaker disbelieved it or knew facts that a reasonable person would assume did not exist based on hearing the estimate.[11]

For the May 26 and June 2011 SEC filings, the plaintiffs have not met that pleading requirement.  There are no allegations (other than the facially incorrect allegation that Plains purged Line 901 in late May) that, when the company filed the May 26 and June 11 SEC documents, Plains or its officers knew facts contradicting the estimates provided.  The statements in the SEC filings are not actionable as pleaded.

The plaintiffs also allege that Plains made various false statements about the spill after June 18.  They allege that Plains posted "Incident Response Updates" on the spill website and "published Armstrong's June 19, 2015 letter to Congress concerning the spill, its impact, and the shutdown of Line 903."  Compl. ¶ 248.  In their opposition to the motion to dismiss, the plaintiffs argue that because Plains chose to speak about the spill, they had to disclose their new estimate each time they spoke.  The problem is that the plaintiffs have alleged only the existence of statements about the spill, not their content.  Paragraph 248 of the complaint does not allow the court to evaluate whether the post-June 18 statements would have left a reasonable investor with the mistaken impression that the company did not know new information about the probable amount of oil spilled.  The

---

[11]   This approach is a trivial extension of firmly established principles.  The Fifth Circuit has consistently held that predictive statements are only actionable if they are "false when made," e.g., *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993), and courts have analyzed spill estimates as predictive statements, *e.g.*, *BP I*, 843 F. Supp. 2d at 773 (holding that spill estimates were actionable because plaintiffs alleged that speakers were aware of internal documents that gave higher estimates, making it possible that the statements were false when made).  *Omnicare* merely provides a framework to evaluate whether this type of statement was false or misleading when made.

statements may have been misleadingly incomplete without disclosure of the new spill estimate, but there is no basis in the complaint to support that inference. The plaintiffs must identify statements that would have given a reasonable investor the impression that the company did not have new information on the spill estimate, and must make individualized allegations that the speakers were aware of the results of the company's analysis of the June 18 purge data when the statements were made.

The final set of statements that the plaintiffs identify as false or misleading were made by the Plains safety and security director, Patrick Hodgins, at a June 26, 2015 California state legislative hearing. Hodgins stated at the hearing that "[t]he first time I heard anything about the corrosion is what I read in the newspapers. . . . We had no indication at all to assume there was an issue." Compl. ¶ 250. When asked whether the 2007 or 2012 in-line inspection runs had uncovered any sections of Line 901 with metal loss greater than 50%, Hodgins stated that Plains "had not had any indication at that time." *Id.* ¶ 251. A person asked Hodgins about the spill, and mentioned a volume of 105,000 gallons. Hodgins did not correct that figure, despite Plains's alleged knowledge that the spill could be much larger. *Id.*

Three of these statements are actionably misleading. The plaintiffs allege facts that specifically conflict with Hodgins's statements about what Plains knew about the corrosion issues on Line 901. The plaintiffs allege that the company was aware of a sharp increase in the number of corrosion problems between the 2007 and 2012 inspection runs, *id.* ¶ 252(b), and of a number of areas where corrosion had eaten away more than 50% of the pipe wall. *Id.* ¶ 143. As a result, Hodgins's two statements that the company was not aware of corrosion issues with the pipeline or of areas where corrosion had destroyed over 50% of the pipe wall are false.

74

The plaintiffs have also plausibly alleged that it was misleading for Hodgins to fail to disclose the company's higher spill estimate when he was asked about a "105,000 gallon" spill. Hodgins's failure to provide a correct statement of the company's newer and much higher estimate could leave a reasonable investor with the impression that Plains still believed that its earlier estimate was accurate.

The plaintiffs have identified three actionable post-spill statements: (1) Hodgins's statement that Plains had no indication that corrosion was an issue; (2) Hodgins's statement that Plains was not aware of any pipe wall areas that were corroded more than 50% based on the 2007 and 2012 in-line inspection runs; and (3) Hodgins's response to the question about the 105,000 gallon estimate that omitted the updated estimate numbers.

### e.    Conclusion on material-misrepresentation allegations

The plaintiffs have identified four actionable misstatements: the three statements by Hodgins just discussed, alleged at paragraphs 250 to 251 of the complaint, and the statement on the Plains website that the company "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate," *id.* ¶ 207.  The next issue is whether the plaintiffs have adequately alleged scienter as to these four statements.

### 2.    Scienter

### a.    The Scienter Allegations on the Actionable Statements

The plaintiffs argue that they have adequately alleged scienter as to Hodgins because the in-line inspection reports showed that there was significant corrosion in sections of the pipeline, and because he knew the size of the spill.  The plaintiffs then argue that Hodgins's scienter is imputable to Plains, because it designated him to speak on the company's behalf.  The problem is that the

complaint contains no allegations about what Hodgins knew and when he knew it.  The complaint allegations do not make show that Hodgins was aware of the results of the in-line inspection runs or the company's spill estimate at the time he spoke.  The plaintiffs have not adequately alleged scienter as to Hodgins's statements.

The final actionable statement, from the Plains website, is the representation that the company "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate."  *Id.* ¶ 207.  To plead scienter for an unattributed corporate statement like this one, the plaintiffs must first tie it to "a corporate officer who can be seen as acting on behalf of the corporation in making the statement."  *BP I*, 843 F. Supp. 2d at 789 (citing *Southland*, 365 F.3d at 366).  One way to meet this requirement is to plausibly and specifically allege that the statement, although made in unattributed form, was made or authorized by an officer who had the requisite scienter.  There is no such allegation here.  Another way to meet the pleading requirement is to allege that the statement was so important and "dramatic" that it must "have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."  *Id.* (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) [*Tellabs II*]; *In re Dell Sec. Litig.*, 591 F.Supp.2d 877, 899 (W.D. Tex. 2008)).

