UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| In re PLAINS ALL AMERICAN PIPELINE, L.P. SECURITIES LITIGATION | § § § | Lead Case No. 4:15-cv-02404 |
| | § | <u>CLASS ACTION</u> |
| This Document Relates To: | § § | Judge Lee H. Rosenthal |
| ALL ACTIONS. | § § § | |

**SECOND AMENDED CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................1

II.    NATURE OF THE ACTION ..................................................................2

III.   JURISDICTION AND VENUE ..............................................................6

IV.   PARTIES ..............................................................................................7

    A.    Plaintiffs...........................................................................................7

    B.    Entity Defendants............................................................................8

    C.    Officer Defendants........................................................................10

    D.    Director Defendants ......................................................................13

    E.    Underwriter Defendants ................................................................15

V.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ........................28

    A.    Plains' Relevant Operations and Applicable Legal Framework..........................28

    B.    Plains' Pre-Class Period Maintenance and Safety Deficiencies Resulted in a Consent Decree with the EPA....................................32

    C.    Plains Created a New Corporate Image to Lure Investors by Purporting to Implement Enhanced Safety and Maintenance Initiatives....................................33

    D.    The Spill........................................................................................38

    E.    Governmental Inspections and Investigations of Lines 901 and 903 ...................42

        1.    March 4, 2009 PHMSA Letter to Nerbonne................................42

        2.    December 24, 2013 PHMSA Warning Letter to Valenzuela....................44

        3.    May 21, 2015 PHMSA Corrective Action Order ......................45

        4.    June 3, 2015 PHMSA Corrective Action Order – Amendment No. 1........................................................................................45

        5.    September 11, 2015 Notice of Probable Violation and Proposed Compliance Order........................................................46

        6.    November 12, 2015 Corrective Action Order – Amendment No. 2..........50

        7.    May 16, 2016 Indictment................................................................52

        8.    May 19, 2016 PHMSA Failure Investigation Report ................................52

1264030_1

**Page**

F.  Plains' Testing, Enhanced Corrosion Control, Leak Detection, and Damage Prevention Program Deficiencies Were Pervasive System-Wide ..........55

G.  Plains' Legal and Regulatory Compliance Failures and the Company's Material Pipeline Integrity Deficiencies Were Recorded, Processed, Summarized and Communicated to the Individual Defendants ..........................61

H.  Plains' Officers Reported and Discussed with the Audit Committee Potential and Actual Failures to Comply with Laws and Regulations .................63

I.  Armstrong and Swanson Certified that Plains' Numerous Pipeline Integrity Deficiencies and Material Failures to Comply with Laws and Regulations Were Timely Reported to Them ........................................67

J.  Details About Pipeline Integrity Deficiencies Were Provided to Senior Executive Officers to Review and Certify in Annual Integrity Management Performance Reports to PHMSA ....................................67

K.  The Company's Material Failures to Comply with Laws and Regulations Were Waived and Approved by Plains' Senior Executive Officers as Required by Plains' Code of Business Conduct ....................................69

L.  The Officer Defendants Were Incentivized to Minimize Expenditures on Pipeline Maintenance and Safety in Order to Increase Profits and Thereby Increase Distributions to Themselves ....................................70

M.  Defendants Knew Line 901 Had Reached or Exceeded Its Useful Life ...............74

N.  Decreasing Volumes Motivated Defendants to Look the Other Way As Lines 901 and 903 Deteriorated ..........................................75

VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD .................................77

A.  Defendants' False and Misleading Statements and Omissions Concerning Plains' Integrity Management Program ....................................77

1.  Defendants' Statements About Plains' Integrity Management Program Were False and Misleading and Omitted Material Facts: Due to Regulatory Violations, the Company's Smart Pig In-Line Inspections Undercalled Corrosion on Lines 901 and 903 ........................84

2.  Defendants' Statements About Plains' Integrity Management Program Were False and Misleading and Omitted Material Facts: Plains Failed to Evaluate or Conduct Mitigative Measures for Lines 901 and 903 ..........................................101

3.  Defendants' Statements About Plains' Integrity Management Program Were False and Misleading and Omitted Material Facts: Plains' Cathodic Protection System Provided Ineffective Protection Against External Corrosion of Lines 901 and 903....................................126

**Page**

       4.     Defendants' Statements About Plains' Integrity Management Program Were False and Misleading and Omitted Material Facts: Plains' Leak Detection System Was Deficient and the Company Failed to Provide Proper Training ............................................................... 139

    B.    Defendants False and Misleading Statements and Omissions About Plains' Spill Response Capabilities .................................................................... 150

    C.    Defendants False and Misleading Statements and Omissions About the Spill Size .......................................................................................... 162

    D.    Defendants' False and Misleading Statements and Omissions About Legal Compliance ....................................................................................... 168

VII.    LOSS CAUSATION ..................................................................................... 190

VIII.    NO SAFE HARBOR .................................................................................... 194

IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE ................... 195

X.    CLASS ACTION ALLEGATIONS ............................................................ 197

XI.    CLAIMS FOR RELIEF ............................................................................... 198

    COUNT I ..................................................................................................... 198

    COUNT II .................................................................................................... 200

    COUNT III ................................................................................................... 201

    COUNT IV ................................................................................................... 202

    COUNT V .................................................................................................... 204

    COUNT VI ................................................................................................... 205

XII.    PRAYER FOR RELIEF ............................................................................... 206

XIII.    JURY DEMAND ......................................................................................... 207

## GLOSSARY OF TERMS AND ABBREVIATIONS

| Defined Term | Definition |
|---|---|
| 2010 Consent Decree | The consent decree the Company entered into with the EPA just weeks after the EPA filed suit under which the Company agreed to pay significant fines and adopt new safety measures. |
| AAP | Plains AAP, L.P. |
| April 2014 Notes Offering | Plains' 4.7% senior notes due 2044 pursuant and traceable to the public offering conducted on or about April 15, 2014. |
| April 2014 Notes Offering Materials | Plains Shelf |
| | Plains Prospectus |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 dated Apr. 15, 2014 and filed on Apr. 15, 2014. |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 dated Apr. 15, 2014, and filed on Apr. 16, 2014, and signed by PAA GP LLC, GP LLC, AAP and McGee. |
| | Form 8-K: Underwriting Agreement dated Apr. 15, 2014, filed on Apr. 18, 2014, and signed by PAA GP LLC, GP LLC, AAP and McGee. |
| August 2013 Notes Offering | Plains' 3.85% senior notes due 2023 pursuant and traceable to the public offering conducted on or about August 8, 2013. |
| August 2013 Notes Offering Materials | Plains Shelf |
| | Plains Prospectus |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 dated Aug. 8, 2013, and filed on Aug. 8, 2013. |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 dated Aug. 8, 2013, and filed on Aug. 9, 2013. |
| | Form 8-K: Underwriting Agreement dated Aug. 8, 2013, filed on Aug. 12, 2013, and signed by PAA GP LLC, GP LLC, AAP and McGee. |
| CEO | Chief Executive Officer. |
| Class | All persons who purchased or otherwise acquired Plains common units, Plains Holdings Class A shares, and the Notes Offerings during the Class Period.  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest. |

Page

| Defined Term | Definition |
|---|---|
| Class Period | Period between February 27, 2013 and August 5, 2015 during which common units of Plains All American Pipeline, L.P. were purchased and period between October 16, 2013 and August 5, 2015 during which Class A shares of Plains GP Holdings, L.P. were purchased. |
| CIS | Close internal survey. |
| Consent Decree | The consent decree the Company entered into with the EPA just weeks after the EPA filed suit under which the Company agreed to pay significant fines and adopt new safety measures. |
| CWA | Clean Water Act. |
| December 2014 Notes Offering | Plains 2.6% senior notes due 2019 and 4.9% senior notes due 2045 pursuant and traceable to the public offering conducted on or about December 2, 2014. |
| December 2014 Notes Offering Materials | Plains Shelf |
| | Plains Prospectus |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 dated Dec. 2, 2014, and filed on Dec. 3, 2014. |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 dated Dec. 2, 2014, and filed on Dec. 2, 2014. |
| | Form 8-K: Underwriting Agreement dated Dec. 2, 2014, filed on Dec. 4, 2014, and signed by PAA GP LLC, GP LLC, AAP and McGee. |
| EPA | U.S. Environmental Protection Agency. |
| Equities Offerings | The Plains Offering together with the IPO and Plains Holdings Secondary Offering. |
| Equities Offerings Materials | IPO Offering Materials, Plains Holdings Secondary Offering Materials, and Plains Offering Materials |
| Exchange Act | Securities Exchange Act of 1934. |
| FLS | Plains forward-looking statements issued during the Class Period. |
| FOSC | Federal On Scene Coordinator. |
| GP LLC | Plains All American GP LLC. |
| HCAs | High consequence areas |
| HLPSA | Hazardous Liquids Pipeline Safety Act of 1979. |
| IDRs | Incentive distribution rights. |
| ILI | In-line inspection. |
| IM | Integrity Management. |
| IMP | Integrity Management Program. |

Page

| Defined Term | Definition |
|---|---|
| IPO | Plains Holdings' Class A Shares pursuant and traceable to its initial public offering conducted on or about October 16, 2013. |
| IPO Offering Materials | Form S-1: Registration Statement 333-190227, filed on July 29, 2013, and signed by Holdings LLC, Armstrong, Swanson, Herbold, Raymond, and Sinnott. |
| | Form S-1/A: Am. No. 1 333-190227, filed on Sept. 6, 2013, and signed by Holdings LLC, Armstrong, Swanson, Herbold, Raymond, and Sinnott. |
| | Form S-1/A: Am. No. 2 333-190227, filed on Sept. 26, 2013, and signed by Holdings LLC, Armstrong, Swanson, Herbold, Raymond, and Sinnott. |
| | Form S-1/A: Am. No. 3 333-190227, filed on Oct. 2, 2013, and signed by Holdings LLC, Armstrong, Swanson, Herbold, Raymond, and Sinnott. |
| | Form S-1/A: Am. No. 4 333-190227, filed on Oct. 7, 2013, and signed by Holdings LLC, Armstrong, Swanson, Herbold, Raymond, and Sinnott. |
| | Rule 424(b)(4) Prospectus 333-190227 dated Oct. 15, 2013, and filed on Oct. 16, 2013. |
| | Form 8-K: Underwriting Agreement dated Oct. 15, 2013, filed on Oct. 21, 2013, and signed by Holdings LLC and McGee. |
| June 3 CAO | The amended Corrective Action Order issued by PHMSA on June 3, 2015 that revealed that there was "extensive external corrosion" on Line 901 and also identified "extensive corrosion" and other deficiencies on adjoining Line 903 and required Plains to take additional corrective actions, including shutting down Line 903. |
| May 21 CAO | The Corrective Action Order issued by PHMSA on May 21, 2015, requiring Plains to take corrective actions with respect to Line 901 in order to protect the public, property and the environment from potential hazards caused by the spill. |
| MLP | Master limited partnership. |
| MOC | Management of Change. |
| NACE | National Association of Corrosion Engineers |
| Notes Offerings | The December 2014 Notes Offerings together with the August 2013 Notes Offering, the April 2014 Notes Offering, and the September 2014 Notes Offering. |
| Notes Offerings Materials | August 2013 Notes Offering Materials, April 2014 Notes Offering Materials, September 2014 Notes Offering Materials, and December 2014 Notes Offering Materials |

Page

| Defined Term | Definition |
|---|---|
| November 12 CAO | Amendment No. 2 to the May 21 CAO sent to Troy Valenzuela, Plains' Vice President of Environmental Health and Safety, on November 12, 2015, which contained additional findings and required Plains to take additional corrective actions with respect to Lines 901 and 903. |
| NRC | National Response Center. |
| NYSE | New York Stock Exchange. |
| Offering Materials | The Notes Offerings Materials and the Equities Offerings Materials. |
| Offerings | The Notes Offerings together with the Equities Offerings. |
| OPA | Oil Pollution Act. |
| PAA Finance | PAA Finance Corp. |
| PHMSA | Pipeline and Hazardous Materials Safety Administration. |
| Pipeline Safety Act | Hazardous Liquids Pipeline Safety Act of 1979. |
| Plains Holdings Secondary Offering | Plains Holdings' Class A Shares pursuant and traceable to the public offering conducted on or about November 12, 2014. |
| Plains Holdings Secondary Offering Materials | Form S-3: Shelf Registration Statement 333-199903, filed on Nov. 6, 2014, and signed by PAGP, Holdings LLC, Armstrong, Swanson, Herbold, Pefanis, Burk, Goyanes, Raymond, Shackouls, Sinnott, and Sutil. |
| | Rule 424(b)(1) Prospectus 333-199903 dated Nov. 10, 2014, and filed on Nov. 12, 2014. |
| | Form 8-K: Underwriting Agreement dated Nov. 10, 2014, filed on Nov. 13, 2014, and signed by Holdings LLC and McGee. |
| Plains Offering | Plains' shares pursuant and traceable to the public offering on or about February 26, 2015. |
| Plains Offering Materials | Plains Shelf |
| | Plains Prospectus |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 dated Feb. 25, 2015, and filed on Feb. 25, 2015. |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 dated Feb. 26, 2015, and filed on Feb. 27, 2015. |
| | Form 8-K: Underwriting Agreement dated Feb. 25, 2015, filed on Mar. 2, 2015, and signed by PAA GP LLC, GP LLC, AAP and McGee. |
| Plains Prospectus | Prospectus dated Sep. 27, 2012 forming a part of the Plains Shelf, and filed on Sep. 27, 2012. |

Page

| Defined Term | Definition |
|---|---|
| Plains Shelf | Form S-3: Shelf Registration Statement 333-184137, filed on Sept. 27, 2012, and signed by Plains, PAA GP LLC, Plains AAP, L.P., GP LLC, Armstrong, Swanson, Herbold, Pefanis, Goyanes, Petersen, Raymond, Sinnott, Sutil, Symonds, and Temple. |
| Rule 10b-5 | SEC Rule 10b-5, 17 C.F.R. §2401.10b-6. |
| SEC | Securities and Exchange Commission. |
| Securities Act | §§11, 12, and 15 of the Securities Act of 1933. |
| September 11 Compliance Order | Notice of Probable Violation and Proposed Compliance Order sent to Troy Valenzuela, Plains' Vice President of Environmental Health and Safety, on September 11, 2015. |
| September 2014 Notes Offering | Plains 3.6% senior notes due 2024 pursuant and traceable to the public offering conducted on or about September 2, 2014. |
| September 2014 Notes Offering Materials | Plains Shelf |
| | Plains Prospectus |
| | Rule 424(b)(2) Preliminary Prospectus Supplement 333-184137 dated Sep. 2, 2014, and filed on Sep. 2, 2014. |
| | Rule 424(b)(5) Prospectus Supplement 333-184137 dated Sep. 2, 2014, and filed on Sep. 4, 2014. |
| | Form 8-K: Underwriting Agreement dated Sep. 2, 2014, filed on Sep. 5, 2014, and signed by PAA GP LLC, GP LLC, AAP and McGee. |
| SOX | Sarbane-Oxley Act of 2002. |
| SRCR | Safety Related Condition Reports. |

## I.      INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased Plains All American Pipeline, L.P. ("Plains," "PAA," or the "Company") Common Units between February 27, 2013 and August 5, 2015 (the "Class Period"), and the Class A Shares of Plains GP Holdings, L.P. ("Plains Holdings" or "PAGP") between October 16, 2013 and August 5, 2015, for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. §2401.10b-6 ("Rule 10b-5") promulgated thereunder.

2.      Plaintiffs also bring claims under §§11, 12, and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons who purchased:

(i)      Plains Holdings' Class A Shares pursuant and traceable to its initial public offering conducted on or about October 16, 2013 (the "IPO");

(ii)      Plains Holdings' Class A Shares pursuant and traceable to the public offering conducted on or about November 12, 2014 (the "Plains Holdings Secondary Offering");

(iii)      Plains shares pursuant and traceable to the public offering on or about February 26, 2015 (the "Plains Offering" and, together with the IPO and Plains Holdings Secondary Offering, the "Equities Offerings");

(iv)      Plains 3.85% senior notes due 2023 pursuant and traceable to the public offering conducted on or about August 8, 2013 (the "August 2013 Notes Offering");

(v)      Plains 4.7% senior notes due 2044 pursuant and traceable to the public offering conducted on or about April 15, 2014 (the "April 2014 Notes Offering");

(vi)      Plains 3.6% senior notes due 2024 pursuant and traceable to the public offering conducted on or about September 2, 2014 (the "September 2014 Notes Offering"); and

(vii)      Plains 2.6% senior notes due 2019 and 4.9% senior notes due 2045 pursuant and traceable to the public offering conducted on or about December 2, 2014 (the "December 2014 Notes Offerings" and, together with the August 2013 Notes Offering, the April 2014 Notes Offering, and the September 2014 Notes Offering,

the "Notes Offerings") (the Notes Offerings, together with the Equities Offerings, are herein referred to as the "Offerings").[1]

3.     Plaintiffs' Securities Act claims arise from false and misleading statements or omissions in the "Offering Materials" (as defined in the Glossary of Terms and Abbreviations, *supra*).

4.     Plaintiffs, individually and on behalf of all others similarly situated, by and through their counsel, allege the following based upon personal knowledge as to plaintiffs and plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Plains, Plains Holdings and PAA Finance Corp. ("PAA Finance"), media reports, analyst reports, conference call transcripts and investor presentations, reports issued by governmental agencies about the Company, and documents obtained from government sources, as well as consultation with industry experts, interviews with former Plains employees, and interviews with former employees of a Plains contractor.

## II.    NATURE OF THE ACTION

5.     This securities class action arises from defendants' false statements and omissions to investors, which concealed pervasive oil pipeline monitoring and maintenance failures, repeated failures to comply with federal regulations and mandates, and other misconduct that led to the largest oil spill in California in 25 years.  Plains is one of the largest crude oil and other liquid energy pipeline operators in the United States.  Throughout the Class Period, defendants represented that Plains' pipelines were in compliance with applicable regulations, that pipeline integrity and maintenance was Plains' "***primary operational emphasis***" and a "***core value***," and that the Company

---

[1]     In light of the Court's March 29, 2017, Order, the August 2013 Notes Offering, September 2014 Notes Offering, and December Notes Offerings are included in this Complaint in order to preserve all rights related to claims arising out of those offerings.

had undertaken significant measures to prevent oil spills, ensure its pipelines' integrity, and minimize the damage any such incidents may cause.  Defendants even promised that they had "implemented" pipeline maintenance and integrity measures that went "***beyond regulatory mandate***" in high consequence areas.  Further, in an effort to mitigate a history blemished by multiple oil spills, defendants specifically assured investors during the Class Period that they had adopted significant measures to remedy their past record, including through "pipeline integrity measures" that complied with or exceeded the requirements of a consent order entered into with the U.S. Environmental Protection Agency ("EPA").

6.      Defendants' representations were false.  In reality, the Company systematically eschewed pipeline integrity in an effort to reduce expenses, and defendants also knowingly or recklessly disregarded multiple red flags indicating widespread pipeline integrity problems at the Company, violations of the laws and regulations governing the Company's operations in high consequence areas ("HCAs"), and severe problems with Plains' Lines 901 and 903, two crude oil pipelines that run through Santa Barbara County, and during the Class Period comprised 9-10% of Plains' interstate crude oil pipelines in HCAs, and 15-18% of those affecting commercially navigable water and sensitive ecological resources.  As described herein, contrary to defendants' representations, Plains had inadequate and ineffective pipeline integrity monitoring and maintenance procedures, spill response plans and protocols, and did not comply with federal regulations pertaining to the maintenance and operation of its pipelines – let alone develop and implement enhanced "integrity measures that go beyond [its] regulatory mandate," which was specifically required by regulation for Lines 901 and 903.

7.      Defendants knew about, or recklessly disregarded, Plains' pipeline integrity problems and violations through, among other things, warnings from Pipeline and Hazardous Materials Safety Administration ("PHMSA") – the federal agency responsible for regulating Lines 901 and 903 – and

Plains' inspections of Lines 901 and 903.  In fact, during the Class Period, Plains stated in Form 8-K filings with the SEC that material information concerning Plains and its subsidiaries – which would include the material legal and regulatory violations alleged herein as well as the material problems with Lines 901 and 903 – was "recorded, processed, summarized, and communicated to" the Individual Defendants each reporting period.  Furthermore, PHMSA regulations required that a Plains "senior executive" sign "integrity management program performance reports."  The signatures certified that the senior executive had "(1) reviewed the Report and (2) to the best of his or her knowledge, believes the Report is true and complete."  During the Class Period, "the Report[s]" were issued yearly and contained, among other information, the results of pipeline inspections in HCAs (including the number and severity of anomalies found), and "all actions taken" as a result of the inspections.

8.      Pursuant to the Company's audit committee charter, Defendants Armstrong, Pefanis, Swanson and McGee and their direct reports, were required to provide reports to the audit committee each quarter "with respect to compliance by each" Plains entity subsidiary, and affiliate "with applicable legal requirements."  Defendant McGee then discussed with the audit committee the legal matters "that *may* (a) have an impact on PAGP's of PAA's financial statements, or (b) result in material non-compliance by PAGP, PAA GP, LLC or the Company with legal or regulatory requirements."

9.      The substantial pipeline integrity problems and material legal and regulatory violations concealed by Defendants' Class Period false statements resulted in disaster.  On May 19, 2015, Line 901 ruptured, spilling up to 143,000 gallons of crude oil into sensitive marine habitats, populated community areas and the Pacific Ocean along the scenic Santa Barbara coastline.  Line 901, along with Line 903, made up Plains' All American Pipeline, and was a segment that defendants told regulators was "***state-of-the-art***" and from which a spill would be "***extremely***

- 4 -

*unlikely*."   In contrast to their representation to regulators that "[t]he risk and hazard analysis [conducted on Lines 901 and 903] concluded that the potential for a leak [due] to corrosion is *adequately mitigated*," the spill in Santa Barbara was the result of Plains' systematic failure to properly address pipeline corrosion and the deliberate disregard of information showing that Line 901's rupture was inevitable.   Moreover, despite defendants' representations about safety and corrosion control on Lines 901 and 903, regulators ordered defendants to shut down Line 903 shortly after the Santa Barbara oil spill because of Line 903's history of anomalies and "the similarities between the characteristics of [Line 901] and Line 903."  PHMSA later concluded that, contrary to defendants' Class Period false statements, Lines 901 and 903 had extensive, "similar corrosion characteristics" and that, in light of the extensive corrosion, "*it does not appear that Plains has an effective corrosion control program*."

10.      In the days immediately following the spill, defendants sought to reassure investors that the situation was under control, the spill was contained, the Company's response was appropriate, and that the damage inflicted was minimal.  Specifically, Plains reported that its "worst case scenario" for the spill was that 21,100 gallons of crude oil had been dumped into the Pacific Ocean and that as many as 105,000 gallons in total had been released from Line 901.  In a subsequent Form 8-K dated May 26, 2015, Plains revised its total estimate *downward* by 4,000 gallons to 101,000 gallons.

11.      By the end of the Class Period, however, Plains disclosed that – contrary to its publicly reported "worst case scenario" – Plains had internally concluded that the spill could actually be 42,000 gallons greater – a more than 40% increase.  Plains also disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, that the Company could be liable for criminal violations of the Clean Water Act, and that the Company

estimated it would cost millions to remediate the spill and satisfy potential criminal and civil penalties.

12.     Plains' Class Period misrepresentations covered up serious conditions and legal violations, which led directly Line 901's rupture and 903's closure.  Ultimately, the spill cost Plains at least $269 million before even accounting for lost revenues from the shutdown of Lines 901 and 903.  The Company and its employee were indicted on four felony and 42 misdemeanor counts. Plains' largest clients, ExxonMobil and Venoco, had to shut down their drilling platforms with no means to transport the oil, and over 200 of their employees were relocated as Plains continued to have no timeline for restarting the pipelines.  As Armstrong admitted, "[w]e had a release in Santa Barbara, County.  If you could pick any place in the world you would not want to have a release, that would probably qualify as the one."

13.     In the wake of the disclosures revealing the true state of the Company's deficient pipeline maintenance and monitoring protocols, as well as the materialization of the risks those deficiencies caused and that were manifested in the Santa Barbara spill, Plains securities plunged in value, wiping out billions in market capitalization.  Specifically, Plains' Common Units lost approximately one-third of their value, Plains Holdings' Class A Shares fell 15% from their IPO price, and the senior notes have also declined substantially in value.  Through this action, plaintiffs seek to recover the damages that plaintiffs and other Class members have suffered as a result of defendants' violations of the federal securities laws, and the resultant decline in the value of their investments in Plains and Plains Holdings.

## III.   JURISDICTION AND VENUE

14.     The claims asserted arise under §§10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, as well as §§11, 12 and 15 of the Securities Act.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities

1264030_1

Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa.  Venue is proper pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Defendants have operations in this District and acts giving rise to the violations complained of herein, including the dissemination of materially false and misleading statements, occurred in this District.

15.     In connection with the acts alleged in this complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation, the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## IV.   PARTIES

### A.     Plaintiffs

16.     Lead plaintiff IAM National Pension Fund ("IAM") is a multi-employer defined benefit plan administered by a board of trustees that has provided retirement protection for members of the International Association of Machinists and Aerospace Workers and their families for over 50 years.  IAM has approximately $10.9 billion in assets and pays pension benefits to over 90,000 retirees and beneficiaries.  IAM purchased Plains and Plains Holdings securities on the open market during the Class Period and was damaged as a result of defendants' wrongdoing as alleged in this complaint.

17.     Additional plaintiff City of Warren Police and Fire Retirement System ("Warren P&F") is a single employer, defined benefit governmental retirement system providing retirement, disability and death benefits to active and retired police officers and firefighters of the City of Warren, Michigan.  Warren P&F purchased 4.7% Plains notes in the April 2014 Notes Offerings and was damaged thereby.

18.     Additional plaintiff Ming Liu ("Liu") purchased Plains Holdings securities at artificially inflated prices during the Class Period and was damaged as a result of defendants'

wrongdoing as alleged in the complaint.  Liu purchased Plains Holdings Class A Shares in the IPO and was damaged thereby.

19.     Additional plaintiff the Jacksonville Police and Fire Pension Fund ("Jacksonville P&F") is a single employer, defined benefit governmental retirement system providing retirement, disability and death benefits to active and retired police officers and firefighters of the Consolidated City of Jacksonville, Florida.  Jacksonville P&F purchased Plains and Plains Holdings securities at artificially inflated prices during the Class Period and was damaged as a result of defendants' wrongdoing as alleged in this complaint.  Specifically, Jacksonville P&F purchased Plains Holdings Class A Shares in both the IPO and the Plains Holdings Secondary Offering and was damaged thereby.

20.     Additional plaintiff the Police and Fire Retirement System of the City of Detroit ("Detroit P&F") is a single employer, defined benefit governmental retirement system providing retirement, disability and death benefits to active and retired police officers and firefighters of the City of Detroit, Michigan.   Detroit P&F purchased Plains and Plains Holdings securities at artificially inflated prices during the Class Period and was damaged as a result of defendants' wrongdoing as alleged in this complaint.  Specifically, Detroit P&F purchased Plains Holdings Class A Shares in the Plains Holdings Secondary Offering and Plains Common Units in the Plains Offering and was damaged thereby.

**B.     Entity Defendants**

21.     ***Plains All American Pipeline, L.P.***  Defendant Plains is a publicly traded Delaware master limited partnership (or "MLP"), involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities.  Its principal executive offices are located at 333 Clay Street, Suite 1600, Houston, Texas.  Plains has grown into one of North America's largest energy pipeline operators by acquiring significant pipelines and terminal systems in California, Texas and

- 8 -

Canada, among other places.  As of February 25, 2015, Plains owned 17,800 miles of crude oil and natural gas pipelines and gathering systems.

22.      Plains does not directly have officers, directors or employees.  Instead, its operations and activities are managed by Plains All American GP LLC ("GP LLC"), which employs the officers, directors on the board of directors, managers, and employees (except for those in Canada).  While GP LLC manages Plains' operations and activities, Plains Holdings "effectively controls [Plains'] business and affairs through the exercise of its rights as the sole and managing member of GP LLC, including its right to appoint certain members to the board of directors of GP LLC."

23.      Plains Common Units are traded on the New York Stock Exchange ("NYSE") under the symbol "PAA."

24.      ***Plains GP Holdings, L.P.***  Defendant Plains Holdings is a publicly traded Delaware limited partnership formed on July 17, 2013 to own an interest in PAA's general partner, GP LLC, and PAA's incentive distribution rights ("IDRs").  Its principal executive offices are located at 333 Clay Street, Suite 1600, Houston, Texas.  Management of Plains Holdings is vested in PAA GP Holdings, LLC.  However, its officers and personnel necessary to run the business are employed by GP LLC.  Plains Holdings has no board of directors, but its partnership agreement defines "Board of Directors" to mean the Board of Directors of Holdings LLC.

25.      GP LLC is managed by or under the direction of its board of directors, whose members are either designated by certain members of Holdings LLC or appointed by Plains Holdings, as the sole member of GP LLC acting through the Holdings LLC board of directors.

26.      Although Plains Holdings was formed as a limited partnership, it is taxed as a corporation for U.S. federal income taxes purposes.  For financial reporting purposes, Plains Holdings consolidates the financial results of Plains and its subsidiaries, as well as Plains AAP, L.P. ("AAP"), a Delaware limited partnership that directly owns all of Plains' IDRs and indirectly owns

the 2% general partner interest in Plains.  Plains Holdings has no separate operating activities apart from those conducted by Plains and, therefore, its financial results, segment analysis, presentation and discussion as set forth in Plains Holdings' SEC filings is the same as that of Plains.  Since it has no separate operating activities, Plains Holdings' "primary business objective is to increase [its] cash available for distribution to [its] Class A shareholders through the execution by [Plains] of [Plains'] business strategy."

27.     Following its IPO in October 2013, Plains Holdings' Class A Shares trade on the NYSE under the symbol "PAGP."

28.     ***PAA Finance Corp.***  Defendant PAA Finance is a Delaware corporation formed in 2001 and wholly owned by Plains.  It was organized for the purpose of co-issuing Plains' debt securities.  Its principal executive offices are located at 333 Clay Street, Suite 1600, Houston, Texas. PAA Finance, together with Plains, filed the Plains Shelf and Plains Prospectus.  It is an "issuer" of the Notes Offerings.

29.     ***PAA GP Holdings LLC ("Holdings LLC")***.  Defendant Holdings LLC holds the general partner interest in Plains Holdings and thus conducts, directs and manages all activities of PAGP.  Its principal office is at 333 Clay Street, Suite 1600, Houston, Texas 77002.  Holdings LLC's board of directors consists of seven individuals, one of which is the CEO of Holdings LLC (*i.e.*, Armstrong).  Holdings LLC itself has no employees – all of its officers and other personnel necessary for its business to function are employed by GP LLC.

### C.     Officer Defendants

30.     ***Greg L. Armstrong ("Armstrong")***.  Defendant Armstrong is, and was at all relevant times, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of GP LLC, which, holding PAA's general partner interest, manages and operates PAA.  Armstrong is also, and was at all relevant times, Chairman, CEO and Director of PAA Finance and Holdings LLC, PAGP's

- 10 -

general partner and thus the entity that conducts, directs and manages all of PAGP's activities. Armstrong signed all of the Offering Materials and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.  Armstrong also signed the SEC filings that contained the materially false and misleading statements in §§VI.A. and VI.D., *infra*.  Moreover, Armstrong made materially false and misleading statements during investor conferences, as set forth in §§VI.A. and VI.B., *infra*.  In addition, he made materially false and misleading statements in a Congressional letter posted on the www.plains901response.com website as set forth in §VI.C., *infra*.

31.     ***Chris Herbold ("Herbold")***.  Defendant Herbold is, and was at all relevant times, Vice President-Accounting and Chief Accounting Officer of GP LLC, PAA Finance and Holdings LLC.  Herbold signed the Registration Statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.   Herbold also signed the SEC filings that contained the materially false and misleading statements in §§VI.A. and VI.D., *infra*.

32.     ***Richard McGee ("McGee")***.  Defendant McGee is, and was at all relevant times, Executive Vice President, General Counsel, and Secretary of GP LLC and Holdings LLC.  McGee signed the SEC filings that contained the materially false and misleading statements in §§VI.A. and VI.D., *infra*.

33.     ***Harry N. Pefanis ("Pefanis")***.  Defendant Pefanis is, and was at all relevant times, President and Chief Operating Officer of GP LLC and Holdings LLC, as well as President of PAA Finance.  Defendant Pefanis signed the Registration Statement for the Plains Holdings Secondary and the Notes Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Plains Holdings Secondary Offering Materials and the Notes Offerings Materials.  Pefanis also signed all of PAA's and PAGP's Forms 10-K that contained the materially false and misleading statements in §§VI.A. and VI.D., *infra*.  Pefanis attended and

- 11 -

presented at investor conferences during which materially false and misleading statements were made, as set forth in §§VI.A. and VI.B., *infra*.

34.     ***Al Swanson ("Swanson")***.  Defendant Swanson is, and was at all relevant times, Executive Vice President and Chief Financial Officer of GP LLC, PAA Finance and Holdings LLC. Defendant Swanson signed the Registration Statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.  Swanson also signed the SEC filings that contained the materially false and misleading statements in §§VI.A. and VI.D., *infra*.  Swanson attended and presented at investor conferences during which materially false and misleading statements were made, as set forth in §§VI.A. and VI.B., *infra*.

35.     Defendants Armstrong, Herbold, McGee, Pefanis and Swanson, are collectively referred to herein as the "Officer Defendants."  The Officer Defendants, because of their executive positions at GP LLC, Holdings LLC and PAA Finance, possessed the power and authority to control the contents of PAA's, PAGP's, and PAA Finance's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of PAA's and PAGP's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### D.   Director Defendants

36.   ***Victor Burk ("Burk")***.  Defendant Burk is, and was at all relevant times, a Director of GP LLC and Holdings LLC.  Burk signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

37.   ***Everardo Goyanes ("Goyanes")***.  Defendant Goyanes is, and was at all relevant times, a Director of GP LLC and Holdings LLC.  On each board, Goyanes served as the chairman of the audit committee during the Class Period.  Defendant Goyanes was named in the IPO Registration Statement, with his consent, as being or about to become a director.  Goyanes signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

38.   ***Gary R. Petersen ("Petersen")***.  Defendant Petersen is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Petersen served as member of the compensation and governance committees during the Class Period.  Petersen signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

39.   ***John T. Raymond ("Raymond")***.  Defendant Raymond is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Raymond is also, and was as at all relevant times, a Director of Holdings LLC, PAGP's general partner and the entity whose corporate governance is in effect PAGP's corporate governance.  Raymond signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

40.   ***Bobby S. Shackouls ("Shackouls")***.  Defendant Shackouls became in January 2014 a Director of Holdings LLC, PAGP's general partner and the entity whose corporate governance is in effect PAGP's corporate governance.  Shackouls signed offering materials related to the offerings

and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

41.     **Robert V. Sinnott (*"Sinnott"*)**.  Defendant Sinnott is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Sinnott also became in October 2013 a Director of Holdings LLC, PAGP's general partner and the entity whose corporate governance is in effect PAGP's corporate governance.  Sinnott signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

42.     **Vicky Sutil (*"Sutil"*)**.  Until her departure from both boards in January 2015, Defendant Sutil was at all relevant times, a Director of GP LLC, which manages and operates PAA, and from October 2013 through January 2015, a Director of Holdings LLC, PAGP's general partner and the entity whose corporate governance is in effect PAGP's corporate governance.  Defendant Sutil was named in the IPO Registration statement, with her consent, as being or about to become a director.  Sutil signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

43.     **J. Taft Symonds (*"Symonds"*)**.  Defendant Symonds is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Symonds served as member of the audit and governance committees during the Class Period.  Symonds signed offering materials related to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

44.     **Christopher M. Temple (*"Temple"*)**.  Defendant Temple is, and was at all relevant times, a Director of GP LLC, which manages and operates PAA.  Temple served as member of the audit and governance committees during the Class Period.  Temple signed offering materials related

to the offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions therein.

### E.   Underwriter Defendants

45.   ***Barclays Capital Inc. ("Barclays")***.  Defendant Barclays was an underwriter of the IPO, the Plains Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.   As an underwriter of the IPO, the Plains Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, Barclays was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Offering Materials, the September 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

46.   ***BB&T Capital Markets, a division of BB&T Securities, LLC. ("BB&T")***. Defendant BB&T was an underwriter of the IPO and the August 2013 Notes Offering, as specified herein.  As an underwriter of the IPO and the August 2013 Notes Offering, BB&T was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the August 2013 Notes Offering Materials.

47.   ***BBVA Securities Inc. ("BBVA")***.  Defendant BBVA was an underwriter of the IPO and all of the Notes Offerings, as specified herein.  As an underwriter of the IPO and all of the Notes Offerings, BBVA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the Notes Offerings Materials.

48.   ***BMO Capital Markets Corp. ("BMO")***.  Defendant BMO was an underwriter of the August 2013 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.   As an underwriter of the August 2013 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, BMO was responsible for

ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the August 2013 Notes Offering Materials, the September 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

49.     ***BNP Paribas Securities Corp. ("BNP Paribas")***.  Defendant BNP Paribas was an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein.   As an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, BNP Paribas was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, and the September 2014 Notes Offering Materials.

50.     ***CIBC World Markets Corp. ("CIBC")***.  Defendant CIBC was an underwriter of the IPO and all of the Notes Offerings, as specified herein.  As an underwriter of the IPO and all of the Notes Offerings, CIBC was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Notes Offerings Materials.

51.     ***Citigroup Global Markets Inc. ("Citigroup")***.   Defendant Citigroup was an underwriter of the IPO, the Plains Holdings Secondary Offering, and the April 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, and the April 2014 Notes Offering, Citigroup was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, and the April 2014 Notes Offering Materials.

52.     ***Deutsche Bank Securities Inc. ("Deutsche Bank")***.  Defendant Deutsche Bank was an underwriter of the IPO and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO and the December 2014 Notes Offerings, Deutsche Bank was responsible for

ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the December 2014 Notes Offering Materials.

53.     ***DNB Markets, Inc. ("DNB")***.  Defendant DNB was an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, DNB was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, and the September 2014 Notes Offering Materials.

54.     ***Fifth Third Securities, Inc. ("Fifth Third")***.  Defendant Fifth Third was an underwriter of all of the Notes Offerings, as specified herein.  As an underwriter of all of the Notes Offerings, Fifth Third was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the Notes Offerings Materials.

55.     ***Goldman, Sachs & Co. ("Goldman Sachs")***.  Defendant Goldman Sachs was an underwriter of the IPO and the Plains Holdings Secondary Offering, as specified herein.  As an underwriter of the IPO and the Plains Holdings Secondary Offering, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Plains Holdings Secondary Offering Materials.

56.     ***ING Financial Markets LLC ("ING Financial")***.  Defendant ING Financial was an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offering as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offering, ING Financial was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, the

- 17 -

April 2014 Notes Offering Materials, the September 2014 Notes Offering Materials, and the December 2014 Offering Materials.

57.     ***J.P. Morgan Securities LLC ("J.P. Morgan")***.  Defendant J.P. Morgan was an underwriter of the IPO, the Plains Holdings Secondary 2014 Offering, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, the August 2013 Notes Offering, and the September 2014 Notes Offering, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, the August 2013 Notes Offering Materials, and September 2014 Notes Offering Materials.

58.     ***Ladenburg Thalmann & Co. Inc. ("Ladenburg")***.  Defendant Ladenburg was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Ladenburg was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

59.     ***Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch")***.  Defendant Merrill Lynch was an underwriter of the IPO, the Plains Holdings Secondary Offering, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, the August 2013 Notes Offering, and the September 2014 Notes Offering, Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, the August 2013 Notes Offering Materials, and September 2014 Notes Offering Materials.

60.     ***Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi")***.  Defendant Mitsubishi was an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the

December 2014 Notes Offerings, as specified herein. As an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, Mitsubishi was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, the April 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

61. ***Mizuho Securities USA Inc. ("Mizuho")***. Defendant Mizuho was an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, as specified herein. As an underwriter of the IPO, the August 2013 Notes Offering, and the September 2014 Notes Offering, Mizuho was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, and the September 2014 Notes Offering Materials.

62. ***Morgan Stanley & Co. LLC ("Morgan Stanley")***. Defendant Morgan Stanley was an underwriter of the IPO and the Plains Holdings Secondary Offering, as specified herein. As an underwriter of the IPO and the Plains Holdings Secondary Offering, Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Plains Holdings Secondary Offering Materials.

63. ***Oppenheimer & Co. Inc. ("Oppenheimer")***. Defendant Oppenheimer was an underwriter of the IPO, as specified herein. As an underwriter of the IPO, Oppenheimer was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

64. ***Piper Jaffray & Co. ("Piper Jaffray")***. Defendant Piper Jaffray was an underwriter of the IPO, as specified herein. As an underwriter of the IPO, Piper Jaffray was responsible for

ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

65.     ***PNC Capital Markets LLC ("PNC")***.  Defendant PNC was an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, PNC was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, the April 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

66.     ***Raymond James & Associates, Inc. ("Raymond James")***. Defendant Raymond James was an underwriter of the IPO and the Plains Holdings Secondary Offering, as specified herein.  As an underwriter of the IPO and the Plains Holdings Secondary Offering, Raymond James was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Plains Holdings Secondary Offering Materials.

67.     ***RBC Capital Markets, LLC ("RBC")***.  Defendant RBC was an underwriter of the IPO, the August 2013 Notes Offering and the December 2014 Notes Offerings, as specified herein. As an underwriter of the IPO, the August 2013 Notes Offering and the December 2014 Notes Offerings, RBC was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials and the December 2014 Notes Offering Materials.

68.     ***Regions Securities LLC ("Regions")***.  Defendant Regions was an underwriter of the IPO and all of the Notes Offerings, as specified herein.  As an underwriter of the IPO and all of the Notes Offerings, Regions was responsible for ensuring the truthfulness and accuracy of the

statements contained in or incorporated by reference into the IPO Offering Materials and the Notes Offerings Materials.

69.     ***Robert W. Baird & Co. Incorporated ("Robert Baird")***.  Defendant Robert Baird was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Robert Baird was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

70.     ***Scotia Capital (USA) Inc. ("Scotia")***.  Defendant Scotia was an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, Scotia was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, the April 2014 Notes Offering Materials, and the December 2014 Notes Offerings Materials.

71.     ***SG Americas Securities, LLC ("SG Americas")***.  Defendant SG Americas was an underwriter of the IPO, the August 2013 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the August 2013 Notes Offering, the September 2014 Notes Offering, and the December 2014 Notes Offerings, SG Americas was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the August 2013 Notes Offering Materials, the September 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

72.     ***Simmons & Company International ("Simmons")***.  Defendant Simmons was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Simmons was responsible

for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

73.    ***SMBC Nikko Securities America, Inc. ("SMBC")***.   Defendant SMBC was an underwriter of the IPO and all of the Notes Offerings, as specified herein.  As an underwriter of the IPO and all of the Notes Offerings, SMBC was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials and the Notes Offerings Materials.

74.    ***Stephens Inc. ("Stephens")***.  Defendant Stephens was an underwriter of the IPO, as specified herein.   As an underwriter of the IPO, Stephens was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

75.    ***Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus")***.   Defendant Stifel Nicolaus was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Stifel Nicolaus was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

76.    ***SunTrust Robinson Humphrey ("SunTrust")***.   Defendant SunTrust was an underwriter of the IPO, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.   As an underwriter of the IPO, the April 2014 Notes Offering, and the December 2014 Notes Offerings, SunTrust was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the April 2014 Notes Offering Materials and the December 2014 Notes Offering Materials.

77.    ***Tudor, Pickering, Holt & Co. Securities, Inc. ("Tudor")***.   Defendant Tudor was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, Tudor was responsible for

ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

78.    ***UBS Securities LLC ("UBS")***.  Defendant UBS was an underwriter of the IPO, the Plains Holdings Secondary Offering, and the April 2014 Notes Offering, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, and the April 2014 Notes Offering, UBS was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, and the April 2014 Notes Offering Materials.

79.    ***U.S. Bancorp Investments, Inc. ("U.S. Bancorp")***.  Defendant U.S. Bancorp was an underwriter of all of the Notes Offerings, as specified herein.  As an underwriter of all of the Notes Offerings, U.S. Bancorp was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the Notes Offerings Materials.

80.    ***USCA Securities LLC ("USCA")***.  Defendant USCA was an underwriter of the IPO, as specified herein.  As an underwriter of the IPO, USCA was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials.

81.    ***Wells Fargo Securities LLC ("Wells Fargo")***.  Defendant Wells Fargo was an underwriter of the IPO, the Plains Holding Secondary Offering, the April 2014 Notes Offering, and the December 2014 Notes Offerings, as specified herein.  As an underwriter of the IPO, the Plains Holdings Secondary Offering, the April 2014 Notes Offering, and the December 2014 Notes Offering, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the statements contained in or incorporated by reference into the IPO Offering Materials, the Plains Holdings Secondary Offering Materials, the April 2014 Notes Offering Materials, and the December 2014 Notes Offering Materials.

82.     Barclays, BB&T, BBVA, BMO, BNP Paribas, CIBC, Citigroup, Deutsche Bank, DNB, Fifth Third, ING Financial, J.P. Morgan, Merrill Lynch, Mitsubishi, Mizuho, PNC, RBC, Regions, Scotia, SG Americas, SMBC, SunTrust, U.S. Bancorp, UBS, and Wells Fargo are collectively referred to herein as the "Notes Underwriter Defendants."  The Notes Underwriter Defendants sold and distributed the senior notes in the Notes Offerings.  The extent of the Notes Underwriter Defendants' participation in the Notes Offerings and the fees earned are as follows:

| Underwriter Defendant | August 2013 Notes Offering | April 2014 Notes Offering | September 2014 Notes Offering | December 2014 Notes Offerings (4.9% due 2045) | December 2014 Notes Offerings (2.6% due 2019) | Total | Fees |
|---|---|---|---|---|---|---|---|
| Barclays | | | 112,500,000 | 104,000,000 | 80,000,000 | 296,500,000 | $2,121,250 |
| SunTrust | | 105,000,000 | | 104,000,000 | 80,000,000 | 289,000,000 | $2,308,750 |
| Wells Fargo | | 105,000,000 | | 104,000,000 | 80,000,000 | 289,000,000 | $2,308,750 |
| J.P. Morgan | 136,500,000 | | 112,500,000 | | | 249,000,000 | $1,618,500 |
| Merrill Lynch | 136,500,000 | | 112,500,000 | | | 249,000,000 | $1,618,500 |
| BBVA | 21,000,000 | 28,000,000 | 37,500,000 | 52,000,000 | 40,000,000 | 178,500,000 | $1,320,250 |
| SMBC | 21,000,000 | 28,000,000 | 37,500,000 | 52,000,000 | 40,000,000 | 178,500,000 | $1,320,250 |
| Mitsubishi | 28,000,000 | 70,000,000 | | 26,000,000 | 20,000,000 | 144,000,000 | $1,142,000 |
| Scotia | 28,000,000 | 70,000,000 | | 26,000,000 | 20,000,000 | 144,000,000 | $1,142,000 |
| BNP Paribas | 21,000,000 | | 112,500,000 | | | 133,500,000 | $867,750 |
| DNB | 73,500,000 | | 60,000,000 | | | 133,500,000 | $867,750 |
| Mizuho | 73,500,000 | | 60,000,000 | | | 133,500,000 | $867,750 |
| RBC | 21,000,000 | | | 52,000,000 | 40,000,000 | 113,000,000 | $831,500 |
| Citigroup | | 105,000,000 | | | | 105,000,000 | $918,750 |
| UBS | | 105,000,000 | | | | 105,000,000 | $918,750 |
| CIBC | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| Fifth Third | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| Regions | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| SG Americas | 28,000,000 | | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $453,250 |
| U.S. Bancorp | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| BMO | 14,000,000 | | 15,000,000 | 13,000,000 | 10,000,000 | 52,000,000 | $362,250 |
| PNC | 14,000,000 | 14,000,000 | | 13,000,000 | 10,000,000 | 51,000,000 | $387,250 |
| Deutsche Bank | | | | 26,000,000 | 20,000,000 | 46,000,000 | $347,500 |
| ING Financial | 14,000,000 | 14,000,000 | 15,000,000 | 13,000,000 | 10,000,000 | 66,000,000 | $484,750 |
| BB&T | 14,000,000 | | | | | 14,000,000 | $91,000 |
| Total | 700,000,000 | 700,000,000 | 750,000,000 | 650,000,000 | 500,000,000 | 3,300,000,000 | $24,237,500 |

83.     Barclays, Goldman Sachs, J.P. Morgan, Citigroup, Merrill Lynch, UBS, Wells Fargo, Deutsche Bank, Morgan Stanley, Raymond James, RBC, Oppenheimer, Robert Baird, Stifel

1264030_1

Nicolaus, USCA, Mitsubishi, BBVA, BNP Paribas, DNB, ING Financial, Mizuho, Piper Jaffray,

PNC, Scotia, SG Americas, SMBC, SunTrust, BB&T, CIBC, Ladenburg, Regions, Simmons,

Stephens, and Tudor are collectively referred to herein as the "IPO Underwriter Defendants."  The

IPO Underwriter Defendants sold and distributed the securities in the IPO.  The extent of the IPO

Underwriter Defendants' participation in the IPO and the fees earned are as follows:

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---|---|---|
| Barclays | 24,000,000 | $528,000,000 | $15,840,000 |
| Goldman Sachs | 21,653,333 | $476,373,326 | $14,291,200 |
| J.P. Morgan | 21,653,333 | $476,373,326 | $14,291,200 |
| Citigroup | 10,373,333 | $228,213,326 | $6,846,400 |
| Merrill Lynch | 9,093,333 | $200,053,326 | $6,001,600 |
| UBS | 9,093,333 | $200,053,326 | $6,001,600 |
| Wells Fargo | 9,093,333 | $200,053,326 | $6,001,600 |
| Deutsche Bank | 2,346,667 | $51,626,674 | $1,548,800 |
| Morgan Stanley | 2,346,667 | $51,626,674 | $1,548,800 |
| Raymond James | 2,346,667 | $51,626,674 | $1,548,800 |
| RBC | 2,346,667 | $51,626,674 | $1,548,800 |
| Oppenheimer | 1,173,333 | $25,813,326 | $774,400 |
| Robert Baird | 1,173,333 | $25,813,326 | $774,400 |
| Stifel Nicolaus | 1,173,333 | $25,813,326 | $774,400 |
| USCA | 826,667 | $18,186,674 | $545,600 |
| Mitsubishi | 800,000 | $17,600,000 | $528,000 |
| BBVA | 586,667 | $12,906,674 | $387,200 |
| BNP Paribas | 586,667 | $12,906,674 | $387,200 |
| DNB | 586,667 | $12,906,674 | $387,200 |
| ING Financial | 586,667 | $12,906,674 | $387,200 |
| Mizuho | 586,667 | $12,906,674 | $387,200 |
| Piper Jaffray | 586,667 | $12,906,674 | $387,200 |
| PNC | 586,667 | $12,906,674 | $387,200 |
| Scotia | 586,667 | $12,906,674 | $387,200 |
| SG Americas | 586,667 | $12,906,674 | $387,200 |
| SMBC | 586,667 | $12,906,674 | $387,200 |
| SunTrust | 586,667 | $12,906,674 | $387,200 |
| BB&T | 293,333 | $6,453,326 | $193,600 |
| CIBC | 293,333 | $6,453,326 | $193,600 |
| Ladenburg | 293,333 | $6,453,326 | $193,600 |
| Regions | 293,333 | $6,453,326 | $193,600 |

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---|---|---|
| Simmons | 293,333 | $6,453,326 | $193,600 |
| Stephens | 293,333 | $6,453,326 | $193,600 |
| Tudor | 293,333 | $6,453,326 | $193,600 |
| To be determined[2] | 4,380,000 | $96,360,000 | $2,890,800 |
| **Total** | **132,380,000** | **$2,912,360,000** | **$87,370,800** |

84.     Citigroup, J.P. Morgan, Goldman Sachs, Merrill Lynch, Morgan Stanley, Raymond James, UBS, and Wells Fargo are collectively referred to herein as the "Plains Holdings Secondary Offering Underwriter Defendants."   The Plains Holdings Secondary Offering Underwriter Defendants sold and distributed the securities in the Plains Holdings Secondary Offering.  The extent of the Plains Holdings Secondary Offering Underwriter Defendants' participation in the Plains Holdings Secondary Offering and the fees earned are as follows:

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---|---|---|
| Citigroup | 15,000,000 | $375,000,000 | $8,437,500 |
| J.P. Morgan | 15,000,000 | $375,000,000 | $8,437,500 |
| Goldman Sachs | 7,500,000 | $187,500,000 | $4,218,750 |
| Merrill Lynch | 7,500,000 | $187,500,000 | $4,218,750 |
| Morgan Stanley | 7,500,000 | $187,500,000 | $4,218,750 |
| Raymond James | 2,500,000 | $62,500,000 | $1,406,250 |
| UBS | 2,500,000 | $62,500,000 | $1,406,250 |
| Wells Fargo | 2,500,000 | $62,500,000 | $1,406,250 |
| To be determined[3] | 9,000,000 | $225,000,000 | $5,062,500 |
| **Total** | **69,000,000** | **$1,725,000,000** | **$38,812,500** |

85.     Barclays sold and distribute all of the securities in the Plains Offering.  Barclays' distribution amount and fees earned are as follow:

[2]   The IPO Underwriter Defendants had an option to purchase, severally, additional Plains Holdings' Class A Shares from Plains Holdings for distribution to investors on or before the 30th day after the date of the IPO Prospectus.  The identities of the IPO Underwriter Defendants that exercised the option to purchase will be determined in discovery.

[3]   The Plains Holdings Secondary Offering Underwriter Defendants had an option to purchase, severally, additional Plains Holdings' Class A Shares from Plains Holdings for distribution to investors on or before the 30th day after the date of the Plains Holdings Secondary Offering Prospectus.  The identities of the Plains Holdings Secondary Offering Underwriter Defendants that exercised the option to purchase will be determined in discovery.

| Underwriter Defendant | Number of Shares | Dollar Amount | Fees |
|---|---|---|---|
| Barclays | 21,000,000 | $1,050,000,000 | $8,610,000 |

86.     In aggregate, the Underwriter Defendants received $159,030,800 in fees from the

Offerings:

| Underwriter Defendant | Fees |
|---|---|
| Barclays | $26,571,250 |
| J.P. Morgan | $24,347,200 |
| Goldman Sachs | $18,509,950 |
| Citigroup | $16,202,650 |
| Merrill Lynch | $11,838,850 |
| Wells Fargo | $9,716,600 |
| UBS | $8,326,600 |
| Morgan Stanley | $5,767,550 |
| Raymond James | $2,955,050 |
| SunTrust | $2,695,950 |
| RBC | $2,380,300 |
| Deutsche Bank | $1,896,300 |
| BBVA | $1,707,450 |
| SMBC | $1,707,450 |
| Mitsubishi | $1,670,000 |
| Scotia | $1,529,200 |
| BNP Paribas | $1,254,950 |
| DNB | $1,254,950 |
| Mizuho | $1,254,950 |
| SG Americas | $840,450 |
| PNC | $774,450 |
| Oppenheimer | $774,400 |
| Robert Baird | $774,400 |
| Stifel Nicolaus | $774,400 |
| CIBC | $678,350 |
| Regions | $678,350 |
| ING Financial | $871,950 |
| USCA | $545,600 |
| Fifth Third | $484,750 |
| U.S. Bancorp | $484,750 |
| Piper Jaffray | $387,200 |
| BMO | $362,250 |
| BB&T | $284,600 |

| Underwriter Defendant | Fees |
|---|---|
| Ladenburg | $193,600 |
| Simmons | $193,600 |
| Stephens | $193,600 |
| Tudor | $193,600 |
| To be determined | $7,953,300 |
| **Total** | **$159,030,800** |

## V.   FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.   Plains' Relevant Operations and Applicable Legal Framework

87.     Plains is a publicly traded MLP, involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities.  Prior to and during the Class Period, Plains grew into one of North America's largest energy pipeline operators.  That growth was achieved primarily through an acquisition binge during which Plains acquired significant pipelines and terminal systems – many of them aging and in need of crucial maintenance – in California, Texas and Canada, among other places.  Taking control of a vast network of pipelines placed significant obligations on the Company to ensure the integrity of those networks.

88.     Among Plains' acquisitions were Lines 901 and 903, which make up the All American Pipeline, built in 1987 and acquired by Plains in 1998.  Line 901 extends approximately 10.6 miles from Exxon's onshore facilities at Las Flores, California on the California coast to Chevron's onshore facilities at Gaviota, California (a 24-inch diameter pipe) where it connects with Line 903 (a 30-inch diameter pipe) that continues from Gaviota approximately 128 miles through Santa Barbara County, California and into Kern County, California.  When the lines were acquired, Plains stated in its Form 10-K for 1998:

> The Partnership performs scheduled maintenance on the pipeline and makes repairs and replacements when necessary or appropriate.  As one of the most recently constructed major crude oil pipeline systems in the United States, the All American Pipeline requires a relatively low level of maintenance capital expenditures.  The Partnership attempts to control corrosion of the pipeline through the use of corrosion inhibiting chemicals injected into the crude stream, external pipe coatings and an

- 28 -

anode bed based cathodic protection system.  The Partnership monitors the structural integrity of the Plains All American Pipeline through a program of periodic internal inspections using electronic "smart pig" instruments.  The Partnership conducts a weekly aerial surveillance of the entire pipeline and right-of-way to monitor activities or encroachments on rights-of-way.  Maintenance facilities containing equipment for pipe repair, digging and light equipment maintenance are strategically located along the pipeline.  The Partnership believes that the All American Pipeline has been constructed and is maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards prescribed by the American Petroleum Institute and accepted industry standards of practice.

89.     Following initiation of operations of Lines 901 and 903, Plains conducted periodic inspections of the condition of the pipeline with internal inspection devices called pipeline inspection gauges, or "smart pigs."  Smart pigs are run inside a pipeline to detect anomalies caused by corrosion, cracks, laminations, dents and other defects.  These runs are referred to as in-line inspections, or ILIs.  ILIs were conducted on Line 901 between the Las Flores and Gaviota pump stations starting in September 1996.  Additional ILIs were performed in June 1 and 19, 2007, July 2012, and May 5, 2015.  Beginning with the 2007 ILI, Rosen conducted the ILIs on Lines 901 and 903.

90.     Lines 901 and 903 were controlled remotely by the Midland, Texas Control Room.  According to Plains' website, "[a]ll of Plains' pipeline systems are remotely controlled and monitored by" the Midland Control Room.  As such, "[t]he Control Center handles and continuously monitors all of Plains' liquid product movements within our pipelines and maintains system integrity through leak detection."  Furthermore:

The Plains Operational Control Center is one of the largest in North America and assists with scheduling and moving over 1 billion barrels of liquid product per year.  The Control Center is operated and staffed 24 hours a day, 365 days a year, and monitors and operates more than 850 remote sites via SCADA (Supervisory Control And Data Acquisition) utilizing primarily satellite communications.

Pipeline Controllers have the authority, the responsibility, and the obligation to shut down the pipeline systems when pipeline integrity is in doubt . . . .

91.     During the Class Period, the majority of Plains' pipelines, including Lines 901 and 903, were subject to the jurisdiction of PHMSA, which enforces regulations promulgated under the Hazardous Liquids Pipeline Safety Act of 1979 ("Pipeline Safety Act" or the "HLPSA").  Under the HLPSA, Plains was required to adopt measures to reduce the environmental impact of oil spills.  In particular, the HLPSA imposes safety requirements on petroleum pipeline operators, like defendants, related to the "design, installation, testing, construction, operation, replacement and management of pipeline and tank facilities."  Further, federal regulations enacted pursuant to the HLPSA required defendants "to adopt measures designed to reduce the environmental impact of oil discharges from onshore oil pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel."

92.     Amendments to the HLPSA in 2002 and 2006 required Plains "to implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways." During the Class Period, Lines 901 and 903 comprised 9-10% of Plains' interstate crude oil pipelines in HCAs, and 15-18% of those affecting commercially navigable water and sensitive ecological resources.  In such "high consequence areas," or HCAs, Plains recognized that "a pipeline leak or rupture could produce significant adverse consequences."   Accordingly, PHMSA regulations pursuant to the HLPSA required Plains to implement enhanced measures in HCAs, such as: (i) conducting assessments of internal and external corrosion; (ii) establishing an integrity management program that provides for "[a] continual process of assessment and evaluation to maintain a pipeline's integrity"; (iii) implementing "preventive and mitigative measures to protect the high consequence area," including monitoring cathodic protection to control corrosion, establishing shorter inspection intervals, and modify systems monitoring pressure and leaks;

(iv) "tak[ing] prompt action to address all anomalous conditions" discovered through an integrity assessment; and (v) considering installation of Emergency Flow Restricting Devices to protect an HCA in the event of a hazardous liquid pipeline release.  Because Lines 901 and 903 were in an HCA – due to their proximity to the pristine and environmentally sensitive Santa Barbara coastline, rivers, state parks, and national forest – they were at all relevant times subject to PHMSA's enhanced HCA requirements.

93.     During the Class period, Plains also was subject to the Federal Water Pollution Control Act, as amended, also known as the Clean Water Act ("CWA"), which imposes restrictions and strict controls regarding the discharge of pollutants, such as crude oil, into navigable waters of the United States and Canada, as well as state waters.  Under the CWA, federal and state regulatory agencies can impose administrative, civil and/or criminal penalties for non-compliance with discharge permits or other requirements of the CWA.  Moreover, the Oil Pollution Act ("OPA") amended certain provisions of the CWA related to petroleum product spills into navigable waters. The OPA makes owners of pipeline facilities subject to strict, joint and potentially unlimited liability for containment and removal costs, natural resource damages, and certain other consequences of an oil spill.  Under the OPA, 49 C.F.R. Part 195 regulates oil spill response plans for onshore pipelines, such as Lines 901 and 903.  Such response plans require "[i]mmediate notification procedures" and "[s]pill detection and mitigation procedures."

94.     Plains was further subject to EPA Risk Management Plan regulations.  Under EPA regulations, Plains was required to develop and implement a plan to help emergency response personnel prepare for and respond to chemical emergencies.  The plan includes "a five-year accident history, an offsite consequence analysis process, a prevention program and an emergency response program."

1264030_1

95.     As described herein, defendants stated falsely throughout the Class Period that the Company was in compliance with these laws and regulations.  Indeed, defendants even misleadingly promised investors that for its pipelines running through HCAs, Plains had implemented pipeline maintenance and integrity measures that went "beyond regulatory mandate."

### B.   Plains' Pre-Class Period Maintenance and Safety Deficiencies Resulted in a Consent Decree with the EPA

96.     During the Class Period, Plains was attempting to rehabilitate its public image to portray itself as a safe and responsible pipeline operator in the wake of a series of oil spills, rendering the Company one of, if not the worst, safety and environmental-regulation violators in the pipeline business.  Before and during the Class Period, Plains and its related companies reported to federal regulators 229 safety and maintenance incidents on pipelines.  In fact, among more than 1,700 operators included in a PHMSA-maintained database tracking incidents from 2006 to 2015, only three operators reported more incidents than Plains.  The Company's reported infractions involved pipeline corrosion, pump failure, equipment malfunction, excavation damage and operator error, resulting in more than $141 million in property damage and the release of more than 802,000 gallons of hazardous liquid.

97.     As a result of the Company's pre-Class Period violations, in 2010, the EPA sued Plains for a series of spills in Texas, Louisiana, Oklahoma and Kansas that resulted in the discharge of 273,420 gallons of crude oil.  These spills included, among others, a spill in West Texas in which 189,000 gallons of oil were discharged, which wound up polluting the nearby Pecos River, as well as a second spill in East Texas that resulted in the release of approximately 50,000 gallons of oil.

98.     Just weeks after the EPA filed suit, the Company entered into a Consent Decree with the EPA under which the Company agreed to pay significant fines and adopt new safety measures (the "Consent Decree" or "2010 Consent Decree").  Specifically, under the 2010 Consent Decree,

Plains was required to pay $3.25 million in fines and to spend $41 million to upgrade more than 10,000 miles of pipeline. Line 901 was expressly covered by the Consent Decree. However, CEO Armstrong would later confirm in response to a joint U.S. House and Senate investigation of the Santa Barbara spill that *none* of the $41 million in maintenance funds included in the 2010 Consent Decree were spent on upgrades, repairs, or maintenance to Line 901. The 2010 Consent Decree specifically required Plains to maintain leak detection protocols for Lines 901 and 903 that complied with API 1130 for as long as the pipeline remained in service. API 1130 required, among other things, that Plains implement and maintain a leak detection system using computerized algorithmic measuring systems that should have quickly and effectively detected integrity defects and potential leaks. The Consent Decree also required, among other things, that Plains conduct weekly aerial patrols of certain of its pipelines to check for leaks and spend millions of dollars on efforts to mitigate threats posed by corrosion, install computational pipeline monitoring capabilities, ensure ongoing monitoring for 110 segments of pipeline, including Lines 901 and 903, and provide semi-annual updates to the EPA regarding its compliance with the Consent Decree.

   **C.    Plains Created a New Corporate Image to Lure Investors by Purporting to Implement Enhanced Safety and Maintenance Initiatives**

99.    In the wake of Plains' numerous prior violations and the Consent Decree, Plains executives made a concerted effort to assure investors that Plains had adopted enhanced measures to ensure the integrity of its pipelines, and that, as a result, spill incidents – and the risk of future incidents – had reduced significantly. For example, in the Company's Form 10-K for the year ended December 31, 2012, filed with the SEC on February 27, 2013 – the first day of the Class Period – defendants pointed to the measures the Company had taken as part of the 2010 Consent Decree, and reassured investors that "pipeline integrity management" in HCAs was its "primary operational emphasis," and that the Company had "implemented programs intended to maintain the integrity of

- 33 -

1264030_1

our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention."  Referring specifically to regulations governing HCAs, the Company further represented that its "pipelines are in substantial compliance with [applicable regulations]" and that the Company's "integrity management program" included measures that went well beyond those legal requirements.  Defendants repeated these false and misleading statements throughout the Class Period.

100.    During the Class Period, CEO Armstrong led the effort to convince the market that Plains' maintenance and corrosion control problems were in the past, that Plains went above and beyond applicable regulations when it came to safety and maintenance, that the risk of a catastrophic spill was extremely low, and that the Company was well prepared should a spill occur.  For example, Armstrong dedicated large portions of a June 5, 2014 Investor Day conference to convincing investors that at Plains "[s]afety is a core value" and that Plains "foster[s] a culture that emphasizes operational excellence, asset integrity & safety."  In his presentation, the top three items Armstrong highlighted as demonstrating Plains' "Commitment to Operational Excellence" were "Safety," "Pipeline Integrity Management," and "Incident Response Preparation."  Armstrong assured investors that "[w]e are committed to operational excellence in safety, pipeline integrity management, and responding to incidents in the unfortunate development that they do occur."  Armstrong was emphatic: "we do a lot and I mean a tremendous amount that will never be appreciated by the public" when it comes to safety and spill prevention.  Armstrong continued, acknowledging that safety and environmental compliance may "in the short-term hurt our performance in terms of relative to EBITDA targets, etc.," but notwithstanding those costs, "*in all cases* we want to make sure we do the right thing."  These and similar false and misleading representations repeated throughout the Class Period falsely assured the members of the Class, who invested in Plains and Plains Holdings securities in reliance on public representations, that the

1264030_1

Company had prioritized accident prevention while at the same time managing to meet or beat EBITDA guidance to Wall Street for 53 consecutive quarters.

101.     Reasonable Plains investors would believe and expect that defendants' statements that (1) "[t]he DOT regulations include requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences. We have also developed and implemented certain pipeline integrity measures that go beyond regulatory mandate," and (2) "[i]n that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention," were true, and not misleading, as to all of Plains' pipelines running through HCAs, including Lines 901 and 903.  In its Class Period Form 10-Ks, moreover, Plains provided additional comfort to investors that the Company was dedicated to compliance in HCAs, emphasizing that the Plains "devote[d] substantial resources to comply with [government]-mandated pipeline integrity rules . . . for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences."  These representations apply specifically – and exclusively – to all Plains' pipelines running through HCAs.

102.     Likewise, Plains' representation in each of its Form 10-K annual reports that it had complied with the DOT's requirements for HCAs, including "more frequent inspections, correction of identified anomalies and other measures, to ensure pipeline safety in 'high consequence areas,' such as . . . commercially navigable waterways," also applies specifically – and exclusively – to all Plains' pipelines running through HCAs.

103.     Lines 901 and 903 not only reside in a high consequence area, but in an area of highest consequence that "because of its location, could reasonably be expected to cause substantial harm, or significant and substantial harm to the environment by discharging oil into or on any

- 35 -

1264030_1

navigable waters of the United States or adjoining shorelines."[4]  Throughout the Class Period, Lines 901 and 903 made up 9-10% of Plains' interstate crude oil pipelines in HCAs, and 15-18% of those affecting commercially navigable water and sensitive ecological resources.

104.   Furthermore, based on the context in which they were made, reasonable investors in Plains securities would believe and expect that defendants' other false and misleading statements about corrosion control, including that (1) "Plains All American supports its commitment to safe and environmentally responsible operations through extensive and ongoing education and training, as well as investment in *any necessary* equipment, systems, processes, or other resources," and (2) "[w]e have an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if *any of our assets* warrant additional investment or replacement," were true, and not misleading, as to *all* of Plains' pipelines, including Lines 901 and 903.  Indeed, at the same time defendants made these representations, they also represented that:

(i)     The Company "perform[s] scheduled maintenance on *all of our pipeline systems* and make[s] repairs and replacements when necessary or appropriate."

(ii)    Plains "will continue to focus on pipeline integrity management as a *primary operational emphasis*."

105.   Plains assured investors that the Officer Defendants were directly involved in and responsible for the Company's safety, pipeline integrity management and incident response preparation.  For example, defendants stated on their website during the Class Period that the Company's Environmental, Health and Safety program "is successful because it is *developed, supported and carried out by our employees, from the senior management team down to the newest hire*."  The Company's website also represented that "Plains All American is committed to

---

[4]     The significance of Lines 901 and 903's location in potentially contaminating navigable water and the resulting substantial harm is recognized by federal regulations in that separate and distinct response plan requirements are established just for pipelines near navigable waters.  *See* 49 C.F.R. §194.3.

public safety, protection of the environment and operation of our facilities in a prudent and safe manner" and that defendants "believe that all of our pipelines have been constructed and are maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards proscribed by the American Petroleum Institute and accepted industry practice."

106.    In light of defendants' materially false and misleading statements and omissions, and the context in which they were made, reasonable investors would expect and believe that Plains' ILI surveys, enhanced corrosion control, leak detection and damage prevention programs, cathodic protection, and control room management complied with the standards established in the Hazardous Liquid Pipeline Safety Regulations and the Liquid Integrity Management Rule for *all* Plains' pipelines running through HCAs, including Lines 901 and 903.

107.    Indeed, based on defendants' assurances, reasonable investors would expect and believe both that Plains' corrosion program company-wide, and Lines 901 and 903, in particular, complied with applicable regulations and did not have material defects at the time the statements were made.  Reasonable investors would not expect that, with respect to Lines 901 and 903, Plains (1) ignored troubling warnings from PHMSA and the Company' field measurements demonstrating that the ILI tool was inaccurate, (2) instructed its ILI vendor to ignore anomalies, (3) ignored ILI inaccuracies in its repair decisions, (4) failed to properly repair or replace pipelines, (5) disregarded regulatory requirements and PHMSA's notice to conduct preventive and mitigative evaluations, (6) ignored troubling warnings from the proliferating corrosion anomalies signaling that the cathodic protection system was ineffective, (7) ignored PHMSA's warnings about control room violations, and (8) ignored industry practices as the only pipeline operator in Santa Barbara to not install automatic shutoff valves.

108.    In fact, the enhanced safety protocols Plains purportedly instituted in Santa Barbara were illusory – nothing more than false promises used by defendants to cover up the fact that Plains had severely disregarded its pipeline integrity and maintenance obligations and that it was continuing to operate pipelines, like Lines 901 and 903, that should have been taken out of operation.  Indeed, PHMSA warned Plains repeatedly that it had committed "probable violations" of the pipeline safety regulations governing "pipeline integrity management in high consequence areas" through which Lines 901 and 903 ran.  *See* §V.E., VI.A., *infra*.  Among other things, PHMSA found that Plains failed to take additional preventative and mitigative measures in HCAs without any evidence of its justification for its failure to implement the required measures.  *See also* §VI.A.2., *infra*.

109.    Defendants also falsely represented that Plains was well positioned to minimize the impact of spills, assuring investors that in the event any leak was detected, Plains' response would be "immediate," well-coordinated with public officials, and comprehensive so as to minimize any environmental impact.  In reality, Plains' response plans were either slipshod or nonexistent, and, with respect to Lines 901 and 903, violated PHMSA regulations.  *See also* §VI.B., *infra*.

**D.    The Spill**

110.    On May 19, 2015, Line 901 ruptured, triggering what would become the worst California oil spill in 25 years – a spill that wrought devastation spanning several miles of some of the most environmentally sensitive and protected coastline in North America.

111.    The breach in Line 901 developed on the north side of the Pacific Coast Highway and U.S. Highway 101.  Photographic evidence indicates the oil from the breached pipeline first collected in a depression in the ground surface surrounding the location of the pipeline breach.  The oil flowed southward along a surface drainage "gully" that followed the route of the buried pipeline and paralleled the highways.  The oil then flowed west through drainage culverts that passed under the highways to Refugio State Beach, where the oil entered the Pacific Ocean.

- 38 -

112.     The Pacific Ocean tides, waves, and currents then spread the oil to the surrounding beaches and adjacent areas of public and environmental sensitivity including Bell Canyon, Tecolote Canyon, the City of Gaviota, and Coal Oil Point Reserve.  As a result of the spill, wildlife officials reported that nearly 200 birds and more than 100 marine mammals, including dolphins and sea lions, were found dead in the spill area.  As Armstrong conceded during an Investor Day Conference held shortly after the spill, "[i]f you could pick any place in the world you would not want to have a release, [Santa Barbara] would probably qualify as the one."

113.     California state, local and federal agencies responded to the scene, including the U.S. Coast Guard, U.S. EPA, California County Office of Emergency Service, and local fire departments. Plains and ExxonMobil personnel and contracted private oil spill response organizations also responded and initiated oil spill clean-up operations.

114.     Contrary to the Company's representations to investors and regulators, Plains was wholly unprepared for the spill once it occurred.  For example, state law required the Company to report the spill to the federal National Response Center within 30 minutes of detection – and the Company's own plans indicated that it should take no more than 15 minutes to discover a release and shut down the flow and required such notification "at the earliest practicable moment."  Yet, Plains did not report the spill to the National Response Center for hours after it had been discovered.  In fact, it was not Plains, but a 911 call placed to the local fire department, that alerted the National Response Center to the spill.  Although Plains officials noticed anomalies in Line 901 by 10:30 a.m. and shut down the pipeline at 11:30 a.m., government officials first learned of the spill through a 911 call from beachgoers to the Santa Barbara County Fire Department at approximately 11:42 a.m.  And it was the local fire department that first notified the National Response Center of the spill at 12:43 p.m. – nearly two-and-a-half hours before Plains notified the agency.

115.    Almost immediately, defendants mobilized to spin the story.  Defendant Armstrong led the charge – according to testimony from Plains' corporate representative in front of state and county officials investigating the spill, defendant "Chairman and CEO Greg Armstrong was here [in Santa Barbara] from day one."  Plains sought to reassure investors that the spill was under control and contained, that the Company's response was appropriate, and that the damage inflicted was minimal.  Specifically, Plains officials reported that the Company's own analysis of a "worst case" scenario for the spill, which was based on the typical flow rate of oil and the elevation of the pipeline, showed that at most 21,100 gallons of crude oil had gone into the Pacific Ocean, and that as many as 105,000 gallons in total may have been released from Line 901.  Subsequently, on May 26, 2015, Plains filed a Form 8-K with the SEC describing the spill and noting that the Company "currently estimates that the amount of released crude oil could be as high as approximately 2,400 barrels" or 101,000 gallons – a figure reflecting a 4,000-gallon ***reduction*** from the initial estimates the Company provided to investors.  As discussed below, Plains' estimates were false based on Plains' own mathematical method for calculating the size of potential spills.  Ultimately, a year after the Class Period ended, Plains was indicted on felony charges for "knowingly mak[ing] a false or misleading oil spill report to the California Office of Emergency Services" in violation of Government Code §8670.64, subdivision (c)(2)(B).

116.    Defendants worked hard to conceal the scope of the problem.  As a result, in the wake of the spill, "[v]arious county officials . . . expressed multiple concerns with [their] experience with [the] unified command throughout the current situation it is felt that the information was controlled, not transparent and definitely not responsive."  At a public hearing on June 26, 2015, those officials expressed "ongoing concerns about the role of the responsible party, in this case Plains, and the dynamics that allowed that party to influence virtually every aspect of response and communication often contrary to the local agencies' values and practices."

- 40 -

117.    Consistent with the county officials' concerns, a document created by the Spill Unified Command – the committee put together to manage the spill aftermath, which included representatives from Plains – demonstrates Plains' effort to spin the spill story.  For example, a document entitled "Media Briefing Proposal: Refugio Oil Spill Response," which was approved by a Plains representative and other government agencies, indicates that "[i]n recent days, there have been a couple of neutral to negative local news stories about perceived lack of accessibility to the [Unified Command] and in-field operations.  Additionally, we are beginning to detect significant concern from the community about response efforts and a lack of understanding about why and where operations are happening."  The document stated a desire to avoid leaving the "public with the perception that we are abandoning some areas or not completing operations."  The Unified Command encouraged "individual media briefings for members of the Unified Command with a handful of *neutral to positive reporters* who have been covering the incident" to whom to "tell the 'progress' story . . . ."  The document went on to identify certain "Key 'Progress' Themes For Media Briefings" and also identified certain reporters that the Unified Command viewed as "neutral to positive."  Plains' objective was clear: spin the so-called "progress" story rather than disclose the true extent of the disaster.

118.    Finally, on August 5, 2015, the Company disclosed in an investor presentation given in connection with 2Q15 results that the spill could actually be 1,000 barrels – 143,000 gallons – 42% larger than previously reported.  The Company further disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, and that the Company could be liable for potential criminal violations of the CWA.  Further, defendants disclosed that Lines 901 and 903 were subject to multiple PHMSA corrective actions.  Defendants also disclosed for the first time that the spill would cost Plains $257 million, and that the Company's insurance did not cover all of the costs associated with the spill.  The Company also made clear that the

- 41 -

$257 million cost did ***not*** include any lost revenue associated with the shutdown of Lines 901 and 903.

### E.    Governmental Inspections and Investigations of Lines 901 and 903

#### 1.    March 4, 2009 PHMSA Letter to Nerbonne

119.    On March 4, 2009, PHMSA issued a Notice of Amendment to Dan Nerbonne, Vice President of Engineering at Plains.  During April to July 2008 and February 18, 2009 inspections of Lines 901 and 903, PHMSA identified more than 20 "apparent inadequacies found with Plains' plans or procedures."  PHMSA and the California State Fire Marshal conducted the inspection to review Plains' "procedures for Operations and Maintenance, Operator Qualifications, and Integrity Management."  Inadequacies included:

(i)     Plains' data integration process failed to apply ILI tool uncertainty when comparing ILI results to the integrity management rule repair requirement in violation of 49 C.F.R. §195.452(f) and (g).  The inspection team found that tool uncertainty "did not have a direct impact on the timing for the remediation of immediate and 180-day metal loss conditions."  In addition, the inspection found a worksheet that evaluated the ILI tool's as-called anomaly dimensions against the excavation's as-found anomaly dimensions, but Plains' integrity management plan did not show the evaluation methodology.  PHMSA ordered that the evaluation methodology must be incorporated into Plains' integrity management plan.

(ii)    Plains' Operations and Maintenance Manual did not provide guidance on "specific composite repairs methods that are approved for use" and did not provide procedures to follow when making repairs on corroded pipes – in violation of 49 C.F.R. §195.585(a) and (b).  These regulations required that (a) for general corrosion, the operator must replace the pipe, reduce the maximum operating pressure, or "repair the pipe by a method that reliable engineering tests and analyses show can permanently restore the serviceability of the pipe"; and (b) for localized corrosion pitting, the operator must replace or repair the pipe, or reduce maximum operating pressure.

(iii)   Plains' integrity management program did not provide for the submission of "Safety Related Condition Reports (SRCR)" to PHMSA when "pressure reductions are taken for conditions" that meet the SRCR criteria – in violation of 49 C.F.R. §195.55.  This regulation required that Plains submit a report to PHMSA when safety related conditions occur, such as general corrosion that "has reduced the wall thickness to less than that required for maximum operating pressure, and localized corrosion pitting to a degree where leakage might result."  Furthermore, 49 C.F.R. §195.452(h) governing pipeline integrity management in

HCAs requires that pipeline operators "must take prompt action to address all anomalous conditions that the operator discovers through the integrity assessment or information analysis" and "a reduction in operating pressure cannot exceed 365 days without an operator taking further remedial action to ensure the safety of the pipeline."

(iv)    Plains' Operation and Maintenance Manual Section 412 on Corrosion Control did not provide "adequate details for employees to perform their maintenance activities safely" in violation of 49 C.F.R. §195.402, which required that the procedural manual for operations, maintenance, and emergencies must include procedures to provide safety during maintenance and normal operations.

(v)     Plains' "Aboveground Storage Tank Inspection, Repair, and Maintenance Specification [did] not address the hydrostatic test requirements of [industry standard] API 653 section 12.3. The Specification call[ed] for testing per API 653, but [did] not address the hydrostatic test requirements" in violation of 49 C.F.R. §195.307.

(vi)    Plains' O&M [Operation and Maintenance] manual did not provide procedures for pipeline coating inspection in violation of 49 C.F.R. §195.561 governing inspection of pipe coating for external corrosion control.

(vii)   Plains' O&M manual did not have procedures to monitor a Vapor Corrosion Inhibitor System used for breakout tanks and did not have explanation as to why "the use of cathodic protection [was] not needed for the tank bottom protection" in violation of 49 C.F.R. §195.565.

(viii)  Plains did not have specific procedures on how it "will review the result of CIS [close interval survey] and perform quality checks on performance of CIS and data collected to ensure that data actually is representative of what is occurring in the field." In addition, the procedures did not address how Plains will handle issues with the CIS, such as inconsistency between CIS data and field observations, the "development and implementation of action plans for addressing the external corrosion issues identified in CIS," and "[c]orrosion [s]upervisor responsibilities in the implementation of CIS, review of the results of the CIS, and remediation of anomalies identified during the CIS." Plains violated 49 C.F.R. §195.573 governing external corrosion monitor with all of the deficiencies.

(ix)    Plains used an inadequate method for determining voltage drops in monitoring the adequacy of cathodic protection, and its operation and maintenance manual's section on corrosion control provided little guidance on how such drops would be considered. These deficiencies violated 49 C.F.R. §195.571, which required that the determination of the adequacy of cathodic protection must comply with the criteria established in NACE RP0169-96.

(x)     Plains failed to record and include galvanic anodes in the cathodic protection process, and did not address "the practice of installing test points at all galvanic installations to allow on/off reading." These deficiencies violated 49 C.F.R.

§195.589, which required that corrosion control information be maintained, including those for cathodic protection facilities.

(xi)     Plains failed to comply with the coating standards for transition coating used in repairs.  Pursuant to 49 C.F.R. §195.559, coating materials for external corrosion control "must have sufficient adhesion to the metal surface [of the pipeline] to prevent under film migration of moisture."

### 2.     December 24, 2013 PHMSA Warning Letter to Valenzuela

120.     On December 24, 2013, PHMSA issued a Warning Letter to Troy Valenzuela, Vice President of Environmental Health and Safety at Plains.  PHMSA, the Railroad Commission of Texas, and New Mexico Public Regulation Commission inspected the Midland Control Room and found that Plains had "committed probable violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations."  The probable violations concerned control room management and included:

(i)      Plains made changes "to the critical alarm type description and response priority" without following the Management of Change Procedures as required by 49 C.F.R. §195.446(j).  The regulation required that any deviations from procedures "necessary for the safe operation of the pipeline facility" must be documented and maintained for PHMSA's review during inspections.  Furthermore, after interviews with control room staff, PHMSA found that Plains did not follow its "Change Management Procedure, Section 7 of the Midland Control Room Management Plan," which required that Plains follow its own change management procedures when the Pipeline Controller Procedure Manual was modified.  The Management of Change process must be followed when "new or revised procedures, operating responsibilities between pipeline controller and field personnel or third-party operations, field maintenance activity affecting pipeline control room operations, control system changes, [or] SCADA system changes" or other changes occurred affecting the control room operation.

(ii)     Plains provided no evidence of compliance with 49 C.F.R. §195.446(j)'s requirement "to review the controller training program content" at least once a year (but at intervals not longer than 15 months) to identify potential improvements to the training program.

(iii)    Control room personnel failed to completely fill out Abnormal Operations forms, with information such as maximum operating pressure, signatures, and dates missing – in violation of 49 C.F.R. §195.446(j).

### 3. May 21, 2015 PHMSA Corrective Action Order

121.  On May 21, 2015, PHMSA issued a Corrective Action Order (the "May 21 CAO") requiring Plains to take corrective actions with respect to Line 901 in order to protect the public, property and the environment from potential hazards caused by the spill.  The May 21 CAO noted certain preliminary findings concerning the spill, including that Line 901 had been inspected by Plains on May 5, 2015 as part of a complete in-line inspection to collect data and evaluate the integrity of the pipeline.  The May 21 CAO noted that Plains had not yet received a formal report regarding that inspection, but that previous inspections performed on Line 901 in June 2007 and July 2012 had demonstrated a worsening of pipeline integrity.  In 2007, Plains made 13 excavations related to corrosion of Line 901, and in 2012, Plains made 41 such excavations.  Furthermore, PHMSA found that Plains used shrink wrap sleeve coating on Line 901.  The May 21 CAO required Plains to take immediate corrective actions, including shutting down and reviewing the line, testing the line, developing a remedial plan, performing a review of the Company's emergency response plan and training, and identifying all areas of Line 901 that used shrink wrap sleeve coating.

### 4. June 3, 2015 PHMSA Corrective Action Order – Amendment No. 1

122.  On June 3, 2015, PHMSA issued an amended Corrective Action Order (the "June 3 CAO") that revealed that there was "***extensive external corrosion***" on Line 901 and also identified extensive corrosion and other deficiencies on adjoining Line 903.  The June 3 CAO required Plains to take additional corrective actions, including shutting down Line 903.  PHMSA noted that the results of Plains' own May 5, 2015 inspection survey revealed four areas on Line 901 with pipe anomalies that required "immediate investigation and remediation" under relevant regulations and Plains' own integrity management plan.

123.  Specifically, the June 3 CAO stated:

The results of Plains' May 5, 2015 In-Line Inspection (ILI) survey revealed four areas on [Line 901] with pipe anomalies requiring ***immediate investigation and remediation*** in accordance with 49 C.F.R. §195.452(h) or Plains' own criteria for investigation under its integrity management plan.  Examination and measurements of three of these areas indicated ***extensive external corrosion***, primarily on the bottom quadrant of the pipe.  The deepest ***metal loss*** at each area, as measured by Plains nondestructive testing contractors, ranged between ***54% and 74%*** of the original pipe wall thickness.  The anomalies were not limited to being near the girth welds, but also occurred at other locations along the length of the pipe.  The fourth area to be investigated has not yet been completed.

[Line 901] is experiencing ***active external corrosion***, as follows:

- Plains has reported to PHMSA that the May 5th ILI survey revealed metal loss of approximately 45% of the original wall thickness in the area of the pipe that failed on May 19.

- PHMSA inspectors noted ***general external corrosion*** of the pipe body during field examination of the failed pipe segment.

- The rupture characteristics at the Failure site indicate a longitudinally oriented opening approximately 6 inches in length and located in the bottom quadrant of the pipe.  Third-party metallurgists in the field estimated that corrosion at the Failure site had degraded the wall thickness to an estimated 1/16 of an inch (.0625").  This thinning of the pipe wall is greater than the 45% metal loss which was indicated by the recent ILI survey.

- PHMSA inspectors observed three repairs to [Line 901] in the area near the Failure site that had been made due to external corrosion.  These repairs were made after the 2012 ILI survey.

124.    The pipeline wall's corrosion to one-sixteenth of an inch amounts to a reduction of over ***80%*** of the original thickness.  PHMSA further noted that inspection surveys conducted for different segments of Line 903 appeared inconsistent – a red flag that should have prompted immediate investigation by the Company – and ordered the Company to shut down Line 903 as well.

### 5.    September 11, 2015 Notice of Probable Violation and Proposed Compliance Order

125.    On September 11, 2015, PHMSA sent Plains a Notice of Probable Violation and Proposed Compliance Order ("September 11 Compliance Order") to Troy Valenzuela, Plains' Vice President of Environmental Health and Safety at Plains' headquarters in Houston.  Mr. Valenzuela

- 46 -

reported directly to defendant Pefanis.   The September 11 Compliance Order was based on violations found during PHMSA's August 19-22, 2013, September 16-19, 2013, and September 30-October 4, 2013 inspections of Lines 901 and 903 conducted pursuant to Chapter 601 of 49 United States Code.   The September 11 Compliance Order outlined several "probable violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations."

126.   The September 11 Compliance Order determined that Plains violated §195.310(a) because "Plains did not maintain adequate documentation of pressure tests as part of its baseline assessment plan for its seven (7) breakout tanks at Pentland Station in Kern County, California." During the inspections, Plains was unable to "present evidence of past pressure tests performed on the breakout tanks to the inspection team."  Although Plains later provided PHMSA with records of tests from 1995, those "documents did not demonstrate that pressure tests were performed on the tanks in accordance with" applicable law.

127.   PHMSA also found two probable violations of §195.452, governing "Pipeline integrity management in high consequence areas."

128.   First, Plains could provide no written evidence during or after the inspection that it had undertaken the required preventive and mitigative evaluations prior to or during 2013 for segments of Line 903 that run through HCAs.  Specifically, the September 11 Compliance Order states:

> Plains did not maintain adequate documentation of its preventive and mitigative evaluations prior to the 2013 calendar year for "Sisquoc to Pentland" and "Pentland to Emidio" pipeline segments.  A Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate the 2013 preventive and mitigative evaluations for those pipeline segments.

129.   Second, the September 11 Compliance Order found that Plains failed to take additional preventative and mitigative measures in HCAs, and was unable to show evidence that it

had even considered such measures or provide a justification for the failure to implement them in

violation of applicable law.  Specifically, the September 11 Compliance Order states:

> For High Consequence Areas (HCAs) where Plains does not take additional
> preventive and mitigative (P&M) measures, Plains did not adequately document its
> consideration of P&M measures or its justification for not implementing these
> measures.  The inspection team found a lack of documentation to demonstrate the
> consideration and decision-making process of potential P&M measures.

130.    The September 11 Compliance Order further found that Plains violated §195.403,

which governs Emergency Response Training, because Plains could produce no documentation to

demonstrate the required annual review of response training or the "the decision-making process for

changes made to its program."   Additionally, Plains "did not have adequate documentation to

demonstrate that supervisors maintained a thorough knowledge of that portion of the emergency

response procedures established under §195.402 for which they are responsible to ensure

compliance."

131.    Finally, the September 11 Compliance Order found that Plains violated §195.507

regarding recordkeeping because "Plains did not document which qualified contractors performed

each covered task on a daily basis.  Each project file had a written list of all qualified individuals, but

there was no written documentation to show who performed each task on a day-to-day basis."

132.    Plains was aware of the probable violations identified by PHMSA in the

September 11 Compliance Order at the time of the 2013 inspections, or shortly thereafter.  Although

the final September 11 Compliance Order was sent on September 11, 2015, the foregoing "findings

and probable violations were determined *prior to* the May 19, 2015 crude oil spill in Santa Barbara

County, California."  Further, "PHMSA requested additional information [from Plains] following

[PHMSA's] field visit, which was provided between late 2013 and June 2014."   Finally, the

September 11 Compliance Order states that the items detailed therein "were discovered in these

2013 inspections, and include consideration of supporting documentation provided by Plains in 2014."

133.    In addition to the probable violations, PHMSA enumerated a series of "Additional Areas of Safety Concern" in the Compliance Order.  PHMSA stated that "[d]uring the course of our inspection, our representatives found concerns that may impact your current level of safety. These areas of concern were discussed with Plains during the inspection, but they are not considered to be explicit regulatory violations.  Nevertheless, PHMSA recommends that these issues be addressed to improve the level of safety on your pipeline system."

134.    First, "Plains had unclear procedures and documentation of its decision making process for addressing when in-line inspection (ILI) tool run data indicates anomalous conditions. Specifically, the Plains procedures did not appear to fully discuss or document how tool tolerance was addressed or how measured anomalies that deviated significantly from the size predicted by the tool were addressed."

135.    Second, "Plains had incomplete documentation of its Management of Change (MOC) for a pressure reduction.  The inspection team found an incomplete MOC form, specifically Plains MOC form 5012-5004, dated January 12, 2012.  A pressure reduction was to be taken, but the current and proposed pressure set points were inadequately documented."

136.    Finally, "Plains is responsible for educating emergency response officials as part of its Public Awareness Program.  A review of Plains' Emergency Response Contact Reports for local fire and sheriff departments on June 26, 2013 indicated evidence of a lack of familiarity with the California One-Call System.  Plains did not provide any documentation of follow-up where Plains educated emergency response officials on the One-Call System."

6.      **November 12, 2015 Corrective Action Order – Amendment No. 2**

137.    On November 12, 2015, PHMSA sent Valenzuela Amendment No. 2 to the May 21 CAO ("November 12 CAO"), which contained additional findings and required Plains to take additional corrective actions with respect to Lines 901 an 903.  The additional findings arising from PHMSA's investigation of the accident included the following:

- PHMSA's independent review of in-line inspection (ILI) tool surveys for Lines 901 and 903 over the past 10 years found that anomalies were "***under-called***" in areas of general corrosion.  Direct field examination and measurements of the anomalies revealed that the actual length and width of the anomalies were greater than the measurements predicted by the ILI tool.  Specifically, on Line 901, direct measurement of the metal loss anomaly at the failure site and other anomalies excavated in 2015 showed that these anomalies were generally more significant than the ILI results indicated they would be.

- Common practice in the pipeline industry is to provide the ILI vendor with field data from direct investigation of anomalies to validate the ILI tool's detection capabilities and limitations, the accuracy with which it can locate and size anomalies, and the confidence associated with the tool's measurements.   After excavating, investigating, characterizing, and measuring anomalies from the results of various ILI surveys, ***Plains did not share its actual field findings with the ILI vendor so that it could enhance its interpretation of the ILI data***.

- PHMSA's independent review of ILI surveys from the past 10 years show that Line 903, particularly the Gaviota to Sisquoc segment, has ***similar corrosion characteristics as Line 901 and a number of the anomalies had characteristics consistent with the failure site***.  Specifically, Line 903 has both localized and larger or "general" areas of external corrosion.

                             *       *       *

- Freeport-McMoRan Oil & Gas (Freeport) operates a 37-mile pipeline system from its Hidalgo, Hermosa and Harvest offshore platforms. . . .   This unprocessed crude may contain water, natural gas, and other impurities that contribute to internal corrosion.  According to Freeport, the biocide and rust inhibitor in this crude oil will begin to lose effectiveness around November 2015, adding to the risk of accelerated internal corrosion on Line 903.

- Due to the number of corrosion-caused anomalies identified on Line 903 in past ILI surveys, particularly on the Gaviota to Sisquoc segment, ***it does not***

- 50 -

*appear that Plains has an effective corrosion control program and the pipe
can be expected to have degraded (lost metal due to corrosion) since the
last ILI survey*.  Furthermore, leaving crude oil in Line 903 is likely to result
in an increased potential for internal corrosion as the inhibitor loses its
effectiveness.  The crude oil in Line 903 needs to be removed from the
pipeline and the line purged with an inert gas in order to prevent further
degradation of the pipeline, and eliminate the potential harm it poses from an
unintended release.

- Stress corrosion cracking (SCC) or environmentally-assisted cracking can be
  induced on a pipeline from the combined influence of tensile stress and a
  corrosive medium.  As noted in PHMSA's Advisory Bulletin ADB-03-05
  (issued October 7, 2003), SCC is commonly associated with disbonded
  coatings. Disbonded coatings may prevent the cathodic protection current
  used for corrosion control from reaching the pipe surface and allow an SCC-
  susceptible environment to form between the pipe and coating.  Tape
  coatings and shrink wrap sleeves are both coatings susceptible to
  disbondment and may lead to corrosion and possibly environmentally
  assisted cracking or SCC.  Line 903 has shrink wrap sleeves on the girth
  welds, which could contribute to SCC.

138.    In light of these findings, and PHMSA's conclusion that "a failure to issue this Order
expeditiously to require immediate corrective action would result in the likelihood of serious harm to
life, property, or the environment," Plains was required to immediately take steps to empty, purge,
and shut down Line 903.  Plains was also required to provide a purge plan that included the
"[i]dentification and remediation of any anomalies with characteristics similar to the Line 901 failure
location."   Plains was also ordered to provide its ILI vendor "with the field measured data and
request that the ILI vendor use the field data to re-evaluate the ILI results in order to identify any
additional anomalies that must be remediated per §195.452(h) or that have characteristics similar to
the Line 901 failure location."   Finally, Plains was ordered to provide additional training and
"enhanced preventive and mitigative measures that Plains will implement to monitor the pipeline
during the purge activity."

139.    PHMSA's findings were based on historical data defendants either knew about or
recklessly disregarded.  For example, PHMSA's conclusions that "it does not appear that Plains has
an effective corrosion control program" and that Line 903 likely had degraded further since the last

- 51 -

ILI were based on their study of historical ILI data that had been provided by Plains' ILI vendor, Rosen, to Plains in real time.  PHMSA's conclusion that Plains' ILI surveys "under-called" anomalies was based on the same data.

### 7.    May 16, 2016 Indictment

140.    After the Class period, on May 16, 2016, Plains was indicted on 46 criminal counts, including four felony charges for discharging oil into state and federal waters in violation of the Clean Water Act, knowingly causing a hazardous substance to spill on a road, street, highway or railroad, and knowingly making false or misleading reports following the spill.  On February 27, 2017, the Santa Barbara Superior Court denied Plains' motions to set aside the criminal indictment.

### 8.    May 19, 2016 PHMSA Failure Investigation Report

141.    On May 19, 2016, PHMSA published the Failure Investigation Report on "Plains Pipeline, L.P., Line 901 Crude Oil Release, May 19, 2015, San Barbara County, California," which contained additional findings and conclusions from its investigation of the spill.[5]  In its report, PHMSA found that Line 901 was only operating at 56% of its maximum operating pressure immediately prior to the release and concluded that such pressure "should not have caused the release *if the pipeline's integrity had been maintained to federal standards.*"  To arrive at its conclusions, PHMSA conducted interviews, "reviewed numerous historical documents and available records, and performed a thorough review of Plains Control Room in Midland, TX."  As part of PHMSA's investigation, "factual evidence reviewed include[d]: the Plains Integrity Management Plan (IMP), CP [cathodic protection] records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures, and reports obtained from the pipeline operator

---

[5]    On June 16, 2016, PHMSA issued Amendment No. 3 to the Corrective Action Order to Armstrong with additional requirements for the Line 901 and Line 903 restart plans.  Amendment No. 3 required the addition of many enhancements to Plains' integrity management program, control room management, and corrosion prevention program to address deficiencies found in the Failure Investigation Report before PHMSA would approve a restart plan for Line 901 and parts of Line 903.  To date, neither pipeline has returned to service.

and PHMSA SMEs."  Plains had substantially all of this factual evidence in its possession long before the spill occurred.

142.     PHMSA determined that the direct cause of the release was external corrosion that occurred below the pipeline's coating "that thinned the pipe wall to a level where it ruptured suddenly and released heavy crude oil."  In addition, PHMSA found "numerous contributory causes of the rupture" and categorized them "into three categories: 1) ineffective protection against external corrosion of the pipeline; 2) failure by Plains to detect and mitigate the corrosion; and 3) lack of timely detection of the rupture."

143.     The first contributory cause – the ineffective protection against external corrosion of the pipeline – stemmed from (1) Plains' deviation from industry practices by using an ineffective cathodic protection system for Lines 901 and 903 and (2) Plains' violation of regulatory requirements by removing segments of Line 901 from cathodic protection altogether.  PHMSA stated that "[i]ndustry practices recognize that an impressed current system like the one utilized in Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) became compromised."  In addition to ineffective cathodic protection, "Plains provided a statement to PHMSA indicating that between 2008 and 2015, approximately 2120 feet of the 20-inch and 24-inch piping was disconnected from or removed from the cathodically protection pipeline system."

144.     The second contributory cause – failure by Plains to detect and mitigate external corrosion – stemmed from deficiencies in Plains' Integrity Management Program and its failure to "fully implement [its] IMP."  These deficiencies included:

    (i)    Plains failed to identify corrosion under insulation as a risk factor in its integrity management program.

    (ii)    Plains' field measurements of anomalies were inconsistent with the ILI tool's data on the anomalies for the 2007 and 2012 surveys.  "Plains did not consult the ILI vendor to help resolve the inconsistency."

(iii)  Plains' written procedures required appropriate statistical analysis of the anomalies after field measurements.  While Plains created a unity plot showing the inconsistencies between field measurements and ILI survey data, there was no evidence of Plains doing anything with the information from the unity plot.

(iv)  Plains excavated within six feet of the rupture location after the 2012 ILI survey. "There was evidence of corrosion and degraded coating systems between the 2012 repair site and the 2015 rupture site."  Plains left them unrepaired.

(v)  The anomaly that caused the rupture was measured at 45% by the ILI tool in 2012. Plains integrity management program "specified adding 10% to all anomalies (55% depth in this case) and then 'growing them' to predict failure using an anticipated corrosion growth rate.  This analysis would provide a predicted failure time.  Plains did not excavate the anomaly that failed."  Per Plains' own calculation, the anomaly was at 55% depth even before adjusting for the ILI tool's uncertainty.  Plains decided not to repair the anomaly even though it was excavating another one that was only six feet away.

145.  The third contributory cause – lack of timely detection of and response to the rupture – stemmed Plains' deficient control room management, inadequate training program and failure to upgrade its leak detection system.  The defects included:

(i)  The leak detection system was outmoded and was not able to conduct line pack calculations to assist in leak detection by determining the amount of oil remaining in the pipeline segment.  Plains recognized the need for an upgrade, but relegated Lines 901 and 903's priority to low-to-medium status as a result of its failure to account for culverts leading to the ocean as part of its consequence-based evaluation.

(ii)  With a faulty alarm management process, Plains set the low pressure alarm below 200 psig and failed to identify the alarm as a "high priority safety related alarm" in its alarm description.  While the pipeline was leaking and throughout the purge, the pipeline pressure remained at 210 to 211 psig and did not dip below 200 psig. The low pressure alarm was set at an unreasonably low level.

(iii)  The controller and step-up shift supervisors were not adequately trained to detect abnormal conditions.  Decreased pressure and increased flow – characteristics of Line 901 on the morning of the release – was "consistent with a pipeline release." But both the controller and step-up shift supervisors failed to recognize the signs and restarted the line after rupture.

(iv)  Step-up and shift supervisors were not trained for emergency shutdown of pipelines, even though emergency shutdown was part of their responsibilities.

     (v)    Plains did not account for the culverts near the release site in its spill response plan and "[t]he response plan did not have a response strategy that considered the presence of the culverts."

146.    The Failure Investigation Report included a "Line 901 Release (5/19/15) Technical Root Cause Analysis" written by Det Norske Veritas (U.S.A.), Inc. for "customer Plains All American Pipeline, L.P." While the report authored by a Plains' vendor is biased and is contradicted by certain of PHMSA's findings, it nevertheless conceded that an "IMP [integrity management program] is only as good as the data that are utilized to monitor and measure its performance," and in many areas, Plains' process was not "in strict adherence with the requirements of IMP."

**F.    Plains' Testing, Enhanced Corrosion Control, Leak Detection, and Damage Prevention Program Deficiencies Were Pervasive System-Wide**

147.    The corrosion control deficiencies related to Lines 901 and 903 were not unique; Plains' pipeline systems throughout the United States were rife with similar problems:

     (i)    On April 6, 2010, PHMSA sent a letter to Valenzuela with a DOT final order finding that Plains had violated 49 C.F.R. §195.406(a)(2) for failing to electrically check external corrosion control rectifiers at the intervals required by regulations, to promptly correct corrosion control deficiencies, and to examine coupons that monitor corrosion inhibitors in its pipeline systems at various facilities. PHMSA and the California State Fire Marshal identified these deficiencies during their inspections of Plains' facilities in ten states in the southern and western regions during February to July 2008.

     (ii)    On March 15, 2011, PHMSA sent a letter to Gorman with a DOT final order stating that Plains violated 49 C.F.R. §195.581 for failing to coat a pipeline against atmospheric corrosion. PHMSA identified this deficiency during its February 17, 2009 to March 12, 2009 inspections of Plains' facilities in Texas, Oklahoma, and New Mexico.

     (iii)    On April 5, 2013, PHMSA issued a Notice of Probable Violation to Valenzuela concerning Plains' removal of tanks from cathodic protection and not meeting the criteria for cathodic protection established in NACE SP 0169. Plains removed 16 tanks from cathodic protection in violation of 49 C.F.R. §195.563, which required cathodic protection on breakout tank areas, bare pipelines, and buried piping in pumping stations. In addition, the voltage readings on various tanks did not meet the criteria established in NACE SP 0169 in violation of 49 C.F.R. §195.571, which required that the adequacy of cathodic protection "must comply with one or more of the applicable criteria and other considerations" in NACE SP 0169.

1264030_1

These deficiencies were identified by PHMSA during its 2011 to 2012 inspection of Plains' facilities in Oklahoma.

(iv)    On April 5, 2013, PHMSA issued a Notice of Probable Violation to Valenzuela concerning Plains' failure to establish proper inspection intervals for 30 tanks. Pursuant to API 653, "[w]hen corrosion rates are not known and similar service experience is not available to estimate the bottom plate minimum thickness at the next inspection, the internal inspection interval shall not exceed 10 years." However, Plains established its inspection interval at 14 years. As such, Plains violated 49 C.F.R. §195.432, which required that inspections must be made in accordance with API 653. This deficiency was identified by PHMSA during its 2011 to 2012 inspection of Plains' facilities in Oklahoma.

(v)    On April 5, 2013, PHMSA issued a warning letter to Valenzuela concerning Plains' failure to specify that API standard RP 651 must be used in its corrosion control procedures for breakout tanks in violation of 49 C.F.R. §195.565. This deficiency was identified by PHMSA during its 2011 to 2012 inspection of Plains' facilities in Oklahoma.

(vi)    On April 5, 2013, PHMSA issued a warning letter to Valenzuela concerning Plains' conflicting criteria for cathodic protection in its procedures. In addition, Plains must account for voltage drop from one point of the tank to another if it chose to use the criteria for on potential. Plains' inadequacies violated 49 C.F.R. §195.565 and was identified by PHMSA during its 2011 to 2012 inspection of Plains' facilities in Oklahoma.

(vii)    On May 17, 2013, PHMSA sent a letter to Pefanis with a DOT final order finding that Plains had violated 49 C.F.R. §195.579(b) by failing to inspect coupons used to monitor internal corrosion at least twice a year at the Calumet location. PHMSA found this violation during its June 27, 2011 to December 2, 2011 inspections of facilities in Texas, Louisiana, and New Mexico.

(viii)    On July 30, 2014, PHMSA issued a warning letter to Valenzuela regarding Plains' failure to inspect a pipe for internal corrosion in violation of 49 C.F.R. §195.579, which required that Plains investigate a pipe longitudinally and circumferentially "to determine whether additional corrosion requiring remedial action exists in the vicinity of the removed pipe." Plains' Operations and Maintenance Procedures Manual Appendix C had a similar requirement, but Plains failed to conduct an investigation on the Kirby to Casper line. PHMSA identified such failure during its July 2013 and September 2013 inspections of the Houston headquarter and field facilities in Wyoming.

(ix)    On December 3, 2014, PHMSA issued a warning letter to Valenzuela regarding Plains' deficiency in corrosion control after its inspections of the pipeline facilities in Louisiana, Illinois, Oklahoma, New Mexico, Texas between February 18 to August 29, 2014. Plains violated 49 C.F.R. §195.581 for the failure to properly coat pipings against corrosion, resulting in paint peeling off at the Quitman

station, coating degradation at the Healdton pump station, coating degradation at the Buffalo pipeline system, and other coating issues.

(x)     On April 28, 2016, PHMSA sent a letter to Valenzuela concerning Plains' deficiencies in external corrosion control.  First, Plains failed to meet the cathodic protection criteria established in NACE SP 0169 in "at least two sequential annual [close interval] surveys in 2012 and 2013 for various points along the Buffalo pipeline system.  This failure violated 49 C.F.R. §195.571, which required that cathodic protection must comply with the applicable criteria in paragraph 6.2 and 6.3 of NACE SP 0169.  Second, Plains failed to adequately inspect rectifiers used for monitoring external corrosion for the Laverne to Stockholm facilities in violation of 49 C.F.R. §195.573.  The regulation required six inspections annually, but Plains checked the rectifiers only five times in 2013.  These violations were discovered by PHMSA during its February 18, 2014 to August 29, 2014 inspections of pipeline facilities in Texas, New Mexico, Illinois, Oklahoma and Louisiana.

(xi)    On May 11, 2016, PHMSA sent a letter to Valenzuela concerning Plains' inadequacies in defining a detailed process for validating ILI tool results and failure to establish both the ILI vendor's and Plains' criteria for a successful ILI run.  These deficiencies were in violation of 49 C.F.R. §195.452(f)(4) governing pipeline integrity management in high consequence areas and were discovered by PHMSA during its February 18, 2014 to August 29, 2014 inspections of pipeline facilities in Texas, New Mexico, Illinois, Oklahoma and Louisiana.

148.    Plains' additional deficiencies involving testing, leak detection, damage prevention, and spill response included:

(i)     On April 6, 2010, PHMSA sent a letter to Valenzuela with a DOT final order finding that Plains had violated 49 C.F.R. §195.406(a)(2) for failing to provide overpressure protection to a pipeline with maximum operating pressure exceeding maximum design pressure of the valves.  PHMSA and the California State Fire Marshal identified this problem during their February to July 2008 inspections of Plains' facilities in ten states in the southern and western regions.

(ii)    On April 6, 2010, PHMSA sent a letter to Valenzuela with a DOT final order finding that Plains had violated 49 C.F.R. §195.420 for failing to inspect valves at least twice a year.  This deficiency was found by PHMSA and the California State Fire Marshal during their February to July 2008 inspections of Plains' facilities in ten states in the southern and western regions.

(iii)   On April 6, 2010, PHMSA sent a letter to Valenzuela with a DOT final order finding that Plains had violated 49 C.F.R. §195.430 for not having fire extinguishers or fire plan at the Odessa station, not having adequate firefighting equipment at each breakout tank and pump station, and not coordinating with local fire departments to ensure that they were aware of the Eucutta, Lumberton, Ten Mile, and Liberty stations facilities.  These deficiencies were found by

PHMSA and the California State Fire Marshal during their February to July 2008 inspections of Plains' facilities in ten states in the southern and western regions.

(iv)     On March 15, 2011, PHMSA sent a letter to Gorman with a DOT final order stating that Plains' violated 49 C.F.R. §195.432 for failing to conduct monthly inspection of five tanks during 2007 to 2009 as required by API 653. These failures were found by PHMSA during the February 17, 2009 to March 12, 2009 inspections of Plains' facilities in Texas, Oklahoma, and New Mexico.

(v)      On February 25, 2013, PHMSA sent a letter to Valenzuela concerning Plains' failure to include procedures in its manual "directing the actions [to be] taken by a controller during an emergency as required by control room management." This failure violated 49 C.F.R. §195.402. PHMSA identified this deficiency during its October 8 to 12, 2012 inspections at the Trenton gathering system in North Dakota.

(vi)     On April 5, 2013, PHMSA issued a Notice of Probable Violation to Valenzuela concerning Plains' failure to demonstrate that all repairs to breakout tanks required by API 653 were completed or to provide engineering justification on why repairs were not made. As such, Plains violated 49 C.F.R. §195.205, which required that repairs must be made in accordance to API 653. The deficiency was identified by PHMSA during its 2011 to 2012 inspections of Plains' facilities in Oklahoma.

(vii)    On April 5, 2013, PHMSA issued a Notice of Probable Violation to Valenzuela concerning Plains' failure to "maintain adequate firefighting equipment at their Cushing Terminal" in violation of 49 C.F.R. §195.430. The deficiency was identified by PHMSA during its 2011 to 2012 inspections of Plains' facilities in Oklahoma.

(viii)   On April 5, 2013, PHMSA issued a warning letter to Valenzuela concerning Plains' failure to reference the proper API standard for pressure testing in violation of 49 C.F.R. §195.307. The deficiency was identified by PHMSA during its 2011 to 2012 inspections of Plains' facilities in Oklahoma.

(ix)     On May 17, 2013, PHMSA sent a letter to Pefanis with a DOT final order finding that Plains had violated 49 C.F.R. §195.432 by failing to inspect or test a tank used to relieve surges from Plains' pipelines, and 49 C.F.R. §195.404(c)(3) for failing to maintain records of each inspection or test. PHMSA identified these deficiencies during its June 27, 2011 to December 2, 2011 inspections of facilities in Texas, Louisiana, and New Mexico.

(x)      On January 6, 2016, PHMSA issued a Notice of Probable Violation to Valenzuela concerning Plains' failure to carry out its written damage prevention program, which resulted in damages to the Mesa to Basin pipeline on January 1, 2015. Plains failed to provide line markings for the buried pipeline, to determine and provide to the excavator the depth of cover on its buried pipeline, and to inspect the pipeline during excavation activity – all in violation of 49 C.F.R. §195.442.

(xi)     On April 28, 2016, PHMSA sent a letter to Valenzuela concerning Plains' failure to adequately inspect valves for the Mayson to Ellis pipeline and to verify that they were functioning properly.  Pursuant to 49 C.F.R. §195.420, each mainline valve must be inspected at least twice annually.  This violation was discovered by PHMSA during its February 18, 2014 to August 29, 2014 inspections of pipeline facilities in Texas, New Mexico, Illinois, Oklahoma and Louisiana.

149.     As a result of Plains' pervasive violations, before and during the Class Period, Plains and its related companies reported to federal regulators 229 safety and maintenance incidents on pipelines.  In fact, among more than 1,700 operators included in a PHMSA-maintained database tracking incidents from 2006 to 2015, only three operators reported more incidents than Plains.  The Company's reported infractions involved pipeline corrosion, pump failure, equipment malfunction, excavation damage and operator error, resulting in more than $141 million in property damage and the release of more than 802,000 gallons of hazardous liquid.

150.     At all times during the Class Period, defendants were well aware of the risks associated with Plains' failure to properly address the corroding pipelines.  As described above, prior to and during the Class Period, PHMSA repeatedly cited Plains for corrosion control deficiencies.  In fact, Plains' systemic corrosion control failures in violation of the HLPSA resulted in more than 78 oil spills since 2006 directly caused by corrosion.  Plains' corrosion-related incidents represented close to 40 percent of the Company's overall releases and corrosion was the leading cause of its oil spills in the past ten years.  In addition, as set forth in the annual Integrity Management Performance Reports certified by Plains' senior executive officers (*see* §V.J., *infra*), the number of severe corrosion anomalies infesting the Company's HCA pipelines proliferated every year from 28 in 2012, 184 in 2013, 257 in 2014, and 580 in 2015 – a 20-fold increase during the time period.  Pursuant to 49 C.F.R. §195.452(h)(4), these severe anomalies were required to be remediated either immediately or within two or six months.

151.    In fact, PHMSA data reveals that Plains, prior to and during the Class Period, was the *worst* pipeline operator in the United States as measured both by the number of total incidents and number of incidents per 1,000 miles of pipeline operated.  Such incidents raised red flags during the Class Period that were known to defendants but ignored in favor of a short-sighted profits-based strategy that directly contradicted the Company's public statements.

152.    Plains' dismal record of oil spills is a direct result of its long history of non-compliance with regulatory requirements on corrosion control, integrity management and emergency response training.  The effects of regulatory compliance deficiencies are further exacerbated by its deviation from industry norms in its failure to share corrosion anomalies field examination results with its ILI vendor and absence of automatic shutoff system in its pipeline networks.  As a result, Plains outranks it competitors in both numbers of incidents in the past ten years and incidents per 1,000 miles of pipeline:

|   | Operator | System Type | Pipeline Miles | No. of Incidents | Incidents per 1,000 Miles | Pct. of Incidents Caused by Corrosion |
|---|---|---|---|---|---|---|
| 1 | **PLAINS PIPELINE, L.P.** | **HL** | **6,430** | **196** | **30** | **40%** |
| 2 | BUCKEYE PARTNERS, LP | HL | 6,214 | 141 | 23 | 13% |
| 3 | COLONIAL PIPELINE CO | HL | 5,587 | 164 | 29 | 12% |
| 4 | ENBRIDGE ENERGY, LIMITED PARTNERSHIP | HL | 4,604 | 107 | 23 | 6% |
| 5 | NUSTAR PIPELINE OPERATING PARTNERSHIP L.P. | HL | 4,359 | 47 | 11 | 15% |
| 6 | SHELL PIPELINE CO., L.P. | HL | 3,761 | 92 | 24 | 15% |
| 7 | NUSTAR LOGISTICS, L.P. | HL | 3,612 | 17 | 5 | 35% |
| 8 | PLANTATION PIPE LINE CO | HL | 3,173 | 43 | 14 | 5% |
| 9 | SFPP, LP | HL | 2,829 | 46 | 16 | 11% |
| 10 | CENTURION PIPELINE L.P. | HL | 1,882 | 15 | 8 | 31% |

153.    Plains caused 39% more incidents than Buckeye Partners, LP, its closest competitor that operates hazardous liquid pipelines with similar pipeline mileage.  When measured by incidents per 1,000 miles of pipeline, Plains exceeded Buckeye Partners, LP by 34% on an incidents-per-1,000-miles of pipeline basis.  For Plains, corrosion was the leading cause of spills and represented

40% of all incidents.  For Buckeye Partners, LP, corrosion represented only 13% of the all incidents. Indeed, Plains had *four times* more corrosion-caused spills than its closest competitor.

154.    Despite regulatory agencies' efforts in imposing civil penalties and injunctive relief, Plains' record continued to worsen.  The number of Plains' pipeline incidents resulting in significant releases of greater than 20 barrels *increased* by 44% in the four years after the execution of the 2010 Consent Decree when compared to the four years leading up to the Consent Decree.

155.    Armstrong recognized Plains' dismal record in his internal presentation to Plains employees on environmental safety just hours before the Santa Barbara disaster: "*Have we always highlighted or communicated safety as much as we could/should have?  Undoubtedly we have not*. Can we do even better?  You bet!  . . .  Must we do better?  Absolutely."  However, when speaking with investors, Armstrong blamed others for Plains' dismal record: "We used to say: I really fear shallow-line pipelines and deep-pulling plows, because if somebody pulls their plow through our pipeline it may be their fault but it's our problem, and we have to go out and take care of that . . . you have the same goal, zero incidents.  That doesn't always happen.  There are wrecks; people do pull in front of you; things happen."  In truth, nobody pulled a plow through Line 901.

156.    In fact, analyses conducted on behalf of plaintiffs show that leading up to the Class Period, Plains' failure to address maintenance issues on an expansive, but degraded pipeline system had caused it to become the worst safety and environmental-regulation violator in the pipeline business, both by total number of incidents and incidents per 1,000 miles of pipeline operated.

**G.    Plains' Legal and Regulatory Compliance Failures and the Company's Material Pipeline Integrity Deficiencies Were Recorded, Processed, Summarized and Communicated to the Individual Defendants**

157.    During the Class Period, Plains' pipeline integrity information and its material failure to comply with applicable laws and regulations were "recorded, processed, summarized, and

communicated" to Armstrong, Swanson, Pefanis and McGee.  In all of the Form 8-K underwriting agreements, PAA and PAGP represented and warranted that "[t]he Partnership maintains disclosure controls and procedures (to the extent required by and as such term is defined in Rules 13a-15 and 15d-15 of the Rules and Regulations), that (i) are designed to provide reasonable assurance that material information relating to the Partnership, including its consolidated subsidiaries, *is recorded, processed, summarized and communicated to the principal executive officer, the principal financial officer and other appropriate officers of GP LLC* to allow for timely decisions regarding required disclosure, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared; (ii) have been evaluated for effectiveness as of the end of the Partnership's most recent fiscal quarter; and (iii) are effective in all material respects to perform the functions for which they are established."  As stated in the Form 10-K annual reports filed by PAA and PAGP during the Class Period, Defendants Armstrong, Pefanis, McGee, Swanson were "executive officers" for the purpose of Regulation S-K disclosure requirements.

158.    In its guidance concerning Rules 13a-15 and 15d-15, the SEC emphasized that the "disclosure controls and procedures" must address quality and timeliness in order to effectuate "Congress' intent to have senior officers certify that *required material non-financial information*, as well as financial information, is included in an issuer's quarterly and annual reports."  In the process of putting together the Form 10-K Annual Reports and Form 10-Q Quarterly Reports filed with the SEC during the Class Period, material information and reports concerning Plains' pipeline integrity and Plains' associated regulatory non-compliance were timely "recorded, processed, summarized, and reported" and "accumulated and communicated to management."

159.    PAA and PAGP also admitted in each of its Form 10-Ks and Form 10-Qs that "[w]e maintain written disclosure controls and procedures, which we refer to as our 'DCP.'  Our DCP is designed to ensure that information required to be disclosed by us in reports that we file under the

Securities Exchange Act of 1934 (the 'Exchange Act') is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow for timely decisions regarding required disclosure."

### H. Plains' Officers Reported and Discussed with the Audit Committee Potential and Actual Failures to Comply with Laws and Regulations

160.    During the Class Period, Plains' pipeline integrity deficiencies and the Company's potential and actual failures to comply with laws and regulations were reported by officers such as Armstrong, Pefanis, McGee, Swanson, Gorman, Nerbonne, and Valenzuela to the audit committee as part of the committee's compliance oversight responsibilities conferred by the audit committee charter.  The committee reviewed and discussed with defendant McGee all potential or actual regulatory non-compliance that could "result in material non-compliance" by PAA or PAGP.  The committee then reported such information and its recommendations to the Board, where Armstrong served as Chairman throughout the Class Period.

161.    According to its charter, which is published on Plains' website, the Plains audit committee was "appointed by the Board to assist the Board in monitoring . . . (4) the compliance by PAGP and PAA with legal and regulatory requirements."  According to its charter, the audit committee met at least quarterly "prior to the filing of each of PAA's and PAGP's Quarterly Reports on Form 10-Q and Annual Report on Form 10-K," and regularly reported to the Board to "provide such background and supporting information as may be necessary for the Board to make an informed decision."

162.    In executing its compliance oversight responsibilities, the committee "[o]btain[ed] reports from management . . . with respect to compliance by each of PAGP, PAA and their respective subsidiary/foreign affiliated entities with applicable legal requirements" and

- 63 -

"[d]iscuss[ed] with the General Counsel legal matters that may (a) have a material impact on PAGP's or PAA's financial statements or (b) result in material non-compliance by PAGP, PAA, GP LLC or the Company with legal or regulatory requirements."  "Management" referred to officers and employees responsible for managing PAGP and PAA, which according to the Form 10-Ks, included Armstrong, Pefanis, McGee, Swanson, Gorman, Nerbonne, and Valenzuela.  Armstrong, Pefanis, McGee, Swanson, and Gorman, were "executive officers."  Nerbonne was the officer in charge of Engineering and Valenzuela was the officer in charge of Environment, Health and Safety.

163.    Plains' integrity management program was overseen by Nerbonne and its Environmental, Health and Safety program was overseen by Valenzuela.  Nerbonne was made Vice President of Engineering on March 8, 2005 and promoted to Senior Vice President of Engineering on the eve of the Class Period, on February 25, 2013.  Valenzuela was made Vice President of Environmental, Health and Safety in July 2002 and "had oversight responsibility for the environmental, safety and regulatory compliance efforts."  Both Nerbonne and Valenzuela reported to Pefanis, and Valenzuela also reported to McGee, the General Counsel.  Thus, the people in charge of the very integrity management program supposed to augment safety measures and prevent spills – particularly in HCAs like the Santa Barbara coastline – were senior executives with direct and steady contact with senior management and the board of directors.  Defendants' own SEC filings confirm that "[a]ll [board of] directors have access to members of management, and *a substantial amount of information transfer and informal communication occurs between meetings*."  Moreover, defendants represented on their website during the Class Period that the Company's Environmental, Health and Safety program "is successful because it is developed, supported and carried out by our employees, *from the senior management team down to the newest hire*."

164.    Defendants confirmed that they stayed abreast of the procedures implemented in their integrity management program.  A year before the Line 901 burst, defendants claimed in a June 5,

2014 investor conference attended by defendants Armstrong, Pefanis, and Swanson, and other Plains

senior management, that Nerbonne's integrity management group had "implemented a tremendous

amount of testing procedures."  Armstrong described the integrity management program under

Nerbonne:

> We have implemented a tremendous amount of testing procedures, Dan Nerbonne
> and Rick Jensen and their groups in both US and Canada spend a tremendous
> a[m]ount of time investing in testing and trying to advance technologies to be able to
> monitor the pipe and to proactively get in front of some of these opportunities and
> issues.

To implement these procedures, Armstrong emphasized on that call that since 2007, Plains had

dedicated $1.3 billion to the Company's integrity management and incident prevention program.

Because of upper management's purported focus on Plains' integrity management program and the

amount of money put toward the program, defendants were at the very least severely reckless in

continuing to promote Plains' safety record and legal compliance while permitting Lines 901 and

903 to corrode to the point of a devastating rupture and a government-mandated operational shut-

down.

165.   In addition, throughout the Class Period, in each of its annual reports, Plains

repeatedly represented to investors that "[w]e have an internal review process in which we examine

the condition and operating history of our pipelines and gathering assets to determine if any of our

assets warrant additional investment or replacement."  Defendants further assured investors, "we will

continue to focus on pipeline integrity management as a primary operational emphasis.  In that

regard, we have implemented programs intended to maintain the integrity of our assets, with a focus

on risk reduction through testing, enhanced corrosion control, leak detection, and damage

prevention."  "Accordingly, in addition to potential cost increases related to unanticipated regulatory

changes or injunctive remedies resulting from regulatory agency enforcement actions, we may elect

(as a result of our own internal initiatives) to spend substantial sums to ensure the integrity of and

upgrade our pipeline systems to maintain environmental compliance and, in some cases, we may take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines."

166.    In addition, Mark Gorman signed the 2010 Consent Decree and was Plains' designee for continuous communications with the Department of Justice and the EPA.  He was Senior Vice President of Operations and Business Development and was made Executive Vice President on February 25, 2013.  Gorman also reported to defendant Pefanis.  The 2010 Consent Decree required defendants to enhance their integrity management program and corrosion control measures, conduct weekly aerial inspections, install algorithmic leak detection monitoring tools on thirty segments of pipeline, including Lines 901 and 903, spend at least $6 million toward mitigating threats posed by corrosion, and provide employee training for positions related to pipeline integrity, controls, and leak detection.   In complying with these requirements, Gorman was required to submit semi-annual reports to the EPA detailing the status of the compliance measures, any problems encountered in complying with the Consent Decree, and summaries of action plans developed.  And although Plains was able to terminate the Consent Decree in November 2013, it represented that compliance with the Consent Decrees was not all it had accomplished to mitigate the risk of spills.  Rather, PAA and PAGP represented in their SEC filings that they had "developed and implemented certain pipeline integrity measures that go beyond regulatory mandate, some of which are now incorporated into the 2010 Consent Decrees."  With "pipeline integrity management as a primary operational emphasis," Plains had instituted an "internal review process pursuant to which we examine various aspects of our pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate."

I.     **Armstrong and Swanson Certified that Plains' Numerous Pipeline Integrity Deficiencies and Material Failures to Comply with Laws and Regulations Were Timely Reported to Them**

167.   All of PAA and PAGP's Form 10-Ks and Form 10-Qs filed during the Class Period contained signed certifications pursuant to the Sarbane-Oxley Act of 2002 ("SOX") by Armstrong and Swanson stating that "material information relating to registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

J.     **Details About Pipeline Integrity Deficiencies Were Provided to Senior Executive Officers to Review and Certify in Annual Integrity Management Performance Reports to PHMSA**

168.   Plains' pipeline integrity information – including the in-line inspection data and results for pipeline running through HCAs and the related excavations for repairs and measurements demonstrating that Plains' in-line inspections drastically understated actual corrosion – was provided in annual reports to Plains' senior executive officers who reviewed the reports and certified their accuracy.

169.   Section 16 of the Pipeline Inspection, Protection, Enforcement, and Safety Act of 2006, 49 U.S.C. 60109(f), is entitled "Certification of pipeline integrity management program performance."   The Section states that "[t]he [U.S. Transportation] Secretary shall establish procedures requiring certification of annual and semiannual pipeline integrity management program performance reports by a senior executive officer of the company operating a pipeline subject to this chapter.   The procedures shall require a signed statement, which may be effected electronically in accordance with the provisions of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7001 et seq.), certifying that – (1) the signing officer has reviewed the report; and (2) to the best of such officer's knowledge and belief, the report is true and complete."

170.    In drafting the provision for senior executive certification of the integrity management performance report, Senate commerce committee chief Senator Ted Stevens stated that "***the main goal of the bill is to increase the responsibility of CEOs with regards to pipeline safety***." The Pipeline and Gas Journal, reporting on the passage of the bill, stated: "More recently, the US Congress passed the Pipeline Inspection, Protection, Enforcement, and Safety (PIPES) Act of 2006. This bill requires senior executives of pipeline operating companies to certify annual and semiannual pipeline integrity management program performance reports. His or her signature on the report verifies that the signing officer has reviewed it and that to the best of the officer's knowledge and belief, the report is true and complete. ***This places legal responsibility on senior executive officers to ensure pipeline integrity***."

171.    In implementing 49 U.S.C. 60109(f), PHMSA created Form F 7000-1.1 that states: "CERTIFYING SIGNATURE must be a senior executive officer of the operator. The Pipeline Inspection, Protection, Enforcement and Safety Act (signed in December 2006) requires pipeline operators to have a senior executive officer of the company sign and certify annual pipeline Integrity Management Program (IMP) performance reports (Parts B [Miles of Pipe by Location], F [Integrity Inspections Conducted and Actions Taken Based on Inspection], G [Miles of Baseline Assessments and Reassessments Completed in Calendar Year (segment miles that could affect HCAs ONLY), and L [Total Segment Miles That Could Affect HCAs] of this Report). By this signature, the senior executive officer is certifying that he or she has (1) reviewed the Report and (2) to the best of his or her knowledge, believes the Report is true and complete."

172.    Part F of the annual performance report on "Integrity Inspections Conducted and Actions Taken Based on Inspection" contains six sections.  Sections 1 and 2 address in-line inspections in HCAs.  Section 1 concerns "[m]ileage inspected in calendar year using the following In-Line Inspection (ILI) tools."  Section 2 required Plains to identify "all actions taken during the

- 68 -

1264030_1

calendar year that resulted from information obtained during an ILI inspection. This should include actions taken as a result of information developed during ILI inspections conducted during the calendar year PLUS actions taken as a result of ILI inspections conducted during prior years and for which all required actions were not completed during the year of the inspection."  Plains was required to "[r]eport in items a. and b. the total number of anomalies excavated and repaired based on the operator's repair criteria even if those criteria are different from (i.e., require repair of damage more or less significant) than the repair criteria in IM regulations applicable to anomalies in pipeline segments that could affect HCA. (The operator's criteria for anomalies in segments that could affect an HCA must be at least as conservative as those required by the regulations)."  Finally, Plains was required to "[r]eport in c. only the anomalies in pipeline segments that could affect an HCA that were repaired because they met one of the three repair criteria in the IM regulations. (The total of repairs reported in item c. should not exceed the total number of repairs reported in item b.)"  Thus, the reports could not be compiled or verified without the underlying data Plains obtained through its ILIs and excavations of Lines 901 and 903 throughout the Class Period.  For each year during the Class Period, Plains' senior executive officers reviewed this information and signed off on its accuracy on June 12, 2013, June 11, 2014, and June 12, 2015.

### K.    The Company's Material Failures to Comply with Laws and Regulations Were Waived and Approved by Plains' Senior Executive Officers as Required by Plains' Code of Business Conduct

173.    Plains' Code of Business Conduct is drafted in conformance with PIPES Act of 2006. The Code of Conduct requires that any material deviation from pipeline safety and protection of the environment must be approved by two of the four senior executive officers: Defendants Armstrong, Pefanis, Swanson, and McGee.  The Code published on the Company's website states that "Plains All American supports its commitment to safe and environmentally responsible operations through extensive and ongoing education and training, as well as investment in any necessary equipment,

systems, processes, or other resources.  Our commitment also includes compliance with applicable environmental, health and safety rules, laws, and regulations."  All waivers of the Code, "must be obtained in writing from the Vice President (or Senior Vice President or Executive Vice President, as applicable) of your business unit or corporate function.  In addition, all waiver requests determined to be material by the applicable Vice President (or Senior Vice President or Executive Vice President, as applicable) must also be approved by two of the following four persons: Chief Executive Officer [Armstrong], the President [Pefanis], the Chief Financial Officer [Swanson], and the General Counsel [McGee]."

174.    Each employee must sign and certify compliance to the Code.

**L.    The Officer Defendants Were Incentivized to Minimize Expenditures on Pipeline Maintenance and Safety in Order to Increase Profits and Thereby Increase Distributions to Themselves**

175.    The MLP forming PAA, like other MLPs, had a limited partner and a general partner. The limited partner is the entity that provides the capital and receives periodic distributions from the MLP's cash flow.  Here, the limited partnership represented a 98% interest in PAA and was made up of the common unitholders of PAA.  PAA unitholders receive distributions within 45 days after the end of each quarter.  The distributions come from PAA's available cash, which PAA defines as "cash equivalents on hand at the end of each quarter less reserves established in the discretion of [the] general partner for future requirements."

176.    The general partner is the entity that manages the MLP's affairs and receives compensation linked to the company's performance.  Here, the general partner held a 2% interest in PAA.  In addition to the distributions received on that 2% interest, the general partner also received IDRs if the amount distributed to the PAA common unitholders exceeded levels specified in the partnership agreement.  In other words, the more defendants could inflate the amount of the PAA distributions, the more IDRs the general partner would receive in addition to the 2% PAA interest.

- 70 -

PAA's general partner was PAA GP LLC, in which Plains AAP, L.P. held a 100% member interest, and thereby received all of the general partner benefits from PAA, including the 2% interest and all of the IDRs.[6]  For the 12 months ending June 30, 2013 (immediately before the IPO), AAP had received a total distribution from PAA of $398 million, including IDRs.  During 2014, PAA paid $473 million to the general partner, including $454 million in IDRs.

177.    PAGP was formed in July 2013, just before the IPO.  Its then-"Existing Owners" directly or indirectly owned all of the ownership interest in both AAP (also a limited partnership) and AAP's general partner, GP LLC, the entity that manages AAP's affairs.  As general partner of AAP, who was general partner of PAA, GP LLC, then is effectively general partner of PAA.  PAA's operations are conducted through GP LLC, which employs all of the business's employees, including executives and management, and maintains a board of directors.

178.    As part of the IPO on October 16, 2013, the Existing Owners sold to PAGP 128,000,000 AAP units (representing a 21.1% limited partnership interest) and an aggregate 21.1% of the membership interests in Holdings LLC, PAGP's general partner.  PAGP, and its Existing Owners, expected to net $2.727 billion from the issuance of 128,000,000 Class A shares, whose proceeds, after underwriting discounts and commissions and offering expenses, were to be distributed to the Existing Owners.

179.    Upon completion of the recapitalization undertaken with the IPO, PAGP's sole assets consisted of a 100% member interest in GP LLC, which it thus owned and controlled, and a 21.1% limited partner interest (19.7% economic interest) in AAP, which in turn directly or indirectly owns

---

[6]    AAP's ownership of PAA's IDRs and PAA's 2% general partnership interest entitles it to receive, without duplication: 2% of all cash distributed in a quarter until $0.2250 has been distributed in respect of each PAA common unit for that quarter; 15% of all cash distributed in a quarter after $0.2250 has been distributed in respect of each PAA common unit for that quarter; 25% of all cash distributed in a quarter after $0.2475 has been distributed in respect of each PAA common unit for that quarter; and 50% of all cash distributed in a quarter after $0.3375 has been distributed in respect of each PAA common unit for that quarter.  PAGP, owning a limited partner interest in AAP, owns an interest in these distributions.

all of the IDRs and the 2% general partner interest in PAA.  The remaining interests in AAP were held by the Existing Owners, with a 78.9% limited partner interest (73.5% economic interest), and the AAP management unit owners with a 6.8% economic interest.

180.    As of December 31, 2014, 34.1% of AAP's limited partner interest (31.8% economic interest) was held by PAGP; the remaining 65.9% of its limited partner interest  (61.2% economic interest, diluted by 7.0% for the AAP management unit owners) was held by the Existing Owners.

181.    First, on top of Armstrong's $375,000 annual salary, Pefanis's $300,000 annual salary, and Swanson's $250,000 annual salary, each executive garnered millions of dollars annually in cash bonuses.  For 2013 and 2014, Armstrong received a bonus of $4.4 million and $3.9 million, respectively; Pefanis gained $4.25 million of $3.8 million, respectively; and Swanson took home $1.65 million and $1.8 million, respectively.  The cash bonuses were meant to serve as "a near-term motivation."  The primary performance metric upon which cash bonuses were determined was the ability to generate increasing and sustainable cash distributions to PAA unitholders – in other words, maximizing "available cash," which disincentivized defendants to spend money on pipeline upkeep and replacement.  Also considered was PAA's adjusted EBITDA, relative to established guidance.

182.    On top of their salaries and bonuses, PAA generally granted phantom-unit awards to executive officers on a three-year cycle to encourage both performance and retention.  These long-term incentive awards are granted based on PAA's ability to increase sustainable quarterly distribution to the PAA unitholders.  The phantom-unit grants are issued to encourage and reward timely achievement of targeted distribution levels, but also required minimum service periods before vesting.  When the phantom unit "vests," unlike an option, it results in the delivery of a common PAA unit or cash of equivalent value.  In 2013, Armstrong received $2.66 million, Pefanis receive $2.40 million and Swanson received $1.77 million in long-term incentive plan phantom grants.

183.    In addition to the phantom unit grants, executives may receive AAP Management Units, which represented a "profits interest" in AAP and additional long-term incentives for management.  Upon reaching certain performance thresholds "aligned with interest of our common [PAA] unitholders," the holders of AAP Management Units are entitled to receive a portion of the distributions that would otherwise be paid to holders of AAP units.

184.    Thus, the executive officers, including defendants Armstrong, Pefanis and Swanson, were entirely incentivized – to the tune of millions of dollars – to minimize the amount spent on pipeline integrity and maintenance to keep up the PAA quarterly distributions.  Not only were the bonuses based on PAA distributions, but long-term grants were based on PAA unitholder distributions, as well as the distributions received as limited partners in PAGP.  In fact, PAA's Form 10-K noted that as of February 17, 2015, the aggregate value of the equity ownership obtained through holding various interests in the partnership structure was "significantly" greater than the value for the salaries and bonuses of the "Named Executive Officers" (which included defendants Armstrong, Pefanis and Swanson:

> As of February 17, 2015, our Named Executive Officers beneficially owned, in the aggregate, (i) approximately 2.2 million of our common units (excluding any unvested equity awards), (ii) through their ownership of interests in PAA Management, L.P., an approximate 2.0% indirect ownership interest (approximate 1.9% economic interest) in AAP, and (iii) 28,931,571 AAP Management Units, which represent an approximate 4.1% economic interest in AAP.  Based on the market price of our common units and PAGP's Class A shares at February 17, 2015 and assuming the conversion of all earned AAP Management Units into AAP units at a conversion factor of approximately 0.930 and the exchange of such AAP units for an equivalent number of PAGP Class A shares, *the value of the equity ownership of these individuals was significantly greater than the combined aggregate salaries and bonuses of these individuals for 2014*.

185.    Additionally, defendants Armstrong, Pefanis and Swanson beneficially owned Class B shares, which they had the right to exchange along with the same number of AAP units and general partner units to receive PAGP Class A shares.  Of Class B shares, Armstrong owned

15,208,540, Pefanis owned 10,415,200, and Swanson owned 3,577,528 shares. Armstrong, Pefanis and Swanson's Class B share-ownership comes from their ownership interests in PAA Management L.P. and ownership of AAP units and (pre-IPO) Class B units. This gave defendants the right to exchange for Class A shares and receive even more compensation through PAGP distributions, which again, based on the partnership structure, were maximized if the PAA unitholders' distributions were maximized (because of the flow of 2% general partnership interest and the IDRs up to PAGP).

186.    Through this convoluted structure, Plains executives were incentivized to minimize maintenance and replacement costs on Plains' pipelines in order to increase profits and distributions to themselves.

### M.    Defendants Knew Line 901 Had Reached or Exceeded Its Useful Life

187.    Construction on Lines 901 and 903 began in 1987. The lines went operational in 1990. When Line 901 ruptured in May 2015, the line was 28 years old and had been operating for 25 years – one of the oldest pipelines owned by the Company. According to the Company's financial statements filed with the SEC, Lines 901 and 903 had a *maximum* useful life of 30 years. In order for the Company to properly account for the depreciation of its pipelines, it had to accurately estimate the useful life for each pipeline. SEC and Generally Accepted Accounting Principles rules require companies to depreciate assets based on the asset's useful life (ASC 360-10-35-3), and continually evaluate the appropriateness of the useful life of that asset (ASC 360-10-s99-2, SAB Topic 5.CC). Defendants represented that useful life estimates for Line 901 were based on various factors including its condition, manufacturing specifications, technological advances and historical data concerning useful lives of similar assets. As detailed herein, Plains knew that Line 901 was not only near the end of its useful life based on supposed comparable assets, but that the Line was located in a sandy, water-logged coastal environment and rife with serious corrosion

problems.  Likewise, defendants knew that Line 903 was exposed to material that caused similar corrosive effects.  In addition, in calculating the useful lives of Lines 901 and 903, Plains failed to consider that the pipelines were in HCAs.  In fact, Plains used the same 30-year useful life to cover the entire All American Pipeline, without regard to whether they traversed an HCA.  If in fact defendants monitored and evaluated the condition of Lines 901 and 903, as represented to investors during the Class Period, then they knew, but simply ignored, that the Lines were at or past the end of their useful lives.  Otherwise, defendants failed to monitor and evaluate Line 901, in contrast to their Class Period representations.

### N.   Decreasing Volumes Motivated Defendants to Look the Other Way As Lines 901 and 903 Deteriorated

188.   PAA and PAGP reported that its All American Pipeline system, which included Lines 901 and 903, transported crude oil from two outer continental shelf ("OCS") fields, off the shore of California.  On February 27, 2013, PAA reported in its 2012 Form 10-K that "[v]olumes shipped from the OCS are in decline."  In its 2013 Form 10-K filed on February 28, 2014, and repeated in its 2014 Form 10-K filed on February 25, 2015, PAA slightly modified its disclosure to say "[v]olumes shipped from the OCS are expected to decline."  From a peak of 152,000 average net barrels per day in 1995, oil transported on the All American Pipeline declined to 37,000 average net barrels per day in 2014, the last reported figure – a *75% reduction*.  Based on defendants' own disclosures, volumes had declined significantly and were likely to decline even further.

189.   Declines in oil production from the All American Pipeline system meant defendants had little incentive to undertake the massive repairs necessary to keep an almost thirty-year-old pipeline safe and compliant with regulations.  As discussed herein, Plains estimated the maximum useful life of a pipeline to be 30 years.  Thus, for an aging pipeline near the end of its maximum useful life of 30 years, transporting less and less oil, defendants knowingly, or at least severely

recklessly, made the calculation that it was not worth the costs required to conduct the necessary repairs.  And these repairs, as the spill ultimately showed, would have required more than patchwork, one-off fixes – they would have required replacements of large segments of pipeline heavily damaged by years of exposure to a highly corrosive, coastal environment.

190.    Despite the fact that Lines 901 and 903 traversed HCAs, defendants' motivation to repair pipeline with diminishing volumes and life expectancy was further exacerbated by the fact that Plains' insurance covered certain clean-up costs from any spills.  As Armstrong reported in the August 5, 2015 conference call to investors, while the total loss for the Santa Barbara spill as of that date was a $257 million charge, this cost was "offset by an estimated $192 million insurance recovery," which covered "actual and projected emergency response and cleanup costs, natural resource damage, third and third party claim settlements, as well as estimate for fines, penalties, and certain legal fees."

191.    And diminishing volumes on Lines 901 and 903 meant that any repair costs or maintenance capital spent on those lines would have detracted from PAA's reported adjusted EBITDA and the distributable cash flow – the two primary performance metrics defendants looked at in determining bonuses.  Avoiding replacement costs for Lines 901 and 903 had the desirable effect of increasing profits for the transportation segment, which was critical to Plains' consolidated earnings projections provided to Wall Street during the Class Period.[7]  For example, in a May 21, 2015 NAPTP Annual Investor Conference in Orlando Florida, the Company stated "[t]ransportation segment is the **_leading driver_** of anticipated 2015 adjusted EBITDA growth (*i.e.*, 24% year-over year growth, or ~$1.2B contribution)."  In fact, defendants boasted that they met or exceeded EBITDA guidance for the past 13 years (53 consecutive quarters).  By avoiding the costs associated with

---

[7]    Pipeline revenue, expenses and profits were reported in the transportation segment of the Company's financial statements.

replacing Lines 901 and 903, defendants were able to continue their "meet or beat" record.  As a result, it was simply not worth it to defendants to perform the repairs necessary to Lines 901 and 903 that would have prevented the Santa Barbara spill.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD[8]

### A.   Defendants' False and Misleading Statements and Omissions Concerning Plains' Integrity Management Program

192.    Beginning on February 27, 2013, each of the Annual Reports on Form 10-K filed by PAA and PAGP contained the following materially false and misleading statements and omissions concerning the integrity management programs, policies and practices Plains undertook to maintain the integrity of all of its pipelines in HCAs through testing, enhanced corrosion control, leak detection, and damage prevention:

> The DOT regulations include requirements for the establishment of pipeline integrity management programs and for protection of "high consequence areas" where a pipeline leak or rupture could produce significant adverse consequences.  *We have also developed and implemented certain pipeline integrity measures that go beyond regulatory mandate*. . . .

> Accordingly, for 2013 and beyond, *we will continue to focus on pipeline integrity management as a primary operational emphasis*.  In that regard, *we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention*.

193.    At all times during the Class Period, Plains' Code of Business Conduct, published on Plains' website and incorporated into PAA and PAGP's Form 10-Ks, falsely stated:

> *Plains All American supports its commitment to safe and environmentally responsible operations through extensive and ongoing education and training, as well as investment in any necessary equipment, systems, processes, or other resources.*

---

[8]    In light of the Court's March 29, 2017, Order dismissing the First Amended Consolidated Complaint ("FAC") with leave to amend, this Complaint does not include certain allegations, including certain alleged false and misleading statements, that were included in the FAC. Nevertheless, Plaintiffs expressly reserve their right to raise on appeal the correctness of the March 29, 2017 Order as to all of the false and misleading statements alleged in the FAC.

This statement was incorporated into PAA and PAGP's Class Period Form 10-Ks, and thus was made, authorized and endorsed by defendants Armstrong, Swanson, and Pefanis who signed all of the Class Period Form 10-Ks, each of which expressly states:

> All of our standing committees have charters. Our committee charters and governance guidelines, as well as our Code of Business Conduct and our Code of Ethics for Senior Financial Officers, which apply to our principal executive officer, principal financial officer and principal accounting officer, are available under the Structure and Governance tab in the Investor Relations section of our Internet website at http://www.plainsallamerican.com.  We intend to disclose any amendment to or waiver of the Code of Ethics for Senior Financial Officers and any waiver of our Code of Business Conduct on behalf of an executive officer or director either on our Internet website or in an 8-K filing.

194.    Beginning on February 27, 2013, each of the Annual Reports on Form 10-K filed by PAA and PAGP also contained the following materially false and misleading statements and omissions concerning Plains' review process for all of its pipelines in determining additional investment in repairs or replacement:

> ***We have an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement***.

195.    Each of the Annual Reports on Form 10-K filed by PAA and PAGP during the Class Period also falsely represented that the Company had complied with the DOT's requirements for HCAs, including "***more frequent inspections, correction of identified anomalies*** and other measures, to ensure pipeline safety in 'high consequence areas,' such as . . . commercially navigable waterways," and that "[w]e believe we are operating in substantial compliance with our risk management program."[9]

---

[9]    The statements are each reiterated in full, taking into account adjustments for pronouns and the relevant year, with one exception.  This statement regarding defendants' "internal review process" was excised from the 2014 Form 10-K: "We have an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement."

- 78 -

196.    During the Class Period, PAA filed its 2012, 2013 and 2014 Annual Reports on Form 10-K on February 27, 2013, February 28, 2014 and February 25, 2015, respectively; and PAGP filed its 2013 and 2014 Annual Reports on Form 10-K on March 12, 2014 and February 25, 2015, respectively.  All of the Form 10-Ks contained signed certifications pursuant to the SOX by defendants Armstrong and Swanson stating that "material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."  All of the Form 10-Ks were also signed by defendants Pefanis and Herbold.  In addition, for PAA, its Form 10-Ks were signed by PAA GP LLC, AAP, GP LLC, and the directors of GP LLC.  For PAGP, its Form 10-Ks were signed by Holdings LLC and its directors.

197.    In addition, each of PAA's and PAGP's Quarterly Reports on Form 10-Q filed with the SEC during the Class Period referred investors to the materially false and misleading statements in the most recently-filed Form 10-K as set forth in ¶¶192-195.  PAA filed its Form 10-Qs on May 8, 2013 (for 1Q13), August 8, 2013 (2Q13), November 6, 2013 (3Q13), May 9, 2014 (1Q14), August 8, 2014 (2Q14), November 7, 2014 (3Q14), and May 8, 2015 (1Q15).  PAGP filed its Form 10-Qs on November 22, 2013 (3Q13), May 13, 2014 (1Q14), August 12, 2014 (2Q14), November 7, 2014 (3Q14), and May 8, 2015 (1Q15).  All of the Form 10-Qs contained signed certifications pursuant to SOX by defendants Armstrong and Swanson stating that "material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."  All of the Form 10-Qs were also signed by defendant Herbold.  In addition, for PAA, its Form 10-Qs were signed by PAA GP LLC, AAP, and GP LLC.  For PAGP, its Form 10-Qs were signed by Holdings LLC.

198.    PAGP's IPO Offering Materials also contained the materially false and misleading statements set forth in ¶¶192, 194-195.  The IPO Offering Materials included: a Form S-1

Registration Statement filed on July 29, 2013; its Amendment Nos. 1, 2, 3, and 4 filed on September 6, 2013, September 26, 2013, October 2, 2013, and October 7, 2013, respectively.  The Form S-1 Registration Statement and its amendments were all signed by defendants Armstrong, Swanson, Herbold, Raymond, Sinnott, and Holdings LLC.  The Rule 424(b)(4) Final Prospectus was filed on October 16, 2013.

199.    After the IPO, in its Secondary Offering, PAGP filed with the SEC a Form S-3 Registration Statement on November 6, 2014 and a Prospectus on November 12, 2014.  These Plains Holdings Secondary Offering Materials incorporated by reference PAGP's 2013 Form 10-K and the materially false and misleading statements set forth in ¶¶192-195.  The Registration Statement was signed by PAGP, Holdings LLC, Armstrong, Swanson, Herbold, Pefanis, Burk, Goyanes, Raymond, Shackouls, Sinnott, and Sutil.

200.    PAA, in its securities offerings, also incorporated by reference its Form 10-Ks and their materially false and misleading statements set forth in ¶¶192-195.  PAA's August 2013 Notes Offering Materials incorporated by reference PAA's 2012 Form 10-K.  PAA's April 2014 Notes Offering Materials, September 2014 Notes Offering Materials, and December 2014 Notes Offerings incorporated by reference PAA's 2013 Form 10-K.  The Plains Offering Materials for PAA's February 2015 common units offering incorporated by reference PAA's 2014 Form 10-K.

201.    All of PAA's securities offerings were conducted pursuant to a Form S-3 Registration Statement dated September 27, 2012 and signed by Plains, PAA GP LLC, Plains AAP, L.P., GP LLC, Armstrong, Swanson, Herbold, Pefanis, Goyanes, Petersen, Raymond, Sinnott, Sutil, Symonds, and Temple.

202.    In November 2013, Plains continued to state on its website, as it would throughout the Class Period, that:

1264030_1

***The Company "perform[s] scheduled maintenance on all of our pipeline systems
and make[s] repairs and replacements when necessary or appropriate."***

203.    This statement was authorized and endorsed by defendants Armstrong, Swanson, and

Pefanis.  First, Armstrong, Swanson, and Pefanis signed all of the Form 10-Ks during the Class

Period, each of which refers investors to Plains' website for additional information about the

Company, including various aspects of its policies, financial results, and operations.  Second,

Armstrong, Swanson, and Pefanis, each attended and spoke on conference calls during the Class

Period during which investors were directed to the website for additional information about the

Company.  Finally, in its Form 8-Ks – filed on May 6, 2013, May 7, 2013, August 5, 2013, and

November 4, 2013, for example – the Company referred investors to the website stating that the

Plains' website at www.paalp.com was "where PAA routinely posts important information about the

Partnership."  Swanson, the "Executive Vice President and CFO," was identified as the Plains

contact person for information relating to the Form 8-K filings.

204.    On June 5, 2014, Armstrong, Pefanis, and Swanson presented at an Investor Day

Conference.  During the conference, Armstrong falsely represented that the Company properly

maintained and operated its acquired pipelines for 25 to 30 years of use:

> When we buy an asset in an acquisition we have not only the opportunity capital in
> our forecast but we have in our forecast the amount of what we call fix up capital that
> it takes just to get that pipeline or that tank running at the – and ***operated in a way
> that we would feel comfortable running it for the next 25 or 30 years***.

205.    The slides accompanying Armstrong's June 5, 2014 Investor Day Conference

presentation reiterated defendants' false statements concerning the Company's safety and

maintenance:

> (i)     ***Continue to regularly assess pipeline integrity using state-of-the-art inspection
>         tools and technologies***;
>
> (ii)    ***Smart pigs, advanced data interpretation/integration, advanced GIS mapping
>         and risk screening***; and

1264030_1

(iii)    *Improving data/interpretation/integration capabilities to better prioritize, focus on and assess areas warranting attention*.

206.    After the Line 901 ruptured, during the June 4, 2015 Investor Day Conference presentation, defendants Armstrong, Pefanis, and Swanson touted Plains' safety and maintenance procedures and ILI results data analyses while discussing the Santa Barbara oil spill:

> *We assess the pipeline using the best tools that are available.  Smart pigs, we run them when it makes sense, more often than are required.  We improve our data interpretation to make sure that we are trying to prevent things from happening, not diagnose what did happen.*

207.    Several weeks after touting Plains' usage of the best pipeline assessment tools available and data interpretation prowess, Patrick Hodgins, director of security and safety for Plains and the Incident Commander of the Unified Command for the Refugio Incident, testified before a California state legislative committee investigating the Line 901 spill that:

> [T]he first time I heard anything about the **corrosion** is what I read in the newspapers. . . .  *We had no indication at all to assume that there was an issue*.

208.    In response to questions concerning the 2007 or 2012 ILI results, Hodgins also falsely testified that:

> *"We had not had any indication at that time," after the 2007 and 2012 ILIs, that there was "metal loss greater than 50%."*

209.    The statements in ¶¶192, 195, 206-208, above, apply specifically – and exclusively – to Plains' pipelines in HCAs, including Lines 901 and 903.

210.    The statements in ¶¶192-195, 197-208 were materially false and misleading, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of §10(b).

211.    The statements in ¶¶192-195, 197-201 were materially false and misleading, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of §11.

- 82 -

212.     Contrary to defendants' Class Period representations that Plains went "beyond regulatory mandate" in HCAs, "focuse[d] on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention," that Plains would and did "invest[] in *any necessary* equipment, systems, processes, or other resources" to prevent an environmental disaster, that Plains "regularly assess[ed] pipeline integrity using state-of-the-art inspection tools," that Plains properly "examine[d] the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement," and that Plains "correct[ed] . . . identified anomalies" in HCAs, the company did not in fact perform needed maintenance on its pipeline systems, including aging parts subject to corrosion that ran through sensitive high-consequence areas.  Specifically, and contrary to the representations above, Plains systematically failed to comply with the minimum standards for pipeline integrity management established in the Hazardous Liquid Pipeline Safety Regulations and the Liquid Integrity Management Rule, leading to deficiencies in testing, corrosion control, leak detection, and damage prevention.  As discussed below, Plains failed to conduct proper data integration, which led to inaccuracies in its in-line inspection tool and the tool's deficiencies in detecting corrosion.  Additionally, Plains failed to mitigate corrosion by not accounting for the in-line inspection tool's inaccuracies and not conducting preventive and mitigative evaluations.  Further, Plains' use of an ineffective cathodic protection system and compromised coating led to the failure to protect the pipeline against corrosion.  Finally, the lack of preventive and mitigative evaluations also caused Plains' failure to timely detect the rupture.  As PHMSA concluded, after studying historical data that had been provided by Plains' ILI vendor, Rosen, to Plains in real time throughout the Class Period "it does not appear that Plains has an effective corrosion control program."

213.     In light of the context in which they were made, and given defendants' repeated representations that Plains senior executives were provided with all material information concerning

Plains and its subsidiaries at least on a quarterly basis (*see* §V.H., *supra*), reasonable investors would expect that defendants' statements above fairly aligned with the material information in their possession at the time the statements were made.  As detailed below, however, each time Plains and the Officer Defendants made these statements, they had in their possession information establishing their material falsity.  Furthermore, reasonable investors would expect that defendants' statements above rested on a meaningful inquiry into Plains' compliance record, and the Company's integrity management and corrosion control program's policies, practices and results in high consequence areas.  If defendants did not perform such an inquiry, then the statements above were misleadingly incomplete.

        1.      **Defendants' Statements About Plains' Integrity Management Program Were False and Misleading and Omitted Material Facts: Due to Regulatory Violations, the Company's Smart Pig In-Line Inspections Undercalled Corrosion on Lines 901 and 903**

     214.   **Falsity:** The statements in ¶¶192-194, 202, 205-208 concerning: (1) Plains' focus on "risk reduction through testing, enhanced corrosion control," (2) "using the best tools that are available" to assess its pipelines, (3) "trying to prevent things from happening, not diagnose what did happen," (4) "investment in any necessary equipment, systems, processes, or other resources" to ensure environmentally responsible operations, (5) using "advanced data integration" with respect to smart pig inspections, (6) "improving data/interpretation/integration capabilities to better prioritize, focus on and assess areas warranting attention," (7) "examining the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement," (8) "mak[ing] repairs and replacements when necessary or appropriate," and (9) going "beyond regulatory mandate" for pipelines in HCAs, were materially false and misleadingly incomplete because Plains' in-line inspection (ILI) tool – the smart pig – was consistently inaccurate in measuring metal losses and corrosion sizes on Lines 901 and 903.  The

tool's inaccuracy stemmed from: (1) Plains' failure to share its field measurement data with its ILI vendor to continually calibrate the tool, and (2) Plains' flawed instructions to the vendor to ignore certain metal loss anomalies – both in violation of 49 C.F.R. §195.591, which requires operators to comply with industry standards.  By virtue of the leak-prevention and corrosion control inspections and measures, defendants knew or recklessly disregarded the corrosion issues in Lines 901 and 903. Hodgins' post-spill statements that "Plains had no indication at all to assume that there was an issue," and Plains "had not had any indication at that time" that after the 2007 and 2012 ILIs there was metal loss greater than 50%, were false and misleading for the same reasons.

215.    By conducting excavations of selected corrosion anomalies to measure their actual size in the field and to make repairs, Plains was able to ascertain the accuracy level of its ILI tool by comparing the field measurements to the measurements calculated by the ILI.  Plains, through its vendor Rosen, performed ILIs on Line 901 on June 1 and 19, 2007, July 3, 2012, and May 5, 2015. It excavated and took field measurements of corrosion anomalies in 2008 with 13 excavations, in 2013 with 41 excavations, and in 2015 with four excavations.

216.    The field measurements revealed that the 2007 ILI, 2012 ILI and 2015 ILI were not within 10% of the ILIs' measurements.  Specifically, the 2007 ILI was inaccurate and understated actual metal loss 67% of the time, the 2012 ILI was inaccurate and understated actual metal loss 42% of the time, and the 2015 ILI was inaccurate and understated actual metal loss 43% of the time. Rosen also conducted an ILI on Line 903 in 2013, and that ILI was also inaccurate.  The 2013 ILI on Line 903 calculated only 66% metal loss corrosion when actual field measurement from excavation of the anomaly revealed actual metal loss was 93%.[10]

---

[10]    Although Plains reached out to Rosen to re-adjust the tool for this particular instance which was deemed a "close call," emails produced to PHMSA revealed that even after the adjustment the ILI measurement still underestimated the anomaly by coming up with 76% metal loss.  However, Plains made no additional effort to pursue improvement on the ILI tool inaccuracy.  PHMSA noted that

217.    Plains' Integrity Management Program required ILI metal loss calculations to be within +/- 10% of the field measurements 80% of the time – meaning that the actual measurements of the anomalies from the field should be within 10% of the measurements calculated by the ILI tool for 80% of the time.  Because "[t]he data reported by the ILI vendor were inconsistent (and did not meet published accuracy of the ILI tools of +/- 10%, 80% of the time for depth) when compared to the results of the field-measured corrosion anomalies," PHMSA found that "[t]he stated accuracy of the tool in the vendor-operator contract *was not met for any of the ILI surveys*.  Also, the tool accuracy using the accepted industry standard, API 1163, was not within stated specifications either."

218.    In addition to inaccuracies in measuring metal loss, Plains' ILI tool also underestimated the length and width of external corrosion anomalies.  Plains' data from the 2007, 2012, and 2015 ILIs and their related excavations indicated that "38% of the anomalies had an area stated by the ILI of $\leq 1.5$ in$^2$, when in fact the corrosion areas were between 2.5 in$^2$ and *7,300 in*$^2$."  The underestimation resulted from Plains' instruction to its ILI vendor to group together, or "cluster," only those anomalies with metal loss of 15% or greater.  As such, the vendor ignored the "vast majority" of 257 anomalies in 2007 and 1,241 anomalies in 2012 that were in the 10-19% metal loss category, as delineated in the 2007 and 2012 ILI survey reports.  According to PHMSA, this practice "differs from the usual [because] [t]ypically *all* ILI delineated corrosion is interacted to define 'clusters.'"  As a result, "[t]he vast majority of all excavated anomalies have been undercalled in length."

219.    When confronted by PHMSA on the underestimated length measurements, Plains responded that "[g]rowth of an anomaly in depth has a much greater deleterious effect on failure

---

"[e]ven after re-analyzing the anomaly, the vendor still undercalled the anomaly by 19%.  This should have led to increased conversation."

pressure than growth in length, so much so that growth in length can be safely ignored." PHMSA rejected this excuse as *"misleading and incorrect"* and found that Plains *quoted "API 1160 is out of context"*:

> Having the most accurate length is very important to the calculation of the remaining strength of every type of anomaly. The length must be defined as accurately as possible. The comment quoted [by Plains] from API 1160 above refers only to the known fact that when corrosion is growing, the depth aspect will be much more influential than the length. This occurs because the percentage depth increases much more rapidly due to the thin wall of the pipe.

220. The ILI tool's inaccuracy was the direct result of Plains' failure to share its field measurement data with its vendor in contravention of industry practice and regulatory requirements. Section 8.7.1 of NACE Standard RP0102[11] on "In-Line Inspection of Pipelines" states: "An important part of 'closing the loop' is the feedback of the field inspection results to the ILI service provider. Using this information, the ILI vendor can continuously improve the validity and accuracy of the data analysis." All pipeline operators choosing to use ILI inspections must comply with this NACE Standard as required by 49 C.F.R. §195.591 of Subpart H of the Hazardous Liquid Pipeline Safety Regulations on Corrosion Control, which mandates: "[w]hen conducting in-line inspections of pipelines required by this part, each operator must comply with the requirements and recommendations of API Std 1163, Inline Inspection Systems Qualification Standard; ANSI/ASNT ILI-PQ, Inline Inspection Personnel Qualification and Certification; and NACE SP0102-2010, Inline Inspection of Pipelines (incorporated by reference, *see* §195.3)." In addition, the Liquid Integrity Management Rule for HCAs 49 C.F.R. §195.452(b)(6) requires that "[e]ach operator of a pipeline covered by this section [§195.452 Pipeline Integrity Management in High Consequence Areas] must . . . [f]ollow recognized industry practices in carrying out this section . . . ."

---

[11] NACE Standard RP0102 later became NACE SP0102-2010.

221.    PHMSA emphasized that the practice of sharing field measurements with the ILI vendor was crucial to validate "the ILI tool's detection capabilities and limitations, the accuracy with which it can locate and size anomalies, and the confidence associated with the tool's measurements," and between 2008 and 2013, PHMSA raised its concerns to Plains about the Company's ILI under-call bias during its inspections.  During the 2008 and 2009 inspections of Plains' procedures for integrity management and operations and maintenance, PHMSA and the California State Fire Marshal found Plains' data integration process inadequately addressed ILI tool uncertainty.

222.    In a March 4, 2009 letter to Plains' Vice President of Engineering, Dan Nerbonne, PHMSA warned that Plains' integrity management program did not specify an approach to handling the tool tolerances.  *See* §V.E.1.  As a result, PHMSA required that Plains modify its process for validating ILI results to incorporate the known ILI "under-call" bias.

223.    Despite the warning, the problem was not corrected.  Four years later, during its 2013 inspections of Lines 901 and 903, PHMSA again raised the concern to Plains that its integrity management procedures failed to address how differences in anomalies as directly measured in the fields and as sized by ILI tool would be handled.  *See* §V.E.5.

224.    Once again, despite PHMSA's 2013 warning, Plains did not correct the problem.  As a result of Plains' failure to work with its vendor to calibrate the ILI tool and its instructions to its vendor to ignore anomalies, the corrosion anomaly that ultimately led to Line 901's rupture was erroneously sized at metal loss of 47% when the actual metal loss was 89% and the length of the anomaly was underestimated by 7.94 inches.  PHMSA concluded that "[f]ailure by Plains to detect and mitigate the corrosion" was one of the contributory causes to Line 901's rupture.

225.    **Scienter.**  By virtue of the facts set forth below and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in ¶¶192-194, 202, 205-208 were materially misleading to investors.

226.    Since at least 2006, the DOT has required oil transportation operators – like defendants – to implement integrity management programs.  As defendants repeatedly represented in their Class-Period SEC filings, these programs meant defendants were to carry out "more frequent inspections, correction of identified anomalies and other measures, to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways."   As described above, Plains' "frequent inspections" of Lines 901 and 903 revealed exponentially increasing corrosion on both lines.  The "frequent inspections" also confirmed that Plains' primary method for finding corrosion – the one its executives touted to investors as "state-of-the-art inspection tools," and "the best tools" there are – in line inspections using smart pigs were wildly inaccurate and consistently understated the amount and severity of corrosion.  Only with at least severe recklessness could defendants ignore the results from such "frequent inspections," especially in places as environmentally sensitive as the pristine Santa Barbara coastline.

227.    Furthermore, between 2008 and 2013, PHMSA raised its concern about Plains' ILI under-call bias during its inspections.  During the 2008 and 2009 inspections of Plains' procedures for integrity management and operations and maintenance, PHMSA and the California State Fire Marshal found Plains' data integration process inadequately addressed ILI tool uncertainty.  In a March 4, 2009 letter to Dan Nerbonne, Vice President of Engineering, PHMSA stated that it had "identified the apparent inadequacies found within Plains' plans or procedures" in violation of 49 C.F.R. §195.452.  The letter stated that "Plains' data integration process must be modified to require the application of tool uncertainty to ILI results during the discovery phrase of assessment reviews when comparing ILI results to IM [Integrity Management] rule repair requirements."  As a result, PHMSA asked Plains to modify its process for validating ILI results to incorporate the known ILI "under-call" bias.  However, the validation process was never corrected.  Four years later, during

its 2013 inspections of Lines 901 and 903, PHMSA again raised the concern to Plains that its integrity management procedures failed to address how differences in anomalies as directly measured in the fields and as sized by ILI tool would be handled. Still, Plains did not correct the problem, resulting in a massive undercall of the metal loss (47% vs. 89%) on the anomaly that ultimately ruptured causing the spill.

228.    In addition to PHMSA's repeated warnings, between 2008 and 2013, Plains made 54 excavations to investigate Line 901's corrosion anomalies and was aware of the ILI tool's undercall biases, but did not share its measurements with its vendor. In its Failure Investigation Report, PHMSA indicated that "[a]ll of the data used in the ILI-SME [subject matter expert] report was provided by Plains' IMP Group," which included "raw ILI data from the 2007, 2012, and 2015 ILI surveys, and comparing that data to the as-found data when each anomaly was excavated and measured in the field" by Plains. Thus, Plains had the data in real time showing that its ILI measurements were substantially understating corrosion. This data was necessarily reviewed at least annually during the Class Period in or before June when Plains' Senior Executives, Valenzuela and Gorman, reviewed and signed off on the accuracy of the Annual Integrity Management Performance Reports to PHMSA. The reports, which contain detailed information about anomalies found, excavations conducted, and repairs made in all of Plains' pipelines running through HCAs, could not have been compiled or verified without the underlying data Plains obtained through its ILIs and excavations of Lines 901 and 903 throughout the Class Period.

229.    Furthermore, Plains violated its own Integrity Management Program policy. As PHMSA noted, Plains' Integrity Management Program states:

> External anomalies will be measured by Company field personnel who are qualified to perform API Covered Tasks 8.1 and 8.3. Measurements will be made and recorded for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld. Digital photographs and a sketch or etchings of the anomalies will be made and included in the record. Length of the

affected joint and its location relative to the reference marker will be included for comparison to information provided by Tool Vendor.  The Company will provide copies of all information obtained from the selected anomalies to the Tool Vendor as soon as possible. The Tool Vendor will review the field data for any corrections to the data analysis for the Final Report.

230.    When "PHMSA requested all records and analyses performed after each of the ILI Surveys on line 901, Plains submitted a Unity Plot for as-found versus as-called depth that was created in 2013 – after the 2012 survey and the ILI digs."  The Unity Plot showed that only approximately "57% of the plotted anomalies are within the +/- 10% lines" despite the fact that "[r]eported tool accuracy is +/- 10% 80% of the time."  Plains could provide "no documentation regarding any further analysis or discussion which may have ensued after the creation of this Unity Plot for wall loss (depth)."  Contrary to Plains' policy, there was no review of "the field data for any corrections to the data analysis for the Final Report" by the ILI vendor.

231.    Similarly, Plains' vendor for the root cause analysis found that Plains could not "produce documentation to indicate that Plains communicated with the ILI vendor, such as requesting a re-grade" and concluded that "Plains could adopt additional practices to identify and address any inaccuracies in future ILI runs."  The root cause analysis further stated that "an IMP [Integrity Management Program] is only as good as the data that are utilized to monitor and measure its performance.  As addressed as a contributing cause, the ILI significantly undersized (47% versus an actual value of 89% through wall) the feature that eventually failed."

232.    As a result, contrary to Armstrong, Pefanis, and Swanson's representations to investors (¶¶192-194, 202, 205-208), while Plains' own data interpretation managed to "diagnose what did happen," following excavations Plains failed to "prevent things from happening" because Plains chose to not share the information it discovered from field measurements with its vendor, or take other steps to rectify the corrosion problems.  Furthermore, Plains was incentivized to deliberately ignore the failure and unreliability of its smart pig program because an accurate

assessment tool would only lead to more costly repair or replacement of Lines 901 and 903 – an investment that Plains was not willing to make in a segment with persistently declining oil transport volume for the past 20 years.  *See* §V.N., *supra.*

233.    The in-line inspection results, the related excavations for repairs, and the measurements demonstrating that Plains' in-line inspections drastically understated actual corrosion were provided to senior executive officers of Plains who reviewed them and certified their accuracy as required by law.  *See* §V.J., *supra*.

234.    Additionally, each quarter, PHMSA's warnings, and the material understatement of corrosion problems – known to Plains by virtue of the ILIs, the excavations, and the as-called and as-found corrosion measurements – were reviewed and discussed with defendant McGee and the audit committee pursuant to Plains' audit committee charter.  These items were then reported to the Board, including Armstrong, who served as Chairman throughout the Class Period.  Pursuant to Plains' internal policies, all material information arising out of these reviews, which would include the ILI surveys and excavation results for Lines 901 and 903, as well as PHMSA's warnings about corrosion control deficiencies, was "recorded, processed, summarized, and communicated" to each of the Individual Defendants, as stated in the underwriting agreements, Form 10-Ks, and Form 10-Qs filed by PAA and PAGP during the Class Period.  *See* §V.G., *supra*.

235.    Armstrong was at all times the "principal executive officer" as referred to in the underwriting agreements.  By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Armstrong's role as Chairman of the Board receiving reports of potential and actual regulatory non-compliance from the audit committee (*see* §V.H., *supra*), (3) Armstrong's SOX certification (*see* §V.I., *supra*), and (4) Armstrong's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its

subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to in-line inspections impacting HCAs, and inspection results and dig reports that showed that in-line inspections on Lines 901 and 903 drastically understated actual corrosion, was recorded, processed, summarized and communicated to Armstrong.

236.    Swanson was at all times the "principal financial officer" as referred to in the underwriting agreements.  By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Swanson's SOX certification (*see* §V.I., *supra*), and (3) Swanson's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to in-line inspections impacting HCAs, and inspection results and dig reports that showed that in-line inspections on Lines 901 and 903 drastically understated actual corrosion, was recorded, processed, summarized and communicated to Swanson.

237.    Pefanis was at all times the President and Chief Operating Officer.  Pefanis was the "appropriate officer[] of GP LLC" and "management" with responsibility for overseeing Plains' operations, including pipeline safety and integrity with Gorman, Nerbonne, and Valenzuela reporting to him.  *See* §V.H., *supra*.  In addition, Pefanis had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*. Therefore, all material information concerning Plains' operations, including the numerous material failures to comply with applicable laws and regulations detailed above relating to in-line inspections impacting HCAs, and inspection results and dig reports that showed that in-line inspections on Lines 901 and 903 drastically understated actual corrosion, was recorded, processed, summarized and communicated to Pefanis.  *See* §V.G., *supra*.

238.     McGee was at all times the General Counsel and Valenzuela reported to him.  McGee was the "appropriate officer[] of GP LLC" with responsibility for overseeing Plains' legal department and who repeatedly stated without qualification that none of Plains' entities had directly or indirectly violated any environmental safety, health or similar law or regulations.  He also had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*.  In addition, as required by the audit committee charter, he discussed with the committee all potential and actual regulatory non-compliance that could "result in material non-compliance" by PAA and PAGP, including the numerous material failures to comply with applicable laws and regulations detailed above relating to in-line inspections impacting HCAs, and inspection results and dig reports that showed that in-line inspections on Lines 901 and 903 drastically understated actual corrosion.  *See* §V.H., *supra*.

239.     By virtue of the foregoing, Armstrong, Swanson, Pefanis, and McGee received the following information and documents or summaries thereof, as set forth below:

240.     Prior to (1) the filing of PAA's 2012 Form 10-K on February 27, 2013 and PAA's 1Q13 Form 10-Q on May 8, 2013; and (2) the incorporation of the Code of Conduct into PAA's Form 10-K; Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

    (i)     PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra*.

    (ii)    Plains had instructed the ILI vendor for the June 2007 ILIs to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 257 anomalies found in the 2007 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra*.

    (iii)    Dig reports for the 13 excavations completed in 2008 showed that the 2007 ILI for Line 901 was inaccurate 67% of the time.  The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld.  Digital photographs

and a sketch or etchings of the anomalies [was] made and included in the record. Length of the affected joint and its location relative to the reference marker [was] included for comparison to information provided by" the ILI vendor.  The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591.  *See* ¶¶216-217, 229, *supra.*

(iv)   2008 field measurements of anomalies from the 13 excavations for Line 901 were not shared with the ILI vendor, resulting in the ILI tool's inaccuracy due to the lack of calibration.  This practice violated NACE RP0102, 49 C.F.R. §195.591, Plains' integrity management program section 8.0, and 49 C.F.R. §195.452(b)(5).  *See* ¶¶215-216, 220, *supra.*

(v)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶228, *supra.*

(vi)   PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to specify an approach to handling the ILI tool tolerances in its integrity management program.  The letter also stated that Plains must modify its process for validating ILI results to incorporate the known ILI "under-call" bias.  These inadequacies violated 49 C.F.R. §§195.452(f) and (g).  *See* §V.E.1. and ¶227, *supra.*

(vii)   Plains had instructed the ILI vendor for the July 2012 ILI to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 1,241 anomalies found in the 2012 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra.*

241.   Prior to the filing of (1) the PAGP IPO's Form S-1 on July 29, 2013, (2) PAA's 2Q13 Form 10-Q on August 8, 2013, (3) the August 2013 Notes Offering Materials on August 8, 9, and 12, 2013, (4) Amendment No. 1 to PAGP IPO's Form S-1 on September 6, 2013, (5) Amendment No. 2 to PAGP IPO's Form S-1 on September 26, 2013, (6) Amendment No. 3 to PAGP IPO's Form S-1 on October 2, 2013, and (7) Amendment No. 4 to PAGP IPO's Form S-1 on October 7, 2013, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)   PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra.*

- 95 -

(ii)     Plains had instructed the ILI vendor on for the June 2007 ILIs to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 257 anomalies found in the 2007 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra*.

(iii)    Dig reports for the 13 excavations completed in 2008 showed that the 2007 ILI for Line 901 was inaccurate 67% of the time.  The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld.  Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record.  Length of the affected joint and its location relative to the reference marker [was] included for comparison to information provided by" the ILI vendor.  The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591.  *See* ¶¶216-217, 229, *supra*.

(iv)    2008 field measurements of anomalies from the 13 excavations for Line 901 were not shared with the ILI vendor, resulting in the ILI tool's inaccuracy due to the lack of calibration.  This practice violated NACE RP0102, 49 C.F.R. §195.591, Plains' integrity management program section 8.0, and 49 C.F.R. §195.452(b)(5).  *See* ¶¶215-216, 220, *supra*.

(v)     The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶228, *supra*.

(vi)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to specify an approach to handling the ILI tool tolerances in its integrity management program.  The letter also stated that Plains must modify its process for validating ILI results to incorporate the known ILI "under-call" bias.  These inadequacies violated 49 C.F.R. §§195.452(f) and (g).  *See* §V.E.1., *supra*.

(vii)   Plains had instructed the ILI vendor for the July 2012 ILI to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 1,241 anomalies found in the 2012 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra*.

(viii)  Plains had instructed the ILI vendor for the April 26, 2013 and June 12, 2013 ILIs to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the underestimation of corrosion size for Line 903.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra*.

(ix)    The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-

line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶228, *supra.*

242.    Prior to (1) the filing of (a) the PAGP IPO's prospectus on October 16, 2013, (b) PAA's 3Q13 Form 10-Q on November 6, 2013, (c) PAGP's 3Q13 Form 10-Q on November 22, 2013, (d) PAA's 2013 Form 10-K on February 28, 2014, (e) PAGP's 2013 Form 10-K on March 12, 2014, (f) the April 2014 Notes Offering Materials on April 15, 16, and 18, 2014, (g) PAA's 1Q14 Form 10-Q on May 9, 2014, and (h) PAGP's 1Q14 Form 10-Q on May 13, 2014, (2) the incorporation of the Code of Conduct into PAA and PAGP's Form 10-Ks; and (3) the presentation at the June 5, 2014 investor day, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)     PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra.*

(ii)    Plains had instructed the ILI vendor for the June 2007 ILIs to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 257 anomalies found in the 2007 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra.*

(iii)   Dig reports for the 13 excavations completed in 2008 showed that the 2007 ILI for Line 901 was inaccurate 67% of the time.  The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld.  Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record.  Length of the affected joint and its location relative to the reference marker [was] included for comparison to information provided by" the ILI vendor.  The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591.  *See* ¶¶216-217, 220, 229, *supra.*

(iv)    2008 field measurements of anomalies from the 13 excavations for Line 901 were not shared with the ILI vendor, resulting in the ILI tool's inaccuracy due to the lack of calibration.  This practice violated NACE RP0102, 49 C.F.R. §195.591, Plains' integrity management program section 8.0, and 49 C.F.R. §195.452(b)(5).  *See* ¶¶215-216, 220, *supra.*

(v)     The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-

line inspection results and the dig reports that showed the ILI drastically understated actual corrosion. *See* ¶228, *supra*.

(vi) PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to specify an approach to handling the ILI tool tolerances in its integrity management program. The letter also stated that Plains must modify its process for validating ILI results to incorporate the known ILI "under-call" bias. These inadequacies violated 49 C.F.R. §§195.452(f) and (g). *See* §V.E.1., *supra*.

(vii) Plains had instructed the ILI vendor for the July 2012 ILI to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 1,241 anomalies found in the 2012 ILI for Line 901 and the underestimation of corrosion size. This practice violated API 1160 and 49 C.F.R. §195.452(b)(6). *See* ¶¶218-220, *supra*.

(viii) Plains had instructed the ILI vendor for the April 26, 2013 and June 12, 2013 ILIs to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the underestimation of corrosion size for Line 903. This practice violated API 1160 and 49 C.F.R. §195.452(b)(6). *See* ¶¶218-220, *supra*.

(ix) The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion. *See* ¶228, *supra*.

(x) Dig reports for the 41 excavations completed on October 3, 2013 showed that the 2012 ILI for Line 901 was inaccurate 42% of the time. The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld. Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record. Length of the affected joint and its location relative to the reference marker [was] included for comparison to information provided by" the ILI vendor. The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591. *See* ¶¶216-217, 220, 229, *supra*.

(xi) 2013 field measurements of anomalies from the 41 excavations for Line 901 were not shared with the ILI vendor, resulting in the ILI tool's inaccuracy due to the lack of calibration. This practice violated NACE RP0102, 49 C.F.R. §195.591, Plains' integrity management program section 8.0, and 49 C.F.R. §195.452(b)(5). *See* ¶¶215-216, 220, *supra*.

(xii) Unity plot showing that the 2012 ILI for Line 901 was within +/- 10%, only 57% of the time when compared to field measurements. The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591. *See* ¶¶216-217, 220, 230, *supra*.

(xiii)   PHMSA completed its 2013 inspections of Lines 901 and 903 on October 4, 2013. During the course of the inspections, PHMSA again raised the concern to Plains that its integrity management procedures failed to address how differences in anomalies as directly measured in the fields and as sized by ILI tool would be handled.  *See* §V.E.5., *supra.*

(xiv)   The dig report relating to the 2013 ILI on Line 903, which calculated only 66% metal loss corrosion when actual field measurement from excavation of the anomaly revealed actual metal loss was 93%.  The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591.  *See* ¶¶216-217, 220, *supra.*

243.   Prior to (1) the filing of (a) PAA's 2Q14 Form 10-Q on August 8, 2014, (b) PAGP's 2Q14 Form 10-Q on August 12, 2014, (c) the September 2014 Notes Offering Materials on September 2, 4, and 5, 2014, (d) PAA and PAGP's 3Q14 Form 10-Qs on November 7, 2014, (e) PAGP's Secondary Offering Materials on November 12 and 13, 2014, (f) the December 2014 Notes Offering Materials on December 2, 3, and 4, 2014, (g) PAA and PAGP's 2014 Form 10-K on February 25, 2015, (h) PAA's Offering Materials on February 25 and 27, 2015 and March 2, 2015, and (i) PAA and PAGP's 1Q15 Form 10-Qs on May 8, 2015, (2) the incorporation of the Code of Conduct into PAA and PAGP's Form 10-K; and (3) the presentation at the June 4, 2015 investor day, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)   PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra.*

(ii)   Plains had instructed the ILI vendor for the June 2007 ILIs to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 257 anomalies found in the 2007 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra.*

(iii)   Dig reports for the 13 excavations completed in 2008 showed that the 2007 ILI for Line 901 was inaccurate 67% of the time.  The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld.  Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record. Length of the affected joint and its location relative to the reference marker [was]

included for comparison to information provided by" the ILI vendor.  The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591.  *See* ¶¶216-217, 229, *supra.*

(iv)     2008 field measurements of anomalies from the 13 excavations for Line 901 were not shared with the ILI vendor, resulting in the ILI tool's inaccuracy due to the lack of calibration.  This practice violated NACE RP0102, 49 C.F.R. §195.591, Plains' integrity management program section 8.0, and 49 C.F.R. §195.452(b)(5).  *See* ¶¶215-216, 220, *supra.*

(v)      The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶228, *supra.*

(vi)     PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to specify an approach to handling the ILI tool tolerances in its integrity management program.  The letter also stated that Plains must modify its process for validating ILI results to incorporate the known ILI "under-call" bias.  These inadequacies violated 49 C.F.R. §§195.452(f) and (g).  *See* §V.E.1.

(vii)    Plains had instructed the ILI vendor for the July 2012 ILI to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 1,241 anomalies found in the 2012 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra.*

(viii)   Plains had instructed the ILI vendor on April 26, 2013 and June 12, 2013 to disregard metal loss anomalies of 15% or less in determining the size of the corrosion anomaly clusters, resulting in the underestimation of corrosion size for Line 903.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6).  *See* ¶¶218-220, *supra.*

(ix)     The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶228, *supra.*

(x)      Dig reports for the 41 excavations completed on October 3, 2013 showed that the 2012 ILI for Line 901 was inaccurate 42% of the time.  The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld.  Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record.  Length of the affected joint and its location relative to the reference marker [was] included for comparison to information provided by" the ILI vendor.  The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591.  *See* ¶¶216-217, 220, 229, *supra.*

(xi)    2013 field measurements of anomalies from the 41 excavations for Line 901 were not shared with the ILI vendor, resulting in the ILI tool's inaccuracy due to the lack of calibration.  This practice violated NACE RP0102, 49 C.F.R. §195.591, Plains' integrity management program section 8.0, and 49 C.F.R. §195.452(b)(5). *See* ¶¶215-216, 220, *supra*.

(xii)   Unity plot showing that the 2012 ILI for Line 901 was within +/- 10%, only 57% of the time when compared to field measurements.  The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591.  *See* ¶¶216-217, 220, 230, *supra*.

(xiii)  PHMSA completed its 2013 inspections of Lines 901 and 903 on October 4, 2013. During the course of the inspections, PHMSA again raised the concern to Plains that its integrity management procedures failed to address how differences in anomalies as directly measured in the fields and as sized by ILI tool would be handled.  *See* §V.E.5., *supra*.

(xiv)   The dig report relating to the 2013 ILI on Line 903, which calculated only 66% metal loss corrosion when actual field measurement from excavation of the anomaly revealed actual metal loss was 93%.  The tool accuracy was not within stated specification and violated API 1163 and 49 C.F.R. §195.591.  *See* ¶¶216-217, 220, *supra*.

(xv)    The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 11, 2014, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶228, *supra*.

## 2.    Defendants' Statements About Plains' Integrity Management Program Were False and Misleading and Omitted Material Facts: Plains Failed to Evaluate or Conduct Mitigative Measures for Lines 901 and 903

244.    **Falsity:**  The statements in ¶¶192-195, 202, 205-206 that Plains: (1) focused on risk reduction through enhanced corrosion control and damage prevention, (2) "perform[ed] scheduled maintenance on all of our pipeline system and ma[de] repairs and replacements when necessary or appropriate," (3) used "advanced data interpretation," "state-of-the-art inspection tools and technologies," (4) "improv[ed] our data interpretation to make sure that we are trying to prevent things from happening, not diagnose what did happen," (5) focused on "[i]mproving data/interpretation/integration capabilities to better prioritize, focus on and assess areas warranting attention," (6) invested "in any necessary equipment, systems, processes, or other resources" to

ensure environmentally responsible operations, (7) went "beyond regulatory mandate" for pipelines in HCAs, and (8) "operat[ed] in substantial compliance with our risk management program" were materially false and misleading, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading for the additional reason that Plains failed to properly evaluate or conduct mitigative measures for Lines 901 and 903. Specifically, Plains ignored data in its possession since 2008 indicating that the smart pig inspections were inaccurate, failed to account for the smart pig's inaccuracy in making repair decisions, decided to forgo repairs of some of the most significant corrosion defects on Line 901 or made patchwork repairs in lieu of replacements, and failed to conduct scheduled preventive and mitigative evaluations of the ILI results and repairs – all in violation of the Hazardous Liquid Pipeline Safety Regulations and Liquid Integrity Management Rules in 49 C.F.R. §195.452.

245.    According to PHMSA, one of the contributory causes of the Line 901 rupture was "failure by Plains to detect and mitigate the corrosion."  The failure to detect the corrosion was attributed to the undercall bias of the smart pig as discussed above in §VI.A.1.  The failure to mitigate the corrosion resulted from Plains failure to repair and conduct preventive and mitigative evaluations as required by 49 C.F.R. §§195.492(h) and (i) of the Liquid Integrity Management Rules.

246.    On September 24, 2012, Plains received the final report for the 2012 ILI survey of Line 901 from its vendor, and the survey revealed that corrosion anomalies had proliferated from 386 in 2007 to 1,578 in 2012.  At the time of the 2012 ILI survey, Plains had already completed its excavation and repairs from the 2007 ILI.  Based on the 2008 field measurements of anomalies, the ILI tool's true accuracy was within "+/-10%," only "33% of the time."

247.    Nevertheless, in its decision process to determine required excavations and repairs, Plains ignored the ILI tool's bias in undercalling anomalies.  According to PHMSA, in making

decisions to repair, Plains' policy required it to add 10% metal loss to all anomalies based on the stated accuracy of the ILI tool, which was "+/- 10%, 80% of the time," even though the true accuracy was "+/-10%, 33% of the time."  The 2012 ILI survey revealed that at least 56 anomalies had metal loss of 40% or greater.  Plains decided to leave at least ten of these anomalies unrepaired.

248.    Plains' failure to account for the ILI tool's inaccuracies in determining whether to excavate and repair anomalies violated the Liquid Integrity Management Rule for HCAs. Specifically, 49 C.F.R. §195.452(h)(4)(iii) states that "an operator must schedule evaluation and remediation of the following within 180 days of discovery of the condition: . . . (E) an area of general corrosion with a predicted metal loss greater than 50% of nominal wall."  Notwithstanding the specific 50% requirement, 49 C.F.R. §195.452(h)(1) also mandates that "[a]n operator must take prompt action to address all anomalous conditions the operator discovers through the integrity assessment or information analysis."   In turn, 49 C.F.R. §195.452(g) (governing information analysis) requires that "an operator must analyze *all available information* about the integrity of the entire pipeline and the consequences of a failure."  Furthermore, in its Hazardous Liquid Integrity Management Rule Frequently Asked Questions, PHMSA emphasized that operators must consider tool tolerances when determining whether anomalies need to be repaired:

7.19    Should tool tolerances be considered when determining if a detected anomaly meets repair criteria?

Yes. Operators are required to integrate relevant information on the condition of the pipeline in making decisions on excavation timing and other mitigative actions. *Tool tolerances should be considered as part of the data integration process*.

Information on tool tolerances should be used to assure that defects requiring early excavation and mitigative action are properly identified and characterized. *This does not necessarily mean simply adding the vendor-supplied tolerance value to reported depth of indications. Several sources of data may be used, in conjunction with vendor-supplied tool tolerances, to characterize pipeline defects. These include results of previous excavations, confirmation digs, results of concurrent inspections, and comparison to prior inspections.* Uncertainties in this data should also be considered.

- 103 -

249.    Plains' vendor for the root cause report concurred, finding that "the excavation results conducted as part of the ILI validation should be included in the data integration process."

250.    Plains failed to follow these regulations and the consequences were dire.  One of the ten 40% or greater metal loss anomalies revealed by the 2012 ILI but left unrepaired ultimately ruptured on May 19, 2015.  As stated by PHMSA in the Failure Investigation Report, "[t]he anomaly that ruptured was called out by the ILI tool at 45% depth in 2012.  Plains' IMP specified adding 10% to all anomalies (55% depth in this case) then 'growing them' to predict failure using an anticipated corrosion growth rate.  This analysis would provide a predicted failure time.  Plains did not excavate the anomaly that failed."  By failing to excavate and remediate the anomaly, which was greater than 50% taking into account the smart pig's tool tolerance pursuant to Plains' own IMP, Plains violated 49 C.F.R. §195.452(h)(4)(iii)(E).  Furthermore, Plains' vendor for the root cause report found that Plains' calculation failed to account for "the reported metal loss depths from previous assessments" and was not in "strict adherence with the requirements of Plains IMP 9.2.2."  This violated 49 C.F.R. §195.452(b)(5)'s requirement to implement and follow the IMP, and 49 C.F.R. §195.452(h)(1)'s requirement "to address all anomalous conditions the operator discovers through the integrity assessment or information analysis."  By failing to "analyze all available information," which made clear that the smart pig's tolerance was much greater than 10%, Plains also violated 49 C.F.R. §195.452(g).

251.    Furthermore, 49 C.F.R. §195.452(h)(4)(iii) also states that "an operator must schedule evaluation and remediation of the following within 180 days of discovery of the condition: . . . (D) a calculation of the remaining strength of the pipe shows an operating pressure that is less than the current established maximum operating pressure at the location of the anomaly.  Suitable remaining strength calculation methods include, but are not limited to, ASME/ANSI B31G and PRCI PR-3-805 (R-STRENG)."  Using this regulatory standard to predict the burst pressure of a pipeline with 58%

corrosion results in a burst pressure of 700 psi, equal to the reported Line 901 pressure of 700 psi prior to the rupture.  This level of corrosion correlates with "[t]he anomaly that ruptured[, which] was called out by the ILI tool at 45% depth in 2012."  Based on the results of the ILIs in 2007 and 2012, Plains was well aware that Lines 901 and 903 were operating with corrosion that measured as high as 67% even before correcting for the "under-call" bias.  Plains also knew that this corrosion was getting worse as time went by but continued to operate the lines at excessive pressure.

252.   For pipelines that are infested with general corrosion, like Lines 901 and 903, 49 C.F.R. §195.585 requires that "[i]f you find pipe so generally corroded that the remaining wall thickness is less than that required for the maximum operating pressure of the pipeline, you must replace the pipe.  However, you need not replace the pipe if you – (1) [r]educe the maximum operating pressure commensurate with the strength of the pipe needed for serviceability based on actual remaining wall thickness; or (2) [r]epair the pipe by a method that reliable engineering tests and analyses show can permanently restore the serviceability of the pipe."  Plains violated this regulation.  Rather than replace or shut down Lines 901 and 903 – remedies that were costly, but required given the age of the pipe, the proliferating corrosion, and the pipe's metal loss – Plains opted to conduct patchwork repairs or forgo repairs of severe anomalies altogether.  During its 2008 and 2009 inspections, PHMSA warned Plains about its patchwork repairs.  In a March 4, 2009 letter to Nerbonne, PHMSA cited 49 C.F.R. §195.585 ("What must I do to correct corroded pipe?"), and stated that "Plains must modify their procedures to provide specific guidance in their Operation and Maintenance Manual for those specific composite repairs methods that are approved for use and the procedures that are to be followed when performing composite repairs."

253.   On May 13, 2013, Plains excavated and exposed the pipe for an anomaly that was within an arm's reach away – dig 13 – from the anomaly that ultimately ruptured, but failed to follow the requirements of 49 C.F.R. §§195.561(b) and 195.569 to investigate and repair anomalies

nearby.  Specifically, 49 C.F.R. §195.569 requires that "[w]henever you have knowledge that any portion of a buried pipeline is exposed, you must examine the exposed portion for evidence of external corrosion *if the pipe is bare, or if the coating is deteriorated*.  If you find external corrosion requiring corrective action under § 195.585, *you must investigate circumferentially and longitudinally beyond the exposed portion (by visual examination, indirect method, or both) to determine whether additional corrosion requiring remedial action exists in the vicinity of the exposed portion*."  Further, 49 C.F.R. §195.561(b) requires that *the pipeline operator "must repair any coating damage discovered*."

254.    The corrosion that ate up 89% of the pipe's wall thickness did not happen overnight.  As the root cause report written by Plains' own vendor stated: "it is conceivable that the actual depth [of the anomaly] in 2012 was much closer to 89% WT [wall thickness]."  Moreover, the length of the anomaly was over a foot long at 12.99 inches longitudinally.  As such, the degraded coating and the general and severe corrosion existed in 2012 when Plains conducted the dig within arm's reach of the rupture point because the 89% corrosion was caused by degraded coating: "the external coating system failed to prevent moisture from reaching the pipe steel, allowing the external corrosion process to occur" and "the damage to the external protective coating system allowed for water ingress, retention of water, and subsequent CUI [corrosion under insulation]."  According to the root cause report, "[t]he compromised coating on Line 901 was not isolated to just the failure location.  Evidence of wrinkles and cracks were observed within the PE [polyethylene] tape *along the length of the excavated pipeline* during the incident investigation" and "[d]isbondment of the coal tar coating was observed on the bottom of the pipe *along the length*."



According to PHMSA, "[t]he release location was within 6 feet of a corrosion anomaly that was exposed and repaired after the 2012 ILI survey.  There was evidence of corrosion and degraded coating systems between the 2012 repair site and the 2015 rupture site."

255.    Whether Plains saw the degraded coating and failed to repair it, or failed to look within arm's reach longitudinally and circumferentially for potential additional remedial needs, Plains violated the Hazardous Liquid Pipeline Safety Regulations, and the "minimum requirements" it established for corrosion control.[12]  As such, Plains' representations to investors that it "make[s] repairs and replacements when necessary or appropriate," and invests in "***any necessary*** . . . processes, or other resources" to prevent environmental disasters, were materially false and misleading by at least October 3, 2013, when Plains wrapped up excavations and repairs on Line 901 based on the 2012 ILI survey.

---

[12]   "This subpart [H – Corrosion Control] prescribes minimum requirements for protecting steel pipelines against corrosion."  49 C.F.R. §195.551.

256.    In addition to addressing repairs, the Liquid Integrity Management Rule requires Plains to conduct risk analyses to determine additional preventive and mitigative measures for pipelines in HCAs.  The additional measures that outlined in 49 C.F.R. §195.452(i), which states:

> *An operator must take measures to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area*.  These measures include conducting a risk analysis of the pipeline segment to identify additional actions to enhance public safety or environmental protection.  Such actions may include, but are not limited to, *implementing damage prevention best practices, better monitoring of cathodic protection where corrosion is a concern, establish shorter inspection intervals, installing EFRDs on the pipeline segment, modifying the systems that monitor pressure and detect leaks, providing additional training to personnel on response procedures, and detect leaks, conducting drills with local emergency responders and adopting other management controls*.

257.    Furthermore, 49 C.F.R. §195.492(j) requires that "[a]n operator must conduct a periodic evaluation as frequently as needed to assure pipeline integrity. . . .  The evaluation must consider the results of the baseline and periodic integrity assessments, information analysis (paragraph (g) of this section), and decisions about remediation, and preventive and mitigative actions (paragraph (h) and (i) of this section)."  Plains' Integrity Management Program also requires that "P&M [preventive and mitigative] evaluations of assessments will occur within 15 months of the receipt of the final [ILI] reports [to allow] time for reviewing the assessment results and investigating the worst anomalies to develop confidence in the validity of the assessment and to understand the pipeline segment's condition."

258.    Because the Liquid Integrity Management Rule applies only to pipelines in high consequence areas with severe repercussion from an oil release, the rule imposes strict recordkeeping requirements to demonstrate compliance.  For example, 49 C.F.R. §195.452(l) requires that:

> An operator must maintain, *for the useful life of the pipeline*, records that demonstrate compliance with the requirements of this subpart.  *At a minimum*, an operator must maintain the following records for review during an inspection: . . . (ii) Documents to support the decisions and analyses, including any modifications,

justifications, deviations and determinations made, variances, and actions taken, to implement and evaluate each element of the integrity management program listed in paragraph (f) of this section.

259.    In turn, 49 C.F.R. §195.452(f)'s list of integrity management program elements includes:

> (5) A continual process of assessment and evaluation to maintain a pipeline's integrity (*see* paragraph (j) of this section); (6) Identification of preventive and mitigative measures to protect the high consequence area (*see* paragraph (i) of this section).

260.    Plains failed to conduct the required periodic preventive and mitigative evaluations, and accordingly, also failed to maintain any records justifying the failure to conduct such evaluations.  Plains received the final 2012 ILI report for Line 901 on September 24, 2012 and all excavations based on the results of the report were completed by October 3, 2013.  According to Plains' own Integrity Management Program, the preventive and mitigative evaluation should have taken place "within 15 months of the receipt of the final report" – by December 2013 at the latest. Plains' vendor for the root cause report found no evidence of "a Preventive and Mitigative Evaluation Meeting within the 15 month window of the receipt of the final report required in Section 11.3 [of Plains' Integrity Management Program]."  As such, contrary to defendants' Class Period representations to investors, including that Plains "operat[ed] in substantial compliance with our Risk Management Program," Plains not only violated 49 C.F.R. §195.452(i), (j), and (l), but also §195.452(b)(5), which requires that each operator of a pipeline must "implement and follow the [integrity management] program."

261.    Similarly, for Line 903, during PHMSA's inspection between August to October 2013, PHMSA found that Plains failed to take the required enhanced preventive and mitigative measures required for pipelines in an HCA and failed to document any justifications or considerations for not implementing such measures as required by 49 C.F.R. §195.492(i).  On

March 25, 2014, a Plains representative emailed PHMSA, admitting that the Company had no record of preventive and mitigative evaluations for the pipeline segments.

262.     Proper performance of the preventive and mitigative evaluations in accordance to 49 C.F.R. §195.452(i) would have prevented the Santa Barbara oil spill.  For example, proper evaluation and implementation of the ILI assessment interval would have reduced the time between inspections to two years instead of three.  Based on its review of a one-page "assessment plan" dated December 31, 2012, Plains' vendor stated in the root cause report that "[w]hile the assessment interval was shortened from five to three years . . . prior to December 31, 2012, there is no documentation (e.g., Form F11-2) provided to DNV GL specifying the assumptions or calculations that were used to justify the three-year assessment interval."  Indeed, the lack of assumptions, calculations, or justifications as of December 31, 2012 for the three-year interval was not surprising as Plains had not completed excavation and repairs until October 3, 2013 and the excavation that took place six feet from the rupture – dig 13 out of 41 – did not happen until May 13, 2013.  According to Plains' Integrity Management Program, the rationale for setting a preventive and mitigative evaluation "within 15 months of the receipt of the final report was [to allow] time for reviewing the assessment results and investigating the worst anomalies to develop confidence in the validity of the assessment and to understand the pipeline segment's condition."  By failing to incorporate assumptions, calculations or justifications in its determination of three-year assessment interval, Plains violated 49 C.F.R. §195.452(j)(3), which requires assessment intervals to be based on risk factors specified in §195.452(e).  Furthermore, 49 C.F.R. §195.452(l) requires the documentation of "modifications, justifications, deviations, and determinations" made to support any decisions made to "evaluate each element of the integrity management program listed in" 49 C.F.R. §195.452(f), which includes pipeline assessment interval.

263.    Because Plains had no justification, assumptions, or calculations for the three-year assessment interval, Plains' vendor for the root cause report proceeded to perform calculations in an attempt "to evaluate whether the three year inspection interval was justified for the feature associated with the 2015 failure." One of the calculations found that the necessary reassessment interval was 2.5 years when the ILI tool inaccuracies were taken into account by increasing the tool tolerance level to +/- 16% from the stated level of +/- 10%.  At the +/- 10% tool tolerance, the reassessment interval was 3.4 years.  However, even increasing the tool tolerance level to +/- 16% was too lenient because available data on the type of ILI instrumentation used to perform the 2007 survey indicates that the ILI underestimated metal loss by 20% to 25% for anomalies that were at a range of 40% to 50% metal loss.

264.    Indeed, on May 21, 2015, two days after the Line 901 rupture, Plains completed an accident report on Form F11-2 that, according to its root cause report vendor, stated "[t]his form references the *2012 ILI data (not the 2015 ILI)* and: States that the current inspection interval is three years (Part A-1: Review of Design, Operation and Risk Data), References the release on 5/19/2015 (Part A-3: Leaks from Segment or Facility), and *Recommends a reduction in the reassessment interval from three to two years* to 'ensure the control of growth of external corrosion under shrink sleeves.'"

265.    If Plains had conducted the ILI inspection using a 2 to 2.5 year assessment interval, the 2015 ILI survey would have been completed between July 2014 and January 2015.  Had Plains then followed the applicable guidelines, the four severe anomalies on Line 901 with extensive external corrosion and metal loss up to 74% that required immediate "investigation and remediation" under 49 C.F.R. §195.452(h)(4) would have caused Plains to "temporarily reduce the operating

pressure or shut down the pipeline until the operator completes the repair of these conditions."  The eventual Line 901 spill would have been avoided entirely.[13]

266.   **Scienter:**  By virtue of the facts set forth below and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in ¶¶192-195, 202, 205-206 were materially misleading to investors.

267.   Since at least 2006, the DOT has required oil transportation operators – like defendants – to implement integrity management programs.  As defendants repeatedly represented in their Class-Period SEC filings, these programs meant defendants were to carry out "more frequent inspections, correction of identified anomalies and other measures, to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways."  Only with at least severe recklessness could defendants ignore the results from such "frequent inspections," especially in places as environmentally sensitive as the pristine Santa Barbara coastline.

268.   During the 2008 and 2009 inspections of Plains' procedures for integrity management and operations and maintenance, PHMSA and the California State Fire Marshal found Plains' repair protocol problematic.  In a March 4, 2009 letter to Dan Nerbonne, Vice President of Engineering, PHMSA stated that it had "identified the apparent inadequacies found within Plains' plans or procedures" in violation of 49 C.F.R. §195.452.  The letter stated that "Plains' data integration

---

[13]   On May 5, 2015, Rosen conducted the ILI that revealed four areas on Line 901 with pipe anomalies that required "immediate investigation and remediation" under relevant regulations and Plains' own integrity management plan.  Rosen's normal practice was to immediately notify Plains of any anomalies, such as those found in the May 5 ILI, that required immediate attention.  Such anomalies were identified by Rosen in a preliminary "first pass" of the data and communicated to Plains within seven to 14 days, meaning Plains would have received notice of the anomalies requiring immediate corrections before the spill or, at the very latest, on the day of the spill.  Under applicable regulations, the Company was required to shut down Line 901 pending resolution of the immediate issues.  Even if defendants did not have the preliminary data before the spill, use of the proper inspection period – or any period shorter than the unjustified and unsupported three-year interval – would have prevented the spill if Plains had followed the regulations.

process must be modified to require the application of tool uncertainty to ILI results during the discovery phase of assessment reviews when comparing ILI results to IM [Integrity Management] rule repair requirements."   Furthermore, "[t]he Inspection Team reviewed Plains' processes (including CGAR) for handling tool tolerances in the remediation of metal loss anomalies as reported in the ILI vendor report and determined that it did not have a direct impact on the timing for the remediation of immediate and 180-day metal loss conditions at the time of discovery."   With respect to repairs of corroded pipe, mandated by 49 C.F.R. §195.585, PHMSA stated that "Plains must modify their procedures to provide specific guidance in their Operations and Maintenance Manual for those specific composite repairs methods that are approved for use and the procedures that are to be followed when performing composite repairs."   With respect to pipe coating inspection and repair for corrosion control, required by 49 C.F.R. §195.561, PHMSA found "Plains' O&M Manual Section 412, Corrosion Control, page 9 states a coating inspection is needed.   The procedures do not state or reference what this activity entails and how it will be carried out.   The Corrosion Specification manual does provide details, but only for new construction."

269.   Plains did not comply with PHMSA's directives.   Four years later, during its 2013 inspections of Lines 901 and 903, PHMSA again raised the concern to Plains that its integrity management procedures failed to address how differences in anomalies as directly measured in the field and as sized by ILI tool would be handled.   In addition, PHMSA requested records of 2013 preventive and mitigative evaluations of Line 903.   Plains admitted via email to PHMSA dated March 25, 2014 that no such records existed.   Plains' failure to produce records was not simply a recordkeeping violation.   Indeed, 49 C.F.R. 195.452(i) requires a "risk analysis of the pipeline segment to identify additional actions to enhance public safety or environmental protection" as part of the preventive and mitigative evaluation.   The absence of records demonstrates the absence of risk analysis taken to assess preventive and mitigative measures, which violates 49 C.F.R. 194.452(i)

governing preventive and mitigative measures for HCAs, as well as 49 C.F.R. 195.452(l) governing recordkeeping to demonstrate compliance.

270.    In addition to PHMSA's repeated warnings between 2008 and 2013, Plains' own Integrity Management Program established the processes for determining: (1) which anomalies to repair, and (2) the preventative and mitigative evaluations to be undertaken after completion of excavation and repairs – both of which Plains failed to follow.  Plains' 2012 corrosion growth assessment report, titled CGAR 2012_Las Flores to Gaviola_9-26-2012, used 10% ILI tolerance in its repair decision analysis and, according to the root cause report, disregarded "the reported metal loss depths from previous assessments."  Plains' vendor for the root cause report found that the evidence did not "indicate that the process was in strict adherence with the requirements or IMP Section 9.2.2."  Section 11.3 of the IMP required a "Preventive and Mitigative Evaluation Meeting within the 15 month window of the receipt of the final [ILI] report."  The purpose of the meeting was to analyze the ILI results and adjust the preventive and mitigative plan based on the new information.  Plains could provide no evidence that the required meeting had ever taken place.

271.    The in-line inspection results, the related excavations for repairs, and the measurements demonstrating that Plains' in-line inspections drastically understated actual corrosion were provided to senior executive officers of Plains who reviewed them and certified their accuracy as required by law.  *See* §V.J., *supra*.  Pursuant to the Company's policies and practices, the material information contained in these reports was conveyed to Armstrong, Swanson, Pefanis, and McGee.

272.    Armstrong was at all times the "principal executive officer" as referred to in the underwriting agreements.  By virtue of (1) the representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Armstrong's role as Chairman of the Board receiving reports of potential and actual regulatory non-compliance from the audit committee (*see* §V.H., *supra*), (3) Armstrong's SOX certification (*see* §V.I., *supra*), and (4) Armstrong's authority

- 114 -

to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to deficient repairs and lack of preventive and mitigative evaluations impacting HCAs, was recorded, processed, summarized and communicated to Armstrong.

273.    Swanson was at all times the "principal financial officer" as referred to in the underwriting agreements.  By virtue of (1) the representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Swanson's SOX certification (*see* §V.I., *supra*), and (3) Swanson's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to deficient repairs and lack of preventive and mitigative evaluations impacting HCAs, was recorded, processed, summarized and communicated to Swanson.

274.    Pefanis was at all times the President and Chief Operating Officer.  Pefanis was the "appropriate officer[] of GP LLC" and "management" with responsibility for overseeing Plains' operations, including pipeline safety and integrity with Gorman, Nerbonne, and Valenzuela reporting to him.  *See* §V.H., *supra*.  In addition, Pefanis had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*. Therefore, material information concerning the numerous material failures to comply with applicable laws and regulations detailed above relating to deficient repairs and lack of preventive and mitigative evaluations impacting HCAs, was recorded, processed, summarized and communicated to Pefanis. *See* §V.G., *supra*.

1264030_1

275.     McGee was at all times the General Counsel and Valenzuela reported to him.  McGee was the "appropriate officer[] of GP LLC" with responsibility for overseeing Plains' legal department and who repeatedly stated without qualification that none of Plains' entities has directly or indirectly violated any environmental safety, health or similar law or regulations.  McGee also had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*.  In addition, as required by the audit committee charter, he discussed with the committee all potential and actual regulatory non-compliance that could "result in material non-compliance" by PAA and PAGP, including the numerous material failures to comply with applicable laws and regulations detailed above relating to deficient repairs and lack of preventive and mitigative evaluations impacting HCAs.  *See* §V.H., *supra*.

276.     By virtue of the foregoing, Armstrong, Swanson, Pefanis, and McGee received the following information and documents or summaries thereof, as set forth below:

277.     Prior to (1) the filing of PAA's 2012 Form 10-K on February 27, 2013 and PAA's 1Q13 Form 10-Q on May 8, 2013; and (2) the incorporation of the Code of Conduct into PAA's Form 10-K; Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

> (i)      PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra*.
>
> (ii)     The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.
>
> (iii)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide guidance on "specific composite repairs methods that are approved for use" and to provide procedures to follow when making repairs on corroded pipes in its Operations and Maintenance Manual.  These failures were in violation of 49 C.F.R. §§195.585(a) and (b).  *See* §V.E.1. and ¶268, *supra*.

(iv)   PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to (1) apply ILI tool uncertainty when comparing ILI results to the integrity management rule repair requirements in its data integration process, (2) account for the ILI tool's uncertainty in its remediation of metal loss conditions, and (3) incorporate evaluation methodology for analyses of as-called and as-found anomaly dimensions in its integrity management plan.  These failures were in violation of 49 C.F.R. §§195.452(f) and (g).  *See* §V.E.1. and ¶268, *supra*.

(v)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to establish procedures for pipeline coating inspection in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.561 governing inspection of pipe coating for external corrosion control.  *See* §V.E.1. and ¶268, *supra*.

(vi)   The 2012 final ILI report for Line 901 dated September 24, 2012 and Plains' corrosion growth assessment report for repair decisions based on the results of the 2012 ILI.  In its decision process for repairs, Plains disregarded metal losses from previous assessments and the ILI tool's inaccuracy and uncertainty.  These deficiencies violated 49 C.F.R. §§195.452(b)(5), (g), (h)(1), and Plains integrity management program section 9.2.2.  *See* ¶¶250, 270, *supra*.

(vii)  Plains' one-page assessment plan dated December 31, 2012 that arbitrarily moved the ILI inspection interval to 3 years with no calculations, assumptions, or justifications in violation of 49 C.F.R. §§195.452(j) and (l).  *See* ¶262, *supra*.

278.   Prior to the filing of (1) the PAGP IPO's Form S-1 on July 29, 2013, (2) PAA's 2Q13 Form 10-Q on August 8, 2013, (3) the August 2013 Notes Offering Materials on August 8, 9, and 12, 2013, (4) Amendment No. 1 to PAGP IPO's Form S-1 on September 6, 2013, (5) Amendment No. 2 to PAGP IPO's Form S-1 on September 26, 2013, (6) Amendment No. 3 to PAGP IPO's Form S-1 on October 2, 2013, and (7) Amendment No. 4 to PAGP IPO's Form S-1 on October 7, 2013, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)    PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra*.

(ii)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.

- 117 -

(iii) PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide guidance on "specific composite repairs methods that are approved for use" and to provide procedures to follow when making repairs on corroded pipes in its Operations and Maintenance Manual.  These failures were in violation of 49 C.F.R. §§195.585(a) and (b).  *See* §V.E.1., *supra.*

(iv) PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to (1) apply ILI tool uncertainty when comparing ILI results to the integrity management rule repair requirements in its data integration process, (2) account for the ILI tool's uncertainty in its remediation of metal loss conditions, and (3) incorporate evaluation methodology for analyses of as-called and as-found anomaly dimensions in its integrity management plan.  These failures were in violation of 49 C.F.R. §§195.452(f) and (g).  *See* §V.E.1., *supra.*

(v) PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to establish procedures for pipeline coating inspection in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.561 governing inspection of pipe coating for external corrosion control.  *See* §V.E.1., *supra.*

(vi) The 2012 final ILI report for Line 901 dated September 24, 2012 and Plains' corrosion growth assessment report for repair decisions based on the results of the 2012 ILI.  In its decision process for repairs, Plains disregarded metal losses from previous assessments and the ILI tool's inaccuracy and uncertainty.  These deficiencies violated 49 C.F.R. §§195.452(b)(5), (g), (h)(1), and Plains integrity management program section 9.2.2.  *See* ¶¶250, 270, *supra.*

(vii) Plains' one-page assessment plan dated December 31, 2012 that arbitrarily moved the ILI inspection interval to 3 years with no calculations, assumptions, or justifications in violation of 49 C.F.R. §§195.452(j) and (l).  *See* ¶262, *supra.*

(viii) The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra.*

279.   Prior to (1) the filing of (a) the PAGP IPO's prospectus on October 16, 2013,

(b) PAA's 3Q13 Form 10-Q on November 6, 2013, and (c) PAGP's 3Q13 Form 10-Q on

November 22, 2013; and (2) the continuous posting of false statements on its website, Armstrong,

Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i) PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra.*

1264030_1

(ii)    The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.

(iii)   PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide guidance on "specific composite repairs methods that are approved for use" and to provide procedures to follow when making repairs on corroded pipes in its Operations and Maintenance Manual.  These failures were in violation of 49 C.F.R. §§195.585(a) and (b).  *See* §V.E.1., *supra*.

(iv)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to (1) apply ILI tool uncertainty when comparing ILI results to the integrity management rule repair requirements in its data integration process, (2) account for the ILI tool's uncertainty in its remediation of metal loss conditions, and (3) incorporate evaluation methodology for analyses of as-called and as-found anomaly dimensions in its integrity management plan.  These failures were in violation of 49 C.F.R. §§195.452(f) and (g).  *See* §V.E.1., *supra*.

(v)     PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to establish procedures for pipeline coating inspection in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.561 governing inspection of pipe coating for external corrosion control.  *See* §V.E.1., *supra*.

(vi)    The 2012 final ILI report for Line 901 dated September 24, 2012 and Plains' corrosion growth assessment report for repair decisions based on the results of the 2012 ILI.  In its decision process for repairs, Plains disregarded metal losses from previous assessments and the ILI tool's inaccuracy and uncertainty.  These deficiencies violated 49 C.F.R. §§195.452(b)(5), (g), (h)(1), and Plains integrity management program section 9.2.2.  *See* ¶¶250, 270, *supra*.

(vii)   Plains' one-page assessment plan dated December 31, 2012 that arbitrarily moved the ILI inspection interval to 3 years with no calculations, assumptions, or justifications in violation of 49 C.F.R. §§195.452(j) and (l).  *See* ¶262, *supra*.

(viii)  The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.

(ix)    Dig reports for the 41 excavations relating to the 2012 ILI of Line 901.  All excavations were completed on October 3, 2013.  In addition to making patchwork repairs, Plains decide not to repair ten anomalies from the 2012 ILI reports with 40% or greater metal loss.  The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld.  Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record.  Length of the affected joint and its location relative to the reference marker [was]

included." The repair deficiencies were in violation of 49 C.F.R. §§195.452(g), (h)(1), (h)(4)(iii), and 195.585. *See* ¶¶216-217, 229, 247-252, *supra*.

(x)  The dig reports included information for dig 13, six feet from the rupture site, for which excavation was conducted on May 13, 2013. The dig records showed degraded coating, the failure to repair the degraded coating, and the need to investigate longitudinally and circumferentially for further remedial measures. Plains' failure to repair and to investigate the pipe was in violation of 49 C.F.R. §§195.561(b) and 195.569. *See* ¶¶253, 262, *supra*.

(xi)  PHMSA's request during the 2013 inspections for preventive and mitigative evaluations relating to Line 903. PHMSA completed its inspections on October 4, 2013 and Plains could not provide any evidence of the evaluations or justifications for not conducting the evaluations during the inspections, which violated 49 C.F.R. §§195.452(b)(5), (i), (j), and (l), and Plains integrity management program section 11. *See* ¶¶260-261, *supra*.

280.  Prior to (1) the filing of PAA's 2013 Form 10-K on February 28, 2014 and PAGP's 2013 Form 10-K on March 12, 2014; (2) the incorporation of the Code of Conduct into PAA and PAGP's Form 10-Ks; and (3) the continuous posting of false statements on its website, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)  PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903. *See* §V.F., *supra*.

(ii)  The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion. *See* ¶¶228, 271, *supra*.

(iii)  PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide guidance on "specific composite repairs methods that are approved for use" and to provide procedures to follow when making repairs on corroded pipes in its Operations and Maintenance Manual. These failures were in violation of 49 C.F.R. §§195.585(a) and (b). *See* §V.E.1., *supra*.

(iv)  PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to (1) apply ILI tool uncertainty when comparing ILI results to the integrity management rule repair requirements in its data integration process, (2) account for the ILI tool's uncertainty in its remediation of metal loss conditions, and (3) incorporate evaluation methodology for analyses of as-called and as-found anomaly dimensions in its integrity management plan. These failures were in violation of 49 C.F.R. §§195.452(f) and (g). *See* §V.E.1., *supra*.

(v)     PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to establish procedures for pipeline coating inspection in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.561 governing inspection of pipe coating for external corrosion control. *See* §V.E.1., *supra*.

(vi)    The 2012 final ILI report for Line 901 dated September 24, 2012 and Plains' corrosion growth assessment report for repair decisions based on the results of the 2012 ILI. In its decision process for repairs, Plains disregarded metal losses from previous assessments and the ILI tool's inaccuracy and uncertainty. These deficiencies violated 49 C.F.R. §§195.452(b)(5), (g), (h)(1), and Plains integrity management program section 9.2.2. *See* ¶¶250, 270, *supra*.

(vii)   Plains' one-page assessment plan dated December 31, 2012 that arbitrarily moved the ILI inspection interval to 3 years with no calculations, assumptions, or justifications in violation of 49 C.F.R. §§195.452(j) and (l). *See* ¶262, *supra*.

(viii)  The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion. *See* ¶¶228, 271, *supra*.

(ix)    Dig reports for the 41 excavations relating to the 2012 ILI of Line 901. All excavations were completed on October 3, 2013. In addition to making patchwork repairs, Plains decide not to repair ten anomalies from the 2012 ILI reports with 40% or greater metal loss. The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld. Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record. Length of the affected joint and its location relative to the reference marker [was] included." The repair deficiencies were in violation of 49 C.F.R. §§195.452(g), (h)(1), (h)(4)(iii), and 195.585. *See* ¶¶216-217, 229, 247-252, *supra*.

(x)     The dig reports included information for dig 13, six feet from the rupture site, for which excavation was conducted on May 13, 2013. The dig records showed degraded coating, the failure to repair the degraded coating, and the need to investigate longitudinally and circumferentially for further remedial measures. Plains' failure to repair and to investigate the pipe was in violation of 49 C.F.R. §§195.561(b) and 195.569. *See* ¶¶253, 262, *supra*.

(xi)    PHMSA's request during the 2013 inspections for preventive and mitigative evaluations relating to Line 903. PHMSA completed its inspections on October 4, 2013 and Plains could not provide any evidence of the evaluations or justifications for not conducting the evaluations during the inspections. Similarly, the preventive and mitigative meeting for Line 901 for the purpose of "reviewing the assessment results and investigating the worst anomalies to develop confidence in the validity of the assessment and to understand the pipeline segment's condition" also failed to take place by the required deadline of December 24, 2013 with no

justifications.  These failures violated 49 C.F.R. §§195.452(b)(5), (i), (j), and (l), and Plains integrity management program section 11.  *See* ¶¶260-261, *supra*.

281.    Prior to (1) the filing of (a) the April 2014 Notes Offering Materials on April 15, 16, and 18, 2014, (b) PAA's 1Q14 Form 10-Q on May 9, 2014, and (c) PAGP's 1Q14 Form 10-Q on May 13, 2014; (2) the presentation at the June 5, 2014 investor day; and (3) the continuous posting of false statements on its website, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)     PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra*.

(ii)    The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.

(iii)   PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide guidance on "specific composite repairs methods that are approved for use" and to provide procedures to follow when making repairs on corroded pipes in its Operations and Maintenance Manual.  These failures were in violation of 49 C.F.R. §§195.585(a) and (b).  *See* §V.E.1., *supra*.

(iv)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to (1) apply ILI tool uncertainty when comparing ILI results to the integrity management rule repair requirements in its data integration process, (2) account for the ILI tool's uncertainty in its remediation of metal loss conditions, and (3) incorporate evaluation methodology for analyses of as-called and as-found anomaly dimensions in its integrity management plan.  These failures were in violation of 49 C.F.R. §§195.452(f) and (g).  *See* §V.E.1., *supra*.

(v)     PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to establish procedures for pipeline coating inspection in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.561 governing inspection of pipe coating for external corrosion control.  *See* §V.E.1., *supra*.

(vi)    The 2012 final ILI report for Line 901 dated September 24, 2012 and Plains' corrosion growth assessment report for repair decisions based on the results of the 2012 ILI.  In its decision process for repairs, Plains disregarded metal losses from previous assessments and the ILI tool's inaccuracy and uncertainty.  These deficiencies violated 49 C.F.R. §§195.452(b)(5), (g), (h)(1), and Plains integrity management program section 9.2.2.  *See* ¶¶250, 270, *supra*.

(vii)    Plains' one-page assessment plan dated December 31, 2012 that arbitrarily moved the ILI inspection interval to 3 years with no calculations, assumptions, or justifications in violation of 49 C.F.R. §§195.452(j) and (l).  *See* ¶262, *supra*.

(viii)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.

(ix)     Dig reports for the 41 excavations relating to the 2012 ILI of Line 901.  All excavations were completed on October 3, 2013.  In addition to making patchwork repairs, Plains decide not to repair ten anomalies from the 2012 ILI reports with 40% or greater metal loss.  The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld.  Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record.  Length of the affected joint and its location relative to the reference marker [was] included."  The repair deficiencies were in violation of 49 C.F.R. §§195.452(g), (h)(1), (h)(4)(iii), and 195.585.  *See* ¶¶216-217, 229, 247-252, *supra*.

(x)      The dig reports included information for dig 13, six feet from the rupture site, for which excavation was conducted on May 13, 2013.  The dig records showed degraded coating, the failure to repair the degraded coating, and the need to investigate longitudinally and circumferentially for further remedial measures.  Plains' failure to repair and to investigate the pipe was in violation of 49 C.F.R. §§195.561(b) and 195.569.  *See* ¶¶253, 262, *supra*.

(xi)     PHMSA's request during the 2013 inspections for preventive and mitigative evaluations relating to Line 903.  PHMSA completed its inspections on October 4, 2013 and Plains could not provide any evidence of the evaluations or justifications for not conducting the evaluations during the inspections.   Similarly, the preventive and mitigative meeting for Line 901 for the purpose of "reviewing the assessment results and investigating the worst anomalies to develop confidence in the validity of the assessment and to understand the pipeline segment's condition" also failed to take place by the required deadline of December 24, 2013 with no justifications.  These failures violated 49 C.F.R. §§195.452(b)(5), (i), (j), and (l), and Plains integrity management program section 11.  *See* ¶¶260-261, *supra*.

(xii)    Plains' email to PHMSA on March 25, 2014 admitting that the Company had no record of conducting the required preventive and mitigative evaluations for Line 903 or justifications for failure to conduct the evaluations.  This failure violated 49 C.F.R. §§195.452(b)(5), (i), (j), and (l), and Plains integrity management program section 11.  *See* ¶¶260-261, *supra*.

282.    Prior to (1) the filing of (a) PAA's 2Q14 Form 10-Q on August 8, 2014, (b) PAGP's

2Q14 Form 10-Q on August 12, 2014, (c) the September 2014 Notes Offering Materials on

September 2, 4, and 5, 2014, (d) PAA and PAGP's 3Q14 Form 10-Qs on November 7, 2014, (e) PAGP's Secondary Offering Materials on November 12 and 13, 2014, (f) the December 2014 Notes Offering Materials on December 2, 3, and 4, 2014, (g) PAA and PAGP's 2014 Form 10-K on February 25, 2015, (h) PAA's Offering Materials on February 25 and 27, 2015 and March 2, 2015, and (i) PAA and PAGP's 1Q15 Form 10-Qs on May 8, 2015; (2) the presentation at the June 4, 2015 investor day; (3) the incorporation of the Code of Conduct into PAA and PAGP's Form 10-Ks; and (4) the continuous posting of false statements on its website, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)    PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra*.

(ii)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.

(iii)  PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide guidance on "specific composite repairs methods that are approved for use" and to provide procedures to follow when making repairs on corroded pipes in its Operations and Maintenance Manual.  These failures were in violation of 49 C.F.R. §§195.585(a) and (b).  *See* §V.E.1., *supra*.

(iv)   PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to (1) apply ILI tool uncertainty when comparing ILI results to the integrity management rule repair requirements in its data integration process, (2) account for the ILI tool's uncertainty in its remediation of metal loss conditions, and (3) incorporate evaluation methodology for analyses of as-called and as-found anomaly dimensions in its integrity management plan.  These failures were in violation of 49 C.F.R. §§195.452(f) and (g).  *See* §V.E.1., *supra*.

(v)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to establish procedures for pipeline coating inspection in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.561 governing inspection of pipe coating for external corrosion control.  *See* §V.E.1., *supra*.

(vi)   The 2012 final ILI report for Line 901 dated September 24, 2012 and Plains' corrosion growth assessment report for repair decisions based on the results of the 2012 ILI.  In its decision process for repairs, Plains disregarded metal losses from previous assessments and the ILI tool's inaccuracy and uncertainty.  These

deficiencies violated 49 C.F.R. §§195.452(b)(5), (g), (h)(1), and Plains integrity management program section 9.2.2.  *See* ¶¶250, 270, *supra*.

(vii)   Plains' one-page assessment plan dated December 31, 2012 that arbitrarily moved the ILI inspection interval to 3 years with no calculations, assumptions, or justifications in violation of 49 C.F.R. §§195.452(j) and (l).  *See* ¶262, *supra*.

(viii)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.

(ix)   Dig reports for the 41 excavations relating to the 2012 ILI of Line 901.  All excavations were completed on October 3, 2013.  In addition to making patchwork repairs, Plains decide not to repair ten anomalies from the 2012 ILI reports with 40% or greater metal loss.  The dig reports showed measurements made and recorded "for the depth, length and width of the anomaly, as well as the location of the anomaly relative to the reference girth weld.  Digital photographs and a sketch or etchings of the anomalies [was] made and included in the record.  Length of the affected joint and its location relative to the reference marker [was] included."  The repair deficiencies were in violation of 49 C.F.R. §§195.452(g), (h)(1), (h)(4)(iii), and 195.585.  *See* ¶¶216-217, 229, 247-252, *supra*.

(x)   The dig reports included information for dig 13, six feet from the rupture site, for which excavation was conducted on May 13, 2013.  The dig records showed degraded coating, the failure to repair the degraded coating, and the need to investigate longitudinally and circumferentially for further remedial measures.  Plains' failure to repair and to investigate the pipe was in violation of 49 C.F.R. §§195.561(b) and 195.569.  *See* ¶¶253, 262, *supra*.

(xi)   PHMSA's request during the 2013 inspections for preventive and mitigative evaluations relating to Line 903.  PHMSA completed its inspections on October 4, 2013 and Plains could not provide any evidence of the evaluations or justifications for not conducting the evaluations during the inspections.  Similarly, the preventive and mitigative meeting for Line 901 for the purpose of "reviewing the assessment results and investigating the worst anomalies to develop confidence in the validity of the assessment and to understand the pipeline segment's condition" also failed to take place by the required deadline of December 24, 2013 with no justifications.  These failures violated 49 C.F.R. §§195.452(b)(5), (i), (j), and (l), and Plains integrity management program section 11.  *See* ¶¶260-261, *supra*.

(xii)   Plains' email to PHMSA on March 25, 2014 admitting that the Company had no record of conducting the required preventive and mitigative evaluations for Line 903 or justifications for failure to conduct the evaluations.  This failure violated 49 C.F.R. §§195.452(b)(5), (i), (j), and (l), and Plains integrity management program section 11.  *See* ¶¶260-261, *supra*.

- 125 -

(xiii)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 11, 2014, including the in-line inspection results and the dig reports that showed the ILI drastically understated actual corrosion.  *See* ¶¶228, 271, *supra*.

3.      **Defendants' Statements About Plains' Integrity Management Program Were False and Misleading and Omitted Material Facts:  Plains' Cathodic Protection System Provided Ineffective Protection Against External Corrosion of Lines 901 and 903**

283.   **Falsity:**   The statements in ¶¶192-194, 202, 204 concerning Plains' "enhanced corrosion control," "investment in any necessary equipment, systems, processes, or other resources," going "beyond regulatory mandate" for pipelines in HCAs, "mak[ing] repairs and replacements when necessary or appropriate," and properly operating and maintaining its pipelines so they "would feel comfortable running it for the next 25 or 30 years," were materially false and misleading and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading for the additional reason that Plains removed a portion of Line 901 from cathodic protection, used a cathodic protection system geared for non-insulated pipelines on Lines 901 and 903, which was insulated, and allowed the pipeline coating to deteriorate – all in violation of the Hazardous Liquid Pipeline Safety Regulations and the Liquid Integrity Management Rules.

284.   As a result of Plains' deficient cathodic protection system and failure to maintain protective coating on Line 901, severe corrosion under insulation developed and led to the rupture. PHMSA concluded that "ineffective protection against external corrosion of the pipeline" was one of the contributory causes to Line 901's rupture.

285.   Pursuant to 49 C.F.R. §195.563(a), "each buried or submerged pipeline" constructed after March 1970 "must have cathodic protection."  However, Plains proactively disconnected or removed 2,120 feet of Line 901 – almost half a mile of pipeline  – from cathodic protection between 2008 and 2015.  Although the remaining portions of Lines 901 and 903 were connected to Plains'

- 126 -

cathodic protection system, Plains' cathodic protection for Lines 901 and 903 was set at "protection levels that typically are sufficient to protect non-insulated, coated steel pipe. Line 901 and Line 903, however, are insulated" – in violation of industry practice as according to PHMSA.

286.    Specifically, Plains violated 49 C.F.R. §195.452(b) ("Pipeline integrity management in high consequence areas") which states: "Each operator of a pipeline covered by this section must: . . . (6) Follow recognized industry practices in carrying out this section."  In 2006, the National Association of Corrosion Engineers published a technical committee report titled "Effectiveness of Cathodic Protection (CP) on Thermally Insulated Underground Metallic Structures" that reaffirmed "[t]he inability of an impressed cathodic protection system to protect insulated pipelines."  The report indicated that in order to mitigate the limitations of cathodic protection systems, operators should:

> 1.    Generally, the application of external CP to thermally insulated metallic surfaces has been ineffective.
>
> 2.    The principal or primary means of corrosion control of thermally insulated metallic surface is the application of an effective coating on the metallic surface.
>
> *       *       *
>
> 4.    When practical, the thermally insulated metallic surface needs to be inspected at routine time intervals for metal loss (e.g. an internal pipeline inspection tool could be used.)

In addition, the 2006 report found empirically that close-interval surveys were not effective in identifying corrosion problems: "At many of these sites, close-interval surveys were taken before the defect was excavated in order to determine whether the corrosion cell could be located in this manner.  In every test section, this method proved ineffective."

287.    Plains failed to properly implement any of the options provided by the 2006 NACE report.

288.     First, despite the NACE's warning that in all tests close interval surveys "proved ineffective," Plains used close interval surveys to verify the effectiveness of its cathodic protection system, but again, failed to confirm that the test results were consistent with what was occurring in the field.  Due to this failure, PHMSA warned Plains during its inspections in 2008 and 2009 that it "must modify [its] procedures for the implementation of Close Interval Survey (CIS), reviewing the results of the CIS, and remediation of anomalies identified during the CIS to ensure consistent application and repeatability.  The amended procedures must include specific requirements" of, among other things, "How Plains will review the results of the CIS and perform quality checks on performance of CIS and data collected to ensure the data actually is representative of what is occurring in the field, [and] [h]ow Plains will handle issues identified in CIS."

289.     Second, the 2006 NACE report recommended the use of an effective coating as the primary means of corrosion control.  However, by failing to conduct proper repairs, Plains allowed the coating of the insulated pipelines to deteriorate to the point where moisture entered the insulation and interfered with the operation of the cathodic protection system with its failure to conduct proper repairs.  *See* §VI.A.2., *supra*.  NACE International published a standard in April 26, 1984, which states that at high operating temperatures, "and when exposed to a chloride environment, CTU [coal tar urethane] coatings exhibited poor cathodic disbondment properties" that "influenced the adhesion of the CTU coating to the pipeline steel" and promoted CUI [corrosion under insulation].  Line 901 carried crude oil at a high temperature of 135 degrees Fahrenheit.  Plains maintained records of the pipeline's operating temperature data from May 26, 2011 to May 20, 2015, and data showed that temperatures sometimes fluctuated up to 145 degrees Fahrenheit.

290.     Moreover, Line 901 was set in sandy granular soils characteristic of coastal beach deposits.  These soils, the coastal environment, the tendency for the pipeline to accumulate water inside and outside, and the associated surface drainage features produced a highly corrosive

- 128 -

environment for a buried steel pipeline.  Plains  recorded soil conditions in each of its excavations.

Dig reports for the 2007 ILI (digs #5 and 6) and for the 2012 ILI (digs #12 and 13) contained the soil

information at the rupture location.   The soil information also indicated wet and dry soil

environments that conformed with Santa Barbara's weather conditions.  The "corrosivity of soil,"

local climatic environment, and "operating stress level" are among the crucial "risk factors that

reflect the risk conditions on the pipeline segment" and "[a]n operator must base the assessment

schedule on all risk factors that reflect the risk conditions on the pipeline segment" per the Liquid

Integrity Management Rule 49 C.F.R. §195.452(e).  In addition, 49 C.F.R. §195.452(j) requires that

"[a]n operator must base the frequency of evaluation on risk factors specific to its pipeline, including

the factors specified in paragraph (e) of this section."   As such, through its assessments and

evaluations, Plains knew that these risk factors were having a deleterious effect on the pipelines'

coating.

291.    Indeed, during its 2008 and 2009 inspections, PHMSA warned Plains of its lack of

coating standard in its integrity management program.  In a March 4, 2009 letter to Nerbonne,

PHMSA cited 49 C.F.R. §195.559(b), which required that "[c]oating material for external corrosion

control under §195.557 must – (b) Have sufficient adhesion to the metal surface to prevent under

film migration of moisture."   PHMSA further stated that "Plains' O&M Manual Section 412,

Corrosion Control, pages 10 and 11 provides little guidance to what is expected as a coating standard

for the transition coating."

292.    Third, the 2006 NACE report on "Effectiveness of Cathodic Protection (CP) on

Thermally Insulated Underground Metallic Structures" further concluded that "[w]hen practical, the

thermally insulated metallic surfaces need to be inspected at routine time intervals for metal loss

(e.g. an internal pipeline inspection tool could be used)."   Plains opted to use a smart pig that

undercalled metal loss anomalies and was severely inaccurate because of  Plains' failure to calibrate

the tool with its vendor.  *See* §VI.A.1., *supra*.  In addition, Plains arbitrarily and unjustifiably decided on a three-year inspection interval – without any evidence of regard to the crucial risk factors identified in 49 C.F.R. §§195.452(e) and (j) – when shorter assessment interval was needed based on the proliferating corrosion and the smart pig's true tolerance level.  *See* ¶¶262-265, *supra*.

293.    Even without these standards and publications, Line 901's 2007 and 2012 inline inspections provided Plains with clear indications of degraded coating as the number of anomalies with metal loss 10% or greater increased *four times from 386 to 1,578* despite cathodic protection on the line.  According to PHMSA, the proliferating number of anomalies indicated "that external corrosion was active on line 901."  Line 903 was in a similar state.  During an inspection of the 38-mile segment between the Gaviota and Sisquoc Stations on April 26, 2013, the vendor reported 99 metal loss anomalies.  Similarly, during the June 12, 2013 inspection, the 75-mile segment between Sisquoc and Pentland Stations had a vast number of metal loss anomalies consistent with general corrosion.  As Plains' vendor concluded in the root cause report, "[t]his inconsistency between the CP level and the external metal loss is likely a result of the electrical shielding produced by the coating system.  The cathodic protection current cannot reach (or marginally reaches) the steel surface exposed to trapped electrolyte and the sensitivity of the electrical surveys used to monitor the condition of the buried pipe is significantly limited and not reliable."

294.    According to PHMSA, "Plains' CP system was ineffective in protecting thermally insulated underground pipeline systems from external corrosion.  Industry practices recognize that an impressed current system like the one utilized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised.  The external coating in the area of the rupture had allowed moisture to enter the insulation adjacent to the steel pipe.  Corrosion under insulation (CUI) cannot be prevented on insulated lines where the coating system has been compromised."

295.    By allowing Line 901's coating to deteriorate, having ineffective cathodic protection, and removing portions of Line 901 from the cathodic protection system, Plains violated subpart H of the Hazardous Liquid Pipeline Safety Regulations on Corrosion Control and the Liquid Integrity Management Rules, 49 C.F.R. §195.557, which requires that "each buried or submerged pipeline must have an external coating for external corrosion control if the pipeline is – (a) [c]onstructed" after March 1970.   Under 49 C.F.R. §195.559, the coating material must "(a) [b]e designed to mitigate corrosion of the buried or submerged pipeline; (b) [h]ave sufficient adhesion to the metal surface to prevent under film migration of moisture; . . . (e) [s]upport any supplemental cathodic protection; and (f) [i]f the coating is an insulating type, have low moisture absorption and provide high electrical resistance." 49 C.F.R. §195.573(e) states that the pipeline operator "must correct any identified deficiency in corrosion control . . . .  However, if the deficiency involves a pipeline in an integrity management program under §195.452, you must correct the deficiency as required by §195.452(h)." §195.452(h) is a HCA regulation.  As such, the statute recognizes the significance of a corroded pipeline in a high consequence area and refers Plains to the elevated requirements of the Liquid Integrity Management Rules applicable only to HCAs for remediation guidelines.

296.    **Scienter:** By virtue of the facts set forth below and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in ¶¶192-194, 202, 204 were materially misleading to investors.

297.    Since at least 2006, the DOT has required oil transportation operators – like defendants – to implement integrity management programs.  As defendants repeatedly represented in their Class-Period SEC filings, these programs meant defendants were to carry out "more frequent inspections, correction of identified anomalies and other measures, to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways."  Only with at least severe recklessness could

- 131 -

defendants ignore the results from such "frequent inspections," especially in places as environmentally sensitive as the pristine Santa Barbara coastline.

298.    Plains knew of the factors that caused the pipeline coating to degrade and was required to analyze them in accordance to the mandates of Liquid Integrity Management Rule. Plains tracked and maintained the pipeline operating temperature data from May 26, 2011 to May 20, 2015 and soil conditions information from excavation and dig reports for the 2007 ILI Dig #5 and 6 and 2013 digs #12 and 13.  According to 49 C.F.R. §195.452(e), "corrosivity of soil," local "climatic" environment, and "operating stress level" are among crucial "risk factors that reflect the risk conditions on the pipeline segment."

299.    Plains knew that its cathodic protection system was ineffective against corrosion on insulated pipelines such as Lines 901 and 903 as various standards and publications from 2001 to 2009 discussed the issue.  In fact, in explaining to PHMSA its procedures for corrosion control on Line 901 Plains cited and provided PHMSA with the 2006 publication by NACE that provided empirical evidence of ineffectiveness of cathodic protection on insulated pipelines – the publication was in Plains' possession the whole time.  As PHMSA wrote in Appendix E to the Final Report:

> CP is Ineffective on Buried Insulated Pipelines
>
> After the release, PHMSA personnel visited Plains offices in Houston, TX, to continue the investigation.  During this first visit, one of the first questions concerned external corrosion and cathodic protection because this appeared to be the apparent cause of the release.  Plains personnel showed PHMSA [the 2006 NACE Report]
>
> This report details the reasons CP is not effective on buried insulated underground structures.

300.    During its 2008 to 2009 inspections, PHMSA found violations of 49 C.F.R. §§195.571 and 195.573 relating to monitoring for adequacy and effectiveness of cathodic protection. PHMSA warned Plains that it needed to establish procedures to review the results of the CIS to ensure the data is consistent with what is occurring in the field and to handle issues identified in the

- 132 -

CIS. The CIS data between 2008 to 2015 revealed that "the polarized potential of the pipeline" had move from -1,000mV to -1,100mV, indicating "the removal of a significant amount of steel from the protected pipeline system."

301.    Furthermore, Plains' 2007 and 2012 in-line inspection results alerted Plains to the problems of degraded coating and the ineffectiveness of its cathodic protection system. The number of anomalies with metal loss 10% or greater increase four times from 386 to 1,578 for Line 901. Similarly, Line 903's in-line inspection results showed a vast number of corrosion anomalies and general corrosion.

302.    The in-line inspection results, the proliferating number of anomalies, and information about the mileage of Line 901 protected by cathodic protection were provided to senior executive officers of Plains who reviewed them and certified their accuracy as required by law. *See* §V.J., *supra*.

303.    Furthermore, these Integrity Management Reports and supporting materials and the numerous material compliance failures associated with degraded coating and deficiencies in corrosion control were "recorded, processed, summarized, and communicated" to Armstrong, Swanson, Pefanis and McGee as stated in the underwriting agreements, Form 10-Ks, and Form 10-Qs filed by PAA and PAGP during the Class Period. *See* §V.G., *supra*.

304.    Armstrong was at all times the "principal executive officer" as referred to in the underwriting agreements. By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Armstrong's role as Chairman of the Board receiving reports of potential and actual regulatory non-compliance from the audit committee (*see* §V.H., *supra*), (3) Armstrong's SOX certification (*see* §V.I., *supra*), and (4) Armstrong's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its

- 133 -

subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to degraded coating and deficiencies in corrosion control for pipelines in HCAs, was recorded, processed, summarized and communicated to Armstrong.

305.    Swanson was at all times the "principal financial officer" as referred to in the underwriting agreements.  By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Swanson's SOX certification (*see* §V.I., *supra*), and (3) Swanson's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to degraded coating and deficiencies in corrosion control for pipelines in HCAs, was recorded, processed, summarized and communicated to Swanson.

306.    Pefanis was at all times the President and Chief Operating Officer.  Pefanis was the "appropriate officer[] of GP LLC" and "management" with responsibility for overseeing Plains' operations, including pipeline safety and integrity with Gorman, Nerbonne, and Valenzuela reporting to him.  *See* §V.H., *supra*.  In addition, Pefanis had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*. Therefore, all material information concerning Plains' operations, including the numerous material failures to comply with applicable laws and regulations detailed above relating to degraded coating and deficiencies in corrosion control for pipelines in HCAs, was recorded, processed, summarized and communicated to Pefanis.  *See* §V.G., *supra*.

307.    McGee was at all times the General Counsel and Valenzuela reported to him.  McGee was the "appropriate officer[] of GP LLC" with responsibility for overseeing Plains' legal department and who repeatedly stated without qualification that none of Plains' entities has directly or indirectly violated any environmental safety, health or similar law or regulations.  He also had

authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct. §V.K., *supra*. In addition, as required by the audit committee charter, he discussed with the committee all potential and actual regulatory non-compliance that could "result in material non-compliance" by PAA and PAGP, including the numerous material failures to comply with applicable laws and regulations detailed above relating to degraded coating and deficiencies in corrosion control for pipelines in HCAs. §V.H., *supra*.

308. By virtue of the foregoing, Armstrong, Swanson, Pefanis, and McGee received the following information and documents or summaries thereof, as set forth below:

309. Prior to (1) the filing of PAA's 2012 Form 10-K on February 27, 2013 and PAA's 1Q13 Form 10-Q on May 8, 2013; and (2) the incorporation of the Code of Conduct into PAA's Form 10-K; Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i) PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903. *See* §V.F., *supra*.

(ii) The 2006 NACE report indicated that Plains' cathodic protection was ineffective on insulated pipelines like Lines 901 and 903. Plains failed to follow NACE's recommendations for mitigating corrosions on insulated pipelines and violated industry practice and 49 C.F.R. §195.452(b)(6). *See* ¶¶285-292, *supra*.

(iii) The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and dig reports, which indicated degraded coating, and the mileage of pipelines cathodically protected and cathodically unprotected, which showed removal of portions of Line 901 from cathodic protection. *See* ¶¶228, 271, 302, *supra*.

(iv) PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' lack of any process for reviewing close interval survey results, using data collected in the field to quality check the close interval survey results, and handling inconsistencies between CIS data and field observations. 49 C.F.R. §195.573. *See* §V.E.1. and ¶300, *supra*.

(v) PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide coating standards for transition coating used in repairs in its O&M

- 135 -

[Operation and Maintenance] manual in violation of 49 C.F.R. §195.559(b).  *See* §V.E.1. and ¶291, *supra.*

(vi)     The final ILI report for Line 901 dated September 24, 2012 indicated degraded coating with greater than 10% metal loss anomalies increasing from 386 in 2007 to 1,578 in 2012 despite the use of cathodic protection.  This deficiency violated 49 C.F.R. §§195.557, 195.559, and 195.573(e).  *See* ¶¶293-295, *supra.*

310.     Prior to (1) the filing of (a) the PAGP IPO's Form S-1 on July 29, 2013, (b) PAA's 2Q13 Form 10-Q on August 8, 2013, (c) the August 2013 Notes Offering Materials on August 8, 9, and 12, 2013, (d) Amendment No. 1 to PAGP IPO's Form S-1 on September 6, 2013, (e) Amendment No. 2 to PAGP IPO's Form S-1 on September 26, 2013, (f) Amendment No. 3 to PAGP IPO's Form S-1 on October 2, 2013, and (g) Amendment No. 4 to PAGP IPO's Form S-1 on October 7, 2013, (h) the PAGP IPO's prospectus on October 16, 2013, (i) PAA's 3Q13 Form 10-Q on November 6, 2013, (j) PAGP's 3Q13 Form 10-Q on November 22, 2013, (k) PAA's 2013 Form 10-K on February 28, 2014, (l) PAGP's 2013 Form 10-K on March 12, 2014, (m) the April 2014 Notes Offering Materials on April 15, 16, and 18, 2014, (n) PAA's 1Q14 Form 10-Q on May 9, 2014, and (o) PAGP's 1Q14 Form 10-Q on May 13, 2014; (2) the presentation at the June 5, 2014 investor day; (3) the incorporation of the Code of Conduct into PAA and PAGP's Form 10-K; and (4) the continuous posting of false statements on its website, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)     PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra.*

(ii)     The 2006 NACE report indicated that Plains' cathodic protection was ineffective on insulated pipelines like Lines 901 and 903.  Plains failed to follow NACE's recommendations for mitigating corrosions on insulated pipelines and violated industry practice and 49 C.F.R. §195.452(b)(6).  *See* ¶¶285-292, *supra.*

(iii)     The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and dig reports, which indicated degraded coating, and the mileage of pipelines cathodically protected and cathodically unprotected, which

showed removal of portions of Line 901 from cathodic protection.  *See* ¶¶228, 271, 302, *supra.*

(iv)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' lack of any process for reviewing close interval survey results, using data collected in the field to quality check the close interval survey results, and handling inconsistencies between CIS data and field observations.  49 C.F.R. §195.573.  *See* §V.E.1. and ¶300, *supra.*

(v)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide coating standards for transition coating used in repairs in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.559(b).  *See* §V.E.1. and ¶291, *supra.*

(vi)    The final ILI report for Line 901 dated September 24, 2012 indicated degraded coating with greater than 10% metal loss anomalies increasing from 386 in 2007 to 1,578 in 2012 despite the use of cathodic protection.  This deficiency violated 49 C.F.R. §§195.557, 195.559, and 195.573(e).  *See* ¶¶293-295, *supra.*

(vii)    The April 26, 2013 ILI survey for Line 903 indicated degraded coating with 99 metal loss anomalies for the 38-mile segment between the Gaviota and Sisquoc Stations despite the use of cathodic protection.  This deficiency violated 49 C.F.R. §§195.557, 195.559, and 195.573(e).  *See* ¶¶293-295, *supra.*

(viii)    2013 dig reports for dig numbers 12 and 13 on May 13, 2013, and 2008 dig reports for dig numbers 5 and 6 – all four digs near the rupture point – contained soil condition information indicative of corrosive and wet environment deleterious to the pipeline's coating.  *See* ¶290, *supra.*

(ix)    The June 12, 2013 ILI survey for Line 903 indicated degraded coating with vast numbers of anomalies consistent with general corrosion despite the use of cathodic protection.  This deficiency violated 49 C.F.R. §§195.557, 195.559, and 195.573(e).  *See* ¶¶293-295, *supra.*

(x)    The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and dig reports, which indicated degraded coating, and the mileage of pipelines cathodically protected and cathodically unprotected, which showed removal of portions of Line 901 from cathodic protection.  *See* ¶¶228, 271, 302, *supra.*

311.    Prior to (1) the filing of (a) PAA's 2Q14 Form 10-Q on August 8, 2014, (b) PAGP's 2Q14 Form 10-Q on August 12, 2014, (c) the September 2014 Notes Offering Materials on September 2, 4, and 5, 2014, (d) PAA and PAGP's 3Q14 Form 10-Qs on November 7, 2014, (e) PAGP's Secondary Offering Materials on November 12 and 13, 2014, (f) the December 2014

Notes Offering Materials on December 2, 3, and 4, 2014, (g) PAA and PAGP's 2014 Form 10-K on February 25, 2015, (h) PAA's Offering Materials on February 25 and 27, 2015 and March 2, 2015, and (i) PAA and PAGP's 1Q15 Form 10-Qs on May 8, 2015; (2) the presentation at the June 4, 2015 investor day; (3) the incorporation of the Code of Conduct into PAA and PAGP's Form 10-K; and (4) the continuous posting of false statements on its website, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)     PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra.*

(ii)    The 2006 NACE report indicated that Plains' cathodic protection was ineffective on insulated pipelines like Lines 901 and 903.  Plains failed to follow NACE's recommendations for mitigating corrosions on insulated pipelines and violated industry practice and 49 C.F.R. §195.452(b)(6).  *See* ¶¶285-292, *supra.*

(iii)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results and dig reports, which indicated degraded coating, and the mileage of pipelines cathodically protected and cathodically unprotected, which showed removal of portions of Line 901 from cathodic protection.  *See* ¶¶228, 271, 302, *supra.*

(iv)    PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' lack of any process for reviewing close interval survey results, using data collected in the field to quality check the close interval survey results, and handling inconsistencies between CIS data and field observations.  49 C.F.R. §195.573.  *See* §V.E.1. and ¶300, *supra.*

(v)     PHMSA's letter to Nerbonne dated March 4, 2009 concerning Plains' failure to provide coating standards for transition coating used in repairs in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.559(b).  *See* §V.E.1. and ¶291, *supra.*

(vi)    The final ILI report for Line 901 dated September 24, 2012 indicated degraded coating with greater than 10% metal loss anomalies increasing from 386 in 2007 to 1,578 in 2012 despite the use of cathodic protection.  This deficiency violated 49 C.F.R. §§195.557, 195.559, and 195.573(e).  *See* ¶¶293-295, *supra.*

(vii)   The April 26, 2013 ILI survey for Line 903 indicated degraded coating with 99 metal loss anomalies for the 38-mile segment between the Gaviota and Sisquoc Stations despite the use of cathodic protection.  This deficiency violated 49 C.F.R. §§195.557, 195.559, and 195.573(e).  *See* ¶¶293-295, *supra.*

(viii)   2013 dig reports for dig numbers 12 and 13 on May 13, 2013, and 2008 dig reports for dig numbers 5 and 6 – all four digs near the rupture point – contained soil condition information indicative of corrosive and wet environment deleterious to the pipeline's coating.  *See* ¶290, *supra*.

(ix)   The June 12, 2013 ILI survey for Line 903 indicated degraded coating with vast numbers of anomalies consistent with general corrosion despite the use of cathodic protection.  This deficiency violated 49 C.F.R. §§195.557, 195.559, and 195.573(e).  *See* ¶¶293-295, *supra*.

(x)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 12, 2013, including the in-line inspection results and dig reports, which indicated degraded coating, and the mileage of pipelines cathodically protected and cathodically unprotected, which showed removal of portions of Line 901 from cathodic protection.  *See* ¶¶228, 271, 302, *supra*.

(xi)   The supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA on June 11, 2014, including the in-line inspection results and dig reports, which indicated degraded coating, and the mileage of pipelines cathodically protected and cathodically unprotected, which showed removal of portions of Line 901 from cathodic protection.  *See* ¶¶228, 271, 302, *supra*.

### 4.   Defendants' Statements About Plains' Integrity Management Program Were False and Misleading and Omitted Material Facts: Plains' Leak Detection System Was Deficient and the Company Failed to Provide Proper Training

312.   **Falsity:**  The statements in ¶¶192-195 were materially false and misleading and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading for the additional reason that Plains' poor control room management, inadequate training, and lack of preventive and mitigative evaluations to account for the consequence of pipeline rupture in a high consequence area led to its failure to timely detect the Line 901 rupture – all in violation of subpart F of the Hazardous Liquid Pipeline Safety Regulations on Operation and Maintenance of pipelines and the Liquid Integrity Management Rules.

313.   As a result of Plains' failure to upgrade its leak monitoring system, properly manage its alarm settings, and adequately train control room personnel, the rupture went undetected for hours

and aggravated the magnitude of the spill.  PHMSA concluded that the "lack of timely detection of

the rupture" was one of the contributory causes of the disaster.

314.    Plains' failure to conduct preventive and mitigative evaluations in 2013 and 2014 for

both Lines 901 and 903, as discussed above in ¶¶256-261, also led to its failure to timely upgrade its

leak detection system.  Plains recognized the need for an upgrade to Lines 901 and 903's leak

detection system, but relegated it to only "low to medium priority," according to Plains' hydraulic

specialist during an interview with PHMSA.  49 C.F.R. §195.492(i)(3) on leak detection in a HCA

requires that "[a]n operator must have a means to detect leaks on its pipeline system. An operator

must evaluate the capability of its leak detection means and modify, as necessary, to protect the high

consequence area. An operator's evaluation must, at least, consider, the following factors – length

and size of the pipeline, type of product carried, the pipeline's proximity to the high consequence

area, the swiftness of leak detection, location of nearest response personnel, leak history, and risk

assessment results."  PHMSA's interpretation of this rule states: "The operator must conduct a risk

analysis, per §195.452(i)(2) to identify the need for additional preventive and mitigative features.

Leak detection capability must be evaluated, per §195.452(i)(3), using the results of this risk analysis

and other factors listed in that paragraph."  In turn, 49 C.F.R. §195.492(i)(2) mandates that "[i]n

identifying the need for additional preventive and mitigative measures, an operator must evaluate the

likelihood of a pipeline release occurring and how a release could affect the high consequence area.

This determination must consider all relevant risk factors, including, but not limited to: (i) Terrain

surrounding the pipeline segment, including *drainage systems* such as small streams and other

smaller waterways *that could act as a conduit to the high consequence area*."

315.    PHMSA indicated that "[a]ccording to information obtained during meetings with

Plains hydraulic specialist, Lines 901 and 903 were pipeline systems with a low-to-medium priority

defined for future modeling efforts compared to other assets in the Plains operations.  The approach

utilized by Plains for prioritizing which systems should be modeled first did not appear to take into account all appropriate consequence-based asset impacts (such as culverts providing pathway to the ocean) associated with these two systems." The culvert that Plains failed to account for in its "low to medium priority" determination was the very first risk factor listed by the regulation. By failing to account for HCA risk factors in its upgrade prioritization approach, Plains violated the Liquid Integrity Management Rules.

316.    Exacerbating the outmoded leak detection system, Plains also failed to conform to industry standards because Plains' pipelines are the only ones in Santa Barbara county operating without automatic shutoff system. Such a system would have automatically shut off the Las Flores pump upon detecting changes in pressure and flow indicative of a problem in the pipeline. Instead, Plains relied on a manual system requiring remote shutdown by personnel located in Midland, Texas. The Midland Control Room's delay in shutting down the Las Flores pump caused pressure surges in the pipeline after the Sisquoc pump broke down twice in the morning of the spill. The Santa Barbara County planner concluded that the spill would have been less extensive, if not avoided, had Plains followed industry practice and installed automatic shutoff system in its pipelines. Pursuant to 49 C.F.R. §195.452(b), pipeline operators in HCAs must follow industry practices.

317.    On June 26, 2015, Dianne Black, Assistant Director of Planning and Development Department for Santa Barbara County, confirmed that automatic shut-off systems are the safest pipeline shut-off mechanism and that, despite the heightened safety, Plains was the ***only*** pipeline operator in Santa Barbara County that did not utilize automatic shut-off systems. Black testified that "environmental impacts are reduced, the potential for environmental impacts are reduced, with pipeline safety systems that include an automatic shut off system." Thus, when asked, "if [Plains] had an automatic shut-off system, that may have been an earlier warning," Black confirmed: "I think it would have been an earlier reaction and it certainly could have ***reduced the amount of oil spilled***."

Black also testified that she disagreed with Plains' position that automatic shut-off systems may be more dangerous that manual shut-off systems.

318.     In addition to non-compliance with industry practice, Plains' Midland Control Room, which operates and monitors the leak detection system, was in systemic violation of the vast majority of the Control Room Management regulations set forth in 49 C.F.R. §195.446.   For example, 49 C.F.R. §195.446(e)(3) mandates that "[e]ach operator using a SCADA system must have a written alarm management plan to provide for effective controller response to alarms" and an operator must "[v]erify the correct safety-related alarm set-point values and alarm descriptions when associated field instruments are calibrated or changed and at least once each calendar year, but at intervals not to exceed 15 months."  At the time of the rupture, Plains' "SCADA system did not have safety-related alarms on low pressure configured at the correct value or priority to alert the control room staff."  The alarm's set-point value was set at an impossibly low level that it only rang for less than a minute when pressure dipped slightly below 200 psig.  Even while oil was leaking, and until the pipeline was purged, the pipeline pressure remained at 210 to 211 psig without triggering the alarm.  Furthermore, according to PHMSA, "[t]his type of alarm should be identified as high priority safety related alarm,"  but Plains failed to establish such identification in its alarm descriptions. PHMSA found that "information reported by the SCADA system that indicated a release had occurred by approximately 10:58 a.m., and an alarm was generated on low pressure.  The alarm was not set at an appropriate value.  The alarm also did not have a major priority/severity or safety-related alarm status."

319.     However, even without the alarm, proper training would have enabled the controllers to recognize that a rupture had occurred as clear signs of Line 901 release was evident, but "[n]either

the pipeline controller nor step-up shift supervisor[14] detected the initial abnormal conditions as the release occurred.  There was an indication of decreased pressure and increased flow between 10:53 and 10:58 a.m., which is consistent with a pipeline release."  49 C.F.R. §149.446(h)(2) requires that "[e]ach operator must establish a controller training program and review the training program content to identify potential improvements at least once each calendar year, but at intervals not to exceed 15 months. An operator's program must provide for training each controller to carry out the roles and responsibilities defined by the operator.  In addition, the training program must include the following elements: . . . (2) [u]se of a computerized simulator or non-computerized (tabletop) method for training controllers to recognize abnormal operating conditions."  Plains violated the regulation.

320.    Furthermore, even if the controller and step-up shift supervisor recognized the signs of Line 901's rupture, they were not trained for emergency shutdown of the pipeline.  According to PHMSA, "[s]tep-up and shift supervisor responsibilities include emergency shutdown of any pipeline.  However, [Plains'] training does not cover a means by which to accomplish this for all relevant pipelines.   A general emergency shutdown provision has not been programed for supervisory use on all systems."  49 C.F.R. §149.446(h)(5) requires that Plains' training program to train "[f]or pipeline operating setups that are periodically, but infrequently used, providing an opportunity for controllers to review relevant procedures in advance of their application."  According to PHMSA's Control Room Management Frequently Asked Questions, "operating setups that periodically but infrequently occur" includes shutdown of pipelines.

321.    PHMSA warned Plains of its Midland control room management deficiencies as early as 2013.  In December 2013, Plains received a warning letter from PHMSA indicating that the

---

[14]   A step-up shift supervisor is a controller who "has received some informal training by working on shift with other shift supervisors.  Step-up shift supervisor are used to cover the shift supervisor positions when additional personnel are needed due to illness."

Company was in probable violation of several HLPSA regulations related to pipeline management and control room management, including failure to record pipeline operating pressure information. PHMSA's December 2013 letter informed the Company of the findings from two inspections undertaken on March 19-21, 2013 and June 11-12, 2013.  It specifically found violations for failing to: (1) follow Management of Change procedures by not maintaining documentation as required by PHMSA when, for example, new pipelines were added or taken offline; (2) complete Abnormal Operations forms, including providing maximum operating pressure information; and (3) maintain or provide any records demonstrating an at least annual review of the controller training program to identify potential improvements.  The September 11 Compliance Order following the spill later reiterated Plains' incomplete documentation for its Management of Change for a pressure reduction.

322.    **Scienter:** By virtue of the facts set forth below and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in ¶¶192-195 were materially misleading to investors.

323.    As early as December 2013, PHMSA had warned Plains' Midland Control Room regarding its deficiencies in alarm management.  In a December 24, 2013 warning letter to Troy Valenzuela, Vice President of Environmental Health and Safety, PHMSA stated that the Company had committed probable violations of control room management regulations. During the inspection, PHMSA found that "changes were made to the critical alarm type description and response priority," but such changes were not documented as required under Management of Change procedures.  As required by 49 C.F.R. §195.446(j)(2), all changes made that deviated from the safe operation of the pipeline must be documented:  "[d]ocumentation to demonstrate that any deviation from the procedures required by this section was necessary for the safe operation of the pipeline facility."  Indeed, on the day of the Line 901 rupture, a critical safety-related alarm was set at low priority, and the controller, distracted by other matters, did not recognize the alarm as "indicative of an abnormal

- 144 -

operation." PHMSA further found that "[t]he lack of documentation and interviews with control room staff demonstrates that Plains did not follow their MOC [management of change] procedure for modifying their Pipeline Controller Procedure Manual."

324.    In addition to requiring that pipeline operators maintain records of changes that affect safe operation of the pipeline facility, 49 C.F.R. §195.446(j) requires that operators maintain records to demonstrate compliance with requirements of the control room management regulations, including controller training program. 49 C.F.R. §195.446(h) mandates that "[e]ach operator must establish a controller training program and review the training program content to identify potential improvements at least once each calendar year, but at intervals not to exceed 15 months." In the December 24, 2013 warning letter, PHMSA stated that Plains had no evidence that it complied with this requirement. The Midland Control Room was Plains' only control room and remotely controlled and monitored all of Plains' pipeline systems.

325.    Plains knew that Lines 901 and 903's leak detection systems needed an upgrade but assigned it low-to-medium priority in violation of the Liquid Integrity Management Rule. Compliance with the rule would have resulted in Plains considering risk factors, such as proximity to commercial navigable water and culverts, in prioritizing the leak detection system's upgrade.

326.    Furthermore, the material failures to comply with applicable laws and regulations relating to the low-to-medium priority for leak monitoring system upgrade, control room management deficiencies, and inadequate training were "recorded, processed, summarized, and communicated" to Armstrong, Swanson, Pefanis and McGee as stated in the underwriting agreements, Form 10-Ks, and Form 10-Qs filed by PAA and PAGP during the Class Period. *See* §V.G., *supra*.

327.    Armstrong was at all times the "principal executive officer" as referred to in the underwriting agreements. By virtue of the (1) representations in the underwriting agreements, the

Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Armstrong's role as Chairman of the Board receiving reports of potential and actual regulatory non-compliance from the audit committee (*see* §V.H., *supra*), (3) Armstrong's SOX certification (*see* §V.I., *supra*), and (4) Armstrong's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to the low-to-medium priority for leak monitoring system upgrade, control room management deficiencies, and inadequate training impacting pipelines in HCAs, was recorded, processed, summarized and communicated to Armstrong.

328.    Swanson was at all times the "principal financial officer" as referred to in the underwriting agreements.  By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Swanson's SOX certification (*see* §V.I., *supra*), and (3) Swanson's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to the low-to-medium priority for leak monitoring system upgrade, control room management deficiencies, and inadequate training impacting pipelines in HCAs, was recorded, processed, summarized and communicated to Swanson.

329.    Pefanis was at all times the President and Chief Operating Officer.  Pefanis was the "appropriate officer[] of GP LLC" and "management" with responsibility for overseeing Plains' operations, including pipeline safety and integrity with Gorman, Nerbonne, and Valenzuela reporting to him.  *See* §V.H., *supra*.  In addition, Pefanis had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*. Therefore, all material information concerning Plains' operations, including the numerous material

1264030_1

failures to comply with applicable laws and regulations detailed above relating the low-to-medium priority for leak monitoring system upgrade, control room management deficiencies, and inadequate training impacting pipelines in HCAs, was recorded, processed, summarized and communicated to Pefanis. *See* §V.G., *supra.*

330.    McGee was at all times the General Counsel and Valenzuela reported to him.  McGee was the "appropriate officer[] of GP LLC" with responsibility for overseeing Plains' legal department and who repeatedly stated without qualification that none of Plains' entities has directly or indirectly violated any environmental safety, health or similar law or regulations.  He also had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra.*  In addition, as required by the audit committee charter, he discussed with the committee all potential and actual regulatory non-compliance that could "result in material non-compliance" by PAA and PAGP, including the numerous material failures to comply with applicable laws and regulations detailed above relating to the low-to-medium priority for leak monitoring system upgrade, control room management deficiencies, and inadequate training impacting pipelines in HCAs.  *See* §V.H., *supra.*

331.    By virtue of the foregoing, Armstrong, Swanson, Pefanis, and McGee received the following information and documents or summaries thereof, as set forth below:

332.    Prior to (1) the filing of (a) PAA's 2012 Form 10-K on February 27, 2013, (b) PAA's 1Q13 Form 10-Q on May 8, 2013, (c) the PAGP IPO's Form S-1 on July 29, 2013, (d) PAA's 2Q13 Form 10-Q on August 8, 2013, (e) the August 2013 Notes Offering Materials on August 8, 9, and 12, 2013, (f) Amendment No. 1 to PAGP IPO's Form S-1 on September 6, 2013, (g) Amendment No. 2 to PAGP IPO's Form S-1 on September 26, 2013, (h) Amendment No. 3 to PAGP IPO's Form S-1 on October 2, 2013, (i) Amendment No. 4 to PAGP IPO's Form S-1 on October 7, 2013, (j) the PAGP IPO's prospectus on October 16, 2013, (k) PAA's 3Q13 Form 10-Q on November 6, 2013,

and (l) PAGP's 3Q13 Form 10-Q on November 22, 2013; and (2) the incorporation of the Code of Conduct into PAA's Form 10-K, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

- Plains failed to install automatic shutoff valves on Lines 901 and 903 and was the only pipeline operator in Santa Barbara county for failing to do so. Plains' failure was in contravention of industry practice and violated 49 C.F.R. §195.452(b)(6). *See* ¶¶316-317, *supra*.

333.   Prior to (1) the filing of PAA's 2013 Form 10-K on February 28, 2014, and PAGP's 2013 Form 10-K on March 12, 2014; and (2) the incorporation of the Code of Conduct into PAA and PAGP's Form 10-Ks, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)   PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903. *See* §V.F., *supra*.

(ii)   Plains failed to install automatic shutoff valves on Lines 901 and 903 and was the only pipeline operator in Santa Barbara county for failing to do so. Plains' failure was in contravention of industry practice and violated industry practice and 49 C.F.R. §195.452(b)(6). *See* ¶¶316-317, *supra*.

(iii)   PHMSA's request during the 2013 inspections for preventive and mitigative evaluations relating to Line 903. PHMSA completed its inspections on October 4, 2013 and Plains could not provide any evidence of the evaluations or justifications for not conducting the evaluations during the inspections. Similarly, the preventive and mitigative meeting for Line 901 also failed to take place by the required deadline of December 24, 2013 with no justification. Leak detection capability must be assessed as part of the preventive and mitigative evaluations, including accounting for the presence of drainage system acting as a conduit to the high consequence area. Plains' failures to conduct preventive and mitigative evaluations on its leak detection system for Lines 901 and 903 violated 49 C.F.R. §§195.452(b)(5), (i), and (l), and Plains integrity management program section 11. *See* ¶¶314-315, *supra*.

(iv)   PHMSA's letter to Valenzuela dated December 24, 2013 concerning PHMSA's finding that Plains changed critical alarms type description and response priority without documenting the changes for PHMSA's review in contravention of 49 C.F.R. §195.446(j)(2), which required all deviations from procedure that affect the safe operation of the pipeline be provided to PHMSA for review during its inspection. *See* §V.E.2., and ¶323, *supra*.

(v)     PHMSA's letter to Valenzuela dated December 24, 2013 concerning Plains' failure to conduct annual review of its controller training program in violation of 49 C.F.R. §195.446(h).  *See* §V.E.2., and ¶324, *supra*.

334.    Prior to (1) the filing of (a) the April 2014 Notes Offering Materials on April 15, 16, and 18, 2014, (b) PAA's 1Q14 Form 10-Q on May 9, 2014, (c) PAGP's 1Q14 Form 10-Q on May 13, 2014, (d) PAA's 2Q14 Form 10-Q on August 8, 2014, (e) PAGP's 2Q14 Form 10-Q on August 12, 2014, (f) the September 2014 Notes Offering Materials on September 2, 4, and 5, 2014, (g) PAA and PAGP's 3Q14 Form 10-Qs on November 7, 2014, (h) PAGP's Secondary Offering Materials on November 12 and 13, 2014, (i) the December 2014 Notes Offering Materials on December 2, 3, and 4, 2014, (j) PAA and PAGP's 2014 Form 10-Ks on February 25, 2015, (k) PAA's Offering Materials on February 25 and 27, 2015 and March 2, 2015, and (l) PAA and PAGP's 1Q15 Form 10-Qs on May 8, 2015; and (2) the incorporation of the Code of Conduct into PAA and PAGP's Form 10-Ks, Armstrong, Pefanis, Swanson, and McGee received the following information for disclosure purposes:

(i)     PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra*.

(ii)    Plains failed to install automatic shutoff valves on Lines 901 and 903 and was the only pipeline operator in Santa Barbara county for failing to do so.  Plains' failure was in contravention of industry practice and violated industry practice and 49 C.F.R. §195.452(b)(6).  *See* ¶¶316-317, *supra*.

(iii)   PHMSA's request during the 2013 inspections for preventive and mitigative evaluations relating to Line 903.  PHMSA completed its inspections on October 4, 2013 and Plains could not provide any evidence of the evaluations or justifications for not conducting the evaluations during the inspections.  Similarly, the preventive and mitigative meeting for Line 901 also failed to take place by the required deadline of December 24, 2013 with no justification.  Leak detection capability must be assessed as part of the preventive and mitigative evaluations, including accounting for the presence of drainage system acting as a conduit to the high consequence area.  Plains' failures to conduct preventive and mitigative evaluations on its leak detection system for Lines 901 and 903 violated 49 C.F.R. §§195.452(b)(5), (i), and (l), and Plains integrity management program section 11.  *See* ¶¶314-315, *supra*.

(iv)     PHMSA's letter to Valenzuela dated December 24, 2013 concerning PHMSA's finding that Plains changed critical alarms type description and response priority without documenting the changes for PHMSA's review in contravention of 49 C.F.R. §195.446(j)(2), which required all deviations from procedure that affect the safe operation of the pipeline be provided to PHMSA for review during its inspection.  *See* §V.E.2., and ¶323, *supra*.

(v)      PHMSA's letter to Valenzuela dated December 24, 2013 concerning Plains' failure to conduct annual review of its controller training program in violation of 49 C.F.R. §195.446(h).  *See* §V.E.2., and ¶324, *supra*.

(vi)     Plains' email to PHMSA on March 25, 2014 admitting that the Company had no record of conducting the required preventive and mitigative evaluations for Line 903 or justifications for failure to conduct the evaluations.  This failure violated 49 C.F.R. §§195.452(b)(5), (i), and (l), and Plains integrity management program section 11.  *See* ¶¶260-261, 314-315, *supra*.

## B.     Defendants False and Misleading Statements and Omissions About Plains' Spill Response Capabilities

335.     On June 5, 2014, during the PAA and PAGP Investor Day Conference, defendants Armstrong, Pefanis and Swanson conducted a presentation to investors that stated:

> ***In the unfortunate event that we do have an incident we will be prepared***. Our key objective obviously is to preserve life and safeguard the environment.  The personnel that are on site at the time that we have an event that does come up have as much unrestricted authority to make decisions to spend money as it would if I was standing on that [side alone].

*      *      *

> ***Incident management tools and resources ready for use, including specific tactical plans and response strategies to be used in critical areas in the event of an emergency***.

336.     Armstrong's statements regarding "specific tactical plans and response strategies" for use in "critical areas" refer specifically – and exclusively – to Plains' pipelines in HCAs, including Lines 901 and 903.  *See* ¶335, *supra*.

337.     **Falsity:**  The statements in ¶335 were materially false and misleading, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of §10(b).  Plains' ineffective response to the pipeline

- 150 -

rupture on the morning of May 19, 2015, in combination with its deficient and outmoded leak detection system and control room problems, led to the largest oil spill in California's recent 25 years history in an environmentally sensitive, high consequence area.  The spill size would have been substantially contained if Plains had conducted its preventive and mitigative evaluations in 2013 and 2014 as discussed in ¶¶256-261 and complied with training requirements for spill response in high consequence areas.  As PHMSA stated, "[t]he consequences of the spill were additionally aggravated by an oil spill response plan that did not identify the culvert near the release site as a spill pathway to the Pacific Ocean."  In addition, Plains' deficient spill response hindered the efficiency of federal and state authorities in responding to the oil discharge.

338.    Despite the inadequate spill response training and failure to identifying the need for additional preventive and mitigative measures to account for the likelihood of a pipeline release occurring and how a release could affect the high consequence area, throughout the Class Period, Plains assured that in the event any leak was detected, Plains' response would be "immediate," well-coordinated with public officials, and comprehensive so as to minimize any environmental impact. During the June 5, 2014 investor day presentation, Armstrong made clear: "In the unfortunate event that we do have an incident we will be prepared" and "we are . . . prepared," in part because the Company had purportedly "improved [its] ability to communicate with the local officials, the regulatory bodies, etc." regarding a spill.  In addition to the false statements above, the slides presented by Armstrong:

(i)      touted the Company's "Commitment to Operational Excellence" in "Incident Response Preparation";

(ii)     represented that the Company engaged in "[i]ncident planning and response training on an ongoing basis" and had "[i]ncident management tools and resources ready for use, including specific tactical plans and response strategies to be used in critical areas in the event of an emergency";

(iii)    repeated that the Company "will be prepared"; and

(iv)    touted the Company's ability for "immediate response and deployment of resources" in the event of a spill.

339.    In addition, as set forth above, throughout the Class Period, in each of its annual reports, Plains repeatedly misled investors by stating that "Federal regulations implementing the HLPSA require pipeline operators to adopt measures designed to reduce the environmental impact of oil discharges from onshore oil pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel."  In addition, Plains also falsely stated throughout the Class Period, "[c]urrently, we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments."

340.    On the basis of these statements, a reasonable investor would believe and expect that defendants' representations above about the comprehensiveness of Plains' spill response plan and the extensiveness of its training, including that Plains had "[i]ncident management tools and resources ready for use, including specific tactical plans and response strategies to be used in critical areas in the event of an emergency" applied to all of Plains' pipelines that run through HCAs. Furthermore, reasonable investors would expect that Plains' spill response plan and training complied with the standards established in the Hazardous Liquid Pipeline Safety Regulations and the Liquid Integrity Management Rule given that "substantial sums" and "substantial resources" were spent to ensure compliance.  Likewise, investors would expect Plains' Midland Control Room, the single facility Plains used to operate all of its pipelines to conduct training and emergency procedures in compliance with applicable regulations.  Reasonable investors would not expect that Plains' spill response plan in general company-wide, and for Lines 901 and 903, in particular, suffered from severe defects at the time the statements were made and that Plains disregarded regulatory requirements and PHMSA's notices to conduct preventive and mitigative evaluations and risk analyses for additional measures that would safeguard high consequence areas and failed to

- 152 -

adequately train its employees for spill response in a high consequence area, including the basic requirements of making a timely call to the National Response Center.  Plains' unpreparedness in responding to the Line 901 rupture and its lack of simple resources such as sandbags and shovels to stop the flow from the culverts to the Pacific Ocean exacerbated the extent of the spill.

341.    49 C.F.R. §194.3 states that "[t]his part applies to an operator of an onshore oil pipeline that, because of its location, could reasonably be expected to cause substantial harm, or significant and substantial harm to the environment by discharging oil into or on any navigable water of the United States or adjoining shorelines."  Because of the potential of substantial harm of an oil release into navigable water, 49 C.F.R. §194.117 contains heightened training and recordkeeping mandates to ensure that operators comply with the regulatory requirements.  49 C.F.R. §194.117(a) requires that "[e]ach operator shall conduct training to ensure that:  (1) [a]ll personnel know (i) their responsibilities under the response plan, . . . (2) [r]eporting personnel know . . . (iii) the notification process [for the National Response Center], and (3) [p]ersonnel engaged in response activities know . . . (iii) [t]he steps necessary to control any accidental discharge of oil and to minimize potential for . . . environmental damage."

342.    In addition, the Liquid Integrity Management Rule 49 C.F.R. 195.452(i) requires that "an operator to include a process in its program for identifying which pipeline segments could affect a high consequence area and to take measures to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area."  "These measures include conducting a risk analysis of the pipeline segment to identify additional actions to enhance public safety or environmental protection. . . .  In identifying the need for additional preventive and mitigative measures, an operator must evaluate the likelihood of a pipeline release occurring and how a release could affect the high consequence area.  This determination must consider all relevant risk factors, including, but not limited to: (i) [t]errain surrounding the pipeline segment, including drainage

- 153 -

systems such as small streams and other smaller waterways that could act as a conduit to the high consequence area; (ii) elevation profile . . . ."

343.    As discussed in ¶¶256-261, Plains did not conduct the preventive and mitigative evaluations as required by 49 C.F.R. 195.452(i).  As a result, Plains' "oil spill response plan required by 49 C.F.R. §194 did not account for a culvert near the release site that traversed the Pacific Coast Highway and Amtrak railroad tracks.  This culvert provided a quick flow path between the pipeline ROW [right-of-way] and the Pacific Ocean, thereby allowing crude oil to flow easily towards Refugio State Beach and the ocean.  The response plan did not have a response strategy that considered the presence of the culverts."

344.    By failing to account for the presence of culverts, Plains violated 49 C.F.R.195.452(i), which states that drainage systems are one of the mandatory risk factors in the risk analysis of Line 901 to determine preventive and mitigative measures.  With a spill response plan that "did not have a response strategy that considered the presence of the culverts," accordingly, the spill response personnel did not receive trainings on steps necessary to control any accidental discharge of oil in the presence of a drainage pathway leading from the release site to the Pacific Ocean to minimize potential for environmental damage – in violation of 49 C.F.R. §194.117.

345.    Indeed, Plains' unpreparedness for a pipeline rupture and the lack of tactical plans and response strategies as a result of its failure to comply with spill response and high consequence area regulations manifested themselves on the day of the Line 901 rupture.  Without accounting or training for the existence of culverts along Line 901, Plains personnel "noted oil in the ocean but could not determine the source of the oil.  One of the Plains representatives told the assembled group that he did not think the oil was coming from Line 901 because the pipeline is located on the other side of Highway 101, and there would be oil flowing across Highway 101 if Line 901 was leaking."  When the leak was finally located over 2.5 hours after the rupture, Plains' representative was wholly

- 154 -

unprepared and sought to staunch the gushing oil using a single shovel to construct "a makeshift berm." As PHMSA noted "the culvert was too large to stop the flow with shovels, and sand bags were not readily available, so their immediate efforts were unsuccessful." It took another 1.5 hours before Plains' "additional equipment and  personnel arrived, the culvert was dammed and oil was prevented from entering the  culvert." According to the root cause report, two culverts drained the released oil to the Pacific Ocean. For "the culvert closest to the release site[, a] makeshift berm was created at this culvert to prevent any additional product from flowing through the culvert." For the second culvert through which product flowed, no makeshift berm, sandbag or any material was used to block the oil flow.

346.    Plains' emergency response shortcomings manifested themselves on the day of the Line 901 rupture. Despite Armstrong's representations that Plains' spill response efforts would be immediate and well-coordinated, in truth, the response to the Santa Barbara oil spill proved to be a disaster:



347.    Although Plains' employees ultimately managed to discover the leak location at 1:27 p.m., they failed to notify the National Response Center ("NRC") until 1.5 hours later.  According to PHMSA, "Federal pipeline safety regulations, (49 C.F.R. § 195.52), require that the NRC be notified at the earliest practicable moment following discovery of a release of a hazardous liquid, including '[a]ny failure that resulted in pollution of any stream, river, lake, reservoir, or other similar body of water that violated applicable water quality stands, caused a discoloration of the surface of the water or adjoining shoreline, or deposited a sludge or emulsion beneath the surface of the water or upon adjoining shorelines.'"  49 C.F.R. §195.52(a) further mandates that the pipeline operator must notify the National Response Center "no later than one hour after confirmed discovery."  The NRC served

as a "communication hub" to notify and communicate with the Federal On Scene Coordinator ("FOSC") and other stakeholders to assist the FOSC in effectively responding to oil discharges.

348.    Plains' employee, James Buchanan, was indicted on misdemeanor charges for knowingly failing to "call the National Response Center within one hour after confirmation of a pipeline release of oil" in violation of Government Code §8670.64, subdivision (c)(2)(D), "immediately notify the California Office of Emergency Services in violation of Government Code §8670.25.5, subdivision (a)(1)," and "immediately report any release or threatened release of a hazardous material to the unified program agency and to the Office of Emergency Services in violation of Health and Safety Code §22510."

349.    **Scienter:**  By virtue of the facts set forth below and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in ¶335 were materially misleading to investors.

350.    As defendants repeatedly represented in their Class-Period SEC filings, since at least 2006, the DOT has required oil transportation operators – like defendants – to implement comprehensive spill response plans and to provide extensive spill response training to pipeline personnel.  Only with at least severe recklessness could defendants ignore the implementation of such comprehensive plan and the requirement for "extensive spill response training," especially in places as environmentally sensitive as the pristine Santa Barbara coastline.

351.    Plains knew of its deficiencies in spill response training when PHMSA inspected Plains' implementation of its spill response plan for Lines 901 and 903 during its August to October 2013 inspections.  During the inspection, Plains could not provide evidence to PHMSA inspectors that it conducted annual reviews of emergency response training, Plains' supervisors were trained to maintain a thorough knowledge of the emergency response procedure for which they were responsible, and Plains made appropriate changes to the emergency response training program as

- 157 -

necessary to ensure that it is effective – all in violation of 49 C.F.R. §195.403.   In addition, 49 C.F.R. §194.117 – applicable to oil pipelines with potential to cause "substantial harm to the environment by discharging oil into or on any navigable water" – contains heightened training and recordkeeping mandates to ensure that operators comply with the regulatory requirements. 49 C.F.R. §194.117 requires that "(a) [e]ach operator shall conduct training to ensure that . . . (1) [a]ll personnel know (i) [t]heir responsibilities under the response plan . . . and (b) [e]ach operator shall *maintain a training record for each individual* that has been trained as required under this section.  These records must be maintained in the following manner as long as the individual is assigned duties under the response plan: (1) [r]ecords for operator personnel must be maintained at the operator's headquarters; and (2) [r]ecords for personnel engaged in response, other than operator personnel, shall be maintained as determined by the operator."   By failing to provide records to PHMSA inspectors during the inspection, Plains knew at the time of the inspection in 2013 that it failed to comply with the annual review or training requirements of 49 C.F.R. §195.403 and failed to train emergency response personnel in substantial harm areas near navigable water and maintain each of their training record as required under 49 C.F.R. §194.117.  These violations were more than mere recordkeeping because updates to an emergency response training program would be documented in Plains' spill response plan.  The lack of such documentation necessarily mean that Plains failed to make the appropriate changes to the emergency response training program to ensure its effectiveness.  Similarly, under the regulations, each individual was required to sign forms certifying that he or she had completed training.  The lack of such executed forms further demonstrates that Plains failed to conduct the requisite training as mandated by the regulations.

352.    In addition, Plains knew that it had failed to conduct the required preventive and mitigative evaluations for Lines 901 an 903 as PHMSA requested for records of such evaluations during its inspection and Plains confirmed that it lacked such documentation in March 2014.  *See*

¶¶256-261, 337, 343, *supra*.  In identifying the need for additional preventive and mitigative measures, an operator must evaluate the likelihood of a pipeline release occurring and how a release could affect the high consequence area and must consider all relevant risk factors, including culverts in the high consequence area.

353.    Furthermore, in 2008 and on May 13, 2013, Plains conducted excavations near the rupture point and next to the culvert and knew that such culvert existed but ignored it in its spill response plan.  As part of Plains' Integrity Management Program, after each dig, "a dig package is then created for each anomaly and includes pictures, data forms, NDE [non-destructive excavation] measurements, etc. Once an anomaly dig is completed, the dig package is sent back to the IMP Group in Houston, TX" for analysis.  The dig packages contained photographs of the excavated pipeline and immediate areas.

354.    The failure to comply with regulations relating to Plains' failure to conduct preventive and mitigative evaluations and conduct the required risk analysis and inadequate training were "recorded, processed, summarized, and communicated" to Armstrong, Swanson, Pefanis and McGee as stated in the underwriting agreements, Form 10-Ks, and Form 10-Qs filed by PAA and PAGP during the Class Period.  *See* §V.G., *supra*.

355.    Armstrong was at all times the "principal executive officer" as referred to in the underwriting agreements.  By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Armstrong's role as Chairman of the Board receiving reports of potential and actual regulatory non-compliance from the audit committee (*see* §V.H., *supra*), (3) Armstrong's SOX certification (*see* §V.I., *supra*), and (4) Armstrong's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and

- 159 -

regulations detailed above relating to Plains' failure to conduct preventive and mitigative evaluations and conduct the required risk analysis and inadequate training impacting HCAs, was recorded, processed, summarized and communicated to Armstrong.

356.    Swanson was at all times the "principal financial officer" as referred to in the underwriting agreements.  By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Swanson's SOX certification (*see* §V.I., *supra*), and (3) Swanson's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to Plains' failure to conduct preventive and mitigative evaluations and conduct the required risk analysis and inadequate training impacting HCAs, was recorded, processed, summarized and communicated to Swanson.

357.    Pefanis was at all times the President and Chief Operating Officer.  Pefanis was the "appropriate officer[] of GP LLC" and "management" with responsibility for overseeing Plains' operations, including pipeline safety and integrity with Gorman, Nerbonne, and Valenzuela reporting to him.  *See* §V.H., *supra*.  In addition, Pefanis had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*. Therefore, all material information concerning Plains' operations, including the numerous material failures to comply with applicable laws and regulations detailed above relating Plains' failure to conduct preventive and mitigative evaluations and conduct the required risk analysis and inadequate training impacting HCAs, was recorded, processed, summarized and communicated to Pefanis.  *See* §V.G., *supra*.

358.    McGee was at all times the General Counsel and Valenzuela reported to him.  McGee was the "appropriate officer[] of GP LLC" with responsibility for overseeing Plains' legal

- 160 -

department and who repeatedly stated without qualification that none of Plains' entities has directly

or indirectly violated any environmental safety, health or similar law or regulations.  He also had

authority to waive deviations from pipeline safety and environmental protection policies as stated in

the Code of Conduct.  *See* §V.K., *supra.*  In addition, as required by the audit committee charter, he

discussed with the committee all potential and actual regulatory non-compliance that could "result in

material non-compliance" by PAA and PAGP, including the numerous material failures to comply

with applicable laws and regulations detailed above relating to Plains' failure to conduct preventive

and mitigative evaluations and conduct the required risk analysis and inadequate training impacting

HCAs.  *See* §V.H., *supra.*`

359. By virtue of the foregoing, Armstrong, Swanson, Pefanis, and McGee received the

following information and documents or summaries thereof, as set forth below:

360. Prior to the June 5, 2014 investor day conference, Armstrong, Pefanis, Swanson, and

McGee received the following information for disclosure purposes:

(i)   PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra.*

(ii)  PHMSA completed its 2013 inspections of Lines 901 and 903 on October 4, 2013. During the course of the inspections, Plains failed to provide any evidence of its annual review of emergency response training or its implementation any appropriate changes to the emergency response training program as necessary to ensure that it is effective.  These deficiencies violated 49 C.F.R. §195.403(b).  *See* ¶351, *supra.*

(iii) PHMSA completed its 2013 inspections of Lines 901 and 903 on October 4, 2013. During the course of the inspections, Plains failed to provide any evidence that its emergency response supervisors were trained to maintain a thorough knowledge of the emergency response procedure for which they were responsible.  This failure violated 49 C.F.R. §§195.403(b) and 194.117.  *See* ¶351, *supra.*

(iv)  PHMSA's request during the 2013 inspections for preventive and mitigative evaluations relating to Line 903.  PHMSA completed its inspections on October 4, 2013 and Plains could not provide any evidence of the evaluations or justifications for not conducting the evaluations during the inspections.  Similarly, the preventive and mitigative meeting for Line 901 also failed to take place by the

required deadline of December 24, 2013 with no justifications.  In identifying the need for additional preventive and mitigative measures, an operator must evaluate the likelihood of a pipeline release occurring and how a release could affect the high consequence area and must consider all relevant risk factors, including culverts in the high consequence area.  Plains' failures to conduct preventive and mitigative evaluations on its leak detection system for Lines 901 and 903 violated 49 C.F.R. §§195.452(b)(5), (i), and (l), and Plains integrity management program section 11.  *See* ¶¶256-261, 342-344, *supra*.

(v)   Plains' email to PHMSA on March 24, 2014 admitting that the Company had no record of conducting the required preventive and mitigative evaluations for Line 903 or justifications for failure to conduct the evaluations.  This failure violated 49 C.F.R. §§195.452(b)(5), (i), and (l), and Plains integrity management program section 11.  *See* ¶¶256-261, 342-344, *supra*.

## C.   Defendants False and Misleading Statements and Omissions About the Spill Size

361.   On June 24, 2015, Plains posted Armstrong's June 19, 2015 letter to Congress concerning the spill, its impact, and the shutdown of Line 903 on the website they created to track the spill response, www.plainsline901response.com.   Armstrong's letter was entitled "Plains Pipeline Response to 6-5-15 Congressional Letter" and misleadingly omitted that Plains knew the spill was larger than previously estimated:

At 2:56 p.m. a Plains Pipeline Bakersfield employee called the NRC and formally notified them of the coordinates of the release and, despite being unable to get through to the on-site Plains employees, gave a volume estimate of approximately 500 barrels (equivalent of approximately 21,000 gallons).

362.   Two days later, on June 26, 2015, Patrick Hodgins, director of security and safety for Plains, testified before a California state legislative committee investigating the spill.  When asked about a spill volume of "105,000 gallons," Hodgins omitted the true size of the spill.

363.   **Falsity:**  The statements in ¶¶361-362 were materially false and misleading, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of §10(b).

364.   These statements concerning Plains' spill estimate were materially false and misleading because Armstrong and Hodgins failed to disclose that Plains' estimate of the publicly-

stated spill size had increased 42% from the 101,000 gallon number disclosed in the Company's May 26, 2015 8-K.  As PHMSA noted, "after Plains completed the PHMSA-mandated purge [on June 18, 2016], the company's calculation indicated that up to 3,400 [barrels or 142,800 gallons] had possibly been released from the pipeline."  The corrected amount was similar to the worst case discharge estimate contained in Plains' spill response plan, certified as "both feasible and executable" by Plains on August 27, 2011.  Since June 18, 2016, when the PHMSA-mandated purge was completed, Plains was aware that the size of the spill was greater than the 105,000 gallons conveyed to investors.  Nevertheless, on June 24, 2015, Plains posted Armstrong's letter to Senators Boxer, Feinstein and Markey and Congresswoman Capps on the www.plainsline901response.com website with erroneous spill information without updating the size of the spill.

365.   The website continuously posted updates to the public and to investors with information concerning the Line 901 spill, clean-up effort, clean-up cost, and distance that the oil traveled.  Thus, in addition to Armstrong's letters to members of Congress dated June 24, 2015, which referenced the initial spill estimate, the website provided "daily updates," including (1) incident updates on June 29, 2015, July 6, 2015, and July 13, 2015, (2) "Recovery Q&As" on June 17, 2015 discussing Plains' safety record, recovery completion, the affected pipeline, and how oil traveled to the ocean, and (3) the investor day presentation from June 4, 2015.  Defendants McGee and Armstrong referred investors to the website for updated information about the spill.  On the day of the spill, defendant McGee instructed investors to "visit www.plainsline901response.com for updates from Plains regarding the Line 901 release" in Form 8-Ks filed by PAA and PAGP.  On June 4, 2015, defendants hosted an investor day where Armstrong discussed the Santa Barbara oil incident, presented on the Company's history of incidents and release volumes, and likewise encouraged investors to visit the Company website to obtain "daily updates" on the spill.

We have a website out there that has all the information you could ever possibly want. We provided daily updates. There's www.refugioresponse.com, which will have the Unified Command information. If you go to Plains' website, at the lower part of the cover page or opening page, there's a Plains Line 901 response, and again you'll see all the information that you could ever want about that release.

366.   Given that McGee and Armstrong specifically referred investors to the website for "updates from Plains" on the spill, defendants had a duty to disclose on the website that the spill was 42% larger than Plains had reported starting at least as early as June 18, 2015.  Indeed, because there were constant incident updates, the absence of an update on the spill size amounted to a representation that the prior representations were correct.  In addition to misleading investors through its website, in public testimony before a California state legislative committee investigating the spill, Hodgins reaffirmed the false spill information by failing to convey the true spill size, when asked about a spill volume of "105,000 gallons."

367.   Because Line 901 is located in an area where it "could reasonably be expected to cause substantial harm, or significant and substantial harm to the environment by discharging oil into or on any navigable waters of the United States," 49 C.F.R. §194.105 requires that "[e]ach operator shall determine the worst case discharge for each of its response zones."  In the event of a release greater than five gallons, the Hazardous Liquid Pipeline Safety Regulations 49 C.F.R. §195.52 requires that the pipeline operator notifies the National Response Center within an hour of discovery.  Per 49 C.F.R. §195.52(b), the notice "must include the following information: . . . (6) Initial estimate of amount of product released in accordance to paragraph (c) of this section."  Paragraph (c) mandates that "[a] pipeline operator must have a written procedure to calculate and provide a *reasonable initial estimate* of the amount of released product."

368.   The spill response plan for Line 901 contains a summary of a "Risk and Hazard Analysis" performed by Plains to evaluate the likelihoods and consequences of a major breach in the pipeline.  The spill response plan determined that the maximum discharge from a spill, or the "Worst

Case Discharge," was 148,092 gallons (3,526 barrels) assuming "*10 minutes total time to detect rupture and 5 minutes to shutdown pipeline.*" On the day of the spill, Plains' computer monitoring system in its control room in Midland, Texas failed to detect the rupture for hours. It was not until 1:30 p.m. – more than *two hours* after the rupture – that Plains employees sought to staunch the gushing oil using a single shovel to construct "a makeshift berm." When Plains finally did report the spill after over 1.5 hours after discovering the spill, it estimated that merely 500 barrels (or 21,000 gallons) had spilled – even though oil had been pumping through the pipeline at 2,000 barrels per hour for several hours and Plains had in hand its own worst case discharge calculation which was substantially higher at 3,526 barrels.

369. The 500 barrels off-the-cuff estimate was far from "a reasonable initial estimate of the amount of released product." Indeed, Plains was indicted on felony charges for "knowingly mak[ing] a false or misleading oil spill report to the California Office of Emergency Services" in violation of Government Code §8670.64, subdivision (c)(2)(B).

370. After bungling the spill response, defendants downplayed the spill's size and scope. Several days after the spill, Plains' officials reported that the "worst case" scenario for the spill was 105,000 gallons. In a subsequent Form 8-K dated May 26, 2015 filed by Plains and Plains Holdings, Plains further revised its total estimate *downward* by 4,000 gallons to 101,000 gallons.

371. Plains revised down its estimate to 101,000 gallons while purging and removing the affected pipeline as ordered by PHMSA – adding credence to the misleading spill size. In the May 21 CAO, PHMSA ordered Plains to empty and purge the 10.6 miles of affected pipeline (Line 901) and fill it with inert gas as soon as applicable "but no longer than *10 days* after receipt of this order." On the www.plainsline901response.com website, Plains stated that "[o]n May 28, [2015], under the oversight of PHMSA and the Unified Command, excavation and removal of the affected section of pipe was completed." Documents obtained from government sources confirm that, in fact,

- 165 -

defendants had excavated, purged, and removed a portion of the failed pipe for "mechanical and metallurgical testing and failure analysis" as required by PHMSA, by this date.  Armstrong himself asserted to members of the Congress on June 19, 2015 that "the affected pipe was excavated, placed in a box, sealed and transported to a third-party laboratory for evaluation and testing."

372.   Plains had the duty to disclose the actual spill size as the company had many public discussions regarding the spill and the recovery effort with daily updates, investor day presentation, letters to Congress, media briefings, and numerous conversations with the press.  In fact, as PHMSA noted, even as late as "August 4, 2015, Plains reported to the Unified Command that the 2,400 bbl [101,000 gallons] release estimate was still accurate."  At all times between the purge and the end of the Class Period, in discussing the spill and its effects, defendants were obligated to disclose that the true size of the Santa Barbara oil spill was significantly larger than represented and/or correct their prior misstatements regarding the size of the spill.

373.   Nevertheless, the Company waited until August 5, 2015, in an investor presentation given in connection with the second quarter of 2015 results, to disclose that the spill was actually 143,000 gallons – 42% larger than previously reported and similar to the worst case discharge estimate in its spill response plan certified since 2011 – despite the fact that they knew the true spill size at least six weeks earlier.  The Company further disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, and that the Company could be liable for potential criminal violations of the CWA.

374.   **Scienter:**  By virtue of the facts set forth below and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in ¶¶361-362 were materially misleading to investors.

375.   Immediately after the spill, Plains attempted to control the spill story, with Armstrong leading the charge on the ground in Santa Barbara "from day one."  Representatives from Plains,

- 166 -

including Hodgins, were part of the Spill Unified Command, a committee meant to organize the response in the spill's aftermath.  Justifying county concerns that Plains was "influenc[ing] virtually every aspect of response and communication often contrary to the local agencies' values and practices," Plains encouraged "individual media briefings for members of the Unified Command with a handful of **neutral to positive reporters**" to "tell **the 'progress' story**" in an effort to counteract negative local stories about the spill response.  As such, Armstrong was acutely aware of the purge and the resulting spill estimates – "Chairman and CEO Greg Armstrong was here from day one" acting as the leader of Plains' spill response team and interacting with the press with focus on the market's reaction to the spill.

376.     Defendants concealed the true size of the spill throughout the summer, despite providing constant updates regarding the scope of the spill on a specially-created spill response website, in investor conferences, and in official letters to Congress.  When defendants finally came clean about the true size of the spill on August 5, 2015 – the end of the Class Period – they admitted that purging Line 901 supported the updated spill estimate.  But government sources confirm that defendants had excavated, purged, and removed a portion of the failed pipe for testing by May 28, 2015, as required by PHMSA's May 21 CAO.  And that Plains completely purged the pipe and filled it with inert gas by June 18, 2015.  Thus, defendants knew the true size of the spill – 42% larger than previously reported – more than **six weeks** before disclosing that information to the market in August 2015.  Indeed, PHMSA found that Plains knew the size of the spill was 3,400 barrels or 142,800 gallons when the purge was completed but even as late as "August 4, 2015, Plains reported to the Unified Command that the 2,400 bbl [101,000 gallons] release estimate was still accurate." Furthermore, Plains provided the 2,400 bbl or 101,000 gallons estimate while it was purging and removing the failed pipe in May 2015 and painted a picture that the estimate was credible.  When in fact, Plains knew that it was an underestimate because it was aware, since at least 2011, that the

- 167 -

"worst case discharge" for Line 901 was 148,092 gallons or 3,526 barrels assuming a scenario of "10 minutes total time to detect rupture and 5 minutes to shutdown pipeline."  On the day of the spill, Plains' personnel took over two hours to detect the rupture.  As a result, the true size of the spill was almost identical to the worst case discharge estimate.

377.    This was not the first time that Plains had engaged in this type of deception.  Despite applicable regulations requiring Plains to provide reasonable estimates of spill volumes when a spill may result in property damage exceeding $50,000 or the pollution of any body of water, Plains has demonstrated a pattern and practice of understating spill volumes, only to later revise them upward.  For example:

(i)     On April 29, 2011, the Rainbow Pipeline, a 45-year old Plains' pipeline ruptured in Alberta, Canada, resulting in the worst oil spill in that area in 36 years.  On the day of the spill, Plains reported to the Canadian authorities that the pipeline released an estimated 260,400 gallons.  The actual spill size was 1,176,000 gallons – four and half times larger than the reported spill.

(ii)    On December 24, 2006, Plains' High Island Pipeline ruptured and spilled crude oil into the Gulf of Mexico.  On the day of the spill, Plains provided an estimated release of 20,000 gallons.  The actual spill size was 36,540 gallons – more than 80 percent larger than the reported spill.

(iii)   Plains' Pocahontas Station spilled crude oil into Silver Creek, a high consequence area near a drinking water reservoir in Illinois.  According to a PHMSA Corrective Action Order dated July 14, 2015, on the day of the spill, Plains provided an estimated release of "0 barrels" and an "unknown value" for spillage into the creek.  The actual spill size was later corrected to 4,200 gallons.

**D.     Defendants' False and Misleading Statements and Omissions About Legal Compliance**

378.    The 2012 Form 10-K, filed on February 27, 2013, contained the following materially false and misleading statements concerning PAA's compliance with the applicable HLPSA, OPA and related state regulations:

The HLPSA was amended by the Pipeline Safety Improvement Act of 2002 and the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006.  These amendments have resulted in the adoption of rules by the Department of Transportation ("DOT") that require transportation pipeline operators to implement

- 168 -

integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in "high consequence areas," such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways. . . . ***Currently, we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments.***

\*     \*     \*

***We believe that we are in substantial compliance with applicable OPA requirements.  State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when they occur.  We believe that we are in substantial compliance with all such federal, state and Canadian requirements***.

379.   During the Class Period, each of the 2013 and 2014 Annual Reports on Form 10-K filed by PAA on February 28, 2014 and February 25, 2015, respectively, and filed by PAGP on March 12, 2014 and February 25, 2015, respectively, repeated the materially false and misleading statements in the 2012 Form 10-K as set forth in ¶¶378, 381.  All of the 2012, 2013, and 2014 Form 10-Ks contained signed certifications pursuant to the Sarbane-Oxley Act of 2002 ("SOX") by defendants Armstrong and Swanson stating that "material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."  All of the Form 10-Ks were also signed by defendants Pefanis and Herbold.  In addition, for PAA, its Form 10-Ks were signed by PAA GP LLC, AAP, GP LLC, and the directors of GP LLC.  For PAGP, its Form 10-Ks were signed by Holdings LLC and its directors.

380.   Each PAA and PAGP's Annual Reports on Form 10-K filed during the Class Period expressly referred investors to the Company's web site to view Plains' Code of Business Conduct, stating:  "All of our standing committees have charters.  Our committee charters and governance guidelines, as well as our Code of Business Conduct and our Code of Ethics for Senior Financial Officers, which apply to our principal executive officer, principal financial officer and principal accounting officer, are available under the Structure and Governance tab in the Investor Relations

- 169 -

section of our Internet website at http://www.plainsallamerican.com.  We intend to disclose any amendment to or waiver of the Code of Ethics for Senior Financial Officers and any waiver of our Code of Business Conduct on behalf of an executive officer or director either on our Internet website or in an 8-K filing."

381.    At all times during the Class Period, Plains' Code of Business Conduct, published on Plains' website and incorporated into PAA and PAGP's Form 10-Ks, falsely stated:

> Our commitment [to safe and environmentally responsible operations] also includes **compliance with applicable environmental, health and safety rules, laws, and regulations**.

382.    In addition, each of PAA's and PAGP's Quarterly Report on Form 10-Q filed with the SEC during the Class Period referred investors to the materially false and misleading statements in the most recently-filed Form 10-K as set forth in ¶¶378, 381.  PAA filed its Form 10-Qs on May 8, 2013 (1Q13), August 8, 2013 (2Q13), November 6, 2013 (3Q13), May 9, 2014 (1Q14), August 8, 2014 (2Q14), November 7, 2014 (3Q14), and May 8, 2015 (1Q15).  PAGP filed its Form 10-Qs on November 22, 2013 (3Q13), May 13, 2014 (1Q14), August 12, 2014 (2Q14), November 7, 2014 (3Q14), and May 8, 2015 (1Q15).  All of the Form 10-Qs contained signed certifications pursuant to SOX by defendants Armstrong and Swanson stating that "material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."  All of the Form 10-Qs were also signed by defendant Herbold.  In addition, for PAA, its Form 10-Qs were signed by PAA GP LLC, AAP, and GP LLC.  For PAGP, its Form 10-Qs were signed by Holdings LLC.

383.    PAGP's IPO Offering Materials also contained the materially false and misleading statements set forth in ¶¶192, 194-195.  The IPO Offering Materials included: a Form S-1 Registration Statement filed on July 29, 2013; its Amendment Nos. 1, 2, 3, and 4 filed on September 6, 2013, September 26, 2013, October 2, 2013, and October 7, 2013, respectively.  The

Form S-1 Registration Statement and its amendments were all signed by defendants Armstrong, Swanson, Herbold, Raymond, Sinnott, and Holdings LLC. The Rule 424(b)(4) Final Prospectus was filed on October 16, 2013.

384.    After the IPO, in its Secondary Offering, PAGP filed with the SEC a Form S-3 Registration Statement on November 6, 2014 and a Prospectus on November 12, 2014. These Plains Holdings Secondary Offering Materials incorporated by reference PAGP's 2013 Form 10-K and the materially false and misleading statements set forth in ¶¶378, 381. The Registration Statement was signed by PAGP, Holdings LLC, Armstrong, Swanson, Herbold, Pefanis, Burk, Goyanes, Raymond, Shackouls, Sinnott, and Sutil.

385.    PAA, in its securities offerings, also incorporated by reference its Form 10-Ks and their materially false and misleading statements set forth in ¶¶378, 381. PAA's August 2013 Notes Offering Materials incorporated by reference PAA's 2012 Form 10-K. PAA's April 2014 Notes Offering Materials, September 2014 Notes Offering Materials, and December 2014 Notes Offerings incorporated by reference PAA's 2013 Form 10-K. The Plains Offering Materials for PAA's February 2015 common units offering incorporated by reference PAA's 2014 Form 10-K. All of PAA's securities offerings were conducted pursuant to a Form S-3 Registration Statement dated September 27, 2012 and signed by Plains, PAA GP LLC, Plains AAP, L.P., GP LLC, Armstrong, Swanson, Herbold, Pefanis, Goyanes, Petersen, Raymond, Sinnott, Sutil, Symonds, and Temple.

386.    In addition to misrepresenting PAA's compliance with the applicable HLPSA, OPA, and related state regulations, in an underwriting agreement filed with the SEC in a Current Report on Form 8-K dated August 8, 2013 and incorporated by reference therein, PAA and PAA Finance falsely represented that PAA, PAA GP LLC, AAP, GP LLC, and all of their material subsidiaries were in compliance with all applicable laws or regulations:

- 171 -

(ii) **[N]one of the Issuers, the GP Entities or the Material Subsidiaries is in violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or of any decree of any court or governmental agency or body having jurisdiction over it** and (iii) none of the Issuers, the GP Entities or the Material Subsidiaries is in breach, default (or an event that, with notice or lapse of time or both, would constitute such an event) or violation in the performance of any obligation, covenant or condition contained in any bond, debenture, note or any other evidence of indebtedness or in any agreement, indenture, lease or other instrument to which it is a party or by which it or any of its properties may be bound, which breach, default or violation, in the case of (ii) or (iii) would, if continued, reasonably be expected to have a Material Adverse Effect or materially impair the ability of either of the Issuers to perform its obligations under this Agreement.

*     *     *

Environmental Compliance. Except as described in the Pricing Disclosure Package and the Prospectus, **none of the Plains Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants** ("Environmental Laws"), or lacks any permits, licenses or other approvals required of them under applicable Environmental Laws to own, lease or operate their properties and conduct their business as described in the Pricing Disclosure Package and the Prospectus or is violating any terms and conditions of any such permit, license or approval, which in each case would reasonably be expected to have a Material Adverse Effect.

387.     During the Class Period, each of the underwriting agreements in a Current Report on Form 8-K – filed by PAA on April 18, 2014, September 5, 2014, December 4, 2014, and March 2, 2015 and filed by PAGP on October 21, 2013 and November 13, 2014 – repeated the materially false and misleading statements set forth in ¶386.  All of the Form 8-K underwriting agreements were signed by defendant McGee.  In addition, all of PAA's Form 8-K underwriting agreements were signed by PAA GP LLC, GP LLC, and AAP, and incorporated by reference into the Offering Materials for PAA's August 2013 Notes Offering, April 2014 Notes Offering, September 2014 Notes Offering, December 2014 Notes Offering, and the February 2015 Plains Offering.  *See* Exhibit A hereto.  All of PAGP's Form 8-K underwriting agreements were signed by Holdings LLC and incorporated by reference into the Offering Materials for the IPO and Plains Holdings Secondary Offering.  *See* Exhibit A hereto.

388.     In November 2013, Plains continued to state on its website, as it would throughout the Class Period, that the Company "believe[s] that *all of our pipelines have been* constructed and are *maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards proscribed by the American Petroleum Institute and accepted industry practice*."   This statement was authorized and endorsed by defendants Armstrong, Swanson, and Pefanis.   First, Armstrong, Swanson, and Pefanis signed all of the Form 10-Ks during the Class Period, each of which refers investors to Plains' website for additional information about the Company, including various aspects of its policies, financial results, and operations.   Second, Armstrong, Swanson, and Pefanis, each attended and spoke on conference calls during the Class Period during which investors were directed to the website for additional information about the Company.   Finally, in its Form 8-Ks – filed on May 6, 2013, May 7, 2013, August 5, 2013, and November 4, 2013, for example - the Company referred investors to the website stating that the Plains' website at www.paalp.com was "where PAA routinely posts important information about the Partnership."   Swanson, the "Executive Vice President and CFO," was identified as the Plains contact person for information relating to the Form 8-K filings.

389.     The statement in ¶378, above, concerning substantial compliance with HLPSA and the 2002 and 2006 amendments applies specifically – and exclusively – to all Plains' pipelines in HCAs, including Lines 901 and 903.

390.     Defendants' false and misleading statements and omissions concerning Plains' lack of material violations of laws and regulations, or belief in substantial compliance to laws and regulations are actionable false statements in light of the context in which they were made.

391.     Reasonable investors would expect that defendants' statement above that (1) "we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments," (2) "[w]e believe that we are in substantial compliance with applicable OPA

- 173 -

requirements," and (3) "[w]e believe that we are in substantial compliance with all such federal, state and Canadian requirements" rested on some meaningful legal inquiry.  If defendants did not perform such an inquiry, then the statements were false and misleadingly incomplete.  If defendants did perform a meaningful legal inquiry, then defendants were aware of the raft of material violations associated with Plains and its pipelines that are detailed herein, and that Plains and its pipelines were not in substantial compliance with the laws, regulations and requirements referenced in their statements.

392.    Reasonable investors would expect that defendants' statement above that (1) "we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments," (2) "[w]e believe that we are in substantial compliance with applicable OPA requirements," and (3) "[w]e believe that we are in substantial compliance with all such federal, state and Canadian requirements" fairly aligned with the information in their possession at the time the statements were made.  As detailed herein, each time Plains and the Officer Defendants made these statements, they had in their possession information establishing a raft of material violations associated with Plains and its pipelines.

393.    **Falsity:** The statements in ¶¶378-388 were materially false and misleading, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of §10(b).  In addition, the statements in ¶¶378-387 were materially false and misleading, and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of §11.  Plains' widespread violations of HLPSA and its 2002 and 2006 amendments ultimately led to the rupture of Line 901 and shutdown of Line 903.  According to 49 C.F.R. Part 195, Appendix A, "the HLPSA provides for a national hazardous liquid pipeline safety program with nationally uniform minimum standards."  These standards are codified in the Hazardous Liquid

- 174 -

Pipeline Safety Regulations, 49 C.F.R. Part 195, where "PHMSA has issued a set of comprehensive safety standards for the design, construction, testing, operation, and maintenance of hazardous liquid pipelines."[15]   These standards include requirements for operation and maintenance, emergency response, control room management, corrosion control, reporting, and recordkeeping – all of which Plains violated in its management of Lines 901 and 903.  Furthermore,  on May 16, 2016, Plains was indicted on 46 criminal counts, including four felony charges for discharging oil into state and federal waters in violation of the Clean Water Act, knowingly causing a hazardous substance to spill on a road, street, highway or railroad, and knowingly making false or misleading reports following the spill.

394.    In addition, the 2002 and 2006 amendments to the HLPSA, as stated by Plains in each of its Form 10-Ks, "have resulted in the adoption of rules by the Department of Transportation that require transportation pipeline operators to implement integrity management programs" in HCAs.  These Liquid Integrity Management Rules are codified in 49 C.F.R. §195.452.   49 C.F.R. §195.452(b)(4)(i) requires that each pipeline operators' integrity management program must "[a]ddress each element of the integrity management program under paragraph (f) of this section, including continual integrity assessment and evaluation under paragraph (j) of this section," and 49 C.F.R. §195.452(b)(5) requires that each operator of a pipeline must "[i]mplement and follow the program."  49 C.F.R. §195.452(f) outlines the eight elements of an integrity management program.  During the Class Period, Plains violated six of the elements (numbers (3) through [(8)] below):

(1)     A process for identifying which pipeline segments could affect a high consequence area;

(2)     A baseline assessment plan meeting the requirements of paragraph (c) of this section;

---

[15]   80 F.R. 61610, at *61611.

(3)    *An analysis that integrates all available information about the integrity of the entire pipeline and the consequences of a failure (see paragraph (g) of this section)*;

(4)    *Criteria for remedial actions to address integrity issues raised by the assessment methods and information analysis (see paragraph (h) of this section)*;

(5)    *A continual process of assessment and evaluation to maintain a pipeline's integrity (see paragraph (j) of this section)*;

(6)    *Identification of preventive and mitigative measures to protect the high consequence area (see paragraph (i) of this section)*;

(7)    *Methods to measure the program's effectiveness (see paragraph (k) of this section)*; and

(8)    *A process for review of integrity assessment results* and information analysis by a person qualified to evaluate the results and information (*see* paragraph (h)(2) of this section).

395.    Throughout the Class Period, Plains promised investors that the Company was in compliance with applicable laws and regulations.  In reality, Plains persistently and pervasively violated the minimum standards laid out in the Hazardous Liquid Pipeline Safety Regulations concerning operation and maintenance, emergency response, control room management, corrosion control, reporting, and recordkeeping, and failed to implement and follow the integrity management program pertaining to Lines 901 and 903 as required by the Liquid Integrity Management Rules.

396.    Each of the statements in ¶¶378-388 above were materially false and misleading because defendants violated the laws and regulations set forth below.

397.    Prior to making the materially false and misleading statements in (1) PAA's 2012 Form 10-K on February 27, 2013, (2) PAA's 1Q13 Form 10-Q on May 8, 2013; and (3) the Code of Conduct as incorporated into PAA's Form 10-K; Armstrong, Pefanis, Swanson, and McGee knew that Plains had materially violated laws and regulations through their receipt of information set forth below for disclosure purposes:

(i)     PHMSA's notifications to Plains' senior executive officers concerning testing, corrosion control, leak detection, and damage prevention violations on Plains' pipelines other than Lines 901 and 903.  *See* §V.F., *supra*.

(ii)    Plains violated industry practices and 49 C.F.R. §195.452(b)(6) beginning in 2006 when NACE published its technical committee report that indicated Plains' cathodic protection was ineffective on insulated pipelines like Lines 901 and 903. Plains failed to follow NACE's recommendations for mitigating corrosions on insulated pipelines, and according to PHMSA, "[i]ndustry practices recognize that an impressed current system like the one utilitized on Line 901 cannot protect an insulated steel pipeline should the coating (tape wrap over insulation) become compromised."  Accordingly, Plains violated 49 C.F.R. §195.452(b)(6), which required pipeline operators to follow industry practice.  *See* ¶¶285-292, *supra*.

(iii)   Plains violated industry practices and 49 C.F.R. §195.452(b)(6) by failing to install automatic shutoff valves on Lines 901 and 903 and was the only pipeline operator in Santa Barbara county for failing to do so.  Plains' failure was in contravention of industry practice and violated 49 C.F.R. §195.452(b)(6), which required pipeline operators to follow industry practice.  *See* ¶¶316-317, *supra*.

(iv)    Plains failed to comply with 49 C.F.R. §195.452(b)(6) since at least June 1 and 19, 2007, when the Company instructed the ILI vendor to ignore metal loss anomalies 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 257 anomalies found in the 2007 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6), which required pipeline operators to follow industry practice.  *See* ¶¶218-220, *supra*.

(v)     Plains failed to comply with 49 C.F.R. §195.563(a) since at least 2008, when the company removed 2,120 feet of Line 901 from cathodic protection, when the regulation required that "each buried or submerged pipeline" constructed after March 1970 "must have cathodic protection."  *See* ¶285, *supra*.

(vi)    Plains failed to comply with 49 C.F.R. §195.591 since at least 2008, when the Company completed excavations of anomalies based on the 2007 ILI, had taken their actual measurements, and failed to share the field measurement data with its ILI vendor to allow for the calibration of the ILI tool.  The failure to close the loop with the ILI vendor violated NACE RP0102, and 49 C.F.R. §195.591 required operators using ILIs to comply with NACE SP0102.  *See* ¶¶215-216, 220, *supra*.

(vii)   Plains also failed to comply with 49 C.F.R. §195.591 by violating API 1163 when thirteen excavations completed in 2008 showed that the 2007 ILI for Line 901 was within +/- 10% only 33% of the time. The tool accuracy was not within stated specification of +/- 10%, 80% of the time and violated API 1163, and 49 C.F.R. §195.591 required operators using ILIs to comply with API 1163.  *See* ¶¶216-217, 229, *supra*.

(viii)   Plains failed to comply with regulations concerning in-line inspections, repairs, and cathodic protections as evidence by the supporting materials for the filing and certification of the annual Integrity Management Performance Reports to PHMSA for 2008-2012, including the in-line inspection results, the dig reports, and the mileage of pipelines cathodically protected and cathodically unprotected that showed the ILI drastically understated actual corrosion, degraded coating, and the removal of portions of Line 901 from cathodic protection.  *See* ¶¶228, 271, 302, *supra.*

(ix)   Plains violated 49 C.F.R. §§195.452(f) and (g) as indicated in PHMSA's letter to Nerbonne dated March 4, 2009.  Plains failed to specify an approach to handling the ILI tool tolerances in its integrity management program. Plains must modify its process for validating ILI results to incorporate the known ILI "under-call" bias and account for the ILI tool's uncertainty in its remediation of metal loss conditions.  These inadequacies violated 49 C.F.R. §195.452(f), which required an operator "must include, at a minimum" eight elements in its integrity management program, including "an analysis that integrates all available information about the integrity of the entire pipeline" and referenced 49 C.F.R. §195.452(g).   The information analysis regulation, 49 C.F.R. §195.452(g), required that "an operator must analyze all information about the integrity of the pipeline" in conducting its periodic evaluation, including "data gathered through the integrity assessment required under this section."  *See* §V.E.1. and ¶227, *supra.*

(x)   Plains violated 49 C.F.R. §§195.585(a) and (b) as indicated in PHMSA's letter to Nerbonne dated March 4, 2009. Plains failed to provide guidance on "specific composite repairs methods that are approved for use" and to provide procedures to follow when making repairs on corroded pipes in its Operations and Maintenance Manual.  49 C.F.R. §§195.585(a) and (b) required that a pipeline operator with a generally corroded pipe or one with localized corrosion pitting must replace or repair the pipe, or lower the maximum operating pressure.  Repair must be completed using "a method that reliable engineering tests and analyses show can permanently restore the serviceability of the pipe." *See* §V.E.1. and ¶268, *supra.*

(xi)   Plains violated 49 C.F.R. §195.561 as indicated in PHMSA's letter to Nerbonne dated March 4, 2009. Plains failed to establish procedures for pipeline coating inspection in its O&M [Operation and Maintenance] manual. 49 C.F.R. §195.561 mandated that pipeline operators "must repair any coating damage discovered" as 49 C.F.R. §195.557 required that "each buried or submerged pipeline must have an external coating for external coating control." *See* §V.E.1. and ¶268, *supra.*

(xii)   Plains violated 49 C.F.R. §195.573 and NACE SP 0169 Section 10.1.1.3 as indicated in PHMSA's letter to Nerbonne dated March 4, 2009.  Plains failed to show how the close interval survey results would be reviewed, how data collected in the field would be used to quality check the close interval survey results, and how inconsistencies between CIS data and field observations would be handled. NACE 10.1.1.3 required, among other things, the assessment of the effectiveness of the cathodic protection system, determination of areas of inadequate protection levels, and identification of areas likely to be affected adversely by environmental

conditions.  Plains sought to monitor the cathodic protection system using close interval surveys, but failed to identify how the results would analyzed to determine effectiveness.  According to 49 C.F.R. §195.573, pipeline operators must "[i]dentify . . . the circumstances in which a close-interval survey or comparable technology is practicable and necessary to accomplish the objectives of paragraph 10.1.1.3 of NACE SP 0169."  *See* §V.E.1. and ¶300, *supra*.

(xiii)   Plains violated 49 C.F.R. §195.559 as indicated in PHMSA's letter to Nerbonne dated March 4, 2009.  Plains' failed to provide coating standards for transition coating used in repairs in its O&M [Operation and Maintenance] manual in violation of 49 C.F.R. §195.559, which established the minimum standards for "coating materials for external corrosion control." *See* §V.E.1. and ¶291, *supra*.

(xiv)   Plains failed to comply with 49 C.F.R. §195.452(b)(6) on July 3, 2012, when the Company instructed the ILI vendor to ignore metal loss anomalies 15% or less in determining the size of the corrosion anomaly clusters, resulting in the vendor ignoring the vast majority of 1,241 anomalies found in the 2012 ILI for Line 901 and the underestimation of corrosion size.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6), which required pipeline operators to follow industry practice.  *See* ¶¶218-220, *supra*.

(xv)   Plains violated 49 C.F.R. §§195.452(b)(5), (g), (h)(1), and Plains' integrity management program section 9.2.2 on September 24, 2012, when Plains' corrosion growth assessment report for repair decisions, based on the results of the 2012 ILI, disregarded metal losses from previous assessments, such as the 2007 ILI, and ignored the ILI tool's inaccuracy and uncertainty in its decision process for repairs.  Plains' integrity management program section 9.2.2 required that the corrosion growth rates must be based on estimates "from multiple ILI runs, field observations, and observed historical growth rates."  Plains disregarded two of the three elements dictated by its own plan, violating 49 C.F.R. §§195.452(b)(5), which required operators to "implement and follow" the integrity management program.  In addition, §195.452(h)(1) mandated that "an operator must take prompt action to address all anomalous conditions the operator discovers through the integrity assessment or information analysis."  The information analysis regulation, 49 C.F.R. §195.452(g), required that "an operator must analyze all information about the integrity of the pipeline" in conducting its periodic evaluation, including "data gathered through the integrity assessment required under this section." *See* ¶¶250, 272, *supra*.

(xvi)   Plains violated 49 C.F.R. §§195.557, 195.559, and 195.573(e) when the final ILI report for Line 901 dated September 24, 2012 indicated degraded coating with greater than 10% metal loss anomalies increasing from 386 in 2007 to 1,578 in 2012 despite the use of cathodic protection.  Despite the 2006 NACE publication's warning concerning the ineffectiveness of Plains cathodic protection on insulated pipelines, Plains failed to mitigate the problem, resulting in "inconsistency between the CP level and the external metal loss" due to degrade coating.  49 C.F.R. §195.557, which requires that "each buried or submerged pipeline must have an external coating for external corrosion control if the

pipeline is – (a) constructed" after March 1970.  Under 49 C.F.R. §195.559, the coating material must "(a) [b]e designed to mitigate corrosion of the buried or submerged pipeline; (b) [h]ave sufficient adhesion to the metal surface to prevent under film migration of moisture; . . . (e) [s]upport any supplemental cathodic protection; and (f) [i]f the coating is an insulating type, have low moisture absorption and provide high electrical resistance."  49 C.F.R. §195.573(e) states that the pipeline operator "must correct any identified deficiency in corrosion control."  *See* ¶¶293-295, *supra.*

(xvii)   Plains violated 49 C.F.R. §195.452(j)(3) and (l) on December 31, 2012 when it Plains' arbitrarily moved the ILI inspection interval to 3 years with no calculations, assumptions, or justifications in a one-page assessment plan. According to 49 C.F.R. §195.452(j)(3), "[a]n operator must base the assessment intervals on the risk the line pipe poses to the high consequence area to determine the priority for assessing the pipeline segments. An operator must establish the assessment intervals based on the factors specified in paragraph (e) of this section, the analysis of the results from the last integrity assessment, and the information analysis required by paragraph (g) of this section." Paragraph (e) listed nine risk factors and paragraph (g) required, among other things, "data gathered through the integrity assessment required under this section," "[d]ata gathered in conjunction with other inspections, tests, surveillance and patrols," and "[i]nformation about how a failure would affect the high consequence area, such as location of the water intake." None of these variables were assessed in the one-page assessment plan.  In addition, 49 C.F.R. §195.452(l) required that, for the useful life of the pipeline, an operator must maintain, at a minimum, "[d]ocuments to support the decisions and analyses, including any modifications, justifications, deviations and determinations made, variances, and actions taken, to implement and evaluate each element of the integrity management program listed in paragraph (f) of this section." Paragraph (f) included pipeline assessment interval.  *See* ¶262, *supra.*

398.    In addition to the information set forth above, prior to making the materially false and misleading statements in (1) the PAGP IPO's Form S-1 on July 29, 2013, (2) PAA's 2Q13 Form 10-Q on August 8, 2013, (3) the August 2013 Notes Offering Materials on August 8, 9, and 12, 2013, (4) Amendment No. 1 to PAGP IPO's Form S-1 on September 6, 2013, (5) Amendment No. 2 to PAGP IPO's Form S-1 on September 26, 2013, (6) Amendment No. 3 to PAGP IPO's Form S-1 on October 2, 2013, and (7) Amendment No. 4 to PAGP IPO's Form S-1 on October 7, 2013, Armstrong, Pefanis, Swanson, and McGee received additional information set forth below concerning Plains' material non-compliance to laws and regulations for disclosure purposes:

(i)   Plains failed to comply with 49 C.F.R. §195.452(b)(6) on April 26, 2013, when the Company instructed the ILI vendor to ignore metal loss anomalies 15% or less

- 180 -

in determining the size of the corrosion anomaly clusters, resulting in the underestimation of corrosion size for Line 903.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6), which required pipeline operators to follow industry practice.  *See* ¶¶218-220, *supra.*

(ii)     Plains violated 49 C.F.R. §§195.557, 195.559, and 195.573(e) when the April 26, 2013 ILI survey for Line 903 indicated degraded coating with 99 metal loss anomalies for the 38-mile segment between the Gaviota and Sisquoc Stations despite the use of cathodic protection.  Despite the 2006 NACE publication's warning concerning the ineffectiveness of Plains cathodic protection on insulated pipelines, Plains failed to mitigate the problem, resulting in "inconsistency between the CP level and the external metal loss" due to degrade coating.  49 C.F.R. §195.557, which requires that "each buried or submerged pipeline must have an external coating for external corrosion control if the pipeline is – (a) constructed" after March 1970.  Under 49 C.F.R. §195.559, the coating material must "(a) [b]e designed to mitigate corrosion of the buried or submerged pipeline; (b) [h]ave sufficient adhesion to the metal surface to prevent under film migration of moisture; . . . (e) [s]upport any supplemental cathodic protection; and (f) [i]f the coating is an insulating type, have low moisture absorption and provide high electrical resistance."  49 C.F.R. §195.573(e) states that the pipeline operator "must correct any identified deficiency in corrosion control."  *See* ¶¶293-295, *supra.*

(iii)    Plains failed to comply with 49 C.F.R. §195.452(b)(6) on June 12, 2013, when the Company instructed the ILI vendor to ignore metal loss anomalies 15% or less in determining the size of the corrosion anomaly clusters, resulting in the underestimation of corrosion size for Line 903.  This practice violated API 1160 and 49 C.F.R. §195.452(b)(6), which required pipeline operators to follow industry practice.  *See* ¶¶218-220, *supra.*

(iv)    Plains violated 49 C.F.R. §§195.557, 195.559, and 195.573(e) when the June 12, 2013 ILI survey for Line 903 indicated degraded coating with vast numbers of anomalies consistent with general corrosion despite the use of cathodic protection.  Despite the 2006 NACE publication's warning concerning the ineffectiveness of Plains cathodic protection on insulated pipelines, Plains failed to mitigate the problem, resulting in "inconsistency between the CP level and the external metal loss" due to degrade coating.  49 C.F.R. §195.557, which requires that "each buried or submerged pipeline must have an external coating for external corrosion control if the pipeline is – (a) constructed" after March 1970.  Under 49 C.F.R. §195.559, the coating material must "(a) [b]e designed to mitigate corrosion of the buried or submerged pipeline; (b) [h]ave sufficient adhesion to the metal surface to prevent under film migration of moisture; . . . (e) [s]upport any supplemental cathodic protection; and (f) [i]f the coating is an insulating type, have low moisture absorption and provide high electrical resistance."  49 C.F.R. §195.573(e) states that the pipeline operator "must correct any identified deficiency in corrosion control."  *See* ¶¶293-295, *supra.*

- 181 -

(v)    Plains failed to comply with regulations concerning in-line inspections, repairs, and cathodic protections as evidence by the supporting materials for the filing and certification of the annual Integrity Management Performance Report to PHMSA on June 12, 2013, including the in-line inspection results, the dig reports, and the mileage of pipelines cathodically protected and cathodically unprotected that showed the ILI drastically understated actual corrosion, degraded coating, and the removal of portions of Line 901 from cathodic protection. *See* ¶¶228, 271, 302, *supra*.

399.    In addition to the information set forth above, prior to making the materially false and misleading statements in (1) the PAGP IPO's prospectus on October 16, 2013, (2) PAGP IPO's Form 8-K underwriting agreement on October 21, 2013, (3) PAA's 3Q13 Form 10-Q on November 6, 2013, (4) PAGP's 3Q13 Form 10-Q on November 22, 2013, and (5) the continuous posting of the false statements on the Plains' website, Armstrong, Pefanis, Swanson, and McGee received additional information set forth below concerning Plains' material non-compliance to laws and regulations for disclosure purposes:

(i)    Plains failed to comply with 49 C.F.R. §195.591 by violating API 1163 when 41 excavations completed on October 3, 2013 showed that the 2012 ILI for Line 901 was inaccurate 42% of the time. The tool accuracy was not within stated specification of +/- 10%, 80% of the time and violated API 1163, and 49 C.F.R. §195.591 required operators using ILIs to comply with API 1163. *See* ¶¶216-217, 220, 229, *supra*.

(ii)    Plains failed to comply with 49 C.F.R. §195.591 on October 3, 2013, when the Company completed excavations of anomalies based on the 2012 ILI for Line 901, had taken their actual measurements, and failed to share the field measurement data with its ILI vendor to allow for the calibration of the ILI tool. The failure to close the loop with the ILI vendor violated NACE RP0102, and 49 C.F.R. §195.591 required operators using ILIs to comply with NACE SP0102. *See* ¶¶215-216, 220, *supra*.

(iii)    Plains also failed to comply with 49 C.F.R. §195.591 by violating API 1163 when 41 excavations completed on October 3, 2013 showed that the 2012 ILI for Line 901 was inaccurate 42% of the time. The tool accuracy was not within stated specification of +/- 10%, 80% of the time and violated API 1163, and 49 C.F.R. §195.591 required operators using ILIs to comply with API 1163. *See* ¶¶216-217, 220, 229, *supra*.

(iv)    Plains failed to comply with 49 C.F.R. §195.452(g), (h)(1), (h)(4)(iii), h(4)(iv) when it conducted patchwork repairs or left ten anomalies with 40% or greater metal loss unrepaired when the 41 excavations relating to the 2012 ILI for Line

- 182 -

901 were completed on October 3, 2013.  Plains integrity management program added 10% metal loss to all anomalies based on the stated accuracy of the ILI tool of +/- 10%, 80% of the time, even though Plains knew that the true accuracy of the tool was only +/-10%, 33% of the time.  Even without adjusting for the tool uncertainty, Plains should have repaired the ten anomalies with 40% or greater metal loss after adding 10% metal loss adjustment for the ILI tool.  According to 49 C.F.R. §195.452(h)(4)(iii), "an operator must schedule evaluation and remediation of the following within 180 days of discovery of the condition: . . . (E) an area of general corrosion with a predicted metal loss greater than 50% of nominal wall."  Notwithstanding the specific 50% requirement, 49 C.F.R. §195.452(h)(1) also mandates that "[a]n operator must take prompt action to address all anomalous conditions the operator discovered through the integrity assessment or information analysis."  In addition, 49 C.F.R. §195.452(h)(4)(iv) again emphasized that "In addition to the conditions listed in paragraphs (h)(4)(i) through (iii) of this section, an operator must evaluate any condition identified by an integrity assessment or information analysis that could impair the integrity of the pipeline, and as appropriate, schedule the condition for remediation." 49 C.F.R. §195.452(g) (governing information analysis) requires that "an operator must analyze all available information about the integrity of the entire pipeline and the consequences of a failure."  *See* ¶¶216-217, 229, 247-252, *supra.*

(v)     Plains failed to comply with 49 C.F.R. §195.585 when it knew, based on the results of the ILIs in 2007 and 2012, that Lines 901 and 903 were operating with corrosion that measured as high as 67% even before correcting for the "under-call" bias.  Plains also knew that this corrosion was getting worse as time went by but continued to operate the lines at excessive pressure.  For Lines 901 and 903, which were infested with general corrosion, 49 C.F.R. §195.585 requires that "[i]f you find pipe so generally corroded that the remaining wall thickness is less than that required for the maximum operating pressure of the pipeline, you must replace the pipe.  However, you need not replace the pipe if you – (1) Reduce the maximum operating pressure commensurate with the strength of the pipe needed for serviceability based on actual remaining wall thickness; or (2) Repair the pipe by a method that reliable engineering tests and analyses show can permanently restore the serviceability of the pipe."  Plains opted not to replace the pipe despite age of the pipe, the proliferating corrosion, and the pipe's metal loss.  Instead, it conducted patchwork repairs and continued to operate the lines at excessive pressure.  *See* ¶¶251-252, *supra.*

(vi)    Plains failed to comply with 49 C.F.R. §§195.561(b) and 195.569 when dig reports from the completion of excavations on October 3, 2013 included for dig 13, which revealed degraded coating, the failure to repair the degraded coating, and the need to investigate longitudinally and circumferentially for further remedial measures.  When excavation was conducted on May 13, 2013, six feet from the rupture site, it failed to comply with 49 C.F.R. §195.569's requirement that "[w]henever you have knowledge that any portion of a buried pipeline is exposed, you must examine the exposed portion for evidence of external corrosion if the pipe is bare, or if the coating is deteriorated.  If you find external corrosion requiring corrective action under § 195.585, you must investigate

- 183 -

circumferentially and longitudinally beyond the exposed portion (by visual examination, indirect method, or both) to determine whether additional corrosion requiring remedial action exists in the vicinity of the exposed portion." Further, 49 C.F.R. §195.561(b) required that the pipeline operator "must repair any coating damage discovered." *See* ¶¶253, 262, *supra*.

(vii)   Plains violated 49 C.F.R. §195.452(f) and (g) when, during the course of the inspections, which were completed on October 4, 2013, PHMSA again raised the concern to Plains that its integrity management procedures failed to address how differences in anomalies as directly measured in the fields and as sized by ILI tool would be handled.  This deficiency violated 49 C.F.R. §195.452(f), which required an operator "must include, at a minimum" eight elements in its integrity management program, including "an analysis that integrates all available information about the integrity of the entire pipeline" and referenced 49 C.F.R. §195.452(g).   The information analysis regulation, 49 C.F.R. §195.452(g), required that "an operator must analyze all information about the integrity of the pipeline" in conducting its periodic evaluation, including "data gathered through the integrity assessment required under this section." *See* §V.E.5. and ¶227.

(viii)  Plains failed to comply with 49 C.F.R. §195.452(b)(5), (i), (j), and (l), and section 11 of its integrity management program.  PHMSA completed its inspections on October 4, 2013, and during the course of its inspections, Plains could not provide any evidence of conducting preventive and mitigative evaluations relating to Line 903 or justifications for not conducting the evaluations during the inspections. Plains further admitted that it had no record of conducting the required preventive and mitigative evaluations in an email to PHMSA on March 24, 2014. 49 C.F.R. §195.452(i) required that "[a]n operator must take measures to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area."  Further, 49 C.F.R. §195.492(j) required that "[a]n operator must conduct a periodic evaluation as frequently as needed to assure pipeline integrity. . . . The evaluation must consider . . . preventive and mitigative actions (paragraph (h) and (i) of this section)."  Likewise, Plains' Integrity Management Program also requires that "P&M [preventive and mitigative] evaluations of assessments will occur within 15 months of the receipt of the final [ILI] reports [to allow] time for reviewing the assessment results and investigating the worst anomalies to develop confidence in the validity of the assessment and to understand the pipeline segment's condition." In turn, 49 C.F.R. §195.452(b)(5) required Plains to follow the integrity management program.  Finally, with respect to maintaining records, 49 C.F.R. §195.452(l) required that, for the useful life of a pipeline, an operator must maintain records of any "modifications, justifications, deviations, and determinations made" with respect to the "identification of preventive and mitigative measures to protect the high consequence area" as required in 49 C.F.R. §195.452(f). *See* ¶¶260-261, *supra*.

(ix)    By its failure to conduct preventive and mitigative evaluations, Plains failed to comply with 49 C.F.R. §195.452(i)(1), (2), and (3).  In explaining "[w]hat preventive and mitigative measures must an operator take to protect the high consequence area," 49 C.F.R. §195.452(i)(2) required the consideration of "all

relevant risk factors, including, but not limited to (i) . . . drainage systems such as small streams and other smaller waterways that could act as a conduit to the high consequence area." For leak detection, 49 C.F.R. §195.452(i)(3) stated that "[a]n operator must evaluate the capability of its leak detection means and modify, as necessary, to protect the high consequence area." By its failure to conduct preventive and mitigative evaluations, Plains failed to account for the presence of drainage system acting as a conduit to the high consequence area in its decision to postpone the upgrade its leak detection system and assigned it low-to-medium priority. Similarly, for spill response, 49 C.F.R. §195.452(i)(1) stated that preventive and mitigative measures included "conducting a risk analysis of the pipeline segment to identify additional actions to enhance public safety or environmental protection," including "providing additional training to personnel on response procedures." By failing to conduct preventive and mitigative evaluations, Plains failed to account for the presence of culverts acting as a conduit to the high consequence area. As a result, its spill response personnel did not have the training or the resources to take effective actions on the day of the spill with no sandbags and just a shovel to stop the flow of oil into the culvert. *See* ¶¶314-315, *supra.*

(x)    Plains failed to comply with 49 C.F.R. §195.403(b). PHMSA completed its inspections on October 4, 2013, and during the course of its inspections, Plains could not provide any evidence of its annual review of emergency response training or its implementation any appropriate changes to the emergency response training program as necessary to ensure that it is effective. These deficiencies were in violation of 49 C.F.R. §195.403(b). *See* ¶351, *supra.*

(xi)    Plains failed to comply with 49 C.F.R. §§195.403(c) and 194.117. PHMSA completed its inspections on October 4, 2013, and during the course of its inspections, Plains could not provide any evidence that its emergency response supervisors were trained to maintain a thorough knowledge of the emergency response procedure for which they were responsible. According to 49 C.F.R. §194.117 applicable to pipelines in areas that "can be expected to cause significant and substantial harm to the environment in the event of a discharge of oil into or on the navigable waters," the pipeline operator must "conduct training to ensure that all personnel know their responsibilities under the response plan." Further, 49 C.F.R. §195.403(c) required the emergency response supervisors to be trained to maintain a thorough knowledge of the emergency response procedure for which they were responsible. *See* ¶351, *supra.*

(xii)    Plains failed to comply with 49 C.F.R. §195.591 by violating API 1163 when the 2013 ILI on Line 903 calculated only 66% metal loss corrosion when actual field measurement from excavation of the anomaly revealed actual metal loss was 93%. The tool accuracy was not within stated specification and violated API 1163, and 49 C.F.R. §195.591 required operators using ILIs to comply with API 1163. *See* ¶¶216-217, 220, *supra.*

- 185 -

400.     In addition to the information set forth above, prior to making the materially false and misleading statements in (1) PAA's 2013 Form 10-K on February 28, 2014, (2) PAGP's 2013 Form 10-K on March 12, 2014, (3) the April 2014 Notes Offering Materials on April 15, 16, and 18, 2014, (4) PAA's 1Q14 Form 10-Q on May 9, 2014, (5) PAGP's 1Q14 Form 10-Q on May 13, 2014, (6) the Code of Conduct as incorporated into PAA and PAGP's Form 10-Ks; and (7) the continuous posting of the false statements on the Plains' website; Armstrong, Pefanis, Swanson, and McGee received additional information set forth below concerning Plains' material non-compliance to laws and regulations for disclosure purposes:

(i)      Plains failed to comply with 49 C.F.R. §195.452(b)(5), (i), and (j), and section 11 of its integrity management program by not conducting preventive and mitigative evaluations for Line 901 by the required deadline of December 24, 2013.  49 C.F.R. §195.452(i) required that "[a]n operator must take measures to prevent and mitigate the consequences of a pipeline failure that could affect a high consequence area."  Further, 49 C.F.R. §195.492(j) required that "[a]n operator must conduct a periodic evaluation as frequently as needed to assure pipeline integrity. . . .  The evaluation must consider . . . preventive and mitigative actions (paragraph (h) and (i) of this section)."  Likewise, Plains' Integrity Management Program also requires that "P&M [preventive and mitigative] evaluations of assessments will occur within 15 months of the receipt of the final [ILI] reports [to allow] time for reviewing the assessment results and investigating the worst anomalies to develop confidence in the validity of the assessment and to understand the pipeline segment's condition." In turn, 49 C.F.R. §195.452(b)(5) required Plains to follow the integrity management program.  *See* ¶¶261-261, *supra.*

(ii)     Plains failed to comply with 49 C.F.R. §195.446(j)(2) as indicated in PHMSA's letter to Valenzuela dated December 24, 2013 concerning PHMSA's finding that Plains changed critical alarms type description and response priority without documenting the changes for PHMSA's review.  49 C.F.R. §195.446(j)(2) required that all deviations from procedure that affect the safe operation of the pipeline be provided to PHMSA for review during its inspection.  *See* §V.E.2. and ¶323, *supra.*

(iii)    Plains failed to comply with 49 C.F.R. §195.446(h) as indicated in PHMSA's letter to Valenzuela dated December 24, 2013 concerning Plains' failure to conduct annual review of its controller training program.  49 C.F.R. §195.446(h) required that "[e]ach operator must establish a controller training program and review the training program content to identify potential improvements at least once each calendar year, but at intervals not to exceed 15 months."  *See* §V.E.2. and ¶324, *supra.*

- 186 -

401.    In addition to the information set forth above, prior to making the materially false and misleading statements in (1) PAA's 2Q14 Form 10-Q on August 8, 2014, (2) PAGP's 2Q14 Form 10-Q on August 12, 2014, (3) the September 2014 Notes Offering Materials on September 2, 4, and 5, 2014, (4) PAA and PAGP's 3Q14 Form 10-Qs on November 7, 2014, (5) the Plains Holdings Secondary Offering Materials on November 6, 12 and 13, 2014, (6) the December 2014 Notes Offering Materials on December 2, 3, and 4, 2014, (7) PAA and PAGP's 2014 Form 10-Ks on February 25, 2015, (8) the Plains Offering Materials on February 25 and 27, 2015 and March 2, 2015, (9) PAA and PAGP's 1Q15 Form 10-Qs on May 8, 2015; (10) the Code of Conduct as incorporated into PAA and PAGP's Form 10-Ks; and (11) the continuous posting of the false statements on the Plains' website, Armstrong, Pefanis, Swanson, and McGee received additional information set forth below concerning Plains' material non-compliance to laws and regulations for disclosure purposes:

- Plains failed to comply with regulations concerning in-line inspections, repairs, and cathodic protections as evidence by the supporting materials for the filing and certification of the annual Integrity Management Performance Report to PHMSA on June 11, 2014, including the in-line inspection results, the dig reports, and the mileage of pipelines cathodically protected and cathodically unprotected that showed the ILI drastically understated actual corrosion, degraded coating, and the removal of portions of Line 901 from cathodic protection. *See* ¶¶228, 271, 302, *supra.*

402.    These pervasive violations of almost every aspect of the Hazardous Liquid Pipeline Safety Regulations, 49 C.F.R. part 195, and Liquid Integrity Management Rule, 49 C.F.R. §195.452, were not unique to Lines 901 and 903, but persisted throughout the Company's pipeline systems nationwide. *See* §V.F., *supra.*

403.    **Scienter:** By virtue of their receipt of information set forth in ¶¶397-402 above, the facts set forth below and the other facts set forth herein, it may be strongly inferred that defendants knew or recklessly disregarded that the statements in ¶¶378-388 were materially misleading to investors.

- 187 -

404. The Company received multiple violation notices from PHMSA during the Class Period demonstrating that in fact, the Company was **_not_** in substantial compliance. For Plains, its legal compliance statements were in direct conflict with an unbroken chain of legal violations cited by PHMSA and the pipeline ultimately ruptured. The Notices of Probable Violations, in particular, are only issued once "inspection or some other source indicates that a violation of pipeline safety regulations has occurred." Even if Plains could eventually rebut PHMSA's finding – which it could not as evidenced by their continual and persistent violations on the same issues even after PHMSA's warnings – the audit committee's compliance oversight responsibilities included "[d]iscuss[ing] with the General Counsel **_legal matters that may_** (a) have a material impact on PAGP's or PAA's financial statements or (b) result in material non-compliance by PAGP, PAA, GP LLC or the Company with legal or regulatory requirements."

405. The in-line inspection results, the related excavations for repairs, and the measurements demonstrating that Plains' in-line inspections drastically understated actual corrosion all failed to comply with the requirements of the Hazardous Pipeline Regulations and Liquid Integrity Management Rule were provided to senior executive officers of Plains who reviewed them and certified their accuracy as required by law. *See* §V.J., *supra*.

406. Furthermore, the numerous material failures to comply with applicable laws and regulations detailed above relating to and impacting HCAs were "recorded, processed, summarized, and communicated" to Armstrong, Swanson, Pefanis and McGee as stated in the underwriting agreements, Form 10-Ks, and Form 10-Qs filed by PAA and PAGP during the Class Period. *See* §V.G., *supra*.

407. Armstrong was at all times the "principal executive officer" as referred to in the underwriting agreements. By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Armstrong's role as Chairman of the Board

- 188 -

receiving reports of potential and actual regulatory non-compliance from the audit committee (*see* §V.H., *supra*), (3) Armstrong's SOX certification (*see* §V.I., *supra*), and (4) Armstrong's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to and impacting HCAs, was recorded, processed, summarized and communicated to Armstrong.

408.    Swanson was at all times the "principal financial officer" as referred to in the underwriting agreements.  By virtue of the (1) representations in the underwriting agreements, the Form 10-K, and Form 10-Qs (*see* §V.G., *supra*), (2) Swanson's SOX certification (*see* §V.I., *supra*), and (3) Swanson's authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct (*see* §V.K., *supra*), all material information concerning the Partnership and its subsidiaries, including the numerous material failures to comply with applicable laws and regulations detailed above relating to and impacting HCAs, was recorded, processed, summarized and communicated to Swanson.

409.    Pefanis was at all times the President and Chief Operating Officer.  Pefanis was the "appropriate officer[] of GP LLC" and "management" with responsibility for overseeing Plains' operations, including pipeline safety and integrity with Gorman, Nerbonne, and Valenzuela reporting to him.  *See* §V.H., *supra*.  In addition, Pefanis had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*. Therefore, all material information concerning Plains' operations, including the numerous material failures to comply with applicable laws and regulations detailed above relating to and impacting HCAs, was recorded, processed, summarized and communicated to Pefanis.  *See* §V.G., *supra*.

410.    McGee was at all times the General Counsel and Valenzuela reported to him.  McGee was the "appropriate officer[] of GP LLC" with responsibility for overseeing Plains' legal department and who repeatedly stated without qualification that none of Plains' entities has directly or indirectly violated any environmental safety, health or similar law or regulations.  He also had authority to waive deviations from pipeline safety and environmental protection policies as stated in the Code of Conduct.  *See* §V.K., *supra*.  In addition, as required by the audit committee charter, he discussed with the committee all potential and actual regulatory non-compliance that could "result in material non-compliance" by PAA and PAGP, including the numerous material failures to comply with applicable laws and regulations detailed above relating to and impacting HCAs.  *See* §V.H., *supra*.

## VII.    LOSS CAUSATION

411.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused plaintiffs' and class members' economic loss.  Plaintiffs' claims for securities fraud are asserted under the fraud on the market theory of reliance.  *See* §IX., *infra*.  The market prices of Plains Common Units and Plains Holdings Class A Shares, both actively traded on the NYSE, were artificially inflated by the false and misleading statements and material omissions complained of herein, including misleading statements and omissions concerning Plains' compliance with federal, state and local regulations governing the maintenance, monitoring and of the integrity of Plains' pipelines and its spill response procedures.  Instead of truthfully disclosing during the Class Period that Plains' pipelines, including Lines 901 and 903, were hazardously corroded, highly vulnerable to spill, and that the Company lacked required monitoring and spill response procedures and protocols, defendants falsely reassured investors concerning the Company's business and operational risks.  Plaintiffs were unable to evaluate the concealed risks, and, therefore, unable to choose whether or not to undertake those risks.  Further, once Line 901 ruptured and investors learned of the Santa

- 190 -

Barbara spill, the Company misrepresented the severity and extent of the spill and its impact on the Company's business.

412.    These false and misleading statements had the intended effect and caused Plains and Plains Holdings securities to trade at artificially inflated levels throughout the Class Period.

413.    The Class Period inflation in Plains' stock price was removed when the conditions and risks concealed by defendants' false and misleading statements and omissions, or the financial, regulatory, and operational impacts thereof, were revealed to the market.  The information was disseminated through several partial disclosures that slowly revealed the nature and extent of Plains' disregard for pipeline corrosion, its regulatory violations, defendants' deliberate disregard of regulatory requirements, the severity and extent of the Santa Barbara spill, and the increased costs and reduced revenues that would result from attaining the level of regulatory compliance that defendants falsely claimed Plains had been maintaining during the Class Period.  These disclosures, more particularly described below, removed artificial inflation from Plains Common Units and Plains Holdings Class A Shares, causing economic injury to plaintiffs and other members of the Class.

414.    The corrective impact of the individual disclosures alleged herein was, however, tempered by defendants' continued false and misleading statements about the regulatory compliance and safety of Plains' operations, including their false statements concerning their level of compliance, and the scope and impact of the spill.  These continued misrepresentations maintained the price of Plains Common Units and Plains Holdings Class A Shares at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Plains even after the Santa

Barbara spill, and leading to further price declines that caused additional injury to the Class upon the disclosure of additional information about the true condition of Plains' operations.[16]

415.    The risks and conditions concealed from investors by defendants' fraud reached the market through a series of partial disclosures.  Each of these disclosures revealed some of the risks and conditions concealed by defendants' fraudulent scheme, or the financial, legal, and operational consequences thereof, causing the price of Plains securities to decline, and reducing the extent to which the price of those securities was inflated by defendants' misrepresentations, thereby causing economic injury to plaintiffs and other Class members.

416.    None of the disclosures was sufficient on its own to fully remove the inflation from Plains' stock price, because each only partially revealed the risks and conditions that had been concealed from investors.  In addition, the individual corrective impact of these disclosures was reduced by defendants' contemporaneous false assertions about the cause and scope of the spill.  As a result of these partial corrective disclosures of the truth and the materialization of the risks concealed by defendants' misrepresentations and omissions, the price of Plains Common Units fell over 27%, from $49.59 per unit at the close of trading on May 19, 2015 to $35.95 per unit on August 5, 2015.  Similarly, Plains Holdings' Class A Shares declined dramatically in response to disclosures revealing the truth concerning Plains' operations and the risks it posed, as well as the true size and scope of Santa Barbara oil spill, falling from $29.34 per share on May 19, 2015 to close at $18.73 per share on August 5, 2015.

417.    The disclosures that corrected the market price to eliminate the inflation maintained by defendants' fraud are detailed below.

---

[16]   The inflationary and corrective events identified and described herein are based upon plaintiffs' preliminary analysis, and investigation to date.  Upon further investigation, discovery, and analysis, plaintiffs may alter or amend their theory of damages, including by identifying additional inflationary or corrective events that caused or contributed to the damages claimed in this action.

418.    As described herein, on May 19, 2015, Line 901 ruptured and began spilling thousands of barrels of heavy crude oil into the environmentally sensitive Santa Barbara coastal area. On May 21, 2015, PHMSA issued a Corrective Action order requiring Plains to take corrective actions with respect to Line 901, including shutting down and reviewing the line, testing the line, developing a remedial plan and performing a review of the Company's emergency response plan and training, in order to protect the public, property and the environment from potential hazards caused by the spill.   As described in §V.E., *supra*, the Corrective Action order included preliminary findings concerning the spill and noted that prior inspections of Line 901 had identified a consistent degradation of pipeline integrity.   Following these disclosures, Plains Common Units declined $2.03 per unit, or over 4%, from $49.59 per unit on May 19, 2015 to $47.56 per unit on May 21, 2015 – a significant decline on extraordinarily large trading volume that occurred when the overall S&P 500 actually had a gain.   Likewise, Plains Holdings' Class A Shares declined from $29.34 on May 19, 2015 to $28.55 per share on May 21, 2015, also a significant decline on increased trading volumes.

419.    On June 3, 2015, PHMSA issued an amended Corrective Action Order that revealed that there had been "extensive external corrosion" on Line 901 – and that the regulator had also identified "extensive corrosion" and other deficiencies in adjoining Line 903 – and required Plains to take additional corrective actions, including shutting down Line 903.   *See* §V.E., *supra*.   Following these disclosures, Plains Common Units declined another 4%, from $47.80 per unit on June 2, 2015 to $45.89 per unit on June 4, 2015.   Plains Holdings Class A Shares also fell more than 4% on the news, from $28.06 on June 2, 2015 to $26.86 on June 4, 2015.   In contrast to Plains and Plains Holdings' performance, the S&P 500 had a nominal decline of 0.65% over the same time frame.

420.    On August 5, 2015, defendants disclosed that the spill could actually be 1,000 barrels – approximately 42,000 gallons – larger than previously reported.   Defendants disclosed that the Company's estimate of penalties and fines could be impacted by the difference between the

- 193 -

current and final estimate of the worst case oil release.  Defendants further disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill, and that the Company could be liable for potential criminal violations of the CWA.  In addition, the California Attorney General and the Santa Barbara County District Attorney were investigating the spill for violation of state or local laws.  As the Company was a "responsible party" liable under the Oil Pollution Act, it was subject to "various costs and for natural resource damages under the OPA, and . . . exposed to payment of additional fines, penalties and costs under other applicable federal, state and local laws, statutes and regulations."  Defendants also disclosed for the first time that the spill would cost Plains an estimated $257 million, and that the Company's insurance did not cover all of the costs associated with the spill.  Lost revenue related to the Lines 901 and 903 shutdown was not included in the $257 million estimate, and the Company did not establish a timeline to restart Line 901.  In response to an analyst's question concerning how much of the California and Illinois incidents were incorporated in the transportation segment's cost for the second quarter, Swanson disclosed that $65 million of the $209 million, or 31% of the cost, was attributed to the California spill.

421.   In response to the revelation that the spill could be larger than the Company previously represented, and could trigger criminal sanctions, Plains Common Units fell over 10%, from $40.20 per unit to close at $35.95 per unit on August 5, 2015, eliminating over $1.6 billion in investor value.  In addition, this disclosure caused the price of Plains Holdings Class A shares to decline by $5.65 per share, or 23%.

## VIII.   NO SAFE HARBOR

422.   Plains' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were not meaningful and ineffective to shield

those statements from liability, as defendants knew that the risks warned of through their "safe harbor" warnings has already materialized.

423.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of *Plains* who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE

424.    Plaintiffs are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's and Plains Holdings' stocks traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's and Plains Holdings' stocks; and

(e)    plaintiffs and other members of the Class purchased Plains and Plains Holdings securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

425.    At all relevant times, the market for Plains securities traded in an efficient market for the following reasons, among others:

- 195 -

(a)     since well before the Class Period, Plains securities have been listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     as a regulated issuer, Plains filed periodic public reports with the SEC; and

(c)     Plains regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

426.     At all relevant times, the market for Plains Holdings securities traded in an efficient market for the following reasons, among others:

(a)     since the IPO, the Class A Shares of Plains Holdings have been listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     as a regulated issuer, Plains Holdings filed periodic public reports with the SEC; and

(c)     Plains Holdings regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

427.     A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding Plains' failure to comply with federal, state and local regulations governing the maintenance, monitoring and of the integrity of Plains' pipelines, the condition of Plains' pipelines, and Plains' spill response procedures – information that defendants were obligated to disclose – positive proof of reliance is not a

- 196 -

prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    CLASS ACTION ALLEGATIONS

428.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Plains common stock, Plains Holdings Class A shares, and the Notes Offerings during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

429.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Plains and Plains Holdings each has over $4 billion of securities at issue outstanding, owned by hundreds if not thousands of persons.

430.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether defendants violated the Exchange Act;

(b)    whether defendants violated the Securities Act;

(c)    whether defendants omitted and/or misrepresented material facts;

(d)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)      whether defendants knew or deliberately disregarded that their statements were false and misleading;

(f)      whether the prices of Plains' and Plains Holdings' publicly traded securities were artificially inflated; and

(g)      the extent of damage sustained by Class members and the appropriate measure of damages.

431.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

432.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

433.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.     CLAIMS FOR RELIEF

### COUNT I

**Violations of §10(B) of the Exchange Act and Rule 10b-5**
**Against Plains, Plains Holdings, Armstrong, Pefanis, and Swanson**

434.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

435.    During the Class Period, Plains, Plains Holdings, Armstrong, Pefanis, and Swanson carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (ii) cause plaintiffs and other members of the Class to purchase Plains and Plains Holdings securities at artificially inflated prices.

436.    Plains, Plains Holdings, Armstrong, Pefanis, and Swanson (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of PAA and PAGP securities in an effort to maintain artificially high market prices for PAA and PAGP securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

437.    Plains, Plains Holdings, Armstrong, Pefanis, and Swanson individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and compliance with the law.

438.    During the Class Period, Plains, Plains Holdings, Armstrong, Pefanis, and Swanson issued the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

439.    Plains, Plains Holdings, and Armstrong, Pefanis, and Swanson had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Plains, Plains Holdings, Armstrong, Pefanis, and Swanson engaged in this misconduct to conceal Plains' true operations and legal violations from the investing public and to support the artificially inflated prices of the Plains and Plains Holdings securities.

440.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Plains and Plains Holdings securities.  Plaintiffs and the Class would not have purchased these securities at the prices they paid, or at all, had they

been aware that the market prices for Plains and Plains Holdings' securities had been artificially inflated by Plains, Plains Holdings, Armstrong, Pefanis, and Swanson' fraudulent course of conduct.

441.    As a direct and proximate result of the Plains, Plains Holdings, Armstrong, Pefanis, and Swanson's wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

442.    By virtue of the foregoing, Plains, Plains Holdings, Armstrong, Pefanis, and Swanson violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violations of §20(a) of the Exchange Act
### Against Holdings LLC, Plains Holdings,
### and the Officer Defendants ("20(a) Defendants")

443.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

444.    Holdings LLC, Plains Holdings and the Officer Defendants acted as controlling persons of Plains within the meaning of §20(a) of the Exchange Act as alleged herein.  Holdings LLC and the Officer Defendants acted as controlling person of Plains Holdings within the meaning of §20(a) of the Exchange Act.

445.    By virtue of the partnership structure, ownership and contractual rights, awareness of the Plains' and Plains Holdings' operations, their high-level positions and/or intimate knowledge of the false statements filed by Plains and Plains Holdings with the SEC and disseminated to the investing public, the 20(a) Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Plains and Plains Holdings, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

446.    In particular, each of the 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of the Plains and Plains Holdings, and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

447.    As set forth above, Plains, Plains Holdings and the Officer Defendants each violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the 20(a) Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the 20(a) Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Plains and Plains Holdings securities during the Class Period.

### COUNT III

### Violations of §11 of the Securities Act
### Against All Defendants

448.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all members of the Class who purchased or otherwise acquired securities sold pursuant or traceable to the Offerings, and who were damaged thereby.

449.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, plaintiffs do not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §11 claim.

450.    Liability under this Count is predicated on the Officer Defendants' and the Director Defendants' signing of the registration statements and the filings incorporated by reference therein for the Offerings and all defendants' respective participation in the Offerings, which were conducted pursuant to the Offering Materials.  The Offering Materials were false and misleading, contained

- 201 -

untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

451.    Less than one year has elapsed since the time that plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

452.    By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of §11 of the Securities Act to plaintiffs and the other members of the Class pursuant to §11(e).

### COUNT IV

**Violation of §12(a)(2) of the Securities Act
Against Plains, PAA Finance and Plains Holdings**

453.    This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of all members of the Class who purchased or otherwise acquired Plains Holdings Class A Shares, Plains common stock, and Plains senior notes in and/or traceable to the Offerings and who were damaged thereby.

454.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, plaintiffs do not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

455.    By means of the Offering Materials, Plains, PAA Finance and Plains Holdings promoted sold the Plains Holdings' Class A Shares, the Plains shares, and the Plains senior notes to plaintiffs and the other members of the Class.  Plains, PAA Finance and Plains Holdings were

statutory sellers of securities offered and sold pursuant to the Offering Materials and solicited sales thereof for financial gain, as they benefitted financially from the sale of the securities.

456.    The Offering Materials contained untrue statements of material fact, and concealed and failed to disclose material facts.  Plains, PAA Finance and Plains Holdings owed plaintiffs and the other members of the Class who purchased Plains' and Plains Holdings' securities pursuant to the Offering Materials the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Plains, PAA Finance and Plains Holdings, in the exercise of reasonable case, should have known of the misstatements and omissions contained in the Offering Materials, as set forth above.

457.    Plaintiffs and the other Class members did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Documents at the time it acquired the Certificates.

458.    By reason of the conduct alleged herein, Plains, PAA Finance and Plains Holdings violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such violations, plaintiffs and the other members of the Class who purchased the Plains' and Plains Holdings' securities pursuant to the Offering Materials sustained substantial damages in connection with their purchases of the securities.  Accordingly, plaintiffs and the other members of the Class who hold the securities issued pursuant to the Offering Materials have the right to rescind and recover the consideration paid for their shares, with interest thereon, and hereby tender their securities to Plains and Plains Holdings. plaintiffs and the other Class members who have sold their securities seek damages to the extent permitted by law.

1264030_1

## COUNT V

### Violations Of §12(a)(2) of the Securities Act
### Against the Underwriter Defendants

459.    This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of all members of the Class who purchased or otherwise acquired Plains Holdings Class A Shares, Plains common stock, and Plains senior notes in and traceable to the Offerings and who were damaged thereby.

460.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, plaintiffs do not allege that defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

461.    The Underwriter Defendants were statutory sellers of the Offerings issued pursuant to the registration statements.

     (i)      By means of the IPO Offering Materials, the IPO Underwriter Defendants sold over 132 million Class A shares to members of the Class and raised over $2.9 billion.

     (ii)      By means of the Plains Holdings Secondary Offering Materials, the Plains Holdings Secondary Offering Underwriter Defendants sold 69 million Class A shares to members of the Class and raised over $1.7 billion.

     (iii)     By means of the Plains Offering Materials, the Plains Offering Underwriter Defendants sold 21 million common units to members of the Class and raised over $1.05 billion.

     (iv)     By means of the Notes Offering Materials, the Notes Underwriter Defendants sold 3.3 billion of senior notes to members of the Class and raised close to $3.3 billion.

462.    In aggregate, the Offerings generated over $8.9 billion in proceeds, of which over $159 million in fees were received by the Underwriter Defendants.  These defendants were at all relevant times motivated by their own financial interests and sold the offerings by means of the

materially false and misleading Offering Materials.  They acted as sellers, offerors, and/or solicitors of sales of the securities.

463.    The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

464.    Less than one year has elapsed since the time that plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

465.    By reason of the foregoing, the Underwriter Defendants are liable for violations of §12(a)(2) of the Securities Act to plaintiffs and the other members of the Class who purchased securities in or traceable to the Offerings, and who were damaged thereby.

**COUNT VI**

**Violations of §15 of the Securities Act
Against Holdings LLC, Plains Holdings,
the Officer Defendants and the Director Defendants**

466.    This Count is asserted against Holdings LLC, Plains Holdings, the Officer Defendants and the Director Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o, on behalf of plaintiffs and the other members of the Class who purchased or otherwise acquired securities sold pursuant and traceable to the Offerings.

467.    At times relevant hereto, Holdings LLC, Officer Defendants Armstrong, Swanson and Herbold, and Director Defendants Burk, Goyanes, Raymond, Shackouls, Sinnott, and Sutil were controlling persons of Plains Holdings within the meaning of §15 of the Securities Act.

1264030_1

468.    At times relevant hereto, Holdings LLC, Plains Holdings, the Officer Defendants and Director Defendants Goyanes, Petersen, Raymond, Sinnott, Sutil, Symonds, and Temple were controlling persons of Plains within the meaning of §15 of the Securities Act.

469.    Holdings LLC, Plains Holdings, the Officer Defendants and the Director Defendants at times relevant hereto participated in the operation and management of Plains Holdings, and conducted and participated, directly and indirectly, in the conduct of Plains and each entities' business affairs.

470.    The Officer and Director Defendants, as officers and directors of a publicly owned company, had a duty to disseminate accurate and truthful information with respect to Plains and Plains Holdings' financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Plains' and Plains Holdings' general partners, the Officer and Director Defendants were able to, and did, control the contents of the Offering Materials, which contained materially untrue information.

471.    By reason of the foregoing, Holdings LLC, Plains Holdings, the Officer Defendants and the Director Defendants are liable under §15 of the Securities Act, to the same extent that Plains and Plains Holdings is liable under §§11 and 12(a)(2) of the Securities Act, to plaintiffs and the other members of the Class who purchased securities pursuant and/or traceable to the Offerings pursuant to the Registration Statements and/or the applicable Offering Materials.

## XII.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiffs and the other members of the Class damages, including interest;

C.    Awarding plaintiffs reasonable costs and attorneys' fees; and

D.      Awarding plaintiffs such other or further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  May 15, 2017                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                        LUKE O. BROOKS
                                        DARRYL J. ALVARADO
                                        ASHLEY M. PRICE
                                        ANGEL P. LAU


                                        By:    /s/ Luke O. Brooks

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        Lead Counsel for Lead Plaintiff IAM National
                                        Pension Fund and Plaintiff City of Warren Police
                                        and Fire Retirement System

                                        EDISON, MCDOWELL & HETHERINGTON LLP
                                        Andrew M. Edison
                                        Attorney-in-Charge
                                        Southern District Bar No. 18207
                                        andrew.edison@emhllp.com
                                        1001 Fannin Street, Suite 2700
                                        Houston, TX  77002
                                        Telephone:  713/337-5580
                                        713/337-8850 (fax)

                                        Liaison Counsel

                                        KENDALL LAW GROUP, PLLC
                                        JOE KENDALL
                                        JAMIE J. McKEY
                                        3232 McKinney Avenue, Suite 700
                                        Dallas, TX  75204
                                        Telephone:  214-744-3000
                                        214-744-3015 (fax)

                                        Additional Counsel for Plaintiff Ming Liu

- 207 -

1264030_1

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiff City of Warren
Police and Fire Retirement System

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
JEREMY P. ROBINSON
JAKE NACHMANI
1251 Avenue of the Americas, 44th Floor
New York, NY  10020
Telephone:  212/554-1400
212/554-1444 (fax)

Additional Counsel for Plaintiffs Jacksonville Police
and Fire Pension Fund and Police and Fire
Retirement System of the City of Detroit

- 208 -

# EXHIBIT A

## INCORPORATION BY REFERENCE OF THE UNDERWRITING AGREEMENTS

| PLAINS' SECURITIES OFFERINGS | | | | |
|---|---|---|---|---|
| **Offering Material** | **Offering** | **Underwriting Agreement as Part of the Registration Statement** | **Underwriting Agreement Incorporated via Express Incorporation by Reference** | **Underwriting Agreement Incorporated via Future Incorporation by Reference** |
| Form S-3: Shelf Registration Statement and Prospectus filed Sep. 27, 2012 (used for delayed or continuous offerings of all of Plains' publicly offered securities) | August 2013 Notes Offering<br><br>April 2014 Notes Offering<br><br>September 2014 Notes Offering<br><br>December 2014 Notes Offerings<br><br>Plains Offering of common units | Ex. 1.1 Form of Underwriting Agreement | | Form 8-K Underwriting Agreement dated Aug. 8, 2013, filed Aug. 12, 2013<br><br>Form 8-K Underwriting Agreement dated Apr. 15, 2014 filed Apr. 18, 2014<br><br>Form 8-K Underwriting Agreement dated Sep. 2, 2014 filed Sep. 5, 2014<br><br>Form 8-K Underwriting Agreement dated Dec. 2, 2014 filed Dec. 4, 2014<br><br>Form 8-K Underwriting Agreement dated Feb. 25, 2015 filed Mar. 2, 2015 |
| Rule 424B5 Prospectus filed Aug. 9, 2013 | August 2013 Notes Offering (settlement date Aug. 15, 2013) | | | Form 8-K Underwriting Agreement dated Aug. 8, 2013, filed Aug. 12, 2013 |
| Rule 424B5 Prospectus filed Apr. 16, 2014 | April 2014 Notes Offering (settlement date Apr. 23, 2014) | | | Form 8-K Underwriting Agreement dated Apr. 15, 2014 filed Apr. 18, 2014 |

| PLAINS' SECURITIES OFFERINGS | | | | |
|---|---|---|---|---|
| **Offering Material** | **Offering** | **Underwriting Agreement as Part of the Registration Statement** | **Underwriting Agreement Incorporated via Express Incorporation by Reference** | **Underwriting Agreement Incorporated via Future Incorporation by Reference** |
| Rule 424B5 Prospectus filed Sep. 4, 2014 | September 2014 Notes Offering (settlement date Sep. 9, 2014) | | Form 8-K Underwriting Agreement dated Apr. 15, 2014 filed Apr. 18, 2014 | Form 8-K Underwriting Agreement dated Sep. 2, 2014 filed Sep. 5, 2014 |
| Rule 424B5Prospectus filed Dec. 3, 2014 | December 2014 Notes Offerings (settlement date Dec. 9, 2014) | | Form 8-K Underwriting Agreement dated Apr. 15, 2014 filed Apr. 18, 2014<br><br>Form 8-K Underwriting Agreement dated Sep. 2, 2014 filed Sep. 5, 2014 | Form 8-K Underwriting Agreement dated Dec. 2, 2014 filed Dec. 4, 2014 |
| Rule 424B5 Prospectus filed Feb. 27, 2015 | Plains Offering of common units (settlement date Mar. 3, 2015) | | | Form 8-K Underwriting Agreement dated Feb. 25, 2015 filed Mar. 2, 2015 |

- 2 -

| PLAINS HOLDINGS' SECURITIES OFFERINGS | | | | |
|---|---|---|---|---|
| **Offering Material** | **Offering** | **Underwriting Agreement as Part of the Registration Statement** | **Underwriting Agreement Incorporated via Express Incorporation by Reference** | **Underwriting Agreement Incorporated via Future Incorporation by Reference** |
| Form S-1: Registration Statement filed Jul. 29, 2013 | IPO | Ex. 1.1 Form of Underwriting Agreement | | |
| Form S-1/A: Am. No. 1 filed Sep. 6, 2013 | | Ex. 1.1 Form of Underwriting Agreement | | |
| Form S-1/A: Am. No. 2 filed Sep. 26, 2013 | | Ex. 1.1 Form of Underwriting Agreement | | |
| Form S-1/A: Am. No. 3 filed Oct. 2, 2013 | | Ex. 1.1 Form of Underwriting Agreement | | |
| Form S-1/A: Am. No. 4 filed Oct. 7, 2013 | | Ex. 1.1 Form of Underwriting Agreement | | |
| Prospectus filed Oct. 16, 2013 | | | Form 8-K Underwriting Agreement dated Oct. 15, 2013, filed Oct. 21, 2013 | |
| Form S-3: Shelf Registration Statement filed Nov. 6, 2014 | Plains Holdings Secondary Offering (settlement date Nov. 14, 2014) | Ex. 1.1 Form of Underwriting Agreement | | Form 8-K Underwriting Agreement dated Nov. 10, 2014, filed Nov. 13, 2014 |
| Rule 424B1 Prospectus filed Nov. 12, 2014 | | | | Form 8-K Underwriting Agreement dated Nov. 10, 2014, filed Nov. 13, 2014 |

- 3 -

1264030_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 15, 2017.

       *s/ Luke O. Brooks*
       LUKE O. BROOKS

       ROBBINS GELLER RUDMAN
        & DOWD LLP
       655 West Broadway, Suite 1900
       San Diego, CA  92101-8498
       Telephone:  619/231-1058
       619/231-7423 (fax)

       E-mail:  lukeb@rgrdlaw.com

**Mailing Information for a Case 4:15-cv-02404 City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Plains All American Pipeline, L.P.**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Thomas Robert Ajamie**
  tajamie@ajamie.com,dszak@ajamie.com,dmolloy@ajamie.com

- **Darryl J Alvarado**
  dalvarado@rgrdlaw.com

- **Thomas E Bilek**
  tbilek@bileklaw.com,lmank@bileklaw.com

- **Norman J Blears**
  nblears@sidley.com

- **Luke O Brooks**
  lukeb@rgrdlaw.com,lmix@rgrdlaw.com

- **Nicholas E. Chimicles**
  nick@chimicles.com

- **Roger Farrell Claxton**
  roger@claxtonlaw.com

- **Matthew J Dolan**
  mdolan@sidley.com

- **Kimberly M Donaldson Smith**
  kds@chimicles.com

- **Andrew M Edison**
  andrew.edison@emhllp.com,ana.sanchez@emhllp.com

- **William B Federman**
  wbf@federmanlaw.com,ngb@federmanlaw.com,law@federmanlaw.com

- **Mark K Glasser**
  mglasser@sidley.com,nblears@sidley.com,tscuffil@sidley.com,belinda.howard@sidley.com,txefilingnotice@sidley.com,rtallungan@sidley.com,mdolan@sidley.com

- **Roger B Greenberg**
  roger@smglawgroup.com,sam@smglawgroup.com

- **Michael C Holmes**
  mholmes@velaw.com,bgividen@velaw.com,czieminski@velaw.com,pwright@velaw.com,ebrandon@velaw.com,kmccoy@velaw.com,sbishop@velaw.com

- **Jeffrey S Johnston**
  jjohnston@velaw.com,ehenderson@velaw.com

- **Angel P. Lau**
  Alau@rgrdlaw.com,tdevries@rgrdlaw.com

- **Tracy N LeRoy**
  tleroy@sidley.com,belinda.howard@sidley.com,txefilingnotice@sidley.com,efilingnotice@sidley.com,tracy-leroy-8197@ecf.pacerpro.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Ashley M Price**
  aprice@rgrdlaw.com

- **Jeremy P. Robinson**
  jeremy@blbglaw.com

- **Christine Donato Saler**
  cds@chimicles.com

- **Joseph R. Seidman , Jr**
  Seidman@bernlieb.com

- **Gerald H Silk**
  jerry@blbglaw.com

- **Carl E Singley**
  csingley@tlgattorneys.com

- **Thane Tyler Sponsel , III**
  sponsel@smglawgroup.com,sam@smglawgroup.com,claudia@smglawgroup.com

- **Joe H Tucker**
  jtucker@tlgattorneys.com

- **Robin Wechkin**
  rwechkin@sidley.com

- **Craig Eric Zieminski**
  czieminski@velaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Stanley          D Bernstein
Bernstein Liebhard
10 E 40th St
New York, NY 10016

Jeffrey          Haber
Bernstein Liebhard et al
10 East 40th St
New York, NY 10016

Jake             Nachmani
Bernstein Litowitz Berger
1251 Avenue of the Americas
44th Floor
New York, NY 10020
```