**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|   |   |   |
|---|---|---|
| § | | |
| § | | |
| IN RE PLAINS ALL AMERICAN PIPELINE, § | | Lead Case |
| L.P. SECURITIES LITIGATION § | | No H:15-02404 |
| § | | |

**MEMORANDUM AND OPINION**

## I.    Background

This Memorandum and Opinion addresses the defendants' second motion to dismiss this securities-fraud amended complaint.  The complaint arises from a highly publicized oil spill in an environmentally sensitive area on the California coast.  The defendants responded, according to the plaintiffs, with a series of misrepresentations about the extent of the spill and the financial impact on Plains, the oil and gas pipeline owner and operator.  The plaintiffs contend that Plains falsely claimed to have a comprehensive, effective environmental and regulatory compliance program to prevent oil spills and, if they occurred, to quickly remediate the effects.  When the facts emerged, the stock price dropped.  A putative class of stockholders sued the company, its officers and directors, and the banks that underwrote some of its securities offerings, seeking compensation for their stock-price losses.

On March 29, 2017, the court issued a lengthy Memorandum and Opinion addressing the defendants' first motions to dismiss.  The court dismissed the plaintiffs' claims, without prejudice and with leave to amend.  (Docket Entry No. 136).[1]  The specific rulings were as follows:

•    The Exchange Act claims were dismissed, without prejudice and with leave to amend,

---

[1]  The March 29, 2017 Memorandum and Opinion is cited as "Op." in this opinion.

because: (1) the majority of the statements, as pleaded, were not actionably misleading, and (2) the plaintiffs did not allege facts that gave rise to a strong inference of scienter for any defendant for any statement. Op. at 32–33;

- Some of the Exchange Act claims were found potentially actionable, but not as pleaded, including two legal-compliance statements in Plains's agreements with the Underwriter defendants:

  > (1) "None of the Issuers, the GP Entities or the Material Subsidiaries is in violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or of any decree of any court or governmental agency or body having jurisdiction over it . . . ."; and

  > (2) "Environmental Compliance. Except as described in the Pricing Disclosure Package and the Prospectus, none of the Plains Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), or lacks any permits, licenses or other approvals required of them under applicable Environmental Laws to own, lease or operate their properties and conduct their business as described in the Pricing Disclosure Package and the Prospectus or is violating any terms and conditions of any such permit, license or approval, which in each case would reasonably be expected to have a Material Adverse Effect." Op. at 61.

- A statement about corrosion control on the Plains website and three post-spill statements by Plains's safety and security director, Patrick Hodgins, were actionably misleading, as pleaded, including:

  > (1) a statement on Plains's website that it "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate," Op. at 41;

  > (2) Hodgins's statement that "[t]he first time I heard anything about the corrosion is what I read in the newspapers . . . . We had no indication at all to assume there was an issue," Op. at 74–75;

  > (3) Hodgins's statement, when asked whether the 2007 or 2012 in-line inspection runs had uncovered any sections of line 901 with metal loss greater than 50 percent, that Plains "had not had any indication at that time," *id.*; and

  > (4) Hodgins's failure to correct a spill-estimate figure, when asked about a 105,000 gallon spill volume, despite Plains's alleged knowledge that the spill volume could be much larger. *Id.*

- The four statements that were actionably misleading as pleaded—Hodgins's three statements and the statement about corrosion control on Plains's website—were not set out with an alleged basis for a strong inference of scienter. Op. at 76–77.

- The plaintiffs' "general" allegations of scienter as to the statements held to be false or misleading were insufficient. Op. at 77–88.

- The defendants' loss-causation arguments were not a sufficient basis to dismiss the case. Op. at 89.

- The court rejected the plaintiffs' "class standing" argument; held that the plaintiffs who did not purchase notes in or traceable to the August 2013, September 2014, or the two December 2014 notes offerings did not have standing; and dismissed the plaintiffs' claims under § 11 and § 12(a)(2) of the Securities Act for those offerings, for lack of subject-matter jurisdiction. Op. at 97.

The court dismissed the plaintiffs' Exchange Act and Securities Act claims, without prejudice and with leave to amend. Op. at 98. The plaintiffs filed a Second Amended Consolidated Complaint. (Docket Entry No. 137). The Plains defendants and the Underwriter defendants have moved to dismiss this amended pleading. (Docket Entries No. 140, 141). The plaintiffs responded, and both groups of defendants separately replied. (Docket Entry Nos. 142, 143, 144). The court held a hearing at which it heard arguments on the motions.

The primary new factual allegations in the Second Amended Complaint are:

- some of Plains's statements apply "specifically – and exclusively" to its pipelines in high-consequence areas;

- Plains had notice of regulatory violations because of warning letters from the PHMSA from 2009 and 2013 about Lines 901 and 903;

- Plains was indicted in Santa Barbara Superior Court in May 2016 on felony charges for its conduct related to the spill;

- the conclusions in the PHMSA's May 19, 2016 Failure Investigation Report were derived from Plains's own data;

- Plains had received several other warning letters and notices of violations from the PHMSA in 2010, 2011, 2013, 2014, and 2016, about regulatory violations on its pipelines in other

parts of the country;

- conclusions from the May 19, 2016 Failure Investigation Report detailing regulatory violations on Line 901;

- Plains did not perform adequate inspections or maintenance on its pipelines, had ineffective corrosion protection, did not have adequate leak-detection systems or monitoring, and did not adequately respond to the Line 901 spill, in violation of federal regulations;

- Plains's legal and regulatory compliance failures and pipeline-integrity deficiencies were allegedly reported to the individual defendants because of representations in Plains's Form 8-K underwriting agreements and Forms 10-K and 10-Q that Plains maintained disclosure controls and procedures designed to provide reasonable assurance that material information was "recorded, processed, summarized, and communicated" to Plains's officers;

- by virtue of Plains's audit committee's charter, the committee received notice of all potential or actual regulatory non-compliance that could "result in material non-compliance"; the committee in turn reported to the Board;

- two of the named defendants signed Sarbanes-Oxley Act certifications in Plains's Forms 10-K and 10-Q that "material information . . . [was] made known to [them] . . . .";

- reports required by the Pipeline Inspection, Enforcement, and Safety ("PIPES") Act "could not be compiled or verified without the underlying data Plains obtained through its ILIs and excavations of Lines 901 and 903 throughout the class period"; and

- statements in Plains's Code of Business Conduct emphasized a commitment to compliance with applicable laws and a requirement that material deviations from pipeline-safety and environmental-protection measures must be approved by two of four senior executive officers.

The facts set out here are taken primarily from the Second Amended Consolidated Complaint, (Docket Entry No. 137).[2]  The factual background pleaded in the earlier complaints, much of which is repeated in the Second Amended Complaint, is also set out in detail in the March 2017 Memorandum and Opinion.  Op. at 3–21.

Although the Second Amended Complaint alleges more specific facts about Plains's pre-spill

---

[2]  References to the complaint will take the form "2d Compl. ¶ X" throughout this opinion.

regulatory violations, the Second Amended Complaint still does not allege a strong inference of scienter. The new scienter allegations are, again, based on the defendants' positions within the company and certifications they signed affirming that senior executives had reviewed reports containing material information. These allegations are not enough to establish a cogent and compelling inference of scienter. The motions to dismiss, (Docket Entries No. 140, 141), are granted. This third effort to replead does not cure the deficiencies. The claims are dismissed with prejudice and without leave to amend, because further amendment would be futile.

The reasons for these rulings are explained in detail below.

## I.    The Parties and the Plaintiffs' Causes of Action

### A.    The Plaintiffs

The plaintiffs are individuals and institutional investors who purchased equity and debt instruments issued by entities affiliated with Plains All American Pipeline, a major national oil and gas pipeline owner and operator. 2d Compl. ¶¶ 16–20. The named plaintiffs seek to represent a class of investors who purchased Plains All American Pipeline, LP common units between February 27, 2013 and August 5, 2015, or who purchased Plains GP Holdings, LP ("Plains Holdings") Class A Shares between October 16, 2013 and August 5, 2015. The named plaintiffs also seek to represent individuals who purchased securities "pursuant and traceable to" the following public securities offerings:

- the Plains Holdings October 16, 2013 initial public offering of Class A shares ("IPO");

- the Plains Holdings November 12, 2014 public offering of Class A shares ("Secondary Offering");

- the Plains February 26, 2015 public offering of common shares ("Plains Offering");

- the Plains August 8, 2013 public offering of 3.85% senior notes due 2023;

- the Plains April 15, 2014 public offering of 4.7% senior notes due 2044;

- the Plains September 2, 2014 public offering of 3.6% senior notes due 2024; and

- the Plains December 2, 2014 public offering of 2.6% senior notes due 2019 and 4.9% senior notes due 2045.

Lead plaintiff IAM National Pension Fund is a defined-benefit pension plan for members of the International Association of Machinists and Aerospace Workers. IAM bought Plains and Plains Holdings securities on the open market during the class periods. *Id.* ¶ 16.

Plaintiff City of Warren Police and Fire Retirement System is a defined-benefit governmental retirement system for police and firefighters in Warren, Michigan. It purchased 4.7% Plains notes in the April 2014 offering. *Id.* ¶ 17.

Plaintiff Ming Liu is an individual who purchased Plains Holdings Class A shares in the October 2013 IPO. *Id.* ¶ 18.

Plaintiff Jacksonville Police and Fire Pension Fund is a defined-benefit government retirement system for police and firefighters in Jacksonville, Florida. It purchased Plains Holdings Class A shares in the October 2013 IPO and the November 2014 Secondary Offering. *Id.* ¶ 19.

Plaintiff Detroit Police and Fire Retirement System is a defined-benefit governmental retirement system for police and firefighters in Detroit, Michigan. It purchased Plains Holdings Class A shares in the November 2014 Secondary Offering and Plains common units in the February 2015 Plains Offering. *Id.* ¶ 20.

There is no allegation that the named plaintiffs purchased notes in or traceable to the August 2013 senior-notes offering, the September 2014 senior-notes offering, or the two December 2014 senior-notes offerings.

### B. The Defendants

#### 1. The Plains Defendants

##### a. The Corporate Defendants

Plains All American Pipeline, LP ("Plains"), is a publicly traded Delaware master limited partnership that owns and operates oil and gas pipelines throughout the United States. *Id.* ¶ 21. A general partner, Plains All American GP LLC ("GP LLC"), manages Plains and employs Plains's officers, directors, managers, and U.S.-based employees. *Id.* ¶ 22. GP LLC, in turn, is wholly controlled by Plains GP Holdings, LP ("Plains Holdings"), a publicly traded Delaware limited partnership. *Id.* ¶ 24. Plains Holdings is, in turn, managed by PAA GP Holdings LLC ("Holdings LLC"), which owns the general partner interest in Plains Holdings and directs that entity's activities. *Id.* ¶ 29. Plains itself wholly owns PAA Finance Corp., a Delaware corporation formed in 2001 to co-issue Plains's debt securities. *Id.* ¶ 28. Each entity is a named defendant.

##### b. The Individual Defendants

###### i. The Officer Defendants

Greg L. Armstrong is the CEO and Chairman of the Board of GP LLC, Plains's general partner, Holdings LLC (Plains Holdings's general partner), and PAA Finance. *Id.* ¶ 30. Armstrong signed the securities-offering materials at issue and many of the SEC filings alleged to contain false and misleading statements. He also made allegedly false or misleading statements at investor meetings. *Id.*

Chris Herbold is the Vice President – Accounting and Chief Accounting Officer of GP LLC, PAA Finance, and Holdings LLC. *Id.* ¶ 31. He signed the registration statements for some of the securities offerings, as well as the SEC filings that contained allegedly misleading statements. *Id.*

Richard McGee is the Executive Vice-President, General Counsel, and Secretary of GP LLC and Holdings LLC. *Id.* ¶ 32. He signed the SEC filings that contained allegedly false and misleading statements. *Id.*

Harry Pefanis is the President and Chief Operating Officer of GP LLC and Holdings LLC, and President of PAA finance. *Id.* ¶ 33. Pefanis signed the registration statement for some of the securities offerings and other SEC filings that contained allegedly false or misleading statements. *Id.*

Al Swanson is the Executive Vice-President and Chief Financial Officer of GP LLC, PAA Finance, and Holdings LLC. *Id.* ¶ 34. Swanson signed the allegedly misleading registration statements and SEC filings. *Id.*

### ii. The Director Defendants

In addition to the Officer defendants, the plaintiffs sued the following members of the board of directors: Victor Burk, Everardo Goyanes, Gary Petersen, John Raymond, Bobby Shackouls, Robert Sinnott, Vicky Sutil, J. Taft Symonds, and Christopher Temple. These defendants were directors of various Plains entities for at least part of the relevant period, and each signed securities-offering materials containing allegedly untrue or misleading statements. *Id.* ¶¶ 36–44.

### 2. The Underwriter Defendants

The plaintiffs also sued financial institutions that participated in at least one Plains securities offering in which the registration statement or other offering materials contained allegedly false or misleading statements. *Id.* ¶¶ 45–81. Different Underwriter defendants allegedly participated in

each of the securities offerings at issue.[3]

## C.     The Causes of Action

The plaintiffs' Second Amended Complains asserts claims under:

•     § 10(b) of the Exchange Act and Rule 10b-5 against Plains, Plains Holdings, and the Officer defendants;

•     § 20(a) of the Exchange Act against Holdings LLC, Plains Holdings, and the Officer defendants;

•     § 11 of the Securities Act against all defendants;

•     § 12(a)(2) of the Securities Act against the Underwriter defendants; and

•     § 15 of the Securities Act against Holdings LLC, Plains Holdings, the Officer defendants, and the Director defendants.

For the Exchange Act claims under § 10(b)/Rule 10b-5 and § 20(a), the plaintiffs seek to represent a class of those purchasing Plains common units between February 27, 2013 and August 5, 2015, and those purchasing Plains Holdings Class A shares between October 16, 2013 and August 5, 2015.

For the Securities Act claims under §§ 11, 12, and 15, the plaintiffs seek to represent a class of those purchasing securities "pursuant and traceable to" these offerings. *Id.* ¶¶ 1–2. The court's earlier Memorandum and Opinion dismissed the claims related to the August 2013 senior-notes offering, the September 2014 senior-notes offering, and the two December 2014 senior-notes offerings because the plaintiffs did not have standing. Op. at 97. The Second Amended Complaint includes allegations about these offerings only "to preserve all rights related to claims arising out

---

[3] The Underwriter defendants' alleged participation in Plains securities offerings is outlined in the Appendix to this opinion.

of those offerings." 2d Compl. ¶ 2, n.1.

## II.    The Second Amended Consolidated Complaint's Factual Allegations

For purposes of this motion to dismiss, the allegations in the Second Amended Consolidated are taken as true except to the extent that they are contradicted by the narrow category of documents the court may consider on a motion to dismiss without converting it into one for summary judgment.

### A.    The Allegations as to Plains's Operations

Plains All American Pipeline is a publicly traded MLP. Its business is interstate and intrastate crude-oil pipeline transportation and storage. Before and during the class period, Plains was one of North America's largest energy pipeline operators. It grew primarily by acquiring significant pipeline and terminal networks. 2d Compl. ¶ 87. The assets acquired included Lines 901 and 903, built in 1987 and acquired by Plains in 1998. Line 901 extends approximately 10 miles along the California coast, where it connects to Line 903, which continues 128 miles through Santa Barbara County and into Kern County. *Id*. ¶ 88.

Plains conducted periodic inspections of the pipeline with internal inspection devices called pipeline-inspection gauges, or "smart pigs." Smart pigs are run inside a pipeline to detect anomalies caused by corrosion, cracks, laminations, dents, or other defects. These runs are called in-line inspections. Plains's third-party in-line-inspection vendor, Rosen, conducted in-line inspections on Line 901 in June 2007, July 2012, and May 5, 2017. *Id.* ¶ 89.

Plains's pipeline operations are controlled remotely from a center in Midland, Texas that is operated and staffed at all times. The center "continuously monitors all of Plains's liquid product movements" and "maintains system integrity through leak detection." *Id.* ¶ 90. The center monitors and operates over 850 remote sites. *Id.*

During the class period, most of the Plains pipelines, including Lines 901 and 903, were under the regulatory jurisdiction of the Pipeline and Hazardous Materials Safety Administration. The PHMSA enforces regulations under the Hazardous Liquids Pipeline Safety Act of 1979. *Id.* ¶ 91. Federal regulations enacted under the Act, referred to in this opinion as the "Pipeline Safety Act," required Plains to "adopt measures designed to reduce the environmental impact of oil discharges from onshore pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel." *Id.* 2002 and 2006 amendments to the Pipeline Safety Act required Plains to "implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways." *Id.* ¶ 92. PHMSA regulations also required Plains to implement enhanced measures in high-consequence areas. *Id.*

Lines 901 and 903 were in a high-consequence area because they were close to the environmentally sensitive Santa Barbara coastline, rivers, state parks, and national forests. The plaintiffs allege that, during the class period, Lines 901 and 903 comprised 9 to 10 percent of Plains's interstate crude-oil pipelines in high-consequence areas, and 15 to 18 percent of Plains's pipelines affecting commercially navigable waters and sensitive ecological resources. *Id.* Plains had to comply with the PHMSA's enhanced high-consequence-area requirements for Lines 901 and 903. *Id.* Plains was also generally, and specifically for Lines 901 and 903, subject to the Federal Water Pollution Control Act, referred to as the "Clean Water Act," as amended. That Act imposes restrictions on the discharge of pollutants, like crude oil, into navigable waters of the United States,

as well as into state waters.  *Id.* ¶ 93.