In *Tellabs II*, the Seventh Circuit posed a hypothetical unattributed statement by GM that the company had sold a million SUVs in a given year, when the company had sold none.  Despite the lack of specific attribution, the Seventh Circuit would have allowed a claim to go forward, since that is the sort of announcement that management necessarily would have approved.  The defendants argue that the statement at issue here does not make the sort of claim that would necessarily be

approved by a corporate officer before release.  The plaintiffs do not make scienter arguments about this statement, or try to show that it is analogous to the *Tellabs II* hypothetical.  As pleaded,  the statement is not analogous to the hypothetical in *Tellabs II* and is not the sort of statement that would necessarily have been approved by corporate officers.  It is, instead, the sort of statement that could have been written by someone with no specific information, passed to Plains's marketing or investor-relations department, and displayed on the website with no oversight from senior ranks.

The plaintiffs have not adequately alleged scienter for any of the actionable misstatements.

### b.    The Plaintiffs' General Scienter Allegations

Even assuming that the plaintiffs had identified additional actionable misstatements, most of the scienter allegations in the complaint would not be sufficient.  To adequately plead scienter, the plaintiffs must make individualized, specific allegations about each speaker's state of mind for each allegedly false or misleading statement.  *Shaw Group*, 537 F.3d at 533; *TXU Corp.*, 565 F.3d at 207.  Allegations that "the defendants" or "the company" knew something do not meet that standard.  *Southland*, 365 F.3d at 366.  The individualized and specific allegations must generate a cogent and compelling inference that the defendant intended to deceive or was severely reckless. An inference of scienter is cogent and compelling only if it is at least as persuasive as any other inference about the defendant's state of mind that could be drawn from the alleged facts.  It is not enough to plead facts that permit an inference of scienter; the alleged facts must make it as likely as not that the defendant's state of mind was culpable.    *Tellabs*, 551 U.S. at 324.

The defendants argue that the plaintiffs' allegations do not meet this standard.  They note that the scienter allegations tied to specific misstatements are in group pleadings alleging that "the defendants" knew some fact or did or failed to do some act.  These group-pleading allegations are

not entitled to weight under Fifth Circuit precedent.  The defendants emphasize that the boilerplate scienter allegations do not mention any individual defendant, and that the plaintiffs do not connect these generalized allegations to a specific person's mental state.  There is no properly pleaded allegation that the company's officers learned about the problems on Lines 901 and 903 when the challenged statements were made.  The defendants also argue that the plaintiffs' allegations about the officer defendants' corporate positions and financial incentives to boost distributable cash are not enough.  The defendants argue that these allegations, taken together, at most show corporate mismanagement or negligence, and fall short of a strong inference of scienter.

In response, the plaintiffs argue that they have adequately pleaded that the defendants were at least severely reckless.  First, they argue that the importance of Plains's integrity-management efforts creates a strong inference that the officers were aware of the problems on Lines 901 and 903.  The company represented that it was placing a "primary" emphasis on integrity and safety, including efforts by the "senior management team."  Therefore, the plaintiffs say, the officers had access to information about, and a duty to monitor, the company's efforts.  The plaintiffs cite *Nathenson*, 267 F.3d at 424-25, for the proposition that in similar circumstances, corporate officers are charged with knowledge of facts critical to the company's operations.  The fact that Plains operated in a heavily regulated industry strengthens the inference of scienter, the plaintiffs argue, because "it is implausible" that upper management did not get information about regulatory violations.

The plaintiffs also argue that the facts that Armstrong "spoke repeatedly" about the company's integrity and safety measures and acted as the face of the company's safety efforts support a strong inference of scienter.  They cite *BP I*, 843 F. Supp. 2d at 783, in support.  The plaintiffs note that Daniel Nerbonne, the company's Senior Vice-President of Engineering, reported

78

directly to Armstrong, and that Armstrong touted Nerbonne's efforts to improve the company's testing and monitoring abilities.  The plaintiffs argue that this creates a strong inference that Nerbonne gave Armstrong information about the company's testing results and other pipeline integrity information.  They also argue that the company's general counsel, McGee, was reckless when he signed the underwriting agreements, which contained statements that the company had not violated relevant laws or regulations.  Because the company was violating various laws, the plaintiffs argue, McGee was at least reckless for speaking about the issue without knowing whether his statement was accurate.

Second, the plaintiffs argue that the complaint's "detailed allegations" about the defendants' access to information contradicting their own statements generates a strong inference of scienter. The plaintiffs provide a detailed recitation of the allegations about the consent decree, in-line inspections, the corrosion problems on Lines 901 and 903, and the Pipeline Safety Administration notices.

Third, the plaintiffs argue that the fact that the defendants were aware that any significant spills in high-consequence areas would create serious problems means that it was reckless for the defendants to fail to learn the facts about the company's monitoring and integrity efforts on Lines 901 and 903.

Fourth, the plaintiffs argue that the post-spill agency compliance orders generate an inference of scienter.  This argument fails because the plaintiffs do not attempt to show that any individual defendant was aware of the order or the agency's conclusions at any time before the spill.

Fifth, the plaintiffs argue that the defendants' motive and opportunity to commit fraud enhance the strength of the inference of scienter.  Because Armstrong, Pefanis, and Swanson stood

to gain millions if they kept pipeline-repair expenditures low, and because Lines 901 and 903 had declining oil volumes and were near the end of their useful lives, the plaintiffs argue that the court should infer that they acted recklessly or intentionally to inflate their incentive payments.

Sixth, the plaintiffs argue that the company's spill response supports an inference of scienter. The company worked to "spin" the story to avoid negative publicity. Armstrong, the face of the company's spill-response efforts, was "acutely" aware of the company's spill estimates and their likely market impact. The plaintiffs argue that, as in *BP I*, Armstrong's front-and-center presence and his press contacts about the spill create an inference of scienter.

Seventh, and finally, the plaintiffs argue that there is no group-pleading problem here because the individual defendants either made false statements or signed SEC documents that contained false statements. The plaintiffs again cite *BP I*.