Plains publicly stated throughout the class period that it was in substantial compliance with these laws and regulations.  Plains also stated that it had implemented pipeline maintenance and integrity measures "beyond regulatory mandate."  *Id.* ¶ 95.  The plaintiffs allege that Plains knew that both statements were false when they were made.

### B.    Plains's Pre-Class Period Actions and the EPA Consent Decree

Plains and its related companies reported 229 safety and maintenance "incidents" on pipelines to federal regulators, more than all but three other reporting companies.  These incidents resulted in more than $141 million in property damage and the release of more than 800,000 gallons of hazardous liquids.  *Id.* ¶ 96.

The EPA sued Plains in 2010 and obtained a consent decree requiring Plains to pay significant fines for regulatory violations, and to adopt new safety measures to prevent spills and reduce the impact when they did occur.  *Id.* ¶ 97.  The consent decree required Plains to take steps that included the following: to spend $41 million to upgrade more than 10,000 miles of pipeline; to conduct weekly aerial patrols of certain pipelines to check for leaks; to spend millions to mitigate leak threats from corrosion; to install computational pipeline-monitoring capabilities; and to conduct ongoing monitoring of its pipeline system.  *Id.* ¶ 98.  None of the $41 million was spent on upgrading or repairing Lines 901 or 903.  *Id.*  The plaintiffs repeatedly allege that the consent decree specifically required Plains to repair, upgrade, monitor, and take other similar actions on Lines 901 and 903.  The consent decree is a public document central to the plaintiffs' complaint, so the court may consider it on this motion to dismiss.

The defendants insist that the consent decree does not support the plaintiffs' characterization.

The consent decree is discussed in detail later in this opinion. For now, it suffices to note that while the decree did include Lines 901 and 903 on a lengthy list of lines subject to certain requirements, it did not require Plains to make specific expenditures or take specific steps on Lines 901 or 903. And, as the defendants emphasize, the United States and Plains jointly terminated the consent decree in 2013. *See* Docket Entry No. 20, *United States v. Plains All American Pipeline, LP*, 4:10-cv-2833 (S.D. Tex. Nov. 26, 2013).

### C. Plains's Statements About Its Pipeline Integrity

In the wake of the consent decree, Plains executives issued statements telling investors that it had adopted enhanced measures to ensure pipeline integrity. *Id.* ¶ 99. The Plains 2012 Form 10-K, filed the first day of the class period, reassured investors that "pipeline integrity management" was Plains's "primary operational emphasis," and that Plains had "implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention." *Id.* The Form 10-K stated that the Plains "pipelines are in substantial compliance with [applicable regulations]" and that Plains's "integrity management program" included measures that went beyond legal requirements. *Id.*

At a 2014 investor day conference, Plains CEO Greg Armstrong stated that "[s]afety is a core value" and that Plains "foster[s] a culture that emphasizes operational excellence, asset integrity, & safety." *Id.* ¶ 100. The top three items in Armstrong's presentation were "Safety," "Pipeline Integrity Management," and "Incident Response Preparation." *Id.* Armstrong assured investors that "[w]e are committed to operational excellence in safety, pipeline integrity management, and responding to incidents in the unfortunate development that they do occur." *Id.* Armstrong also stated that "we do a lot and I mean a tremendous amount that will never be appreciated by the

public" on safety and spill prevention. *Id.* Armstrong acknowledged that safety and environmental compliance may "in the short-term hurt our performance in terms of relative to EBITDA targets, etc.," but stated that notwithstanding this effect, "in all cases we want to make sure we do the right thing." *Id.*

The Officer defendants made several statements, which the plaintiffs say were false and misleading, about Plains's pipeline integrity-management program and Plains's investments in complying with regulations governing pipelines in high-consequence areas. These statements were:

(1) [t]he DOT regulations include requirements for the establishment of pipeline integrity management programs and for protections of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences. We have also developed and implemented certain pipeline integrity measures that go beyond regulatory mandate.

(2) "[i]n that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention." *Id.* ¶ 101.

The plaintiffs contend that Plains reassured investors of its commitment to regulatory compliance in high-consequence areas, stating in its class-period Form 10-Ks that:

(1) Plains "devote[d] substantial resources to comply with [government]-mandated pipeline integrity rules . . . for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences"; and

(2) that Plains had complied with the Department of Transportation's requirements for high-consequence areas, including "more frequent inspections, correction of identified anomalies and other measures, to ensure pipeline safety in 'high consequence areas,' such as . . . commercially navigable waterways." *Id.* ¶¶ 101–102.

The plaintiffs argue that these statements apply "specifically – and exclusively" to all of Plains's pipelines running through high-consequence areas. *Id.* The defendants, in contrast, argue that the statements describe Plains's company-wide integrity-management plan and are not limited to, or focused on, pipelines in high-consequence areas. (Docket Entry No. 143 at 2–3). This dispute

14

is discussed further below.

Plains also represented that its officers were involved in the company's safety, pipeline-integrity, and incident-response work. 2d Compl. ¶ 105. During the class period, Plains's website asserted that its Environmental, Health, and Safety Program was "successful because it is developed, supported and carried out by our employees, from the senior management team down to the newest hire"; that "Plains All American is committed to public safety, protection of the environment and operation of our facilities in a prudent and safe manner"; and that the Plains entities "believe that all of our pipelines have been constructed and are maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards proscribed by the American Petroleum Institute and accepted industry practice." *Id.*

The plaintiffs contend that these statements would lead reasonable investors to believe that Plains's pipeline integrity-management program, specifically as applied to Lines 901 and 901, fully complied with all applicable regulations. *Id.* ¶ 107. The plaintiffs contend that reasonable investors would not expect that Plains instead: (1) ignored "troubling warnings" from the PHMSA and Plains's own field measurements showing that the in-line inspection tool was inaccurate; (2) instructed its in-line-inspection vendor to ignore anomalies; (3) ignored inaccuracies in its repair decisions; (4) failed to properly repair or replace pipelines; (5) disregarded regulatory requirements and PHMSA notices and warnings to conduct preventive and mitigative evaluations; (6) ignored warnings that its corrosion-control program was ineffective; (7) ignored warnings about control-room violations; and (8) disregarded industry practices by failing to install automatic shutoff valves on Lines 901 and 903. *Id.*

According to the Second Amended Complaint, Plains falsely assured investors that, when

a leak was detected, the company would promptly respond, coordinate with public officials, and implement a comprehensive plan to prevent severe environmental impacts. *Id.* ¶ 109. The plaintiffs say that these promises of safe and effective pipeline operation were illusory. Instead, Plains had, and knew it had, disregarded its pipeline-integrity and maintenance obligations, with predictable results when a spill occurred in a high-consequence area. *Id.* ¶ 108.

### D. The Spill

On May 19, 2015, Line 901 ruptured and spilled oil into the Pacific Ocean and environmentally sensitive coastal areas. The spill killed nearly 200 birds and more than 100 marine mammals, including dolphins and sea lions. *Id.* ¶ 110–112. At an investor day conference held shortly after the spill, Armstrong conceded that "[i]f you could pick any place in the world you would not want to have a release, [Santa Barbara] would probably qualify as the one." *Id.* ¶ 112.

Plains's response to the spill left much to be desired. State law required Plains to report the spill to the federal National Response Center within 30 minutes of detection. Instead, Plains did not report the spill to the National Response Center until hours after it was discovered. *Id.* ¶ 114. Plains's own response plans indicated that it should take no more than 15 minutes to discover a release and shut down the flow. Plains officials noticed anomalies in Line 901 by 10:30 a.m., but they did not shut the pipeline down until 11:30 a.m. Government officials first learned of the spill through a 911 call from beachgoers—not from Plains—at approximately 11:42 a.m. The local fire department notified the National Response Center of the spill at 12:43 p.m., over two hours before Plains itself notified the agency. *Id.*

According to the plaintiffs, Plains's "spin operation" was far more effective than its on-the-ground response. Plains officials stated that the company's "worst case" estimate showed that, at

most, 21,100 gallons of oil had spread into the ocean, and as many as 105,000 gallons had been released. *Id.* ¶ 115. On May 26, 2015, Plains filed a Form 8-K with the SEC. The Form 8-K described the spill and stated that Plains "currently estimates that the amount of released crude oil could be as high as approximately 2,400 barrels," equivalent to 101,000 gallons of oil; this represented a 4,000 gallon reduction from the initial "worst case" estimate. *Id.* Plains allegedly waged a public-relations campaign to create the impression that it was working efficiently and effectively to remedy the spill, when it knew it had understated the extent of the spill and that it lacked the capability to respond effectively. *Id.* ¶¶ 116–117.

### E.    Plains Reveals the Severity of the Spill

On August 5, 2015, Plains disclosed in an investor presentation that as much as 143,000 gallons of oil might have leaked, an amount 42 percent larger than previously reported. *Id.* ¶ 118. Plains also disclosed that both the U.S. Department of Justice and the California Attorney General were investigating the spill; Plains could be liable for criminal violations of the Clean Water Act; and Lines 901 and 903 were subject to multiple PHMSA corrective actions. *Id.* For the first time, according to the plaintiffs, Plains disclosed that the spill would cost the company $257 million—not including lost revenue associated with shutting down Lines 901 and 903—and that Plains's insurance did not cover all the costs. *Id.*

During May and June, the defendants communicated regularly with investors and the public. The communications included the following:

- On June 4, 2015, defendants hosted an investor day, at which Armstrong discussed the Santa Barbara oil spill and encouraged investors to visit the Plains website for "daily updates" on the spill. *Id.* ¶ 365.

- On the www.plainsline901response.com website, in the "daily updates" section, Plains posted: (1) incident updates on June 29, 2015, July 6, 2013, and July 13, 2015; (2)

"Recovery Q&As" on June 17, 2015; (3) the investor day presentation on June 4, 2015; and (4) Armstrong's letters to members of Congress on June 24, 2015. *Id.*

• The defendants and other Plains representatives had numerous conversations with the press about the spill between May 28, 2015 and August 5, 2015. *Id.* ¶ 372.

The PHMSA had required Plains to have a spill-response plan for Lines 901 and 903. That plan, in place before the spill occurred, estimated the worst-case scenario for a spill from Line 901 at 148,092 gallons, closer to the actual damage than to Plains's initially released estimates. *Id.* ¶ 368. The spill-response plan's risk analysis assumed "10 minutes total time to detect the rupture and 5 minutes to shutdown pipeline." *Id.* But on the day of the spill, Plains employees did not shut down the rupture for more than two hours after it began. *Id.* The plaintiffs point to this delay as evidence of Plains's misrepresentations about its pipeline safety and spill-response capabilities.

## F. Plains's Maintenance Record

### i. The March 2009 PHMSA Notice of Amendment

On March 4, 2009, the PHMSA issued a Notice of Amendment to Dan Nerbonne, Plains's Vice President of Engineering. The Notice stated that in 2008 and 2009 inspections of Lines 901 and 903, the PHMSA had identified more than 20 "apparent inadequacies found with Plains's plans or procedures." These inadequacies included the following:

• Plains's data integration process failed to apply in-line-inspection tool uncertainty when comparing in-line-inspection results to the integrity management rule repair requirement, in violation of 49 C.F.R. § 195.452(f) and (g);

• Plains's Operations and Maintenance Manual did not provide guidance on "specific composite repairs methods that are approved for use" and did not provide procedures to follow when making repairs on corroded pipes, in violation of 49 C.F.R. § 195.585(a) and (b);

• Plains's integrity management program did not provide for the submission of "Safety Related Conditions Reports (SRCR)" to the PHMSA when "pressure reductions are taken for conditions" that meet the SRCR criteria, in violation of 49 C.F.R. § 195.55;

- Plains's Operation and Maintenance Manual on Corrosion Control did not provide "adequate details for employees to perform their maintenance activities safely," in violation of 49 C.F.R. § 195.402;

- Plains's "Aboveground Storage Tank Inspection, Repair, and Maintenance Specification [did] not address the hydrostatic test requirements of [industry standard] API 653 section 12.3," in violation of 49 C.F.R. § 195.307;

- Plains's Operations and Maintenance Manual did not provide procedures for pipeline coating inspection, in violation of 49 C.F.R. § 195.561;

- Plains's Operations and Maintenance Manual did not have procedures to monitor a Vapor Corrosion Inhibitor System used for breakout tanks and did not have an explanation as to why "the use of cathodic protection [was] not needed for the tank bottom protection," in violation of 49 C.F.R. 195.565;

- Plains did not have specific procedures on how it reviewed results of close internal surveys and performed quality checks "on performance of CIS and data collected to ensure that data actually is representative of what is occurring in the field," in violation of 49 C.F.R. § 195.573;

- Plains used an inadequate method of determining voltage drops in monitoring the adequacy of cathodic protection, and the section in its Operation and Maintenance Manual provided little guidance on how these drops would be considered, in violation of 59 C.F.R. § 195.573;

- Plains failed to record and include galvanic anodes in the cathodic protection process, and did not address "the practice of installing test points at all galvanic installations to allow on/off reading," in violation of 49 C.F.R. § 195.589; and

- Plains failed to comply with the coating standards for transition coating used in repairs, in violation of 49 C.F.R. 195.559.

*Id.* ¶ 119.

### ii. The December 2013 Warning Letter

On December 24, 2013, the PHMSA sent a Warning Letter to Troy Valenzuela, Plains's Vice President of Environmental Health and Safety. The PHMSA, the Texas Railroad Commission, and the New Mexico Public Regulation Commission had inspected the Midland Control Room and found that Plains had "committed probable violations of the Pipeline Safety Regulations, Title 49,

19

Code of Federal Regulations." *Id.* ¶ 120. The probable violations all concerned control-room management. They included: (1) making changes "to the critical alarm type description and response priority" without following the Management of Change Procedures, in violation of 49 C.F.R. § 195.446(j); (2) providing no evidence of compliance with 49 C.F.R. § 195.446(j)'s requirement "to review the controller training program content" at least once a year to identify potential improvements to the training program; and (3) failures by Control Room personnel to completely fill out Abnormal Operations forms, in violation of 49 C.F.R. § 195.446(j). *Id.* ¶ 120.

### iii. The May 21, 2015 Corrective Action Order

On May 21, 2015, the PHMSA issued a Corrective Action Order requiring Plains to take certain steps on Line 901. *Id.* ¶ 121. The May 21 Order noted that Plains's inspections of Line 901 in June 2007 and July 2012 had demonstrated declining pipeline integrity. *Id.* The May 21 Order noted that Plains had used a shrink-wrap sleeve coating on Line 901, which increases the likelihood of corrosion and of leaks. The May 21 Order required Plains to shut down Line 901, conduct extensive testing, review the company's emergency plans and training, and identify other shrink-wrapped parts of the line. *Id.* On June 3, 2015, the PHMSA issued an amended Corrective Action Order, which identified "extensive external corrosion" on Line 901 and "extensive corrosion" (among other deficiencies) on the adjoining Line 903. *Id.* ¶ 122.

On September 11, 2015, the PHMSA issued a Notice of Probable Violation based on its September and October 2013 inspections of Lines 901 and 903. *Id.* ¶ 125. The Notice stated that Plains had likely violated regulations requiring it to keep records of its pipeline integrity-management efforts for lines in high-consequence areas, including records of required tests on Line 903. *Id.* ¶¶ 127–128. The Notice also stated that Plains did not have records of heightened

prevention and mitigation efforts in other high-consequence areas and did not have records indicating what process it used to determine what measures it should take. *Id.* ¶ 129. The Notice stated that Plains could not produce documents showing its required annual review of its emergency-response training or showing that contractors had performed the tasks that the regulations required. *Id.* ¶¶ 130–131.

The PHMSA Notice of Probable Violation stated that the violations were "determined prior to the May 19, 2015 crude oil spill in Santa Barbara." *Id.* ¶ 132. The Notice stated that the PHMSA had asked Plains to provide "additional information" following the PHMSA's September and October 2013 inspections of Lines 901 and 903, and that "during the course of our inspection, our representatives found concerns that may impact your current level of safety" and "discussed" those concerns with Plains representatives. *Id.* ¶ 132–133. One of these concerns was that "Plains had unclear procedures and documentation of its decision making process for addressing when in-line inspection (ILI) tool run data indicates anomalous conditions." *Id.* ¶ 134. Additionally, Plains did not appear to have adequate documentation of its plans for contacting emergency responders if a spill occurred in California. *Id.* at ¶¶ 135–136. Plains had provided the requested additional information in late 2013 and June 2014.