Despite the many well-presented arguments, the present complaint—with one potential exception, detailed below—does not adequately allege scienter for the challenged statements. The defendants are correct that the plaintiffs have presented only group allegations of scienter. For each statement that the plaintiffs identify as false or misleading, they have the burden to identify specific facts showing scienter. Instead, for each misstatement, they allege the same set of claims about what "the defendants" did or knew. The plaintiffs' response is to say that each individual defendant made a false statement or signed an SEC document containing a false statement. But the fact that an individual defendant made a statement or signed a document containing a statement shows only that the statement is attributable to that defendant, not that he or she had the legally required state of mind. *BP I*, 843 F. Supp. 2d at 780. As pleaded, these allegations fall short of the plaintiffs' burden under Rule 9(b) and the PSLRA. That is an independent basis for the court to conclude that the

plaintiffs' scienter allegations are insufficient and to dismiss all of the plaintiffs' Exchange Act claims.

Apart from the group-pleading problem, the arguments based on the defendants' corporate positions, financial incentives, and access to unidentified sources of information about problems on Lines 901 and 903 are unpersuasive.  The plaintiffs do not tie the scienter arguments in their brief to specific statements.  Even if the court agreed that one of the plaintiffs' arguments was sufficient to conclude that the complaint alleged scienter for some statement or statements, there is no basis to tie any one of the lengthy list of alleged misstatements to the facts showing scienter.  That does not satisfy the plaintiffs' burden of identifying facts giving rise to a strong inference of scienter as to each speaker for each misstatement.  Setting that problem aside, the Fifth Circuit has consistently rejected scienter allegations like those at issue here:

> [T]he[] allegations fail to reach the required standard.  Plaintiffs point to no allegations that the defendants knew about the [problems at issue in the suit], only that they should have known based on their corporate positions within the company . . . .  The plaintiffs' allegations regarding non-specific internal reports are also inadequate.  An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss.  Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients.

*Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003) (quoting *Abrams*, 292 F.3d at 432) (internal quotation marks omitted); *see also Shaw Group*, 537 F.3d at 535.  Similarly, allegations that the company's officers had incentive pay arrangements do not support a strong inference of scienter.  Most executives of major corporations have incentive pay.  *Abrams*, 292 F.3d at 434; *Shaw Group*, 537 F.3d at 544; *Melder*, 27 F.3d at 1102.  Together, these cases reject the plaintiffs' core scienter theory: that the court should infer scienter based on a combination of corporate office and pay structure plus generalized access to unspecified sources of corporate information.  To avoid

dismissal under these Fifth Circuit cases, the plaintiffs must make specific allegations about which corporate officer learned what facts, from what source, on what date.  They cannot allege in general terms that corporate officers had a hand in safety efforts and had access, in some broad sense, to the company's collective knowledge about Lines 901 and 903.

The plaintiffs' argument that the importance of the company's safety and integrity initiatives creates an inference of scienter is unavailing.  They cite *Nathenson* for the proposition that corporate officers are charged with information critical to the company's operations.  But *Nathenson* is a narrow exception to the Fifth Circuit's consistent rule that allegations based on the defendants' position in the company are insufficient.  As the court in *Abrams* clarified, *Nathenson*'s narrow reasoning depended on the facts that the company in question was quite small (fewer than 40 employees); was "essentially a one product company" and its future prospects depended on that product; and the officer in question had already made a variety of statements demonstrating familiarity with the same subject-matter that his challenged statements addressed.  *Abrams*, 292 F.3d at 438 (discussing *Nathenson*, 267 F.3d at 424-25).  By contrast, in *Abrams*, the business unit that produced the accounting problems in controversy in that case was responsible for only 20% of the company's revenue.  Although that was significant, it was not enough to depart from the ordinary rule that general allegations about corporate roles do not satisfy scienter.  *Id.*  As in *Abrams*, the facts in *Nathenson* are not like the facts here.

The plaintiffs' argument that pipeline integrity and legal compliance were critical priorities for the company does not make this case like *Nathenson*.  Plains has far too many employees—between 4,700 and 5,300 during the class period, as reported in Plains All American's 2013, 2014, and 2015 Forms 10-K—and far too large and complex a business for *Nathenson*'s

narrow exception to apply.  *See Schott v. Nobilis Health Corp.*, No. CV H-16-141, 2016 WL 5539756, at *8 n.5 (S.D. Tex. Sept. 29, 2016) (company's 440 employees made *Nathenson* inapplicable); *Carlton v. Cannon*, 2016 WL 2346943 (S.D. Tex. 2016) (183 employees); *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860 (S.D. Tex. 2016) (61 employees).  That alone takes this case outside *Nathenson*.  And the facts that the corporate executive in *Nathenson* was deemed to know concerned a critical issue with the company's only product, and the executive's other statements demonstrated intimate familiarity with the subject-matter at issue.  There was a compelling basis to infer that the executive knew the facts he misrepresented.  Here, executive-level participation in broad aspects of pipeline-integrity and safety program development and management does not show knowledge of the details about the leak-detection or spill-response plans for two pipeline segments that were less than 0.008%, combined, of the company's pipeline network.  It is far more plausible that these executives did not have detailed, ground-level knowledge about how these company-level programs were operationalized at a given site.

The plaintiffs' citation to *Reese* does not help because, as discussed earlier, that case used a now-defunct legal standard and its facts are not analogous to those at issue here.  The plaintiffs' citation to *BP I* does not help, because that case is distinguishable on its facts.  In *BP I*, BP's CEO had traveled around talking about the company's work to improve process safety by implementing the specific recommendations of the Baker report and rolling out a new and detailed Operations Management System designed to improve the company's safety and integrity efforts.  The CEO represented that he was so focused on these safety programs that he was "bored" with emphasizing their importance in internal and external presentations.  The plaintiffs in *BP I* pointed to 19 separate occasions when the CEO made statements about the company's safety efforts, definitely and

83

affirmatively representing that the company was following the Baker report or had implemented the Operations Management System in the Gulf of Mexico. In fact, the plaintiffs alleged, the company had taken none of these steps in the specific area identified. *BP I*, 843 F. Supp. 2d at 782-84.