On November 12, 2015, the PHMSA sent yet another amendment to the May 2015 Corrective Action Order. The amended Order required more remedial measures and the following additional findings on Plains's pipeline maintenance:

- The PHMSA's independent review of in-line inspection tool surveys for Lines 901 and 903 over the past 10 years found that anomalies were "under-called" in areas of general corrosion.

- Despite common industry practice, Plains did not share its in-line inspection field data with the vendor for that task, preventing Plains from more accurately analyzing its inspection

data.

• The PHMSA's independent review of in-line inspection surveys from the past 10 years show that Line 903 has corrosion characteristics similar to Line 901's, and a number of the Line 903's anomalies had characteristics consistent with the Line 901 failure site.

• Based on the number of anomalies identified on Line 903, it did not appear that Plains had an effective corrosion-control program, meaning that Line 903 had likely degraded further since the last in-line inspection.

• Line 903 had shrink-wrap sleeves on some weld sites, which could contribute to stress corrosion cracking.

*Id.* ¶ 137.

Based on these findings, the PHMSA required Plains to take Line 903 off-line, purge it, and try to identify problems like those found on Line 901. The PHMSA also ordered Plains to provide its in-line-inspection vendor with field data, to provide additional training, and to implement enhanced measures to monitor Line 903 during the purge-and-inspection period. *Id.* ¶ 138. The PHMSA's findings, the plaintiffs assert, were based on data that Plains either knew about or recklessly disregarded before the spill. The plaintiffs cite the fact that the PHMSA's conclusions about the in-line inspection undercall bias were derived from Plains's own data. *Id.* ¶ 139.

### iv.    The May 16, 2016 Indictment

After the class period ended, on May 16, 2016, Plains was indicted on 42 misdemeanor counts and 4 felony counts for discharging oil into state and federal waters, in violation of the Clean Water Act; knowingly causing a hazardous substance to spill; and knowingly making false or misleading reports after the spill. *Id.* ¶ 140. The Santa Barbara Superior Court denied Plains's motions to set aside the criminal indictment.[4]

---

[4] The trial is set for April 19, 2018. *See* Docket, People v. Plains All Am. Pipeline LP, No. 1495091, (Santa Barbara Super. Ct. May 16, 2016).

### v.    The May 19, 2016 Failure Investigation Report

On May 19, 2016, the PHMSA published a Failure Investigation Report with additional findings and conclusions from its investigation of the spill.  The PHMSA conducted interviews, "reviewed numerous historical documents and available records, and performed a thorough review of Plains Control Room in Midland, TX," and reviewed "the Plains Integrity Management Plan (IMP), CP [cathodic protection] records, ILI reports, anomaly dig information, SCADA event and alarm logs, pressure and flow trends, procedures, and reports obtained from the pipeline operator and PHMSA SMEs."  *Id.* ¶ 141.  The plaintiffs contend that Plains had "substantially all" of this evidence in its possession long before the spill occurred.  *Id.*

The Report found that Line 901 was operating at 56 percent of its maximum operating pressure immediately before the release, a pressure that "should not have caused the release if the pipeline's integrity had been maintained to federal standards."  *Id.*  The Report found that the release's direct cause was external corrosion below the pipeline's coating "that thinned the pipe wall to a level where it ruptured and suddenly released heavy crude oil."  *Id.* ¶ 142.  The Report identified three contributory causes: (1) "ineffective protection against external corrosion of the pipeline; (2) Plains's failure to detect and mitigate the corrosion; and (3) lack of timely detection of the rupture,"—and described Plains's failures in each category.  *Id.* ¶¶ 142–146.

### G.    The Defendants' Knowledge of the Corrosion Problems

The plaintiffs allege that the problems with Lines 901 and 903 were not unique to those lines, but instead were "pervasive" and "system-wide."  The plaintiffs point to a variety of other environmental incidents and regulatory penalties across the Plains pipeline network in the years before the Santa Barbara spill, alleging that Plains had a "culture of noncompliance."  The plaintiffs

include a bullet-pointed list of PHMSA notices of violations and probable violations and warning letters about Plains's pipelines in California and in other states, from 2008 to 2014. The notices and letters identify failures to correct corrosion-control deficiencies; failures to coat pipelines; insufficient cathodic protection; failures to establish proper inspection intervals for pipes, valves, and tanks; failures to specify the correct standard for corrosion-control procedures; using conflicting criteria for corrosion-control procedures; failures to monitor internal and external corrosion; and inadequate monitoring of in-line inspection tool results. *Id.* ¶ 147. The plaintiffs point to additional PHMSA letters and notices detailing Plains's deficiencies in testing, leak detection, damage prevention, and spill-response capabilities. *Id.* ¶ 148. The plaintiffs contend that Plains's reported infractions together resulted in "more than $141 million in property damage and the release of more than 802,000 gallons of hazardous liquid." *Id.* ¶ 149.

The plaintiffs contend that the Officer defendants "were well aware of the risks associated with Plains' failure to properly address the corroding pipelines" because corrosion-control failures had resulted in more than 78 oil spills since 2006 and because corrosion-related incidents represented "close to 40 percent of the Company's overall releases." *Id.* ¶ 150. The plaintiffs contend that these incidents made Plains the "worst pipeline operator in the United States as measured both by the number of total incidents and number of incidents per 1,000 miles of pipeline operated." *Id.* ¶ 151. The plaintiffs allege that the Officer defendants were aware of the risks associated with these control deficiencies, but ignored them "in favor of a short-sighted profits-based strategy that directly contradicted the Company's public statements." *Id.*

The plaintiffs allege that the regulatory violations were documented, summarized, and communicated to the Officer defendants. The plaintiffs point to underwriting agreements in Plains's

Form 8-K, which stated that Plains had disclosure controls and procedures that "are designed to provide reasonable assurance that material information relating to the Partnership, including its consolidated subsidiaries, is recorded, processed, summarized, and communicated to the principal executive officer, the principle financial officer and other appropriate officers of GP LLC to allow for timely decisions regarding required disclosure," and statements in Plains's Forms 10-K and 10-Q that Plains "maintain[ed] written disclosure controls and procedures . . . [which] is designed to ensure that the information required to be disclosed by us in reports . . . is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms." *Id.* ¶¶ 157, 159. The plaintiffs also point to Plains's audit committee charter, which required the committee to obtain reports from management about compliance and to report that information to Plains's board. *Id.* ¶ 160–62.

The plaintiffs allege that the defendants had ample access to information about Plains's ongoing regulatory violations. Plains's SEC filings stated that the firm's directors "have access to members of management, and a substantial amount of information transfer and informal communication occurs between meetings." *Id.* ¶ 163. Plains represented that its environmental and safety program was "successful" because it was "developed, supported and carried out by our employees, from the senior management team down to the newest hire." *Id.*

In support, the plaintiffs identify two individuals, Nerbonne and Valenzuela, not defendants, who oversaw Plains's integrity-management and environmental health and safety programs, and who reported to Pefanis, one of the Officer defendants. The plaintiffs allege that Nerbonne and Valenzuela had "direct and steady contact with senior management and the board of directors." *Id.* The plaintiffs also point to Plains's Forms 10-K and 10-Q, signed by Armstrong and Pefanis during

the class period.  These Forms contained certifications under the Sarbanes-Oxley Act of 2002, stating that "material information relating to registrant, including its consolidated subsidiaries, is made known to use by others within those entities, particularly during the period in which this report is being prepared."  *Id.* ¶ 167.  The plaintiffs also allege that the Officer defendants reviewed the data underlying the in-line inspections and excavations because of regulations enacted under the PIPES Act, 49 U.S.C. § 60109(f), which require pipeline operators to "have a senior executive officer of the company sign and certify annual pipeline Integrity Management Program (IMP) performance reports."  *Id.* ¶¶ 168–172.

The plaintiffs also point to provisions in Plains's Code of Business Conduct, which Plains adopted in conformance with the PIPES Act.  All Plains employees were required to sign and certify their compliance with the Code.  The Code requires material deviations from pipeline-safety protocols to be approved by two of the four senior executive officers, Armstrong, Pefanis, Swanson, and McGee.  The Code also states that Plains is committed to safe and environmentally responsible operations, investment in necessary equipment and resources, and compliance with applicable laws and regulations.  Waivers of the Code "must be obtained in writing from the Vice President . . . of your business unit or corporate function."  *Id.* ¶ 173.  Waiver requests that a vice president determined to be material were required to be approved by two of the four senior executive officers.

The plaintiffs allege that, despite the regulatory problems, Plains represented that its integrity-management program was sound.  *Id.* ¶ 164.  At a meeting attended by Armstrong, Pefanis, and Swanson, Armstrong stated:

> We have implemented a tremendous amount of testing procedures, Dan Nerbonne and Rick Jensen and their groups in both US and Canada spend a tremendous a[m]ount of time investing in testing and trying to advance technologies to be able to monitor the pipe and to proactively get in front of some of these opportunities and

issues.

*Id.*

The plaintiffs also point to the consent decree, which required Plains to implement an improved pipeline integrity-management program, corrosion-control measures, and other changes designed to reduce the risk of spills. *Id.* ¶ 166. Plains was required to check in with the EPA twice a year, setting out the progress it had made on these improvements. The PAA and PAGP represented in SEC filings that they had "developed and implemented certain pipeline integrity measures that go beyond regulatory mandate, some of which are now incorporated in the 2010 Consent Decree." As part of making "pipeline integrity management" a "primary operational emphasis," Plains had instituted an "internal review process pursuant to which we examine various aspects of our pipeline . . . systems that are not subject to the DOT pipeline integrity management mandate." *Id.*

The plaintiffs allege that the corporate and individual defendants were severely reckless in promoting Plains's safety record while allowing the pipelines to degrade for want of repairs. This recklessness was due, the plaintiffs allege, to the defendants' financial interest in Plains's profits. The ownership structure and internal incentive schemes of the various Plains partnerships and companies rewarded each group of defendants for distributing cash to Plains All American's unit-holders. The Officer defendants' bonuses, some potentially over one million dollars, depended on their generating cash, reducing the incentive to spend money repairing decaying pipelines. *Id.* ¶¶ 175–186.

The plaintiffs allege that the defendants knew before the spill that Line 901 had reached or exceeded its useful life. Lines 901 and 903 were constructed in 1987 and were operational in 1990.

In May 2015, Line 901 had been operating for 25 years. Plains's SEC filings stated that the lines had an estimated maximum useful life of 30 years, based on the "condition, manufacturing specifications, technological advances and historical data concerning useful lives of similar assets." *Id.* ¶ 187. The plaintiffs allege that the defendants knew that Line 901 was located in a sandy, coastal environment that could create corrosion problems, which, combined with the fact that the lines were located in a high-consequence area, made the 30-year estimate unrealistically high. The plaintiffs contend that had the defendants had properly monitored and evaluated Line 901, they would have known that it had exceeded its useful life.

Finally, the plaintiffs allege that decreasing production volumes on Lines 901 and 903 motivated the defendants to look the other way. In 1995, Plains reported that it shipped an average of 152,000 net barrels of oil per day from the outer continental shelf fields, which included Lines 901 and 903. By 2014, the production volumes from these fields had dropped to an average of 37,000 net barrels per day. In its 2013, 2014, and 2015 filings with the SEC, Plains reported the decline in volumes shipped from the outer continental shelf. The plaintiffs allege that this production decrease gave the defendants "little incentive to undertake the massive repairs necessary to keep an almost thirty-year-old pipeline safe and compliant with regulations." *Id.* ¶ 189. Repairing the pipeline would have required replacing large segments, at significant cost, and Plains's insurance would cover some clean-up costs from any spills. The plaintiffs contend that these factors made it "simply not worth it to defendants to perform the repairs necessary to Lines 901 and 903 that would have prevented the Santa Barbara spill." *Id.* ¶¶ 188–191.

**H.     The Challenged Statements During the Class Period**

The Second Amended Complaint asserts claims based on 17 allegedly false statements during the class period.  The statements are identified by the numbers used in Appendix A of the Plains defendants' motion to dismiss.  (Docket Entry No. 140, Appendix A).[5]

- Statement 1: "The DOT regulations include requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences.  We have also developed and implemented certain pipeline integrity measures that go beyond regulatory mandate.

   . . .

   Accordingly, for 2013 and beyond, we will continue to focus on pipeline integrity management as a primary operational emphasis.  In that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection and damage prevention."  2d Compl. ¶ 192.

- Statement 2: "Plains All American supports its commitment to safe and environmentally responsible operations through extensive and ongoing education and training, as well as investment in any necessary equipment, systems, processes, or other resources."  2d Compl. ¶ 193.

- Statement 3: "We have an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement."  2d Compl. ¶ 194.

- Statement 4: "The HLPSA was amended by the Pipeline Improvement Act of 2002 and the Pipeline, Inspection, Protection, Enforcement and Safety Act of 2006.  These amendments have resulted in the adoption of rules by the Department of Transportation ('DOT') that require transportation pipeline operators to implement integrity management programs, including **more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,'** such as high population areas unusually sensitive to environmental damage, and **commercially navigable waterways**.  In the United States, our costs associated with the inspection, testing and

---

[5]  The plaintiffs did not include in the Second Amended Complaint some statements from the previous complaint that the March 2017 Memorandum and Opinion held were not actionable.  The plaintiffs reserve the right to appeal the court's earlier conclusions about those statements.

correction of identified anomalies were approximately $107 million in 2014, $57 million in 2013 and $39 million in 2012.  Based on currently available information, our preliminary estimate for 2015 is that we will incur approximately $75 million in capital expenditures and approximately $27 million in operational expenditures associated with our required pipeline integrity management program.  Significant additional expenses could be incurred if new or more stringently interpreted pipeline safety requirements are implemented.  Currently, we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments.  In addition to required activities, our integrity management program includes several voluntary, multi-year initiatives designed to prevent incidents.  Costs incurred for such activities were approximately $21 million in 2014, $22 million in 2013 and $24 million in 2012, and our preliminary estimate for 2015 is that we will incur approximately $31 million of such costs.

. . . .

We are subject to the EPA's Risk Management Plan regulations at certain facilities.  These regulations are intended to work with OSHA's PSM regulations (see 'Occupational Safety and Health' above) to minimize the offsite consequence of catastrophic releases.  The regulations require us to develop and implement a risk management program that includes a five-year accident history, an offsite consequence analysis program, a prevention program and an emergency response program.  **We believe we are operating in substantial compliance with our risk management program.**"  (Docket Entry No 140, Ex. 6); 2d Compl. ¶ 195 (emphasis added to indicate the excerpt of the statements included in the Second Amended Complaint).

- Statement 5: The Company "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate."  2d Compl. ¶ 202.

- Statement 6: "When we buy an asset in an acquisition we have not only the opportunity capital in our forecast but we have in our forecast the amount of what we call fix up capital that it takes just to get that pipeline or that tank running at the – and operated in a way that we would feel comfortable running it for the next 25 or 30 years."  2d Compl. ¶ 204

- Statement 7 (Slide): "(i) Continue to regularly assess pipeline integrity using state-of-the-art inspection tools and technologies; (ii) Smart pigs, advanced data interpretation/integration, advanced GIS mapping and risk screening; and (iii) Improving data/interpretation/integration capabilities to better prioritize, focus on and assess areas warranting attention."  2d Compl. ¶ 205.

- Statement 8: "We assess the pipeline using the best tools that are available.  Smart pigs, we run them when it makes sense, more often than are required.  We improve our data interpretation to make sure that we are trying to prevent things from happening, not diagnose what did happen."  2d Compl. ¶ 206

- Statement 9: Hodgins: [T]he first time I heard anything about the corrosion is what I read in the newspapers. . . . We had no indication at all to assume there was an issue. . . ."

. . .

When asked about the 2007 and 2012 in-line inspection results, Hodgins stated: "We had not had any indication at that time . . . [that there was] metal loss greater than 50%" 2d Compl. ¶¶ 207–208.

- Statement 10: "In the unfortunate event that we do have an incident we will be prepared. Our key objective obviously is to preserve life and safeguard the environment. The personnel that are on site at the time that we have an event that does come up have as much unrestricted authority to make decisions to spend money as it would if I was standing on that [side alone] . . .

Incident management tools and resources ready for use, including specific tactical plans and response strategies to be used in critical areas in the event of an emergency. 2d Compl. ¶ 335.

- Statement 11: At 2:56 p.m. a Plains Pipeline Bakersfield employee called the NRC and formally notified them of the coordinates of the release and, despite being unable to get through to the on-site Plains employees, gave a volume estimate of approximately 500 barrels (equivalent of approximately 21,000 gallons). 2d Compl. ¶ 361.

- Statement 12: Senator Hannah-Beth Jackson: How are you combating this? How did you combat this corrosion on this particular pipeline that ended up sending 105,000 gallons out of the pipeline? How did you do that?

Patrick Hodgins, Sr: So, this pipeline, like other pipelines, we run inline inspections tools, sometimes they are referred to as "smart pigs." The job of that tool is to look for dents; it's to look at metal loss, which would be corrosion. We have cathodic protection that also is used to combat external corrosion. Those all go into running a pipeline. And if there is a concern that comes up in that in-line inspection tool, such as metal loss greater than 50% or metal loss associated with a dent that could indicate maybe third-party encroachment, if there is corrosion of or along the longitudinal weld or any other metal loss that indicates that, in our opinion, the evaluator would need to investigate further. (Docket Entry No. 140, Ex. 5); 2d Compl. ¶ 362.