The *BP I* court found that these allegations supported a strong inference of scienter. The number and specificity of the statements showed that the CEO was either so closely following the company's progress on the Baker report goals and Operations Management System regional rollouts that he knew that the statements were false, or he was reckless in making these specific statements without knowing if they were true. *Id.* at 783. The *BP I* court analyzed only whether these allegations were sufficient to show scienter as to the statements that were about BP's progress on the Baker report and Operations Management System. Those were the only statements the court found actionably misleading.

This analysis corresponds to one aspect of *Nathenson*, although BP's size would make the entire approach inapplicable. The holding in *BP I* is quite narrow: in the exceptional circumstance when a corporate officer's alleged repeated public statements emphasize a policy or program as critical to the company's success and show specific knowledge of a narrow and measurable aspect of that program so as to give the impression that he is closely tracking the company's progress on that aspect, scienter is adequately pleaded. That simply is not the case here. The allegations about Armstrong's conduct fall far short of the BP CEO's alleged frequently repeated, specific, and definitive statements about specific aspects of the company's safety progress in the area at issue. The analogy to *BP I* would be stronger if the plaintiffs had alleged that Armstrong had made statements about a specific safety or integrity program with objective and verifiable steps or progress markers, and he had represented that Plains had implemented the program throughout the geographic

84

unit that contained Lines 901 and 903.  That is not what the plaintiffs allege here.  The plaintiffs do not allege that Armstrong spoke about a particular safety program with verifiable steps or content or represented that it was in place in the geographic unit containing Lines 901 and 903.  Rather, in effect the plaintiffs argue that it was reckless for Armstrong to make high-level, generalized statements about the company's commitment to safety and its progress on safety issues without first determining whether there were problems on Lines 901 and 903.  The *BP I* analysis does not support an inference that Armstrong was reckless in failing to acquire specific, detailed, and current knowledge about every part of his company's large pipeline network before making broad and general statements about the company's safety commitment and efforts.[12]

The fact that the company's engineering chief was Armstrong's "direct report" does not generate a strong inference that Armstrong received specific and current pipeline-testing information on specific sections of the Plains network.  The complaint does not allege that Nerbonne provided pipeline-testing information to Armstrong or to other corporate officers.  Instead, it alleges generally that Nerbonne was "a senior executive with direct and steady contact with senior management," and that Armstrong mentioned Nerbonne's efforts to develop new testing procedures at various presentations.  Compl. ¶ 185-86.  These allegations do not give rise to an inference that Armstrong was aware of the pipeline-testing information on Lines 901 and 903.

---

[12]  The plaintiffs appear to suggest that *BP I* holds that a corporate officer who repeatedly represents that he has an active and engaged role in a particular corporate initiative is charged with knowledge of all "on the ground" facts about the initiative.  The holding does not appear so expansive.  An exceptionally detail-oriented and engaged top executive who takes a genuine and good-faith interest in a particular program will not naturally acquire detailed information about how the program's on-the-ground implementation is proceeding at every individual site.  In all but exceptional circumstances, the far stronger inference when the executive's general statements about the program are false or misleading due to problems at individual sites is that the corporate officer was somewhere between total blamelessness and gross negligence—still short of the recklessness needed under the securities laws.

The argument that Plains General Counsel McGee was reckless because he signed underwriting agreements containing "unequivocal statements" that the company was not violating relevant laws or regulations is also unpersuasive. The plaintiffs cite *Anadarko*, 957 F. Supp. 2d at 835, for the proposition that this kind of unequivocal statement, without "any qualifying or hedging words," made by a speaker lacking knowledge as to its truth, gives rise to a strong inference of scienter.

There are at least two problems. First, these statements were not "unequivocal," they were qualified. The company represented that it was not committing violations that could reasonably be expected to have a material adverse effect. Second, the plaintiffs in *Anadarko* alleged that, at the time the speaker—a high-level Anadarko executive—stated that the company was not involved "at all" at the Macondo site, the company's executives were in fact "completely" focused on the well and the spill. There is no similar allegation here. *Anadarko* might apply if, after the Santa Barbara spill, McGee made a similar statement, but that is not what the plaintiffs allege here.

The plaintiffs' next argument is that the complaint contains "detailed allegations" that the defendants knew about various problems on Lines 901 and 903. This subsection of the plaintiffs' brief recites the scienter allegations the plaintiffs make throughout the complaint. But the fact that some person or persons at Plains knew about one or more of the various problems that the plaintiffs identify is not sufficient to allege scienter against the company's officers. To proceed on this theory, the plaintiffs must allege in detail who provided the officers what information and when. *Abrams*, 292 F.3d at 432. The complaint does not do so.

The fact that these pipeline sections were in high-consequence areas does not mean that the company's officers were reckless for not knowing current detailed information about specific about

safety issues on those lines.  This is a variation on the argument that safety and integrity issues were a key corporate priority and therefore the officers should be charged with knowledge of specific safety issues in specific parts of the pipeline network.  That argument is unpersuasive, as explained in detail above.

The plaintiffs' argument that their allegations about the defendants' financial incentives to increase distributable cash enhances their scienter pleadings does not change the analysis or result.  The plaintiffs are correct that this kind of motive allegation can strengthen an inference of scienter.  But the plaintiffs' allegations here, taken together, are far from what other cases use to support a cogent and compelling inference of scienter.

The plaintiffs argue that Armstrong's personal involvement in the spill-response efforts supports a strong inference of scienter for the company's misleading spill estimates.  This argument has some persuasive force.  The company's spill estimates could be *Tellabs II*-type statements that were made with the knowledge and approval of senior management even though the statements were not specifically attributed to any particular officer.  Allegations that Armstrong was closely involved in the company's spill-response and public-relations efforts could support an inference of scienter for spill estimates that were false or misleading when made, because the allegations suggest that Armstrong would have known the true size of the spill.  However, this argument does not alter the analysis or result.  The plaintiffs' own Pipeline Safety Administration report shows that Plains was not aware that its spill estimates were too low until after it purged Line 901 on June 18.  As explained earlier, the plaintiffs have not made specific allegations about the content of Plains's post-June 18 statements, but instead have alleged that the statements exist.  Depending on the content and character of the statements, Armstrong's personal involvement in spill-response and public-relations

efforts may support an inference of scienter.  But the complaint as pleaded fails to identify the content of those statements or plead that they contained any specific misrepresentations.