- Statement 13: "The HLPSA was amended by the Pipeline Safety Improvement Act of 2002 and the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006. These amendments have resulted in the adoption of rules by the Department of Transportation ("DOT") that require transportation pipeline operators to implement integrity management programs, including more frequent inspections, correction of identified anomalies and other

measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways. . . . Currently, we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments. . . . . We believe that we are in substantial compliance with applicable OPA requirements. State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when they occur. We believe that we are in substantial compliance with all such federal, state and Canadian requirements." 2d Compl. ¶ 378.

- Statement 14: "Our commitment [to safe and environmentally responsible operations] also includes compliance with applicable environmental, health and safety rules, laws, and regulations." 2d Compl. ¶ 381.

- Statement 15: "[N]one of the Issuers, the GP Entities or the Material Subsidiaries is in violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or any decree of any court or governmental agency or body having jurisdiction over it and (iii) none of the Issuers, the GP Entities or the Material Subsidiaries is in breach, default (or event that, with notice or lapse of time or both, would constitute such an event) or violation in the performance of any obligation, covenant or condition contained in any bond, debenture, note or any other evidence of indebtedness or in any agreement, indenture, lease or other instrument to which it is a party or by which it or any of its properties may be bound, which breach, default or violation, in the case of (ii) or (iii) would, if continued, reasonably be expected to have a Material Adverse Effect or materially impair the ability of either of the issuers to perform its obligations under this Agreement." 2d Compl. ¶ 386.

- Statement 16: "Environmental Compliance. Except as described in the Pricing Disclosure Package and the Prospectus, none of the Plains Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), or lacks any permits, licenses or other approvals required of them under applicable environmental Laws to own, lease or operate their properties and conduct their business as described in the Pricing Disclosure Package and the Prospectus or is violating any terms and conditions of any such permit, license or approval, which in each case would reasonably be expected to have a Material Adverse Effect." 2d Compl. ¶ 386.

- Statement 17: The Company "believe[s] that all of our pipelines have been constructed and are maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards prescribed by the American Petroleum Institute and accepted industry standards of practice."

Each of these statements and the associated claims are examined based on the applicable legal standards.

## III.    The Legal Standards

### A.    Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."  *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).  A court may "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred

to in the complaint." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation marks omitted). Consideration of documents attached to a defendant's motion to dismiss is limited to "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M. Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency. *Lovelace*, 78 F.3d at 1018 n.1. The court may consider these matters of public record without converting the motion into one seeking summary judgment. *See Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir.2011); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366); *Jathanna v. Spring Branch Indep. Sch. Dist.*, No. CIV.A. H-12-1047, 2012 WL 6096675, at *3 (S.D. Tex. Dec. 7, 2012).

### B.    The Exchange Act

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5. The Supreme Court has held that § 10(b) affords

a right of action to purchasers or sellers of securities injured by its violation. *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007). "But the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal citations omitted).

To state a private claim under § 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted).

### 1.    Material Misrepresentations and Omissions

A plaintiff who asserts securities fraud in violation of § 10(b) and Rule 10b-5 must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322. Rule 9(b) requires the complaint to "state with particularity the circumstances constituting the fraud." FED. R. CIV. P. 9(b). In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc*., 407 F.3d 690, 696 (5th Cir. 2005). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Electronics, Inc. v. J.M. Huber Corp*., 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006).

As Judge Ellison explained in a similar case arising from the BP Deepwater Horizon securities fraud multidistrict litigation:

> The PSLRA enhances the requirements of Rule 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2).
>
> In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir.2002). These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* What constitutes particularity will necessarily differ with the facts of each case. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir.1992). A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir.2004).

*In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012) ["*BP I*"]. For each statement that the plaintiffs identify as misleading, they must explicitly and precisely set out why the statement was false or misleading and why the speaker knew (or recklessly disregarded the fact that) the statement was misleading.

The Fifth Circuit has made clear its disapproval of "group pleading" in securities-fraud complaints. Allegations that an undifferentiated group of "defendants" made false or misleading statements are insufficient. Individualized allegations about the specific speaker are required. The plaintiffs cannot rely on or impute to individuals the collective knowledge of all or a group of persons associated with the defendant company. *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

Even if misrepresentations and omissions are pleaded with sufficient specificity and individualization, they must be material to state a claim. There is no bright-line rule for materiality. It requires a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). A representation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Omitted facts make a statement material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *BP I*, 843 F. Supp.2d at 747 (citing *Basic*, 485 U.S. at 232).

Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). "[N]o reasonable investor would consider such statements material and . . . investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *BP I*, 843 F. Supp. 2d at 748. The statements the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance. As in other areas of the law, "puffery" is not an actionable misrepresentation.

## 2. Scienter

In addition to pleading that specific statements made by identified persons misrepresented or omitted material facts, the plaintiffs must plead that the responsible person acted with the necessary culpability, or scienter. *Tellabs*, 551 U.S. at 319. Section 10(b) and Rule 10b-5 are not

insurance against bad corporate management.  Rather, they protect only against intentional or knowing misstatements.  *Shaw Group*, 537 F.3d at 535.  "Scienter, in the context of securities fraud, is defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'"  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Investments LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005)).  "[F]or 'each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Shaw Group*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u–4(b)(2)); *TXU Corp.*, 565 F.3d at 207.

In considering a motion to dismiss challenging whether the factual allegations create a strong inference of scienter, the court can consider documents incorporated by reference into the complaint and matters proper for judicial notice.  *BP I*, 843 F. Supp. 2d at 748 (citing *Tellabs*, 551 U.S. at 323). The court looks to all of the allegations about a particular individual's state of mind when he or she made the statement to determine whether they support a strong inference of scienter.  *Tellabs*, 551 U.S. at 324; *Southland*, 365 F.3d at 364–65.  The inference of scienter must be "cogent and compelling," not simply "reasonable" or "permissive."  The inference must be "at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  The court must consider "plausible  nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 323–24.  "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C.

38

§ 78u–4(b)(2)). "Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice." *BP I*, 843 F. Supp.2d at 749 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)).

The rule against group pleading applies to scienter allegations. The plaintiffs must make specific factual allegations about each responsible individual's state of mind when each challenged statement was made. The plaintiffs cannot simply allege that some other person at the corporation knew of facts that make the statement misleading and impute that knowledge to the speaker. *Southland*, 365 F.3d at 366. Allegations about another person's knowledge, or the defendants' collective knowledge, are insufficient. The plaintiffs must plead facts that give rise to a strong inference of scienter, for each individual defendant, for each alleged misstatement. *Id.* Simply pleading that a defendant had access to internal information that contradicted his or her public statements is not enough. *In re BP P.L.C. Sec. Litig.*, 852 F. Supp. 2d 767, 817 (S.D. Tex. 2012) ["*BP II*"]. To the extent that the plaintiffs' scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the document, its author, contents and character, and when and by whom it was received, to link it to the person making the challenged statement, at the time the statement was made. *Abrams*, 292 F.3d at 432.

### 3. Statements of Opinion After *Omnicare*

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably

misleading statement of opinion.[6]  *Omnicare* provides "two potential avenues for plaintiffs to establish the falsity of an opinion."  *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016).  First, "every . . . statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief."  *Omnicare*, 135 S. Ct. at 1327.  A speaker can be liable for an opinion statement if the speaker did not in fact hold that opinion.  Second, "depending on the circumstances," a reasonable investor could

> understand an opinion statement to convey facts about the speaker's basis for holding that view.  Specifically, [a speaker's] statement of opinion may fairly imply facts about the inquiry the issuer conducted or the knowledge it had.  And if the real facts are otherwise, but not provided, the opinion statement will mislead by omission.

*Id.* at 1328.  Even if

> a speaker's opinion may be sincerely held, the statement may nonetheless be actionable under 10b-5's omissions provision if: (i) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself."

*In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *9 (quoting *Omnicare*, 135 S. Ct. at 1329).

The *Omnicare* Court emphasized that this avenue to liability does not allow a plaintiff to circumvent the particularity and materiality requirements of a § 10(b) claim by alleging in general terms that the defendant improperly failed to reveal the basis for his opinion, or failed to disclose "some fact cutting the other way."  135 S. Ct. at 1329.  "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one

---

[6] Even though "*Omnicare* was decided in the context of Section 11 of the Securities Act, courts have overwhelmingly applied its holdings in the context of alleged omissions under Section 10(b) of the Securities Exchange Act . . . ."  *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *10 (S.D. Tex. May 31, 2016) (collecting cases).  Its analysis bears both on the material misrepresentation aspect of a § 10(b) claim and on the scienter aspect.  *Id.*  Therefore, the *Omnicare* opinion's discussions about an "issuer's" statements are equally applicable to an Exchange Act defendant speaker's statements.

reason why a [speaker] may frame a statement as an opinion, thus conveying uncertainty." *Id.*

One hypothetical the *Omnicare* Court raised bears on the dispute here:

> Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." If the [speaker] makes that statement without having consulted a lawyer, it could be misleadingly incomplete. In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere. Similarly, if the [speaker] made the statement in the face of [her] lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker]'s possession at the time.

*Omnicare*, 135 S. Ct. at 1328–29.

### 4. Section 20(a) of the Securities Exchange Act of 1934

Under § 20(a) of the Exchange Act, every "person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 78t(a). "Control person" liability under § 20(a) is derivative, "predicated on the existence of an independent violation of the securities laws." *Rubinstein v. Collins*, 20 F.3d 160, 166 n.15 (5th Cir. 1994). A party who fails to state an underlying primary claim for an Exchange Act violation fails to state a claim for control-person liability under § 20(a).

### C. The Securities Act

"Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)). The statute provides a cause of action against

the issuer of the security and its underwriters. *Id.*

> To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

*Id.* at 358–59 (quoting 15 U.S.C. § 77k(a)).

"Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions." *Id.* at 359 (citing 15 U.S.C. § 77l(a)(2)). Section 12 has a broader reach than § 11. Only specific offering participants can be liable under § 11, while § 12 liability extends to all "statutory sellers" of the security. *Id.* A "statutory seller" is someone who: "(1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'" *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)). As a result,

> the elements of a prima facie claim under section 12(a)(2) are: (1) the defendant is a "statutory seller"; (2) the sale was effectuated "by means of a prospectus or oral communication"; and (3) the prospectus or oral communication "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."

*Id.* (quoting 15 U.S.C. § 77l(a)(2)).

Sections 11 and 12 claims are "Securities Act siblings with roughly parallel elements, notable both for the limitations on their scope as well as the *in terrorem* nature of the liability they create." *Id.* "Issuers are subject to 'virtually absolute' liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere

negligence." *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). "[U]nlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934 . . . plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." *Id.* The *Omnicare* decision directly addressed claims under § 11, making it apply with equal force in that context.

"Under § 15 of the Securities Act, anyone who controls persons liable under § 11 or § 12 of the Securities Act can be held jointly and severally liable to the same extent as the persons they control." *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 674 (N.D. Tex. 2013). "To allege control person liability under § 15, the plaintiff must allege both a primary violation of § 11 or § 12 and the defendant's control over the primary violator." *Id.* Under 17 C.F.R. § 230.405, "control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Control-person liability under § 15 of the Securities Act, like § 20 of the Exchange Act, is secondary or derivative, dependent on the plaintiff demonstrating an underlying "primary" violation.

Ordinary notice pleading requirements apply to Securities Act claims, unless they sound in fraud—including claims based on the same factual allegations supporting securities-fraud claims under the Exchange Act. Rule 9(b)'s heightened pleading standard applies to Securities Act fraud claims. *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001); *Kurtzman v. Compaq Comput. Corp.*, 2002 WL 32442832, at *24 (S.D. Tex. Mar. 30, 2002). Boilerplate disavowals of an intent to allege fraud do not change the analysis. *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994); *Kurtzman*, 2002 WL 32442832, at *24; *see also In re Stac*

*Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996). When the plaintiff's Securities Act and Exchange Act allegations are substantively identical, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity. *Schlotzsky's*, 238 F.3d at 368–69; *Melder*, 27 F.3d at 1100 n.6; *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 440 (S.D.N.Y. 2000).

## IV.    Analysis

### A.    The Exchange Act Claims

The Second Amended Complaint alleges four categories of the defendants' alleged misrepresentations. The four are misrepresentations about: (1) integrity management, corrosion control, and leak detection; (2) spill-response capabilities; (3) the size and scope of the spill; and (4) legal compliance. The unattributed statements on Plains's website and the allegations added to the Second Amended Complaint about statements from Plains's Code of Business Conduct are separately discussed.

### 1.    The Statements About Plains's Integrity-Management Program

The plaintiffs allege that the statements about Plains's integrity-management program, Statements 1 through 9, (2d Compl. ¶¶ 192–195, 202, 204–208), were materially false and misleading. These statements are allegedly false because: (1) Plains's "smart pig" in-line inspections did not accurately identify the degree of corrosion on Lines 901 and 903, (¶¶ 214–224); (2) Plains failed to evaluate the need for or implement mitigative measures for Lines 901 and 903, (¶¶ 244–265); (3) Plains's cathodic-protection system was ineffective against the degree of external corrosion on Lines 901 and 903, (¶¶ 283–295); and (4) Plains's leak-detection system was deficient and Plains failed to provide proper training on leak detection, (¶¶ 312–321). The Second Amended

Complaint alleges that Plains's officers made representations and signed certifications that Plains provided its senior executives with material information about pipeline integrity. As a result, reasonable investors would have expected that the statements about pipeline integrity would have "fairly aligned with the material information in their possession." (*Id.* ¶ 213). Reasonable investors also would have expected the defendants' statements to be supported by a "meaningful inquiry" into Plains's compliance record, integrity-management and corrosion-control policies, and practices in high-consequence areas. (*Id.*).

### i.    Statements 1 and 3

Statements 1 and 3 are from Plains's Form 10-Ks and Initial Public Offering materials.

- Statement 1: "The DOT regulations include requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences. We have also developed and implemented certain pipeline integrity measures that go beyond regulatory mandate. . . . Accordingly, for 2013 and beyond, we will continue to focus on pipeline integrity management as a primary operational emphasis. In that regard, we have implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection and damage prevention." 2d Compl. ¶ 192.

- Statement 3: "We have an internal review process in which we examine the condition and operating history of our pipelines and gathering assets to determine if any of our assets warrant additional investment or replacement." 2d Compl. ¶ 194.

The March 2017 Memorandum and Opinion held that Statements 1 and 3 were nonactionable "generalized, top-level-executive" statements. Op. at 43.

The plaintiffs argue that Statement 1 is actionable because a reasonable investor would have understood it as a factual representation that Plains had implemented and carried out enhanced integrity-management measures on all of its high-consequence-area pipelines, including Lines 901 and 903. (Docket Entry No. 142 at 16–18). The plaintiffs argue that the word "any" in Statement

3 amounts to a factual representation that Plains had reviewed all of its pipelines, when in reality it did not review Lines 901 and 903. (*Id.* at 4, 19–20). The defendants respond that these are both generalized, top-level statements about Plains's overall safety measures on its pipeline system, and that the statements are not made false or misleading by problems on individual pipelines. (Docket Entry No. 140 at 5–6).

The dispute is about the level of generality. The plaintiffs say the statements are only about Plains's pipelines in high-consequence areas. The defendants say that the statements are summaries of Plains's safety measures generally used on its huge pipeline network.

The defendants have the better argument. The statements that Plains "implemented certain pipeline integrity measures that go beyond regulatory mandate"; had "an internal review process . . . to determine if any of [its] assets warrant additional investment or replacement"; and that pipeline integrity management is a "primary operational emphasis" all describe Plains's overall safety policies and programs. Statement 1 describes two requirements in the conjunctive. One requirement is for establishing pipeline integrity-management programs, and one is for protecting high-consequence areas. The first includes, but goes beyond, the second. The statements do not describe specific actions taken on any particular pipeline, or particularly on pipelines in high-consequence areas. Even if the statements are considered as focused on Plain's pipelines in high-consequence areas, as the plaintiffs argue, Plains owned and operated 2,429.7 miles of pipeline in high-consequence areas in 2015. (Docket Entry No. 140, Ex. 4). Line 901 was itself a 10-mile segment.

The plaintiffs do not allege that Plains lacked an internal-review process for its pipelines, or allege that pipeline integrity management was not Plains's primary operational emphasis.

Allegations that Plains was ineffective in implementing its policies to have pipeline-integrity programs and measures and to make pipeline integrity a "primary operational emphasis" do not make the general statements describing Plains's policies and priorities actionably misleading. *See In re Anadarko Petrol. Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 824 (S.D. Tex. 2013) ("[E]ven if Plaintiffs' allegations are true, and Anadarko failed to employ its risk methodology on the Macondo investment, this one discrepancy is not sufficient to create the inference that Anadarko was not, in fact, employing a risking methodology across its operations."); *BP I*, 843 F. Supp. 2d at 756–57; *BP II*, 852 F. Supp. 2d at 807–08.