The plaintiffs have not adequately alleged scienter for the statements that they identify as false or misleading.  That is an independent basis for the court to dismiss all of the plaintiffs' Exchange Act claims.

### 3.     Loss Causation

The defendants argue that, because the complaint alleges that adverse information about Plains's safety record was publicly available through the Pipeline Safety Administration website and other sources, the complaint does not identify previously concealed truths later revealed by post-spill disclosures by the company or its regulators.  The defendants argue that because the market was aware that Plains (like many pipeline companies) had been responsible for oil spills and related problems in the past, the market necessarily did not rely on the company's generalized representations about safety.  This argument is problematic.

The complaint does not make clear when these various disclosures occurred, or what type of violations they addressed.  The complaint states that, "before and during" the class period, the company reported 229 safety and maintenance incidents to the Pipeline Safety Administration.  Compl. ¶ 92.  It is not clear how many, if any, of these reports were made during the class period.  That is important.  Many of the statements that the plaintiffs identify as false or misleading are statements about Plains's present focus on safety, safety progress, or new safety efforts.  Safety problems before the class period would not necessarily cause the market to discount contemporaneous statements about a current corporate focus on safety improvement.  And the problems that form the core of the plaintiffs' claims here—the problems on Lines 901 and

903—were not addressed in the Pipeline Safety Administration database.  The plaintiffs correctly point out that the complaint contains detailed allegations that the company's share prices fell with the release of information about the Santa Barbara spill.

The loss-causation arguments that the defendants present are not a sufficient basis to dismiss the case at this juncture.

### B.      The Securities Act Claims: § 11, § 12, and § 15

#### 1.      Standing

There is no allegation that any of the plaintiffs purchased notes in or traceable to the August 2013 notes offering, the September 2014 notes offering, or the two December 2014 notes offerings. The underwriter defendants move to dismiss claims relating to those offerings for lack of subject-matter jurisdiction.  These defendants argue that the plaintiffs lack standing to assert claims based on misrepresentations that occurred in offerings for securities they did not purchase.  The plaintiffs respond that because they bought securities offered under shelf registration statements covering both sets of offerings (those in which they made purchases and those in which they did not), and the registration statements contained materially identical misrepresentations, they have standing to assert claims on behalf of absent class members.

The underwriter defendants initially point to basic standing principles.  For each claim, the plaintiff must identify a concrete injury, traceable to the defendant's conduct, that a court can remedy.  *See  Cuno*, 547 U.S. at 352;  *Lujan*, 504 U.S. at 560.  Section 11 of the Securities Act limits the enforceability of the rights it creates to individuals who purchased securities in, or traceable to, the challenged public offering.  *See Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 491-92, 495 (5th Cir. 2005).  Only individuals harmed due to a defendant's violations—those who buy a security sold

under inaccurate offering documents—can sue.  Section 12 of the Securities Act is similarly limited. It allows "the person purchasing" a security from a statutory seller to sue for misrepresentations connected with the sale.  15 U.S.C. § 77l(a)(2).  It follows, the underwriter defendants say, that a plaintiff who purchased securities in offering A cannot sue the participants in offering B for alleged misrepresentations in offering B.  That plaintiff was not injured as a result of those misrepresentations and is a stranger to offering B.

The plaintiffs point out that the Second Circuit holds that a putative class representative *can* sometimes litigate a claim for misrepresentations in a securities offering in which she did not make any purchases.  In *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), the plaintiff purchased securities in some, but not all, of a series of offerings made under a shelf registration statement.  *Id.* at 157-58.  That shelf statement included high-level, general information about the transactions it covered.  The shelf statement was modified by a prospectus supplement specifying the characteristics of the securities in each individual offering.  The plaintiff brought Securities Act claims targeting all of the offerings under the shelf statement, despite the fact that it had purchased securities in only a subset of the offerings.  The defendants moved to dismiss the claims stemming from offerings in which the plaintiff did not purchase securities.  The court rejected that argument.

The plaintiff clearly had constitutional and statutory standing to assert claims stemming from misrepresentations in the offerings in which it had actually purchased securities.  *Id.* at 158.  But the court viewed the plaintiff's "class standing" as distinct from individual standing.  Even though the plaintiff "clearly" lacked standing "to assert such claims on its [own] behalf because it did not purchase those [securities] . . . the class standing analysis is different . . . ."  *Id.*  The court stated that

90

a plaintiff can assert claims in which she has no personal stake if she

> plausibly alleges (1) that he "personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant," . . . and (2) that such conduct implicates "the same set of concerns" as the conduct alleged to have caused injury to other members of the putative class by the same defendants . . . .

*Id.* at 162.  Even though the plaintiff had not purchased securities in several of the offerings, it could still sue as a class representative based on very similar misrepresentations by the same set of defendants also contained in the documents for the offerings in which the plaintiffs did not purchase securities.

In response, the underwriter defendants argue that the Second Circuit's *NECA* class-standing doctrine is incorrect under ordinary standing principles, that the Second Circuit was the first to follow this approach, and that the doctrine has been heavily criticized in cases from outside that circuit.  *See, e.g.*, *Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1058 (D. Minn. 2015); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1229 (C.D. Cal. 2013).  The underwriter defendants also point out that the First Circuit rejected this class-standing theory before *NECA* was decided, but properly recognize that the First Circuit, in dicta, left open the possibility that class standing might be proper along the lines that the *NECA* court identified—when proving the class representative's claim would necessarily prove absent class-members' claims as well.  *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 770 (1st Cir. 2011).