Statements 1 and 3 are generalized, top-level-executive statements about a very large company's overall safety policies and programs, covering a huge pipeline network. The statements did not suggest, muss less affirmatively assert, that specific steps under particular programs applied to every, or any particular part, of the pipeline network, or every part or any particular part of its pipelines in high-consequence areas. The allegations in the Second Amended Complaint describe problems on Lines 901 and 903 and regulatory violations on Plains's other pipelines. Those allegations do not undermine the general proposition that Plains did in fact have an internal-review process in place, that pipeline integrity management was a "primary operational emphasis," and that Plains had and implemented programs intended to maintain the integrity of its pipeline network. Because Statements 1 and 3 broadly and generally refer to Plains's policies and processes, not to specific actions taken on specific pipelines, and because the plaintiffs do not allege facts to contradict those statements, the statements are not actionably false or misleading.

### ii.     Statement 4

Statement 4 is a statement repeated in Plains's Form 10-Ks filed during the class period and

in its Initial Public Offering materials. The statement is set out in its full context, as it appeared in those materials, not as it is excerpted in the Second Amended Complaint.

- Statement 4: "The HLPSA was amended by the Pipeline Improvement Act of 2002 and the Pipeline, Inspection, Protection, Enforcement and Safety Act of 2006. These amendments have resulted in the adoption of rules by the Department of Transportation ('DOT') that require transportation pipeline operators to implement integrity management programs, including **more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,'** such as high population areas unusually sensitive to environmental damage, and **commercially navigable waterways**. In the United States, our costs associated with the inspection, testing and correction of identified anomalies were approximately $107 million in 2014, $57 million in 2013 and $39 million in 2012. Based on currently available information, our preliminary estimate for 2015 is that we will incur approximately $75 million in capital expenditures and approximately $27 million in operational expenditures associated with our required pipeline integrity management program. Significant additional expenses could be incurred if new or more stringently interpreted pipeline safety requirements are implemented. Currently, we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments. In addition to required activities, our integrity management program includes several voluntary, multi-year initiatives designed to prevent incidents. Costs incurred for such activities were approximately $21 million in 2014, $22 million in 2013 and $24 million in 2012, and our preliminary estimate for 2015 is that we will incur approximately $31 million of such costs.

   . . . .

   We are subject to the EPA's Risk Management Plan regulations at certain facilities. These regulations are intended to work with OSHA's PSM regulations (see 'Occupational Safety and Health' above) to minimize the offsite consequence of catastrophic releases. The regulations require us to develop and implement a risk management program that includes a five-year accident history, an offsite consequence analysis program, a prevention program and an emergency response program. **We believe we are operating in substantial compliance with our risk management program.**"

(Docket Entry No 140, Ex. 6); 2d Compl. ¶ 195 (emphasis added to indicate the excerpt from the statements set out in the Second Amended Complaint).

The plaintiffs allege that this statement is a false and misleading factual representation that Plains had complied with Department of Transportation's requirements for its pipelines in high-consequence areas. According to the plaintiffs, this statement was false because "Plains did not in

48

fact perform required inspections or maintenance on its pipelines, including aging pipelines running through HCAs"; "failed to conduct proper inspections"; "failed to conduct mitigative measures for Lines 901 and 903"; "employed ineffective cathodic protection systems that failed to protect against corrosion"; and "did not have appropriate leak detection systems or training." (Docket Entry No. 142 at 16 (citing 2d Compl. ¶¶ 212, 214–224, 244–265, 283–295, 312–321)). The plaintiffs also allege the PHMSA's conclusion that "it does not appear that Plains has an effective corrosion control program," issued after the spill and the class period, makes Statement 4 false or misleading. (*Id.* at 17).

The defendants respond that the plaintiffs fail to consider the context of the two statements. The Second Amended Complaint lists the two bolded sentences next to each other. The first bolded sentence is a description of the Department of Transportation's requirements. The second bolded sentence, which appears in a different paragraph on a different page of the Form 10-Ks and the IPO materials, does not refer to those requirements. (Docket Entry No. 140 at 7). The defendants also argue that the second bolded sentence states an opinion that Plains was operating in "substantial compliance" with its risk-management program, and that allegations of "scattered regulatory issues are not adequate to render such a statement false or misleading." (*Id.* at 8).

The first bolded sentence in Statement 4 is not actionable. It describes the Department of Transportation's requirements for pipeline operators' integrity-management programs, and makes no representation about Plains's actions. The bolded part outlines the actions the regulations require. The following sentences describe the amount of money Plains spent on its pipeline integrity-management program and on complying with those regulations.

The second bolded sentence refers to OSHA and EPA regulations, not to the Department of

49

Transportation's requirements, as the plaintiffs claim, and it is not false or misleading as to Plains's compliance with those requirements. The sentence, which contains the "substantial compliance" qualifier, is a statement of opinion. The court's March 2017 Memorandum and Opinion dismissed the falsity allegations as to this statement because they did "not mention Plains's risk-management system or detail substantial deviations from it." Op. at 48.

Although the Second Amended Complaint's allegations about Statement 4 list several regulations that Plains allegedly violated, the violations are not about Plains's failure to comply with the OSHA-mandated risk-management system. *See* 2d Compl. ¶¶ 244–265. As with the other legal-compliance statements discussed below, the "we believe" and "substantial compliance" language are additional and alternative reasons that Statement 4 is not actionably false or misleading.

### iii. Statements 6, 7, and 8

Statements 6, 7, and 8 are about Plains's use of fix-up capital, "smart pigs," and advanced inspection and data-interpretation tools. Armstrong made Statements 6 and 8 at a June 4, 2015 investor day speech, 16 days after the spill. Statement 7 is a slide presented at that speech.

- Statement 6: "When we buy an asset in an acquisition we have not only the opportunity capital in our forecast but we have in our forecast the amount of what we call fix up capital that it takes just to get that pipeline or that tank running at the – and operated in a way that we would feel comfortable running it for the next 25 or 30 years." 2d Compl. ¶ 204

- Statement 7 (Slide): "(i) Continue to regularly assess pipeline integrity using state-of-the-art inspection tools and technologies; (ii) Smart pigs, advanced data interpretation/integration, advanced GIS mapping and risk screening; and (iii) Improving data/interpretation/integration capabilities to better prioritize, focus on and assess areas warranting attention." 2d Compl. ¶ 205.

- Statement 8: "We assess the pipeline using the best tools that are available. Smart pigs, we run them when it makes sense, more often than are required. We improve our data interpretation to make sure that we are trying to prevent things from happening, not diagnose what did happen." 2d Compl. ¶ 206.

The March 2017 Memorandum and Opinion held that Statements 6 and 8 were "potentially actionable," but the plaintiffs had not alleged facts contradicting the statements or making them misleading by omission. Op. at 43. The claim as to Statement 7 was dismissed because the plaintiffs did not allege facts contradicting the statement and because it summarized Plains's safety and prevention efforts at a "broad and general level." Op. at 45.

The plaintiffs argue that, contrary to what Plains represented in these statements, Plains "did not in fact perform needed maintenance on its pipeline systems, including aging parts subject to corrosion that ran through sensitive high-consequence areas," and "systematically failed to comply with the minimum standards for pipeline integrity management." (2d Compl. ¶ 212). The plaintiffs allege that Plains used an ineffective cathodic-protection system and failed to conduct proper data integration, which led to inaccuracies in its in-line inspection tool. The plaintiffs argue that the statements are false because:

> Plains did not perform appropriate inspections or maintenance on its pipelines, including aging pipelines running through HCAs (¶¶ 214-224), failed to conduct mitigative measures for Lines 901 and 903 (¶¶ 244-265), employed ineffective corrosion protection (¶¶ 283-295), and did not have appropriate leak detection or training (¶¶ 312-321). In short, "Plains systematically failed to comply with the minimum standards for pipeline integrity management established in the Hazardous Liquid Pipeline Safety Regulations and the Liquid Integrity Management Rule, leading to deficiencies in testing, corrosion control, leak detection, and damage provision." ¶ 212.

(Docket Entry No. 142 at 5).

The cited paragraphs from the Second Amended Complaint allege that a 2012 in-line inspection survey of Line 901 concluded that Plains's in-line inspection tool had an "undercall" bias, which would cause inaccuracies in the data on the extent of pipeline metal loss and the length and width of corrosion anomalies. (2d Compl. ¶¶ 214–224). The paragraphs allege that Plains did not

share its field-measurement data with its third-party in-line-inspection vendor, Rosen, deviating from industry practice and violating regulatory requirements. (*Id.*). The cited complaint paragraphs refer to the PHMSA's post-spill failure investigation report on the Line 901 spill and corrosion levels on Lines 901 and 903 that violated regulatory requirements. (¶¶ 244–265).

The paragraphs cited next discuss how Plains disconnected thousands of feet of Line 901 from its cathodic-protection system; refer to a 2006 National Association of Corrosion Engineers report setting out guidelines to mitigate the limits of cathodic-protection systems and warning against using certain corrosion-control measures; and refer to 2008 and 2009 letters from the PHMSA to Plains warning that its coating standards and corrosion-control measures were inadequate. (¶¶ 283–295). These cited paragraphs allege that despite these warnings, Plains's corrosion-control measures on Lines 901 and 903 were ineffective and violated federal regulations. (*Id.*).

The final cited paragraphs allege that Plains failed to upgrade its leak-monitoring system; did not properly manage its alarm settings; and failed to adequately train control-room personnel. (¶¶ 313–321). The paragraphs also allege that Plains did not conduct preventive or mitigative evaluations in 2013 and 2014 for Lines 901 and 903, because Plains had characterized those lines as "a low-to-medium priority" compared to other parts of its pipeline network. (*Id.*). The cited paragraphs allege that the failure to upgrade the leak-monitoring system and to implement an automatic shut-off system violated pipeline-safety regulations and industry practices. (*Id.*).

The Second Amended Complaint does not allege facts that make Statements 6, 7, or 8 false or misleading. Statement 6 makes no allegations that Plains did not make fix-up-capital forecasts or that they were inaccurate as to the lines at issue. The Second Amended Complaint's allegations

as to Statements 7 and 8 are that the in-line inspection tools were consistently inaccurate in measuring metal losses and corrosion on Lines 901 and 903. The falsity allegations are that the tools and technology were ineffective because of: the "undercall bias"; the failure to conduct preventive and mitigative measures on Lines 901 and 903; and ineffective corrosion protection and leak-detection systems and training. The plaintiffs do not allege that Plains failed to use available advanced tools or technologies. The falsity allegations are that the tools were ineffectively used, and that was confirmed by the Line 901 spill. The statements are about the tools and programs Plains had in place, not about how well the tools worked or that they were 100 percent effective. The plaintiffs have not alleged facts that would make the statements actionably misleading.

### 2. The Code-of-Conduct Statements

The Second Amended Complaint challenges two statements that were not challenged in the earlier complaint. One is about Plains's integrity-management program, the second is about legal compliance. Both are taken from Plains's Code of Business Conduct, which was published on Plains's website and incorporated in its filings.

- Statement 2: "Plains All American supports its commitment to safe and environmentally responsible operations through extensive and ongoing education and training, as well as investment in any necessary equipment, systems, processes, or other resources." 2d Compl. ¶ 193.

- Statement 14: "Our commitment [to safe and environmentally responsible operations] also includes compliance with applicable environmental, health and safety rules, laws, and regulations." 2d Compl. ¶ 381.

The defendants argue that statements in a corporate code of conduct are not actionable under the federal securities laws. (Docket Entry No. 140, at 4–5.) The defendants rely on cases from outside the Fifth Circuit, including a Sixth Circuit case holding that a statement in a corporate code of conduct was "not actionable because it was a statement of aspiration . . . rather than an assertion

of objective fact made in a public filing or press release." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015).

The *Bondali* court reasoned that "treating a corporate code of conduct as a statement of what a corporation will do, rather than what a corporation aspires to do, would turn the purpose of a code of conduct on its head." *Id.* The Ninth Circuit adopted this position, explaining that a code of conduct "expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (citing *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685–86 (D. Colo. 2007)); *see also City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 415 (D. Del. 2009) (rejecting an argument that statements in SEC-mandated corporate codes of ethics are actionable because any company with a compliant code would be "required to disclose all violations of that code or face liability under federal securities law"). The defendants also argue that even if statements in a corporate code of conduct could be actionable, Plains's Code is replete with "corporate cheerleading" and high-level statements that "are not undermined by either allegations of scattered regulatory warnings . . . or technical issues on small and discrete segments of Plains' system of pipelines." (Docket Entry No. 140 at 5).

The plaintiffs rely on cases holding that false statements in a code of conduct that "go beyond aspirational or general puffery, so as, for example, to falsely represent a record of past or present compliance with such policies" may be actionable. *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 756 (S.D.N.Y. 2017). According to the plaintiffs, Statement 2 "constitutes an unambiguous representation" about the company's training and investment in required equipment

54

and repairs. (Docket Entry No. 142 at 20). The plaintiffs argue that Statements 2 and 14 falsely represent a record of past or present compliance with the Code's policies, because Plains employees were required to sign and certify their compliance with the Code and that they are "not aware of any unreported instances of non-compliance by another individual." (*Id.*).

*Bondali* is instructive. The plaintiffs' securities-fraud class action alleged false and misleading statements in the defendant's corporate code of conduct, cited in SEC filings. *Bondali*, 620 F. App'x at 487. The statements were:

> (1) "Food safety is a primary responsibility of Yum!, and nothing, including cost, is allowed to interfere with this responsibility."
>
> (2) "To ensure that our customers receive safe, wholesome food, and 'food you crave,' Yum!:
>
>> Maintains strict specifications which meet or exceed government requirements.
>>
>> . . . .
>>
>> Adheres to a strict food safety testing program.
>>
>> Continually monitors and improves its procedures and practices to ensure food safety.
>>
>> Continually monitors and improves its procedures and practices to ensure food safety."
>
> (3) "The responsibility for food safety is shared by everyone in our system: Any product suspected to be unsafe must immediately be pulled from distribution until safety can be assured. . . ."

*Id.* The plaintiffs argued that these statements were misleading because the standards and protocols the company used were inadequate, and the company, contrary to the third statement, did not promptly pull products suspected to be tainted from distribution. *Id.* at 490. The Sixth Circuit held that the first two statements were not misleading because plaintiffs alleged no facts showing that the

company failed to adhere to food standards and safety protocols, even though "a few suppliers did not adhere to the standards," and the description of the standards as "strict" was debatable. The third statement, that any product suspected to be unsafe must immediately be pulled from distribution, was "arguably" false or misleading, but was not actionable "because it was a statement of aspiration made in Yum's corporate Code of Conduct rather than an assertion of objective fact made in a public filing or press release." *Id.*

Statement 2 at issue here describes Plains's commitment to safe operations through training and investment in necessary equipment. Statement 14 is a company-wide commitment to compliance with environmental laws and regulations. The statements are similar to, but less specific than, the statements the *Bondali* court found not actionable. The code-of-conduct statement in *Bondali* promised the specific action of immediately pulling products suspected as unsafe. The statements here outline general commitments to improving safety and legal compliance. The statements are not specific or objective factual representations, much less "unambiguous representations" that every Plains pipeline was safely maintained or fully complied with all applicable laws and regulations.

Statements 2 and 14 are not actionable because they are aspirational statements in a code of business conduct. *See Bondali*, 620 F. App'x at 490; *see also In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 860–61 (S.D. Tex. 2016). The statements do not "go beyond aspirational or general puffery" or "falsely represent a record of past or present compliance" with Plains's policies. *See In re Braskem*, 246 F. Supp. 3d at 756.

### 3. The Unattributed Website Statements

Statements 5 and 17 are statements on Plains's website from November 2013 to the end of

the class period.  Plains's SEC filings referred investors to the website.

- Statement 5:  The Company "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate."  2d Compl. ¶ 202.

- Statement 17:  The Company "believe[s] that all of our pipelines have been constructed and are maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards prescribed by the American Petroleum Institute and accepted industry standards of practice."  2d Compl. ¶ 388.

The March 2017 Memorandum and Opinion held that Statement 5 was actionable, but that the complaint did not adequately allege scienter.  There was no allegation that the unattributed statement on Plains's website was made or authorized by an officer, or that the statement was so important and "dramatic" that it must have been approved by corporate officials sufficiently knowledgeable about the company to know that the statement was false.  Op. at 41, 45, 76–77.

The court held in the March 2017 Memorandum and Opinion that Statement 5 was "an explicit statement that Plains performs needed maintenance on all parts of its pipeline network, and the plaintiffs allege that, at least as to Lines 901 and 903, this was not true. . . . That affirmative representation makes this statement different from the . . . .  And the statement is material; the allegation that the company did not in fact perform needed maintenance on its pipeline systems, including aging parts subject to corrosion that ran through sensitive high-consequence areas, would undoubtedly alter the 'total mix' of information on which a reasonable investor would rely in considering whether to invest in a pipeline company.  This website statement is actionable and material."  Op. at 41–42.  The allegations as to this statement are repeated in the Second Amended Complaint.