The underwriter defendants argue that, even if the court adopts the Second Circuit's class-standing approach, the plaintiffs do not meet its requirements here.  The underwriter defendants note that the Second Circuit's approach requires both identical defendants and identical issues.  That is not the case here.  There is not a single syndicate of banks underwriting a series of securities

offerings.  Instead, this case involves a rotating cast of underwriters, changing transaction by transaction.  *See* Appendix.  For example, the April 2014 notes offering (the only notes offering in which any plaintiff made a purchase) was underwritten by Citigroup Global Markets, ING Bank, Mitsubishi UFJ Securities, PNC Capital Markets, and UBS Securities.  That was the only notes offering in which Citigroup and UBS participated.  ING Bank participated only in the April 2014 and two December 2014 offerings, and not in the August 2013 or September 2014 offerings. Mitsubishi UFJ Securities participated in the August 2013, April 2014, and December 2014 offerings, but not the September 2014 offering.  PNC Capital Markets underwrote only the August 2013 and April 2014 offerings.  By contrast, lead underwriters of the other offerings, including JP Morgan Securities, Barclays Capital, Merrill Lynch, Pierce, Fenner & Smith, and BNP Paribas Securities, did not participate in the April 2014 offering.  As a result, the defendants argue, the identity of defendants required under *NECA* fails.

Although the specific statements in the various registration papers that the plaintiffs challenge are identical, the underwriter defendants also point out that each statement was made at a different time.  The different misrepresentations alleged—that pipeline integrity was a primary operational emphasis, that Plains exceeded the regulatory mandate, and that Plains was in substantial compliance with relevant legal requirements—could have been true at certain points but false at others.  The plaintiffs would have to demonstrate that each statement was false when made, requiring different evidence for each offering from the middle of 2013 to the end of 2014.  That undoes the identity of interest between the claims arising from the April 2014 notes offering and the claims involving the other notes offerings.  Proving that the April 2014 offering statements were false or misleading does not prove that the other offering statements were false or misleading when

made.  Therefore, proof of the plaintiffs' claims is not proof of absent class-members' claims, and there is no identity of interest as required in *NECA*.

The underwriter defendants have the better argument.  This court disagrees with the reasoning and result in *NECA*.  The Second Circuit based its holding in *NECA* on a review of Supreme Court standing cases addressing the connection between the injury that a representative plaintiff suffered and the relief sought on behalf of a purported class.  The *NECA* court first noted several cases that closely tracked ordinary standing principles.  These cases required that the plaintiff have suffered an "injury in fact," *Lujan*, 504 U.S. at 560, for "each claim," *Cuno*, 547 U.S. at 352, regardless of whether it was pleaded as a class action.  In *Blum v. Yaretsky*, 457 U.S. 991, 1001 & n.13 (1982), the court held that class representatives subject to or threatened with reductions in the level of Medicaid-funded nursing-home care that they would receive could not assert claims about transfers to higher levels of care.  The representative plaintiffs objected that, while they did not face a transfer to a higher level of care, members of the class that they represented did.  The Court rejected that argument:

> Respondents . . . "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).  Unless these individuals "can thus demonstrate the requisite case or controversy between themselves personally and [petitioners], 'none may seek relief on behalf of himself or any other member of the class.' *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)."

*Id.* at 1001 n.13.  The Court held that the plaintiffs could not pursue the claims for increasing levels-of-care.

The *NECA* court then examined *Lewis v. Casey*, 518 U.S. 343 (1996).  In that case, 22 prisoners sued a state prison system, alleging that its law libraries were constitutionally inadequate.

After trial, the district court found that only one named plaintiff had been injured by the alleged deficiencies.  An illiterate prisoner was harmed by the prison's failure to provide services necessary to enable him to present his case to the courts.  The district court nonetheless entered a broad injunction with provisions directed to "non-English speakers, . . . prisoners in lockdown, and . . . the inmate population at large."  *Id.* at 358.  The Court found this injunction improper because the relief ran beyond the specific "inadequacy that produced the injury in fact that the plaintiff has established."  *Id.* at 357.  The Court stated that standing was neither relaxed nor irrelevant because the suit was brought as a class action.  The Court quoted *Warth v. Seldin* for the proposition that the class representative has to show personal injury in order to seek a given form of relief.  It is not enough to show an injury suffered by another.  *Id.*

So far, so good.  These two cases agree that the standing analysis in the class-action context follows the same rules as in other cases.  The next case that the Second Circuit reviewed in *NECA*, *Gratz v. Bollinger*, 539 U.S. 244 (2003), does not conflict with *Blum* or *Lewis*.  In *Gratz*, a student denied admission to the University of Michigan under a race-conscious freshman admission policy, but who had not reapplied for admission as a transfer student under the university's race-conscious transfer admission policy, sought to represent a class of individuals who were not underrepresented minorities and who had applied for admission and been rejected.  The district court certified the class.  At the Supreme Court, Justice Stevens argued in dissent that, under *Blum* and *Lewis*, the class-representative student lacked standing to seek injunctive relief on the freshman admission policy.  The student had already enrolled in another university and did not allege that he would seek readmission as a freshman.  Justice Stevens argued that the transfer admission policy did not operate the same way as the freshman admission policy, and so the student lacked standing to seek

prospective relief as to the freshman admission policy.  *Id.* at 285-87 (Stevens, J., dissenting).

The Court majority first noted that, in at least one prior case, it had treated variations between a plaintiff's individual claims and class claims as a matter of Rule 23 adequacy, not standing.  *Id.* at 263 (majority op.).  The majority acknowledged a "tension" in the cases, because *Blum* and other cases treated this variation as a standing problem.  *Id.* & n.15.  The court sidestepped the problem by finding that the class-representative student had personal standing to litigate the freshman admission policy.  In finding standing, the Court did use the "similar concerns" language that *NECA* relied on.  The Court characterized *Blum* as holding that "transfers to lower levels of care involved a number of fundamentally different concerns than did transfers to higher ones[,]" but found that, "[i]n the present case, the University's use of race in undergraduate transfer admissions does not implicate a significantly different set of concerns than does its use of race in undergraduate freshman admissions."  *Id.* at 264.