Statement 17 is an unattributed statement about legal compliance published on Plains's website.  The court held that this statement was not actionable because of its qualifying "believe" and "in all material respects" language.  Op. at 64.  Like Statement 5, Statement 17 is an unattributed

website statement that makes a representation about "all" of Plains's pipelines. Statement 17 is discussed below with other statements about Plains's legal compliance.

To plead scienter for unattributed corporate statements, a plaintiff must first tie the statement to "a corporate officer who can be seen as acting on behalf of the corporation in making the statement." *BP I*, 843 F. Supp. 2d at 789 (citing *Southland*, 365 F.3d at 366). One way to do so is to plausibly and specifically allege that the unattributed statement was made or authorized by an officer who had the requisite scienter. Another way is to allege that the statement was so "extraordinary and dramatic" that it must "have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) [*Tellabs II*]; *In re Dell Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008)). In *Tellabs II*, the Seventh Circuit posed a hypothetical about an unattributed statement by GM that the company had sold a million SUVs in a year of no sales. *Tellabs II*, 513 F.3d at 710. Despite the lack of attribution, the Seventh Circuit would have allowed a claim to go forward because the statement was the type of announcement that management would have had to approve.

The issue is whether the Second Amended Complaint has adequately tied Statements 5 and 17 to a specific corporate officer with scienter, or are so extraordinary and dramatic that approval by a knowledgeable officer would have been required. In addition to the "general" scienter allegations discussed more below, the plaintiffs contend that Statements 5 and 17 were "authorized and endorsed by" Armstrong, Swanson, and Pefanis because: (1) these officers signed the Form 10-Ks that referred investors to Plains's website for information about its "policies, financial results, and operations"; (2) Armstrong, Swanson, and Pefanis referred investors to Plains's website on earnings conference calls; and (3) Swanson was listed as the contact person in a Form 8-K that referred investors to the website "where PAA routinely posts important information about the

Partnership." (Docket Entry No. 142 at 48 (citing 2d Compl. ¶ 203)). Citing *Southland*, the plaintiffs argue that Armstrong, Swanson, and Pefanis are liable because they "approved" the statements, making them attributable to Plains.

*Southland* held that scienter for a statement can be attributed to a corporation "only if the individual corporate officer making the statement has the requisite level of scienter . . . at the time he or she makes the statement" and that "[f]or purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366. The plaintiffs cite no cases for the proposition that corporate officers who generally refer to a company's website in SEC filings or on investor calls may be held liable for any or all statements on that website.

The allegations in the Second Amended Complaint do not support an inference that Armstrong, Swanson, or Pefanis made or approved Statements 5 or 17. Nor do the statements create a strong inference of scienter as to Plains. The only connection between these individual officers and the statements on the Plains website are allegations that the officers signed Forms 10-K and 8-K that refer to the website, and that the officers referred to the website in investor earnings calls. (2d Compl. ¶ 203). But there are no "specific factual allegations linking the individual to the statement." *BP I*, 843 F. Supp. 2d at 791; *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003).

Statement 5 does not rise to the "level of extraordinary and dramatic falsity contemplated by the Seventh Circuit in *Tellabs II*." *BP I*, 843 F. Supp. 2d at 791. The plaintiffs make no analogy

to the *Tellabs II* hypothetical, and Statement 5 is not the sort of statement that would require approval by corporate officers. Statement 5 could have been written by someone with no specific information, passed to Plains's marketing or investor-relations department, and displayed on the website with no oversight from senior ranks. Op. at 77.

Statement 17 is a relatively specific statement about legal compliance and is closer to the type of statement likely to require high-level corporate-officer approval. But even assuming that it required this approval, the allegations as to Statement 17 do not adequately allege scienter. The statement has hedging language—Plains "believe[s]" and "in all material respects." This hedging language and the absence of alleged facts showing that the defendants knew of facts contradicting the statement amount to a lack of adequately alleged scienter.

### 4. The Statement About Plains's Spill-Response Capabilities

Statement 10 is a statement about Plains's spill-response capabilities. Armstrong made the statement at a June 5, 2014 investor day speech:

- Statement 10: "In the unfortunate event that we do have an incident we will be prepared. Our key objective obviously is to preserve life and safeguard the environment. The personnel that are on site at the time that we have an event that does come up have as much unrestricted authority to make decisions to spend money as it would if I was standing on that [side alone]

  . . .

  Incident management tools and resources ready for use, including specific tactical plans and response strategies to be used in critical areas in the event of an emergency.

2d Compl. ¶ 335.

The court's March 2017 Memorandum and Opinion held that this statement was "closer to the line" because it was a "specific representation that Plains had 'specific tactical plans and response strategies' for use in 'critical areas,' which included the Santa Barbara area," Op. at 68, which the plaintiffs alleged was false because Plains did not have an "adequate" spill-response plan in place when the Santa Barbara leak occurred. The plaintiffs alleged that: (1) nearly a year before

the June 2014 statement was made, Plains did not have adequate records on its review of the spill-response plans; (2) Plains did not have adequate leak-monitoring systems, and (3) Plains did not react properly when the spill occurred. Because these allegations that Plains's response to the Santa Barbara spill was not effective did not contradict the June 2014 representation that Plains had response plans for spills in critical areas, the plaintiffs did not adequately allege that the statement was false or misleading when made. Op. at 69. The allegations were compatible with the statement that Plains had specific response plans for critical areas.

The falsity allegations in the Second Amended Complaint, (2d Compl. ¶¶ 337–348), are that: (1) Plains's response to the Line 901 spill was ineffective; (2) the spill size would have been "substantially contained" if Plains had properly conducted preventive and mitigative evaluations in 2013 and 2014 and complied with PHMSA training requirements; (3) Plains's ineffective response to the spill hindered federal and state authorities in responding to the discharge; and (4) based on Plains's other statements about its ability for "immediate response and deployment of resources," reasonable investors would have believed that Plains's response to a spill in a high-consequence area would be "immediate and well-coordinated." The plaintiffs allege that Plains's response to the Santa Barbara spill violated federal pipeline-safety regulations in 49 C.F.R. §§ 195.452, 194.3, and 194.117. Plains did not conduct preventive and mitigative evaluations, and Plains's response plan did not account for a culvert near the release site. Plains's response to the spill also allegedly violated 49 C.F.R. § 195.52, which required Plains to notify the National Response Center at the earliest practicable moment after discovering the hazardous liquid release.

The plaintiffs argue that these new allegations make Statement 10 misleading because the Santa Barbara spill "provided concrete evidence" that Plains was not prepared and did not have incident-management tools or resources ready for an emergency. The plaintiffs argue that Plains's response on the day of the spill revealed that it had not implemented specific tactical plans and

response strategies to be used in critical areas like the Santa Barbara coast. Plains's response systems were found to have violated pipeline safety regulations and left Plains unprepared to effectively respond to a spill. The plaintiffs argue that the statement must be considered in context: "simply having *any* plan, no matter how defective or violative of applicable law," does not make Statement 10 true, because reasonable investors would have expected Plains to have effective plans, especially for such a sensitive area. (Docket Entry No. 142 at 40).

The defendants argue that Statement 10 is not false, because Plains did have spill-response plans in place for critical areas, which the plaintiffs do not dispute. According to the defendants, the plaintiffs dispute the *effectiveness* of the plan and its execution. A claim primarily about the effectiveness of a corporate response, the defendants contend, is a claim of mismanagement that is not actionable under the federal securities laws. The defendants argue that Statement 10 says nothing about Plains's evaluations, training, or compliance with legal requirements; it is instead a statement about the spill-response plans Plains had in place.

The plaintiffs are correct that disclosures are measured "not by literal truth, but by the ability of the statements to accurately inform rather than mislead." *Normand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009). Judge Ellison's opinion in *BP I* provides a helpful comparison. BP made a specific representation that it was prepared to respond to a spill in the Gulf of Mexico "between 162,000 and 250,000 barrels of oil per day." *BP I*, 843 F. Supp. 2d at 763. When the Deepwater Horizon spill occurred, and even 49 days after the spill, BP was recovering oil "at a rate of only 15,000 barrels per day." *Id.* BP executives made post-spill statements that it did not have a proven response plan, that its contingency plans were inadequate, and that it was "making it up day to day." *Id.* These facts were enough to allege that BP had "misrepresented the size of the spill it was prepared to respond to in the Gulf and misrepresented the Company's general spill response capabilities." *Id.* The statements expressly referred to the Gulf of Mexico and gave a specific

number to measure BP's spill-response capabilities. The specificity of the representations and of the falsity allegations made the statements actionable.

Here, by contrast, Plains represented that it had specific strategies and response plans for critical areas. The statement does not represent that Plains's response plan would meet a certain number. Nor does the statement refer to a particular "critical area." The plaintiffs' falsity allegations are about: (1) Plains's general failure to conduct "preventative and mitigative evaluations"; (2) generally inadequate spill-response training; and (3) Plains's inadequate response to the Santa Barbara spill. Although the allegations provide additional details about Plains's training and spill-response implementation, they are consistent with Plains's statement that it had a spill-response plan in place. Unlike the falsity allegations in *BP I* of admissions from BP executives that the company had no spill-response plans, the allegations here are tied to whether the spill-response plan that was in place was properly implemented. Statement 10 is not actionably false or misleading.

### 5. The Statement About the Spill Size

Statement 11 is from a June 19, 2015 letter from Armstrong to members of the United States Congress. The letter was also posted on Plains's spill-response website:

- Statement 11: At 2:56 p.m. a Plains Pipeline Bakersfield employee called the NRC and formally notified them of the coordinates of the release and, despite being unable to get through to the on-site Plains employees, gave a volume estimate of approximately 500 barrels (equivalent of approximately 21,000 gallons). 2d Compl. ¶ 361.

Members of Congress had asked in a June 5, 2015 letter for additional details about the Line 901 spill. Plains answered the letter, explaining what happened on the day of the spill. The defendants correctly describe Statement 11 as a "historical snapshot" of reports made on the day of the spill. Because the statement explained Plains's response to the spill, it is not actionably misleading. *See Greenthal v. Joyce*, 2016 WL 362312, at *3 (S.D. Tex. Jan. 29, 2016).

### 6.    The Statements by Patrick Hodgins

Statement 9 is a statement by Patrick Hodgins about corrosion on Line 901.  Hodgins was

Plains's director of security and safety.  He made the statement in a California state legislative

committee session on June 26, 2015.

- Statement 9: [T]he first time I heard anything about the corrosion is what I read in the newspapers. . . . We had no indication at all to assume there was an issue.

  . . .

  When asked about the 2007 and 2012 in-line inspection results, Hodgins stated: "We had not had any indication at that time . . . [that there was] metal loss greater than 50%"  2d Compl. ¶¶ 207–208.

Statement 12, taken from Hodgins's testimony at the same legislative session, is allegedly

misleading because of an omission about the spill size:

- Senator Hannah-Beth Jackson: How are you combating this?  How did you combat this corrosion on this particular pipeline that ended up sending 105,000 gallons out of the pipeline?  How did you do that?

  Statement 12: Patrick Hodgins, Sr: So, this pipeline, like other pipelines, we run inline inspections tools, sometimes they are referred to as "smart pigs."  The job of that tool is to look for dents; it's to look at metal loss, which would be corrosion.  We have cathodic protection that also is used to combat external corrosion.  Those all go into running a pipeline.  And if there is a concern that comes up in that in-line inspection tool, such as metal loss greater than 50% or metal loss associated with a dent that could indicate maybe third-party encroachment, if there is corrosion of or along the longitudinal weld or any other metal loss that indicates that, in our opinion, the evaluator would need to investigate further.

(Docket Entry No. 140, Ex. 5).  The Second Amended Complaint alleges that when Hodgins was

asked about a spill volume of 105,000 gallons, he omitted information about the actual size spill

size.  (2d Compl. ¶ 362).

The March 2017 Memorandum and Opinion found that Statement 9 was actionably

misleading.  Op. at 74 ("The plaintiffs allege facts that specifically conflict with Hodgins's

statements about what Plains knew about the corrosion issues on Line 901.  The plaintiffs allege that

the company was aware of a sharp increase in the number of corrosion problems between the 2007

and 2012 inspection runs . . . and of a number of areas where corrosion had eaten away more than 50% of the pipe wall. . . . As a result, Hodgins's two statements that the company was not aware of corrosion issues with the pipeline or of areas where corrosion had destroyed over 50% of the pipe wall are false."). The allegations as to Statement 9 are repeated in the Second Amended Complaint; Statement 9 remains actionable.

The March 2017 Memorandum and Opinion also held that Statement 12 was actionable. The additional context for Statement 12 changes the earlier analysis as to these allegations. Hodgins's actual testimony was not provided in the briefs on the first motions to dismiss. The allegation was simply that Hodgins omitted the true, much larger, spill size when he was asked about a spill volume of 105,000 gallons. In the briefs on the motions to dismiss the Second Amended Complaint, the defendants attached Hodgins's testimony at the legislative session. (Docket Entry No. 140, Ex. 5). Because this transcript is taken from a public proceeding that is publicly available, it is appropriately considered at the motion-to-dismiss stage.

Statement 12 is Hodgins's response to a compound question: "How are you combating this? How did you combat this corrosion on this particular pipeline that ended up sending 105,000 gallons out of the pipeline? How did you do that?" Although the interrogator, Senator Jackson, mentioned a spill size of 105,000 gallons, all three of the questions were about Plains's approach to combating corrosion. Senator Jackson did not ask Hodgins about the spill size. Hodgins answered the question he was asked. He was not asked whether the statement about the spill size was correct or not. *See Shaw Group*, 537 F.3d at 541 ("[The plaintiffs'] claim of incomplete disclosure is actionably only if what they said is misleading. '[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.'" (citation omitted)). If Hodgins had said that 105,000 gallons was Plains's spill-volume estimate, or if he had been asked what Plains estimated as the spill volume, and he had omitted correct or any other information about

Plains's estimate, the analysis would be different. But the transcript shows that Hodgins was specifically asked and answered a question about Plains's response to corrosion problems, not spill size. Statement 12 is not actionably misleading.

The March 2017 Memorandum and Opinion held that the plaintiffs had not adequately alleged scienter as to Statements 9 and 12 because the complaint did not allege that Hodgins was aware of the results of the in-line inspection runs or of Plains's spill estimates when he spoke. Op. at 75–76. The Second Amended Complaint does not cure this deficiency. The only references to Hodgins in the Second Amended Complaint describe the statements he made, that he was Plains's director of security and safety, and that he was a member of the Spill Unified Command. (2d Compl. ¶¶ 208, 214, 362, 364, 366). For example, paragraph 376 states that representatives from Plains, "including Hodgins, were part of the Spill Unified Command, a committee meant to organize the response in the spill's aftermath." (*Id.* ¶ 366). Hodgins's participation in the Spill Unified Command is not sufficient to infer scienter as to Plains as to Hodgins's statement. *See Abrams*, 292 F.3d at 432 ("Plaintiffs point to no allegations that the defendants knew about the internal control problems, only that they should have known or that their lack of knowledge based on their corporate positions demonstrates recklessness. A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."). The Second Amended Complaint contains no allegations about what Hodgins knew, or when. The complaint allegations do not support an inference that Hodgins was aware of the results of the in-line inspection runs at the time he made Statements 9 and 12. The plaintiffs have not adequately alleged scienter as to Hodgins's statements.

### 7.     The Statements About Legal Compliance

Statements 13, 14, 15, 16, and 17 are about Plains's legal compliance. Statements 13 and 17 were on Plains's website and in its class-period SEC filings. Statement 14, discussed above, was

in Plain's Code of Business Conduct. Statements 15 and 16 were in Plains's underwriting agreements.

### i.    Statements 13 and 17

Statement 13 appeared in Plains's Form 10-Ks during the class period.

- Statement 13: "The HLPSA was amended by the Pipeline Safety Improvement Act of 2002 and the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006. These amendments have resulted in the adoption of rules by the Department of Transportation ("DOT") that require transportation pipeline operators to implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways. . . . Currently, we believe our pipelines are in substantial compliance with HLPSA and the 2002 and 2006 amendments. . . . . We believe that we are in substantial compliance with applicable OPA requirements. State and Canadian federal and provincial laws also impose requirements relating to the prevention of oil releases and the remediation of areas affected by releases when they occur. We believe that we are in substantial compliance with all such federal, state and Canadian requirements." 2d Compl. ¶ 378.

Statement 17 is a statement on Plains's website. This statement is also discussed above, in the section about unattributed statements on a company website.

- Statement 17: The Company "believe[s] that all of our pipelines have been constructed and are maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards prescribed by the American Petroleum Institute and accepted industry standards of practice." 2d Compl. ¶ 388.