After the quoted language about "sets of concerns," the Court reviewed the freshman and transfer admission policies, and held that there were no relevant differences, because each one treated race as near-determinative.  The Court therefore concluded that the university's consideration of race in admissions was a single policy that did not meaningfully vary between freshman and transfer admissions.  The Court held that the student *did* have a "personal stake" sufficient to support his challenge to the freshman admission policy—that is, that he had individual standing to seek prospective relief for freshman applicants.  *Id.* at 268.

The *NECA* court accurately quoted language from *Gratz*'s gloss on *Blum*, but applied the language for a different purpose and with a different result.  The Second Circuit treated this part of *Gratz* as a two-part holding: first, that individuals seeking admission as transfers suffered a different

injury than individuals seeking admission as freshmen, and second, that the different injuries were similar enough that a class representative subject to one admissions policy could represent individuals who had been subject to the other policy. *See NECA*, 693 F.3d at 162. That is not what this part of *Gratz* held. Rather, it held that, because there were no significant relevant differences between the operation of the freshman and transfer policies, the freshman applicants and transfer applicants suffered the same injury. The student plaintiff had individual standing and could pursue prospective relief for freshman applicants.

This understanding of what the Supreme Court held in *Gratz* removes the tension between it on the one hand and *Blum* and *Lewis* on the other.[13] All three cases use the usual rules of standing in the class-action context. If the plaintiff has individual standing to assert a claim, she may do so on behalf of a class of persons similarly situated. If she does not have individual standing to assert a claim, she may not do so even if she meets the other Rule 23(a) requirements.[14]

---

[13] Although the plaintiffs did not raise the argument, this court is unpersuaded that the existence of some stray Supreme Court cases that treat variance between the class representative's personal claims and the relief sought on behalf of the class as a class certification problem implicating Rule 23 adequacy issues rather than standing, *e.g.*, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982); *Sosna v. Iowa*, 419 U.S. 393 (1975), has any bearing on the correct analysis. Those opinions predate *Blum* and *Lewis*, which *do* treat the variance problem as a standing issue, and this court will follow the Supreme Court's more recent pronouncements on the subject. Further, this court notes that both *Falcon* and *Sosna* predate the Court's modern trend toward more rigorous articulation and enforcement of Article III justiciability doctrines, typified by *Lujan*.

[14] The Second Circuit's approach in *NECA* also produces results that sit uneasily with federal-court jurisdiction. Filing a putative class action has, with exceptions like tolling limitations, no legal effect on potential class-members until the court approves a motion to certify and the opt-out period expires. Until then, a claim pleaded on behalf of a class is legally identical to a claim pleaded on behalf of the individual plaintiff. A decision dismissing a proposed claim issued before certification binds only the named plaintiffs, even if it was also pleaded on behalf of a class. *See Smith v. Bayer Corp.*, 564 U.S. 299, 315 & n.11 (2011). When a putative class claim is dismissed before certification, preclusion does not bar an absent putative class member from filing an identical claim. *Id.*

This principle sits uncomfortably with the rule in *NECA*. Assume a class representative brings a claim for which he lacks personal standing, but has "class action standing" under the Second Circuit's theory. The defendant moves to dismiss the class standing claim for failure to state a claim, and the court grants the

Even if this court followed *NECA*, the plaintiffs lack standing here. *NECA* requires both identity of defendants and identity of interests between the representative and the absent putative class members. In this case, the "class standing" claims are not asserted against the same defendants as the claims for which the plaintiffs have individual standing, and will require different evidence to prove. The named plaintiffs with no standing to assert individual claims have no personal incentive to show that the representations in the Plains securities offering documents in four of the notes offerings were false when made. Proof that the statements were false in April 2014 does not necessarily show that they were false in August 2013, September 2014, or December 2014, and each underwriter defendant could raise a due-diligence defense. *See In re Morgan Stanley*, 592 F.3d at 360 n.7. The named plaintiffs have no claim, and therefore no incentive to litigate whether the banks underwriting the offerings in which they did not purchase securities made a legally sufficient reasonable investigation into whether the statements in the offering documents were true when made. Even if the court accepted the plaintiffs' class standing approach, the claims at issue in this case would not qualify.

The plaintiffs' claims under § 11 and § 12(a)(2) of the Securities Act for all of the notes offerings save for the April 2014 notes offering are dismissed for lack of subject-matter jurisdiction.

### 2.    Rule 9(b)'s Particularization Requirement

The plaintiffs' Securities Act allegations and Exchange Act allegations are substantively

---

motion. The court's order dismissing the class standing claim does not have any binding effect on the named plaintiff, since she could not have brought the claims on her own behalf or recovered damages on them. But the order also does not have any binding effect on the defendant or the putative class members on whose behalf the claim was brought, because no class was certified. (Under *Smith*, the absent putative class members could file an identical complaint, and the defendant could not use the order dismissing the class standing claim as a shield.) In short, it is not clear that the order dismissing the class standing claim would affect anyone's rights, bringing it perilously close to an impermissible advisory opinion.

identical.  Each statement that the plaintiffs identify as a Securities Act violation is also the basis

of an alleged Exchange Act violation.  The plaintiffs allege that these statements are false or

misleading under the Securities Act for the same reasons they alleged showed both falsity and

scienter under the Exchange Act.  *Compare* Compl. ¶ 244 *with id.* ¶ 290.  The Securities Act claims

sound in fraud and the plaintiffs' boilerplate disavowal of an intent to plead fraudulent conduct,

Compl. ¶ 276, is unpersuasive.  *Melder*, 27 F.3d at 1100 n.6; *Kurtzman*, 2002 WL 32442832, at *24;

*In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1405 n.2; *In re Am. Bank Note Holographics, Inc. Sec. Litig.*,

93 F. Supp. 2d at 440.

### 3.    The Securities Act Claims

None of the statements in Plains's SEC filings are actionably misleading.  Because the

plaintiffs' Securities Act allegations sound in fraud and are subject to the same particularized

pleading requirement as the Exchange Act allegations, the analysis and result are the same.  The

court need not sift through the plaintiffs' allegations to try to find actionable "lesser included" strict

liability and negligence allegations.  *Schlotzsky's*, 238 F.3d at 368.  Because none of the statements

on which the plaintiffs base their Securities Act claims are actionably false or misleading, the claims

are dismissed, without prejudice and with leave to amend.