The plaintiffs' falsity allegations in the earlier complaint concerned "Plains's receipt of Pipeline Safety Administration informal communications and notices of recordkeeping violations in other areas." Op. at 56. The court analyzed the statements under *Omnicare*, explaining that the plaintiffs did not "identify facts that any individual defendant knew or did not know when they made the challenge statements" or "identify allegations that any of the individual defendants were aware of the pre-spill Pipeline Safety Administration communications with Plains about regulatory violations." Op. at 53. The falsity allegations were "not particularized or individualized." Op. at 59. The statements were not misleading because "a regulatory agency had sent informal communications and had issued two infraction notices about recordkeeping practices on a different

and small part of the company's large-scale pipeline network and operation." *Id.* Additionally, "even if the complaint did adequately allege the individual defendants' knowledge of the alleged Pipeline Safety Administration prespill communications, that knowledge would not, under *Omnicare*, make the company's legal-compliance statements actionably misleading, either affirmatively or by omission." Op. at 55.

The issue is whether the Second Amended Complaint's factual allegations make the legal-compliance opinion statements actionable. That issue turns on whether the plaintiffs allege that "(i) the speaker 'omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion,' and (ii) 'those facts conflict with what a reasonable investor would take from the statement itself.'" *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *9 (quoting *Omnicare*, 135 S. Ct. at 1329). To determine whether a defendant's opinion statement is misleading, a court "must address the statement's context" by taking "account of whatever facts [the defendant] *did* provide about legal compliance, as well as any other hedges, disclaimers or qualifications it included in its registration statement." *Omnicare*, 135 S. Ct. at 1333.

These statements contain "hedging" language that Plains "believes" that it was operating in "substantial compliance," and "believes" that it constructed and maintained its pipelines in compliance with regulations and industry standards "in all material respects." This language creates a higher bar in the *Omnicare* analysis. The plaintiffs must allege a factual basis to infer that the defendants knew of facts conflicting with the statements.

The plaintiffs, citing paragraphs 92, 93, 220, 260, and 393 to 402 of the Second Amended Complaint, argue that Plains "lacked any basis to make Statements 13 and 17." (Docket Entry No. 142 at 31). Paragraphs 92 and 93 set out federal statutory requirements for integrity-management programs and pollution control in high-consequence areas. These paragraphs allege that Lines 901 and 903 comprised 9 to 10 percent of Plains's pipelines in high-consequence areas and 15 to 18

percent of its pipelines affecting commercially navigable waters. Paragraph 220 sets out the federal regulations and the recommended industry standards from the National Association of Corrosion Engineers regarding corrosion-control processes and in-line inspection systems. Paragraph 260 alleges that Plains failed to conduct required preventive and mitigative evaluations on Line 901 and failed to maintain records justifying that failure, in violation of federal regulations requiring pipeline operators to implement and follow their integrity-management programs. Paragraphs 393 to 402 allege that Plains "persistently and pervasively violated the minimum standards laid out in the Hazardous Liquid Pipeline Safety Regulations concerning operation and maintenance, emergency response, control room management, corrosion control, reporting, and recordkeeping, and failed to implement and follow the integrity management program pertaining to Lines 901 and 903 as required by the Liquid Integrity Management Rules." (2d Compl. ¶ 395). Those paragraphs also allege that Armstrong, Pefanis, Swanson, and McGee had received several letters the PHMSA sent Plains about regulatory violations in Plains's corrosion-control system, in-line inspection tools, and cathodic-protection measures. (*Id.* ¶¶ 397(i)–(xvii)), 398(i)–(v), 399(i)–(xii), 400(i)–(iii)). The plaintiffs allege that these violations were pervasive and persisted throughout Plain's pipeline system.

The Plains defendants attached an appendix listing all of the alleged regulatory violations outside those on Lines 901 and 903, when Plains learned of them, and the fines associated with each. (Docket Entry No. 140, Appendix B). The PHMSA sent ten notices to Plains. Notices 8, 9, and 10 were issued after the class period ended. Notices 4, 6, and 7 were warning letters that resulted in no further action or monetary penalty. Notices 1 and 2 were issued in 2009, four years before the class period began. Notice 4 resulted in no monetary penalty. Notice 5 is the only PHMSA action that resulted in a monetary penalty—a $102,900 fine—within the class period. Many of the notices

that involved larger fine amounts were issued in 2016, long after the challenged legal-compliance statements were made.

Many of the falsity allegations are related to regulatory violations on Lines 901 and 903, many first identified in the post-spill Failure Investigation Report. Statements 13 and 17 represented the defendants' belief that Plains was in substantial compliance with applicable laws. These statements applied to all of Plains's pipeline operations, of which Lines 901 and 903 were a small part. The regulatory violations on pipelines other than Lines 901 and 903, and warning letters and notices from the PHMSA about Plains's other pipelines, do not make Plains's opinion statements about substantial compliance false or misleading. The fine amounts are relatively low, and Plains learned about many of the violations after the statements were made.

Additionally, allegations that Plains was operating in violation of regulations during the class period are different from allegations that the defendants *knew* that Plains was in violation when the statements were made. The plaintiffs allege that the Officer defendants received the PHMSA notices and letters, but that allegation is based only on those defendants' positions at Plains. Those defendants, and their direct reports, "were required to provide reports to the audit committee," which reported to the board, on which Armstrong served as chairman during the class period. (2d Compl. ¶ 8). Those defendants also signed Sarbanes-Oxley Act certifications, (¶¶ 167, 379), Plains's Code of Business Conduct, (¶ 173), and representations in Plains's Forms 10-K and 10-Q that material information was "recorded, processed, and summarized, and reported . . . and accumulated and communicated to management," (¶ 159). Although the plaintiffs allege that the defendants actually received the PHMSA notices and letters, that conclusion requires an added assumption, not alleged, that the reports were actually provided to the defendants before they made the challenged legal-compliance opinion statements.

Reasonable investors understand information in required SEC filings in light of their "surrounding text, including hedges, disclaimers, and apparently conflicting information." For that reason, "an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Omnicare*, 135 S. Ct. at 1329–30.

Evaluated in context, the statements here were not misleading. A reasonable investor would not understand Plains's high-level, general statements in the filings, that it was operating in substantial compliance with regulatory requirements, as implicitly assuring absolute compliance, even with the regulations that the violation notices addressed. A reasonable investor would understand the use of "hedges and disclaimers," such as the phrase "*substantial* compliance," and would not reasonably infer that Plains had fully complied with every regulation or requirement. Nor would a reasonable investor infer that Plains's regulators had or would have no objections to the company's compliance on any pipeline. Instead, reasonable investors would understand that, for a very large pipeline company, with a huge network of pipelines, in a heavily regulated industry, notices of regulatory violations are common. *Cf. Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (reasonable investors are aware of the customs and practices of the pharmaceutical industry and do not interpret positive predictions about drug approval to mean that there are no potential regulatory roadblocks, because arguments with regulators about drug tests are an ordinary part of approval process). That is especially true in light of the overall context in which these statements appeared. The SEC documents noted the possibility that regulators would penalize Plains for instances of noncompliance, and emphasized that it was not only possible but probable that there would be future oil spills. The overlapping hedges and qualifications would inform a reasonable investor's understanding that Plains could express only an opinion that it was operating in substantial—not perfect, complete, or consistent—compliance with the relevant laws.

Statements 13 and 17 are not materially false or misleading. The plaintiffs have not adequately alleged that the defendants lacked a reasonable basis to make the statements when they were made.

### ii.  Statements 15 and 16

Statements 15 and 16 are representations in Plains's underwriting agreements.

- Statement 15: "[N]one of the Issuers, the GP Entities or the Material Subsidiaries is in violation of any law, statute, ordinance, administrative or governmental rule or regulation applicable to it or any decree of any court or governmental agency or body having jurisdiction over it and (iii) none of the Issuers, the GP Entities or the Material Subsidiaries is in breach, default (or event that, with notice or lapse of time or both, would constitute such an event) or violation in the performance of any obligation, covenant or condition contained in any bond, debenture, note or any other evidence of indebtedness or in any agreement, indenture, lease or other instrument to which it is a party or by which it or any of its properties may be bound, which breach, default or violation, in the case of (ii) or (iii) would, if continued, reasonably be expected to have a Material Adverse Effect or materially impair the ability of either of the issuers to perform its obligations under this Agreement." 2d Compl. ¶ 386.

- Statement 16: "Environmental Compliance. Except as described in the Pricing Disclosure Package and the Prospectus, none of the Plains Entities, directly or indirectly, has violated any environmental, safety, health or similar law or regulation applicable to its business relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), or lacks any permits, licenses or other approvals required of them under applicable environmental Laws to own, lease or operate their properties and conduct their business as described in the Pricing Disclosure Package and the Prospectus or is violating any terms and conditions of any such permit, license or approval, which in each case would reasonably be expected to have a Material Adverse Effect." 2d Compl. ¶ 386.

Statements 15 and 16 are representations and warranties in Plains's contracts with various Underwriter defendants during the class period. In contrast to the careful and narrow statements that Plains *believed* it was in *substantial* compliance with applicable regulations, in the underwriting agreements Plains stated that there *were* no regulatory violations that could cause a material adverse effect. The underwriting agreements also lack warnings about possible future regulatory problems or oil-spill incidents. The statements in the underwriting agreements were not surrounded by the hedges and qualifications that were in the SEC filings containing the opinion statements analyzed

above.  The March 2017 Memorandum and Opinion noted that no cases the parties cited addressed how to evaluate a statement in an underwriting contract filed with a Form 8-K.  Is the court to consider whether a reasonable investor would consider the statements in the contact-law context, such that a plaintiff would have to show the statement was false in a way that would also support an action for breach of contract?  Or is the court simply to apply the standard Exchange Act analysis?

The court's March 2017 Memorandum and Opinion held that these statements were "potentially actionable," but that the plaintiffs had not identified with particularity what specific regulatory violations existed when these statements were made, or why those regulatory violations would reasonably be expected to produce material adverse effects.  Op. at 61.  The court invited additional briefing on whether, and under what allegations, representations and warranties in mandatorily disclosed contracts can give rise to liability under Section 10(b).  Op. at 62.

The Plains defendants argue that these statements are not actionable for four reasons.  First, the plaintiffs have not adequately pleaded that any of these violations would reasonably be expected to produce a material adverse effect.  Instead, the plaintiffs have alleged only "a handful of regulatory violations that amounted to $102,900 in fines during the class period."  Second, if the plaintiffs are able to "bootstrap" the spill and its consequences to "material adverse effect" allegations, the net cost of the spill after insurance proceeds was $83 million, plus lost profits from Lines 901 and 903, which is "far short of a 'substantial' threat to the 'company's long-term earnings power.'"  Third, Statements 15 and 16 are promises of indemnification, not expressions of factual certainty, and reasonable investors understand that warranties in an underwriting agreement are not "expressions of certainty."  Finally, the statements were intended "solely for the benefit" of the

underwriters, not for the public, and SEC-mandated disclosures should not make this type of statement actionable. (Docket Entry No. 140 at 15–18).

The Underwriter defendants add the argument that the statements are not actionable against them because they were the *recipients*, not the makers, of the statements. The Underwriter defendants contend that allowing them to be held liable based on statements made by Plains would undermine the underwriting process, in which underwriters negotiate with issuers for more robust representations and warranties.

The plaintiffs respond that these statements are actionable because "the locale of a false statement does not govern its actionability under the securities laws." (Docket Entry No. 142 at 26). The plaintiffs argue that, even though the intended audience was the Underwriter defendants, the underwriting contracts were filed with the SEC and available to prospective investors. If the statements are actionable, the plaintiffs cite the court's earlier conclusion that the Santa Barbara spill and its consequences, both financial and legal, "are easily within the 'material adverse effect' that the statement[s] address[]." Op. at 63.

No case directly addresses whether representations in contracts between an issuer and an underwriter, required to be filed with the SEC, are actionable under the securities laws. The plaintiffs rely on *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Product Liability Litigation*, 2017 WL 66281, at 18 (N.D. Cal. Jan. 4, 2017), which held that whether reasonable investors considered emission stickers on Volkswagen vehicles to be "material investing information" was a factual issue that could proceed. The defendants rely on *Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017), which rejected a similar claim made in the context of a merger agreement included in an SEC filing. The agreement included a disclaimer that the warranties and representations "were not intended by the parties to the merger agreement to be characterizations of the actual state of facts or conditions" of the merging

companies. *Id.* The underwriting agreements here do not contain a similar disclaimer. The defendants also cite *Corbin on Contracts* for the proposition that underwriting agreements amount to promises to indemnify the promisee for losses if the facts warranted prove untrue.

Considering the context of the statements in contractual agreements with underwriters, the fact that the agreements must be filed with the SEC does not make the statements ones that warrant or guarantee facts to investors. Rather, reasonable investors understand that similar statements are not affirmative disclosures by a company about its financial health. That is supported by the surrounding caution that the descriptions were made "solely for the benefit" of the Underwriters and that "no other person shall acquire or have any right under or by virtue of this Agreement." (*E.g.*, Docket Entry No. 140, Ex. 7). The context of the statements indicates that they were made as contractual representations to a counterparty, not as statements of certainty made to the investing public. Because Statements 15 and 16 were made in the context of representations and warranties in underwriting agreements, they are not actionable.

### 7. Conclusion on the material-misrepresentation allegations.

The plaintiffs have alleged two potentially actionable statements. Statement 5, posted on Plains's website, stating that Plains "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary or appropriate," (2d Compl. ¶ 202); and Statement 9, by Hodgins, that the first time he had "heard anything about the corrosion is what I read in the newspapers. . . . We had no indication at all to assume there was an issue," and, when asked about the 2007 and 2012 in-line inspection results, Hodgins stated: "We had not had any indication at that time . . . [that there was] metal loss greater than 50%," (¶¶ 207–208). The next issue is the adequacy of the scienter allegations.

### 8. Scienter

The March 2017 Memorandum and Opinion dismissed all of the claims based on the potentially actionable statements because the plaintiffs had not adequately alleged scienter. Op. at 75–88. The issue is whether the Second Amended Complaint cures that deficiency.

### i. Specific Scienter Allegations About the Actionable Statements

As discussed above, the plaintiffs have not adequately alleged scienter as to Statement 9, the statement by Hodgins. The allegations do not show that Hodgins was aware of the results of the in-line inspections at the time he spoke. The only allegations about Hodgins's scienter when he made the statements are that he was the director of security and safety for Plains and that he was a member of the Spill Unified Command. (2d Compl. ¶¶ 208, 214, 362, 364, 366). There are no specific allegations as to what he knew, when, or how.

Statement 5, posted on Plains's website, represents that Plains "perform[s] scheduled maintenance on all of our pipeline systems and make[s] repairs and replacements when necessary and appropriate." (*Id.* ¶ 202). The March 2017 Memorandum and Opinion held that this statement was not sufficiently linked to a corporate officer acting on Plains's behalf. Op. at 76–77. Nor was the statement so "dramatic" that it would be analogous to the *Tellabs II* hypothetical—the type of statement that necessarily would have been approved by corporate officers. *Id.* As discussed above, the allegations in the Second Amended Complains are not sufficient to change these conclusions.

### ii. General Scienter Allegations

To adequately plead scienter, the plaintiffs must make individualized, specific allegations about each speaker's state of mind for each allegedly false or misleading statement. *Shaw Group*, 537 F.3d at 533; *TXU Corp.*, 565 F.3d at 207. Group allegations that "the defendants" or "the company" knew something do not meet that standard. *Southland*, 365 F.3d at 366. The individualized and specific allegations must generate a cogent and compelling inference that the particular defendant intended to deceive or was severely reckless as to whether the statement was

true.  An inference of scienter is cogent and compelling only if it is at least as persuasive as any other inference about the defendant's state of mind that could be drawn from the alleged facts.  It is not enough to plead facts that permit an inference of scienter.  The alleged facts must make it as likely as not that the defendant's state of mind was culpable.  *Tellabs*, 551 U.S. at 324.  The earlier opinion held that the plaintiffs' general scienter allegations did not meet this burden.  Op. at 77–88.

The defendants argue that the court has already rejected the plaintiffs' new scienter allegations, some repeated verbatim from the earlier complaint.  The defendants also argue that the prior and added scienter allegations are group pleadings, referring generally to "defendants," "senior executive officers," "Plains," or "the Company."  (Docket Entry No. 140 at 24–25).  Paragraph 405, for example, alleges that "in-line inspection results . . . were provided to senior executive officers."

The plaintiffs argue that the Second Amended Complaint has adequately alleged scienter for seven reasons.  (Docket Entry No. 142 at 8–12).

- Armstrong and Swanson were "executive officers" for public-disclosure purposes and they signed SEC forms representing that Plains's disclosure controls required that "material information" would be "recorded processed, summarized and communicated to the principal executive officer [Armstrong], the principal financial officer [Swanson] . . . to allow for timely decisions regarding required disclosure."  (2d Compl. ¶ 157).

- Armstrong, Pefanis, Swanson, and McGee, as well as Gorman, Nerbonne, and Valenzuela, not defendants, were required to report to the Plains audit committee, which reviewed reports from management about areas subject to regulatory compliance.  (¶¶ 160–162).  These reports were to identify legal issues that could result in material noncompliance with regulatory requirements; the audit committee, on which Gorman, Nerbonne, and Valenzuela served, reported to the Plains's board to help it make informed disclosure decisions.  (*Id.*).