## V.    Conclusion and Order

For the reasons stated, the plaintiffs' claims are dismissed, without prejudice and with leave

to amend.  The plaintiffs must file their amended complaint by **May 15, 2017.**

SIGNED on March 29, 2017, at Houston, Texas.

Lee H. Rosenthal

Chief United States District Judge

98

## APPENDIX

The plaintiffs allege that the Underwriter Defendants participated in Plains securities offerings as follows:

- Barclays Capital, Inc. was an underwriter of the IPO, the Plains Offering, and the September and December 2014 notes offerings.  *Id.* ¶ 42.

- BB&T Capital Markets was an underwriter of the IPO and the August 2013 notes offering. *Id.* ¶ 43.

- BBVA Securities, Inc. was an underwriter of the IPO and all of the notes offerings.  *Id.* ¶ 44.

- BMO Capital Markets Corp. was and underwriter of the August 2013 notes offering, the September 2014 notes offering, and the December 2014 notes offering.  *Id.* ¶ 45.

- BNP Paribas Securities Corp. was an underwriter of the IPO, the August 2013 notes offering, and the September 2014 notes offering.  *Id.* ¶ 46.

- CIBC World Markets Corp. was an underwriter of the IPO and all of the notes offerings.  *Id.* ¶ 47.

- Citigroup Global Markets Inc. was an underwriter of the IPO, the Secondary Offering, and the April 2014 notes offering.  *Id.* ¶ 48.

- Deutsche Bank Securities Inc. was an underwriter of the IPO and the December 2014 notes offering.  *Id.* ¶ 49.

- DNB Markets, Inc. was an underwriter of the IPO, the August 2013 notes offering, and the September 2014 notes offering.  *Id.* ¶ 50.

- Fifth Third Securities, Inc. was an underwriter of all of the notes offerings.  *Id.* ¶ 51.

- Goldman, Sachs & Co. was an underwriter of the IPO and the Secondary Offering.  *Id.* ¶ 52.

- ING Bank N.V. was an underwriter of the April 2014 and December 2014 notes offerings. *Id.* ¶ 53.

- ING Financial Markets, LLC, was an underwriter of the IPO, the August 2013 notes offering, and the September 2014 notes offering.  *Id.* ¶ 54.

- JP Morgan Securities, LLC, was an underwriter of the IPO, the Secondary Offering, the August 2013 notes offering, and the September 2014 notes offering.  *Id.* ¶ 55.

- Ladenburg Thallman & Co., Inc., was an underwriter of the IPO.  *Id.* ¶ 56.

- Merrill Lynch Pierce Fenner & Smith, Inc., was an underwriter of the IPO, the Secondary Offering, and the August 2013 and September 2014 notes offerings.  *Id.* ¶ 57.

- Mitsubishi UFJ Securities (USA), Inc., was an underwriter of the IPO, the August 2013 notes offering, the April 2014 notes offering, and the December 2014 notes offering.  *Id.* ¶ 58.

- Mizuho Securities USA, Inc., was an underwriter of the IPO, the August 2013 notes offering, and the September 2014 notes offering.  *Id.* ¶ 59.

- Morgan Stanley & Co., LLC, was an underwriter of the IPO and the Secondary Offering. *Id.* ¶ 60.

- Oppenheimer & Co., Inc., was an underwriter of the IPO.  *Id.* ¶ 60.

- Piper Jaffray & Co. was an underwriter of the IPO.  *Id.* ¶ 61.

- PNC Capital Markets, LLC, was an underwriter of the IPO, the August 2013 notes offering, the April 2014 notes offering, and the December 2014 notes offering.  *Id.* ¶ 63.

- Raymond James & Associates, Inc., was an underwriter of the IPO and the Secondary Offering.  *Id.* ¶ 64.

- RBC Capital Markets, LLC, was an underwriter of the IPO and the August 2013 and December 2014 notes offerings.  *Id.* ¶ 65.

- Regions Securities LLC was an underwriter of the IPO and all of the notes offerings. *Id.* ¶ 66.

- Robert W. Baird & Co., Inc., was an underwriter of the IPO.  *Id.* ¶ 67.

- Scotia Capital (USA), Inc., was an underwriter of the IPO, the August 2013 notes offering, and the April and December 2014 notes offerings.  *Id.* ¶ 68.

- SG Americas Securities, LLC, was an underwriter of the IPO, the August 2013 notes offering, the September 2014 notes offering, and the December 2014 notes offering.  *Id.* ¶ 69.

- Simmons & Company International was an underwriter of the IPO.  *Id.* ¶ 70.

- SMBC Nikko Securities of America, Inc., was an underwriter of the IPO and all of the notes offerings.  *Id.* ¶ 71.

- Stephens, Inc., was an underwriter of the IPO.  *Id.* ¶ 72.

- Stifel, Nicolaus & Company, Inc., was an underwriter of the IPO.  *Id.* ¶ 73.

- SunTrust Robinson Humphrey was an underwriter of the IPO and the April and December 2014 notes offerings.  *Id.* ¶ 74.

- Tudor, Pickering, Holt & Co. Securities, Inc. was an underwriter of the IPO.  *Id.* at ¶ 75.

- UBS Securities, LLC, was an underwriter of the IPO, the Secondary Offering, and the April 2014 notes offering.  *Id.* ¶ 76.

- US Bancorp was an underwriter of all of the notes offerings.  *Id.* ¶ 77.

- USCA Securities LLC was an underwriter of the IPO.  *Id.* ¶ 77.

- Wells Fargo Securities, LLC, was an underwriter of the IPO, the Secondary Offering, and the April and December 2014 notes offerings.  *Id.* ¶ 79.