- Plains's integrity-management program was overseen by Nerbonne, who reported to Pefanis, and its environmental, health, and safety program was overseen by Valenzuela, who reported to Pefanis and McGee.  (¶ 163).  Plains's SEC disclosures also stated that all of the members of the Board had ready access to management.  (*Id.*).

- Armstrong, Swanson, and Pefanis signed SEC disclosure forms that repeatedly highlighted Plains's testing procedures, advanced technologies, and internal review processes used to determine if any of its assets needed additional investment or replacements.  (¶¶ 164–165).

- Armstrong and Swanson signed Sarbanes-Oxley Act certifications that material failures to comply with laws and regulations were timely reported to them, and representations in

Plains's Forms 10-K and 10-Q that material information was "recorded, processed, and summarized, and reported . . . and accumulated and communicated to management." (¶¶ 159, 167).

- The PIPES Act required Plains's senior executive officers to review reports to the PHMSA. The Second Amended Complaint alleges that these reports "could not be compiled or verified without the underlying data Plains obtained through its ILIs and excavations of Lines 901 and 903." (¶ 172). The Second Amended Complaint alleges that Valenzuela and Gorman, who reported to Pefanis, signed off on these reports. (¶ 228).

- Plains's Code of Business Conduct states a commitment to "invest in any necessary equipment systems, processes, or other resources," and to "compliance with applicable environmental, health and safety rules, laws, and regulation." The Code states that material deviations from the pipeline-safety plan must be approved by two of the four senior executive officers. (¶¶ 173–174).

The defendants are correct that the plaintiffs make group allegations of scienter in the Second Amended Complaint. For each statement that the plaintiffs identify as false or misleading, they must identify specific facts supporting an inference of scienter. The plaintiffs seek to avoid the prohibition on group pleading by alleging that the individual Officer defendants received specific internal reports based on their positions as "senior executive officers," who were provided with "all material information." Those defendants allegedly reviewed in-line-inspection and integrity-management reports and certified their accuracy. Although the plaintiffs have alleged specific reports and notices of regulatory violations, the allegations that the individual defendants received and reviewed these reports and notices are group allegations based on the defendants' positions as senior executive officers. These allegations fall short of the plaintiffs' burden under Rule 9(b) and the PSLRA. *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) ("[T]his court has rejected the 'group pleading approach to scienter,' and focuses on the state of mind of the corporate officials who make, issue, or approve the statement rather than the 'collective knowledge of all the corporation's officers and employees.'" (quoting *Shaw Group*, 537 F.3d at 533)). That the scienter allegations are group pleaded is an independent

basis for the court to conclude that the allegations are insufficient and to dismiss the plaintiffs' Exchange Act claims.

Apart from the group-pleading problem, the plaintiffs' arguments for pleading sufficiency based on the defendants' corporate positions, financial incentives, and access to sources of information about problems on Lines 901 and 903 are unpersuasive. The new scienter allegations, combined with those repeated from the prior complaint, do not satisfy the plaintiffs' burden of identifying facts giving rise to a strong inference of scienter as to each speaker for each statement, particularly those the court has found potentially actionable. The Fifth Circuit has consistently rejected scienter allegations like those at issue here:

> Plaintiffs point to no allegations that the defendants knew about the [problems at issue in the suit], only that they should have known based on their corporate positions within the company . . . . The plaintiffs' allegations regarding non-specific internal reports are also inadequate. An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients.

*Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003) (quoting *Abrams*, 292 F.3d at 432) (internal quotation marks omitted); *see also Shaw Group*, 537 F.3d at 535.

In *BP II*, Judge Ellison extensively analyzed and rejected similar scienter allegations as to BP's CEO during the Deepwater Horizon oil spill:

> The allegations regarding Hayward's access to "analyses and data" and other reports pursuant to his [group operations committee] membership are inadequate. Plaintiffs provide very little detail about the source of the reports and data Hayward supposedly received. For example, Plaintiffs allege that BP had an "internal web-based data management system" that compiled any reported safety incidents, including problems on the rigs in the Gulf, and Plaintiffs claim that Hayward had access to the system as a member of the [group operations committee]. An unnamed senior BP safety employee also confirmed that an internal database was utilized and accessible for all recorded safety incidents . . . An unnamed BP safety analyst testified that he had prepared reports regarding safety incidents that were delivered to the Board or a Board representative . . . A senior member of the PB internal audit team testified that Gulf operations were audited by an audit risk team, which reported to the full Board of Directors. . . . "[U]nsupported general claim[s] about the

existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *Abrams*, 292 F.3d at 432. Here, all the allegations lack corroborating details about the content of the reports, their authors, and their specific recipients. *Id.* at 431–32 (finding that allegations that "senior level executives" received "unidentified daily, weekly and monthly financial reports" was insufficient to establish scienter; *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003) (noting that the allegations "that the individual defendants (the CEO and CFO) received daily, weekly, and monthly financial reports that appraised them of the company's true financial status" were insufficient and overly general); *ABC Arbitrage*, 291 F.3d at 358 (allegations concerning "regular reports" from specified subsidiary to parent's CEO and named member of executive committee insufficient because "any such 'regular reports' are insufficiently identified as to who prepared them and how frequently they were prepared"); *Southland*, 365 F.3d at 370 ("An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss.").

Plaintiffs "need[ ] to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *ABC Arbitrage*, 291 F.3d at 356. Plaintiffs fails to do so here. Plaintiffs provide no details regarding the contents of the reports Hayward received, whether Hayward was the determined recipient (or whether such reports were sent en masse to [group operations committee] members), or the frequency with which such reports were prepared and distributed. The additional allegations that Hayward had access to an internal web-based data management system suffers from the same deficiency. Plaintiffs have not alleged facts sufficient to demonstrate that Hayward has access to information contradicting his representations about [the operating management system] and BP's success in implementing [the operating management system]. As a result, they cannot provide a "cogent and compelling" inference of scienter with respect to Hayward.

*BP II*, 852 F. Supp. 2d at 816–17.

Like the allegations in *BP II*, the scienter allegations here purport to show scienter because of the individual defendants' positions as senior executives and their access to internal information. Several paragraphs of the Second Amended Complaint allege that the individual defendants "knew" that Plains had materially violated laws and regulations "through their receipt of information set forth below for disclosure purposes." (*E.g.*, 2d Compl. ¶ 397). The cited paragraphs also allege that "in-line inspection results, the related excavations for repairs, and the measurements demonstrating that Plains' in-line inspections drastically understated actual corrosion were provided to senior executive officers of Plain who reviewed them and certified their accuracy." (¶¶ 233, 302).

The allegations that the individual defendants knew about the regulatory violations before speaking rest on an assumption that the defendants received "all material information" based on their corporate positions and because of Sarbanes-Oxley Act and PIPES Act certifications that senior executive officers had reviewed material information. Together, *BP II* and Fifth Circuit cases reject the plaintiffs' core scienter theory. That theory would require the court to infer scienter based on a combination of corporate office and generalized access to reports of corporate information. To avoid dismissal under these cases, the plaintiffs must make specific allegations about which corporate officer learned what facts, from what source, on what date. The plaintiffs cannot generally attribute to the individual defendants the company's collective knowledge about Lines 901 and 903 because of the defendants' positions as senior executive officers. *See Diodes*, 810 F.3d at 958 ("[T]he predominant theme in this circuit's case law [is] that 'an officer's position with a company does not suffice to create an inference of scienter'" (quoting *Nathenson*, 267 F.3d at 424)).

The fact that Plains's engineering chief, Dan Nerbonne, to whom many of the PHMSA letters were addressed, directly reported to Pefanis does not generate a strong inference that Pefanis received current pipeline-testing information on specific sections of the Plains's pipelines, much less on the lines at issue here. The Second Amended Complaint does not allege that Nerbonne provided pipeline-testing information to Pefanis or to other corporate officers. Instead, the complaint alleges generally that Nerbonne was "a senior executive with direct and steady contact with senior management," and that Armstrong mentioned Nerbonne's efforts to develop new testing procedures at various presentations. (2d Compl. ¶ 163–164). These allegations do not give rise to an inference that Pefanis or the other Officer defendants were aware of the pipeline-testing information on Lines 901 and 903. The Second Amended Complaint focuses on the statements' applicability to high-consequence areas. But the fact that these pipeline sections were in high-consequence areas does

not mean that Plains's officers were reckless as to whether their statements were consistent or inconsistent with current detailed information about specific safety issues on those particular lines.

The Fifth Circuit has also rejected scienter allegations like the ones here based on Sarbanes-Oxley Act certifications. In *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006), the court concluded that a Sarbanes-Oxley certification, standing alone, is not indicative of scienter. The court reasoned that "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *Garfield*, 466 F.3d at 1266. Instead, the court held that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Id.* There must be facts establishing that the officer who signed the certification had a "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Id.* The Fifth Circuit has "cited the *Garfield* analysis approvingly" and has rejected scienter allegations where the defendants were not "on notice of glaring irregularities or red flags." *Shaw Group*, 537 F.3d at 545. Because the falsity allegations here based on the defendants' Sarbanes-Oxley and PIPES Act certifications do not show that the individual defendants were on notice of "glaring irregularities or red flags," the allegations are not sufficient to establish a cogent and compelling inference of scienter. *See id.*

The plaintiffs argue that their allegations about the defendants' financial incentives to increase distributable cash enhances their scienter pleadings. These allegations do not change the analysis or result. Most executives of major corporations receive incentive pay. The plaintiffs are correct that this kind of motive allegation can strengthen an inference of scienter. But the plaintiffs' allegations here, taken together, fall short of what other cases use to support a cogent and compelling

inference of scienter. *Abrams*, 292 F.3d at 434 ("The plaintiffs allege that the defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation and the desire to sell stock at inflated prices. This court has held that similar allegations were insufficient to support an inference of scienter."); *Shaw Group*, 537 F.3d at 544; *Melder*, 27 F.3d at 1102.

The plaintiffs have not adequately alleged scienter for the statements that they identify as false or misleading. That is an independent basis for the court to dismiss all of the plaintiffs' Exchange Act claims.

## B.     The Securities Act Claims: § 11, § 12, and § 15

The plaintiffs' Securities Act allegations and Exchange Act allegations are substantively identical. Each statement that the plaintiffs identify as a Securities Act violation is also the basis of an alleged Exchange Act violation. The plaintiffs allege that these statements are false or misleading under the Securities Act for the same reasons they alleged showed both falsity and scienter under the Exchange Act. The Securities Act claims sound in fraud and the plaintiffs' boilerplate disavowal of an intent to plead fraudulent conduct is unpersuasive. *Melder*, 27 F.3d at 1100 n.6; *Kurtzman*, 2002 WL 32442832, at *24; *In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1405 n.2; *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d at 440.

The Second Amended Complaint reasserts the Securities Act claims arising from the September 2014 senior-notes offering and the two December 2014 senior-notes offerings "to preserve all rights related to claims arising out of those offerings." (2d Compl. ¶ 2, n.1). The claims related to these offerings are dismissed because the plaintiffs lack standing, for the reasons set out in detail in the court's March 2017 Memorandum and Opinion. Op. at 89–97.

For the remaining Securities Act claims, none of the statements in Plains's SEC filings are actionably misleading. Because the plaintiffs' Securities Act allegations sound in fraud and are

subject to the same particularized pleading requirements as the Exchange Act allegations, the analysis and result are the same. The court need not sift through the plaintiffs' allegations to try to find actionable "lesser included" strict liability and negligence allegations. *Schlotzsky's*, 238 F.3d at 368. Because none of the statements on which the plaintiffs base their Securities Act claims is actionably false or misleading, the claims are dismissed.

## V. Futility of Amendment and Dismissal with Prejudice

The motions to dismiss, (Docket Entries No. 140, 141), are granted. The Second Amended Complaint contains more specific and detailed allegations about the pre-spill regulatory violations at Plains. But those allegations are not sufficient to establish a cogent and compelling inference of scienter. Although the plaintiffs' arguments are well-presented, the Second Amended Complaint does not meet the rigorous pleading requirements of the PSLRA. Because the plaintiffs have amended twice already, and further amendment would be futile, the plaintiffs' claims are dismissed, with prejudice and without leave to amend.

SIGNED on March 30, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge

The plaintiffs allege that the Underwriter defendants participated in Plains securities offerings as follows:

- Barclays Capital, Inc. was an underwriter of the IPO, the Plains Offering, and the September and December 2014 notes offerings. 2d Compl. ¶ 45.

- BB&T Capital Markets was an underwriter of the IPO and the August 2013 notes offering. *Id.* ¶ 46.

- BBVA Securities, Inc. was an underwriter of the IPO and all of the notes offerings. *Id.* ¶ 47.

- BMO Capital Markets Corp. was and underwriter of the August 2013 notes offering, the September 2014 notes offering, and the December 2014 notes offering. *Id.* ¶ 48.

- BNP Paribas Securities Corp. was an underwriter of the IPO, the August 2013 notes offering, and the September 2014 notes offering. *Id.* ¶ 49.

- CIBC World Markets Corp. was an underwriter of the IPO and all of the notes offerings. *Id.* ¶ 50.

- Citigroup Global Markets Inc. was an underwriter of the IPO, the Secondary Offering, and the April 2014 notes offering. *Id.* ¶ 51.

- Deutsche Bank Securities Inc. was an underwriter of the IPO and the December 2014 notes offering. *Id.* ¶ 52.

- DNB Markets, Inc. was an underwriter of the IPO, the August 2013 notes offering, and the September 2014 notes offering. *Id.* ¶ 53.

- Fifth Third Securities, Inc. was an underwriter of all of the notes offerings. *Id.* ¶ 54.

- Goldman, Sachs & Co. was an underwriter of the IPO and the Secondary Offering. *Id.* ¶ 55.

- ING Financial Markets, LLC, was an underwriter of the IPO, the August 2013 notes offering, the April 2014 notes offering, and the December 2014 notes offering notes offering. *Id.* ¶ 56.
- JP Morgan Securities, LLC, was an underwriter of the IPO, the Secondary Offering, the August 2013 notes offering, and the September 2014 notes offering. *Id.* ¶ 57.

- Ladenburg Thallman & Co., Inc., was an underwriter of the IPO. *Id.* ¶ 58.

- Merrill Lynch Pierce Fenner & Smith, Inc., was an underwriter of the IPO, the Secondary Offering, and the August 2013 and September 2014 notes offerings. *Id.* ¶ 59.

- Mitsubishi UFJ Securities (USA), Inc., was an underwriter of the IPO, the August 2013 notes offering, the April 2014 notes offering, and the December 2014 notes offering. *Id.* ¶ 60.

- Mizuho Securities USA, Inc., was an underwriter of the IPO, the August 2013 notes offering, and the September 2014 notes offering. *Id.* ¶ 61.

- Morgan Stanley & Co., LLC, was an underwriter of the IPO and the Secondary Offering. *Id.* ¶ 62.

- Oppenheimer & Co., Inc., was an underwriter of the IPO. *Id.* ¶ 63.

- Piper Jaffray & Co. was an underwriter of the IPO. *Id.* ¶ 64.

- PNC Capital Markets, LLC, was an underwriter of the IPO, the August 2013 notes offering, the April 2014 notes offering, and the December 2014 notes offering. *Id.* ¶ 65.

- Raymond James & Associates, Inc., was an underwriter of the IPO and the Secondary Offering. *Id.* ¶ 66.

- RBC Capital Markets, LLC, was an underwriter of the IPO and the August 2013 and December 2014 notes offerings. *Id.* ¶ 67.

- Regions Securities LLC was an underwriter of the IPO and all of the notes offerings. *Id.* ¶ 68.

- Robert W. Baird & Co., Inc., was an underwriter of the IPO. *Id.* ¶ 69.

- Scotia Capital (USA), Inc., was an underwriter of the IPO, the August 2013 notes offering, and the April and December 2014 notes offerings. *Id.* ¶ 70.

- SG Americas Securities, LLC, was an underwriter of the IPO, the August 2013 notes offering, the September 2014 notes offering, and the December 2014 notes offering. *Id.* ¶ 71.

- Simmons & Company International was an underwriter of the IPO. *Id.* ¶ 72.

- SMBC Nikko Securities of America, Inc., was an underwriter of the IPO and all of the notes offerings. *Id.* ¶ 73.

- Stephens, Inc., was an underwriter of the IPO. *Id.* ¶ 74.

- Stifel, Nicolaus & Company, Inc., was an underwriter of the IPO. *Id.* ¶ 75.

- SunTrust Robinson Humphrey was an underwriter of the IPO and the April and December 2014 notes offerings. *Id.* ¶ 76.

- Tudor, Pickering, Holt & Co. Securities, Inc. was an underwriter of the IPO. *Id.* at ¶ 77.

- UBS Securities, LLC, was an underwriter of the IPO, the Secondary Offering, and the April 2014 notes offering. *Id.* ¶ 78.

- US Bancorp was an underwriter of all of the notes offerings. *Id.* ¶ 79.

- USCA Securities LLC was an underwriter of the IPO. *Id.* ¶ 80.

- Wells Fargo Securities, LLC, was an underwriter of the IPO, the Secondary Offering, and the April and December 2014 notes offerings. *Id.* ¶ 81.